MICHAEL E. GATES, City Attorney (SBN 258446)
MICHAEL J. VIGLIOTTA, Chief Assistant City Attorney (SBN 207630)
Office of the City Attorney
2000 Main Street, P.O. Box 190
Huntington Beach, CA 92648
(714) 536-5555
Email:  Michael.Gates@surfcity-hb.org
Email:  MVigliotta@surfcity-hb.org

Attorneys for Plaintiffs
CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal
Corporation, HUNTINGTON BEACH CITY COUNCIL, and
MAYOR OF HUNTINGTON BEACH, TONY STRICKLAND, and
MAYOR PRO TEM OF HUNTINGTON BEACH, GRACEY VAN DER MARK

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation, the HUNTINGTON BEACH CITY COUNCIL, MAYOR OF HUNTINGTON BEACH, TONY STRICKLAND, and MAYOR PRO TEM OF HUNTINGTON BEACH, GRACEY VAN DER MARK<br>                    Plaintiffs,<br><br>                    v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California, and individually; GUSTAVO VELASQUEZ in his official capacity as Director of the State of California Department of Housing and Community Development, and individually; STATE LEGISLATURE; STATE OF CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT; | CASE NO. CASE NO. 8:23-CV-00421-FWD (ADSx)<br><br>**(1) PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO FED. R. CIV. P. 65**<br>**(2) DECLARATION OF MICHAEL E. GATES IN SUPPORT**<br>**(3) DECLARATION OF TONY STRICKLAND IN SUPPORT**<br>**(4) DECLARATION OF GRACEY VAN DER MARK IN SUPPORT**<br>**(5) [PROPOSED] ORDER**<br><br>**Ctrm: 10D**<br>**Honorable Judge Fred W. Slaughter** |

1

SOUTHERN CALIFORNIA
ASSOCIATION OF
GOVERNMENTS; and
DOES 1-50, inclusive,

Defendants.

**TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** before the Honorable Judge Fred W. Slaughter, located at 411 West 4th Street, Santa Ana, CA 92701, Plaintiff(s), CITY OF HUNTINGTON BEACH, the HUNTINGTON BEACH CITY COUNCIL ("City Council" or "Council Members"), the MAYOR OF HUNTINGTON BEACH TONY STRICKLAND ("Mayor"), and the MAYOR PRO TEM OF HUNTINGTON BEACH GRACEY VAN DER MARK ("Mayor Pro Tem") all collectively hereinafter referred to together as either "City" or "Plaintiff(s)," **will move for an order for a Temporary Restraining Order and/or an Order to Show Cause why a Preliminary Injunction should not be issued pursuant to Fed. R. Civ. P. 65,** restraining and enjoining Defendants, GAVIN NEWSOM, in his official capacity as Governor of the State of California ("Governor"), and individually; GUSTAVO VELASQUEZ in his official capacity as Director of the State of California Department of Housing and Community Development ("Director"), and individually; STATE LEGISLATURE; STATE OF CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT ("HCD"); SOUTHERN CALIFORNIA ASSOCIATION OF GOVERNMENTS ("SCAG"), hereinafter referred to together as "Defendants," and their officers, agents, servants, employees and attorneys, and all those in active concert or participation from ongoing and upcoming Constitutional violations and from enforcing all of the fines and penalties provided by certain State laws, explained *infra*, on the City.

1         Plaintiff(s)' request for Temporary Restraining Order will be made on the

2    grounds that immediate and irreparable injury will result to Plaintiff(s) unless the

3    activities described above are enjoined pending trial of this action, and will be based

4    on this Notice of Motion and Motion, the accompanying Memorandum of Points

5    and Authorities, upon all records, papers and documents on file herein and upon

6    such oral and documentary evidence as may be presented at the hearing on this

7    matter.

8

9    DATED: March 13, 2023       MICHAEL E. GATES, CITY ATTORNEY

10

11                   By:  _/s/  *MICHAEL E. GATES*

12                   MICHAEL E. GATES, CITY ATTORNEY
                     Attorney for Plaintiffs,

13                   CITY OF HUNTINGTON BEACH, and

14                   HUNTINGTON BEACH CITY COUNCIL, and
                     MAYOR TONY STRICKLAND, and

15                   MAYOR PRO TEM GRACEY VAN DER

16                   MARK

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO
FED. R. CIV. P. 65

# **TABLE OF CONTENTS**

Page(s)

MEMORANDUM OF POINTS AND AUTHORITIES.................................8

I.  INTRODUCTION...........................................................................8

II. STATEMENT OF FACTS............................................................11

III. PLAINTIFF(S) SHOULD BE GRANTED A TEMPORARY
     RESTRAINING ORDER AND PRELIMINARY INJUNCTION.........15

     A.  If the TRO is not Granted, the City Faces Irreparable Harm
         in the Form of First Amendment Violations, Loss of
         Permitting Authority, Loss of Local Control, Forced
         Compliance Despite Violating CEQA, Funding
         Disqualification and Punitive Fines...............................................16

     B.  Under the Ninth Circuit's Standard for Granting a TRO,
         Serious Questions are Raised by Plaintiff(s), especially as to
         its First and Fourteenth Amendment and CEQA Claims,
         therefore the Proposed TRO Should be Granted in
         Favor of Plaintiff(s)..........................................................19

         i.   Plaintiff's First Amendment Rights claim has a
              High Probability of Success because Defendants have
              Mandated Plaintiff(s) make Certain Declarations about
              the "Housing Crisis," which are in Direct Conflict with
              Plaintiff(s)' Environmental Findings on Increased
              Housing within the City ....................................19

         ii.  Plaintiff(s)' Procedural Due Process claim pursuant to
              the Fourteenth Amendment of the United States and
              State's Constitution has a High Likelihood of Success
              because the City was Excluded from Providing Input
              the Vote to Alter HCD's Methodology for Determining
              RHNA Numbers and there is No Judicial Review for
              HCD's ..............................................21

PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO
FED. R. CIV. P. 65

1
2
3
4
5
          iii.    Plaintiff(s) have a High Probability of Prevailing on its Substantive Due Process Claim pursuant to the Fourteenth Amendment of the United States and State's Constitution because HCD Utilized Flawed Project Growths in Determining the City's RHNA Numbers ..............................................................24

6
7
8
9
          iv.    Plaintiff(s)' ENVIRONMENTAL QUALITY ACT (PUBLIC RESOURCES CODE 21000 *et. seq.* (CEQA)) Claim has a High Likelihood of Success Because it is in Direct Conflict with the State's Housing Laws ..............................................................27

10    C.    The Balance of Equities Tips Heavily in Plaintiff(s)' Favor........28

11    D.    A TRO would Not Harm the Public's Interest. ...........................30

12
13    E.    The Bond Requirement Should be Waived because it is not Compulsory....................................................................................29

14 IV.    CONCLUSION. ......................................................................30

15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO FED. R. CIV. P. 65

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Air Transp. Ass'n of Am. v. City & Cnty. Of S.F.*,
 No. C 97-01763 CW, 1998 U.S. Dist. LEXIS 2936, at * 161998 U.S. Dist.
 (N.D. Cal. 1998)......................................................................................16

*Alliance for the Wild Rockies v. Cottrell*,
 632 F.3d 1127, 1131 (9th Cir. 2011)......................................................16

*Arcamuzi v. Continental Air Lines, Inc.*,
 819 F.2d 935, 937 (9th Cir. 1987) .........................................................16

*Caribbean Marine Servs. Co. v. Baldrige*,
 844 F.2d 668, 674 (9th Cir. 1988)..........................................................16

*Cate v. Oldham*,
 2022) 707 F.2d 1176, 1983 U.S. App. LEXIS 27141 (11th Cir.)............8

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
 321 F.3d 878, 882 (9th Cir. 2003)..........................................................29

*Credit Bureau Connection, Inc. v. Pardini*,
 726 F. Supp. 2d 1107, 1114 (E.D. Cal.   2010)......................................15

*Expressions Hair Design v. Schneiderman*,
 (2017) 137 S. Ct. 1144 ...........................................................................20

*Flagg Bros., Inc. v. Brooks*,
 436 U.S. 149, 98 S. Ct. 172, (1978) .......................................................22

*Flemming v. Nestor*,
 363 U.S. 603, 611 (1960) ........................................................................24

*Johnson v. Coururier*,
 572 F.3d 1067, 1086 (9th Cir. 2009).......................................................29

*NE Ohio Coal. For the Homeless v. Blackwell*,
 467 F.3d 999, 1009 (6th Cir. 2006).........................................................15

*People v. State of Cal. Ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
 766 Fed 1319, 1326 (9th Cir. 1985) ........................................................30

*Right to Life of Cent. Cal. v. Bonta*,
 (2021) 562 F. Supp. 3d 947 (9th Cir.)...................................................20

*Roland Mach. Co. v. Dresser Indus., Inc.*,
 749 F.2d 380, 386 (7th Cir. 1984)...........................................................16

*Thomas Cusack Co. v. Chicago*,
 242 U.S. 526, 37 S. Ct. 190, (1917) ........................................................21

*Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*,
 609 F.3d 975, 982 (9th Cir. 2010)...........................................................15

*Winter v. Natural Res. Def. Council, Inc.*,
 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ..............................15

6

1

2

## TABLE OF AUTHORITIES (CONT.)

3

**STATUTES**:

4

5

Fed. R.Civ. P. 65(c) ...........................................................................2, 29

6

Government Code § 65583(g)(1) ....................................................12

Government Code § 65583(g)(3) .....................................................13

7

Government Code § 65584(c)(4).................................................22, 25

8

Government Code § 65584.01(a) ....................................................14

Government Code § 65584.04 .........................................................22

9

Government Code § 65584.3 ...........................................................23

Government Code § 65585 ..............................................................30

10

Government Code § 65585(l)(1) ................................................18, 30

11

Government Code § 65585(l)(3)(B) ...........................................18, 30

Government Code § 65588(b) ..........................................................12

12

Government Code § 65589.5 ......................................................25, 30

13

Government Code § 65589.5(d) ..................................................17, 30

14

Government Code § 65589.5(d)(5) ..................................................12

Government Code § 65589.5(d)(5)(B) .......................................17, 30

15

Government Code § 65755(a)(1)-(3) ...............................................12

16

Government Code § 65755(a)(4)-(6)................................................13

Health & Safety Code § 50829 .......................................................13

17

18

**OTHER AUTHORITY**:

19

Senate Bill 35 ...............................................................................17

20

21

22

23

24

25

26

27

28

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

Plaintiff(s)' Complaint arises from violations of the U.S. Constitution, California Constitution, and State Statutes.  As illustrated by the Declarations of the Mayor and Mayor Pro Tem filed concurrently herewith, the State's Housing and RHNA Laws (as defined in the underlying Action previously filed with the court) force the City Council Members to make specific statements of "State speech," specific findings (speech) consistent with "State speech," and make specific votes (speech) in favor of pre-ordained outcomes mandated by the State regarding the "need for housing," in violation of the Mayor's, the Mayor Pro Tem's, the entire City Council Members,' and the City's First Amendment rights under the U.S. Constitution.

As federal courts and the United States Supreme Court have consistently held, "direct penalization of First Amendment Rights constitutes irreparable injury." (*Cate v. Oldham*, (2022) 707 F.2d 1176, 1983 U.S. App. LEXIS 27141 (11th Cir.))

There is a regular, publicly held, City Council Meeting currently set for Tuesday March 21, 2023 ("Meeting").  At that Meeting, the City's planning staff will be presenting a proposed update to the City's Housing Element.  The City's planning staff has been working with the State's Housing Department and RHNA Laws enforcement agency ("HCD") for months.  At the Meeting, planning staff will present a proposed Housing Element update that necessarily includes HCD's mandated quota of 13,368 high density housing ("RHNA Units" as defined in the same way by the underlying Action filed in this case) on the City of Huntington Beach for this Planning Cycle.  This RHNA Units, high density mandate, was imposed on the City of Huntington Beach by a series of HCD and SCAG determinations throughout 2020 and 2021.

Any zoning update as the one proposed for the City Council Meeting involves a lengthy and detailed process, including having to analyze the impacts of the

8

zoning changes to the environment pursuant to the California Environmental Quality Act ("CEQA"), and making statements of findings (speech) related thereto.

The RHNA Laws in concert with CEQA require that, as part of approving and adopting an updated Housing Element at the Meeting, force the adoption of a "Statement of Overriding Considerations" ("Statement").  This is a written Statement that, at least in part, essentially states 'the benefits in the Housing Element Update, which provides for 13,368 of new high density housing, "outweigh the significant and unavoidable impacts" of the high density housing to the environment in Huntington Beach.'  RHNA Laws (in concert with CEQA) force Council Members, and ultimately the City by passage on vote, to make this Statement in order to approve the proposed updates to the City's Housing Element. According to the RHNA Laws (in concert with CEQA), this compelled speech is unavoidable, and therefore, violative of my First Amendment rights.  This is essentially State-mandated speech, compelled speech, and content-based restriction on speech is a violation of the First Amendment.  This is a real, irreparable harm under the U.S. Constitution. (See Declarations of Tony Strickland and Gracey Van Der Mark filed concurrently herewith).

In addition, the RHNA Laws, at least according to the Defendants (including among others, the Director, HCD and SCAG as set forth in the Action) are forcing Council Members, and ultimately the City by passage on vote, to vote in a certain, State-pre-ordained way at the Meeting, without freedom of choice in voting, to accept and adopt an updated Housing Element that provides for 13,368 units of high density development (again, "RHNA Units").

To be clear, according to the Defendants, including among others, the Director, HCD and SCAG, explained *infra*, the City Council Members, and ultimately the City by passage on vote, have no discretion, no voice, no freedom of choice, and no other options but to vote in favor of this proposed updated Housing Element that necessarily includes the 13,368 high density development mandated by

the State.  This too violates the First Amendment.  This is State-mandated speech, compelled speech, and content-based restriction on speech is a violation of the First Amendment.  This is a real, irreparable harm under the U.S. Constitution.

In addition to the pressing and time-sensitive First Amendment issues, the Meeting also presents another imminent irreparable harm that must be stopped by judicial intervention.  Setting freedom of speech issues aside for the moment, if the Meeting takes place, and a City Council vote at the Meeting on the proposed Housing Element (as required by RHNA Laws and HCD), without judicial resolution of the controversies alleged in the Action first, irreparable harm will occur in the City no matter what the outcome of the vote.

If the City Council, for instance, votes to approve the proposed Housing Element, suddenly the flood-gates will open to developers to come in to begin development projects in the City.  Once those flood-gates are open, which could the occur any time after the Meeting and developers will gain property rights for their projects and many of the possible projects will not be subject to the City Council's discretionary approval process, yet, those development projects will be permanent fixtures in the City for decades to come.  Whatever negative impacts those development projects present to the community, including to the environment, they will be permanent and irreversible.

If on the other hand the City Council votes not to approve the Housing Element, then the City will be deemed to be "out of compliance" of the Housing and RHNA Laws.  The Defendants, including HCD, have threatened the City of Huntington Beach that if the City is "out of compliance" with the Housing and RHNA Laws, in then in part under the so-called "Builder's Remedy" provision of the Housing Accountability Act ("HAA" not placed in controversy by this Action), developers would then be able to come into Huntington Beach and "side-step" the City's zoning codes that dictate the "where and how" of proposed developments.  This means that again, suddenly the flood-gates will open to developers to come in

to begin development projects in the City under the HAA.  Once those flood-gates are open, which could begin immediately after the Meeting, and developers gain property rights for their projects and not be subject to the City Council's discretionary approval process, and those development projects will be permanent fixtures in the City for decades to come.  Whatever negative impacts those development projects present to the community, including to the City's environment, will be permanent and irreversible.  In addition to the foregoing, if the City does not approve the proposed Housing Element, the City faces exorbitant fees, fines, penalties and other harsh consequences referred to herein. Therefore, immediate judicial intervention is necessary to avoid irreparable harm.

## II.    STATEMENT OF FACTS

Since 1969, the California State Legislature has passed laws requiring that general law cities and counties adequately plan to meet the future housing needs of people at all income levels in the community.  California's general law cities (and counties) must meet housing development goals/requirements by adopting housing plans as part of their "General Plan" as required by the State.  As part of "Housing Element Law" and a subset, RHNA Laws, the State requires that jurisdictions conduct a *regional housing needs assessment*, which in part attempts to determine the future housing needs of a jurisdiction during a planning cycle.

The process begins with HCD determining a total housing need for the entire State (the State is divided into regions) ("Regional Determination"). The Regional Determination considers measures of existing housing needs in addition to forecast population growth.  Orange County and Huntington Beach are within the region covered by Southern California Association of Governments (hereinafter "SCAG"). In this case, HCD provided SCAG a Regional Determination of 1,341,827 RHNA allocation for the current Planning Cycle, 2021-2029.  SCAG developed a methodology for allocating the Regional Determination to each city and county in the region, and each jurisdiction is assigned a RHNA allocation.  The Council of

Governments ("COG") develops a Regional Housing Need Allocation Plan ("RHNA-Plan") allocating the Regional Determination to cities and counties within the region.  SCAG is responsible for creating a formula for distributing the Regional Determination to local governments/cities.  Each city and county must adopt a Housing Element that demonstrates how the jurisdiction will accommodate its assigned RHNA units through its current zoning or potential rezoning program.  HCD reviews each jurisdiction's proposed Housing Element for compliance with State law, i.e., Housing Laws and RHNA Laws.

If a local government fails to submit a compliant Housing Element within the required timeframe or is found to be noncompliant with its RHNA requirements, it can face significant penalties, including the following:

    a. A local government will be subject to a 4-year housing element review cycle, rather than an 8-year cycle. (Gov't Code § 65588(b).)

    b. A local government will be prohibited from disapproving housing development projects that meet certain affordability requirements, even though the proposed projects are not in conformance with the government's zoning or general plan (colloquially known as the "Builder's Remedy").  (Gov't Code § 65589.5(d)(5).)

    c. Under certain conditions, if a local government fails to complete a required rezoning within the time frame required upon the housing element update, the local government is prohibited from disapproving a housing development project (that is located on property that is required to be rezoned and objectively consistent with the general plan policies and design standards) or from taking certain other actions. (Gov't Code § 65583(g)(1).)

    d. A court may suspend a local government's authority to issue any building or zoning permit or any subdivision map approval. (Gov't Code § 65755(a)(1)-(3).)  Conversely, a court may mandate that a

PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO FED. R. CIV. P. 65

local government approve certain housing projects. (Gov't Code § 65755(a)(4)-(6).)

 e. A local government will become the target of lawsuits by both the Attorney General and interested parties, subject to financial penalties. (Gov't Code § 65583(g)(3).)

 f. The local government will not be eligible for certain State or federal grant funds. (*See, e.g.,* Health & Saf. Code § 50829.)

For the current Planning Cycle, HCD has determined that the City must immediately zone for 13,368 units of RHNA (again, "RHNA Units"), which, if built at a 20% inclusionary rate means that the City must reasonably zone for 66,840 of new apartment units of development.  That number would increase the housing supply in Huntington Beach by nearly 100% over the next few years, a near doubling of the size of the City almost overnight, a pace that is too fast and impossible for the City to keep up with other State Laws and safely maintain infrastructure and the environment.  If the City does not immediately zone as required, State laws allow Defendants to punish the City.

More than half of HCD's Regional Determination for the SCAG region is due to a number of flawed factors, including HCD's use of the wrong population forecast, erroneous comparable region data, and vacancy rates, as well as the last-minute substitution of a new methodology that includes overcrowding and cost burdening factors  that HCD did not previously consider.  HCD's use of the wrong population forecast, regions that are not comparable to Southern California, and inaccurate and unattainable vacancy rates, as well as a methodology that grossly overestimates the projected housing needs by including overcrowding resulted in double counting the number of required dwelling units for this Planning Cycle, which was also all done in violation of RHNA Laws.  Such factors were not included in prior methodologies and such calculations are in violation of statutory law.

The Orange County member of SCAG, known as "OCCOG," sent letters to SCAG regarding its RHNA Methodology and ultimate RHNA allocations, and reiterated its strong support for the inclusion of local factors (including growth forecast) as part of the ultimately selected methodology for the allocation of HCD's Regional Determine to SCAG's jurisdictions.  OCCOG also noted that HCD ignored the language in Government Code Section 65584.01(a) by using the State's Department of Finance ("DOF") total regional population forecast instead of SCAG's forecast.  On November 7, 2019, during a meeting of the SCAG Regional Council, SCAG introduced a surprise and unanticipated substitute methodology for the RHNA allocation, which had not previously been disclosed to the public.  The substitute methodology was later used by SCAG in its RHNA allocation to each local government in its jurisdiction.

The California Independent Auditor (defined above as "DOF") released a 2022 Report highly critical of the RHNA process, finding the Defendants' RHNA determinations, like the 13,368 RHNA Units assigned to the City, are not supported by evidence[1].  For example, HCD uses a combined vacancy rate of 5% to non-rural counties, while applying a 4% vacancy rate for rural counties. The DOF questioned and investigated this vacancy rate because it was not sufficiently justified or supported. In turn, this flawed vacancy rate created substantially higher number of high-density units while under-calculating the needs of Californians to live in single family homes.

Pursuant California Environmental Quality Act ("CEQA"), the City Council is required to adopt a "Statement of Overriding Consideration," a document containing "statements of findings" by the City Council, in order to justify, as a matter of environmental impact, the massive increase in high-density housing. Alternatively, it could not adopt a "Statement of Overriding Consideration" required

---

[1] https://www.auditor.ca.gov/pdfs/reports/2021-125.pdf

by CEQA (because the high density zoning is not justified in light of requisite environmental concerns) and not zone for the massive high-density housing mandated by the "Regional Housing Needs Allocation Laws" (hereinafter "RHNA Laws"), but face crippling penalties and lawsuits from Defendants.

The State, through the enforcement of the RHNA Laws, is *forcing* the City Council to "say" through its Statement of Overriding Consideration, which is absolutely required by CEQA, something that the City Council may not otherwise choose to say, may not believe to necessarily be true, e.g., that the benefits of the proposed high-density housing outweigh the negative impacts on the City's environment.  This is not only forcing the City Council to engage in bad government, it is forcing the City Council to "choose" high-density housing over protecting the environment, and it is forcing the City Council to "say" both in speeches and in writing that protecting its environment is not a priority – completely contrary to the spirit and strictures of CEQA itself.

By March 21, 2023, at the next City Council Meeting, the City Council will be forced to engage in State-compelled speech in violation of the First Amendment or be subject to severe consequences, punitive fines and lawsuits.

## III.   PLAINTIFF(S) SHOULD BE GRANTED A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders ("TRO") and preliminary injunctions, and courts apply the same standard for both.  See *Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1114 (E.D. Cal. 2010) (citing *NE Ohio Coal. For the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)).  A plaintiff seeking injunctive relief must show: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing

1  *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d
2  249 (2008)).

3      However, matters decided under the jurisdiction of the Ninth Circuit can also
4  meet an alternative test when seeking preliminary injunctive relief.  The plaintiff
5  must show either: (1) probable success on the merits and the possibility of
6  irreparable injury; or (2) that serious questions are raised by plaintiff and the balance
7  of hardships tips sharply in plaintiff's favor.  *Caribbean Marine Servs. Co. v.*
8  *Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  "These two formulations represent two
9  points on a sliding scale in which the required degree of irreparable harm increases
10 as the probability of success decreases."  *Arcamuzi v. Continental Air Lines, Inc.*
11 819 F.2d 935, 937 (9th Cir. 1987).  A stronger showing of one element may
12 counterbalance a fainter showing of another.  *Alliance for the Wild Rockies v.*
13 *Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Under either test, the plaintiff must
14 also demonstrate the public's interest as a factor in balancing the hardships.
15 *Caribbean Marine Servs. Co., supra,* 844 F.2d at p. 674.

16      **A.    If the TRO is not Granted, the City Faces Irreparable Harm in the**
17              **Form of First Amendment Violations, Loss of Permitting**
              **Authority, Loss of Local Control, Forced Compliance Despite**
18              **Violating CEQA, Funding Disqualification and Punitive Fines**.

19      Monetary damages alone are not enough to claim irreparable harm, a plaintiff
20 must establish "an award of damages would be seriously deficient as a remedy for
21 the harm suffered" and that an "award of damages would come too late to remedy
22 the harm." *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386 (7th Cir.
23 1984).  Additionally, damages that are not easily quantifiable can amount to
24 irreparable harm. *Air Transp. Ass'n of Am. v. City & Cnty. Of S.F.* No. C 97-01763
25 CW, 1998 U.S. Dist. LEXIS 2936, at * 161998 U.S. Dist. (N.D. Cal. 1998).

26      Here, the irreparable harm the Plaintiff(s) will face if the City's Housing
27 Element is not certified is severe, unsalvageable and comes in a multitude of forms.

28      • Violation of First Amendment Rights.  If the TRO is not granted,

16

Plaintiff(s) First Amendment rights will certainly be violated not only at the March 21, 2023 City Council Meeting, but in the permanent administrative record by virtue of being forced to adopt the "Statement of Overriding Consideration" to satisfy CEQA.  The City Council, through this process, will be *forced to say*, by way of State-compelled speech, that the "benefits of high density housing in the City outweigh the negative impacts to the environment."

- <u>Loss of Permitting Authority</u>. The City will lose its permitting authority and courts will be able to take over the City's ability to issue residential and nonresidential permits until The City's housing element is deemed compliant.  Cal. Gov. Code Section 65589.5(d)(5)(B).
  - <u>Builder's Remedy</u>. As part of this loss of permitting power, the "Builder's Remedy" allows developers to file "Builder's Remedy" projects that do not require the usual consent of the City's planning commission.  Cal. Gov. Code Section 65589.5(d).
- <u>Streamlined Ministerial Approval Process</u>. Proposed developments in The City will be subject to less rigorous "ministerial" approvals in order to quicken the production of housing.  Senate Bill 35.
- <u>Lawsuits and Attorneys' Fees</u>. Plaintiff(s) will be vulnerable to litigation from various housing rights organizations, developers, individuals and HCD seeking to force The City to adhere to HCD's RHNA allocation of new housing units.  Effects of these lawsuits include mandatory compliance with the State's Housing Laws within 120 days (once HCD sues), substantial attorneys' fees, suspension of the City's ability to issue building permits and court approval of housing developments.
- <u>Court Receivership</u>. Courts can appoint an agent with all powers

17

1    necessary to remedy identified housing element deficiencies in order to
2    bring the City's Housing Element in substantial compliance.  Cal. Gov.
3    Code Section 65585(l)(3)(B).

4    • Funding Disqualification. If the City is not deemed in compliance with
5    their Housing Element, the City is no longer eligible for various State
6    funding, including various bonds, grants, and loans (e.g. SB 1
7    (Sustainable Community Planning Grants) and SB 2 (Planning Grants)
8    grants).

9    • Fines and Fees. The City will be subject to court-issued judgements,
10   which include fines against the City for its noncompliance up to
11   $100,000 per month and if the fines are not paid, the City can be fined
12   by a multiplier of six.  Cal. Gov. Code Section 65585(l)(1).

13   The above-mentioned punitive consequences Plaintiff(s) face if the TRO is
14   not granted and the status quo is not maintained until the resolution of this lawsuit
15   are grave and will cause irreversible damage to the City.  If the City loses its
16   permitting authority (an essential power of a city entity), courts who do not have the
17   same knowledge of the City and its needs, landscape and terrain will be able to take
18   over local control of the City's development.  If the City's planning commission is
19   unable to assess projects and make sure they are in accordance with health and
20   safety standards and fit within a particular well thought out zoning scheme, the
21   entire City and its citizens will suffer serious harm.

22   If Plaintiff(s) have to face various lawsuits from developers, HCD and
23   individuals, the City will spend an enormous amount of resources in fighting these
24   lawsuits, which could last years.  Moreover, attorneys' fees for these cases will
25   come from taxpayers' monies and wreak havoc for the City's financial capital.
26   Simultaneously, the City will be automatically disqualified from obtaining
27   substantial State funding, which would only be used to benefit the City's citizens
28   and aid certain projects and improvements.

18

PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO
FED. R. CIV. P. 65

Forcing compliance of the City's Housing Element prior to the finality of this lawsuit will allow housing to be built prematurely (without the proper City approvals and safeguards) and rapidly.  Before the trial in this matter, the entire City's landscape could be significantly altered.

The likelihood of irreparable harm if the TRO is not granted is insurmountable and the penalties Plaintiff(s) will be permanent and beyond repair. Additionally, it is difficult to quantify the damages Plaintiff(s) will suffer.  There can be no dispute that if the status quo is disrupted and Plaintiff(s) are obliged to cooperate with HCD and its current RHNA allocation and Plaintiff(s) refuse to comply until the resolution of this matter, the City faces immediate and momentous harm.  Even if the Court does not find the likelihood of success as to Plaintiff(s)' causes of action (detailed below) wholly compelling, the irreparable harm the City if the above-mentioned severe consequences, punitive fines, penalties and loss of local control are enacted, cause the balance of hardships to undoubtedly tip sharply in Plaintiff(s)' favor.  For all the foregoing reasons, the TRO should be granted in favor of Plaintiff(s).

**B.** **Under the Ninth Circuit's Standard for Granting a TRO, Serious Questions are Raised by Plaintiff(s), especially as to its First and Fourteenth Amendment and CEQA Claims, therefore the Proposed TRO Should be Granted in Favor of Plaintiff(s).**

Plaintiff(s)' Complaint asserts several causes of action, which have a likelihood of success, as discussed herein.

**i.** **Plaintiff(s)' First Amendment Rights claim has a High Probability of Success because Defendants have Mandated Plaintiff(s) make Certain Declarations about the "Housing Crisis," which are in Direct Conflict with Plaintiff(s)' Environmental Findings on Increased Housing in the City**.

The Housing and RHNA Laws force the City Council Members to make specific statements of "State speech," specific findings (speech) consistent with "State speech", and make specific votes (speech) pre-approved by the State

regarding, and related to, "need for housing" in violation of the City Council
Members' and the City's First Amendment rights under the U.S. Constitution.
(*Shurtleff v. City of Boston*, (2022) 142 S. Ct. 1583, that governments have protected
First Amendment "speech" and; *Expressions Hair Design v. Schneiderman*, (2017)
137 S. Ct. 1144, finding against the State compelling "speech").  Indeed, the
Housing Laws and RHNA Laws require the City Council Members to replace their
free speech with the words of the State that advance the State's political agenda.
The Governor, the Director, HCD, and SCAG even mandate how the City
communicates its stance on housing, what ultimately the Council Members' "say" in
their vote, and what Council Members are compelled to say to the public with
regard to "housing need" to justify their vote. (See *Right to Life of Cent. Cal. v.
Bonta*, (2021) 562 F. Supp. 3d 947 (9th Cir.)

Moreover, as illustrated by the Declarations of the Mayor and Mayor Pro Tem
filed separately and concurrently, the RHNA Laws in concert with CEQA required
that, as part of approving and adopting an updated Housing Element at the Meeting,
force the adoption of a "Statement of Overriding Consideration" ("Statement"),
which is a written Statement, that, at least in part, essentially states "the benefits of
high density housing outweigh the negative impacts of high density housing to the
environment" in Huntington Beach.  RHNA Laws (in concert with CEQA) force
Council Members, and ultimately the City by passage on vote, to make this
Statement in order to approve the proposed updates to the City's Housing Element.
It is part of the RHNA Laws (in concert with CEQA); it is unavoidable, and
therefore, violates the First Amendment.  This is essentially State-mandated speech,
compelled speech, and content-based restriction on speech is a violation of the First
Amendment.  This is a real, irreparable harm under the U.S. Constitution.

In addition, the RHNA Laws, at least according to the Defendants (including
among others, the Director, HCD and SCAG as set forth in the Action) are forcing
Council Members, and ultimately the City by passage on vote, to vote in a certain,

State-pre-ordained way at the Meeting, without freedom of choice in voting, to accept and adopt an updated Housing Element that provides for 13,368 units of high density development (again, "RHNA Units").

According to the Defendants, including among others, the Director, HCD and SCAG, the City Council Members, and ultimately the City by passage on vote, have no discretion, no voice, no freedom of choice, and no other options but to vote in favor of this proposed updated Housing Element (and against my conscience and good judgment) that necessarily includes the 13,368 high density RHNA Units mandated by the State. This too violates the First Amendment. This is State-mandated speech, compelled speech, and content-based restriction on speech is a violation of the First Amendment. This is a real, irreparable harm under the U.S. Constitution.

Plaintiff(s)' cause of action regarding a violation of First Amendment rights has a high probability of success because Defendants' mandated and forced speech onto Plaintiff(s) is a clear violation of free speech. Defendants require Plaintiff(s) to make certain declarations to the citizen of the City regarding a housing crisis and the benefits of additional high-density housing, despite environmental findings that affirm otherwise. This content-based restriction is unconstitutional and it is Defendants' burden to demonstrate how their restrictive speech meets strict scrutiny. There is a high probability of success for Plaintiff(s) as to the First Amendment violation claims.

ii.  **Plaintiff(s)' Procedural Due Process Claim Under the Fourteenth Amendment of the U.S. Constitution has a High Likelihood of Success because the City was Excluded from Providing Input Before the Vote to Alter HCD's Methodology To Determine RHNA Units and there is no Judicial Review for HCD's Determination of RHNA Units.**

The Fourteenth Amendment safeguards fundamental rights of persons and of property against arbitrary and oppressive state action. (*Thomas Cusack Co. v.*

21

*Chicago*, 242 U.S. 526, 37 S. Ct. 190, (1917)).  Involvement of State officials may provide State action essential to show direct violation of the City's Fourteenth Amendment rights, whether an official's actions were officially authorized, or lawful.  (*Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S. Ct. 172, (1978)).  The State Legislature amended the RHNA process to eliminate judicial review of decisions and determinations by the Director, HCD, and/or SCAG when it amended Section 65584(c)(4).  This violates Plaintiff(s)' Procedural Due Process rights because the process begins and ends with HCD.

In addition, the State's Housing Laws and RHNA Laws are violative of the City's Procedural Due Process rights insofar as the State claims preemptive authority over the City's Constitutional Charter City Home Rule authority, yet there is no State law whatsoever that specifically provides that the City must plan for 13,368 units of high density RHNA housing units in this Planning Cycle.   In fact, this number of 13,368 RHNA Units of high-density development for the City was created by a flawed administrative process through the Director, HCD, and SCAG, and not State law.  Since this number of 13,368 RHNA Units is administratively-created and not passed by the State Legislature and signed by the Governor into law, it does not have the force and effect of State law, and therefore can have no pre-emptive power over the City's Constitutional Charter City Home Rule authority.  This "mandate" and the Housing Laws and RHNA Laws that have produced this absurdity violate Plaintiff(s)' Procedural Due Process rights.

Defendants did not provide Plaintiff(s)' with requisite Procedural Due process before requiring that the Plaintiff(s) absorb and plan for an additional 13,368 RHNA Units in Huntington Beach.  As detailed in a letter sent to SCAG by the City of Huntington Beach, in late 2019, SCAG failed to follow the process provided for by State law, i.e., Government Code Section 65584.04.  SCAG had improperly voted to permit an illegal, vague, arbitrary, and capricious RHNA Methodology that incorrectly allocated an additional approximately 6,000 high-density RHNA Units to

PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO
FED. R. CIV. P. 65

1   the City of Huntington Beach.

2       On November 7, 2019, however, during a meeting of the SCAG Regional

3   Council, SCAG introduced a new, last-minute substitute methodology for the

4   RHNA allocation, which had not previously been disclosed to the public or to the

5   City.  The 2019 SCAG vote that ultimately resulted in the City being mandated to

6   plan for 13,368 RHNA Units, was not based upon any empirical data, was in

7   violation of the law.  Government Code Section 65584.3 requires that actions taken

8   by the Director, HCD, and SCAG be done according to a vote based on well-

9   established law and grounded in general principles of Due Process.

10      On January 13, 2020, the Director and HCD formally admonished SCAG in

11   writing that it's new; last-minute RHNA Methodology was wrongful and erroneous,

12   claiming that it was failing to further the five statutory objectives of the RHNA

13   Laws. SCAG disregarded, moved forward, and the flawed 13,368 RHNA Units was

14   imposed on the City of Huntington Beach.

15      Because the State's RHNA process, by way of its RHNA Laws, violates law,

16   is vague, arbitrary, and capricious regarding the creation of the mandates of 13,368

17   RHNA Units violates the City's Due Process and its citizens have, and will, sustain

18   damages. In addition, there is a high likelihood of success Plaintiff(s) will prevail on

19   its procedural due process claim, as there is clear evidence the City was excluded in

20   providing input prior to the vote, which would dictate its own RHNA allocation.

21      Moreover, the State has impermissibly delegated authority to HCD, who then

22   created administrative regulations that have the effect of law, regarding the process

23   to certify housing elements.  Failure to follow these administrative regulations

24   means a city's housing element will not be certified.  Failure to certify subjects a

25   city to excessive fines and penalties.  HCD is the legislature, the arbiter of disputes,

26   and the enforcing agency.  Currently, the State Planning and Housing laws preclude

27   judicial relief.  The Housing Bills impermissibly delegated executive authority to

28

PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO
FED. R. CIV. P. 65

HCD to create administrative regulations that are pretext for actual laws that are enforced by HCD.

Allowing HCD to be the final arbiter when a city appeals their RHNA allocation also violates the City's procedural due process rights and leaves the City without proper judicial review.  There should be further appellate review in the RHNA process besides HCD's final determination.  There is a clear conflict of interest and bias when HCD is permitted to have the final say on each City's RHNA Units.  Accordingly, there is a high probability of success as to their Fourteenth Amendment violation claims.

   iii.   **Plaintiff(s) have a High Probability of Prevailing on its Substantive Due Process Claim pursuant to the Fourteenth Amendment of the United States and State's Constitution because HCD Utilized Flawed Project Growths in Determining the City's RHNA Units**.

The protection afforded by the guarantee of substantive due process interposes a bar to legislation that "manifests a patently arbitrary classification, utterly lacking in rational justification." (*Flemming v. Nestor*, 363 U.S. 603, 611 (1960)).  To satisfy Substantive Due Process, a statute must be sufficiently clear to provide adequate notice of the prohibited or required conduct referred to therein. Thus, a statute will be deemed void for vagueness if it either forbids or requires the doing an act in terms so vague that persons of common intelligence must necessarily guess to its meaning and differ as to what is required.  In this case, the penalties amount to near criminal sanctions.

In addition, the State's Housing Laws and RHNA Laws are violative of the City's Substantive Due Process rights insofar as the State claims preemptive authority over the City's Constitutional Charter City Home Rule authority. There is no State law whatsoever that specifically provides that the City must plan for 13,368 units of high density RHNA housing units in this Planning Cycle.  In fact, this number of 13,368 RHNA Units of high-density development for the City was

24

created by a flawed administrative process through the Director, HCD, and SCAG, and not State law.  Since this number of 13,368 RHNA Units is administratively-created and not passed by the State Legislature and signed by the Governor into law, it does not have the force and effect of State law, and therefore can have no pre-emptive power over the City's Constitutional Charter City Home Rule authority.  This "mandate" and the Housing Laws and RHNA Laws that have produced this unfair result violate Plaintiff(s)' Substantive Due Process rights.

Yet, the State Legislature amended the RHNA process to eliminate judicial review of decisions and determinations by the Director, HCD, and/or SCAG when it amended Section 65584(c)(4).  Having zero judicial recourse available to resolve disputes of law violates Plaintiff(s)' Substantive Due Process rights.  The RHNA process attempts to add some mathematic and pseudo-scientific components; however, most of the process to allocate RHNA is completely unknown or unascertainable by reading the plain language of the RHNA Laws, and, executed by an *ad hoc* political process.  The RHNA Laws simply do not provide a real verifiable method used to determine how much housing a particular jurisdiction should have in the future, then how that number translates into housing units that each city or county must plan to build within the Planning Cycle.

As part of AB 101, it is a recent damning admission by the State Legislature that the Housing Laws and RHNA Laws are fatally flawed.  According to AB 101, HCD is now tasked with preparing a report on potential RHNA reform and compelled to make recommendations to the State Legislature by December 31, 2022.  In October 2021, the California State Joint Legislative Audit Committee approved an emergency audit to examine HCD's Regional Determination process.

The request for an audit was based on an assertion that the public had limited information on the formula that HCD uses to calculate the regional RHNA Units, and cited confusion and mistrust among regional planning bodies and jurisdictions, and the need for an independent and objective review of the process.

PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO
FED. R. CIV. P. 65

1    Because the State's RHNA process, by way of its RHNA Laws, violates law,

2    is vague, arbitrary, and capricious regarding the creation of the mandates of 13,368

3    RHNA Units violates the City's Due Process and its citizens have, and will, sustain

4    damages. Plaintiff(s)' cause of action regarding a violation of its substantive due

5    process rights has a probability of success because there is no State law that requires

6    for the amount of RHNA housing units that is being forced onto Plaintiff(s) by

7    HCD.  Rather, HCD has administratively created a mandate on Plaintiff(s) without

8    having gone through the proper channels of being passed by the appropriate

9    legislature body and given by the Governor.  Rather, the current systems imposed by

10   HCD and their RHNA allocation to each region violates Plaintiff(s)' Substantive

11   Due Process rights.

12   Moreover, there is no judicial review of the RHNA housing units imposed

13   onto Plaintiff(s).  The only recourse Plaintiff(s) can seek is an appeal, which starts

14   and stops with HCD.  There is no independent review or either the RHNA allocation

15   to each region and then onto each city, nor is there a judicial review of the actual

16   methodology or process HCD utilized to formulate their numbers.  HCD cannot be

17   the one and only arbitrator of housing units that are mandated to be built in each

18   city, with severe and punitive penalties and fines if not followed.

19   SCAG's reliance on forming a RHNA allocation number to the City is based

20   on flawed population growth projections, which is demonstrated by the DOF's

21   statistics.  Moreover, the State's Auditor declared the numbers produced by HCD

22   were unsupported.  Multiple State agencies are therefore in conflict with one another

23   and if SCAG utilizes population growth to form the basis for their RHNA numbers

24   and the DOF declared a significant population decrease for the City, the entire

25   RHNA allocation must be called into question, as Defendants have violated

26   Plaintiff(s)' substantiate due process rights.

27   / / /

28   / / /

PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO
FED. R. CIV. P. 65

iv.  **Plaintiff(s)' ENVIRONMENTAL QUALITY ACT (PUBLIC RESOURCES CODE 21000 *et. seq.* (CEQA)) Claim has a High Likelihood of Success because it is in Direct Conflict with the State's Housing Laws**.

RHNA Laws require the City to make a "Hobson's Choice," i.e., that the local legislature, the City Council, is required to adopt a "Statement of Overriding Consideration" pursuant to California Environmental Quality Act ("CEQA") in order to justify, as a matter of environmental impact, the massive increase in high density housing, or not adopt a "Statement of Overriding Consideration" required by CEQA (because the high density zoning is not justified in light of requisite environmental concerns) and not zone for the massive high density housing mandated by the RHNA Laws and Defendants, but then face crippling penalties and lawsuits from Defendants.  The City Council meeting will take place on March 21, 2023, which is another significant reason the TRO is being sought as there is imminent detriment Plaintiff(s) are facing if forced to adopt a statement of overriding considerations that does not comply with CEQA.  The RHNA Laws (and Housing Laws) are pitted against CEQA, thereby putting the City Council in an impossible, irreconcilable impasse.

More importantly, the high-density development goals of the RHNA Laws *compel* the City Council to arrive at a pre-ordained, "fixed," State-approved conclusion (of implementing high-density development zoning, i.e., the Defendants' RHNA Units) even before the City Council's consideration by way of conducting local public hearings before adopting a "Statement of Overriding Consideration" as required by CEQA.  For the two State laws, RHNA Laws and CEQA, to be in direct competition or conflict forces local City Council's in Huntington Beach to relinquish local decision-making one way or the other.  Following the Housing and RHNA Laws forces the City Council to essentially violate CEQA, or lie about a Statement of Overriding Consideration in order to satisfy the Housing and RHNA Laws.  This violates CEQA.

In order to comply with State Housing and RHNA law, Plaintiff(s) are forced to ignore the mandates of State Environmental Quality Act law (Public Resources Code 21000 et. seq CEQA) which requires cities to refrain from adopting projects with significant environmental impacts if there are feasible alternatives or mitigation measures that can lessen the effects. Plaintiff(s) are forced to adopt a Statement of Overriding Considerations, which cannot explain the specific reasons why or other beneficial aspects of the proposed project (i.e. rezoning property to allow for high-density housing) outweigh the inevitable adverse environmental impacts. Yet without such a statement, Plaintiff(s) would then not be able to adopt its Housing Element.

There is a high likelihood of success Plaintiff(s) will succeed under this cause of action, as there is a clear conflict between the directives outlined in CEQA and HCD's RHNA allocation to the City. Moreover, the City cannot gain compliance with its Housing Element when it has empirical evidence that the allotted amount of high-density housing to the City will cause unavoidable harmful environmental impacts to the City, so Plaintiff(s) cannot adopt a Statement of Overriding Considerations. The City must follow mandates outlined in CEQA and would be violating the law under CEQA in order to have its Housing Element certified.

If the Court finds Plaintiff(s) raised serious questions concerning their First Amendment, due process and CEQA claims, then the TRO should be granted. Moreover, in using the Ninth Circuit's test for deciding if TROs are appropriate, if the Court concludes irreparable harm will be caused to Plaintiff(s), but at this stage is not entirely convinced of Plaintiff(s)' success on the merits, the scale still tips in favor of Plaintiff(s) and a TRO should be granted.

**C.** **The Balance of Equities Tips Heavily in Plaintiff(s)' Favor**

As detailed above, Plaintiff(s) will suffer irreparable harm if it continues to oppose HCD's RHNA Units allocated to the City. Defendants cannot claim an equitable interest in seeking to enforce their arbitrary and capricious methodology

and formula when determining the City's RHNA Units, especially when other State agencies' (DOF and the State's Auditor) data provides for a contrary outcome.

### D. A TRO would Not Harm the Public's Interest

The public's interest would not be detrimentally impacted by maintaining the status quo until the resolution of this matter. To the contrary, there is no dispute the public's interest would be served in maintaining the status quo, until there is judicial resolution. The citizens of the City would be greatly harmed if the City lost its' permitting authority and developments were allowed to be built without restriction and without health and safe inspections from the City's inspectors. There would be rapid growth of development in the City, without any oversight.

The citizens of the City expect their planning commission to be at the forefront of allowing certain development and/or ascertaining certain deficiencies for projects. Additionally, the City's finances would be impacted from having to fight numerous lawsuits, pay extensive and punitive fines and from being disqualified to receive various State grants. The public's interest in having this matter adjudicated prior to all of the consequences that are allowable if the City does not comply with its Housing Element is of utmost importance. Therefore, Plaintiff(s)' request for a TRO should be granted.

### E. The Bond Requirement Should be Waived because it is not Compulsory

Fed. R. Civ. P. 65(c) allows a court to grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or retained." However, it is not compulsory for a bond to be paid, "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couuurier*, 572 F.3d 1067, 1086 (9th Cir. 2009).

If a defendant cannot show evidence that it would suffer damages from the injunction, "the bond amount may be zero." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). Additionally, if the

29

Court finds a strong likelihood of success, the Court can permit a minimal bond or no bond at all. *People v. State of Cal. Ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 Fed 1319, 1326 (9th Cir. 1985).

Here, Defendants cannot demonstrate they will be harmed if the TRO is granted. Defendants will not be harmed by the TRO in any fashion, as the Court maintains the status quo while determining if the RHNA allocation is constitutional. There is no cost to Defendants if enforcement of the RHNA number to the City is deferred. As discussed above, Plaintiff(s)' likelihood of success as to its Fourteenth Amendment and CEQA claims is compelling. Therefore, Plaintiff(s) request the Court waive the bond requirement.

## IV.   <u>CONCLUSION</u>

Plaintiff(s) respectfully request this Court issue a Temporary Restraining Order and/or Issue an Order to Show Cause why a Preliminary Injunction should not be issued. Plaintiff(s) further request Defendants be temporarily restrained from enforcing any of the fines or penalties enumerated within Cal. Gov. Code sections 65585 and 65589.5, and also including:

1.   Loss of Permitting Authority pursuant to Cal. Gov. Code Section 65589.5(d)(5)(B);

2.   The Builder's Remedy pursuant to Cal. Gov. Code section 65589.5(d);

3.   Defendants from filing new lawsuits against the Plaintiff(s) seeking to enforce the City's compliance with their current RHNA Laws or RHNA Units (of 13,368 as defined by the Action) upon the City;

4.   Court receivership pursuant to Cal. Gov. Code section 65585(l)(3)(B); and

5.   Fines and penalties pursuant to Cal. Gov. Code section 65585(l)(1);

In other words, Plaintiffs respectfully seek a TRO preventing the Defendants from taking any enforcement or punitive action against the City for any claimed or alleged violation of the RHNA Laws by the City during the pendency of this lawsuit.

30

1    Dated:  March 14, 2023        MICHAEL E. GATES, CITY ATTORNEY

2

3                      By:_____ /s/  *MICHAEL E. GATES*_____

4                      MICHAEL E. GATES, CITY ATTORNEY

5                      Attorney for Plaintiffs,
                     CITY OF HUNTINGTON BEACH, and

6                      HUNTINGTON BEACH CITY COUNCIL, and

7                      MAYOR TONY STRICKLAND, and MAYOR
                     PRO TEM GRACEY VAN DER MARK

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO
FED. R. CIV. P. 65