ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DAVID PAI, Bar No. 227058
Supervising Deputy Attorney General
MATTHEW STRUHAR, Bar No. 293973
THOMAS KINZINGER, Bar No. 323889
Deputy Attorneys General
  1300 I Street, 15th Floor
  Sacramento, CA 95814
  Telephone: (916) 210-7246
  Fax: (916) 731-2121
  E-mail:  Matthew.Struhar@doj.ca.gov
           Thomas.Kinzinger@doj.ca.gov

*Attorneys for Defendants Gavin Newsom, in his
official capacity as Governor of the State of
California, and individually; Gustavo Velasquez, in
his official capacity as Director of the State of
California Department of Housing and Community
Development, and individually; and the California
Department of Housing and Community
Development*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| **CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation, the HUNTINGTON BEACH CITY COUNCIL, MAYOR OF HUNTINGTON BEACH, TONY STRICKLAND, and MAYOR PRO TEM OF HUNTINGTON BEACH, GRACEY VAN DER MARK,** | 8:23-cv-00421-FWS-ADS<br><br>**OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO FED. R .CIV. P. 65**<br><br>Date:<br>Time:<br>Courtroom:   10D<br>Judge:       The Honorable Fred W. Slaughter<br><br>Trial Date:   None Set<br>Action Filed: 3/09/2023 |
| Plaintiffs, | |
| v. | |
| **GAVIN NEWSOM, in his official capacity as Governor of the State of** | |

1  | **California, and individually;**
2  | **GUSTAVO VELASQUEZ in his**
3  | **official capacity as Director of the**
   | **State of California Department of**
4  | **Housing and Community**
   | **Development, and individually;**
5  | **STATE LEGISLATURE; STATE OF**
6  | **CALIFORNIA DEPARTMENT OF**
   | **HOUSING AND COMMUNITY**
7  | **DEVELOPMENT; SOUTHERN**
8  | **CALIFORNIA ASSOCIATION OF**
   | **GOVERNMENTS; and DOES 1-50,**
9  | **inclusive,**
10 |                          Defendants.

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Background ............................................................................................................ 4

    I.     The State's Housing Laws ................................................................ 4

    II.    The City's Actions That Led to This Point ...................................... 6

Standard of Review ............................................................................................... 7

Legal Argument .................................................................................................... 7

    I.     The City Will Not Prevail on the Merits ......................................... 7

          A.    Plaintiffs Lack Standing to Bring Their Claims ....................... 7

          B.    The City Has No Enforceable First Amendment Rights, But Even if it Did, the State's Requirement that the City Adopt a Compliant Housing Element Does Not Implicate Free Speech ............................................................................... 9

               1.    The City Does Not Possess Enforceable First Amendment Rights Against the State ................................ 9

               2.    The State's Housing Laws Do Not Burden or Compel "Speech" ...................................................... 10

               3.    CEQA Does Not Implicate the First Amendment ......... 11

          C.    The City's Due Process Claims Are Without Merit ................ 12

               1.    The City Has No Procedural Due Process Right to Challenge the State's Housing Laws or RHNA Allocation ............................................................. 12

               2.    The City's Substantive Due Process Claim Has No Merit Because It Has No Fundamental Right to Control Land Use ..................................................... 13

          D.    The City's CEQA Claim is Barred Under the Eleventh Amendment, and the Court Should Decline to Exercise Jurisdiction Over This Entire Case, Which Concerns Purely State Law Matters .............................................................. 15

    II.    The City Will Not Incur Irreparable Harm without a TRO, and Any Harm to the City is Ultimately of Its Own Making .................... 17

          A.    There is No "Emergency" Warranting Expedited Preliminary Relief ................................................................. 17

          B.    Plaintiffs Cannot Demonstrate Any Irreparable Harm Warranting Extraordinary Relief ........................................ 18

    III.   The Public Interest Weighs Against a TRO ................................... 19

Conclusion ......................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*
    149 F.3d 971 (9th Cir. 1998) .................................................. 12

*Buckingham v. Sec'y of U.S. Dep't of Agr.*
    603 F.3d 1073 (9th Cir. 2010) ................................................ 12

*Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*
    136 F.3d 1360 (9th Cir. 1998) .............................................. 2, 8

*City of Los Angeles v. David*
    538 U.S. 715 (2003) ........................................................... 13

*City of S. Lake Tahoe v. California Tahoe Reg'l Plan. Agency*
    625 F.2d 231 (9th Cir. 1980) ............................................ 2, 8, 9

*City of San Juan Capistrano v. California Pub. Utilities Comm'n*
    937 F.3d 1278 (9th Cir. 2019) .............................................. 8

*Clark v. Cmty. for Creative Non-Violence*
    468 U.S. 288 (1984) ........................................................... 9

*Columbia Broadcasting System, Inc. v. Democratic National
    Committee*
    412 U.S. 94 (1973) ............................................................ 10

*Doe v. Regents of the Univ. of Cal.*
    891 F.3d 1147 (9th Cir. 2018) ............................................. 15

*FCC v. Beach Commc'ns, Inc.*
    508 U.S. 307 (1993) ........................................................... 14

*Franceschi v. Yee*
    887 F.3d 927 (9th Cir. 2018) .............................................. 13

*Gov't Employees Ins. Co. v. Dizol*
    133 F.3d 1220 (9th Cir. 1998) (en banc) ................................ 16

*Hunter v. City of Pittsburgh*
    207 U.S. 161 (1907) ............................................................ 8

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

4

*Huth v. Hartford Ins. Co. of the Midwest*
    298 F.3d 800 (9th Cir. 2002) .......................................................................... 15, 16

5

6

*LA Alliance for Human Rights v. County of Los Angeles*
    14 F.4th 947 (9th Cir. 2021) ................................................................................. 7

7

8

*Mathews v. Eldridge*
    424 U.S. 319 (1976) ............................................................................................ 12

9

*Mission Power Eng'r Co. v. Continental Cas. Co.*
    883 F.Supp. 488 (C.D. Cal. 1995) .................................................................... 7, 19

10

11

*Mullins v. Oregon*
    57 F.3d 789 (9th Cir. 1995) ................................................................................ 13

12

13

*Nevada Comm'n on Ethics v. Carrigan*
    564 U.S. 117 (2011) ............................................................................................ 11

14

15

*Palomar Pomerado Health Sys. v. Belshe*
    180 F.3d 1104 (9th Cir. 1999) .............................................................................. 8

16

17

*Pennhurst State Sch. & Hosp. v Halderman*
    465 U.S. 89 (1984) ............................................................................................ 2, 15

18

19

*Romero-Ochoa v. Holder*
    712 F.3d 1328 (9th Cir. 2013) ........................................................................ 14, 15

20

21

*Shurtleff v. City of Boston*
    142 S. Ct. 1583 (2022) ........................................................................................ 10

22

*Williams v. Mayor & City Council of Baltimore*
    289 U.S. 36 (1933) ................................................................................................ 8

23

24

*Winter v. Nat. Res. Def Council*
    555 U.S. 7 (2008) ................................................................................ 7, 18, 19, 20

25

26

*Ex Parte Young*
    209 U.S. 123 (1908) ............................................................................................ 15

27

28

# TABLE OF AUTHORITIES
## (continued)

Page

**CALIFORNIA CASES**

*Buena Vista Gardens Apartments Assn. v. City of San Diego Planning Dept.*
  175 Cal.App.3d 289 (1985) ................................................................ 14

*California Renters Legal Advoc. & Educ. Fund v. City of San Mateo*
  68 Cal.App.5th 820 (2021) ........................................................... *passim*

*Ruegg & Ellsworth v. City of Berkeley*
  63 Cal.App.5th 277 (2021) ................................................................ 14

*Sequoyah Hills Homeowners Ass'n v. City of Oakland*
  23 Cal.App.4th 704 (1993) ................................................................ 18

**FEDERAL STATUTES**

28 U.S.C.
  § 2201(a) ........................................................................................... 15

**STATUTES**

California Evidence Code
  § 669.5(a) .......................................................................................... 20

California Government Code
  § 65302(c) ..................................................................................... 4, 10
  § 65580 ..................................................................................... 4, 10, 15
  § 65583 .................................................................................................. 4
  § 65584 .................................................................................................. 4
  § 65584(b) ............................................................................................. 4
  § 65584.04(a) ........................................................................................ 5
  § 65584.05 ....................................................................................... 5, 13
  § 65584.05(a) ........................................................................................ 5
  § 65584.05(f) ........................................................................................ 5
  § 65585(b) ............................................................................................. 5
  § 65585(b)(3) ........................................................................................ 5
  § 65585(e) ............................................................................................. 5
  § 65585(f) ....................................................................................... 5, 16
  § 65585(i) ............................................................................................ 16

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3   California Government Code

4   § 65585(j) .............................................................................................. 17

5   § 65585(l)(1)(2) ...................................................................................... 17

    § 65588 ...................................................................................................... 4

6   § 65589.5 ................................................................................................... 4

7   § 65589.5(a) ........................................................................................... 15

    § 65589.5(a)(1)-(2) ............................................................................... 20

8   § 65589.5(b) ........................................................................................... 20

    § 65589.5(d) .............................................................................................. 3

9   § 65589.5(d)(2) ............................................................................... *passim*

10  § 65589.5(d)(5) ..................................................................... 5, 6, 10, 18

    § 65589.5(e) ........................................................................... 6, 18, 19

11  § 65589.5(f)(1) ....................................................................................... 18

12  § 65589.5(g) ........................................................................................... 20

    § 65589.5(j) ....................................................................................... 3, 18

13  § 65589.5(j)(1) ................................................................................. 18, 19

14  § 65589.5(j)(1)(A) .......................................................................... *passim*

    § 65913.4 ................................................................................................ 14

15

16  California Public Resources Code

    § 21081(b) ............................................................................................... 11

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs City of Huntington Beach, Huntington Beach City Council, Mayor Tony Strickland, and Mayor Pro Tem Gracey Van Der Mark (collectively, the City or Plaintiffs) want to shirk their responsibility to meet their fair share of the state's housing needs, and this case is only the latest chapter in the City's longstanding defiance of state housing laws. The very purpose of the housing laws challenged by the City is to solve the "collective action problem" created by local governments whose policies "contribute to the collective shortfall in housing." *California Renters Legal Advoc. & Educ. Fund v. City of San Mateo*, 68 Cal.App.5th 820, 851 (2021). Recognizing that "California has a housing supply and affordability crisis of historic proportions," a matter of statewide concern (*see, e.g., id*. at 830, 848), state courts have consistently upheld California's housing laws against local challenges—including ones brought by Huntington Beach itself. *See, e.g*., Request for Judicial Notice (RJN), Ex. 5, *City of Huntington Beach v. Newsom, et al*. (Los Angeles County Superior Court, Case No. 30-2019-01044945), Order Denying Petition for Writ of Mandate (Jan. 28, 2021) (finding that California's housing laws "do not violate the municipal affairs doctrine of the California Constitution and may be enforced") (no appeal taken).

Now, Plaintiffs try their hand in federal court, alleging baseless constitutional violations in yet another attempt to challenge the state's housing laws. However, as outlined below, Plaintiffs wholly fail to meet the exacting standard needed to obtain a temporary restraining order (TRO), and their application against Defendants Governor Gavin Newsom, Director Gustavo Velasquez, and the California Department of Housing and Community Development (HCD and, collectively with other Defendants, the State), should be denied.

First, Plaintiffs are not likely to succeed on the merits of their claims, for multiple reasons. The City is a political subdivision of the state, and as such, under well-settled law, lacks standing to bring federal constitutional challenges to state

statutes. *See City of S. Lake Tahoe v. California Tahoe Reg'l Plan. Agency*, 625
F.2d 231, 233–34 (9th Cir. 1980); *Burbank-Glendale-Pasadena Airport Auth. v.
City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (finding that charter cities,
too, are political subdivisions of the state). The other plaintiffs—the City Council,
Mayor, and Mayor Pro Tem—do not and could not assert claims that are
distinguishable from the City's. Thus, they also lack standing. *See City of S. Lake
Tahoe, supra*, 625 F.2d at 237.

Even if Plaintiffs could demonstrate that they have standing to bring their
federal constitutional claims, the claims fail on the merits. The challenged state
statutes do not regulate anyone's "speech"; they simply require the City to maintain
housing policies that comply with State law. Plaintiffs' due process claims also fail:
they have not alleged a liberty interest protected under substantive due process, and
they have procedurally safeguarded opportunities to challenge the State's housing
laws and any attempt by the State to enforce those laws against them. Ultimately,
Plaintiffs' federal constitutional claims are a smokescreen. At their core, the
complaint and TRO take issue with the State's methodology for determining the
City's regional housing needs allocation. These are matters of state, not federal,
law. Thus, all of Plaintiffs' claims should be barred under the Eleventh
Amendment; but, in particular, its claims brought under the California
Environmental Quality Act (CEQA) and other state laws plainly are. *See Pennhurst
State Sch. & Hosp. v Halderman*, 465 U.S. 89, 106 (1984).

Second, Plaintiffs have failed to demonstrate that they are likely to suffer
irreparable harm in the absence of a TRO. There is no emergency warranting
expedited preliminary relief. As demonstrated by their own allegations, Plaintiffs
have been aware of their obligations under the State's housing laws, and the
consequences for failing to meet those obligations, for years, if not *decades*. *See,
e.g.,* Compl. ¶ 2 ("[In 2017 and 2018 California lawmakers passed two packages of
housing bills."); ¶ 14 ("Defendants . . . determined in 2021 that the City must . . .

allow the development of 13,368 units.”); ¶ 16 (noting that judicial review of RHNA process was eliminated by statutory amendment in 2004); ¶ 18 (referencing auditor report issued in 2022); ¶ 62 (noting that California has required cities and counties, since 1969, to adequately plan to meet future housing needs). The only imminent action is the City Council’s upcoming March 21, 2023 meeting, at which Plaintiffs allege they will be “forced” to take certain actions. But this is an “emergency” of Plaintiffs’ own making. Plaintiffs control their own city council agenda, and they have been out of compliance with the relevant state housing laws since at least October 15, 2021, when it failed to timely adopt its updated housing element. Therefore, they are already subject to the State’s enforcement scheme they seek to enjoin in this action. And with respect to the fines and penalties they are further seeking to enjoin, those are judicial remedies for a state court to impose post-judgment in an action to enforce the state’s Housing Element Law.

Plaintiffs’ further allegation that the City stands to lose its permitting authority, and therefore will suffer irreparable harm, mischaracterizes the requirements of state law. The Housing Accountability Act (the HAA) does not revoke permitting authority; it merely changes the standards by which local agencies can disapprove new housing developments under various circumstances. *See* Cal. Gov. Code § 65589.5(d), (j). In no instance does the HAA prohibit the City from denying projects for public health and safety reasons. *See § 65589.5(d)(2), (j)(1)(A).

Finally, the public interest weighs strongly against granting a TRO. California is facing a critical shortage of housing, and Plaintiffs’ repeated attempts to duck the City’s obligations under state law will only make the problem worse.

For all these reasons, this Court should deny Plaintiffs’ TRO application.

**BACKGROUND**

## I.   THE STATE'S HOUSING LAWS

Two state housing laws are at issue here. The first is Article 10.6 of the California Government Code, better known as the Housing Element Law, originally enacted in 1969. Cal. Gov. Code § 65580, et seq. The second, which is technically part of the Housing Element Law, is the HAA, originally enacted in 1982. § 65589.5.[1]

Under these laws, local governments must include a housing element as part of their general plan. § 65302(c). Housing elements govern how local governments will control and foster the development of housing for the period in which they are in effect. § 65583. Localities must, therefore, update their housing elements in periodic "cycles" ranging from 5 to 8 years, to accommodate regional housing needs for residents across all income levels (very low-, low-, moderate-, and above moderate). § 65588. This is commonly referred to as the Regional Housing Needs Allocation, or "RHNA," process.

The RHNA process plays a critical role in setting the stage for housing production and is designed to bring local zoning and planning into alignment with the state's regional housing needs. First introduced as "fair share planning" in 1977, RHNA is the foundation for each local government's housing element's land-inventory requirement. § 65584 *et seq*. Briefly, in each housing element cycle, HCD relies on data supplied by the Department of Finance to assign a target number or goal for additional housing units in each region of the State. This projection of additional housing units includes projected household growth across all income levels, and final determination of regional housing needs are made in consultation with the appropriate regional council of governments. § 65584(b). Each council of government, such as the Southern California Association of

---

[1] Unless otherwise specified, all further statutory references are to the California Government Code.

Governments (SCAG) of which the City is a member, then allocates its assigned number of housing units to its member jurisdictions. This regional allocation is determined exclusively by regional councils like SCAG with its member jurisdictions, though its proposed methodology is made in consultation with HCD. § 65584.04(a). The draft allocation is distributed to member jurisdictions at least 18 months prior to the scheduled housing element revision deadline. § 65584.05(a). Member jurisdictions wishing to appeal its draft allocation must then do so, to its regional council of government, within 45 days. § 65584.05. Final allocations are adjusted based upon the results of the administrative appeals, but the total distribution of housing need shall not equal less than the regional housing needs determination. § 65584.05(f).

In updating their housing elements, local governments must prepare a draft housing element for review by HCD. § 65585(b). HCD reviews the draft and issues findings on whether it substantially complies with Housing Element Law. § 65585(b)(3), (e). If it does not, then the local government may either conform the proposed housing element to HCD's comments *or* adopt it without changes. § 65585(f) (emphasis added). If it does the latter, it must explain why it believes that its draft complies with the law. *Id*.

The HAA helps enforce these obligations. One way it does so is through the "Builder's Remedy," a self-effectuating provision the Legislature added to the HAA in 1990, which prohibits cities from relying on outdated planning and zoning rules as a basis for disapproving new affordable housing projects. § 65589.5(d)(5). Specifically, when a local government fails to maintain a substantially compliant housing element that meets or exceeds its allotted share of regional housing needs by the relevant deadline—here, October 15, 2021—affordable housing developers may invoke the "Builder's Remedy," which sharply limits a city's ability to deny affordable housing projects. A city may not, under that circumstance, deny a proposed affordable housing development on the grounds that it is noncompliant

1   with local zoning or general plan standards. This is because those outdated

2   standards would not be consistent with a housing element designed to meet the

3   housing needs for the current cycle. Importantly however, local governments can

4   still deny projects that violate health and safety standards when they make a

5   specific, fact-based finding that such projects would have a significant adverse

6   impact on public health or safety. § 65589.5(d)(2), (j)(1)(A). Moreover, housing

7   projects generally remain subject to CEQA's requirements. *See* § 65589.5(e).

8   ## II.   THE CITY'S ACTIONS THAT LED TO THIS POINT

9       The City was required to adopt a compliant housing element within 120 days

10  of October 15, 2021. *See* RJN, Ex. 1. It failed to do so, but it did submit a draft

11  housing element to HCD for review on August 1, 2022. *Id*. HCD informed the City

12  that the draft element substantially complied with the Housing Element Law, but

13  that the City Council would need to formally adopt it, and have it found in

14  compliance, by October 15, 2022. *Id*. Otherwise, HCD could not find it in

15  compliance until the City completed certain actions to implement the draft housing

16  element. *Id*.

17      The City did not adopt a housing element by October 15, 2022. It instead

18  placed a different draft housing element—which has not been submitted for HCD's

19  review—up for City Council approval on March 21, 2023. That will be 522 days

20  from its October 15, 2021 deadline. It then filed this federal complaint and

21  application for a TRO, citing the March 21 City Council meeting as cause for this

22  Court's emergency intervention to protect the City from having to adopt *its own*

23  *housing element*, and to avoid any potential effects from the Builder's Remedy,

24  which has been in effect since October 15, 2021. *See* § 65589.5(d)(5).

25      As noted above, this case is only the latest chapter in the City's longstanding

26  defiance of state housing laws. On February 21, 2023, the City adopted a policy

27  banning new housing accessory dwelling and duplex units on its residents'

28  property, in violation of state laws requiring ministerial approval of such projects.

*See* RJN, Ex. 3. That action prompted a lawsuit from HCD and the Attorney General of California. *See id*. The City also prompted a lawsuit from HCD in 2019 when it violated its housing element from the previous planning cycle by illegally downzoning property. *See id*.

## STANDARD OF REVIEW

"To warrant injunctive relief, Plaintiffs must establish that they are 'likely to succeed on the merits,' that they are 'likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021) (quoting *Winter v. Nat. Res. Def Council*, 555 U.S. 7, 20 (2008)).

Courts are especially reluctant to grant injunctive relief from an *ex parte* application, as those motions "are inherently unfair, and they pose a threat to the administration of justice." *Mission Power Eng'r Co. v. Continental Cas. Co.*, 883 F.Supp. 488, 490 (C.D. Cal. 1995). Thus, to obtain *ex parte* relief, the applicant must make two showings. First, they must, *with evidence*, "show that the moving party's cause will be irreparably prejudiced if the underlying motion is heard according to the regular noticed motion procedures." *Id*. at 492. Second, "it must be established that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect." *Id*.

## LEGAL ARGUMENT

### I.   THE CITY WILL NOT PREVAIL ON THE MERITS

#### A.   Plaintiffs Lack Standing to Bring Their Claims

The Supreme Court has expressly held that municipal governments *do not have* federal constitutional rights vis-à-vis state governments. This is fatal to Plaintiffs' federal constitutional claims.

"A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933). Rather, it is longstanding law that states may control the conduct of their own subdivisions. Over a century ago, the Supreme Court held that "[m]unicipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be [e]ntrusted to them." *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907). Thus, the United States Constitution simply does not protect municipal corporations vis-à-vis the state. "[T]he state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States." *Id.* at 179.

Put simply, subject to the restraints established by its own state constitution, California is entitled to control the conduct of the city governments that it created. Thus, the City of Huntington Beach has no standing in federal court to challenge state laws that govern its operations. "[P]olitical subdivisions of a state may not challenge the validity of a state statute in a federal court on federal constitutional grounds" because "they have no rights against the state of which they are a creature." *Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1107 (9th Cir. 1999); *see also City of San Juan Capistrano v. California Pub. Utilities Comm'n*, 937 F.3d 1278, 1280 (9th Cir. 2019) ("[W]e have consistently held that political subdivisions lack standing to challenge state law on constitutional grounds in federal court."); *City of S. Lake Tahoe, supra*, 625 F.2d at 233–34 (rejecting city's federal constitutional challenge to state regulations for lack of standing). Huntington Beach's status as a charter city is irrelevant to this analysis. *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) ("[C]harter cities in California generally are defined as political subdivisions along with other governmental entities.").

With respect to the City Council and the individual city executives, the Complaint does not assert any constitutional interest separate and distinct from the City's interests. Plaintiff's First Amendment claim, for example, alleges that state housing laws unconstitutionally compel councilmembers to engage in "speech" about housing needs. But state housing laws impose obligations on cities, not on city councilmembers: any interest of Plaintiff councilmembers is entirely derivative of the City's interests. *See City of S. Lake Tahoe,* 625 F.2d at 237. Moreover, any "personal dilemma" that a councilmember may harbor in complying with state law cannot confer standing because the councilmember lacks any "concrete personal injury" that differs from the consequences to the City. *Id.* In short, neither the Council nor its members have standing to raise constitutional challenges to state laws in federal court. *Id.*

Because the City lacks standing, all of Plaintiffs' federal claims necessarily fail.

**B.    The City Has No Enforceable First Amendment Rights, But Even if it Did, the State's Requirement that the City Adopt a Compliant Housing Element Does Not Implicate Free Speech**

Even if some or all of the Plaintiffs could demonstrate standing to bring one or more claims, the claims would still fail on the merits. As the parties invoking the First Amendment, Plaintiffs have the initial burden of showing that it applies. *See, e.g.*, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."). Plaintiffs do not and cannot meet that burden here.

**1.    The City Does Not Possess Enforceable First Amendment Rights Against the State**

Plaintiffs fail to cite to any authority supporting their proposition that they have First Amendment rights under the facts alleged, let alone First Amendment

1   rights as against the State of California. The case the City cites merely states, in

2   dicta, that the "First Amendment's Free Speech Clause does not prevent the

3   government from declining to express a view." *Shurtleff v. City of Boston*, 142 S.

4   Ct. 1583, 1589 (2022) (holding that the City violated a private group's free speech

5   rights when it denied the group's request to raise a flag over city property on the

6   basis of the group's religious viewpoint); *but see Columbia Broadcasting System,*

7   *Inc. v. Democratic National Committee,* 412 U.S. 94, 139 (1973) (Stewart, J.,

8   concurring) ("The First Amendment protects the press *from* governmental

9   interference; it confers no analogous protection *on* the government."). Even

10  assuming that local governments have First Amendment rights in some contexts,

11  they do not, and cannot, use the First Amendment as an excuse to violate state

12  housing and zoning laws that apply equally to charter cities. As discussed above, a

13  municipality is a creature of the state and as such is bound to comply with state law,

14  subject only to limits imposed by the *state* constitution.

15          **2.     The State's Housing Laws Do Not Burden or Compel**
16                  **"Speech"**

17          Even if Plaintiffs could invoke the First Amendment against the State, they

18  have not suffered any restriction on their "speech." The State merely requires the

19  City to adopt and cyclically update a housing element as part of its general plan. §§

20  65302(c), 65580, *et seq*. Failure to do so has consequences, but those consequences

21  do not punish cities for their *views*, or "compel speech"; they impose consequences

22  on cities for maintaining *policies* that violate state law. *See, e.g.,* § 65589.5(d)(5). If

23  the City wants to control housing growth, it must do so in a manner consistent with

24  state law, which requires that it meet its fair share of regional housing needs

25  pursuant to clear and objective rules adopted in advance of a proposed new

26  development. *See California Renters Legal Advoc. & Educ. Fund v. City of San*

27  *Mateo*, 68 Cal.App.5th 820, 850 (2021). The State does not implicate, let alone

28

violate, the First Amendment by placing conditions on how local governments regulate the production of housing.

Plaintiffs contend that the State is violating their First Amendment rights by requiring the City to adopt legislation that includes certain declarations with respect to the "need for housing," and take certain votes, at the time it adopts a housing element. ECF No. 10 at 19-20. But legislators have no protectable First Amendment interest in their votes on legislation. *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011). In *Carrigan*, the Supreme Court upheld a Nevada statute requiring a legislator's recusal in the event of a conflict of interest. *Id*. at 125. According to the Supreme Court, a legislative vote is an "apportioned share of the legislature's power" to adopt or reject legislation. *Id*. at 125-26. "The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Id*. at 126. A "legislator has no right to use official powers for expressive purposes." *Id*. at 127.

By that same logic, requiring local legislative bodies to adopt certain housing policies has no First Amendment implications. Just as an individual "legislator has no right to use official powers for expressive purposes[,]" a local legislative body cannot have a First Amendment interest in the discharge of its official duties. *Id*. A governmental act does not become "expressive simply because the governmental actor wishes it to be so." *Id*. at 128. The First Amendment, at bottom, does not confer "a right to use governmental mechanics to convey a message." *Id*. at 127.

### 3.   CEQA Does Not Implicate the First Amendment

Finally, while the City is correct that CEQA may require it to adopt a statement of overriding considerations that explains why it is proceeding with its housing element notwithstanding the disclosure of potential environmental impacts, *see* Cal. Pub. Res. Code § 21081(b), such a requirement does not implicate the First Amendment for the reasons discussed above. In addition, CEQA and the Housing Element Law do not require any statement of agreement with HCD's positions on

1   housing or the Legislature's findings in the Housing Element Law and the HAA.

2   Plaintiffs can simply cite the City's legal obligation to comply with the Housing

3   Element Law as the rationale for adopting the updated housing element,

4   notwithstanding any environmental impacts. *See id*.

5      In summary, Plaintiffs are free to say whatever they want about state and local

6   housing policies. What they cannot do is openly defy state laws requiring the City

7   to adopt land use policies consistent with the State's housing needs and imposed on

8   them by the Legislature.

9      **C.   The City's Due Process Claims Are Without Merit**

10         **1.   The City Has No Procedural Due Process Right to**
               **Challenge the State's Housing Laws or RHNA Allocation**

11

12      Plaintiffs argue their procedural due process rights have been violated because

13   they were excluded from providing input into the various legislative and

14   administrative processes that resulted in its RHNA allocation, and because there is

15   no judicial review of HCD's RHNA determination.

16      Even if the City possessed "due process" rights as against the State, and it

17   does not, the City's procedural due process claims would fail on the merits. "A

18   procedural due process claim has two distinct elements: (1) a deprivation of a

19   constitutionally protected liberty or property interest, and (2) a denial of adequate

20   procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*,

21   149 F.3d 971, 982 (9th Cir. 1998). "The base requirement of the Due Process

22   Clause is that a person deprived of property be given an opportunity to be heard 'at

23   a meaningful time and in a meaningful manner.'" *Id.* at 984. "[D]ue process does

24   not always require an adversarial hearing . . . a full evidentiary hearing . . . or a

25   formal hearing[.]" *Buckingham v. Sec'y of U.S. Dep't of Agr.,* 603 F.3d 1073, 1082–

26   83 (9th Cir. 2010) (internal quotations and citations omitted). Rather, "[d]ue

27   process is flexible and calls for such procedural protections as the particular

28   situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal

quotation and citation omitted). An analysis of whether due process has been afforded looks to three factors:

> [(1)] the *private* interest that will be affected by the official action; [(2)] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [(3)] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*City of Los Angeles v. David,* 538 U.S. 715, 716 (2003) (emphasis added). Here, Plaintiffs argue that they do not have an opportunity to seek judicial review of their RHNA allocations. ECF No. 10 at 25–26. But there is no "private" interest at stake here, and constitutional due process does not always require judicial intervention. Indeed, as outlined above, Plaintiffs are afforded sufficient process to challenge their regional allocations under statute. *See* § 65584.05 (providing for an administrative appeal process for member cities and counties to challenge their housing allocations to their respective council of governments).

### 2. The City's Substantive Due Process Claim Has No Merit Because It Has No Fundamental Right to Control Land Use

The City's substantive due process claim closely tracks its procedural due process claim and also fails as a matter of law. The Due Process Clause of the Fourteenth Amendment includes a substantive component that protects individual liberties from state interference. *Mullins v. Oregon*, 57 F.3d 789, 793 (9th Cir. 1995). But the range of liberty interests that are protected is narrow, and has largely been confined to deeply personal matters such as marriage, procreation, contraception, family relationships, child rearing, education, and a person's bodily integrity. *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018). Plaintiffs do not and could not allege violation of any such rights. A municipality's control over local zoning is simply not a liberty interest protected by substantive due process.

At base, Plaintiffs' substantive due process claim (like all of its claims in this case) is rooted in their belief that, as a charter city, Huntington Beach enjoys unfettered "home rule" authority to control local zoning and permitting decisions. Plaintiffs are flatly incorrect. As California courts have *repeatedly* explained, the Legislature can permissibly limit a charter city's authority and preempt local law when it deems a subject area to be of "statewide concern," as the Legislature has often done for housing and which actions California courts have consistently upheld. *See, e.g. California Renters*, 68 Cal.App.5th at 846-851 (upholding the constitutionality of the HAA against a "home rule" challenge); *Ruegg & Ellsworth v. City of Berkeley*, 63 Cal.App.5th 277, 315 (2021) (upholding the constitutionality of section 65913.4, a streamline permit approval law for multifamily developments, against a "home rule" challenge); and *Buena Vista Gardens Apartments Assn. v. City of San Diego Planning Dept.*, 175 Cal.App.3d 289, 306-307 (1985) (upholding the constitutionality of the Housing Element Law against a "home rule" challenge.) Plaintiffs do not have a "right" to control local zoning under the California Constitution, much less a *fundamental* right to control local zoning that is protected by the United States Constitution. Simply put, Plaintiffs have no likelihood of success on their substantive due process claim.[2]

Even if Plaintiffs could raise a valid constitutional claim—and, as outlined above, they cannot—they do not allege any circumstances triggering a level of scrutiny beyond rational basis review, which the State's housing laws would easily meet. *Romero-Ochoa v. Holder*, 712 F.3d 1328, 1331 (9th Cir. 2013) (challenged law did "not implicate a fundamental right or target a suspect class, so it is subject to rational basis review"). Rational basis review "does not provide 'a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Id*. (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). The issue is not whether

---

[2] For the same reason, Plaintiffs' claim that the state's RHNA laws "unconstitutionally overreach[] into Charter City Home Authority" has no likelihood of success. Compl., ¶¶ 152-170.

the legislature has chosen the best means for achieving its purpose, but only whether there are plausible reasons for the legislature's action. *Id.* And in this case, the Legislature has repeatedly explained its rationale for passing the various housing laws, applying them to charter cities, and requiring cities to adequately zone for new housing via the RHNA process. See, *e.g.* §§ 65580 (Legislature's findings with respect to Housing Element Law); 65589.5(a) (Legislature's findings with respect to HAA). The state's housing laws easily pass muster under rational basis review.

### D. The City's CEQA Claim is Barred Under the Eleventh Amendment, and the Court Should Decline to Exercise Jurisdiction Over This Entire Case, Which Concerns Purely State Law Matters

The City contends that the State is somehow forcing it to violate CEQA. This claim, aside from demonstrating a deep misunderstanding of CEQA, is based on state law and thus is barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–102 (1984). There is a limited exception to state sovereign immunity under *Ex Parte Young*, 209 U.S. 123 (1908), such that state officials sued in their official capacities may be enjoined from violating federal law, but this exception does not apply to claims brought under state law. *Pennhurst*, 465 U.S. at 102–06; *see also Doe v. Regents of the Univ. of Cal.*, 891 F.3d 1147 (9th Cir. 2018). Thus, Plaintiffs' claim under CEQA is barred.

Indeed, at their core, *all* of Plaintiffs' claims ultimately sound in state law, which counsels strongly against exercising jurisdiction in this case. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), the exercise of jurisdiction in such cases is committed to the "sound discretion of the federal district courts." *Huth v. Hartford Ins. Co. of the Midwest*, 298 F.3d 800, 802 (9th Cir. 2002) (citations omitted). "Even if the district court has subject matter jurisdiction, it is not required to exercise its authority to hear the case." *Id*. The court "must also

1    be satisfied that entertaining the action is appropriate." *Gov't Employees Ins. Co. v.*

2    *Dizol*, 133 F.3d 1220, 1223 (9th Cir. 1998) (en banc).

3          In deciding whether to entertain a declaratory relief action, courts consider

4    how the action would affect the principles of judicial economy, comity, and

5    cooperative federalism that the Declaratory Judgment Act was designed to advance.

6    *Dizol*, 133 F. 3d at 1224. Three primary factors guide the court's exercise of its

7    discretion: a district court should (1) avoid duplicative litigation, (2) discourage

8    litigants from filing declaratory actions as a means of forum shopping, and

9    (3) avoid needless determination of state law issues. *Huth*, 298 F.3d at 803; *Dizol*,

10   133 F.3d at 1225.

11         These factors strongly weigh against exercising federal jurisdiction in this

12   case. This case is a transparent attempt to find a friendlier forum for the City's

13   baseless and repeatedly rejected "home rule" challenges to state housing laws.

14   Further, the City could just as well raise its arguments as defenses in an

15   enforcement action brought by HCD, in the event the City fails to comply with the

16   Housing Element Law and the HAA. It does not need *federal* declaratory relief in

17   advance of such an action, particularly given its specious bases for asserting federal

18   subject matter jurisdiction, and also because it could always bring itself into

19   compliance with the Housing Element Law by adopting and implementing a

20   compliant housing element. *See* § 65585(f), (i).

21         Accordingly, Plaintiffs' CEQA claim (and all of its state law claims) are

22   barred by the Eleventh Amendment. More broadly, because this case turns

23   ultimately on questions of state, not federal, law, and because any legitimate federal

24   questions that may arise can be litigated in state court at the appropriate time, this

25   Court should decline to exercise jurisdiction in this case.

26

27

28

**II.   THE CITY WILL NOT INCUR IRREPARABLE HARM WITHOUT A TRO, AND ANY HARM TO THE CITY IS ULTIMATELY OF ITS OWN MAKING**

**A.   There is No "Emergency" Warranting Expedited Preliminary Relief**

As an initial matter, there is no emergency warranting expedited preliminary relief. As demonstrated by their own allegations, Plaintiffs have known about their obligations under the State's housing laws, and the consequences for failing to meet those obligations, for *years*, and, in some cases, *decades*. California has required cities and counties to adequately plan to meet future housing needs since 1969. *See, e.g.,* Compl. ¶ 62. The amendments to the RHNA process that eliminated judicial review, which Plaintiffs now argue violate their due process rights, occurred almost 20 years ago, back in 2004. Compl. ¶ 16. The housing laws challenged in the Complaint were last amended in 2017 and 2018. Compl. ¶ 2. And Plaintiffs have known since at least 2021 that they must plan for the development of 13,368 units. Compl. ¶ 14.

The only imminent action is the City Council's upcoming March 21 meeting, at which Plaintiffs allege they will be "forced" to take certain actions, but this is an "emergency" of Plaintiffs' own making. Plaintiffs have control over their own meeting agenda. Moreover, Plaintiffs have been out of compliance with the relevant state housing laws, and therefore are subject to one of the remedies they seek to enjoin in this action, since at least October 15, 2021. *See* RJN Exs. 1, 2. As for other remedies, the City faces no imminent fines, penalties, or other punitive measures. To obtain those remedies, HCD would have to take legal action to enforce the Housing Element Law, which the City would have every right to defend, and HCD would have to prevail in that lawsuit. *See* § 65585(j). Statutory fines and penalties are imposed only after a local government does not comply with a court order or judgment within a 12-month period. § 65585(l)(1)(2). There is, therefore, simply no emergency facing the City.

1

2

**B.** **Plaintiffs Cannot Demonstrate Any Irreparable Harm Warranting Extraordinary Relief**

3

According to the City, updating its housing element would open the

4

"floodgates" to new housing. ECF No. 10 at 10. But that is wholly speculative, and

5

therefore insufficient to obtain a TRO. *See Winter*, 555 U.S. at 22.[3] The City has

6

not pointed to any projects or proposals in the pipeline, or provided any evidence of

7

significant developer interest in the City. The City, moreover, would still possess

8

some means to control new development under the HAA. The HAA allows local

9

governments "to establish and enforce policies and development standards

10

appropriate to local circumstances" as long as those policies are consistent with

11

meeting its RHNA obligations and are objective. *California Renters*, 68

12

Cal.App.5th at 850 (citing Cal. Gov't Code § 65589.5(f)(1), (j)). The HAA also

13

does not override the City's obligation to comply with CEQA, although it may limit

14

the scope of CEQA review. *See* § 65589.5(e); *Sequoyah Hills Homeowners Ass'n v.*

15

*City of Oakland*, 23 Cal.App.4th 704, 717 (1993). And the City can still enforce

16

public health and safety standards as a means of disapproving projects that comply

17

with its updated planning and zoning policies. *See* § 65589.5(d)(2), (j)(1)(A). In

18

short, none of these statutory provisions usurp the City's permitting authority; they

19

simply change the standards by which the City must review housing development

20

permit applications.

21

For example, subdivision (d)(5) of the HAA, colloquially known as the

22

"Builder's Remedy," prohibits cities from relying on outdated planning and zoning

23

rules to disapprove affordable housing projects. § 65589.5(d)(5). It does not revoke

24

permitting authority, however. Cities retain discretion to disapprove housing

25

development projects that would have a significant adverse impact on public health

26

or safety. § 65589.5(d)(2), (j)(1). The City could still rely on outdated planning and

27

---

[3] Indeed, the City has been subject to the "Builder's Remedy" since October

28

15, 2021, and the City has not identified any development activity resulting
therefrom in support of its application.

zoning rules to disapprove market-rate residential projects. *§* 65589.5(j)(1). And the City would still have to comply with CEQA in considering "Builder's Remedy" projects. § 65589.5(e).

The City's argument that its planning commission will be "unable to assess projects and make sure they are in accordance with health and safety standards" is thus false. ECF No. 10 at 18. The HAA expressly allows local agencies to rely on public health and safety standards to disapprove projects, notwithstanding their compliance with the Housing Element Law. See § 65589.5(d)(2), (j)(1)(A).

Finally, the risks associated with the enforcement of state housing laws, including the risks of fines, legal fees, and judicial remedies, are entirely of the City's own making. It need not pass an ordinance banning "Builder's Remedy" projects, which would directly conflict with the HAA and violate state planning and zoning laws. And it could have adopted its draft housing element after the State found that such a draft would substantially comply with Housing Element Law. *See* RJN, Ex. 1. Instead, the City delayed doing so, and now wants to avoid that obligation altogether. Thus, the March 21 "deadline" here is purely a creation of the City itself. There is nothing special about that day, other than the City's own anticipated action to change the status quo, and pass an ordinance banning "Builder's Remedy" projects in contravention of state law.

Under this Court's decision in *Mission Power*, ex parte relief is unavailable because the City bears fault for its own predicament. *See Mission Power v. Continental Cas. Co.*, 883 F.Supp. at 492-93. As the City has not shown irreparable harm, or that it lacks fault, the balance of equities favors denying the TRO.

### III.  THE PUBLIC INTEREST WEIGHS AGAINST A TRO

The Supreme Court has made clear that preliminary injunctive relief "is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Courts must give due consideration to an injunction's adverse impact on the public

interest. *Id*. Injunctive relief "is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Id*. at 32.

As explained above, the alleged harms to the City either do not exist or are of the City's own making. The adverse consequences of granting the TRO, however—which the City gives *no consideration whatsoever*—are severe. California needs more housing opportunities, especially opportunities that are affordable to lower-income and working class families. *See* § 65589.5(a)(1)-(2), (b), (g). A "shortage of housing" in California "has led to escalating costs that for many have rendered adequate shelter unaffordable." *California Renters*, 68 Cal.App.5th at 848. A TRO would relieve the City of its obligation to accommodate its fair share of the regional housing need and signal to other like-minded cities that they, too, can avoid California's housing laws. In doing so, it would let stand outdated policies that would have presumptive adverse effects on the supply of housing units throughout Southern California. *See* Cal. Evid. Code § 669.5(a).

A TRO, simply put, would not serve the public interest, nor would it be necessary to enable the City to protect the health and safety of its residents. *See* § 65589.5(d)(2), (j)(1)(A).

## CONCLUSION

The State respectfully requests this Court deny the application for the TRO.

Dated: March 20, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DAVID PAI
Supervising Deputy Attorney General

*/s/* Matthew T. Struhar

MATTHEW T. STRUHAR
THOMAS P. KINZINGER
Deputy Attorneys General
*Attorneys for Defendant Department of Housing and Community Development*

SA2023301426

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants Gavin Newsom, Gustavo Velasquez, and the California Department of Housing and Community Development, certifies that this brief contains 6,431 words, which complies with the word limit of L.R. 11-6.1.

Dated: March 20, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California

/s/ Matthew T. Struhar

MATTHEW T. STRUHAR
Deputy Attorneys General
*Attorneys for Defendants, Gavin Newsom, in his official capacity as Governor of the State of California, and individually; Gustavo Velasquez, in his official capacity as Director of the State of California Department of Housing and Community Development, and individually; and the California Department of Housing and Community Development*

# CERTIFICATE OF SERVICE

Case Name: **City of Huntington Beach, et al.**        No.    **8:23-cv-00421**
**v. Gavin Newsom, et al.**

I hereby certify that on <u>March 20, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO FED. R .CIV. P. 65**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>March 20, 2023</u>, at Sacramento, California.

| Leticia Aguirre | /s/ Leticia Aguirre |
|:---:|:---:|
| Declarant | Signature |

SA2023301426
37019733.docx