1   ROB BONTA
    Attorney General of California
2   DANIEL A. OLIVAS
    Senior Assistant Attorney General
3   DAVID PAI, Bar No. 227058
    Supervising Deputy Attorney General
4   MATTHEW STRUHAR, Bar No. 293973
    THOMAS KINZINGER, Bar No. 323889
5   Deputy Attorneys General
      1300 I Street, 15th Floor
6     Sacramento, CA 95814
      Telephone: (916) 210-7246
7     Fax: (916) 731-2121
      E-mail:   Matthew.Struhar@doj.ca.gov
8               Thomas.Kinzinger@doj.ca.gov

9   *Attorneys for Defendants Gavin Newsom, in his*
    *official capacity as Governor of the State of*
10  *California, and individually; Gustavo Velasquez, in*
    *his official capacity as Director of the State of*
11  *California Department of Housing and Community*
    *Development, and individually; and the California*
12  *Department of Housing and Community*
    *Development*

13

14              IN THE UNITED STATES DISTRICT COURT

15            FOR THE CENTRAL DISTRICT OF CALIFORNIA

16                      SOUTHERN DIVISION

17

18  **CITY OF HUNTINGTON BEACH, a**        8:23-cv-00421-FWS-ADS
19  **California Charter City, and**
    **Municipal Corporation, the**        **REQUEST FOR JUDICIAL**
20  **HUNTINGTON BEACH CITY**              **NOTICE IN OPPOSITION TO**
                                           **PLAINTIFFS' APPLICATION FOR**
    **COUNCIL, MAYOR OF**                  **A TEMPORARY RESTRAINING**
21  **HUNTINGTON BEACH, TONY**             **ORDER AND/OR ORDER TO**
    **STRICKLAND, and MAYOR PRO**          **SHOW CAUSE RE**
22                                         **PRELIMINARY INJUNCTION**
    **TEM OF HUNTINGTON BEACH,**           **PURSUANT TO FED. R .CIV. P. 65**
23  **GRACEY VAN DER MARK,**
                                           **Fed. R. Evid. 201**
24
                                           Date:
25              **v.**                     Time:
                                           Courtroom:   10D
26  **GAVIN NEWSOM, in his official**      Judge:       The Honorable Fred W.
    **capacity as Governor of the State of**              Slaughter
27  **California, and individually;**
    **GUSTAVO VELASQUEZ in his**           Trial Date:  None Set
28                                         Action Filed: 3/09/2023

1
2
3
4
5
6
7
8

**official capacity as Director of the State of California Department of Housing and Community Development, and individually; STATE LEGISLATURE; STATE OF CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT; SOUTHERN CALIFORNIA ASSOCIATION OF GOVERNMENTS; and DOES 1-50, inclusive,**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**REQUEST FOR JUDICIAL NOTICE**

Plaintiffs Governor Gavin Newsom, Director Gustavo Velasquez, and the California Department of Housing and Community Development (HCD) respectfully request that the Court take judicial notice of the following facts:

1. The City of Huntington Beach (the City) had, according to HCD, an October 15, 2021, deadline to adopt a housing element update that substantially complied with Article 10.6 of the Government Code (the Housing Element Law). *See* September 30, 2022 Letter from HCD to Ursula Luna-Reynosa, Director of the City's Community Development Department, attached hereto as **Exhibit 1**; HCD Housing Element Update Schedule for Regional Housing Need Assessment (RHNA), attached hereto as **Exhibit 2**, at page 4.

2. The City adopted a policy banning SB 9 projects and accessory dwelling units in accordance with State law. *See* February 21, 2023 Memorandum from Pat Burns, City Councilmember of the City, attached hereto as **Exhibit 3**; *see also* Jill Replogle, "Huntington Beach City Council Votes to Fight State Housing Laws; Stop Permitting ADUs," *LAist*, available at Huntington Beach City Council Votes To Fight State Housing Laws; Stop Permitting ADUs | LAist. This prompted a lawsuit from the Attorney General and HCD. *See* California Sues Huntington Beach for Violating State Housing Laws | California Governor.

3. HCD sued the City in 2019 for violating its housing element. *See* Petition for Writ of Mandate and Complaint for Declaratory Relief, *California Department of Housing and Community Development v. City of Huntington Beach, et al.*, (Orange County Superior Court, Case No. 30-2019-01046493), attached hereto as **Exhibit 4**.

4. In another state court action initiated by the City to challenge certain state laws, judgment was entered against the City. *See* Judgment, *City of*

1    *Huntington Beach v. Newsom, et al.* (Los Angeles County Superior

2    Court, Case No. 30-2019-01044945), attached hereto as **Exhibit 5**.

3

4    Dated: March 20, 2023                    Respectfully submitted,

5                                             ROB BONTA
                                             Attorney General of California
6                                             DAVID PAI
                                             Supervising Deputy Attorney General

7                                             */s/ Matthew T. Struhar*

8

9                                             MATTHEW T. STRUHAR
                                             THOMAS KINZINGER
10                                            Deputy Attorney General
                                             *Attorneys for Defendant Department*
11                                            *of Housing and Community*
                                             *Development*

12   SA2023301426

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

STATE OF CALIFORNIA - BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY                    GAVIN NEWSOM, *Governor*

**DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT**
**DIVISION OF HOUSING POLICY DEVELOPMENT**
2020 W. El Camino Avenue, Suite 500
Sacramento, CA 95833
(916) 263-2911 / FAX (916) 263-7453
www.hcd.ca.gov



September 30, 2022

Ursula Luna-Reynosa, Director
Community Development Department
City of Huntington Beach
2000 Main Street
Huntington Beach, CA 92648

Dear Ursula Luna-Reynosa:

**RE: Huntington Beach's 6th Cycle (2021-2029) Revised Draft Housing Element**

Thank you for submitting the City of Huntington Beach's (City) revised draft housing element update received for review on August 1, 2022, along with revisions received on September 23, 2022. Pursuant to Government Code section 65585, subdivision (b), the California Department of Housing and Community Development (HCD) is reporting the results of its review. Conversations on September 7 and 22, 2022 with you and the housing element team facilitated the review.

The revised draft element, incorporating the additional revisions, meets the statutory requirements described in HCD's June 9, 2022 review. The housing element will comply with State Housing Element Law (Article 10.6 of the Gov. Code) when it is adopted, submitted to and approved by HCD, in accordance with Government Code section 65585.

For your information, pursuant to Senate Bill 197 (Chapter 70, Statutes of 2022), as the City did not adopt a compliant housing element within 120 days of the statutory deadline (October 15, 2021). As a result, the City's adopted element must be found in compliance by October 15, 2022 or HCD cannot find the element in compliance until programs to rezone (Program 2A (Adequate Sites) and Program 2B (Establish Affordable Housing Overlay Zone) are complete.

As a reminder, if the housing element relies upon nonvacant sites to accommodate more than 50 percent of the regional housing needs allocation (RHNA) for lower-income households, the housing element must demonstrate that existing uses are not an impediment to additional residential development in the planning period. This can be demonstrated by providing substantial evidence that the existing use is likely to be discontinued during the planning period. (Gov. Code, § 65583.2, subd. (g)(2).) Absent findings in an adoption resolution based on substantial evidence, the existing uses will be presumed to impede additional residential development and will not be utilized

Ursula Luna-Reynosa, Director
Page 2

toward demonstrating adequate sites to accommodate the regional housing need allocation (RHNA).

In addition, pursuant to Government Code section 65583.3, the City must submit an electronic sites inventory with its adopted housing element. The City must utilize standards, forms, and definitions adopted by HCD. Please see HCD's housing element webpage at https://www.hcd.ca.gov/community-development/housing-element/index.shtml#element for a copy of the form and instructions.

HCD understands the City made revisions available on September 23, 2022 for seven days prior to submitting to HCD. While this meets the requirement per AB 215 (Chapter 342, Statutes of 2021), public participation in the development, adoption and implementation of the housing element is essential to effective housing planning. Throughout the housing element process, the City must continue to engage the community, including organizations that represent lower-income and special needs households, by making information regularly available while considering and incorporating comments where appropriate. Please be aware, any revisions to the element must be posted on the local government's website and to email a link to all individuals and organizations that have previously requested notices relating to the local government's housing element at least seven days before submitting to HCD.

Several federal, state, and regional funding programs consider housing element compliance as an eligibility or ranking criteria. With a compliant housing element, the City meets housing element requirements for these and other funding sources.

HCD appreciates the hard work, responsiveness, and dedication the housing element team provided in preparation of the City's housing element and looks forward to receiving the City's adopted housing element. If you have any questions or need additional technical assistance, please contact Jose Ayala, of our staff, at Jose.Ayala@hcd.ca.gov.

Sincerely,

Paul McDougall
Senior Program Manager

# EXHIBIT 2

## California Department of Housing and Community Development
## Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Project Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual [Note:1, 2] | Housing Element Planning Period |
|---|---|---|---|---|
| **Calaveras County (HCD acts as COG):** Calaveras County (1) and all cities [1] | 2 | December 31, 2018 – June 15, 2027 | June 15, 2019* *Actual* | June 15, 2019 – June 15, 2027 (8 years): [Note 4] |
| **Nevada County (HCD acts as COG):** Nevada County (1) and all cities [3] | 4 | | | |
| **Mono County (HCD acts as COG):** Mono County (1) and all cities [1] | 2 | December 31, 2018 – August 15, 2027 | August 15, 2019* *Actual* | August 31, 2019 – August 31, 2027 (8 years): [Note 4] |
| **Mendocino Council of Governments (MCOG):** Mendocino County (1) and all cities [4] | 5 | | | |
| **Lake County City Area-wide Planning Council:** Lake Country (1) and all cities [2] | 3 | | | |

## California Department of Housing and Community Development
## Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual Note:1, 2 | Housing Element Planning Period |
|---|---|---|---|---|
| **Humboldt County Association of Governments (HCAOG):** Humboldt County (1) and all cities [7] | 8 | December 31, 2018 – August 31, 2027 | **August 31, 2019*** *Actual* | August 31, 2019 – August 31, 2027 |
| **Other Regions (non-COG) (HCD acts as COG):** Counties (total 9). Cities [total 8]]. Alpine [0], Lassen [1], Mariposa [0], Modoc [1], Plumas [1], Sierra [1], Tehama [3], Trinity [0], and Tuolumne [1] | 17 | December 31, 2018 – August 31, 2024 | **August 31, 2019** *Actual* | August 31, 2019 – June 30, 2024 |
| **Shasta County (HCD acts as COG):** Shasta County (1) and all cities [3] | 4 | December 31, 2018 – April 15, 2028 | **April 15, 2020*** *Actual* | April 15, 2020 – April 15, 2028 |
| **Colusa County (HCD acts as COG):** Colusa County (1) and all cities [2] | 3 | December 31, 2018 – December 31, 2028 | **December 31, 2020*** Actual | December 31, 2020 – December 31, 2028 |

## California Department of Housing and Community Development
## Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

| The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period |
| :---: |

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual Note:1, 2 | Housing Element Planning Period |
| :---: | :---: | :---: | :---: | :---: |
| **San Luis Obispo Council of Governments (SLOCOG):** San Luis Obispo County (1) and all cities [7] | 8 | December 31, 2018 – December 31, 2028 | **December 31, 2020\*** *Actual* | December 31, 2020 – December 31, 2028 |
| **San Diego Association of Governments (SANDAG):** San Diego County (1) and all cities [18] | 19 | June 30, 2020 – April 15, 2029 | **April 15, 2021\*** *Actual* | April 15, 2021 – April 15, 2029 |
| **Inyo County (HCD acts as COG):** Inyo County (1) and all cities (1) | 2 | December 31, 2018 – April 30, 2029 | **April 30, 2021\*** *Actual* | April 30, 2021 – April 30, 2029 |
| **Sacramento Area Council of Governments (SACOG):** Counties (6) and cities [23] within each county: El Dorado [2], Placer [6], Sacramento [7], Sutter [2], Yolo [4], and Yuba [2] | 28 | June 30, 2021 – August 31, 2029 | **May 15, 2021** *Actual* | May 15, 2021 – May 15, 2029 |

## California Department of Housing and Community Development
## Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual Note:1, 2 | Housing Element Planning Period |
|---|---|---|---|---|
| **Tahoe Regional Planning Agency (HCD acts as COG)** <br><br> City of South Lake Tahoe [1] | 1 | December 31, 2021 – June 30, 2027 | **June 30, 2022** <br> *Actual* | June 30, 2022 – June 30, 2027 |
| **Amador County (HCD acts as COG):** <br><br> Amador County (1) and all cities [5] | 6 | December 31, 2018 – September 15, 2029 | **September 15, 2021\*** <br> *Actual* | September 15, 2021 – September 15, 2029 |
| **Southern California Association of Governments (SCAG):** <br><br> Counties (6) and cities [191] within each county: Imperial [7], Los Angeles [88], Orange [34], Riverside [28], San Bernardino [24], and Ventura [10] | 197 | June 30, 2021 – October 15, 2029 | **October 15, 2021\*** <br> *Actual* | October 15, 2021 – October 15, 2029 |
| **Glenn County (HCD acts as COG):** <br><br> Glenn County (1) and all cities [2] | 3 | December 31, 2018 – November 30, 2029 | **November 30, 2021\*** <br> *Actual* | November 30, 2021 – November 30, 2029 |

**California Department of Housing and Community Development**
**Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)**

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual [Note:1, 2] | Housing Element Planning Period |
|---|---|---|---|---|
| **Butte County Association of Governments (BCAG):** Butte County (1) and all cities [5] | 6 | December 31, 2021 – June 15, 2030 | **June 15, 2022*** *Estimate* | June 15, 2022 – June, 2030 |
| **Del Norte County (HCD acts as COG):** Del Norte County (1) and all cities [1] | 2 | December 31, 2018 – September 15, 2030 | **September 15, 2022*** **Actual** | September 15, 2022 – September 15, 2030 |
| **Siskiyou (HCD acts as COG):** Siskiyou County (1) and all cities [9] | 10 | December 31, 2018 – November 15, 2030 | **November 15, 2022*** *Estimate* | November 15, 2022 – November 15, 2030 |
| **Association of Bay Area Governments (ABAG):** Counties (9) and all cities [100] within each county: Alameda [14], Contra Costa [19], Marin [11], Napa [5], San Francisco [0], San Mateo [20], Santa Clara [15], Solano [7], and Sonoma [9] | 109 | June 30, 2022 – December 15, 2030 | **January 31, 2023*** *Estimate* | January 31, 2023 – January 31, 2031 |

## California Department of Housing and Community Development
## Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual [Note:1, 2] | Housing Element Planning Period |
|---|---|---|---|---|
| **Santa Barbara County Assn of Governments (SBCAG):** Santa Barbara County (1) and all cities [8] | 9 | June 30, 2022 – February 15, 2031 | **February 15, 2023\*** *Estimate* | February 15, 2023 – February 15, 2031 |
| **Association of Monterey Bay Area Governments (AMBAG):** The counties (2) and all cities [16] within each county: Monterey County [12] and Santa Cruz County [4] | 18 | June 30, 2023 – December 31, 2031 | **December 31, 2023\*** *Estimate* | December 31, 2023 – December 31, 2031 |
| **San Benito County Council of Governments (San Benito COG):** San Benito County [1] and all cities [2] | 3 | | | |

**California Department of Housing and Community Development**
**Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)**

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual [Note:1, 2] | Housing Element Planning Period |
|---|---|---|---|---|
| **San Joaquin County Council of Governments (SJCOG):** San Joaquin County (1) and all cities [7] | 8 | | | |
| **Stanislaus County Council of Governments (Stan COG):** Stanislaus County (1) and all cities [9] | 10 | June 30, 2023 – December 31, 2031 | **December 31, 2023*** *Estimate* | December 31, 2023 – December 31, 2031 |
| **Tulare County Association of Governments (TCAG):** Tulare County (1) and all cities [8] | 9 | | | |
| **Fresno Council of Governments (FCOG):** Fresno County (1) and all cities [15] | 16 | | | |

**California Department of Housing and Community Development**
**Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)**

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual Note:1, 2 | Housing Element Planning Period |
|---|---|---|---|---|
| **Kern Council of Governments (KCOG):** Kern County (1) and all cities [11] | 12 | | | |
| **Kings County Association of Governments (KCAG):** Kings County (1) and all cities [4] | 5 | June 30, 2023 – December 31, 2031 | **December 31, 2023\*** *Estimate* | December 31, 2023 – December 31, 2031 |
| **Kern Council of Governments (KCOG):** Kern County (1) and all cities [11] | 12 | | | |
| **Kings County Association of Governments (KCAG):** Kings County (1) and all cities [4] | 5 | | | |

### California Department of Housing and Community Development
### Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual [Note:1, 2] | Housing Element Planning Period |
|---|---|---|---|---|
| **Madera County Transportation Commission (MCTC)** *(HCD acts as COG):* Madera County (1) and all cities [2] | 3 | June 30, 2023 – January 31, 2032 | **January 31, 2024\*** *Estimate* | January 31, 2024 – January 31, 2032 |
| **Merced County Association of Governments (MCAG):** Merced County (1) and all cities [6] | 7 | | | |

### California Department of Housing and Community Development
### Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

> The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

**<u>NOTES:</u>**

1. Until actual RTP adoption date is known, housing element due date is marked "*Estimated*."

   a. **"*Estimated*"** date is based on required MPO/RTPA 12-month notice to HCD and any subsequent required notices from changes to the <u>estimated</u> RTP adoption date.

   b. **"*Actual*"** date is based on official RTP adoption date.  <u>An adoption date past the estimated date used by HCD to determine the RHNA period will change the actual housing element due date and period past the RHNA period (GC 65588(e)(5)).</u>

2. HCD rounds <u>up</u> the housing element due date falling in a month to the 15th or last day of the month.

3. To <u>change from a 5-year to a 8-year housing element period</u>, an <u>MPO/RTPA must elect to adopt the RTP on a 4-year schedule</u>.  After making an election, <u>all local governments within a county in the region change the next housing element period to 8-years.</u> For the next 7th housing element cycle (starting after June 30, 2024), the <u>election must have been made by</u> **<u>January 1, 2020</u>** (54 months before the next housing element due date) and the next RTP adopted within three (3) years of the election date.  For HCD to determine RHNA and housing element periods, <u>GC 65588(e)(5) requires MPOs and RTPAs on a 4-year RTP update schedule to notify HCD in writing of the estimated RTP adoption date at least 12 months prior to the estimated adoption date</u>.

4. Elected to change from 5-year to 8-year housing element planning period.

*\* Consequence of late element adoption:  SB 375 (2008, Chapter 728). GC 65588(e)(4).  Jurisdictions on an 8-year planning period that do not adopt their element within 120 calendar days from the start date of the planning period must revise and adopt the housing element every four years until timely adopting at least two consecutive revisions by the applicable due date.*

EXHIBIT 3



**CITY OF HUNTINGTON BEACH**
**CITY COUNCIL MEETING – COUNCIL MEMBER ITEMS REPORT**

TO:            HONORABLE MAYOR AND CITY COUNCIL

FROM:       PAT BURNS, CITY COUNCIL MEMBER

DATE:        FEBRUARY 21, 2023

**SUBJECT:    SB 9 AND SB 10 IMPACTS TO HUNTINGTON BEACH**

---

The State's housing laws in recent years have become incredibly onerous and burdensome to cities, including fully developed cities like Huntington Beach.  In 2021, the State passed SB 9 and SB 10 and State laws expand the ability for development of ADU's that circumvent local zoning controls, all of which produce a proliferation of development and multi-unit housing in already well-established single-family neighborhoods.  The City has a duty to protect the quality and lifestyle of the neighborhoods that current owners have already bought into and for the future sustainability of Huntington Beach, the City has a duty to ensure the principles of Euclidean Zoning, like project/development compatibility, etc., are honored and respected.

SB 9 and SB 10 and the State laws expanding ADU's are designed to undermine local City zoning authority (including in Charter Cities like Huntington Beach) by overriding local single family neighborhood zoning and incentivizing property owners to redevelop their single family residences into mutli-plex apartment-like developments (including for affordable housing).  Radical redevelopment in already-established residential neighborhoods is not only a threat to quality and lifestyle, but to the value of the adjacent and neighboring properties.  The City should not be put in a position by the State through SB 9 and SB 10 or those State laws expanding ADU's that would allow the diminution of an owner's property value without just compensation, and Huntington Beach should not have its Charter City zoning rights provided for by the California Constitution trampled by the State.

**RECOMMENDED ACTION**

Direct the City Attorney to take any legal action necessary to challenge SB 9 and SB 10 and the laws that permit ADU's. Also, direct the City Manager to cease the processing of all applications/permits brought to the City by developers under SB 9, SB 10, or State law related ADU projects, until the courts have adjudicated the matter(s).

# EXHIBIT 4

1   XAVIER BECERRA
    Attorney General of California
2   DANIEL A. OLIVAS
    Senior Assistant Attorney General
3   JAMEE JORDAN PATTERSON
    Supervising Deputy Attorney General
4   KIMBERLY R. GOSLING (SB NO. 247803)
    JEREMY BROWN (SB NO. 269159)
5   Deputy Attorneys General
      600 West Broadway, Suite 1800
6     San Diego, CA 92101
      Telephone:  (619) 738-9519
7     Fax:  (619) 645-2271
      E-mail:  Kimberly.Gosling@doj.ca.gov
8   *Attorneys for Petitioner and Plaintiff*
    *Department of Housing & Community Development*

*NO FEE PURSUANT TO*
*GOVERNMENT CODE § 6103*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**01/25/2019** at 10:24:20 AM
Clerk of the Superior Court
By Mary M Johnson,Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

CENTRAL JUSTICE CENTER

| | |
|---|---|
| **California Department of Housing and Community Development,**<br><br>Petitioner and Plaintiff,<br><br>v.<br><br>**City of Huntington Beach; City Council of Huntington Beach; and Does 1-50,**<br><br>Respondents and Defendants. | Case No.  30-2019-01046493-CU-JR-CJC<br><br>Judge Sheila Fell<br><br>**PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF** |

## INTRODUCTION

1.    California's housing crisis has reached historic proportions.  As the Legislature has found, "[t]he lack of housing . . . is a critical problem that threatens the economic, environmental, and social quality of life in California," and the housing that *does* exist is the most expensive in the country.  (Gov. Code, § 65589.5, subd. (a)(1)(A), (B).)  This crisis is "hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic

1

1   opportunities for workers and businesses, worsening poverty and homelessness, and undermining
2   the state's environmental and climate objectives."  (*Id.*, subd. (a)(2)(A).)

3   2.   The failure of local governments to plan for the necessary housing supply has been a
4   key factor contributing to this crisis.  To overcome this failure, the Legislature for years has
5   required local governments to include housing elements in their general plans.  These housing
6   elements must, among other things, ensure that adequate housing is available to meet each
7   region's housing needs for Californians of all income levels, including low and very low incomes.
8   Not all local governments have complied with this requirement.  Respondent/Defendant the City
9   of Huntington Beach is one such city.

10   3.   Petitioner/Plaintiff Department of Housing and Community Development (HCD)
11   brings this action against the City of Huntington Beach and the City Council of Huntington Beach
12   (collectively, the "City") to remedy this violation.  It requests that the Court issue a writ ordering
13   the City to bring its housing element into compliance with State law, and issue a declaration that
14   the City has abrogated its planning obligations.

15   **PARTIES**

16   4.   HCD is a public agency of the State of California.  (Gov. Code, § 12804.)  Among
17   other things, HCD is responsible for developing housing policy and building codes, for regulating
18   manufactured homes and mobile home parks, and for enforcing state housing laws—including
19   laws regarding housing elements—in a manner that meaningfully and positively impacts the
20   provision of housing in all communities across the State.

21   5.   The City of Huntington Beach is a municipal corporation formed and existing under
22   the laws of the State of California, of which it is a political subdivision.

23   6.   The City Council of Huntington Beach is the elected governing body of the City of
24   Huntington Beach.  It is the legislative body charged under Government Code section 65300 with
25   responsibility for adopting a general plan, including a housing element, for the physical
26   development of the City of Huntington Beach.

27   7.   HCD is unaware of the true names and capacities of respondents and defendants
28   DOES 1 through 50 (the "Doe Respondents"), who are therefore sued by fictitious names

2

1   pursuant to Code of Civil Procedure section 474.  HCD alleges on information and belief that

2   each such fictitiously named Doe Respondent is responsible or liable in some manner for the

3   events and happenings referred to herein, and HCD will seek leave to amend this Petition and

4   Complaint to allege their true names and capacities after the same have been ascertained.

5                              **VENUE AND JURISDICTION**

6       8.   This Court has jurisdiction over this action pursuant to Code of Civil Procedure

7   sections 187, 1060, and 1085.

8       9.   Venue is proper in this Court because the City is located in Orange County and the

9   violations of law alleged herein occurred in Orange County.

10                    **BACKGROUND AND FACTUAL ALLEGATIONS**

11                       **Housing Elements and the Planning Process**

12      10.  The Legislature has declared that "[t]he availability of housing is of vital statewide

13  importance, and the early attainment of decent housing and a suitable living environment for

14  every Californian . . . is a priority of the highest order."  (Gov. Code, § 65580, subd. (a).)

15  California law requires that all local governments adequately plan to meet the housing needs of

16  everyone in the community, at all economic levels.

17      11.  To meet this requirement, every city and county must adopt and periodically update a

18  housing element as part of its general plan.  (See Gov. Code, §§ 65302, subd. (c), 65580, *et seq.*)

19  The law mandating this adoption and periodic update is known as "Housing Element Law."  (*Id.*,

20  § 65580, *et seq*.)  California's Housing Element Law acknowledges that, for the private market to

21  adequately address the housing needs and demand of Californians, local governments must adopt

22  plans and regulatory systems that provide opportunities for, and do not unduly constrain, housing

23  development, especially for a locality's lower-income households and workforce.  As a result,

24  housing policy in California rests largely on the effective implementation of the housing element

25  contained in the local general plan.

26      12.  The housing element is a roadmap for housing development in a given community.

27  The housing element must identify and analyze existing and projected housing needs, and must

28  include "a statement of goals, policies, quantified objectives, financial resources, and scheduled

3

programs for the preservation, improvement, and development of housing." (Gov. Code, § 65583.)  The housing element must also "identify adequate sites for housing" and "make adequate provision for the existing and projected needs of all economic segments of the community." (*Ibid.*)  Each housing element is also subject to review by HCD, as discussed below.

13.  A local jurisdiction's housing element must be updated periodically to ensure compliance with California's Housing Element Law.  (Gov. Code, § 65588.)  Jurisdictions can opt to update their housing elements every five years or every eight years.  (See *id.*, subd. (e)(3).)  Each five- or eight-year cycle is known as a "planning period."  (See *id.*, subd. (f)(1).)

14.  The process of updating a housing element begins with HCD's determination of a Regional Housing Need Allocation (RHNA) for the region for a given planning period.  (Gov. Code, § 65584, subd. (a)(1).)  The RHNA is segmented by income levels.  To arrive at the RHNA, HCD starts with demographic population information from the California Department of Finance and uses a formula to calculate a figure for each region's planning body, known as a "council of governments" (COG).  Each COG also uses its own demographic figures to calculate the regional housing need.  Each COG coordinates with HCD to arrive at a final figure, taking into account factors not captured in the calculations.  This final figure is the RHNA.  (See *id.*, § 65584.01.)

15.  Once the RHNA is set, the COG is responsible for allocating the housing need among all of the cities and counties within that region.  (Gov. Code, § 65584, subd. (b).)  Each local government must then prepare a housing element that, among other things, identifies adequate sites to accommodate that jurisdiction's fair share of the RHNA at each income level.  (*Id.*, §§ 65583, 65583.2.)  Sites must be suitable for residential development and must be made available during the planning period.  (*Id.*, § 65583.2, subd. (a).)  If a sufficient quantity of adequate sites is not currently available, the housing element must commit to identifying and rezoning additional sites within three years from the date of adoption.  (*Id.*, §§ 65583, subd. (c)(1), 65583.2, subd. (h).)  The housing element must also accommodate any unmet portion of the RHNA from the prior planning period.  (*Id.*, § 65584.09, subd. (a).)

4

16.   Each housing element must also evaluate governmental constraints on the development of housing for all income levels, and must show local efforts to remove governmental constraints that impede the local government's ability to meet its share of the RHNA.  (Gov. Code, § 65583, subd. (a)(5).)

17.   Each local government must submit a draft housing element to HCD before adoption. (Gov. Code, § 65585, subd. (b)(1).)  HCD must review the draft element and issue findings as to whether the draft substantially complies with Housing Element Law.  (*Id.*, subds. (b)(3), (d).) After adopting the final housing element, the local government must again submit the element to HCD, and HCD must again review and report its findings to the local government.  (*Id.*, subds. (g), (h).)

18.   Under Chapter 370, Statutes of 2017 ("AB 72"), codified at Government Code section 65585, subdivisions (i) and (j), HCD has authority to review any action or failure to act by a local government that it determines is inconsistent with an adopted housing element or section 65583 of California's Housing Element Law.  This includes failure to implement program actions included in the housing element.  HCD may revoke housing element compliance if the local government's actions do not comply with state law.

19.   AB 72 also authorizes HCD to notify the Office of the Attorney General of California that the local jurisdiction is in violation of state law for noncompliance with, among other things, California's Housing Element Law.

20.   Pursuant to Government Code section 65585, subdivision (i)(1)(A), HCD may take any of the actions authorized by AB 72 after issuing written findings to the local government "as to whether the action or failure to act substantially complies with [California's Housing Element Law]," and providing a reasonable time, no longer than 30 days, for the local government to respond.  (Gov. Code, § 65585, subd. (i)(1)(A).)  HCD has satisfied this requirement here, and has issued letters to the City dated June 23, 2015, and November 14, 2018, both of which noted the City's failure to comply with Housing Element Law.  The City's response to the November 14, 2018 letter is discussed below.

5

**The Huntington Beach Housing Element and**

**The Beach and Edinger Corridors Specific Plan**

21.  The City's current planning period runs from 2013 to 2021.  In 2013, the City submitted a draft housing element for this planning period to HCD for review.  HCD found that the draft met the statutory requirements of California's Housing Element Law.

22.  The City adopted the housing element on September 16, 2013 (the "2013 Housing Element"), and HCD then reviewed it.  On November 12, 2013, HCD found that the adopted 2013 Housing Element was in substantial compliance with California's Housing Element Law.

23.  The compliance finding was based on the identification of sufficient housing development capacity to meet the City's RHNA, and effective programs to facilitate development of housing affordable to lower-income households.  Notably, the housing element's inventory of sites and programs relied heavily on capacity within the Beach and Edinger Corridors Specific Plan (BECSP).  In fact, the housing allocation necessary to meet the needs of the City's lower-income households and workforce was entirely accounted for on sites within the BECSP.

24.  On May 4, 2015, however, the City adopted amendments to the BECSP that changed the maximum number of allowable units in the BECSP to an amount less than the City's remaining RHNA.  The adoption of these amendments fundamentally altered the inventory of available sites, constituting a *de facto* change to the 2013 Housing Element's available sites calculation.  The BECSP amendments changed development standards, reducing unit density by requiring additional parking and restricting development flexibility by requiring a conditional use permit.  These actions posed constraints to the development of housing, particularly on sites identified in the land inventory to meet the City's remaining lower-income housing need.

25.  On June 23, 2015, HCD sent the City a letter notifying the City that the amendments to the BECSP changed the premises upon which HCD's prior certification of the 2013 Housing Element was based, thereby nullifying that prior certification.

26.  HCD also explained in its June 23, 2015 letter that a housing element must be amended when a local government decision changes substantive provisions of the housing element upon which HCD relied in determining substantial compliance.  Housing element drafts

6

1   and amendments must be submitted to HCD for review and commentary before formal adoption.

2   HCD therefore advised the City to immediately submit an amended housing element to HCD to

3   review for compliance with California's Housing Element Law.

4       27.  Shortly after HCD's June 23, 2015 letter, the City began working in consultation with

5   HCD to prepare an amended and legally compliant housing element.

6       28.  On July 31, 2015, while the City was working with HCD to amend the 2013 Housing

7   Element, the City was sued by affordable housing advocates and two individual plaintiffs who

8   argued that the BECSP Amendment was invalid due to its inconsistency with the 2013 Housing

9   Element.  (See *The Kennedy Commission v. City of Huntington Beach*, Case No. 30-2015-

10  00801675, currently pending in the Superior Court of the State of California, County of Los

11  Angeles (hereinafter, "*Kennedy*").)  In its defense against the lawsuit, the City vigorously argued

12  that it was "actively working to amend its housing element to meet its RHNA goals." (*Id.*, City's

13  Opposition to Petition for Writ of Mandate, filed Oct. 29, 2015, at p. 1.)  The City affirmatively

14  represented to the Court that it had held hearings, consulted with HCD and others, and submitted

15  a draft amendment to HCD.  (*Ibid.*)  The City also told the Court that, as a result of this

16  interactive process, the lawsuit was unnecessary and would soon be moot.  (*Ibid.*)  According to

17  the City, "[t]he Court may simply observe that the City is moving quickly to fulfill its statutory

18  obligations and withhold writ relief pending the City's adoption of a new housing element." (*Id.*,

19  at p. 12.)[1]

20  //

21  //

22

23      [1] On January 20, 2016, the Superior Court in *Kennedy* issued a writ of mandate
    commanding the City to cease enforcing, administering, or implementing the BECSP amendment.
24  The Court stated that Government Code section 65454 required the BECSP to be consistent with
    the City's general plan.  The City immediately appealed.
        On May 26, 2016, the Court of Appeal issued an order staying the writ of mandate.  On
25  October 31, 2017, the Court of Appeal reversed the Superior Court and remanded the matter on
    the basis that charter cities are exempt from the consistency requirement of Government Code
26  section 65454, and the consistency requirement did not apply since the City never affirmatively
    adopted it.  (*The Kennedy Com. v. City of Huntington Beach* (2017) 16 Cal.App.5th 841, 851-59.)
27      The Court of Appeal denied the petitioners' request for rehearing on November 20, 2017,
    and the California Supreme Court denied the petitioners' petition for review on January 17, 2018.
28  The case is now proceeding on remand to the Superior Court.

7

29.   On January 29, 2016, HCD found that the draft amendment prepared by the City would satisfy the requirements of California's Housing Element Law when adopted and submitted to HCD.

30.   Despite the fact that HCD had found the draft amendment to be legally compliant, despite every indication from the City to HCD that it was actively working to bring the housing element into compliance, and despite the City's numerous representations to the *Kennedy* Court to the same effect, the City council voted unanimously to reject the amendment—General Plan Amendment No. 15-001—at a March 7, 2016 hearing.  Until that time, HCD had every reason to believe, based on the City's interactions with HCD staff and its representations to the Court, that the City intended to adopt the amendment.

31.   On November 14, 2018, HCD issued a notice of noncompliance in which it found that the City's housing element remained out of compliance with article 10.6 of Government Code title 7, division 1, chapter 3 ("Article 10.6"); that the City failed to act in compliance with Government Code section 65583 when it failed to approve an amended housing element; and that the City violated Article 10.6 by failing to take action to bring the housing element into compliance with applicable statutory requirements since the City Council's vote on March 7, 2016.

32.   On December 6, 2018, the City sent HCD a letter responding to the November 14, 2018 notice of noncompliance.  The City did not commit to complying with its legal duty to immediately bring the 2013 Housing Element back into substantial compliance.  The City instead proposed further delay, stating that it "will set forth a plan to obtain recertification from HCD" only after the *Kennedy* lawsuit is resolved.  The time for empty promises has come to an end. The City should not be allowed to avoid its statutory obligations any longer.

//

//

//

//

//

### FIRST CAUSE OF ACTION

### Writ of Mandate (Code Civ. Proc., § 1085)

### [Against All Defendants]

33.  HCD incorporates by reference each and every allegation of the preceding paragraphs.

34.  Under California's Housing Element Law, the City must ensure that its general plan contains a legally compliant housing element.

35.  The City has completely abdicated this duty.  Based on the events alleged in paragraphs 10 through 32 above, the City's 2013 Housing Element violates Housing Element Law, and the City has failed to enact an amendment bringing the 2013 Housing Element into substantial compliance.  Indeed, by refusing to adopt General Plan Amendment No. 15-001 on March 7, 2016, and by, on information and belief, making no meaningful effort since then to draft and adopt another amendment that would bring the 2013 Housing Element into substantial compliance, the City has publicly and unequivocally violated its duty to comply with California law.

36.  These actions and failures to act by the City are arbitrary, capricious, entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, an abuse of discretion, and a failure to act as required by law.

37.  Accordingly, a writ of mandate should issue ordering the City to bring the 2013 Housing Element into substantial compliance with California's Housing Element Law (Gov. Code, § 65580, *et seq.*) and to ensure that the 2013 Housing Element meets the City's regional housing needs goals by the end of the 2013 – 2021 planning period, as determined by HCD.

38.  HCD has a beneficial interest in the issuance of such a writ, given its authority and mandate to enforce substantial compliance with California's Housing Element Law.  Likewise, the public at large, as well as the lower income residents and workforce in the City, have a significant interest in ensuring that the City complies with the law.

39.  HCD has exhausted all required administrative remedies, or is excused from exhausting its remedies due to the futility of pursuing such remedies, among other things.

9

40.  HCD has no plain, speedy, or adequate remedy in the ordinary course of law.  The only remedy provided by law for HCD to obtain relief is this Petition for Writ of Mandate pursuant to Code of Civil Procedure section 1085.

<u>**SECOND CAUSE OF ACTION**</u>

**Declaratory Relief (Code Civ. Proc., § 1060)**

**[Against All Defendants]**

41.  HCD incorporates by reference each and every allegation of the preceding paragraphs.

42.  There is a controversy between HCD and the City as to whether the 2013 Housing Element substantially complies with California's Housing Element Law (Gov. Code, § 65580, *et seq*.).  Based on the events alleged in paragraphs 10 through 32 above, HCD believes that the 2013 Housing Element does not substantially comply.  Further, based on information and belief, the events alleged in paragraphs 10 through 32, and the administrative record herein, HCD alleges that the City is aware that 2013 Housing Element does not substantially comply and has failed to take any meaningful action to substantially comply.

43.  It is necessary and appropriate for the Court to render a declaratory judgment that sets forth the parties' legal rights and obligations with respect to whether the 2013 Housing Element substantially complies with California's Housing Element Law.  Among other things, such a judgment would inform the parties' conduct in connection with future contemplated amendments to the City's housing element, including those that occur routinely at the beginning of each housing cycle.

44.  HCD therefore requests a declaration that the 2013 Housing Element does not substantially comply with California's Housing Element Law (Gov. Code, § 65580, *et seq*.).

//

//

//

//

//

## **PRAYER FOR RELIEF**

WHEREFORE, HCD prays as follows:

1.  For a writ of mandate ordering the City to bring the 2013 Housing Element into substantial compliance with California's Housing Element Law (Gov. Code, § 65580, *et seq.*) and to ensure that the 2013 Housing Element meets the City's regional housing needs goals by the end of the 2013 – 2021 planning period, as determined by HCD.

2.  For a declaration that the City's 2013 Housing Element does not substantially comply with California's Housing Element Law (Gov. Code, § 65580, *et seq.*).

3.  For costs and attorneys' fees.

4.  For any other relief the Court may deem appropriate.

Dated:  January 25, 2019

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
JAMEE JORDAN PATTERSON
Supervising Deputy Attorney General


KIMBERLY R. GOSLING
Deputy Attorney General
*Attorneys for Petitioner and Plaintiff
Department of Housing & Community
Development*

SD2018102333
82108051.docx

11

Petition for Writ of Mandate and Complaint for Declaratory Relief

# EXHIBIT 5

**CIV-130**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Deputy Attorney General Jennifer E. Rosenberg, SBN 275496<br>Office of the Attorney General<br>300 S. Spring Street, Suite 1702<br>Los Angeles, CA 90013 | *FOR COURT USE ONLY* |

TELEPHONE NO.: 213-269-6617          FAX NO. *(Optional):*
E-MAIL ADDRESS *(Optional):* jennifer.rosenberg@doj.ca.gov
ATTORNEY FOR *(Name):* State of California, Gov. Gavin Newsom, Atty. Gen. Xavier Becerra

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

PLAINTIFF/PETITIONER: City of Huntington Beach
DEFENDANT/RESPONDENT: State of California, et al.

| NOTICE OF ENTRY OF JUDGMENT<br>OR ORDER | CASE NUMBER:<br>30-2019-01044945-CU-WM-CJC |
|---|---|
| *(Check one):*  [x] **UNLIMITED CASE**<br>(Amount demanded<br>exceeded $25,000)   [ ] **LIMITED CASE**<br>(Amount demanded was<br>$25,000 or less) | |

**TO ALL PARTIES :**

1.  A judgment, decree, or order was entered in this action on *(date):* February 18, 2021

2.  A copy of the judgment, decree, or order is attached to this notice.

Date: February 18, 2021

Jennifer E. Rosenberg
(TYPE OR PRINT NAME   [x] ATTORNEY   [ ] PARTY WITHOUT ATTORNEY)

▶   /s/ Jennifer E. Rosenberg
(SIGNATURE)

Page 1 of 2

CIV-130

| | | |
|---|---|---|
| PLAINTIFF/PETITIONER:   City of Huntington Beach | | CASE NUMBER:<br>30-2019-01044945-CU-WM-CJC |
| DEFENDANT/RESPONDENT:   State of California, et al. | | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF ENTRY OF JUDGMENT OR ORDER

*(NOTE: You cannot serve the **Notice of Entry of Judgment or Order** if you are a party in the action. The person who served the notice must complete this proof of service.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

   300 S. Spring Street, Suite 1702
   Los Angeles, CA  90013

2. I served a copy of the *Notice of Entry of Judgment or Order* by enclosing it in a sealed envelope with postage fully prepaid and *(check one):*

   a. ☐  deposited the sealed envelope with the United States Postal Service.

   b. ☒  placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Entry of Judgment or Order* was mailed:

   a. on *(date):*  2/18/2021

   b. from *(city and state):*  Los Angeles, California

4. The envelope was addressed and mailed as follows:

   a. Name of person served:
   Michael F. Rawson, The Public Interest Law Project
   Street address: 449 15th Street, Suite 301
   City: Oakland
   State and zip code: CA, 94612

   b. Name of person served:
   Alexander B. Prieto, Western Center on Law and Poverty
   Street address: 3701 Wilshire Blvd., Suite 208
   City: Los Angeles
   State and zip code: CA  90010

   c. Name of person served:
   Michael E. Gates, Office of the Huntington Beach City Atty
   Street address: 2000 Main Street, Fourth Floor
   City: Huntington Beach
   State and zip code: CA  92648

   d. Name of person served:

   Street address:

   City:

   State and zip code:

   ☐  Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

5. Number of pages attached: _____

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: February 18, 2021 _____

VERONICA SAWERS _____
(TYPE OR PRINT NAME OF DECLARANT)

▶  *Veronica Sawers* _____
(SIGNATURE OF DECLARANT)

Page 2 of 2

**NOTICE OF ENTRY OF JUDGMENT OR ORDER**



Electronically Received 02/17/2021 01:56 PM

Electronically Received 02/17/2021 01:56 PM

1   XAVIER BECERRA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   SETH E. GOLDSTEIN
    Deputy Attorney General
4   JENNIFER E. ROSENBERG
    Deputy Attorney General
5   State Bar No. 275496
      300 South Spring Street, Suite 1702
6     Los Angeles, CA 90013
      Telephone: (213) 269-6617
7     Fax: (916) 731-2124
      E-mail: Jennifer.Rosenberg@doj.ca.gov
8   *Attorneys for Respondents/Defendants Gavin
    Newsom, in his official capacity as Governor of
9   California, and Xavier Becerra, Attorney General of
    California, in his official capacity*

*Exempt from filing fees
per Gov. Code, § 6103*

**FILED**
Superior Court of California
County of Los Angeles

**02/18/2021**

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ Deputy
          J. De Luna

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                    FOR THE COUNTY OF LOS ANGELES

13

14

15   **CITY OF HUNTINGTON BEACH,** a
     California Charter City,

16
                                    Petitioner/Plaintiff,
17

18              v.

19   **THE STATE OF CALIFORNIA; GAVIN
     NEWSOM,** Governor of California, in his
20   official capacity; **XAVIER BECERRA,**
     Attorney General of California, in his official
21   capacity; and **DOES 1 through 20,**

22                      Respondents/Defendants,

23
     **CALIFORNIA COALITION FOR RURAL
24   HOUSING; HOUSING CALIFORNIA;** and
     **THE KENNEDY COMMISSION,**
25
                        Intervenors/Defendants.
26

27

28

30-2019-01044945-CU-WM-CJC
[Consolidated with Case No. 30-2019-
01048692]

[~~PROPOSED~~] **JUDGMENT**

1

[~~PROPOSED~~] Judgment (30-2019-01044945-CU-WM-CJC)

1        This consolidated action came on for trial on January 28, 2021 in Department 85 of the Los

2  Angeles County Superior Court, the Honorable Judge James C. Chalfant presiding.  Jonathan M.

3  Eisenberg and Jennifer E. Rosenberg of the California Attorney General's Office appeared on

4  behalf of Respondents Governor Gavin Newsom, Attorney General Xavier Becerra, and the State

5  of California.  Michael E. Gates appeared on behalf of Petitioner City of Huntington Beach.

6  Michelle K. Kotval and Michael F. Rawson appeared on behalf of Intervenor The Kennedy

7  Commission.  Alexander Prieto appeared on behalf of Intervenors Housing California and

8  California Coalition for Rural Housing.

9        In this action, Case No. 30-2019-01044945-CU-WM-CJC (*City of Huntington Beach v.*

10  *State of California*) and Case No. 30-2019-01048692-CU-WM-CJC (*City of Huntington Beach v.*

11  *State of California*) were transferred to Los Angeles County Superior Court from Orange County

12  Superior Court and consolidated for all purposes, including trial and judgment, under Lead Case

13  No. 30-2019-01044945-CU-WM-CJC in Department 85.  Petitioner City of Huntington Beach

14  filed a Second Amended Consolidated Petition for Writ of Mandamus and Complaint for

15  Declaratory Relief in the consolidated action.

16        Prior to the trial, the Court issued a tentative ruling denying the petition (attached hereto as

17  Exhibit A), which the Court adopted as its final ruling after argument.

18        Accordingly, IT IS ORDERED, ADJUDGED, AND DECREED that:

19      (1)  The consolidated petition for writ of mandate is denied for the reasons set forth in the

20  ruling attached hereto as Exhibit A.

21      (2)  The claim for declaratory relief is granted for the reasons set forth in the ruling attached

22  hereto as Exhibit A.  The Court finds and declares, based on the evidence and for the reasons set

23  forth in the Court's ruling, incorporated herein by reference, that the Housing Bills (Senate Bill

24  No. 35 (2017-2018 Reg. Sess.), Senate Bill No. 166 (2017-2018 Reg. Sess.), Senate Bill No. 1333

25  (2017-2018 Reg. Sess.), and Assembly Bill 101 (2019-2020 Reg. Sess.)) and amendments to

26  California statutes effected thereby, challenged by Petitioner City of Huntington Beach, do not

27  violate the municipal affairs doctrine or Article XI, section 5 of the California Constitution and

28  may be enforced.

2

1      (3) As the State of California was erroneously named as a Respondent in this action, the

2  Court hereby dismisses the State of California from the action for the reasons set forth in the

3  ruling attached hereto as Exhibit A.

4      (4) Judgment is entered in favor of Respondents Governor Gavin Newsom and Attorney

5  General Xavier Becerra and Intervenors The Kennedy Commission, Housing California, and

6  California Coalition for Rural Housing.

7

8  Dated:     02/18/2021

9                                   James C. Chalfant / Judge
                                     The Honorable James C. Chalfant

10

11  Approved as to Form:

12  DATED: February ☐ 2021      MICHAEL E. GATES, City Attorney

13

14                        By: _____

15                          MICHAEL E. GATES, City Attorney
                          Attorneys for Plaintiff-Petitioner

16                          CITY OF HUNTINGTON BEACH

17  DATED: February __, 2021      PUBLIC INTEREST LAW PROJECT

18

19                        By:_____

20                          MICHAEL F. RAWSON, Esq.
                          Attorneys for Intervenor

21                          THE KENNEDY COMMISSION

22  DATED: February __, 2021      WESTERN CENTER ON LAW AND POVERTY
                          CALIFORNIA RURAL LEGAL ASSISTANCE

23                          FOUNDATION

24

25                        By:_____

26                          ALEXANDER PRIETO, Esq.
                          Attorneys for Intervenors HOUSING CALIFORNIA and

27                          CALIFORNIA COALITION FOR RURAL HOUSING

28

3

1      (3)  As the State of California was erroneously named as a Respondent in this action, the

2   Court hereby dismisses the State of California from the action for the reasons set forth in the

3   ruling attached hereto as Exhibit A.

4      (4)  Judgment is entered in favor of Respondents Governor Gavin Newsom and Attorney

5   General Xavier Becerra and Intervenors The Kennedy Commission, Housing California, and

6   California Coalition for Rural Housing.

7

8

9   Dated: _____   _____
                                                      The Honorable James C. Chalfant

10

11  Approved as to Form:

12  DATED:  February __, 2021   MICHAEL E. GATES, City Attorney

13

14                                       By: _____

15                                       MICHAEL E. GATES, City Attorney
                                     Attorneys for Plaintiff-Petitioner

16                                       CITY OF HUNTINGTON BEACH

17  DATED:  February 16, 2021   PUBLIC INTEREST LAW PROJECT

18

19                                     By:_____

20                                       MICHAEL F. RAWSON, Esq.
                                     Attorneys for Intervenor

21                                     THE KENNEDY COMMISSION

22  DATED:  February __, 2021   WESTERN CENTER ON LAW AND POVERTY
                                     CALIFORNIA RURAL LEGAL ASSISTANCE

23                                     FOUNDATION

24

25                                     By:_____

26                                     ALEXANDER PRIETO, Esq.
                                     Attorneys for Intervenors HOUSING CALIFORNIA and

27                                     CALIFORNIA COALITION FOR RURAL HOUSING

28                                     3

1       (3)  As the State of California was erroneously named as a Respondent in this action, the

2   Court hereby dismisses the State of California from the action for the reasons set forth in the

3   ruling attached hereto as Exhibit A.

4       (4)  Judgment is entered in favor of Respondents Governor Gavin Newsom and Attorney

5   General Xavier Becerra and Intervenors The Kennedy Commission, Housing California, and

6   California Coalition for Rural Housing.

7

8

9   Dated:  _____        _____

10                                          The Honorable James C. Chalfant

11  Approved as to Form:

12  DATED:  February __, 2021        MICHAEL E. GATES, City Attorney

13

14                                  By: _____

15                                      MICHAEL E. GATES, City Attorney
                                        Attorneys for Plaintiff-Petitioner
16                                      CITY OF HUNTINGTON BEACH

17  DATED:  February __, 2021        PUBLIC INTEREST LAW PROJECT

18

19                                  By: _____
                                        MICHAEL F. RAWSON, Esq.
20                                      Attorneys for Intervenor
21                                      THE KENNEDY COMMISSION

22  DATED:  February 16, 2021        WESTERN CENTER ON LAW AND POVERTY
                                     CALIFORNIA RURAL LEGAL ASSISTANCE
23                                   FOUNDATION

24

25                                  By: _Alex Prie_____
                                        ALEXANDER PRIETO, Esq.
26                                      Attorneys for Intervenors HOUSING CALIFORNIA and
27                                      CALIFORNIA COALITION FOR RURAL HOUSING

28

                                          3

DATED:  February 16, 2021

OFFICE OF THE ATTORNEY GENERAL, CALIFORNIA
DEPARTMENT OF JUSTICE

By:_____
JENNIFER E. ROSENBERG, Esq.
Attorneys for Respondents GOVERNOR GAVIN
NEWSOM, ATTORNEY GENERAL XAVIER
BECERRA, and the STATE OF CALIFORNIA

4

EXHIBIT A

*Superior Court of California*
*County of Los Angeles*
**FILED**
*Sherri R. Carter*
**JAN 28 2021**
*By: J. De Luna, Deputy*
*Executive Officer/Clerk of Cour*

City of Huntington Beach v. The State of
California, et al., 30-2019-01044945

~~Tentative~~ decision on petition for writ of
mandate: denied

Petitioner City of Huntington Beach ("City") seeks a writ of mandate prohibiting Respondents State of California, Governor Gavin Newsom ("Governor"), and Attorney General Xavier Becerra ("Attorney General") (collectively, "State")[1] from enforcing Senate Bill ("SB") 35, SB 166 -- which was retroactively applied against charter cities by SB 1333 -- and Assembly Bill ("AB") 101 (collectively "Housing Bills") against City. State and Intervenors the Kennedy Commission's ("Commission"), Housing California ("HC"), and California Coalition for Rural Housing ("CCRH") oppose.

The court has read and considered the moving papers, oppositions, and reply, and renders the following tentative decision.

### A. **Statement of the Case**
### 1. **Petition 30-2019-01044945**

City commenced this proceeding on January 17, 2019, in the Orange County Superior Court. The Second Amended Petition ("SAP"), filed on December 9, 2019, is the operative pleading and it alleges claims for traditional mandamus pursuant to CCP section 1085 and declaratory relief. The FAP alleges in pertinent part as follows.

SB 35 when into effect on January 1, 2018 and amended Government Code[2] sections 65400, 65582.1, and 65913.4. SB 35 was part of a "housing package" intended to address the state's alleged housing shortage and high housing cost. The Legislature declared that SB 35 applies to all cities and counties, including charter cities. In part, SB 35 requires cities[3] that have not made sufficient progress towards meeting their allocation of the regional housing need assessment ("RHNA").[4] SB 35 seeks to create a system where the State controls how, where, and when housing is built in every city in California. The effect of SB 35 is to unconstitutionally commandeer cities' discretionary land use authority and permits State to "rezone" a city's local

---

[1] Respondent State of California's opposition points out that mandamus is properly brought against the officer who enforces the law, not the governmental entity. City of Redondo Beach v. Padilla, (2020) 46 Cal.App.5th 902, 908, n.4. State of California argues that it should be dismissed, leaving only the Governor and Attorney General as Respondents. State Opp. at 9, n.1. This is true and State of California is therefore dismissed. Despite this fact, the court will refer to the remaining individual Respondents collectively as "State".

[2] All further statutory references are to the Government Code unless otherwise stated.

[3] Although the laws at issue govern zoning by other local government agencies, the court shall refer to cities for convenience. *See* State Opp. at 12, n. 5.

[4] RHNA is the statutory process to identify the total number of housing units (by affordability) allocated to each jurisdiction for planning purposes. As part of this process, the California Department of Housing and Community Development ("HCD"), through its regional sub-agencies, identifies the total housing need allocated to each city for an eight-year period.

01/29/2021

land use for political purposes.

AB 101 went into effect in August 2019 and amended multiple sections of the Government Code, Health and Safety Code, Public Resources Code, and Revenue and Taxation Code. The unconstitutional portions of this bill were introduced as part of a budget trailer bill that was touted to incentivize jurisdictions to build more housing and assist in providing housing to the homeless.

On October 9, 2019, the Governor signed SB 113 into law which amended sections 65585 and 65589.11. AB 101, as amended by SB 113, now requires that the Attorney General follow a specific statutory procedure if HCD finds that a city's housing element is not substantially compliant with state law. AB 101 makes a capricious finding that the new law is a matter of statewide concern and therefore applicable to charter cities. AB 101 requires HCD to notify a city or county and authorizes HCD to notify the office of the Attorney General, that the city or county is in violation of state law if the local government has taken action in violation of specified provisions of law. The Attorney General must then request that the court issue an order or judgment directing a violating city to bring its housing element into substantial compliance, and the penalty for noncompliance is a fine of $10,000 per month, with the possibility of multipliers for continued noncompliance.

City's right to control the use of land within its jurisdiction has been consistently recognized by the California Supreme Court as a municipal affair. As a charter city, City has supreme authority over the regulation of land use and zoning within its borders. SB 35 and AB 101 violate the municipal affairs doctrine, which provides that a charter city will not be governed by state law in respect to municipal affairs. The regulation of local land use and local zoning is a vital and core function of local government and therefore is a municipal affair of a charter city.

State has a clear, present, and ministerial duty to administer the California Constitution and laws of the state, including SB 35 and AB 101, without interfering with City's zoning and land use authority. State's action in enacting SB 35 unconstitutionally ignores and undermines City's rights as a charter city under the municipal affairs doctrine to the detriment of the health, welfare, and safety of its residents, as well as the authority of a charter city to establish and provide for an orderly system of zoning and land use regulations.

City seeks a writ of mandate and declaratory relief prohibiting State from enforcing SB 35 and AB 101.

### 2. Petition 30-2019-01048692

Petitioner City commenced this proceeding on February 1, 2019 in the Orange County Superior Court. The Petition alleges claims for traditional mandamus pursuant to CCP section 1085 and for declaratory relief. The Petition alleges in pertinent part as follows.

SB 166 amended section 65863 regarding "No Net Loss" local zoning and land use. SB 166 was part of a housing package intended to address the state's alleged housing shortage and high housing cost. When enacting SB 166, the Legislature correctly determined that the law would not apply to charter cities.

In 2018, the Legislature enacted SB 1333, which again amended section 65863 and through *post hoc* rationalization declared that it applies to all charter cities. The unconstitutional mandates of SB 166 impermissibly strip City's constitutionally protected charter city authority with respect to local zoning municipal affairs.

In conjunction with SB 1333, SB 166 creates a system where State controls how, where,

and when housing is built in every city in California, regardless of charter city status, and unconstitutionally purports to vest and exercise authority in the state to rezone established local land designations for political purposes.

City's right to control the use of land within its jurisdiction has been consistently recognized by the California Supreme Court as a municipal affair.  As a charter city, City has supreme authority over regulation of local land use and zoning within its borders.  SB 166 violates the municipal affairs doctrine, which provides that a charter city will not be governed by state law in respect to municipal affairs.  The regulation of local land use and local zoning are vital and core functions of local government, and therefore municipal affairs, of a charter city.

State has a clear, present, and ministerial duty to administer the California Constitution and laws of the State of California, including section 65863, without interfering with City's zoning and land use authority.  In enacting SB 166 and SB 1333, the Legislature unconstitutionally ignored and undermined City's rights as a charter city to control the zoning and land use designations within its borders to the detriment of the health, welfare, and safety of its residents.

City seeks mandamus prohibiting State from enforcing amended section 65863 against it and a declaration that section 65863, as amended by SB 166 and SB 1333, is an unconstitutional overreaching into a charter city's ability to create local zoning schemes.

### 3. **Course of Proceedings**

Petition 30-2019-01044945 (concerning SB 35) and Petition 30-2019-01048692 (concerning SB 166 and SB 1333) are Orange County Superior Court cases that were assigned to the court on March 19, 2019.  On June 4, 2019, the court consolidated the two cases with 30-2019-01044945 as the lead case.  The parties stipulated that, although properly declaratory relief, the case may be tried on paper as mandamus.

On July 25, 2019, the court granted the Commission's motion for permissive intervention. The court also granted HC and the CCRH leave to intervene on the condition that they and the Commission file a joint intervenors' brief.

### B. **The Municipal Affairs Doctrine**
#### 1. **Article XI, Section 5(a)**

"[T]he question whether the power exists to forbid the erection of a building of a particular kind or for a particular use... is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality."  Euclid v. Ambler Realty Co., (1926) 272 U.S. 365, 388.  "The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities." Schad v. Mt. Ephraim, (1981) 452 U.S. 61, 68 (emphasis added).)  Pet. Op. Br. at 11.

Section 5(a) of article XI of the California Constitution provides that a charter city shall not be governed by State law in respect to "municipal affairs", for which charter cities' laws are "supreme and beyond the reach of [State] legislative enactment."  California Federal Savings & Loan Assn. v. City of Los Angeles, ("California Federal Savings") (1991) 54 Cal.3d 1, 12 (quoting Ex Parte Braun, (1903) 141 Cal. 204, 207.)  The California Supreme Court has summarized article XI, section 5:

01/29/2021

Article XI, section 5…addresses the "home rule" powers of charter cities…."It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution [] shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith." Johnson v. Bradley, (1992) 4 Cal. 4th 389, 397-98 (emphasis added).

The California Supreme Court also has stated: "We have recognized that a city's or county's power to control its own land use decisions derives from this inherent police power, not from the delegation of authority by the state." DeVita v. County of Napa, ("DeVita") (1995) 9 Cal. 4th 763, 782.) "The Legislature, in its zoning and planning legislation, has recognized the primacy of local control over land use." Id. "[T]he Legislature has been sensitive to the fact that planning and zoning in the conventional sense have traditionally been deemed municipal affairs. It has thus made no attempt to deprive local governments... of their right to manage and control such matters, but rather has attempted to impinge upon local control only to the limited degree necessary to further legitimate state interests.'" Id. (citation omitted).  Pet. Op. Br. at 11-12.

The Legislature expressly "recognizes that the capacity of California cities and counties to respond to State planning laws varies due to the legal differences between cities and counties, both charter and general law, and to differences among them in physical size and characteristics, population size and density, fiscal and administrative capabilities, land use and development issues, and human needs." §65300.9 (emphasis added). Indeed, until recently, the Legislature has expressly declared that the diversity of the State's communities and their local needs require local legislative bodies to implement local planning requirements in ways that accommodate local conditions and circumstances. §65300.7.

### 2. The Analytical Framework

Historically, judicial consideration of charter cities' authority over municipal affairs suffered from an *ad hoc*, case-by-case approach. California Federal Savings, *supra*, 54 Cal. 3d at 5, 15-16.  In California Federal Savings, the California Supreme Court set forth an analytical framework "for resolving municipal affairs and statewide-concern questions under subdivision (a) of article XI, section 5." Johnson v. Bradley, *supra*, 4 Cal. 4th at 399.

This analytical framework was subsequently re-articulated in a four-part test in State Building & Construction Trades Council of California v. City of Vista, ("Vista") (2012) 54 Cal. 4th 547, 556, as follows: (1) a court first must determine whether the city's authority at issue regulates an activity that can be characterized as a "municipal affair"; (2) second, the court "must satisfy itself that the case presents an actual conflict between local and state law; (3) third, the court must decide whether the state law addresses a matter of "statewide concern."; and (4) fourth, the court must determine whether the law is "reasonably related to … resolution" of that concern and "narrowly tailored" to avoid unnecessary interference in local governance." Id. If the court is persuaded that the subject of the state statute is one of statewide concern and is reasonably related to its resolution, then the conflicting charter city measure ceases to be a municipal affair *pro tanto* and the Legislature is not prohibited by article XI, section 5(a) from

01/29/2021

4

addressing the statewide dimension by its own tailored enactments." Id.

### C. Land Use Law
#### 1. Background
"Zoning laws regulate land uses in two basic ways. Some uses are permitted as a matter of right if the uses conform to the zoning ordinance. Other sensitive land uses require discretionary administrative approval pursuant to criteria in the zoning ordinance. They require a conditional use permit." Save Lafayette Trees v. City of Lafayette, (2019) 32 Cal.App.5th 148, 155 (citations and internal punctuation omitted).

In 1917, the Legislature passed the first statute enabling cities to enact zoning ordinances. Miller v. Board of Public Works, (1925) 195 Cal. 477, 483. In 1925, the California Supreme Court observed that a city may not enact "unreasonable and discriminatory" zoning ordinances. Id. at 489. In 1927, the Legislature reserved to the state an oversight role in local land use and zoning by prescribing that all general law cities had to adopt general or master plans for land development. DeVita, *supra,* 9 Cal.4th at 772. In 1976, the California Supreme Court held that a city would exceed its police power with a zoning decision "if [the] restriction significantly affects residents of surrounding communities." Associated Homebuilders of the Greater East Bay, Inc. v. City of Livermore, (1976) 18 Cal.3d 582, 601. State Opp. at 11-12.

In the history of zoning laws, single-family residence zoning districts have been hallmarks of land use. *See, e.g.*, Fourcade v. City and County of San Francisco, (1925) 196 Cal. 655, 659 (describing zoning district). Ewing v. City of Carmel-By-The-Sea, (1991) 234 Cal.App.3d 1579, 1589 (same); Consaul v. City of San Diego, (1992) 6 Cal.App.4th 1781, 1787-89 (city council rezoned land area to single-family residential in order to block multi-family housing development). State Opp. at 12-13.

#### 2. The Planning and Zoning Law
In 1965, the Legislature enacted the Planning and Zoning Law (§65000 *et seq.*). County of Santa Barbara v. Purcell, Inc., (1967) 251 Cal.App.2d 169, 174. That law declares:

> "The Legislature […] finds that decisions involving the future growth of the [S]tate, most of which are made and will continue to be made at the local level, should be guided by an effective planning process, including the local general plan, and should proceed within the framework of officially approved statewide goals and policies directed to land use, population growth and distribution, development, open space, resource preservation and utilization, air and water quality, and other related physical, social and economic development factors." §65030.1 (emphasis added). State Opp. at 13.

Under the Planning and Zoning Law, the State has regional planning districts (§65061), each of which prepares, maintains, and revises a regional land-use plan, seeking to harmonize the master or general plans of the region's cities. §65061.1. Regional planning encompasses transportation planning (§65070) and congestion management (§65088). Each city has a planning agency (or chooses to have its city council play that role). §65100. Each city must "adopt a comprehensive, long-term general plan for the physical development of the city." §65300. A

general plan consists of a "statement of development policies [...] setting forth objectives, principles, standards, and plan proposals." §65302.) A general plan includes multiple elements: land use, circulation (movement of people and vehicles), housing (discussed further below), conservation, open space, noise, safety, and environmental justice. Ibid. These plans are filed with their regional planning districts. §65067. The city's planning agency must implement (§65103) and administer (§65400 *et seq*.) the general plan. State Opp. at 13-14.

In 1971, the Legislature required general law cities' zoning ordinances to be consistent with their general plans. §65067. Before that, a general plan was considered "merely an 'interesting study.'" DeVita, *supra*, 9 Cal.4th at 772 (quoting City of Santa Ana v. City of Garden Grove, (1979) 100 Cal.App.3d 521, 532). The Legislature subsequently enacted statutes aimed at requiring cities to act consistently with their general and specific plans. *See* §65300.5 (requiring that city's general plan and elements "comprise an integrated, internally consistent, and compatible statement of policies"); §65301.5 (subjecting adoption of general plan or amendment to mandamus challenge); §65359 (requiring city's specific plan to be consistent with general plan); §65450 (similar); §65454 (similar); §65455 (requiring local public works projects, tentative maps, parcel maps, and zoning ordinances to be consistent with specific plan); §65460.8 (consistency requirement for transit villages). State Opp. at 14.

Also in 1971, the Legislature mandated that charter cities, not just general law cities, adopt general plans with the mandatory elements. DeVita, *supra*, 9 Cal.4th at 772; *see* §65300.5. In 1979, the Legislature extended the general plan consistency requirement to charter cities with more than 2 million people (*i.e.,* Los Angeles). City of Los Angeles v. State of California, (1982) 138 Cal.App.3d 526, 531. State Opp. at 14.

### 2. The Housing Element Law

In 1969, the Legislature enacted the Housing Element Law. §65580 *et seq*. The Housing Element Law declares that "[t]he availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every Californian is a priority of the highest order." §65580. The Housing Element Law recognizes the shared responsibility of state and local government to facilitate housing development for "all economic segments of the community" (§65580(b), (d)), and the need for "cooperation of all levels of government" for the provision of affordable housing (§65580(c)).

The Legislature declared that "[d]esignating and maintaining a supply of land and adequate sites suitable, feasible, and available for the development of housing sufficient to meet the locality's housing need for all income levels is essential to achieving the state's housing goals...." §65580(f). "It is the intent of the Legislature in enacting this article [to] assure that counties and cities recognize their responsibilities in contributing to the attainment of the state housing goal." §65581; *see also* San Franciscans for Livable Neighborhoods v. City and County of San Francisco, (2018) 26 Cal.App.5th 596, 609 (discussing purpose of housing element law). State Opp. at 15; Interv. Opp. at 10.

Under the Housing Element Law, all jurisdictions, including charter cities, must adopt a housing element. §§ 65583, 65700(b). Building Industry Assn. v. Marin Mun. Water Dist., (1991) 235 Cal.App.3d 1641, 1650. The housing element must make adequate provision for the housing needs of all economic segments of the community. §65583. The housing element must contain four basic sections: (1) an assessment of housing needs and an inventory of the resources and

constraints relevant to meeting those needs (§65583(a)); (2) a statement of the city's goals, objectives, and policies relative to maintenance, preservation, improvement, and development of housing (§65583(b)); (3) a five-year schedule of action to achieve the goals and objectives (§65583(c)); and (4) a review and evaluation of the prior element (§65583(d)). The housing element must be consistent with the policies identified in the general plan. §§ 65300, 65359, 65582(f). To plan for the community's share of the state housing needs, a housing element must include an assessment of the existing and projected housing need for each income level, identify resources and constraints relevant to meeting that need, and implement programs to address the need. §65583(a), (c). State Opp. at 15; Interv. Opp. at 10.

Every eight years, HCD, relying on data supplied by the Department of Finance, assigns a target number or goal for additional housing units in each region of the state in a RHNA divided into four income levels: very low, low, moderate, and above moderate income. §65584(a)(1), (f); Then the regional Council of Governments (or in some cases HCD) allocates a share of the regional housing need for each income level to each city and county in its region. §65584.05. The locality must then prepare a housing element that accommodates its allocated share of the RHNA. *See* §§ 65583, 65583.2. Interv. Opp. at 11; State Opp. at 15-16.

Key to a city's accommodation of its allocated RHNA at each income level is the requirement that the city's housing element include an inventory of sites suitable and available for residential development during the planning period. §§ 65583(a)(3), 65583.2(a); *see* Creswell Decl., ¶13. The inventory must detail information about the sites -- such as size and type of zoning -- as well as a determination of what portion of the RHNA each site can accommodate by income level. §65583.2(b), (c). To aid with this determination, the Housing Element Law provides set densities (housing units per acre) deemed appropriate to accommodate lower-income housing. §65583.2(c)(3)(B). For jurisdictions in a metropolitan county, sites allowing at least 30 units per acre represent the appropriate density to facilitate lower-income development. §65583.2(c)(3)(B)(iv). When a jurisdiction's inventory lacks the sites to accommodate its full RHNA allocation, its housing element must include a program to rezone and make additional sites available within three years to accommodate any unmet RHNA. §65583(c)(1)(A). Interv. Opp. at 11.

Before a city can adopt a housing element, it must be submitted to HCD to review whether it complies with the Housing Element Law. §65585. A city also must regularly review and revise its housing element to make sure that it continues to advance the city's goals, objectives, and policies. §65588(e)(4).

Each year, the city must report to both the Governor's Office of Planning & Research and HCD the progress made in implementing the programs of the housing element. §65400. Based on that report, HCD has the power to find that a housing element is not in compliance with the city's general plan. §65585. In such an instance, HCD may refer the matter to the Office of the Attorney General for an enforcement action. §65585(i), (j). The Attorney General may bring litigation against the non-complying city that may lead to a court order circumscribing the city's power to approve new housing development, by either suspending that power or requiring the city to approve a proposed residential development containing affordable housing. §§ 65754, 65754.5, 65755. State Opp. at 16-17.

The housing element is the only part of a city's general plan that is subject to substantial oversight by State. That oversight began in 1980 via statutory amendments to the Housing Element

Law and reflects the fact that there have been high degrees of local non-compliance with the law for many years. Coy Decl., Ex. 1, pp. 26-32. In 1991, HCD certified only 19% of localities as having a compliant housing element. More recently, that figure has increased to 55%. Coy Ex. 1, p. 14. State Opp. at 16.

The Housing Element Law and RHNA zoning law (§65863) were not originally intended to apply to charter cities. This was because section 65700 expressly provided that Chapter 3 (Local Planning) "shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city." Stats. 1965, ch. 1880, §5, p. 4345. The same legislation added Chapter 4 (Zoning Regulations) and similarly provided in section that Chapter 4 does not apply to a charter city. Stats. 1965, ch. 1880, §6, p. 4345-46. Pet. Op. Br. at 8.

A 1971 amendment to section 65700 imposed a requirement that charter cities adopt a general plan, including a housing element, for land use development within their boundaries. Pet. RJN Ex. H (Stats. 1971, ch. 1803, §2, p. 3904). The components of a charter city's housing element were discretionary. A 1982 amendment added an exception that new sections 65590 and 65590.1, relating to affordable housing in the coastal zone, apply to charter cities. Pet. RJN Ex. I (Stats. 1982, ch. 43, §§ 3-4, pp. 105-09). A 2017 amendment (AB 879) added another exception that section 65400 (imposing a reporting requirement on planning agencies) applied to charter cities. Pet. RJN Ex. J (AB 879, §3).

In other words, state law through 2017 reflected -- with the exception of the coastal zone provisions (§§ 65590, 65590.1) -- charter cities' home rule authority over the substance of local land use planning and zoning. Pet. Op. Br. at 8.

### D. The Housing Bills

The Housing Bills are codified in title 7 (Planning and Land Use), division 1 (Planning and Zoning), of the Government Code and changed the inapplicability of the Housing Element Law and RHNA zoning laws to charter cities.

#### 1. SB 35 (2017)

SB 35 was passed in 2017 and as pertinent amended sections 65400 and 65582.1 and added section 65913.4. City RJN Ex. M.

New section 65913.4 provides that a developer of multi-family housing may access a streamlined ministerial approval process which bypasses the California Environmental Quality Act ("CEQA") and the need for a conditional use permit ("CUP") in certain circumstances. §65913.4. The circumstances include that (1) the proposed development will be located on an infill site; (2) the city has issued fewer building permits than necessary to meet its RHNA allocation; (3) the development would have at least a mandated minimum of below market-rate units; and (4) the development is consistent with the city's objective zoning and design review standards. Id. If a city determines that the proposed development does not meet the criteria for streamlined approval, it must timely provide the proponent with written documentation of the proposal's shortcoming(s) or else the proposal is deemed to satisfy the requirements. Id. Pet. Op. Br. at 5-6; State Opp. at 18.

SB 35 provides that if a city (general or charter) approves a project under this scheme, the approval will not expire -- even if developer does not begin construction -- if the project includes affordable housing. SB 35 prohibits a city from adopting any requirement for such a project solely

or partially on the basis that it is subject to the streamlined approval. Pet. Op. Br. at 6.

City acknowledges that SB 35 states that it was enacted to address a "statewide housing crisis." City contends that the effect of SB 35 is to commandeer a city's discretionary land use authority over where and how housing construction takes place within its boundaries. SB 35 creates a system where State controls how, where, and when housing is built in throughout California, and essentially imposes a state-wide permissive overlay on local land use. Pet. Op. Br. at 6-7.

### 2. SB 166 (2017) (No Net Loss Zoning)

Historically, most local governments adopted housing elements with site inventories and site rezoning programs to fully accommodate their lower-income RHNA. 2017 LAO Rpt., Kotval Decl., ¶9, Ex. 7, p. 5. When affordable housing developments began to take place on these sites, local governments yielded to neighborhood pressure and reduced site density to hinder these developments. *See* Comm. on Judiciary AB 2292, Interv. RJN Ex. 1, p. 2.

To address this issue, in 2002 the Legislature passed AB 2292 (the "No Net Loss Law"), which prohibits a local jurisdiction from reducing residential density below the figures used in its housing element unless certain conditions are met. §65863 (added by Stats. 2002, c. 706 (AB 2292, §1)). AB 2292 requires a city to ensure that its housing element inventory[5] can accommodate its share of the RHNA throughout the planning period. Section 65863 provides that a city may not allow development of a parcel of land with fewer units by income category than the share allocated in a city's housing element unless the city makes written findings supported by substantial evidence that the reduction in density is consistent with the locality's general plan and housing element, and that the remaining sites identified in the housing element are adequate to accommodate the jurisdiction's share of the regional housing need. §65863(b)(1)(A), (B).

In 2017, the Legislature passed SB 166 to strengthen the No Net Loss Law by closing loopholes, including a city's ability to approve "high-end market-rate housing" or commercial uses on sites identified in their housing elements for lower income households. Interv. RJN Ex. 2, pp. 5-6.

As amended by SB 166 (City RJN Ex. N), section 65863 requires that once a site is identified in a city's RHNA allocation, that site must remain available or, if built upon, the city must within 180 days identify a new site to accommodate its RHNA allocation. Essentially, SB 166 requires a city to maintain adequate sites for low-cost housing development at all times, not just at the beginning of the eight-year RHNA cycle. Pet. Op. Br. at 10; State Opp. at 18.

SB 166 did not amend section 65700, and therefore SB 166 did not apply to charter cities.

### 3. SB 1333 (2018)

In 2013, HCD approved City's 2013-2021 housing element. Covarrubias Decl., ¶25. The housing element identified enough sites to meet its very low and low-income RHNA by incorporating multi-family zoned sites in City's Beach and Edinger Corridors Specific Plan ("BECSP"). *See* Kotval Decl., ¶10, Ex. 8, pp. V-5, V-22–V-23; Covarrubias Decl., ¶25. Facing community opposition to high density development in the BECSP (Covarrubias Decl., ¶26), City

---

[5] "Housing element inventory" means the sites identified within a city where zoning and land use designations allow for housing to be built. Pet. Op. Br. at 9, n.13.

amended the BECSP in May 2015 ("Amendment") to reduce the number of units that can be developed, impose development standards, and require City approval of any development. *See* Kotval Decl., ¶11, Ex. 9; Covarrubias Decl. ¶ 27.  The Amendment created a RHNA allocation shortfall of 413 very low and low-income units. Kotval Decl., ¶13, Ex. 11, p. 3.

In July 2015, Kennedy Commission filed suit against City in <u>Kennedy Comm'n v. Huntington Beach</u>, Case No. 30-2015-00801675.   Kennedy Commission alleged that the Amendment was inconsistent with City's adopted housing element and that City had failed to identify alternate sites to accommodate the low-income RHNA shortfall created by the Amendment. *See* Kotval Decl. ¶14, Ex. 12, ¶¶ 50-86. On January 20, 2016, the trial court found the Amendment void *ab initio* and issued a writ of mandate ordering City to cease enforcing it.

The appellate court reversed in <u>Kennedy Comm'n v. City of Huntington Beach</u>, ("<u>Kennedy Commission</u>") (2017) 16 Cal. App. 5th 841.  Reasoning that section 65700 exempted charter cities from California's local planning provisions, the court held that City was exempt from section 65454's requirement that a city's specific plans be consistent with its general plan and housing element unless City expressly adopted this consistency requirement. <u>Id</u>. at 853-60.

The Legislature deemed this appellate decision to be a loophole left open by its failure in SB 166 to amend sections 65803 and 65700 to expressly apply section 65863's mandatory RHNA provisions and the broader provisions of the Housing Element Law to charter cities.

Passed in 2018, SB 1333 made the Housing Element Law in its entirety, and other planning and zoning provisions dedicated to the promotion of housing development, expressly applicable to charter cities. City RJN Ex. P.  The author of SB 1333, Senator Bob Wieckowski, stated that the <u>Kennedy Commission</u> decision "threaten[ed] to undermine […] critical reforms from the 2017 Housing Package," and explained that by making the Housing Element Law and other statutory sections expressly applicable to charter cities, "SB 1333 will ensure that charter cities do not inappropriately subvert the goals stated in required general plan policies, including approved Housing Elements, and that local planning is internally consistent and not undermined by site-specific decisions." Assembly, Senate Third Reading, Analysis of SB 1333 (Aug. 24, 2018), pp. 3-4.  State Opp. at 17.

SB 1333 expressly made section 65863, the No New Loss Law, applicable to charter cities. City RJN Ex. P. If a charter city approves the downsizing of a site identified in the housing element as available for development at greater density, or approves a development of market-rate housing units on a site identified as available for lower-income housing, then the city may violate the No Net Loss Law.  SB 1333 also expressly provides that several other sections of the Government Code's Planning and Zoning laws apply to charter cities: sections 6536, 65852.10, 65852.25, 65860, 65863.4, 65863.6, 65863.8, 65866, 65867.5, 65869.5.[6]  SB 1333 further amended section

---

[6] Sections 65866, 65867.5, and 65869.5 are contained in the Development Agreements Law (§65864 *et seq*.), which authorizes local agencies to enter development agreements with real-estate project builders, entitling them to proceed on their projects under the local rules, regulations, and ordinances in effect at the time of their approvals.  <u>North Murrieta Community, LLC v. City of Murrieta</u>, (2020) 50 Cal.App.5th 31 41.  The law gives builders some assurance of regulatory stability, given that projects often take years or even decades to complete, and local regulations can and do change over such periods of time.  <u>Ibid</u>. The development agreements are contracts, enforceable like other contracts. <u>Id</u>. at 44. State Opp. at 17-18.

65700 to extend the applicability of sections 65300.5, 65301.5, 65359, 65450, 65454, 65455, 65460.8, 65590, 65590.1, and Article 10.6 (commencing with section 65580) to charter cities.  Pet. Op. Br. at 9; State Opp. at 18.

City argues that SB 1333 represents a tectonic shift in the separation of powers and unconstitutionally treads on charter cities' traditional control over local land use and zoning.  Pet. Op. Br. at 10.

### 4. AB 101 (2019)

AB 101 was adopted in 2019 and it amended section 65585 to require the Attorney General, and the courts, to follow a specific statutory procedure if HCD finds that a city's housing element is not substantially in compliance with the Housing Element Law (§65589.5) and RHNA zoning law (§65863).  §65585(j)-(m).

AB 101 requires HCD to notify a city, and then authorizes HCD to notify the Attorney General, that the city is in violation of state law if its housing element is not in substantial compliance.  City RJN Ex. O.  In any action brought by the Attorney General for a violation of Planning Zoning/Housing Element Law, the Attorney General must request the court issue an order or judgment directing a violating city to bring its housing element into substantial compliance.  Id.  AB 101 requires that the superior court conduct a status conference if a city has not complied with such an order.  Id.

If the superior court determines that a city failed to comply with the order, the court must impose fines.  Id.  The fines are $10,000 per month, not to exceed $100,000 per month (unless the fines are multiplied by a factor of three or six).  Id.  If the city has not complied with the order or judgment within specified time periods after the imposition of fines, AB 101 requires the court to conduct additional status conferences and multiply the amount of the fine by three and then six and order the appointment of an agent of the court to bring the city's housing element into substantial compliance.  Id.  Pet. Op. Br. at 7.

### E. Statement of Facts[7]
### 1. City's Evidence[8]

"The City shall have the power to make and enforce all laws and regulations in respect to municipal affairs, subject only to such restrictions and limitations as may be provided in this Charter or in the Constitution of the State of California."  City Charter §103.  "The general grant of power to the City under this Charter shall be construed broadly in favor of the City.  The specific

---

[7] Petitioner City failed to include the parties' evidence with the trial notebook.

[8] City requests judicial notice of (1) City Charter (Ex. C), (2) Huntington Beach Municipal Code ("HBMC") sections 2.33.010 et seq, and 2.34.010 et seq. (Ex. D), (3) City Zoning and Subdivision Code titles 20-25 (Ex. E), (4) HCD SB 35 Statewide Determination Summary (7/30/20) (Ex. F), (5) Pertinent portions of Statutes of California, Stats. 1965, ch. 1880 (Ex. G), (6) Pertinent portions of Statutes of California, Stats. 1971, ch. 1803 (Ex. H), (7) Pertinent portions of Statutes of California, Stats. 1982, ch. 43 (Ex. I), (8) Assembly Bill 879 (2017) (Ex. J); and (9) the Housing Bills (Exs. M-P).  The requests are granted as to Exhibits C-E, G-J.  Evid. Code §452(b), (c).  Exhibit F is not subject to judicial notice and the request is denied.

provisions enumerated in this Charter are intended to be and shall be interpreted as limitations upon the general grant of power and shall be construed narrowly." City Charter §104.

City's general plan guides its future land use decisions. A city's general plan is the "constitution for all future development" within its borders. Lescher Communications Inc. v. City of Walnut Creek, (1990) 52 Cal. 3d. 531. City's general plan includes a comprehensive long-term plan for City development and includes zoning maps and development goals to achieve the policy recommendations. City has a Department of Community Development and a Planning Commission, which have the duty to administrate the approval process for City's land use decisions. City RJN Ex. D (HBMC §§ 2.33.010, 2.34.010; City Zoning Ordinances titles 20-25). City has promulgated a comprehensive scheme of regulating land use within its borders. Pet. RJN Ex. E (Huntington Beach Zoning and Subdivision Ordinance ("HBZSO") Title 20-25).

The U.S. Department of Housing and Urban Development has observed that Redevelopment Agencies ("RDAs") created 63,600 new affordable housing units and that 44% of the new housing units constructed by RDAs from 2011 to 2008 were affordable at the very low-income level. Gates Decl., Ex. K, p. 4. Before their dissolution, RDAs were an important source of gap funding for federal affordable housing development funds and a longstanding and heavily-used source of funding for affordable housing in California. Gates Decl., Ex. L, p. 3.

City's expert, Nicole Sauviat Criste ("Criste"), opines that the Legislature clearly intended to vest local governments with the authority to control land use in their local jurisdictions. Criste Decl., Ex. B, pp. 1-2. State's general plan reflects this perspective and demonstrates that the Governor believes that land use is a matter of local control. Id., pp. 2-4. City's planning practice is consistent with this legislative intent. Id., p. 5. The flexibility given to cities to control their local issues is critical in enabling cities to regulate consistent with their residents' wishes. Id. Cities are also better situated to manage land use because zoning standards must be based on factors local in nature. Id., pp. 5-6.

Because there is a multiplicity of types of local jurisdictions (e.g., urban, rural, agricultural, industrial), local control over land use and zoning is necessary to meet local needs and concerns, based on local resources and infrastructure. Id., pp. 3-6. For instance, parking requirements in single family residential zones should reflect the demographics of the city – Palm Springs with only two persons per household needs less additional parking than Indio with 3.4 persons per household. Id., p. 6.

Another expert witness, Wendell Cox ("Cox"), opines that the RHNA allocation process imposed by the Housing Bills has no prospect of achieving its housing unit objectives because the funding required for lower income housing subsidies is scarce and because market prices for housing are beyond the financial ability of most middle-income households to afford. Cox Decl., Ex. A, p. 1. These deficiencies cannot be solved by cities. Id.

To the extent there is a shortage of affordable housing production, the fundamental issue is the lack of sufficient funding to build it. Id., pp. 7-8. Through 2018, only 9% of RHNA allocations at the very low-income, and only 13% of RHNA allocations at the low-income, categories have issued permits. Id., p. 13. Builders have not been developing low-income housing however much cities have planned for it. Id. In effect, the RHNA process requires cities to plan for more than ten times the amount of subsidized housing that can be funded. Id., p. 13

City's rate of permitting housing development outpaced all Orange County cities other than Irvine and is greater than California as a whole. Id., 18-19. Whereas the funding for building

market rate housing has been sufficient to meet the need in Orange County, and the permitting of very low-income and low-income housing in Orange County has outpaced the rest of the state, less than a quarter of RHNA allocations in those affordable housing categories have been issued permits. Id., pp. 24-25.  In addition to insufficient funding, City is particularly unfit for affordable housing production because transit access to lower income jobs is constrained. Id., pp. 51-54.

### 2. State's Evidence[9]

State's expert, Melinda Y. Coy ("Coy"), a land use and planning manager with HCD, opines that the Housing Bills are critical for addressing the state's housing crisis and their application to charter cities is necessary to increase the supply of housing. Coy Decl., ¶9.  People burdened in paying for housing suffer an array of problems in physical and mental health, nutrition, education, and job performance.  Id., pp. 15-23.  Businesses have a harder time recruiting employees, who cannot afford the cost of living.  Id., p.20.  The overall economy is negatively impacted. Id., pp. 20-21.

Over the last several decades, California has produced 2.3 million fewer housing units than are needed for the people already here.  Id., pp. 3-5.  The gap between the human population and the number of housing units is growing.  Id.  Housing prices, whether for sale or rental, are exceedingly expensive all over the state.  Id., pp. 5-8.

In 1991, HCD certified only 19% of localities as compliant with their housing elements. By 1995, that figure increased to 52% and has remained more or less at that level until very recently.  Coy Decl., Ex. 1, p. 14.  Even with charter city participation in the 2013-21 cycle of RHNA, the state has achieved 55% of the goal for zoning for and building more housing for people at all income levels.  Id., p. 14.  If all charter cities opted out, the rate would be at only 22%.  Id.

What happens in one city's housing market indisputably spills over city boundary lines and affects other cities.  Id., pp. 8-13.  Over the last 30 years, the median sales prices for existing homes in California, the Los Angeles Metro region (the counties of Los Angeles, Orange, Riverside, San Bernardino, and Ventura), and Orange County on its own, trace almost exactly the same price increases.  Id., p.10, Fig. 9.  This is also reflected by home and condominium sales prices in the City and the surrounding cities—Costa Mesa, Fountain Valley, Garden Grove, Santa Ana, Seal Beach, and Westminster—and Orange County as a whole.  Id., p.11, Fig. 9.

Since section 65852.150 has been in place, albeit not binding on charter cities, the number of ADU permits issued in the state has multiplied by eight times.  Id., p. 39.

---

[9] State requests judicial notice of: (1) Sen. Rules Comm., Office of Senate Floor Analyses, Unfinished Business, Analysis of SB 35 (2017-2018 Reg. Session) (Sept. 15, 2017) (Ex. 2); (2) Sen. Rules Comm., Office of Senate Floor Analyses, Unfinished Business, Analysis of SB 166 (2017-2018 Reg. Session) (Sept. 15, 2017) (Ex. 3); (3) Assembly, Senate Third Reading, Analysis of SB 1333 (2017-2018 Reg. Session) (Aug. 24, 2018) (Ex. 4); and (4) Assembly, Senate Third Reading, Analysis of SB 1333 (2017-2018 Reg. Session) (Aug. 17, 2018) (Ex. 5).  The analyses are subject to judicial notice as legislative history and the requests are granted. Evid. Cod §452(c).

State refers to a Declaration of Jonathan M. Eisenberg (Resp. Opp. at 9, fn.3) but failed to file such a document.

13

### 3. **Intervenors' Evidence**[10]

Housing is generally considered affordable when a household spends 30% or less of their income on it. Wiener Decl., ¶19. Renters in California need to earn 2.9 times the state minimum wage to afford the average monthly rent of $1,982 for a two-bedroom apartment. Kotval Decl., ¶3, Ex. 1, p. 4. Across the state, 79% of extremely low-income households and 54% of very low-income households pay more than 50% of their income on housing. Id., p. 3.

Renters in Orange County must earn 3.2 times the state minimum wage (or $43.23 per hour) to afford the average monthly rent of $2,196 for a two-bedroom apartment. Kotval Decl., ¶4, Ex. 2, p. 3. Orange County's high housing costs disproportionately burden low-income households, with 81% of extremely low-income households paying more than half of their income on housing costs compared to 1% of moderate income households. Id. at p. 2. In the City, 46% of all renters and 73% of its lower-income renters spend over 30% of their income on housing—leaving seniors, persons with disabilities, and female-headed households with children most vulnerable to losing their housing because they cannot afford the rents. Kotval Decl.. ¶ 5, Ex. 3, p. II-40. According to City, 80% of the 61,000 persons employed within its boundaries commute from outside City limits, indicative of the shortage of local affordable housing opportunities for the community's workforce. Kotval Decl., ¶5, Ex. 3, p. II-6.

Orange County saw a 43% increase in homelessness between 2017 and 2019. Kotval Decl., ¶6, Ex. 4 at p.9. Against this backdrop, the high demand for affordable housing in Orange County has been unprecedented, as exemplified when a recent 80-unit affordable housing development in Irvine received 6,818 applications. Covarrubias Decl., ¶22.

The statewide housing crisis extends to the rural areas of California. In the San Joaquin Valley, 70% of low-income residents spend 50% or more of their income on housing. Wiener Decl., ¶19. In the Salinas and Pajaro Valleys, farmworkers are suffering extreme overcrowding, living seven people per dwelling compared with 3.2 overall in Monterey County and 2.6 overall in Santa Cruz County. Id. at ¶20.

Because California's 121 charter cities have nearly half of the state's population, including its largest 15 cities, the lack of affordable housing in those cities has a significant impact on the statewide housing crisis. Wiener Decl., ¶28. Housing scarcity and higher prices in charter cities would drive up housing costs for the surrounding region by increasing demand and infrastructure needs outside municipal borders. *See* Wiener Decl., ¶32; *see also* Kotval Decl., ¶8, Ex. 6 at pp. 10-12. When charter cities adopt exclusionary policies, they impact the surrounding region,

---

[10] Intervenors request judicial notice of: (1) California State Assembly, Committee on Judiciary, analysis of Assembly Bill No. 2292 (2001-2002 Reg. Sess.) (Apr. 16, 2002) (Ex. 1); (2) California State Senate, Senate Rules Committee, analysis of Senate Bill No. 166 (2017-2018 Reg. Sess.) (Sep. 15, 2017) (Ex. 2); (3) Office of Senator Bob Wieckowski SB 1333 Fact Sheet (2017-2018 Reg. Sess.) (updated Mar. 6, 2018) (Ex. 3); (4) California State Senate, Senate Rules Committee, analysis of Senate Bill No. 1333 (2017-2018 Reg. Sess.) (Aug. 30, 2018) (Ex. 4); (5) California State Assembly, Committee on Local Government, analysis of Senate Bill No. 166 (2017-2018 Reg. Sess.) (Jun. 28, 2017) (Ex. 5); and (6) California State Senate, Senate Third Reading analysis of Senate Bill No. 1333 (2017-2018 Reg. Sess.) (Aug. 24, 2018) (Ex. 6). The exhibits are subject to judicial notice as legislative history and the requests are granted. Evid. Code §452(c).

causing a domino effect as increased demand for low-income housing leads other cities to adopt similar exclusionary policies. *See* Wiener Decl. ¶2.

The Housing Element Law is State's primary planning tool to address the housing needs of all current and expected households at all income levels. Creswell Decl., ¶10. The RHNA requirement that cities facilitate sufficient sites with adequate zoning is necessary to State's goal for the housing needs of persons who have been priced out of the housing market. Creswell Decl., ¶13. SB 166 and SB 1333 were necessary to ensure uniform compliance with RHNA requirements. Creswell Decl., ¶¶ 17-18. Compliance by all jurisdiction is necessary to achieve State's housing goal. Creswell Decl., ¶¶ 19-21.

### F. Analysis

City seeks a writ of mandate and declaratory relief prohibiting State from enforcing the Housing Bills on the ground that they violate the municipal affairs doctrine of the California Constitution.[11] State and Intervenors separately oppose.

The question whether the home rule provisions of the California Constitution bar application of state law to charter cities is a bit different than a facial challenge to a statute because evidence is permitted. Nonetheless, the question turns on the meaning and scope of the state law in question and the relevant state constitutional provisions, and their interpretation presents a legal question, not a factual one. State Building and Construction Trades Council of California, AFL-CIO v. City of Vista ("Vista"), (2012) 54 Cal.4th 547, 558. (citations omitted). In doing, so, courts accord great weight to the factual record that the Legislature has compiled and also to any relevant facts established in trial court proceedings. Id. (citing California Federal Savings, *supra*, 54 Cal.3d at 20-25). Factual findings by the Legislature or the trial court, however, are not controlling and the court ultimately must decide what areas of governance are municipal concerns and what are statewide concerns. Id.

The parties agree that the four-part test set forth in Vista, *supra*, 54 Cal.4th at 556 applies to determining whether the Housing Bills violate the municipal affairs doctrine. Pet. Op. Br. at 14; State Opp. at 19-21; Interv. Opp. at 15. The four factors are: (1) whether the subject of regulation is a municipal affair; (2) whether there is an actual conflict between the local measure and the state law; (3) whether the state law addresses a matter of statewide concern; and (4) whether the state law is reasonably related to addressing the matter and narrowly tailored not to unduly interfere with local control. Vista, *supra*, 54 Cal.4th at 556.[12]

### 1. Whether the Subject of Regulation is a Municipal Affair

The Housing Bills' subject is the planning, zoning, and development of land within a city's

---

[11] City does not challenge its obligations to adopt a housing element, identify sites for its housing element site inventory, and accommodate its RHNA allocation.

[12] State notes that the SAC's fourth cause of action, which challenges AB 101's amendment of section 65585 to provide new penalties for non-compliance with housing development laws as violating the California Constitution's "prohibition against Excessive Fines and Bills of Attainder." SAC, ¶¶ 85-90. State further notes that City's opening brief contains no argument concerning this legal theory. Accordingly, the SAC's fourth cause of action is denied as unsupported.

borders.  Whether a subject of regulation is a municipal affair is determined by reference to both (1) article XI, section 5(b), which has an express, non-exhaustive list of municipal affairs (Anderson v. City of San Jose, ("Anderson") (2019) 42 Cal.App.5th 683, 700), and (2) "the historical circumstances presented" (California Federal, *supra,* 54 Cal.3d at 1), which may illuminate the meaning of the term "municipal affair" in article XI, section 5(b).  Vista, *supra*, 54 Cal.4th at 557-58.  If the subject of regulation is not a municipal affair, then the analysis ends and State may regulate in that field without violating the home rule doctrine.  Id. at 556.

As City notes (Pet. Op. Br. at 14), the courts and the Legislature long have recognized and repeatedly affirmed land use and zoning as quintessentially municipal affairs.  Miller v. Board of Public Works, (1925) 195 Cal. 477, 495; Schad v. Mt. Ephraim, (1981) 452 U.S. 61, 68; DeVita, *supra,* 9 Cal.4th at 782; §§ 65300.7 and 65300.9.

State and Intervenors concede that the matter of land use regulation is a municipal affair. State Opp. at 22; Intervenors Opp. at 15.

### 2. **Whether There is an Actual Conflict**

If the subject of regulation is a municipal affair, then the court considers whether there is an actual, inimical conflict between the pertinent city charter provision, ordinance, or regulation, on one hand, and the state law in question, on the other hand.  Vista, *supra*, 54 Cal.4th at 556.  A conflict is inimical if it would be impossible to comply with both the local measure and the state law at the same time.  Lanier v. City of El Centro, (2016) 245 Cal.App.4th 1494, 1505.  If there is no such conflict, then the analysis is over and the local measure and the state law can lawfully co-exist.  Vista, *supra*, 54 Cal.4th at 556.

City submits that this factor is satisfied *ipso facto* by the fact that it and State are opposing parties in this litigation as well as an earlier suit, Orange County Superior Court Case No. 30-2019-01046493, which was filed by the HCD over City's alleged non-compliance with its RHNA allocation in its housing element.[13]  City submits that this factor was developed and articulated by the California Supreme Court in California Federal, and in both California Federal and Vista, the petitioners were private third parties seeking to hold charter city enactments unenforceable under state law where State was not a party.  California Federal, *supra*, 54 Cal. 3d at 6; Vista, *supra*, 54 Cal. 4th at 552.)  This part of the test is necessary for the court to avoid weighing in on a matter where there is no apparent dispute between a charter city and State.  But City and State are the opposing parties in this litigation and there necessarily is a conflict.  Reply at 4.

City is confusing a dispute or conflict between parties (City and State) with a conflict between local and state law.  They are not the same, and the court cannot conclude from the fact of two lawsuits between the parties that there is a conflict between laws for purposes of home rule analysis.

City also argues that the Housing Bills' substantive impositions and potential draconian penalties clearly conflict with its claim to home rule and local control.  City has accepted the full breadth of article XI, section 5's grant of autonomy and control over municipal affairs under and has promulgated a comprehensive plan for development and zoning administered by its

---

[13] By stipulation of the parties, HCD's petition was dismissed as moot after City adopted an amended housing element.  City argues that it agreed to this resolution to become eligible for SB 2 funding to assist in homelessness prevention efforts.

16

Community Development Department and Planning Commission.

In the City, a zoning designation is assigned to every legally defined parcel within a zone. The HBZSO contains zoning maps which show the location of the various zones, and the zoning code specifies which uses are permitted in those zones and the standards that apply to each use. A key goal of land use regulation is for nearby land uses to be compatible with one another. If a property owner wants to use property in a manner not consistent with the municipality's plan and zoning for the property, the owner must apply for a CUP. The permit process allows decision-makers to consider the property owner's beneficial use of the property while assuring targeted solutions to the issues raised by the non-conforming proposed use. "The reason for discretionary treatment is that these are uses which cannot be said to be always compatible in some zones while always compatible in others.... uses that should be allowed as of course, but could be allowed subject to conditions." Neighborhood Action Group v. County of Calaveras, (1984) 156 Cal. App. 3d 1176, 1183.) A strong body of law reflects judicial deference to local governing and administrative agencies in their resolution of CUP applications. Snow v. Garden Grove, (1961) 188 Cal. App. 3d 496, 504-05. Pet. Op. Br. at 16.

In sum, the CUP process highlights the traditional close degree of local control which cities exercise in determining local land use and zoning – both in the promulgation of general plans (including housing elements) and zoning schemes, as well as in considering variances for specific projects. City argues that the Housing Bills eviscerate City's scalpel of local control acutely responsive to local needs by imposing a sledgehammer of streamlined, ministerial approvals and mandated rezoning irrespective of local needs, problems, infrastructure and resources. As a result, the Housing Bills' imposition of substantive obligations and associated penalties necessarily conflicts with City's assertion of plenary control over local land use and zoning.

State points out that this prong of the test requires an actual conflict. If it would be possible to comply with City's charter or ordinance and any of the state statutes in question, then there is no conflict and no home rule problem. City of Huntington Beach v. Becerra, ("Huntington Beach") (2020) 44 Cal.App.5th 243, 269-70 (finding no conflict between a City charter provision and state statute). State notes that, although City presents the entire City Charter and zoning code as evidence, it does not specific a single local law in conflict with any state law. State Opp. at 22-23.

State speculates that this may be because HBMC section 2.34.020(a) calls for local law to harmonize with state law. That ordinance states that the duties of the City's Planning Commission derive from the Government Code, title 7—which covers all the state laws at issue -- as well as City ordinances. State Opp. at 22-23.

City properly rebuts this argument. HBMC section 2.34.020(a) describes the duties of City's Planning Commission in reference both to the Government Code "and as provided by ordinance of the City of Huntington Beach." Thus, City does not defer to state law for the Planning Commission's duties; it only lists the Government Code as a partial source of authority. And City does not refer to the Government Code at all for the City Council's authority to make final land use and zoning decisions. Reply at 4.

State further notes that many of the statutes in the challenged Housing Bills contain either permissive language stating what a charter city may, but is not required, to do, or else merely declare state policy with no directive or restriction on how a charter city exercises its authority. See, e.g., §65300.5 (mere statement of legislative intent); §65582.1 (declaration of legislative findings); §65450 (permissive language for charter city actions). State Opp. at 23. State notes that

17

policy declarations carrying no accompanying mandates pose no possible conflict with charter city authority. *See* Huntington Beach, *supra*, 44 Cal.App.5th at p. 270 (no home rule conflict between City measure giving local police force authority, but not obligation, to enforce all laws and state law limiting local law enforcement participation in federal immigration law enforcement).  State Opp. at 23-24.

City replies that the handful of scattered statutes enacted or amended by the Housing Bills merely declaring State policy can be severed from its challenge to the Housing Bills.  According to City, the fact remains that the remainder of the Housing Bills impose onerous unconstitutional requirements, prohibitions, and penalties.  Reply at 4.

Contrary to City's assertions, it has not demonstrated that the statutes enacted or amended by the Housing Bills necessarily conflict with City's local control such that it is impossible to comply with both simultaneously.   City claims that the Housing Bills impose substantive obligations that interfere with its plenary control, but it does not show specifically what statutes conflict and why their obligations cannot be harmonized with local control.  City only makes the conclusory claim that the Housing Bills' streamlined, ministerial processing of development runs directly counter to City's discretionary review of CUPs to tailor specific local needs.  Reply at 4. This claim is too general and vague.  How is the court to know which statutes in SB 35, SB 166, 1333, and 101 conflict with City's zoning and discretionary CUP review and why?  How would the court know which statutes City agrees could be severed as permissive or merely declarative of policy?[14]

City has not established that there is an actual, inimical conflict between the Housing Bills and its local laws.

### 3. Whether the Housing Bills Address a Matter of Statewide Concern

Whether a state law addresses a matter of statewide concern hinges on "how the state constitution allocates governmental authority between charter cities and the state."  Vista, *supra*, 54 Cal.4th at 557.  The phrase "statewide concern" is an ultimate legal conclusion that requires courts to allocate powers between local and state legislative bodies in the most sensible and appropriate fashion.  California Federal, *supra,* 54 Cal.3d at 17.  "In other words, for state law to control, there must be something more than an abstract state interest, as it is always possible to articulate some state interest in even the most local of matters."  Vista, *supra*, 54 Cal. 4th at 560 (quoting California Federal, *supra*, 54 Cal. 3d at 18).  If the state law does not address a matter of statewide concern, then the state law does not prevail over the conflicting city measure.  Vista, *supra*, 54 Cal.4th at 556.  A subject of regulation can be both a municipal affair and a matter of statewide concern.  Anderson, *supra*, 42 Cal.App.5th at 702; Codding Enterprises v. City of Merced, (1974) 42 Cal.App.3d 375, 377.

The outcome can depend, at least in part, on whether the subject of regulation has extraterritorial dimensions or effects, meaning that it does not obey city boundaries but rather spills over and beyond them, and therefore is appropriately addressed on a statewide basis.  Vista, *supra*, 54 Cal.4th at 557-58.  This determination is made based on case law, historical circumstances

---

[14] On a related issue, State argues that the court should deny the SAP without examining the Vista factors because City fails to particularize an attack on any state law and does not provide any home rule analysis for any of the individual statutes.  State Opp. at 21-22.  The court agrees.

presented in the trial court, and legislative declarations, findings, and history, which are entitled to great weight, but are not controlling.  California Federal, *supra*, 54 Cal. at 18, 20, n. 16; Vista, *supra*, 54 Cal.4th at 558.  The court is required to defer to legislative estimates regarding the significance of a given problem and the responsive measures that should be taken toward its resolution." California Federal, *supra,* 54 Cal.3d at 24.  Any fair, reasonable and substantial doubt whether a matter is a municipal affair or broader state concern must be resolved in favor of the legislative authority of the state.  City of Los Angeles v. Tesoro Refining and Marketing Co., (2010) 188 Cal.App.4th 840, 848-49.  If the Legislature has established a comprehensive regulatory scheme for a subject, then the express or implied goal of uniformity suffices to preclude local action that would disrupt that uniformity.  Fiscal v. City and County of San Francisco, (2008) 158 Cal.App.4th 895, 919 (firearms regulations) (*citing* Long Beach Police Officers Assn. v. City of Long Beach, (1976) 61 Cal.App.3d 364).

In Vista, the state law required cities to pay workers at the prevailing wage set by the director of the Department of Industrial Relations.  54 Cal.4th at 560-61.  The plaintiff labor union challenged a city charter measure proclaiming that the city would not comply with this state law for its public works projects. Id. at 552-53.  The union argued that there is a statewide concern for the state's prevailing wage law based on the "trend toward economic regionalization, with workers driving long distances to a jobsite and multiemployer collective bargaining agreements governing the terms of employment on a regional basis." Id. at 561.

The California Supreme Court admonished that the "hinge of [the statewide concern issue] is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations." 54 Cal. 4th at 560 (citation omitted). "In other words, for state law to control, there must be something more than an abstract state interest, as it is always possible to articulate some state interest in even the most local of matters." Id.

The court held that the union's stated position did not establish a statewide concern because these issues applied statewide only "when considered in the abstract." Id. The courts are "'especially' hesitant to abdicate to the Legislature's view of the issue 'when the issue involves the division of power between local government and that same Legislature.'" Id. (citation omitted).  Because the state law substantively infringed on a core, although un-enumerated, municipal affair, it could not be justified "merely by identifying some indirect effect on the regional and state economies." Id. at 562.  Laws setting forth generally applicable procedural standards are more likely to address a statewide concern, and impinge less on local authority, than substantive obligations.  Id. at 564.  The fact that the state law narrowly applied only to public agencies, and "impose[d] substantive obligations on charter cities, undermined the assertion that it presented a statewide concern.  Id. at 564-65.  As a result, the court held the state law did not address a statewide concern and affirmed the lower court's judgment that the state law was unconstitutional as applied to charter cities. Id. at 566.

### a. City's Position

City compares the Housing Bills to Vista and argues that their generic reference to an affordable housing shortage as a matter of statewide concern is merely a convenient abstract label. There may be a lack of affordable housing in the state, but that fact does not sufficiently backstop the extra-municipal interest in directly targeting local jurisdictions' control over local land use and

19

zoning.  Furthermore, the Housing Bills' imposition of substantive duties and penalties and not procedural requirements – such as those previously imposed on charter cities requiring adoption of a general plan and reporting to HCD -- also weighs against State.  Pet. Op. Br. at 17-18.

City argues that the state laws regarding land use and zoning in the coastal zone are an example of a proper limited extra-municipal concern sufficient to trump charter city autonomy because the coastal zone is a specific area over which State has a uniquely statewide interest.  *See* §§ 65590, 65590.1.  In CEEED v. California Coastal Zone Conservation Committee, ("CEEED") (1974) 43 Cal. App. 3d 306, the court considered the former Coastal Zone Conservation Act of 1972 which imposed certain requirements on developments within the coastal zone.  In determining that the act was applicable to charter cities, the court observed that the coastal zone is a "distinct and valuable natural resource belonging to all the people" and the coastline is uniquely subject to a statewide interest, citing the federal government's recognition of the importance of the coastal zone as a national interest.  Id. at 321-23.  Pet. Op. Br. at 18.

In contrast, the Housing Bills impose substantive interruptions of local control over land use and zoning not based on features of a jurisdiction over which there is a statewide interest, but rather to all local jurisdictions.  Yet, the demand for housing is not at all uniform throughout the state.  The state lost 912,000 net domestic migrants since 2010, and the patterns are not equal in counties across the state.  Since 2010, the Fresno and Sacramento labor markets respectively gained 41,000 and 48,000 domestic migrants, Riverside County gained 135,000 domestic migrants, Orange County lost 85,000 domestic migrants, and Los Angeles County lost 655,000 domestic migrants.  Cox Decl., Ex A, p. 62.  In other words, local population trends vary and present distinct local issues of housing supply and demand.  Pet. Op. Br. at 18-19.

Because there is a multiplicity of different types of local jurisdictions (urban, rural, agricultural, industrial), local control over land use and zoning is necessary to meet local needs and concerns based on locally available resources and infrastructure.  Sauviat Criste Decl., Ex. B, pp. 3-6 (comparing the varied local conditions that require local control).  For instance, the parking requirements in single family residential zones should reflect the demographics of the city – Palm Springs with only two persons per household needs fewer additional parking spaces than Inidio with 3.4 persons per household.  Sauviat Criste Ex. B, p. 6.  Pet. Op. Br. at 19.

State cannot work backwards from its imposition of a purported statewide solution to a lack of affordable housing to justify its intrusion into inherently municipal affairs.  The Legislature's intention to address a statewide interest does not make it one.  Johnson, *supra*, 4 Cal. 4th at 405 ("In other words, we must be satisfied that there are good reasons, grounded on statewide interests, to label a given matter a 'statewide concern.'").)  "No doubt almost anything [a city] does... can have consequences beyond its borders.  But this circumstance does not mean this court may eviscerate clear constitutional provisions, or the Legislature may do what the Constitution expressly prohibits it from doing."  County of Riverside v. Superior Court, (2003) 30 Cal. 4th 278, 296.  City concludes that the Housing Bills do not address a matter of statewide concern.  Pet. Op. Br. at 19.

The court disagrees.  State demonstrates that the affordable housing issue addressed in the Housing Bills is a matter of statewide concern, both in case law, legislative findings, and historical fact.

### b. Historical Facts

Over the last several decades, California has produced 2.3 million fewer housing units than needed for its existing population. Coy Decl., Ex. A, pp. 3-5. The gap between the human population and the number of housing units is growing. Ibid. Housing prices, whether for sale or rental, are expensive all over the state. Id., pp. 5-8. City's expert, Cox, agrees with that assessment. Cox. Decl., Ex. A, pp. 4-11. State argues that the cost of housing causes an array of physical and mental health, nutrition, education, and job performance problems. Coy Ex. A, pp. 15-23. Businesses have a hard time recruiting employees who cannot afford the cost of living and the state's overall economy is negatively impacted. Id., pp. 20-21.) State Opp. at 24.

No city in California has an insular housing market. What happens in one city's housing market indisputably spills over city boundary lines and affects other cities. Coy Decl., Ex. A, pp. 8-13. Over the last 30 years, the median sales prices for existing homes in California, the Los Angeles Metro region (the counties of Los Angeles, Orange, Riverside, San Bernardino, and Ventura), and Orange County trace almost exactly the same jagged line. Id., p. 10, Fig. 9. Even with charter city participation in the 2013-21 cycle of RHNA, State has achieved 55% of the goal for zoning for and building more housing for people at all income levels. Id., p. 14. If charter cities opted out, the rate would be only 22%. Ibid. State Opp. at 24-25.

Intervenors note that there are 121 charter cities in California, including its 15 largest cities, and they house almost half the state's population. Wiener Decl. ¶28. SB 166 and SB 1333 address zoning practices which hinder affordable housing development by preventing developers from building at higher densities suited to the development of low-income housing. *See* Kotval Decl. ¶ 8, Ex. 6, pp. 15, 20. If charter cities are exempted from SB 166 and SB 1333, State's comprehensive statutory scheme to address the regional housing need under the Housing Element Law would devolve into two unequal, incompatible planning systems incapable of meeting the challenges posed by the housing crisis. Interv. Opp. at 8.[15]

Intervenors add that the concrete "regional spillover effects of insufficient housing" identified in Anderson, 42 Cal. App. 5th at 711, also demonstrate the need to address the shortage of affordable housing from a statewide approach. The lack of affordable housing in all cities impacts the surrounding regions, including by increasing housing demand and costs. *See* Wiener Decl., ¶32; Covarrubias Decl., ¶23; Creswell Decl., ¶19. For example, coastal cities often fail to plan for and produce the housing their communities need. Kotval Decl. ¶8, Ex. 6, pp. 12-13. The actions of coastal cities to block housing development leads to migration further inland, increasing housing demand and housing costs there. Id., pp. 12-13, 15. Interv. Opp. at 19-20.

City's own evidence supports this spillover effect. Nearby Riverside County posted a

---

[15] According to Intervenors, City's actions exemplify the local practices that result in the shortage of sites for affordable housing. Prior to the Amendment, City had a compliant housing element with sufficient sites to meet its RHNA allocation at all income levels. The Amendment reduced the density of development on these sites, required City approval of any development, and imposed onerous development standards. These changes effectively eliminated the sites available to meet City's lower income RHNA obligation and greatly impacted the development of affordable housing in the City. When the Amendment was in place from 2015 to 2020, City permitted no very low-income units and only eight low-income units. Kotval Decl. ¶15, Ex. 13, p. 4. In the two years prior to the Amendment, 89 very low and low-income units were permitted in the City. Id. Interv. Opp. at 19.

strong gain in domestic migration, while Orange County lost domestic migrants.  Cox Decl., ¶6, Ex. A, p. 62.  While City suggests that this domestic out-migration demonstrates a lower demand for housing in the region, its evidence shows that the out-migration has been associated with the lack of affordable housing.  Cox Decl., ¶6, Ex. A, p. 62.  City also recently approved a fair housing report stating that the "[l]ack of local or regional cooperation may be a significant contributing factor to fair housing issues in Orange County" and that "there remains a problem with local governments not taking the steps to achieve regionally determined goals like progress toward meeting each jurisdictions [sic] [RHNA] for very low-income and low-income households." Kotval Decl., ¶16, Ex. 14, p. 324.  Interven. Opp. at 20.[16]

### c. Legislative Findings

In enacting SB 1333, the Legislature found as follows:

"The Legislature finds and declares that the serious shortage of decent, safe, and sanitary housing for low- and moderate-income households that was first identified in 1979 continues and that ensuring the location, development, approval, and access to housing for all income levels in all jurisdictions in California is a matter of statewide concern and not exclusively a municipal affair as that term is used in Section 5 of Article XI of the California Constitution. This situation requires the amendment of the charter city exemptions provided in Sections 65700 and 65803 of the Government Code as inconsistent with Section 1 of Article IV and Section 5 of Article XI of the California Constitution."   City RJN Ex. P, §14 (emphasis added).

Intervenors note that the Legislature also declared that the lack of affordable housing is a matter of statewide concern in SB 166 and SB 133.  Interv. Opp. at 16-17.

The author of SB 166 stated that it focuses on one of the biggest barriers to increasing affordable housing supply: a lack of appropriately zoned land for the construction of new housing in many localities.  Interv. RJN Ex. 5, p.6.  Consistent with the author's statement, the Legislature declared in SB 166 that the No Net Loss Law is a reform to facilitate and expedite the construction of affordable housing.  §§ 65582.1; 65582.1(i).

Similarly, the Legislature declared for SB 1333 that "the serious shortage of decent, safe, and sanitary housing for low- and moderate-income households that was first identified in 1979 continues," and that it enacted SB 1333 "to address the lack of affordable housing in the state, which is of vital statewide importance, and that ensuring the location, development, approval, and access to housing for all income levels in all jurisdiction in the state is a matter of statewide concern.  City RJN Ex. P, §§ 1, 14.  According to the author, SB 1333 was necessary because the Kennedy Commission decision threatened to undermine California's Housing Element Law and SB 1333 would ensure that charter cities do not inappropriately subvert the goals stated in required

---

[16] Intervenors also attempt to rely on factual findings in Anderson to support the historical nature of statewide concern.  Interv. Opp. at 19.  The court may not take judicial notice of the truth of the findings in a court document.  Sosinsky v. Grant, (1992) 6 Cal.App.4th 1548, 1551.

general plan policies, including approved housing elements.  Interv. RJN Ex. 6, pp. 3-4.  Interv. Opp. at 18.[17]

State points out that the Housing Bills' amended/enacted statutes all concern low-cost housing or increasing housing generally.  Sections 65852.150, 65852.25, 65863, 65863.4, 65863.6, 65866, and 65913.4 substantively address the statewide housing crisis as a matter of statewide concern.  Sections 65852.150 (encouraging development of accessory dwelling units (granny flats), 65852.25 (preventing opportunistic downzoning in the wake of catastrophes), 65863 (also about downzoning), 65863.4 (same), 65863.6 (same), 65866 (concerning development agreements), and 65913.4 (establishing the streamlined, ministerial approval process of proposed multi-family housing developments that meet objective local standards) all establish obligations and programs that bolster the provision of housing, and low-cost housing, throughout the state.  State Opp. at 28-29.  Sections 65300.5, 65301.5, 65359, 65400, 65450, 65454, 65455, 65460.8, 65580, 655821.5, 65585, 65850, 65860, 65863.4, and 65863.8 govern administrative and procedural aspects of addressing the statewide housing crisis.  State Opp. at 30.

Thus, the Legislature has repeatedly and expressly declared lack of adequate housing to be a matter of statewide concern.  Buena Vista, supra, 175 Cal.App.3d at 306 (citing seven statutes).  While the Legislature's characterization of statewide concern is not determinative, the applicable standard is one of "'defer[ence] to legislative estimates regarding the significance of a given problem and the responsive measures that should be taken toward its resolution'" Anderson, supra, 42 Cal.App.5th at 707 (citation omitted).  State Opp. at 27-28.

### d. Case Law

Over the past 50 years, numerous case decisions have upheld statewide housing and land-use statutes and regulations as overriding conflicting charter-city measures notwithstanding the home-rule doctrine.  State Opp. at 25.

Last year, Anderson upheld the Surplus Land Act ("SLA") (§54220 et seq.) against a charter city's home-rule challenge.  42 Cal.App.5th at 683.  The court held that the shortage of sites available for affordable housing development was a matter of statewide concern in the context of the charter city's challenge to the application of SLA section 54220, which required municipalities disposing of surplus land to give first priority to affordable housing development.  The Anderson court held that the SLA advances state land use policy objectives by mandating a uniform approach to the disposition of local government land that is no longer needed for government use.  By requiring municipalities to prioritize surplus land for the development of low- and moderate-income housing, the statute addresses the shortage of sites available for affordable housing development as a matter of statewide concern.  42 Cal.App.5th at 693.

The Anderson court found that while City had a readily identifiable interest in the

---

[17] City notes that SB 166 did not apply to charter cities and the enactment of SB 1333, citing a purported "serious shortage of... housing for low- and moderate-income households that was first identified in 1979...", begs the question of what changed in the year between SB 166 and SB 1333?  If the problem was not sufficiently of extra-municipal dimension for SB 166, the Legislature should not be able to reverse course a year later merely by fiat.  Pet. Op. Br. at 19.  The short answer is that the legislative history of SB 1333 shows that Kennedy Commission demonstrated to the Legislature that it had made a mistake.

disposition of its real property, the well-documented shortage of sites for low and moderate income housing and the regional spillover effects of insufficient housing demonstrate extramunicipal concerns justifying statewide application of the Act's affordable housing priorities. Anderson, *supra*, 42 Cal.App.5th at 711. Judicial decisions have consistently recognized the statewide dimension of the affordable housing shortage in relation to various impositions by the state into the realm of local affairs. Id. at 709. Anderson quoted the California Supreme Court in California Building Industry Assn. v. City of San Jose, (2015) 61 Cal.5th 435, 441 as follows: "It will come as no surprise to anyone familiar with California's current housing market that the significant problems arising from a scarcity of affordable housing have […] become more severe and have reached what might be described as epic proportions in many of the state's localities." Id. at 708-09.

Anderson relied on four appellate decisions issued over the last five and half decades holding unequivocally that the provision of sufficient housing for Californians is a matter of statewide concern:

> "Judicial decisions predating California Building have recognized the statewide dimension of the affordable housing shortage in relation to various impositions by the state into the realm of local affairs. See Green v. Superior Court, (1974) 10 Cal.3d 616, 625…[citing "enormous transformation in the contemporary housing market, creating a scarcity of adequate low-cost housing in virtually every urban setting"]; Buena Vista [Gardens Apartments Assn. v. City of San Diego Planning Dept., (1985) 175 Cal.App.3d 289, 306] [finding "need to provide adequate housing" is a statewide concern and rejecting home rule challenge to state provision that mandated charter city to include certain actionable components in its "housing element"]; Bruce v. City of Alameda, (1985) 166 Cal.App.3d 18, 22…["locally unrestricted development of low-cost housing is a matter of vital state concern"]; Coalition Advocating Legal Housing Options v. City of Santa Monica, (2001) 88 Cal.App.4th 451, 458…[noting the Legislature and courts have declared housing to be a matter of statewide concern]." 42 Cal.App.5th at 709-10.

The Anderson court concluded that "the well-documented shortage of sites for low- and moderate-income housing and the regional spillover effects of insufficient housing demonstrate 'extramunicipal concerns' justifying statewide application of the [SLA's] affordable housing priorities." Id. at 711. State Opp. at 25-26.

Intervenors also rely (Interv. Opp. at 16-17) on Buena Vista Gardens Apartments Ass'n. v. San Diego Planning Dep't, ("Buena Vista") (1985) 175 Cal.App.3d 289, 306-07, in which the court held that section 65583(c), which requires jurisdictions to commit to specific actions to make sites available to meet their RHNA, addressed a matter of statewide concern. The court rejected the city's argument that, while there is a legitimate statewide concern in requiring all jurisdictions to adopt general plans, section 65583(c) did not apply to charter cities because it intruded on municipal affairs. Id. The court explained that the city's position had no merit because it would limit the Legislature to declarations matters were of statewide concern and would prohibit the Legislature from compelling cities to take action to address the concern. Id. at 307.

Intervenors argue that City's position repeats the same argument rejected by Buena Vista.

Intv. Opp. at 16.  City contends that, while the state can require charter cities to adopt general plans and housing elements and to identify sites to facilitate affordable housing, State cannot enforce those requirements by mandating that the local planning and development decisions of charter cities be consistent with their adopted general plans and housing elements.  Id.  This is similar to Buena Vista, where the court expressly stated that the Legislature must be able to require local action for matters of statewide concern.  Interv. Opp. at 17.

State notes that City's opening brief fails to mention Anderson or any of these cases affirming California's interest in addressing the statewide affordable-housing crisis through broadly applicable legislation.  Even the case cited by City, CEEED, observed that "the municipal affairs concept does not preclude the state from regulating land use when necessary to further the state's interest."  43 Cal.App.3d at 324 (emphasis added).  While City disparages those State policy goals as "abstract", the many cases discussed above prove otherwise.  State Opp. at 26-27.

City argues that Anderson and Buena Vista do not justify the elimination of local control simply to address the lack of affordable housing.  Neither case involved a state law that imposed substantive obligations on local land control.

In Anderson, the SLA provision was predominantly procedural with incidental and uncertain substantive effects.  42 Cal.App.5th at 714.  The SLA does not require a local agency to sell surplus land for less than fair market value.  §§ 54221(b)(3), 54226.  The SLA also expressly recognizes the local agency's authority to enforce its pre-existing "authority or discretion to approve land use, zoning, or entitlement decisions in connection with the surplus land." §54223(b).  In other words, the SLA does not override a charter city's land use and zoning decisions and preserves its ability to receive fair market value for surplus land.  If the surplus land is not zoned for residential development, the city does not need to sell it for affordable housing development.  If certain conditions attach to residential development under the city's land use and zoning rules, they need not be altered to facilitate affordable housing development (other than the minimum set-aside for residential development greater than ten units).  Reply at 8-9.

In holding that the SLA passed the third part of the test, the Anderson court made sure to carefully determine whether "it treads within the boundary indicated by Vista for assessing statewide concern based on the degree to which the law impinges on local governing rights."  42 Cal. App. 5th at 712.  The court noted that the SLA initially imposes procedural requirements for notice and good faith negotiations regarding the disposition of the surplus land.  Id. at 713.  It then noted that there are some substantive limitations which kick in if the land is slated for affordable housing or general housing greater than ten units.  Id.  The Anderson court emphasized, however, that the substantive requirements "arise only in select scenarios" while expressly preserving the right to fair market value.  Id.  Anderson held that the SLA's substantive requirements were attenuated and essentially incidental to the procedural requirements that were the main purpose of the law, and the substantive requirements still left substantial discretion to the city in deciding how and whether to dispose of surplus land.  Id. at 714.  Reply at 9.

City concludes that Anderson does not mean that State has carte blanche to eliminate local control when it purports to address a lack of affordable housing.  Rather, Anderson stands for the proposition that the statewide interest in addressing the lack of affordable housing is sufficient to justify a predominantly procedural law with incidental and uncertain substantive effects, and which preserves substantial discretion to a charter city.  None of these features apply to the Housing Bills.  State has expressly conceded that sections 65852.150, 65252.25, 65863, 65863.4, 65863.6, 65866,

25

and 65913.4 impose substantive obligations/prohibitions.  State Opp. at 28.  There is nothing incidental or conditional to these substantive intrusions.  The Housing Bills cut off charter city discretion completely and impose a State-mandated one-size-fits-all scheme for land use and zoning.  Reply at 9-10.

City argues that Intervenors' reliance on Buena Vista, *supra,* 175 Cal. App. 3d at 289, is similarly misplaced.  The Anderson court provides a helpful gloss: "In Buena Vista... the Housing Element Law required the city to adopt a five-year schedule of actions to achieve the housing element goals... but at the same time afforded 'considerable discretion in the manner of implementing programs' to reach those goals... and expressly refrained from imposing on certain aspects of local control....."  42 Ca. App. 5th at 714 (emphasis added).  City argues that the Housing Bills afford no discretion – indeed, SB 35 literally imposes a streamlined, ministerial approval process for housing developments.  Reply at 10.

Thus, the SLA provision in Anderson was predominantly procedural with incidental and uncertain substantive effects and the law in Buena Vista afforded considerable discretion in the manner of implementing programs to reach its goal.  In contrast, the Housing Bills are substantially more intrusive and onerous.  Reply at 9-10.  The interest in low-cost housing may be sufficient to support a minimally intrusive procedural law, but it does not imbue the magic ability to justify a collection of Housing Bills that decimate charter city's home rule authority over local land use and zoning.  Reply at 10-11.

While City has properly distinguished Anderson as concerning a primarily procedural state law and Buena Vista as affording charter cities with discretion, it fails to explain how the Housing Bills "decimate charter city's home rule authority over local land use and zoning".  The Housing Bills are expressly designed to remedy the failure of California cities to comply with the Housing Element Law and RHNA zoning law (§65863) such that low-cost housing remains unavailable and a housing "crisis".  This lack of low-cost housing is concededly a matter of statewide concern.

As explained by Buena Vista, *supra,* 175 Cal.App.3d at 306-07 and argued by Intervenors, the Legislature has to be able to address this matter of statewide concern and cannot be limited to making declarations about a housing crisis without compelling cities, including charter cities, to take action to address the concern.  As Intervenors point out and City never addresses, there are 121 charter cities in California housing almost half the state's population.  Wiener Decl. ¶28.  If charter cities are exempted from SB 166 and SB 1333, the state's comprehensive statutory scheme to address the regional housing need under the Housing Element Law would devolve into two unequal, incompatible planning systems incapable of meeting the challenges posed by the housing crisis.  Interv. Opp. at 8.  City fails to even consider this point.

### e. City's Abstract/Compartmentalization Argument

City concedes that the Housing Bills are intended to address the issue of insufficient low-cost housing.  City argues that the Housing Bills still fail to qualify as a matter of statewide interest because the interest is too abstract to justify the elimination of local control.  City notes that the Supreme Court in Vista held that there is not a statewide concern where the issues apply statewide only "when considered in the abstract."  54 Cal. 4th at 560.  The "hinge of [the statewide concern issue] is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations."  Id.  "In other words, for state law to control, there must be something more than an abstract state

01/29/201

interest, as it is always possible to articulate some state interest in even the most local of matters." Id. Pet. Op. Br. at 17; Reply at 5-6.

City contends that the issue of affordable housing is similarly abstract. The demand for housing is not uniform and varies greatly by area. Cox Decl., Ex. A, p. 62. A uniform, statewide approach is not justified and local control over land use and zoning is necessary to meet local needs and local concerns based on locally available resources and infrastructure. Criste Decl., Ex. B. As with the wage laws in Vista, the fact that the problem of low-cost housing can be aggregated and considered in the abstract is insufficient to make the matter an issue of statewide concern. Reply at 6-7.

City notes that Vista involved the application of a state prevailing wage law to a charter city's public works projects. The Vista petitioner union argued that "the economy of the state has become more integrated... and wage levels in a local area are now more likely to have an effect regionally and statewide," and "in light of our modern integrated economy, it has become a statewide concern." 54 Cal. 4th at 561. The argument was rejected by the Vista court and City contends that State's argument is the same if "wage levels" is replaced with "housing prices". Reply at 6.

By failing to take account of the substantial difference in the intrusiveness of the Housing Bills versus the laws at issue in Anderson and Buena Vista, State and Intervenors have made the mistake of compartmentalizing "affordable housing" as a purported statewide concern. State and Intervenors rely on "de-contextualized snippets" of case law noting that lack of affordable housing is a statewide concern. Pursuant to their position, once a court has held that lack of affordable housing is a statewide concern sufficient to justify a particular state law's supersession of local control, the floodgates are open to any and all future state law. The California Supreme Court has expressly cautioned against this oversimplification and compartmentalization of "an entire area of governmental activity as either a 'municipal affair' or one of statewide concern...." California Federal, supra, 54 Cal. 3d at 17-18. "To approach the dichotomy of "municipal affairs/statewide concern" as one signifying reciprocally exclusive and compartmented domains would, as one commentator has observed, "ultimately all but destroy municipal home rule." Id. Reply at 7.

City suggests that State and Intervenors would be perfectly fine with the destruction of municipal home rule. But Article XI, section 5 is not a dead letter and is still a vital part of the California Constitution. Significantly missing from State's and Intervenors' discussions of the third part of the test is the fact that there is effectively a sliding scale based on the extent to which a state law substantively intrudes on charter cities' local control over a municipal affair. Reply at 8.

The shortage of low-cost housing does not identify extramunicipal concerns sufficient to justify overriding local control. State's own evidence underscores the fact that a one-size-fits-all, top-down mandated solution is inapt. "Place type – rural, suburban, and urban areas – each present their own unique housing challenges (even when located in the same geographical area) and can require different types of solutions." No one disputes City expert Cox's identification of highly variable domestic migration patterns, which reflect a lack of uniform demand for housing. While the state lost 912,000 domestic migrants since 2010, the patterns are not equal across the state. The Fresno and Sacramento labor markets actually gained 41,000 and 48,000 domestic migrants, Riverside County gained 135,000 net domestic migrants, Orange County lost 85,000 domestic migrants, and Los Angeles County lost 655,000 net domestic migrants. Cox Decl., Ex. A, p. 62.

27

The Legislative Analyst Office issued a chart that shows striking dissimilarities in housing needs between inland and coastal counties, and even among the different coastal counties:



**Figure 8**
**Housing Needs Vary Considerably Across Counties**

*Average Annual Number of New Housing Units Built by County, 1980-2010*

a Estimated new housing construction needed to prevent home prices from growing faster than the rest of the country.

(Exhibit 3 at p. 22.)  Reply at 7.

As with wage levels, it is not enough that there is an abstract problem of a lack of low-cost housing with a statewide dimension.  "[T]hat the Legislature chose to deal with a problem on a statewide basis... does not in itself make the problem a statewide concern....  Put differently, the concept of statewide concern is not coextensive with the state's police power."  Vista, *supra*, 54 Cal. 4th at 562.  Reply at 7.

It is true that Vista teaches that a statute is more likely to be of statewide concern and impinge less on local authority if it is procedural, not substantive, in nature and is narrowly applied only to public agencies.  54 Cal.4[th] at 564.  Where the state law substantively infringes on a core municipal affair, it cannot be justified "merely by identifying some indirect effect on the regional and state economies."  Id. at 562.

The Housing Bills may be summarized as follows.  SB 35 provides for a streamlined ministerial approval process which bypasses the discretionary CUP process for developments with below market-rate units that are consistent with the city's objective zoning and design review standards.  SB 35 also imposes a time deadline for city disapproval.  SB 166 and SB 1333 collectively impose a no net loss requirement for low-cost housing on charter cities.  A charter city will violate the No Net Loss Law if it approves the downsizing of a site identified in its housing element as available for development at greater density, or approves a development of market-rate housing units on a site identified as available for lower-income housing.  AB 101 is a statutory enforcement scheme where a city is not substantially in compliance with the Housing Element Law

28

and RHNA zoning law.

The Housing Bills are narrowly applied only to charter cities, and therefore meet that piece of Vista. 54 Cal.4th at 564-65. However, they have substantive elements as well as procedural ones. As a result, the court should look closely at the Housing Bills substantive impacts. There are multiple problems with City's argument that the demonstrated lack of low-cost housing is too abstract and wrongly compartmentalized as a statewide concern.

First, City fails to identify the specific substantive elements of the Housing Bills. City merely generally contends that SB 35 commandeers its city's discretionary land use authority over where and how housing construction takes place within its boundaries and that SB 1333 represents a tectonic shift in the separation of powers and unconstitutionally treads on charter cities' traditional control over local land use and zoning. This general discussion is insufficient for a serious analysis of the substantive provisions and their infringement on charter city home rule. City has not established that the Housing Bills necessarily will eliminate local discretion in making land use and planning decisions.

Second, City focuses on the purportedly abstract statewide interest in low-cost housing without considering the purpose of the Housing Bills. SB 166 was passed because cities which had adopted housing elements with site inventories that accommodated their lower-income RHNA were succumbing to neighborhood pressure to reduce site density and hinder low-cost housing development. SB 1333 was passed because Kennedy Commission showed that the Legislature inadvertently left charter cities – which make up half the state's population – out of SB 166. SB 35 serves a similar purpose of compelling all cities to follow a ministerial approval process for developments with low-cost housing that are consistent with objective zoning and design review, again taking the neighborhood pressure out of the equation. AB 101 was passed to provide teeth for these statutes. Thus, the Housing Bills addressed a problem that all cities, general and charter, were not complying with statutory law designed to significantly increase the amount of low-cost housing. As such, this case is more like Buena Vista, which held that section 65583(c), which requires jurisdictions to commit to specific actions to make sites available to meet their RHNA, applied to charter cities because the Legislature may compel charter cities to take action to address a statewide concern. 175 Cal.App.3d at 307.

Third, contrary to City's assertions, the evidence shows that the issue of low-cost housing, unlike the wage laws at issue in Vista, is sufficiently concrete to qualify as a matter of statewide concern. City is correct that the demand for housing is not uniform and varies greatly by area, and local control over land use and zoning is necessary to meet local needs and local concerns based on locally available resources and infrastructure. But these facts do not exclude statewide control of low-cost housing issues. No city in California has an insular housing market and what happens in one city's housing market indisputably spills over city boundary lines and affects other cities. Coy Decl., Ex. A, pp. 8-13. Over the last 30 years, the median sales prices for existing homes in California trace almost exactly the same jagged line. Id., p. 10, Fig. 9. There is a regional spillover effect for affordable housing wherein decisions by local municipalities affect the issue of housing in the state as a whole. Coy Decl., Ex. 1, pp. 8-13; Wiener Decl., ¶32; Covarrubias Decl., ¶23; Creswell Decl., ¶19.

Fourth, City overstates its position in contending that the Housing Bills seek to provide "[a] uniform, statewide approach" of control over land use and zoning and a one-size-fits-all, top-down mandated solution that fails to consider different county housing needs and construction.

29

The Housing Bills concern a specific issue -- low-cost housing, not housing in general. They do not purport to regulate a charter city's zoning at all and only impose limitations on discretionary CUPs for low-cost housing.

State and Intervenors have demonstrated that, based on case law, legislative declarations, and historical facts context, the lack of affordable housing addressed in the Housing Bills is a matter of statewide concern.

### 4. Whether the Housing Bills are Reasonably Related and Narrowly Tailored

If the state law is not reasonably related to a matter of statewide concern, it cannot prevail over the conflicting city measure. Vista, *supra*, 54 Cal.4th at 556. If the state law is reasonably related to addressing a matter of statewide concern, but it unnecessarily interferes with local control, then the state law still cannot prevail over the city measure. Id. Only where the state law both is reasonably related to a matter of statewide concern and does not unnecessarily interfere with local control will the state law prevail. Id. A state law passes this test if it legitimately addresses the matter of statewide concern and does not thwart local control. Huntington Beach, *supra*, 44 Cal.App.5th at 278-79.

State notes that the two dozen state statutes at issue in the Housing Bills easily pass the reasonable relationship prong. All the statutes make it simpler for housing developments to get built by removing obstacles to the development. Therefore, they reasonably relate—indeed, directly address—the statewide issue of insufficient affordable housing. State Opp. at 31. City does not address this issue, which is waived.

City makes two arguments that the Housing Bills are not narrowly tailored to avoid unnecessarily interfering with local control. First, they are overbroad, and this overbreadth demonstrates their Trojan horse nature because their effect is to eliminate local control in favor of a uniform statewide system of land use and zoning without any allowance for uniquely local issues, concerns, or problems with proposed development. Pet. Op. Br. at 20.

City's argument – that the Housing Bills are the camel's nose under the tent and State will attempt to regulate all land use and zoning – is pure speculation. As City has pointed out, neither State nor the court can compartmentalize an issue of statewide concern to justify all statutes in that subject area that affect municipal affairs. The court must evaluate each new statute issue on its own merits. Moreover, City has not specified which statutes in the Housing Bills are overbroad or why they are so. When a party asserts a point but fails to support it with reasoned argument and citation to authority, the point may be treated as waived. Badie v. Bank of America (1998) 67 Cal.App.4th 779, 784, 85; Solomont v. Polk Development Co., (1966) 245 Cal.App.2d 488 (point made which lacks supporting authority or argument may be deemed without foundation and rejected). The Housing Bills are reasonably related to the statewide concern of providing low-cost housing.

Second, City argues that the Housing Bills are not narrowly tailored because they are fundamentally unfit to address the issue of low-cost housing. Pet. Op. Br. at 20; Reply at 11. The fundamental issue driving the shortage of affordable housing is the lack of sufficient funding. Id. Housing Bills' imposition of RHNA compliance on charter cities is a quixotic endeavor that is fundamentally not fit to meet the purported statewide concern of inadequate production of affordable housing. Pet. Op. Br. at 20.

City notes that the fundamental issue for low-cost housing production is the lack of

funding. The Legislative Analyst's Office has estimated $15-30 billion annually necessary to meet affordable housing needs and Governor Newsom has proposed only 1.75 billion. Cox Decl., Ex. A, pp. 7-8. According to the UCLA Lewis Center for Regional Policy studies, "[t]o say that there isn't enough public subsidy to build all the income-restricted housing that the state deems necessary is a wild understatement." Id. Through 2018, only 9% of RHNA allocations at the very low-income category, and only 13% of RHNA allocations at the low-income category, have been issued permits. Cox Ex. A, p. 13. In other words, cities have planned for affordable housing, but developers have not been developing. The RHNA process in effect requires cities "to plan for more than 10 times the amount of subsidized housing that can be funded." Cox Ex. A, p. 13. As a result, it is no surprise that 95% of jurisdictions are subject to SB 35's draconian streamlined ministerial permit processing requirement.[18] Pet. Op. Br. at 20.

City contends that it is particularly unfit for low-cost housing production because transit access to lower income jobs is constrained. Cox Ex. A, pp. 51-54. The No Net Loss provisions of SB 166 and SB 1333 exponentially increase the impact on local control by requiring parcels to be set aside for RHNA allocations that have no reasonable prospect of being built, burdening charter cities' ability to manage development and growth in a manner that meets local needs. Pet. Op. Br. at 20-21.

City argues that the growing disconnect between asserted need and production of affordable housing is a result of State's prior attempts to dilute local control – dissolution of Redevelopment Agencies ("RDAs"). As the U.S. Department of Housing and Urban Development observed, RDAs created 63,600 new affordable housing units and 44 percent of new housing units constructed by RDAs from 2011 to 2008 were affordable at the very low-income level. Gates Decl., Ex. K, p. 4. Before their dissolution, RDAs were an important source of gap funding for federal affordable housing development funds and "a longstanding and heavily-used source of funding for affordable housing in California...." Gates Decl., Ex. L, p. 3. Pet. Op. Br. at 21.

City argues that it is contrary to the principles of charter city home rule to impose a draconian uniform statewide solution, including massive financial penalties, that cannot work and which can only serve to leave charter cities perpetually unable to meet local needs with local control. State should not be permitted to take advantage of a problem it exacerbated by dissolving RDAs in order to impose statewide land use and zoning. Narrow tailoring requires the minimal intrusion necessary and the Housing Bills all but guarantee maximum interference with local control. Pet. Op. Br. at 21-22.

City's arguments that the Housing Bills are not narrowly tailored because they will not achieve success in providing low-cost housing, and that the State never should have ended CRAs which did have success, are unavailing. City may be correct that the State's goal of providing sufficient low-cost housing cannot be achieved without a source of funding, but that does not mean that the Housing Bills' housing element and RHNA requirements are not a necessary first step.

---

[18] City notes that its rate of permitting housing development outpaced every Orange County city other than Irvine and was greater than California as a whole. Cox Ex. A, p. 18-19. Although funding for market-rate housing has been sufficient to meet Orange County's needs and permits for very low and low-income housing in Orange County have outpaced the state overall, less than a quarter of RHNA allocations in those affordable housing categories have been issued. Cox Ex. A, pp. 24-25 (Fig. 5-12). Pet. Op. Br. at 20.

City's complaint about the now long-gone CRAs is irrelevant. CRAs were dissolved because they had their own problems of local abuse.

The Housing Bills are tailored to apply only to charter cities, and State demonstrates that each of the statutes does not unnecessarily interfere with or thwart local control. The Housing Bills' procedural statutes -- sections 65300.5, 65301.5, 65359, 65400, 65450, 65454, 65455, 65460.8, 65850, and 65860 – are a mere administrative inconvenience, similar to those with which charter cities already have had to comply in this area of public policy and law. State Opp. at 31.

SB 166 is tailored to narrowly address its specific purpose—to prevent the loss of sites cities have identified as available for low-cost housing, while leaving the cities with significant discretion over the implementation of this obligation. Under SB 166, a city is compelled to identify a new site only when it approves reduced density or different development on a site identified in its housing element as an affordable housing site. §65863(b)-(c). Cities have full discretion over which sites they select. Id.; 65583(a)(3); Creswell Decl., ¶10. While SB 166 requires cities to maintain the sites they previously identified for low-cost housing development, the cities may choose to replace those sites so long as they can show sufficient alternate site capacity to meet their RHNA allocation or they identify a replacement site within 180 days. §65863(b)-(c). Interv. Opp. at 20-21.

SB 1333 amended sections 65300.5, 65301.5, 65359, 65450, 65454, 65455, 65460.8, 65700, 65852.150, 65852.25, 65860, 65863, 65863.4, 65863.6, 65863.8, 65866, 65867.5, and 65869.5 to expressly apply many housing-development statutes to charter cities. SB 1333 is appropriately tailored to ensure the consistent statewide application of the statutory scheme established to address the affordable housing shortage. It does so by making expressly applicable to charter cities those requirements needed to ensure that cities comply with their obligations related to housing element planning to ensure a uniform and comprehensive approach to the statewide lack of affordable housing. Those requirements include taking no action that is inconsistent with a general plan, housing element, specific plan (§65454), or zoning ordinance (§65860), as well as the No Net Loss Law's requirement of taking no action that is inconsistent with the obligation to maintain sites available at all times to meet the RHNA (§ 65863). SB 1333 is narrowly tailored to avoid unnecessarily interfering with local control.[19] Interv. Opp. at 21.[20]

---

[19] Although the original version of SB 1333 would have made all of the Government Code's local planning laws and zoning regulations laws applicable to charter cities, the Legislature addressed opponents' concerns and narrowed the bill's scope to cover only those portions of the laws necessary to the goals of requiring consistency and enforcing no net loss zoning. *See, e.g.*, Assembly, Senate Third Reading, Analysis of Sen. Bill No. 1333 (2017-2018 Reg. Sess.), Aug. 17, 2018, p. 3 ("Opponents argue that this bill goes too far and believe that the author's goal […] can be achieved without broadly applying all of the planning and zoning statutes to charter cities"); Assembly, Senate Third Reading Analysis, Analysis of Sen. Bill No. 1333 (2017-2018 Reg. Sess.), Aug. 24, 2018, pp. 3-4 (noting adoption of narrowing recommendation). State Opp. at 31-32.

[20] State explains the individual statutes amended or enacted by SB 35 and SB 1333. Sections 65300.5, 65582.1 (SB 35), and 65450 do not requires a charter city to do or not to do anything. State Opp. at 32. Sections 65301.5 and 65867.5 have minimal practical impact on a charter city. State Opp. at 32-33. Section 65852.25 prevents a city from taking advantage of a catastrophic event to downzone a site, and its numerous exceptions provide appropriate tailoring,

01/29/2021

City replies that both State and Intervenors simply repeat the purposes of specific statutes in the Housing Bills and ask the court to accept that they are narrowly tailored, *ipse dixit*. The lack of affordable housing production is not driven by a lack of sufficient planned and zoned sites, but rather the lack of sufficient funding. Narrow tailoring requires State to ensure that the law at issue treads only so far as necessary to address the matter of statewide concern. Yet, the Housing Bills could not have been designed better to permanently interfere with local governance. City concludes that the Housing Bills amount to a *de facto* rescission of article XI, section 5. There will be no longer any meaningful distinction between general law cities and charter cities if the Legislature can simply impose an abstract statewide purpose for a law. Reply at 11.

The court does not agree. It is clear that the Housing Bills, and the statutes they amend or implement, are reasonably related to address the issue of insufficient housing. City does not raise any specific argument to dispute State's assertions that each of the implicated statutes is designed to address the issue of low-cost housing. City also fails to argue or establish with sufficient specificity that the Housing Bills are not narrowly tailored such that they unconstitutionally eliminate local control. City's argument that funding is the primary issue behind the lack of low-cost housing merely focuses on a probable lack of success and does not mean that the Housing Bills are not narrowly tailored. In contrast to City's generalized claims of overbreadth, State and Intervenors persuasively argue that the specific statutes amended or adopted in the Housing Bills are narrowly tailored because they permit local discretion to the extent feasible. State Opp. at 33-34; Interv. Opp. at 20.

The Housing Bills are reasonably related to the issue of statewide concern for insufficient low-cost housing and are narrowly tailored to address the issue.

### G. Conclusion

The petition for writ of mandate is denied. The declaratory relief claim is granted. A

---

avoiding unduly interfering with local control over rebuilding decisions. State Opp. at 33. Section 65852.150 encourages construction of ADUs, merely invites charter cities to share in ADU policy choices, and does not thwart local control. State Opp. at 33. Section 65863 *et seq.* is an anti-downzoning scheme containing numerous exceptions and thereby avoids unnecessarily interfering with local control over rebuilding decisions. State Opp. at 33-34. Section 65863.4's mandate against downzoning is limited and the city retains discretion. State Opp. at 34. Section 65863.6 affords a city broad discretion to consider and to address the needs of the city's residents, as well as the local economic and environmental resources that would be impacted by the zoning decision. State Opp. at 34. Section 65863.8 affords a city discretion with respect to whether the change in use may be approved, evidencing an incursion only so intrusive as necessary to accomplish its goal. State Opp. at 34. Changes to the Development Agreements Law (§65864 *et seq.*) do not intrude on a city's discretion whether or not to enter a development agreement or the structure of the agreement. State Opp. at 35. Section 65913.4 (SB 35) streamlines the approval process for multi-family housing development. Although the statute intrudes upon local control, it applies in only limited circumstances. Cities that are making housing development approval decisions in good faith face no compulsion under this statute, making it narrowly tailored. State Opp. at 35-36.

declaration shall issue that the Housing Bills do not violate the municipal affairs doctrine of the California Constitution and may be enforced.

State's counsel is ordered to prepare a proposed judgment, serve it on the other counsel for approval as to form, wait ten days after service for any objections, meet and confer if there are objections, and then submit the proposed judgment along with a declaration stating the existence/non-existence of any unresolved objections. An OSC re: judgment is set for February 18, 2021 9:30 a.m.

# CERTIFICATE OF SERVICE

Case Name: **City of Huntington Beach, et al.**          No.   **8:23-cv-00421**
**v. Gavin Newsom, et al.**

I hereby certify that on <u>March 20, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**REQUEST FOR JUDICIAL NOTICE IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION PURSUANT TO FED. R .CIV. P. 65**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>March 20, 2023</u>, at Sacramento, California.

| Leticia Aguirre | */s/ Leticia Aguirre* |
|:---:|:---:|
| Declarant | Signature |

SA2023301426
37019733.docx