MICHAEL E. GATES, City Attorney (SBN 258446)
MICHAEL J. VIGLIOTTA, Chief Assistant City Attorney (SBN 207630)
Office of the City Attorney
2000 Main Street, P.O. Box 190
Huntington Beach, CA 92648
(714) 536-5555
Email: Michael.Gates@surfcity-hb.org
Email: MVigliotta@surfcity-hb.org

Attorneys for Plaintiffs
CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation,
HUNTINGTON BEACH CITY COUNCIL, and
MAYOR OF HUNTINGTON BEACH, TONY STRICKLAND, and
MAYOR PRO TEM OF HUNTINGTON BEACH, GRACEY VAN DER MARK

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation, the HUNTINGTON BEACH CITY COUNCIL, MAYOR OF HUNTINGTON BEACH, TONY STRICKLAND, also as an individual, and MAYOR PRO TEM OF HUNTINGTON BEACH, GRACEY VAN DER MARK, also as an individual<br><br>          Plaintiffs,<br><br>          v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California; GUSTAVO VELASQUEZ in his official capacity as Director of the State of California Department of Housing and Community Development; STATE OF CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT; SOUTHERN CALIFORNIA ASSOCIATION OF GOVERNMENTS; and | CASE NO. 8:23-CV-00421<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF**<br><br>1.  **VIOLATION OF FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION FOR COMPELLED SPEECH**<br>2.  **VIOLATION OF FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION FOR PROCEDURAL DUE PROCESS**<br>3.  **VIOLATION OF FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION FOR SUBSTANTIVE DUE PROCESS**<br>4.  **VIOLATION OF THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION (U.S. CONST., ART. I, § 8, CL. 3)**<br>5.  **VIOLATION OF CALIFORNIA CONSTITUTION ARTICLE XI (CHARTER CITY AUTHORITY)** |

1

306069

DOES 1-50, inclusive,

          Defendants.

6. **VIOLATION OF CALIFORNIA GOVERNMENT CODE §§ 65583 *ET. SEQ.* (REGIONAL HOUSING NEEDS ALLOCATION LAWS)**
7. **VIOLATION OF CALIFORNIA CONSTITUTION SEPARATION OF POWERS**
8. **VIOLATION OF THE CALIFORNIA CONSTITUTION, ILLEGAL BILL OF ATTAINDER (U.S. CONST., ART. I, § 10)**
9. **VIOLATION OF CALIFORNIA ENVIRONMENTAL QUALITY ACT (PUBLIC RESOURCES CODE §§ 21000 *ET. SEQ.* (CEQA))**
10. **VIOLATION OF CALIFORNIA CONSTITUTION ARTICLE IV, SECTION 16 (SPECIAL STATUTE)**
11. **FRAUD**

**<u>DEMAND FOR JURY TRIAL</u>**

---

The CITY OF HUNTINGTON BEACH ("City of HB"), the HUNTINGTON BEACH CITY COUNCIL ("City Council" or "Council Members")[1], the MAYOR OF HUNTINGTON BEACH TONY STRICKLAND, also as an individual ("Mayor"), and the MAYOR PRO TEM OF HUNTINGTON BEACH GRACEY VAN DER MARK, also as an individual ("Mayor Pro Tem"), are all collectively hereinafter referred to together as "City" or together as "Plaintiff(s)."  The City bring this lawsuit, now as the First Amended Complaint ("Complaint"), seeking declaratory and injunctive relief for violations committed by various State elected and appointed officials, including GAVIN NEWSOM, in his official capacity as Governor of

---

[1]  The HUNTINGTON BEACH CITY COUNCIL is comprised of seven elected Council Members; one Council Member is also the Mayor, and another Council Member, Mayor Pro Tem.  So, when this Complaint refers to "City Council" or "Council Members," those terms include the Mayor and Mayor Pro Tem.

2

306069

the State of California ("Governor"); GUSTAVO VELASQUEZ in his official capacity as Director of the State of California Department of Housing and Community Development ("Director"); STATE OF CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT ("HCD"); SOUTHERN CALIFORNIA ASSOCIATION OF GOVERNMENTS ("SCAG"); and DOES 1-50, inclusive (all together as "Defendants"), against City (and the rights of all others similarly situated) guaranteed by the First and Fourteenth Amendments of the United States Constitution,  Article 1, Section 8, Clause 3 of the U.S. Constitution, Article I Section 7 of California Constitution, Article IV of the California Constitution, Article XI Section 5 of California Constitution, California Government Code Sections 65583, *et. seq*., California Public Resources Code Sections 21000, *et. seq*., and Urban Water Management Planning Act (Cal. Wat. Code, §§ 10610, *et. seq*.).

By this Complaint the Plaintiff(s), seeks a declaration invalidating, and an order enjoining, the enforcement of California Government Code Sections 65583, 65583.1, 65583.2, 65583.3, 65584, 65584.01, 65584.02, 65584.03, 65584.04, 65584.045, 65584.05 65584.06, 65584.07, 65584.09, 65584.2, 65585 of Title 7 of the Government Code (which provides State Planning and Land Use Laws), these aforementioned Government Code Sections as a subset is commonly known as the "Regional Housing Needs Allocation Laws" (hereinafter "RHNA Laws").

The Plaintiff(s) bring this Action pursuant to 28 U.S.C. 1331 as Defendants have committed substantial deprivation of Plaintiff(s)' rights under the U.S. Constitution.

The Plaintiff(s) aver the following upon personal knowledge, information, and belief, and based upon the investigation of counsel as to all other facts alleged in the Complaint. Plaintiff(s) requests a trial by jury of all claims so triable.

3

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

# GENERAL ALLEGATIONS

## I.   INTRODUCTION

1.      This Complaint arises from violations of the U.S. Constitution and California Constitution and State Statutes, i.e., the Governor, the Director, HCD, SCAG, and other Defendants have commandeered the ***rightful and constitutional autonomy and Charter City authority of the City*** regarding local land use matters.

2.      In 2017 and 2018, California lawmakers passed two packages of housing bills that amended Title 7 of the California Government Code Sections 65000, *et. seq.*, ("Planning and Land Use Laws") to provide HCD and its Director unbridled and unlimited ability to commandeer Charter Cities' authority regarding local land use.

3.      Among the housing bills, in 2018, the State passed SB 1333, in violation of the California Constitution, requiring Charter Cities to comply with most of Planning Land Use Laws to deprive Charter Cities of their historical local authority to conduct Municipal Affairs, and punish the City of Huntington Beach. The State did this by making the unfounded allegation that housing is a matter of "Statewide Concern."  This lawsuit will prove that the concept of "Statewide Concern" with regard to the State's Legislative efforts on housing is false.

4.      As a practical matter if allowed to proceed, the State, through its Governor, the Director, and the State's administrative agency, HCD, will continue with an unbridled power play to control all aspects of the City Council's land use decisions in order to eliminate the suburban character of the City and replace it with a high-density mecca.  This will be done through the forced rezoning for high-density housing, including allowing developers to construct high-density projects leaving the City Council with no discretion to deny or condition invasive high-density development.

4

306069

5.     In general, the recent housing bills referred to above (as well as new more onerous and capricious ones) combined with existing Planning and Land Use Laws (California Government Code Sections 65000 through 66300 series as "Housing Laws") deprive the City Council of its authority to zone property, and replace with a State-mandated zoning process.  These laws are so flawed, conflicting, vague, arbitrary and capricious, and left to subjective interpretation and application of political actors as to be unconstitutional.

6.     This rapid, reckless, State-mandated re-development scheme threatens the health, safety, and welfare of the City; it overburdens existing City infrastructure, damages environmentally sensitive areas of the City, and devalues affected private properties.

7.     The RHNA Laws and actions of Defendants violate free speech in four distinct ways, i.e., individual free speech, elected Council Member free speech, free speech of the City Council body (upon a vote), and the free speech of the City as "government speech." (See *Shurtleff v. City of Boston*, (2022) 142 S. Ct. 1583, that governments have protected First Amendment "speech").  The seven members of the City Council are each individual free citizens of America and residents of Huntington Beach, elected by the people of Huntington Beach pursuant to the City's Charter, to serve on the City's governing body, the City Council.  Prior to their election to City Council, each individual has for his or her life enjoyed his or her free speech provided for by the First Amendment of the U.S. Constitution.

8.     Once elected, these individuals serve the community by making policy and land use decisions as elected City Council Members.  Those City Council Members, even in their official capacities as government officials, enjoy his or her free speech provided for by the First Amendment while they each serve in their official capacity as governing leaders of Huntington Beach.

5

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

9.     Together as a body of City Council, these Council Members also enjoy free speech provided for by the First Amendment in their vote on a policy or land use decision.  The City Council "speaks" as a collective body when a majority of Council Members have voted upon and made a policy or land use decision.

10.     Finally, the City enjoys free speech provided for by the First Amendment as the City Council votes on a policy or land use decision and that vote, or decision, continues on in the future as a City "statement" or City "ordinance" or City "resolution" or some other form of lasting City speech of the City.

11.     The Housing Laws, including RHNA Laws as defined above, go far beyond regulating conduct and illegally *force*, in tyrannical fashion, the City to not only conform to the specific political speech of the State, but these laws *force the City Council Members, an independent elected body with decision making autonomy to make specific statements* of "State speech," specific findings consistent with "State speech", and make specific votes pre-approved by the State regarding, and related to, "need for housing" in violation of the City Council Members' and the City's, First Amendment rights under the U.S. Constitution. (*Shurtleff v. City of Boston*, *supra*, that governments have protected First Amendment "speech" and; *Expressions Hair Design v. Schneiderman*, (2017) 137 S. Ct. 1144, finding against the State compelling "speech").

12.     The State cannot subvert the First Amendment and the California Environmental Quality Act ("CEQA") by requiring the City Council Members vote in a certain way.  The State cannot compel the speech of an independent decision-making body or individual Council Members by virtue of mandating the City Council Members say, adopt, approve, or vote that high-density housing outweighs the negative environmental impacts associated therewith.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

13.     The Housing Laws, including RHNA Laws, essentially require the City Council Members to replace their free speech, i.e., the verbal expressions of their freely formed opinions and decision-making thoughts, with the words of the State that advance the State's political agenda.

14.     Indeed, these RHNA Laws demand that the City's Council engage in certain speech while engaged in the local legislative process to say what Governor GAVIN NEWSOM, the Director, HCD, and other State actors want them to say, including but not limited to, there "is a housing crisis," that Huntington Beach "needs more affordable housing," that the State "needs more affordable housing," that "the benefits of high-density development in the City outweigh the negative impacts of high-density development on the environment," and so on, despite objective evidence to the contrary.  The Governor, the Director, HCD, and SCAG use the RHNA Laws regulate, even mandate, *how* the City communicates its stance on housing, what ultimately the Council Members' "say" in their vote, and what Council Members are compelled to say to the public with regard to "housing need" to justify their vote.

15.     There is a chilling effect these sweeping RHNA Laws present to the City's freedom to speak.  According to these laws, the City Council must adopt its Housing Element *by necessarily making findings (speech) that RHNA Units imposed on the City by the State must be planned for based on some amorphous concept that the City (not necessarily the State) needs more housing*.  If the City does not adopt this "State speech," by making these findings, which are demanded by other State environmental laws, the State will punish the City.   This is a content-based restriction by the State on how the City Council speaks.

16.     To illustrate, pursuant to the State's most prominent environmental laws, CEQA, the City Council is required to adopt a "Statement of Overriding Consideration," a document containing "statements of findings" by the City Council, in order to justify, as a matter of environmental impact, the massive

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

increase in high-density housing, or not adopt a "Statement of Overriding Consideration" required by CEQA (because the high density zoning is not justified in light of requisite environmental concerns) and not zoned for the massive high-density housing mandated by the RHNA Laws and Defendants, but then face crippling penalties and lawsuits from Defendants.

17.     The State, through the enforcement of the RHNA Laws, *force* the City Council to "say" through its Statement of Overriding Consideration, which is absolutely required by CEQA, something that the City Council may not otherwise choose to say, may not believe to necessarily be true, e.g., that the benefits of the proposed high-density housing outweigh the negative impacts on the City's environment.  This is not only forcing the City Council to engage in bad government, it is forcing the City Council to "choose" high-density housing over protecting the environment, and it is *forcing* the City Council to "say" both in speeches and in writing that protecting its environment is not a priority – completely contrary to the spirit and strictures of CEQA itself.

18.     Additionally, the high-density development goals of the RHNA Laws *compel* the City Council to arrive at a "fixed" conclusion in favor of high-density housing even before consideration through public hearings, eventually making a public Statement of Overriding Consideration.

19.     Using RHNA Laws, Defendants, including HCD, determined in 2021 that the City must rezone property to allow the development of 13,368 units of high-density RHNA Units (the 13,368 units mandated on the City is hereinafter "RHNA Units") with little to no ability for the City to disapprove, condition, or control the development of RHNA Units.

20.     In order to execute on the State's asserted mandate of 13,368 RHNA Units at a 20% inclusionary rate (which is HCD's goal), essentially means that the City must plan for tens of thousands of additional high-density units of housing by

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

1  the end of the current, 6th, Planning Cycle, in 2029.[2] (hereinafter, "Planning Cycle")

2       21.   Moreover, the State's recent Housing and RHNA Laws impede on

3  City's **independent legislative authority** and claim to **prevent judicial review**[3] *of*

4  *the* HCD *administrative rulings*, which **clearly** violates constitutional principles

5  of Separation of Powers and Procedural and Substantive Due Process afforded

6  by the U.S. Constitution and the California Constitution.

7       22.   The RHNA Laws are vague and ambiguous (at best) and create a

8  flawed process that mandates that the City of Huntington Beach zone for of 13,368

9  RHNA Units. The RHNA Laws violate the U.S. Constitution, the California

10  Constitution, and Federal and State law.

11       23.   In 2022, the State's Independent Auditor determined that the

12  State's/HCD's 2021 calculations created using flawed RHNA Laws, were

13  erroneous, concluding:

14       "HCD does not satisfactorily review its needs assessments to ensure

15        that staff accurately enter data when they calculate how much

16        housing local governments must plan to build… **HCD could not**

17        **demonstrate that it adequately considered all of the factors that**

18        **state law requires**… This insufficient oversight and lack of support

19        for its considerations risks eroding public confidence that HCD is

20        informing local governments of the appropriate amount of housing

21        they will need."[4]

22

23

---

24  [2]  California cities are on the same Planning Cycle; now in the 6th Planning Cycle,

25  which commenced October of 2021 and concludes October of 2029.

    [3]  The State Legislature amended the RHNA process to *eliminate* **judicial review**

26  when it amended Section 65584(c)(4) in 2004.

    [4]  Online:  California City News, "*Auditor Rips Housing Department Over Flawed*

27  *RHNA Process*," April 2022, https://www.californiacitynews.org/2022/04/ state-

28  auditor-rips-housing-department-over-flawed-rhna-process.html

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE
RELIEF; JURY TRIAL

24.     In addition, the requirement to zone for 13,368 RHNA Units is so disproportionate to other jurisdictions, the City believes that, if measured by square mile of City land, the 13,368 is the *highest RHNA number* of any other city throughout the entire State of California (for the current Planning Cycle).[5] Moreover, HCD and other Defendants, through the flawed RHNA process, have allocated highly developed cities like Huntington Beach disproportionately high RHNA unit mandates, *while **reducing the number of RHNA units***, for dozens of other cities.  This skewed, un-uniform, and inconsistent approach to RHNA by the State undermines the State's claim that these Housing and RHNA Laws are a matter of "Statewide Concern."  By their own actions, Defendants prove they are not.

25.     For decades, the Housing Laws, including RHNA Laws, were adopted and amended poorly so as to have no productive effect, and only cause a false narrative and confusion.  The poorly enacted RHNA Laws cause cities like Huntington Beach to be disproportionately burdened while allowing other cities to zone for very few RHNA Units; and, as will be proven at trial, dozens of other cities receive no RHNA unit mandates at all, or theirs have been reduced.

26.     So flawed are the RHNA Laws that the State, in a damning admission that its own Legislation has been flawed for years, recently passed AB 101, which states:

> "this bill, by December 31, 2022, would also require HCD, in collaboration
> with the Office of Planning and Research and after engaging in stakeholder
> participation, to develop a recommended improved regional housing need
> allocation process and methodology that promotes and streamlines housing

---

[5]   The City of Huntington Beach is approximately 28 square miles, much of it environmentally sensitive Wetlands and marshes – so the developable amount of land in Huntington Beach is far less.  At 13,368 units, that is approximately 472 units per square mile. This number would be *much higher* if all of the undevelopable Wetlands, marshes, and other sensitive environmental areas were removed from the calculation.

10

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE
RELIEF; JURY TRIAL

306069

development and substantially addresses California's housing shortage, as provided. The bill would require HCD to submit a report on its findings and recommendations to the Legislature upon completion."[6]

27.     By virtue of AB 101, the State *admits* that its RHNA Laws (and processes) to determine how many RHNA Units are needed in the State, and individual jurisdictions, must be fixed.  As will be demonstrated at trial, a "flawed State mandate" can be no "mandate" on a city at all.

28.     Moreover, if 13,368 RHNA Units are built in the current Planning Cycle, the size of the Huntington Beach would nearly double overnight, making it impossible for the City to provide for reliable infrastructure (including water, sewer and roads), adequate law enforcement and first response departments, health and safety of the community, a clean and safe environment, to name a few.

29.     According to the State, if the City does not immediately zone for these 13,368 RHNA Units as required by RHNA Laws, Defendants will punish the City.

30.     On February 15, 2023, the Office of the Governor of California tweeted on social media "Huntington Beach is playing chicken with housing.  The state will hold them accountable.  California law lets judges appoint a state agent to do their housing planning for them – HB can do it themselves or the court will take control."[7]  In 2019, at a Press Conference, Governor GAVIN NEWSOM proclaimed that as part of his new housing bills package, he sought to punish cities like Huntington Beach, as he said "the State's vision [for housing] will be realized at the local level" and "ask the folks down in Huntington Beach."[8]

31.     The State's high density housing proliferation scheme is also flawed in that it targets already-developed areas of the State, does little or nothing to increase

---

[6]  Online:  LegiScan:  https://legiscan.com/CA/text/AB101/id/2047816
[7]  Online:  Twitter:  https://twitter.com/CAgovernor/status/1625898020683538432
[8]  Online:  YouTube:  https://www.youtube.com/watch?v=JSy2VOGkBF8 at 45:30

11

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

1   housing development in undeveloped areas of the State, and exempts entirely certain

2   "favored" portions of the State.

3          32.    Governor GAVIN NEWSOM, the Director, and other State Defendants

4   advance a false narrative that there is a "housing crisis" yet it has been reported,

5   "according to the 2010 Census, 95 percent of Californians live on just 5.3 percent of

6   the territory in the state."[9]  In other words, over 95 percent of California is

7   undeveloped and unoccupied.  Moreover, it has also been reported that California

8   actually has declining population, that "between April 2020 and July 2022, with the

9   number of residents leaving surpassing those moving in by nearly 700,000."[10]

10          33.    While the State of California is facing an electricity crisis due to supply

11   shortages, a drought, and water supply crisis, Defendants continue to peddle this

12   narrative of a need for *more* development, which would put even more strain on all

13   of these resources.  In doing so, Defendants *target* already developed suburban cities

14   like Huntington Beach for complete *re-development* to densify and transform

15   suburban single-family communities into high-density suburban cities.

16          34.    In addition to a lack of seriousness by the State in creating more

17   housing where it would be productive to do so in undeveloped areas of the State,

18   Defendants have also carved out "favored" portions of the State to be *allowed to*

19   *skirt the very same Housing Laws, including RHNA Laws, which are imposed on*

20   *Huntington Beach.*  In a 2019 article, entitled "*Huntington Beach Sued While Marin*

21   *County Exempted from Affordable Housing Requirements*" it was reported that in

22   order to protect Governor GAVIN NEWSOM's home county, Marin County is

23   "enjoying a moratorium on affordable housing building requirements until 2028."

24

25   [9]  Online:  Daily News, *"Land Use Regulations are obstacles to the California*
    *Dream"* April 3, 2019: https://www.dailynews.com/2019/04/03/land-use-
26   regulations-are-obstacles-to-the-california-dream
27   [10]  Online:  California Globe, *"California Loses Nearly 700,000 Residents Since*
    *2020"* February 17, 2023:  https://californiaglobe.com/articles/california-loses-
28   nearly-700000-residents-since-2020

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE
RELIEF; JURY TRIAL

To accomplish this, "sneaky language inserted into a 2017 budget trailer bill allowed Marin County to maintain its extra restrictions on how many homes developers can build, giving the finger to the California Anti-NIMBY Statute."[11] That Bill was AB 106.

35.    Defendant Governor GAVIN NEWSOM benefitted his home county of Marin County from having to comply with certain RHNA Laws in the same way the City is required to. Marin County is allowed to flout RHNA Laws; the City of Huntington Beach must plan to build 13,368 RHNA Units while Marin County gets a pass.

36.    Moreover, it is reported that "It's at least noteworthy that the affluent suburbs seeking ways around their quotas, mostly in the San Francisco Bay Area, are overwhelmingly Democrat in their political orientation while Huntington Beach is a Republican stronghold.  That would be Montecito, home to celebrities galore, including Oprah Winfrey, Rob Lowe, Ellen DeGeneres and, most recently, expatriate British Prince Harry and his wife, actress Meghan Markle."[12]  And, "Some of the sites are vacant while others are occupied, including some shopping centers and churches. None is in Montecito or an adjacent enclave called Summerland, even though the county's inventory of vacant land includes about a dozen parcels, some of them large, in those two communities. When county officials outlined their plan at a public meeting this month, they were asked why no sites in Montecito were included. County planning director Lisa Plowman said only sites

---

[11]   Online:  California Globe, "*Huntington Beach Sued While Marin County Exempted From Affordable Housing Requirements*" January 31, 2019: https://californiaglobe.com/articles/huntington-beach-sued- while-marin-county-exempted-from-affordable-housing-requirements

[12]   Online:  CalMatters, "*As City-State Housing War Heats Up, One Rich California Enclave Gets A Pass*" February 26, 2023: https://calmatters.org/commentary/2023/02/housing-quota-montecito-enclave

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

whose owners were interested in development were chosen and no one in Montecito or Summerland was amenable to dense multi-family housing." *Id.*

37.    If housing and development were of real concern to the State, the Governor would not have vetoed a bill in 2022 which sought to prevent foreign governments from coming into the State and buying up its precious land resources.[13] The fact that Governor GAVIN NEWSOM vetoed such legislation is another act that undermines any claim that housing and its high-density development is a matter of "Statewide Concern."

38.    Governor GAVIN NEWSOM, the Director, and other Defendants have claimed repeatedly that housing, homelessness, and urban development is a matter of "Statewide Concern."   Their actions are to the contrary.

39.    If increasing housing was a matter of "Statewide Concern," (which it can be proven it is not), there would be a focus on housing development in *undeveloped* areas of the State where development could occur without disrupting existing development and it would be far less expensive.  Moreover, if increasing housing was a matter of legitimate Statewide Concern, the State could not carve-out special treatment for certain "favored" portions of the State like Marin County. Instead, the State's agenda is clearly *not* a matter of "Statewide Concern" and is instead nakedly designed to target already-developed suburban cities, to re-develop them, to make them into new high-density urban areas, thereby reducing the amount of private property lot ownership and increasing the amount of multi-family housing for transient living opportunities.

40.    The favoritism demonstrated by the State is shocking, but it only underscores the lack of consistent application and equal treatment, i.e., "Equal Protection" under the Housing Laws, including RHNA Laws.  Moreover, it

---

[13]   Online:  California Globe, "*Newsom Vetoes Bill To Prohibit Foreign Governments From Buying CA Agricultural Land*" September 28, 2022: https://californiaglobe.com/articles/newsom-vetoes -bill-to-prohibit-foreign-governments-from-buying-ca-agricultural-land

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

highlights to selective and punitive nature of those same laws against cities like Huntington Beach.

41.     By this Complaint the Plaintiff(s), seeks a Declaration from this Court that the State's RHNA Laws are invalid and an Order enjoining the enforcement thereof against Plaintiff(s) and other cities similarly situated.

42.     Plaintiff(s), and on behalf all others similarly situated, brings this lawsuit seeking a Declaration and Injunction to define the limits of a State's police power.  The U.S. Constitution provides such limits, specifically prohibiting unfettered and unchecked "police power" of the State and administrative agencies, like HCD.  The issues raised in this Complaint are novel and complex and are of such importance that they can long longer go without judicial review in Federal Court.

## II.   PARTIES

43.     Plaintiff, CITY OF HUNTINGTON BEACH ("City of HB"), is and at all relevant times was a Municipal Corporation and Charter City[14] organized and existing under a freeholder's charter and exercising "Home Rule" powers over its Municipal Affairs, including without limitation local zoning and land use matters, as authorized by Article XI, Section 5 of the California Constitution.

44.     Plaintiff, HUNTINGTON BEACH CITY COUNCIL ("City Council" or "Council Members"), is and at all relevant times the elected body of seven members, elected by the People of the City.  This City Council body of seven members also includes the Mayor and Mayor Pro Tem.

45.     Plaintiff, MAYOR OF HUNTINGTON BEACH TONY STRICKLAND, also as an individual ("Mayor"), is and at all relevant times elected by the City Council as the leader of the City Council pursuant to the City's Charter.

---

[14]  Online:  Charter, City of Huntington Beach: https://library.qcode.us/lib/ huntington_ beach_ca/pub/municipal_code/item/charter-preamble

306069

46.    Plaintiff, MAYOR PRO TEM OF HUNTINGTON BEACH GRACEY VAN DER MARK, also as an individual ("Mayor Pro Tem"), is and at all relevant times elected by the City Council as a leader of the City Council pursuant to the City's Charter.

47.    Defendant GAVIN NEWSOM ("Governor") is and at all relevant times was the Governor of the State of California.  He is being sued in his official capacity.

48.    Defendant GUSTAVO VELASQUEZ ("Director") is and at all relevant times was the Director of the State of California Department of Housing & Community Development.  He is being sued in his official capacity.

49.    Defendant SOUTHERN CALIFORNIA ASSOCIATION OF GOVERNMENTS ("SCAG") is and at all relevant times was the Southern California Association of Governments, acting as a body to further the implementation of the Housing Laws and RHNA Laws as defined above in concert with, or as an extension of, the STATE OF CALIFORNIA DEPARTMENT OF HOUSING & COMMUNITY DEVELOPMENT.

50.    Defendant, STATE OF CALIFORNIA DEPARTMENT OF HOUSING & COMMUNITY DEVELOPMENT ("HCD") is and at all relevant times was a Department of the State of California.

## III.    POTENTIAL PARTIES

51.    The City is ignorant of the true names and capacities of those Defendants sued herein as DOES 1 through 50, inclusive, and therefore sue those Defendants by such fictitious names.  City will amend this Complaint to allege the true names and capacities of these fictitiously named Defendants when the same have been ascertained.

52.    There are several individuals and/or entities whose true names and capacities are currently not known to the City.  Evidence may come forth that others are legally responsible and liable to the City to the extent of the liability of the

16

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

named Defendants. The City will seek leave of the Court to amend this Complaint to reflect the names and capacities should they become known. The City reserves the right to amend this claim pursuant to Fed. R. Civ. P. 15(a) and Fed. R. Civ. P. 21 with leave of the Court to add potential additional defendants and additional allegations and claims.

## IV.    JURISDICTION AND VENUE

53.    Plaintiff(s) bring this Action pursuant to 28 U.S.C. 1331 as Defendants have committed substantial deprivation of Plaintiff(s)' rights under the U.S. Constitution.

54.    Defendants have deprived Plaintiff(s) of First Amendment rights, Constitutional rights of Procedural and Substantive Due Process, and Defendants have violated the Commerce Clause of the U.S. Constitution.  Accordingly, this Court has federal question jurisdiction under 28 U.S.C. Sections 1331 and 1343. This Court has authority to award the requested Declaratory Relief under 28 U.S.C. § 2201; and the requested Injunctive Relief and damages under 28 U.S.C. § 1343(a).

55.    Venue is proper in the Central District of California under U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

56.    The City of HB has standing to bring this action as a Municipal Corporation, created and existing and known as the "City of Huntington Beach" pursuant to Huntington Beach Charter Section 100, California Constitution Article IX section 9, which is a "person" within the meaning of Fourteenth Amendment, and is entitled to its protection. (*River Vale v. Orangetown*, 403 F.2d 684, 1968 (2d Cir. 1968)).  The City of Huntington Beach was not created by the State.  In fact, the City, invoking Article XI of the California Constitution (which is a document embodying the voice of the people (not the State)), created itself by adopting a Charter and incorporating as Municipal Corporation.

17

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

57.    For decades, the U.S. Supreme Court has viewed Corporations as "persons" (not otherwise created by the State) entitled to Fourteenth Amendment protections, and then most recently, First Amendment Protections under *Citizens United v. Federal Election Commission* 558 U.S. 310 (2010). The Ninth Circuit Court of Appeal, citing *Branson Sch. Dist. RE-82 v. Romer*, (1998) 161 F.3d 619, observed that the Supreme Court has expressed a willingness to extend standing to cities depending on the Constitutional Claim. (*City of San Juan Capistrano v. Cal. PUC*, (2019) 937 F.3d 1278, 1283-1284).

58.    Especially in a conflict with the State where individual property rights and individual Constitutional rights are at issue in addition to the City's property rights and Constitutional rights, the individuals and their Municipal government properly seek recourse in Federal Court.

59.    Challenges in Federal Court by a Municipal Corporation and Charter City are proper when the State legislation adversely affects a municipality's proprietary interest in a specific fund of monies; where the State statute violates "Home Rule" powers of a municipality constitutionally guaranteed under Article XI Section 5 of the California Constitution; California Government Code Sections 65583, *et. seq*., and/or where the municipal challenger asserts that if it is obliged to comply with the State statute it will by that very compliance be forced to violate a constitutional proscription as well as conflicting State environmental laws.

60.    Sovereign immunity does not prevent a suit by Plaintiff(s) to restrain individual officials of the State, thereby restraining the government from violations of the U.S. Constitution. The violations alleged against the Governor and Director are ongoing and continuous, not simply a one-time violation or recurring past violations.

61.    Defendants Governor and HCD through its Director are charged with the enforcement of the unconstitutional acts alleged herein such that the suit against the official is not equated with a suit against the State.

18

306069

62.     Under 28 U.S.C. Section 1367, a Federal District Court may exercise supplemental jurisdiction over State claims that the Federal District Court would not otherwise have.

63.     The City has performed all conditions precedent to filing this Complaint including exhausting all available administrative remedies. The City of Huntington Beach, although maintaining its belief that it was not *required* to as a matter of State law, has always maintained its Home Rule, Charter City authority, yet followed the RHNA Laws process (under protest) as required by State law.

64.     The City further alleges that it is excused from exhausting any available administrative remedies it may have since Defendants have determined on multiple occasions they will not accept, agree to, or approve any City claims regarding the flawed RHNA process including City claims that HCD and SCAG failed to follow the State RHNA Laws process and denied the City Substantive and Procedural Due Process, and that the process itself is flawed and the State requirements of 13,368 RHNA Units imposed on the City are illegal.  Accordingly, any further exhaustion would be a futile act.

65.     This action challenges the decision made and the action already taken by Defendants and accordingly, not subject to the exhaustion of administrative remedies doctrine.

66.     Based upon the recent revelations of the State's Department of Finance's Independent Auditor's 2022 Report of findings, the City of Huntington Beach has timely brought this action to challenge the flawed RHNA Laws that require the City to provide land suitable to build 13,368 RHNA Units for this current Planning Cycle.

67.     City has no plain, speedy, and adequate remedy in the ordinary course of law other than to bring this Action to this Federal Court.

/ / /

/ / /

19

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

## V.   **BACKGROUND**

68.    Since 1969, the California State Legislature has passed laws requiring that *general law* cities and counties adequately plan to meet the future housing needs of people at all income levels in the community.  While these laws did *not* require Charter Cities to comply, most Charter Cities voluntarily followed the process, but did not to relinquish their Charter City Constitutional Home Rule authority.

69.    California's general law cities (and counties) must meet housing development goals requirements by adopting housing plans as part of their "General Plan" as required by the State.

70.    General Plans serve as the local government's "blueprint" for how the city or county will grow and develop and are required to include seven elements. General Plans lay out process; they do not mandate a particular outcome, or production result.  One such element of a General Plan that is required is a Housing Element.

71.    As part of "Housing Element Law" and a subset, RHNA Laws, the State requires that jurisdictions conduct a *regional housing needs assessment*, which in part attempts to determine the future housing needs of a jurisdiction during a planning cycle.  Meeting a certain RHNA housing units goal was always a "mandate" for general law cities, but not for Charter Cities.  SB 1333 suddenly imposed that same mandate on Charter Cities in 2018.

72.    The process begins with HCD determining a total housing need for the entire State (the State is divided into regions) ("Regional Determination"). The Regional Determination considers measures of existing housing needs (such as overcrowding and overpayment or rent) in addition to forecast population growth. Orange County and Huntington Beach are within the region covered by Southern California Association of Governments (hereinafter "SCAG").  In this case, HCD

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

provided SCAG a Regional Determination of 1,341,827 RHNA allocation for the current Planning Cycle, 2021-2029.

73.    SCAG developed a methodology for allocating the Regional Determination to each city and county in the region, and each jurisdiction is assigned a RHNA allocation.

74.    The Council of Governments ("COG") develops a Regional Housing Need Allocation Plan ("RHNA-Plan") allocating the Regional Determination to cities and counties within the region. The typical scenario is that HCD, in consultation with each COG, such as SCAG, determines the existing and projected housing needs for each region. (Government Code § 65584.01 (describing the way the needs determination shall be made)).  SCAG is responsible for creating a formula for distributing the Regional Determination to local governments/cities. Each city and county must adopt a Housing Element that demonstrates how the jurisdiction will accommodate its assigned RHNA units through its current zoning or potential rezoning program.  HCD reviews each jurisdiction's proposed Housing Element for compliance with State law, i.e., Housing Laws and RHNA Laws.

75.    Under a comprehensive administrative appeal procedure listed under Government Code Section 65584.04, a COG may adjust the RHNA numbers of one or more local governments, regardless of whether each government is the subject of any appeal.

76.    Once each local government's share of the amount of RHNA units, has been finalized upon the conclusion of the appeal process, Housing Laws provide that government's planning agency must then submit drafts of proposed Housing Elements containing the finalized RHNA units for that local government to HCD for review. HCD then has ninety-days (for adoptions) or sixty-days (for amendments) to provide written comments to the local government, which the local government must consider before final adoption of the Housing Element.

77.    If HCD finds that a draft Housing Element does not substantially

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

comply with statutory requirements, the local government must either revise the element in accordance with HCD's recommendations or adopt findings explaining why the local government believes the Housing Element substantially complies with the statute despite HCD's comments.  (Gov't Code § 65585(f).)

78.     Once the local government adopts the new or amended Housing Element, the local government must again submit the same to HCD for review. (Gov't Code § 65585(g).)  HCD will then determine whether the Housing Element is in substantial compliance with State law. (Gov't Code § 65585(h).)

79.     If a local government fails to submit a compliant Housing Element within the required timeframe or is found to be noncompliant with its RHNA requirements, it can face significant penalties, including the following:

     a.  A local government will be subject to a 4-year housing element review cycle, rather than an 8-year cycle. (Gov't Code § 65588(b).)

     b.  A local government will be prohibited from disapproving housing development projects that meet certain affordability requirements, even though the proposed projects are not in conformance with the government's zoning or general plan (colloquially known as the "Builder's Remedy"). (Gov't Code § 65589.5(d)(5).)

     c.  Under certain conditions, if a local government fails to complete a required rezoning within the time frame required upon the housing element update, the local government is prohibited from disapproving a housing development project (that is located on property that is required to be rezoned and objectively consistent with the general plan policies and design standards) or from taking certain other actions. (Gov't Code § 65583(g)(1).)

     d.  A court may suspend a local government's authority to issue any building or zoning permit or any subdivision map approval. (Gov't Code § 65755(a)(1)-(3).)  Conversely, a court may mandate that a local

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

government approve certain housing projects. (Gov't Code § 65755(a)(4)-(6).)

e. A local government will become the target of lawsuits by both the Attorney General and interested parties, subject to financial penalties. (Gov't Code § 65583(g)(3).)

f. The local government will not be eligible for certain State or Federal grant funds. (*See, e.g.,* Health & Saf. Code § 50829.)

80.  The Governor, the Director, and HCD have threatened to impose all of these remedies on the City of Huntington Beach.

81.  The process to determine a city's RHNA allocation or determination under the Housing Laws, including RHNA Laws, has some mathematic and pseudo-scientific components, which constitutes the State's "methodology" for determining RHNA units for each city in each planning cycle.  However, much of the process to allocate RHNA has been done more and more recently by virtue of an illicit and illegal *ad hoc political* process, in contravention to aforementioned State laws.

82.  Political gaming has, in actuality, replaced what State RHNA Laws originally sought, which was some verifiable process (the existing law is so convoluted as to be vague) to determine how much housing a particular jurisdiction may actually need in the future.

83.  Through the RHNA Laws mandate, the State is removing the century-old idea of Euclidian zoning, and replace it with chaotic re-zoning and redevelopment with the excuse that a lack of adequately zoned high-density housing sites exacerbates the already significant deficit of housing affordable to lower income households.

A.  **Overview of the Current Flawed RHNA Process as to Charter Cities**

84.  For the current Planning Cycle, recent Housing Laws, including RHNA Laws, impermissibly delegated legislative authority to HCD to provide unbridled

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

1  control and enforcement over the RHNA process and Charter Cities and counties
2  compliance thereto.  This has resulted in *HCD-generated mandates*, not actual State
3  laws of themselves, development quotas (in the City's case, 13,368 RHNA Units for
4  the current Planning Cycle).  An administrative agency's "mandates" are not State
5  laws and as such, they carry no pre-emptive power over a Charter City's
6  Constitutional local decision-making authority.

7    85.    In March 2020, SCAG adopted its 6th Planning Cycle RHNA
8  Allocation Plan SCAG received 1,341,827 housing units, which was distributed to
9  all 197 SCAG jurisdictions (or cities).

10   86.    The 1,341,827 high-density RHNA units represents more than twice the
11  number of projected housing units needed by the end of this Planning Cycle in 2029,
12  if Housing Laws were actually followed, the number would really be 651,000
13  RHNA units.  That is to say, Defendants have so flawed the RHNA process, that the
14  statewide RHNA goal of 1,341,827 that was produced was more than twice as much
15  than if the Housing and RHNA Laws were actually followed.

16   87.    More than half of HCD's Regional Determination for the SCAG region
17  is due to a number of flawed factors, including HCD's use of the wrong population
18  forecast, erroneous comparable region data, and vacancy rates, as well  as the last-
19  minute substitution of a new methodology that includes overcrowding and cost
20  burdening factors  that HCD did not previously consider. HCD's use of the wrong
21  population forecast, regions that are not comparable to Southern California, and
22  inaccurate and unattainable vacancy rates, as well as a methodology that grossly
23  overestimates the projected housing needs by including overcrowding resulted in
24  double counting the number of required dwelling units for this Planning Cycle,
25  which was also all done in violation of RHNA Laws. Such factors were not included
26  in prior methodologies and such calculations are in violation of statutory law.

27   88.    Over the course of 2019, SCAG encouraged public involvement in the
28  development of its RHNA Methodology for its RHNA allocation, and OCCOG

24

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

participated in and contributed to the development of SCAG's RHNA Methodology during this time.

89.   The Orange County member of SCAG, known as "OCCOG," sent letters to SCAG regarding its RHNA Methodology and ultimate RHNA allocations, and reiterated its strong support for the inclusion of local factors (including growth forecast) as part of the ultimately selected methodology for the allocation of HCD's Regional Determine to SCAG's jurisdictions.  OCCOG also noted that HCD ignored the language in Government Code Section 65584.01(a) by using the State's Department of Finance ("DOF") total regional population forecast instead of SCAG's forecast.

90.   On November 7, 2019, during a meeting of the SCAG Regional Council, SCAG introduced a surprise and unanticipated substitute methodology for the RHNA allocation, which had not previously been disclosed to the public. The substitute methodology was later used by SCAG in its RHNA allocation to each local government in its jurisdiction.

91.   SCAG subsequently submitted its Draft Planning Cycle RHNA Methodology for HCD's review. On December 19, 2019, SCAG sent HCD a letter regarding HCD's final Regional Determination and advised that it had incorporated the determination in the development of SCAG's RHNA Methodology under review by HCD. SCAG reiterated its earlier objections that HCD did not base its determination on SCAG's total regional population forecast, as required by Government Code Section 65584.01(a). SCAG also objected to HCD's failure to meet with SCAG, as also required by Government Code Section 65584.01(a).

92.   On January 13, 2020, contrary to law and common sense, HCD sent a letter to SCAG in which it advised that it had completed its review of SCAG's RHNA Methodology and found that it furthered the five statutory objectives of RHNA.  It did not.

93.   Previous State law provided that only limited portions of State Planning

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

1    and Land Use Laws applied to Charter Cities.  Charter Cities were free to control

2    land use matters of local concern, because only local governments would know how

3    to meet the needs of their city while not disrupting already existing development,

4    but also not disrupting local sensitive natural environments.  The recent amendments

5    to State Planning and Land Use Laws since 2017, i.e., Housing Laws and RHNA

6    Laws, force Charter Cities to follow the new law in contravention of the California

7    Constitution and environmental laws or face excessive penalties.

8         **B.    RHNA Reform**

9         94.    The California Independent Auditor (defined above as "DOF") released

10   a 2022 Report highly critical of the RHNA process, finding the Defendants' RHNA

11   determinations, like the 13,368 RHNA Units assigned to the City, are not supported

12   by evidence.  For example, HCD uses a combined vacancy rate of 5% to non-rural

13   counties, while applying a 4% vacancy rate for rural counties. The DOF questioned

14   this vacancy rate because it was not sufficiently justified or supported. In turn, this

15   flawed vacancy rate created substantially higher number of high-density units in the

16   RHNA allocation while under-calculating the needs of Californians to live in single-

17   family homes.

18        95.    The State, recognizing the vague, arbitrary, and unsupported process to

19   calculate and allocate RHNA numbers has just recently called for whole scale

20   reform. It is apparent to the City that the State, through COG/SCAG, has relied on

21   faulty housing data and population projections concerning population growth to

22   create and then require cities to implement components of their Housing Elements.

23        96.    As part of Assembly Bill 101, which is the damning admission by the

24   State that the RHNA process has been flawed and produces erroneous, unreliable

25   results, HCD was tasked with preparing a report on RHNA reform and to make

26   recommendations to the State Legislature by December 31, 2022.  In October 2021,

27   the California State Joint Legislative Audit Committee approved an emergency audit

28   to examine HCD's RHNA determination process.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE
RELIEF; JURY TRIAL

97.     The State's own actions in 2021 and 2022 to address the RHNA Methodology is an admission enough that the RHNA Laws are flawed, and that Defendants violated Housing Laws and RHNA Laws when arriving at the RHNA "mandates," and that such flaws cannot possibly produce "mandates" to be imposed on Charter Cities like Huntington Beach.

**C.     Flawed RHNA Process as Applied to Huntington Beach**

98.     In addition to creating laws that are vague and ambiguous, Defendants used flawed data in calculating, and then allocating, disproportionately high RHNA units to Plaintiff(s) for the current Planning Cycle.  Moreover, HCD and other Defendants, through the flawed RHNA process, have allocated highly developed cities like Huntington Beach disproportionately high RHNA unit mandates, *while reducing the number of RHNA units*, for dozens of other cities.  This skewed, un-uniform, and inconsistent approach to RHNA by the State undermines the State's claim that these Housing and RHNA Laws are a matter of "Statewide Concern."  By their own actions, Defendants prove they are not.

99.     SCAG's RHNA Methodology to determine a jurisdiction's <u>existing</u> housing need "assigns *50 percent of regional existing need* based on a jurisdiction's share of the region's population within the high quality transit areas ("HQTAs") based on *future 2045* HQTAs."  Public Resources Code Section 21155(b) defines a HQTC as "a corridor with fixed route bus service with service intervals no longer than 15 minutes during peak commute hours."

100.   Public Resources Code Section 21155(b) *does not include future planned facilities within the definition*.  SCAG's RHNA Methodology created its own definition of a HQTA as inclusive of planned HQTC.  This move by SCAG created a conflict with the State's statutory definition.  SCAG did this deliberately in order to load up the City with additional RHNA allocations.  The more SCAG could dump high density RHNA units into Huntington Beach, the less SCAG had to

27

306069

allocate to other cities in the region, thus having to deal with less political fall-out from other cities.

101.   In the current, 6th Planning Cycle, RHNA Plan, the flawed data and disproportionately high (13,368) RHNA Units have caused Plaintiff(s) the impossible task of meeting these exceedingly high demands while trying to balance other State law(s), other necessary zoning considerations, and community needs.

102.   California Government Code Sections 65583(a)-(c) set forth an extensive list of the analyses, information, and programs that are required to be included in a city's Housing Element component of its General Plan. Among other things, and most importantly to the issues at hand, the HCD-compliant Housing Elements must contain an analysis of population and employment trends, and documentation of projections and quantification of the locality's existing and projected housing needs, for all income levels. According to HCD, the RHNA-Plan process requires local governments to be accountable for ensuring that projected housing needs can be accommodated and provides a benchmark for evaluating the adequacy of local zoning and regulatory actions to ensure each local government is providing sufficient appropriately designated land and opportunities for housing development to address population growth and job generation.

103.   The City of Huntington Beach informed SCAG on several occasions that SCAG failed to follow the law in California Government Code Section 65584.04(b)-(f) when it voted to follow an illegal, vague, arbitrary, and capricious formula that incorrectly allocated an additional approximately 6,000 high-density RHNA units to Plaintiff(s) for the current Planning Cycle.

104.   This SCAG vote in 2021 was not based on empirical data, the Housing Laws, or the RHNA Laws; instead, the vote was based on last-minute political wrangling between larger, more influential cities pressuring SCAG to take RHNA units away from their cities and force them into other, less politically influential

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE
RELIEF; JURY TRIAL

306069

cities, like Huntington Beach. Plaintiff(s) was not provided requisite Due Process in participating in this vote.

105.   It can be demonstrated that the 13,368 RHNA Units allocated to Plaintiff(s) undermines, and does not promote, the critical objectives of socioeconomic equity, placement of housing that can be reached quickly by transit, and achievement of statewide greenhouse gas emissions reduction goals. Housing Laws require that RHNA Units should be allocated based upon empirical data, not political gaming. The result of this vague, arbitrary, and capricious allocation of RHNA is to exaggerate the actual need for housing in Huntington Beach and corresponding cities.  Such politicking in the RHNA process and ultimate assignment of RHNA Units to the City demonstrates that the Housing Laws and RHNA Laws were not followed by Defendants, and the fact that it occurred at all undermines the entire RHNA process and RHNA Laws as legitimate, or a mandate.

106.   Moreover, the location of Beach Boulevard within the City that was a basis of SCAG analysis was *incorrectly* identified by SCAG as a High Quality Transit Area ("HQTA" or High Quality Transit Corridor "HQTC").  This classification of this area of the corridor is important because with the HQTA designation, SCAG could justify assigning, or allocating, *more* high density RHNA Units to the City than it otherwise would.  Yet, any observer can see, Beach Boulevard does *not* meet the definition of a HQTA under State Housing Laws and RHNA Laws.  SCAG's Final 6th Cycle RHNA Allocation Methodology explains that HQTAs "are based on state statutory definitions of High Quality Transit Corridors ("HQTCs") and major transit stops."  Beach Boulevard does not meet that definition.  SCAG did not care. Even after the City pointed out the error, SCAG persisted in its misclassification of Beach Boulevard as a "HQTC."

107.   HCD's 2018 Statewide Housing Assessment stated that from 2015-2025, approximately 1.8 million new housing units are needed to meet projected population and household growth.  This is 180,000 new homes annually.

29

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

108.    Governor GAVIN NEWSOM included building 3.5 million homes by 2025 as part of his 2018 campaign for Governor.  This is almost double the amount of housing need calculated in HCD's 2018 SHA.  In February 2020, he stated that the 3.5 million units was a "stretch goal" and that HCD would release a more "pragmatic" estimate of housing needs by region via the Statewide Housing Plan ("SHP").  HCD's SHP was released in March 2022 and states that California must plan for 2.5 million homes by 2030, with at least 1 million units for lower income households.

109.    In this Planning Cycle, SCAG received its Regional Determination (approximately 1.3 million units) from HCD on October 15, 2019.  SCAG's Regional Determination was developed under the rhetoric of the Governor's campaign promises for 3.5 million more homes.

110.    The region where Governor GAVIN NEWSOM lives is known as "Association of Bay Area Governments" or hereinafter "ABAG;" ABAG received its Regional Determination of only 441,176 units from HCD on June 9, 2020.  This was "coincidentally" a few months after Governor GAVIN NEWSOM admitted that 3.5 million new homes by 2025 was a "stretch" goal.

111.    The nationwide average is too low for many reasons.  Applying the low nationwide overcrowding adjustment to, ultimately, the City of Huntington Beach, where overcrowding is already occurring, produces a RHNA Units for the City that is far higher than the City could possibly, or reasonably, under Housing Laws and RHNA Laws, absorb.

112.    The nationwide average rate for overcrowding was used as a tool for HCD to artificially inflate SCAG's RHNA to help achieve Governor GAVIN NEWSOM's 3.5 million housing unit campaign promise.

113.    SCAG knew of this political math and various violations of State laws, but the Director of SCAG indicated that it would not sue HCD for the violations of State laws even though SCAG had formally objected to the Regional Determination

30

306069

1  but only because the State has "unlimited lawyers" and resources, not because a

2  challenge would not have merit.

3       114.   HCD could have used other comparable regions to SCAG such as

4  Manhattan, Houston, or even ABAG instead of erroneously using the *nationwide*

5  average.

6       115.   However, Governor GAVIN NEWSOM downplayed his campaign

7  promise once ABAG began its RHNA process so that ABAG cities and their

8  campaign donor residents could avoid the heavy RHNA load coming down from

9  HCD that SCAG was facing in 2021.

10       116.   The City of Huntington Beach has relied upon SCAG's RHNA

11  analysis in good faith has made every effort to cooperate with RHNA goals for each

12  and every planning cycle, even though the City believes that as a Charter City, none

13  of the RHNA Laws are "mandates" for Huntington Beach, or that the Housing Laws

14  and RHNA Laws preempt the City's Constitutional Home Rule authority as a

15  Charter City.

16       117.   In apparent contravention with these principles, it appears that HCD

17  and COG/SCAG, all unelected and politically unaccountable bodies, have been

18  unilaterally requiring Plaintiff(s) to increase its housing, thereby increasing demand

19  for water usage and consumption.

20       118.   In recent years, the State has made findings to support imposing

21  drought-related restrictions on residents and municipalities. Those same findings

22  resulted in a 26% water consumption *reduction* for Huntington Beach (2015).

23       119.   There is no evidence that the State conducted an adequate constraints

24  analysis such that projects built to accommodate the City's additional RHNA Units

25  would conflict with the new State law and regulation regarding water conservation.

26  (Government Code Section 65584.04 (d)(2).)

27       120.   The City appealed the Draft 6th Planning Cycle (2021-2029) RHNA

28  determination totaling 13,368 units, which consists of 3,652 very-low income units,

31

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE
RELIEF; JURY TRIAL

2,179 low income units, 2,303 moderate income units, and 5,203 above-moderate income units. The Appeal was based upon empirical data provided by the City that is comparable to the data used by SCAG and HCD, and which was supported by evidence, including expert reports.  This appeal was, to no one's surprise, denied by SCAG.

## VI.   <u>CAUSES OF ACTION</u>

<u>**FIRST CLAIM FOR RELIEF**</u>
<u>**VIOLATION OF FIRST AMENDMENT OF**</u>
<u>**THE UNITED STATES CONSTITUTION FOR**</u>
<u>**COMPELLED SPEECH**</u>
<u>**(As to ALL DEFENDANTS)**</u>

121.   Plaintiff(s) incorporates paragraphs 1-120 as if fully set forth herein.

122.   The Housing Laws, including RHNA Laws as defined above, go far beyond regulating conduct and illegally *force*, in tyrannical fashion, the City to not only conform to the specific political speech of the State, but these laws *force the City Council Members to make specific statements* of "State speech," specific findings consistent with "State speech", and make specific votes pre-approved by the State regarding, and related to, "need for housing" in violation of the City Council Members' and the City's, First Amendment rights under the U.S. Constitution. (*Shurtleff v. City of Boston*, *supra*, and; *Expressions Hair Design v. Schneiderman*, (2017) 137 S. Ct. 1144, finding against the State compelling "speech")   For decades, the U.S. Supreme Court has viewed Corporations as "persons" (not otherwise created by the State) entitled to Fourteenth Amendment protections, and then most recently, First Amendment Protections under *Citizens United v. Federal Election Commission* 558 U.S. 310 (2010).  The Ninth Circuit Court of Appeal, citing *Branson Sch. Dist. RE-82 v. Romer*, (1998) 161 F.3d 619, observed that the Supreme Court has expressed a willingness to extend standing to cities depending on the Constitutional Claim. (*City of San Juan Capistrano v. Cal. PUC*, (2019) 937 F.3d 1278, 1283-1284).

32

306069

123.   The RHNA Laws and actions of Defendants violate free speech in four distinct ways, i.e., individual free speech, elected Council Member free speech, free speech of the City Council body (upon a vote), and the free speech of the City as "government speech." The seven members of the City Council are each individual free citizens of America and residents of Huntington Beach, elected by the people of Huntington Beach pursuant to the City's Charter, to serve on the City's governing body, the City Council.  Prior to their election to City Council, each individual has for his or her life enjoyed his or her free speech provided for by the First Amendment of the U.S. Constitution.

124.   Once elected, these individuals serve the community by making policy and land use decisions as elected City Council Members.  Those City Council Members, even in their official capacities as government officials, enjoy his or her free speech provided for by the First Amendment while they each serve in their official capacity as governing leaders of Huntington Beach.

125.   Together as a body of City Council, these Council Members also enjoy free speech provided for by the First Amendment in their vote on a policy or land use decision.  The City Council "speaks" as a collective body when a majority of Council Members have voted upon and made a policy or land use decision.

126.   Finally, the City enjoys free speech provided for by the First Amendment as the City Council votes on a policy or land use decision and that vote, or decision, continues on in the future as a City "statement" or City "ordinance" or City "resolution" or some other form of lasting City speech of the City.

127.   The State cannot subvert the First Amendment and CEQA by requiring the City Council Members vote in a certain way.  The State cannot compel the speech of an independent decision-making body or individual Council Members by virtue of mandating the City Council Members say, adopt, approve, or vote that

33

306069

1  high-density housing outweighs the negative environmental impacts associated

2  therewith.

3      128.   Indeed, these RHNA Laws demand that the City's Council engage in

4  certain speech while engaged in the local legislative process to say what Governor

5  GAVIN NEWSOM, the Director, HCD, and other State actors want them to say,

6  including but not limited to, there "is a housing crisis," that Huntington Beach

7  "needs more affordable housing," that the State "needs more affordable housing,"

8  that "the benefits of high-density development in the City outweigh the negative

9  impacts of high-density development on the environment," and so on, despite

10 objective evidence to the contrary.  The Governor, the Director, HCD, and SCAG

11 use the RHNA Laws regulate, even mandate, *how* the City communicates its stance

12 on housing, what ultimately the Council Members' "say" in their vote, and what

13 Council Members are compelled to say to the public with regard to "housing need"

14 to justify their vote.

15     129.   There is a chilling effect these sweeping RHNA Laws present to the

16 City's freedom to speak.  According to these laws, the City Council must adopt its

17 Housing Element *by necessarily making findings (speech) that RHNA Units imposed*

18 *on the City by the State must be planned for based on some amorphous concept that*

19 *the City (not necessarily the State) needs more housing*.  If the City does not adopt

20 this "State speech," by making these findings, which are demanded by other State

21 environmental laws, the State will punish the City.   This is a content-based

22 restriction by the State on how the City Council speaks.

23     130.   To illustrate, pursuant to the State's most prominent environmental

24 laws, CEQA, the City Council is required to adopt a "Statement of Overriding

25 Consideration," a document containing "statements of findings" by the City

26 Council, in order to justify, as a matter of environmental impact, the massive

27 increase in high-density housing, or not adopt a "Statement of Overriding

28 Consideration" required by CEQA (because the high density zoning is not justified

34

in light of requisite environmental concerns) and not zoned for the massive high-density housing mandated by the RHNA Laws and Defendants, but then face crippling penalties and lawsuits from Defendants.

131.   The State, through the enforcement of the RHNA Laws, *force* the City Council to "say" through its Statement of Overriding Consideration, which is absolutely required by CEQA, something that the City Council may not otherwise choose to say, may not believe to necessarily be true, e.g., that the benefits of the proposed high-density housing outweigh the negative impacts on the City's environment.  This is not only forcing the City Council to engage in bad government, it is forcing the City Council to "choose" high-density housing over protecting the environment, and it is *forcing* the City Council to "say" both in speeches and in writing that protecting its environment is not a priority – completely contrary to the spirit and strictures of CEQA itself.

132.   Using RHNA Laws, Defendants, including HCD, determined in 2021 that the City must rezone property to allow the development of 13,368 units of high-density RHNA Units (the 13,368 units mandated on the City is hereinafter "RHNA Units") with little to no ability for the City to disapprove, condition, or control the development of RHNA Units.

133.   Indeed, these RHNA Laws demand that the City's Council engage in certain speech while engaged in the local legislative process to say what Governor GAVIN NEWSOM, the Director, HCD, and other State actors want them to say, including but not limited to, there "is a housing crisis," that Huntington Beach "needs more affordable housing," that the State "needs more affordable housing," that "the benefits of high-density development in the City outweigh the negative impacts of high-density development on the environment," and so on, despite objective evidence to the contrary.  The Governor, the Director, HCD, and SCAG use the RHNA Laws regulate, even mandate, *how* the City communicates its stance on housing, what ultimately the Council Members' "say" in their vote, and what

1    Council Members are compelled to say to the public with regard to "housing need"
2    to justify their vote.

3         134.   More importantly, the high-density development goals of the RHNA
4    Laws *compel* the City Council to arrive at a pre-ordained, "fixed," State-contrived
5    conclusion (of implementing high-density development zoning, i.e., the Defendants'
6    RHNA Units) even before the City Council has an opportunity through its rightful,
7    constitutionally provided, legislative process, to hold public hearings and make its
8    own findings on a proposed zoning issue before adopting a "Statement of
9    Overriding Consideration."

10        135.   If the City Council does not adopt this "State speech," by making these
11   findings, the City will be punished by the State.  This is a content-based restriction
12   by the State *on how the City Council speaks* while performing its constitutional
13   legislative function. This compelled speech is a content-based restriction on how the
14   City Council speaks, violative of the Council Members' First Amendment rights.

15            **SECOND CLAIM FOR RELIEF**
16   **VIOLATION OF FOURTEENTH AMENDMENT OF**
17        **THE UNITED STATES CONSTITUTION FOR**
               **PROCEDURAL DUE PROCESS**
18                **(As to ALL DEFENDANTS)**

19        136.   Plaintiff(s) incorporates paragraphs 1-135 as if fully set forth herein.

20        137.   City of HB, as a Municipal Corporation, is a "person" within the
21   meaning of Fourteenth Amendment, and is entitled to its protection. (*River Vale v.*
22   *Orangetown*, 403 F.2d 684, 1968 (2d Cir. 1968)).  Plaintiff(s), the City of
23   Huntington Beach, was not created by the State.  In fact, the City, invoking Article
24   XI of the California Constitution, created itself by adopting a Charter and
25   incorporating as Municipal Corporation.  For decades, the U.S. Supreme Court has
26   viewed Corporations as "persons" entitled to Fourteenth Amendment protections,
27   and then most recently, First Amendment Protections under *Citizens United v.*
28   *Federal Election Commission*, *supra*.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE
RELIEF; JURY TRIAL

138.   The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State can "deprive any person of life, liberty, or property, without due process of law." (U.S. Const. Amend. XIV§ 1, cl. 3.)

139.   The procedural component of the Due Process Clause prohibits the Defendants (and particularly the State's administrative agencies HCD and SCAG) from creating processes that deprive municipalities and citizens of rights and property without providing a fair process before or after the deprivations have occurred.

140.   The Fourteenth Amendment safeguards fundamental rights of persons and of property against arbitrary and oppressive state action. (*Thomas Cusack Co. v. Chicago*, 242 U.S. 526, 37 S. Ct. 190, (1917)).  Involvement of State officials may provide State action essential to show direct violation of City's Fourteenth Amendment rights, whether an official's actions were officially authorized, or lawful. (*Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S. Ct. 172, (1978)).

141.   The State Legislature amended the RHNA process to *eliminate judicial review* of decisions and determinations by the Director, HCD, and/or SCAG when it amended Section 65584(c)(4).  This violates Plaintiff(s)'s Procedural Due Process rights because the process begins and ends with HCD.

142.   In addition, the State's Housing Laws and RHNA Laws are violative of the City's Procedural Due Process rights insofar as the State claims preemptive authority over the City's Constitutional Charter City Home Rule authority, yet *there is no State law whatsoever that specifically provides that the City must plan for 13,368 units of high density RHNA housing units in this Planning Cycle*.  In fact, this number of 13,368 RHNA Units of high-density development for the City was created by a flawed administrative process through the Director, HCD, and SCAG, *and not State law*. Since this number of 13,368 RHNA Units is administratively-created and not passed by the State Legislature and signed by the Governor into law, it does not have the force and effect of State law, and therefore can have no pre-

306069

emptive power over the City's Constitutional Charter City Home Rule authority. How can an administrative agency's administratively created "mandate" preempt a Charter City's Constitutional authority? It cannot. This "mandate" and the Housing Laws and RHNA Laws that have produced this absurdity violate Plaintiff(s)'s Procedural Due Process rights.

143.   In addition, Defendants did not provide Plaintiff(s) with requisite Procedural Due process before requiring that the Plaintiff(s) absorb and plan for an additional 13,368 RHNA Units in Huntington Beach.  As detailed in a letter sent to SCAG by the City of Huntington Beach, in late 2019, SCAG failed to follow the process provided for by State law, i.e., Government Code Section 65584.04.  SCAG had improperly voted to permit an illegal, vague, arbitrary, and capricious RHNA Methodology that *incorrectly* allocated an additional approximately 6,000 high-density RHNA Units to the City of Huntington Beach.

144.   On November 7, 2019, however, during a meeting of the SCAG Regional Council, SCAG introduced a new, last-minute substitute methodology for the RHNA allocation, which had not previously been disclosed to the public or to the City.  The 2019 SCAG vote that ultimately resulted in the City being mandated to plan for 13,368 RHNA Units, was not based upon any empirical data, was in violation of the law, and was nothing more than last minute political wrangling. Government Code Section 65584.3 requires that actions taken by the Director, HCD, and SCAG be done according to a vote based on well-established law and grounded in general principles of Due Process.

145.   On January 13, 2020, the Director and HCD formally admonished SCAG in writing that it's new, last-minute RHNA Methodology was wrongful and erroneous, claiming that it was failing to further the five statutory objectives of the RHNA Laws. SCAG disregarded, moved forward, and the flawed 13,368 RHNA Units was imposed on the City of Huntington Beach.

146.   The Director acted under color of State law in an official capacity and

within the scope of his official duties when failing to correct the process to implement the RHNA Units.  As a direct and proximate cause of the failure to provide any pre or post deprivation process, Plaintiff(s) suffered prejudice under threat of severe civil sanctions.

147.   Because the State's RHNA process, by way of its RHNA Laws, violates law, is vague, arbitrary, and capricious regarding the creation of the mandates of 13,368 RHNA Units violates the City's Due Process and its citizens have, and will, sustain damages.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF FOURTEENTH AMENDMENT OF**
**THE UNITED STATES CONSTITUTION FOR**
**SUBSTANTIVE DUE PROCESS**
**(As to ALL DEFENDANTS)**

148.   Plaintiff(s) incorporates paragraphs 1-147 as if fully set forth herein.

149.   The protection afforded by the guarantee of substantive due process interposes a bar to legislation that "manifests a **patently arbitrary classification, utterly lacking in rational justification.**" (*Flemming v. Nestor*, 363 U.S. 603, 611 (1960)).

150.   To satisfy Substantive Due Process, a statute must be **sufficiently clear to provide adequate notice of the prohibited or required conduct** referred to therein.

151.   Thus, a statute will be deemed void for vagueness if it either forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess to its meaning and differ as to what is required. Although these principles apply to both civil and criminal statutes, it is recognized that greater leeway is permitted regarding civil enactments, such as statutory regulation of economic or business matters, because the consequences of imprecision are

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

1    qualitatively less severe.  In this case, the penalties amount to near criminal

2    sanctions.

3        152.   In addition, the State's Housing Laws and RHNA Laws are violative of

4    the City's Substantive Due Process rights insofar as the State claims preemptive

5    authority over the City's Constitutional Charter City Home Rule authority, yet ***there***

6    ***is no State law whatsoever that specifically provides that the City must plan for***

7    ***13,368 units of high density RHNA housing units in this Planning Cycle***.  In fact,

8    this number of 13,368 RHNA Units of high-density development for the City was

9    created by a flawed *administrative* process through the Director, HCD, and SCAG,

10   *and **not State law***. Since this number of 13,368 RHNA Units is administratively-

11   created and not passed by the State Legislature and signed by the Governor into law,

12   it does not have the force and effect of State law, and therefore can have no pre-

13   emptive power over the City's Constitutional Charter City Home Rule authority.

14   How can an administrative agency's administratively created "mandate" preempt a

15   Charter City's Constitutional authority?  It cannot. This "mandate" and the Housing

16   Laws and RHNA Laws that have produced this absurdity violate Plaintiff(s)'

17   Substantive Due Process rights.

18       153.   Yet, the State Legislature amended the RHNA process to *eliminate*

19   ***judicial review*** of decisions and determinations by the Director, HCD, and/or SCAG

20   when it amended Section 65584(c)(4). Having zero judicial recourse available to

21   resolve disputes of law violates Plaintiff(s)' Substantive Due Process rights.

22       154.   In addition, the RHNA Laws create patently arbitrary classifications of

23   cities (like the City of Huntington Beach) that must disproportionately (based on

24   population and area of the city), shoulder the production of affordable high-density

25   housing for the entire state.  Moreover, HCD and other Defendants, through the

26   flawed RHNA process, have allocated highly developed cities like Huntington

27   Beach disproportionately high RHNA unit mandates, *while **reducing the number of***

28   ***RHNA units***, for dozens of other cities.  This skewed, un-uniform, and inconsistent

306069

approach to RHNA by the State undermines the State's claim that these Housing and RHNA Laws are a matter of "Statewide Concern."  By their own actions, Defendants prove they are not.

155.   For instance, the City of Irvine spanning 66 square miles has a RHNA number per mile that is far less than Huntington Beach; the City of Santa Ana, which spans almost 28 square miles has a RHNA number per mile that is far, far less than Huntington Beach; the City of Anaheim, which spans over 50 square miles has a RHNA number per mile that is far less than Huntington Beach, and the list goes on.

156.   The RHNA process attempts to add some mathematic and pseudo-scientific components; however most of the process to allocate RHNA is completely unknown or unascertainable by reading the plain language of the RHNA Laws, and, executed by an *ad hoc* political process.  The RHNA Laws simply do not provide a real verifiable method used to determine how much housing a particular jurisdiction should have in the future, then how that number translates into housing units that each city or county must plan to build within the Planning Cycle.

157.    As part of AB 101, explained above, is a recent damning admission by the State Legislature that the Housing Laws and RHNA Laws are fatally flawed. According to AB 101, HCD is now tasked with preparing a report on potential RHNA reform and compelled to make recommendations to the State Legislature by December 31, 2022.  In October 2021, the California State Joint Legislative Audit Committee approved an emergency audit to examine HCD's Regional Determination process.

158.   The request for an audit was based on an assertion that the public had limited information on the formula that HCD uses to calculate the regional RHNA numbers, and cited confusion and mistrust among regional planning bodies and jurisdictions, and the need for an independent and objective review of the process.

159.   Because the State's RHNA process, by way of its RHNA Laws,

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

violates law, is vague, arbitrary, and capricious regarding the creation of the mandates of 13,368 RHNA Units violates the City's Due Process and its citizens have, and will, sustain damages.

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE COMMERCE CLAUSE OF
## THE UNITED STATES CONSTITUTION
## (As to ALL DEFENDANTS)

160.    Plaintiff(s) incorporates paragraphs 1-159 as if fully set forth herein.

161.    The limitation on the power of the states to act, referred to as the "dormant" commerce clause doctrine, subjects State legislation to a two-pronged inquiry.  Where the activity is exclusively in interstate commerce without intrastate aspects, the commerce and supremacy clauses of the U.S. Constitution prohibit state regulation or interference with that activity. It is equally axiomatic that where the activity and its effect is wholly intrastate, the states retain full authority under their police powers to regulate the activity.

162.     The power that reposes in Congress under the commerce clause extends to three categories of commercial activities: first, the use of the channels of interstate commerce; second, protection of the instrumentalities of interstate commerce or persons or things in commerce; third, those activities affecting interstate commerce. (*Perez v. United States*, 402 U.S. 146 (1971))

163.    An activity does not need to have a direct effect on interstate commerce to fall within the commerce power, as long as the effect is substantial and economic. (*Wickard v. Filburn*, 317 U.S. 111 (1942)).  If the cultivation of wheat on a private farm for private consumption can be drawn into scrutiny under the Commerce Clause, so too should the State's mandates to plan for approximately 1,300,000 units of high-density housing throughout the State.

164.    Laws that have an interstate effect by impacting supply and demand for housing, raw material, and accessibility to housing, is a violation of the Commerce

42

306069

Clause.

165.   The State has improperly engaged in attempting to discriminate and manipulate housing supply and housing prices by attempting to offering cheaper, more abundant housing than other states.  In addition, the requirement imposed upon cities to build housing will have an effect on the supply chain throughout the United States.

166.   If a state law or local regulation discriminates against interstate commerce in favor of the locality, it is *per se* invalid, save a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest.  "If a restriction on commerce is discriminatory, it is virtually *per se* invalid."  This is what the Defendants are doing.

167.   Defendants are forcing Plaintiff(s), like other cities in California, to use and divert building supplies and materials from other States to plan for and build additional housing units in the State based on arbitrary and flawed RHNA Methodology. This has a discriminatory effect in the market of supplies and housing and therefore on interstate commerce.  Defendants have demonstrated their intent by this scheme to favor developers in California over developers in other states, to ensure that developers in California are favored in the marketplace and receive favorable monetary benefits.  These efforts by the Defendants violate the Commerce Clause.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF CALIFORNIA CONSTITUTION, ARTICLE XI
## CHARTER CITY AUTHORITY
## (As to ALL DEFENDANTS)

168.   Plaintiff(s) incorporates paragraphs 1-167 as if fully set forth herein.

169.   California Government Code Sections 65583 through 65588 (defined above as "RHNA Laws") unconstitutionally overreaches into Charter City Home Rule Authority.

43

306069

170.   Section 5(a) of Article XI of the California Constitution provides that a Charter City shall not be governed by State law in respect to "Municipal Affairs." Rather, "so far as 'Municipal Affairs' are concerned," Charter Cities' laws are "supreme and beyond the reach of [State] legislative enactment." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 35 Cal.3d 1, 12.)

171.   Regulation of local land use and local zoning are vital and core functions of local government, and are therefore "Municipal Affairs" of a Charter City. (*City of Irvine v. Irvine Citizens Against Overdevelopment* (1994) 25 Cal.App.4th 868, 874).

172.   "Municipal Affairs" or the "Municipal Affairs Doctrine"[15] is a California Constitutional recognition of Charter Cities' exclusive authority over its municipal affairs to the exclusion of general State laws. (California Constitution, Art. XI, §5(a).)  As a Charter City, the City of Huntington Beach has supreme authority over its Municipal Affairs.  Most importantly, the City's regulation of local land use and zoning within its borders.  The California Supreme Court has clearly recognized this general rule: Cities and counties may make and enforce within their limits all local, police, sanitary and other ordinances and regulations not in conflict with general laws.  This is the genesis of zoning laws.  The zoning schemes were created as part of police power to protect against nuisances.

173.   State management of zoning taking away local control will take away the core functions of municipality to protect health safety and welfare.  Allowing development without ability of discretionary approvals and conditional zoning, create health safety and welfare concerns as well as public and private nuisance. (Cal. Const., Art. XI, § 7).

---

[15]  Generations of legislative enactments and judicial interpretations provide that under Article XI, Section 5(a) of the California Constitution, a Charter City is authorized to make and enforce all local laws and regulations, and to be free from State legislation, over local land use/zoning, city property, funds, tax levies and other municipal functions.

44

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

174.   The State Legislature has clearly recognized the primacy of local control over land use. The State Legislature has specified certain minimum standards for local zoning regulations, but has carefully expressed its intent to retain the maximum degree of local control.  (*IT Corp. v. Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 89.)

175.   The principal of local autonomy over local zoning and land use is **guaranteed** to Charter Cities by Article XI, Section 5(a) of the California Constitution.  That provision grants Huntington Beach, as Charter City, exclusive authority devoid of any State control, to "make and enforce all ordinances and regulations in respect to **Municipal Affairs,**" such that with respect to "Municipal Affairs," City authority "shall supersede all [State] laws inconsistent therewith." (Emphasis added.)

176.   Plaintiff(s) has exercised this authority to its maximum extent through Charter Section 103, which grants Plaintiff(s) "the power to make and enforce all laws and regulations in respect to Municipal Affairs, subject only to such restrictions and limitations as may be provided in this Charter or in the Constitution of the State of California." The State must meet a three-part test for any imposed limitations, which is not the case here.

177.   For the current Planning Cycle, recent legislation in the form of Housing Laws and RHNA Laws as defined above, have not only suddenly stripped the City of its former Charter City authority to making local zoning decisions and plan for itself, the Housing Laws and RHNA Laws also impermissibly delegate (legislative) authority to HCD to make its own rules, methods, and formulas, and to provide unbridled oversight and draconian-level enforcement over the City through the RHNA process.  In other words, the Defendants through legislative action have illegally commandeered the City's rightful, independent Constitutional authority to zone for itself as a Charter City under Article XI, Section 5(a).

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

178.   Cities are now required to plan for State-mandated sites for housing, or face severe penalties from the State.

179.   Prior to 2017, this RHNA process did not apply to Charter Cities. However, a flurry of recent housing bills beginning in 2017 originating in both houses of the State Legislature have changed the process from one of City Council's exercising their free speech, rightful legislative authority, and decision-making power, to illegal State-controlled zoning of cites; from local democracy and public input and participation to an illegal State-level centralized system of mandates and punitive action against cities for non-compliance; from a constitutionally harmonious process of zoning and planning, to an unconstitutional stripping of a Charter City's constitutional rights.

180.   In 2017, approximately 150 housing bills were proposed during the legislative session.  A package of 15 bills were signed by the Governor related to funding for housing, streamlining development approvals and increasing accountability for meeting the requirements of Housing Element Law.

181.   These included bills are new requirements adding additional outreach and reporting, modifying the way the RHNA is calculated, increasing the number of topics to be considered in the allocation methodology such as adding a nebulous concept of "furthering fair housing" as a required objective for RHNA and local Housing Elements and giving HCD (on behalf of the State of California) unfettered discretion and the ability to sue individual cities for not meeting requirements in addition to severe fines that may be imposed.

182.   In March 2020, SCAG adopted its 6th Planning Cycle RHNA Allocation Plan, which covers the planning period October 2021 through October 2029.  For the 6th Planning Cycle, SCAG received a need of 1,341,827 housing units, which was distributed to all 197 SCAG jurisdictions.

183.   These Housing Laws and RHNA Laws impede upon Charter City authority to create land use policy that is clearly a local matter.  These laws

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

1 unconstitutionally interfere with the City's Charter authority to enforce local zoning

2 laws and regulations, including the ability to protect the health, safety and welfare of

3 Huntington Beach residents by creating local zoning schemes that correspond to

4 local needs for land use and management as well as elected officials' duties to carry

5 out their respective oaths of office in creating local land use legislation.

6      184.   Because the RHNA process has now been weaponized by Defendants

7 in land use planning, cities are no longer allowed to prioritize local resource

8 allocation, or decide how to address identified existing and future housing needs.

9 Instead, cities are forced to accept State-level flawed data and assumptions about

10 population, employment and household growth and rezone property and re-develop

11 the City in favor of high-density housing.

12      185.   Housing and RHNA Laws require this City, against or irrespective of

13 the City Council's will, to rezone property to the detriment of private property

14 owners, without providing Due Process to affected owners is unconstitutional.

15      186.   Previous State law provided that only limited portions of State Planning

16 and Land Use laws applied to Charter Cities.  Charter Cities were free to control

17 land use matters of local concern.  The recent amendments to the Housing and

18 RHNA Laws, the way those laws are not followed by Defendants, and the way that

19 those laws allow an administrate agency (HCD) to make zoning decisions in

20 Huntington Beach instead of the City Council, strip Charter Cities of their Article XI

21 rights under the California Constitution.

22

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF RHNA LAWS
### (As to ALL DEFENDANTS)

25     187.   Plaintiff(s) incorporates paragraphs 1-186 as if fully set forth herein.

26     188.   In arriving at RHNA units allocations for, and imposing them upon,

27 cities, like the 13,368 RHNA Units imposed on Plaintiff(s), Defendants violated

28 various provisions of State law in the California Government Code Sections 65583

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE
RELIEF; JURY TRIAL

306069

through 65588 (defined above as "RHNA Laws"). Such violations are, including but not limited to, those set forth herein.

189.    For the current Planning Cycle, the State's HCD assigned the entire SCAG region a total of 1,341,827 RHNA units, based on the region's existing, and projected, housing needs, to be allocated by SCAG among the local governments located within the SCAG region.  The City is one of those local governments. However, HCD, through SCAG, violated RHNA Laws in executing and implementing their own RHNA determinations, which resulted in Defendants illegally and erroneously imposing 13,368 RHNA Units on Plaintiff(s) for the current Planning Cycle.

190.    To illustrate, the Orange County member of SCAG, known as "OCCOG," sent a letter to SCAG in 2019 regarding proposed RHNA Methodology options available to distribute the Regional Determination among SCAG's local governments. Among other points, OCCOG advised that local input was the most important factor in selecting a RHNA Methodology and requested the adoption of such a methodology only *after* HCD provides its Regional Determination to SCAG.  OCCOG also advised that it opposed the reallocation of the "above moderate" housing category to other income categories, and raised other issues to be addressed in SCAG's Regional Determinations.  SCAG ignored OCCOG's requests and proceeded down an illegal path.

191.    Among other things, HCD did not base its Regional Determination on SCAG's regional population forecast as stated in its Regional Transportation Plan/Sustainable Community Strategy ("RTP"/"SCS"), which is inconsistent with Government Code section 65584.01(a).  This was a violation of the RHNA Laws.

192.    In addition, HCD did not utilize SCAG's regional population forecast in its determination, as required under Government Code section 65584.01(a). Instead, HCD utilized the DOF's population projection, in violation of the State's Housing Laws and RHNA Laws.  This was in violation of the RHNA Laws.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

193.   In addition, HCD did not use comparable regions when evaluating household overcrowding and cost-burden rates, instead utilizing national averages, which is inconsistent with the statutory language of SB 828, Government Code Sections 65584.01 and 65584.05; another instance of the Defendants violating their own State laws.

194.   In addition, the California Independent Auditor released a 2022 Report highly critical of the RHNA process, finding the Defendants' RHNA determinations, like the 13,368 RHNA Units of high-density housing assigned to the City, are not supported by evidence.  For example, HCD uses a combined vacancy rate of 5% to non-rural counties, while applying a 4% vacancy rate for rural counties. The DOF questioned and investigated this vacancy rate because it was not sufficiently justified or supported. In turn, this flawed vacancy rate used by HCD in making its Regional Determinations created substantially higher number of high-density units, while under-calculating the needs of Californians to live in single family homes.

195.   State law that had been proposed as and is known, as "SB 828" requires HCD through COGs to provide data on the overcrowding rate for a comparable housing market, as well as data on the percentage of households that are cost-burdened.  HCD utilized unreasonable comparison points to evaluate healthy housing market vacancy rates, using an overall 5% total vacancy rate for both for-sale and rental housing markets, rather than a 5% rate for the rental housing market.  SB 828 also requires COGs to provide the vacancy rates in existing stock, as well as the vacancy rates for healthy housing market functioning and regional mobility.

196.   HCD's evaluation of replacement housing needs was based on an arbitrary internal standard, rather than housing demolition data provided by DOF.

197.   HCD did not exclude anticipated household growth on tribal land, despite the fact that tribal lands are sovereign nations and not subject to state land

49

306069

use law.  HCD utilized an unreasonable adjustment for cost-burdenstatistics.
HCD's data and use of data were not current.

198.   Defendants, in particular, HCD, even after repeated warnings from local jurisdictions, refused to follow State Housing Laws and RHNA Laws and instead arrived at, and imposed SCAG, which then imposed on OCCOG, and ultimately to the City of Huntington Beach, arbitrary and unlawful RHNA Units numbers of 13,368.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA CONSTITUTION**
**SEPARATION OF POWERS**
**(As to ALL DEFENDANTS)**

199.   Plaintiff(s) incorporates paragraphs 1-198 as if fully set forth herein.

200.   The State has ***impermissibly delegated its authority*** to administrative agencies the Director, HCD, and SCAG, which have created administrative regulations that, according to the State, have the effect of law regarding the process to certify Housing Elements.  Failure to follow these administrative regulations means the City's Housing Element may not be certified. Failure to certify the Housing Element subjects a City to excessive fines and penalties under the Housing Laws and RHNA Laws.  Under this impermissible delegation, the unelected officials of HCD, including the Director, and SCAG, essentially act as and unaccountable shadow legislature, arbiter of disputes, and the enforcement agency – all without any accountability to the public.

201.   In addition, because the Defendants, through the deployment of its Housing Laws and RHNA Laws, has *commandeered* the City's local zoning authority to re-develop Huntington Beach to accommodate the 13,368 RHNA Units. The State is thereby *forcing* the City to act contrary to the health, safety, and well-being of its citizens, to devalue their private property, and to harm the City's environment.  The Defendants are essentially *mandating* by law that the City act to

50

306069

deprive its citizens of their Due Process in the devaluation of their adjacent properties associated with new high-density zoning, where the 13,368 RHNA Units is a foregone conclusion as determined by the Director, HCD and SCAG, leaving the citizens of the community most impacted without a voice at all and without legal recourse.

202.   These onerous State laws, in particular the Housing Laws and RHNA Laws, send re-development mandates down from on high in violation of the City Council's First Amendment rights and the City's residents' rights under Due Process of law.  Neither the City Council nor the City should not be compelled, or mandated, to act as an agent of the State, to do the State's bidding, and to act against the best interests of its citizens and their private property.  The City should not be caught in the middle and compelled to disrupt the quiet enjoyment of living of the City's citizens, and the City should not, like a helpless agent of the State, be compelled to redevelop the City at the command of the State without any input from the citizens.  In sum, the City should not be compelled to carry out the State's violations of the City's citizens' Due Process.

203.   Moreover, RHNA Laws, by their own terms, *attempt to preclude* judicial relief.  The RHNA process eliminated judicial review when it amended Section 65584(c)(4) in 2004, and impermissibly delegated executive authority to HCD to create administrative "laws" that are enforced by HCD with no review by the courts.  Not allowing judicial review to challenge a State Law is a violation of Separation of Powers.

204.   By the RHNA Laws, the State has improperly intruded upon a core zone of executive authority, impermissibly impeding the exercise of executive functions, and the State retains undue legislative control over a legislative appointee's executive actions, compromising the ability of the legislative appointees to perform their executive functions independently, without legislative coercion or

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

interference.  *Marine Forests Society v. California Coastal Com.*, 36 Cal. 4th 1 (2005).

205.   **The State has impermissibly delegated legislature authority** to HCD, which then created administrative regulations that claim to have the effect of law regarding the process to certify Housing Elements.  Failure to follow these administrative regulations means a City's Housing Element will not be certified.  If not certified, the City can face excessive putative fines and penalties including the requirement to plan for and rezone property (in the case of the City of Huntington Beach, completely re-develop) to accommodate the State's RHNA mandates.

## EIGHTH CLAIM FOR RELIEF
## VIOLATION OF THE CALIFORNIA CONSTITUTION
## ILLEGAL BILL OF ATTAINDER
## (As to ALL DEFENDANTS)

206.   Plaintiff(s) incorporates paragraphs 1-205 as if fully set forth herein.

207.   In the current Planning Cycle, in addition to being subjected to a flawed RHNA mandate of 13,368 units, the City was also subjected to the Defendants singling out Huntington Beach for punishment.  The State Legislature passed SB 1333, which was a 2018 law designed by the State high density housing advocates to deprive Charter Cities of historic local authority to zone.

208.   SB 1333 was in direct response to, and the State cites, the City's *Kennedy Commission v. City of Huntington Beach*[16] a case in which the City prevailed on the merits against the Kennedy Commission on Charter City authority, i.e., that not all of the State's housing laws applied to Charter Cities.[17]  SB 1333 was

---

[16]   *Kennedy Commission v. City of Huntington Beach*, 16 Cal App. 5th 841 (2017)
[17]   Online:  SB 1333 Legislative Text:
https://alcl.assembly.ca.gov/sites/alcl.assembly.
ca.gov/files/SB%201333%20analysis.pdf

52

306069

the State's response to Huntington Beach's independent, constitutionally protected, right to locally zone.

209.   After the City prevailed on a State housing law challenged based on its rightful Charter City authority, in addition to the State Legislature taking action on SB 1333 to deprive Charter Cities of their constitutional rights, various State actors, including Governor GAVIN NEWSOM began to call out Huntington Beach in press releases and other public communications as a target for State punishment.

210.   In 2019, at a Press Conference, Governor GAVIN NEWSOM proclaimed that as part of his new housing laws package, he sought to punish cities like Huntington Beach, as he said "the State's vision [for housing] will be realized at the local level" and "ask the folks down in Huntington Beach."[18]  On February 15, 2023, the Office of the Governor of California tweeted on social media "Huntington Beach is playing chicken with housing.  The state will hold them accountable. California law lets judges appoint a state agent to do their housing planning for them – HB can do it themselves or the court will take control."[19]

211.   While Defendants hide behind the veil of attempting to increase statewide housing supply, **Defendants *target* already highly developed areas** like Huntington Beach for complete re-development. Defendants have ***not*** narrowly tailored its RHNA Laws to; for instance, create positive housing development *incentive programs that focus on the **undeveloped areas*** throughout California.  It has been reported, "according to the 2010 Census, 95 percent of Californians live on just 5.3 percent of the land in the state."[20]  In other words, over 90 percent of California is undeveloped and unoccupied.

---

[18]   Online:  YouTube:  https://www.youtube.com/watch?v=JSy2VOGkBF8 **at 45:30**
[19]   Online:  Twitter:  https://twitter.com/CAgovernor/status/1625898020683538432
[20]   Online: Daily News, *"Land Use Regulations are obstacles to the California Dream"* April, 3, 2019: https://www.dailynews.com/2019/04/03/land-use-regulations-are-obstacles-to-the-california -dream

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

212.   In addition to a lack of seriousness by the State in actually creating more housing where it would be productive to do so in undeveloped areas of the State, Defendants have also carved out "favored" portions of the State to **skirt the very same Housing Laws, including RHNA, that are imposed on Huntington Beach**. In a 2019 article, entitled "*Huntington Beach Sued While Marin County Exempted from Affordable Housing Requirements*" it was reported that in order to protect Governor GAVIN NEWSOM's home county of Marin from RHNA development. Marin County is "enjoying a moratorium on affordable housing building requirements until 2028."  To accomplish this, "sneaky language inserted into a 2017 budget trailer bill allowed Marin County to maintain its extra restrictions on how many homes developers can build, giving the finger to the California Anti-NIMBY Statute."[21]

213.   As detailed in a letter sent to SCAG by the City of Huntington Beach, SCAG failed to follow the process outlined in California Government Code Section 65584.04(b)-(f) when it voted to follow an arbitrary and capricious formula that incorrectly allocated an additional 6,000 RHNA Units than it otherwise would have under the RHNA Methodology to Plaintiff(s).

214.   This SCAG vote was not based on empirical data or the RHNA Laws, but was instead based on last minute political wrangling. Government Code 65584.3(a) requires that actions taken by SCAG be done according to a vote provided for in established rules following general principles of Due Process.

215.   These RHNA Laws that add additional outreach and reporting, modifying the way the RHNA is calculated, increasing the number of topics to be considered in the allocation methodology such as adding a nebulous concept of

---

[21]   Online:  California Globe, "*Huntington Beach Sued While Marin County Exempted From Affordable Housing Requirements*" January 31, 2019:
https://californiaglobe.com/articles/
huntington-beach-sued-while-marin-county-exempted-from-affordable-housing-requirements

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

1  "furthering fair housing" as a required objective for RHNA and local housing

2  elements and giving Defendants unfettered discretion and the ability to sue

3  individual cities for not meeting requirements in addition to severe fines that may be

4  imposed.

5  216.   The requirement for the City to zone for 13,368 RHNA Units is so

6  disproportionately high to other jurisdictions, the City believes that per square mile

7  of City land, the 13,368 is the *highest RHNA number* of any other city throughout

8  the entire State of California for the current Planning Cycle.[22]  An issue such as

9  housing that the State purports is a matter of "Statewide Concern," should be dealt

10  with evenly and consistently throughout the State.  The fact that some regions, like

11  Marin County, essentially get a pass on producing housing, while cities like

12  Huntington Beach disproportionately shoulder high volumes of high-density

13  mandates, shows that these RHNA Laws are nothing more than an illegal Bill of

14  Attainder. Moreover, HCD and other Defendants, through the flawed RHNA

15  process, have allocated highly developed cities like Huntington Beach

16  disproportionately high RHNA unit mandates, *while **reducing the number of**

17  **RHNA units**, for dozens of other cities.  This skewed, un-uniform, and inconsistent

18  approach to RHNA by the State undermines the State's claim that these Housing

19  and RHNA Laws are a matter of "Statewide Concern."  By their own actions,

20  Defendants prove they are not.

21  217.   If RHNA is a State-mandate, and the State is found to have increased

22  the number of the City's RHNA to 13,368 based on either a flawed methodology, or

23  misguided directives from the States executive, or political gamesmanship, or as

---

[22]   The City of Huntington Beach is approximately 28 square miles, much of it is environmentally sensitive Wetlands and marshes – so the developable amount of land in Huntington Beach is far less.  At 13,368 units, that is approximately 472 units per square mile. This number would be *much higher* if all of the undevelopable Wetlands, marshes, and other sensitive environmental areas were removed from the calculation.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

punishment to the City, such an unfounded RHNA mandate amounts to an illegal Bill of Attainder for Huntington Beach.

**NINTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA ENVIRONMENTAL QUALITY ACT**
**PUBLIC RESOURCES CODE SECTIONS 21000 *ET. SEQ.* (CEQA)**
**(As to ALL DEFENDANTS)**

218.   Plaintiff(s) incorporates paragraphs 1-217 as if fully set forth herein.

219.   RHNA Laws require the City to make a "Hobson's Choice," i.e., that the local legislature, the City Council, is required to adopt a "Statement of Overriding Consideration" pursuant to California Environmental Quality Act ("CEQA") in order to justify, as a matter of environmental impact, the massive increase in high density housing, or not adopt a "Statement of Overriding Consideration" required by CEQA (because the high density zoning is not justified in light of requisite environmental concerns) and not zone for the massive high density housing mandated by the RHNA Laws and Defendants, but then face crippling penalties and lawsuits from Defendants.  The RHNA Laws (and Housing Laws) are pitted against CEQA, thereby putting the City Council in an impossible, irreconcilable impasse.

220.   More importantly, the high-density development goals of the RHNA Laws *compel* the City Council to arrive at a pre-ordained, "fixed," State-approved conclusion (of implementing high-density development zoning, i.e., the Defendants' RHNA Units) even before the City Council's consideration by way of conducting local public hearings before adopting a "Statement of Overriding Consideration" as required by CEQA.  For the two State laws, RHNA Laws and CEQA, to be in direct competition or conflict forces local City Council's in Huntington Beach to relinquish local decision-making one way or the other.  Following the Housing and RHNA Laws forces the City Council to essentially violate CEQA, or lie about a

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

Statement of Overriding Consideration in order to satisfy the Housing and RHNA Laws.  This violates CEQA.

## TENTH CLAIM FOR RELIEF
## VIOLATION OF CALIFORNIA CONSTITUTION
## ARTICLE IV, SECTION 16
## (As to ALL DEFENDANTS)

221.   Plaintiff(s) incorporates paragraphs 1-220 as if fully set forth herein.

222.   The Defendants have implemented various State laws, which are unconstitutional Special Statutes, designed to protect certain regions of the State from having to comply with the Housing and RHNA Laws in the same way that the City is purportedly required to comply.  This special treatment by the Defendants of certain favored areas of the State is violative of Article IV, Section 16 of the California Constitution.  A number of Special Statutes, not all listed herein, will be proven at the time of trial.

223.   For instance, Assembly Bill 1537[23] in 2014, which creates a Special Statute for the Counties of Marin, Sonoma, San Francisco, Oakland and Fremont under the State Housing Laws, including RHNA Laws.

224.   In addition, and in extension to AB 1537, the State Legislatures passed Senate Bill 106, which extended the Special Statute time-period for the Counties of Marin, Sonoma, San Francisco, Oakland and Fremont under the State Housing Laws, including RHNA Laws, to 2028.

225.   Regions like Marin County have been allowed by Special Statute to skirt having to implement the RHNA Laws in the way the City is being forced to by planning for large volumes of high-density housing development. Marin County's elected officials lobbied for, and prevailed on, a reduced density requirement

---

[23]   Online:   LegInfo:   http://www.leginfo.ca.gov/pub/13-14/bill/asm/ab_1501-1550/ab_1537_cfa_20140516_114048_asm_floor.html

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

1  pursuant to RHNA Laws, which has the effect of giving it the lowest housing

2  allocation as a percentage of population in the Bay Area. Marin County is only

3  required to create enough new housing for 0.9% of its 2017 population compared to

4  the regional average of 2.4%.

5      226.   Because of the foregoing Special Statutes and others to be presented at

6  the time of trial but not all fully described herein, are unconstitutional in California.

7  Under Cal Const., Art. IV § 16, these are unconstitutional Special Statutes, which

8  has given special treatment to regions of California like Marin County under the

9  RHNA Laws, and as such, are invalid.

## ELEVENTH CLAIM FOR RELIEF
## FRAUD
## (As to ALL DEFENDANTS)

13      227.   Plaintiff(s) incorporates paragraphs 1-226 as if fully set forth herein.

14      228.   For years, the State, including State actors such as Governor

15  GAVIN NEWSOM, HCD, the Director, and SCAG have claimed that there is a

16  "housing crisis," that housing is not affordable and that more housing needs to

17  be developed in order to deal with the "housing crisis." The State, including

18  State actors such as Governor GAVIN NEWSOM, have told the public and

19  cities that the homelessness crisis, among other societal concerns, is a symptom

20  of the "housing crisis."

21      229.   The State, including State actors such as Governor GAVIN

22  NEWSOM, HCD, the Director, and SCAG have also told the public and cities

23  that if cities were forced to plan for and build more affordable housing, then

24  housing prices would drop, becoming more affordable, and the homelessness

25  situation would be cured.

26      230.   The public and cities, for years, relied upon the statements made by

27  the State, including actors such as Governor GAVIN NEWSOM, HCD, the

28  Director, and SCAG believed that planning for more housing and building more

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE
RELIEF; JURY TRIAL

306069

1  housing might be a solution to the stated problems.

2      231.   In reality however, the statements made by the State, including

3  actors such as Governor GAVIN NEWSOM, HCD, the Director, and SCAG

4  were not true and the State and actors such as Governor GAVIN NEWSOM,

5  HCD, the Director, and SCAG knew they were no true.

6      232.   In fact, for the City of Huntington Beach, rents have only *increased*

7  since the State's push for cities to plan for, and build, more high-density housing

8  has occurred. For example, the City's rents were fairly stable for years until

9  after 2017, when the State's new Housing Laws including RHNA Laws were

10  passed.  The State's population has *decreased* during that same timeframe, and

11  the City's population has also decreased.

12      233.   In addition, Governor GAVIN NEWSOM, HCD, the Director, and

13  SCAG have claimed repeatedly that housing, homelessness, and urban development

14  is a matter of "Statewide Concern."

15      234.   In reality however, these statements made by the State, including

16  actors such as Governor GAVIN NEWSOM, HCD, the Director, and SCAG

17  were not true and the State and actors such as Governor, GAVIN NEWSOM,

18  HCD, the Director, and SCAG knew they were no true.

19      235.   Governor GAVIN NEWSOM, HCD, the Director, and SCAG knew

20  or should have known about the ***flawed*** high density RHNA process that created

21  overinflated projected housing needs resulting in a State mandate that the

22  Plaintiff(s) zone for 13,368 units of high density housing that can be built within

23  an eight-year cycle.

24      236.   In addition, Governor GAVIN NEWSOM, HCD, the Director, and

25  SCAG knew or should have known about the ***flawed*** high density RHNA

26  calculations that led to the requirement that the City zone for the allocation of

27  13,368 high density units (determined by HCD and SCAG)  to  the Plaintiff(s).

28  HCD through SCAG failed to follow the process outlined in California

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE
RELIEF; JURY TRIAL

1    Government Code Section 65584.04(b)-(f).

2        237.   As detailed in a letter sent to SCAG by the City of Huntington

3    Beach, HCD through SCAG failed to follow the process outlined in California

4    Government Code Section 65584.04(b)-(f) when it chose in 2021 to arbitrarily

5    and capriciously "dump" an *additional* 6,000 high-density RHNA Units on the

6    City of Huntington Beach.

7        238.   Governor GAVIN NEWSOM, HCD, the Director, and SCAG have

8    made intentional misrepresentations about the need for additional housing units.

9    Under concealment of material facts known to Defendant(s) with regard to

10   population and the methodology used to create and allocate the various high density

11   RHNA unit numbers, including the City's 13,368 units, Defendant(s) have deprived

12   the City of its legal rights, and has forced the City to rely upon the intentional

13   misrepresentations to plan for building over 13,368 additional, unnecessary, high

14   density units.

15       239.   In reality however, the statements made, and the issuance of the

16   13,368 high density RHNA "mandate" by the State, including actors such as the

17   Governor GAVIN NEWSOM, HCD, the Director, and SCAG were not true.

18       240.   The California DOF Independent Auditor released a Report in 2022

19   on the RHNA process, finding RHNA determinations are "*flawed*" and not

20   supported by evidence.

21       241.   These flawed and patently false RHNA determination of 13,368

22   high-density units for the City and representations by Governor GAVIN

23   NEWSOM, HCD, the Director, and SCAG were done to induce Plaintiff(s) to

24   act upon it and plan to build 13,368 high-density units.

25   **VII.   <u>PRAYER FOR RELIEF</u>**

26       WHEREFORE, Plaintiff on behalf of itself and those similarly situated

27   respectfully ask this Court to grant Plaintiff the following relief:

28       1.     Declaratory Judgment that California Government Code Sections

60

306069

65583, 65583.1, 65583.2, 65583.3, 65584, 65584.01, 65584.02, 65584.03, 65584.04, 65584.045, 65584.05 65584.06, 65584.07, 65584.09, 65584.2, 65585. ("Regional Housing Needs Assessment Laws" or RHNA Laws. ("RHNA Laws") violate the First Amendment of U.S. Constitution as the RHNA Laws compel and therefore violate the free speech of Plaintiff(s); and

2.      An Injunction against Defendants from enforcement of the RHNA Laws against Plaintiff(s) as violative of the First Amendment; and

3.      Declaratory Judgment that the RHNA Laws that produced a "mandate" that the City zone for 13,368 high density RHNA Units imposed on Plaintiff(s) by the Defendants, violates Plaintiff(s)' rights under Procedural Due Process and Substantive Due Process of the U.S. Constitution; and

4.      An Injunction against Defendants from enforcement of the RHNA Laws against Plaintiff(s) as violative of Plaintiff(s)' rights under Procedural Due Process and Substantive Due Process of the U.S. Constitution; and

5.      Declaratory Judgment, and Relief, that the RHNA Laws, combined with Government Code Sections 65000 through 66300 (together "Housing Laws) creates an undue burden on interstate commerce in violation of Article 1, Section 8, Clause 3 of the U.S. Constitution, ("Commerce Clause"); and

6.      An Injunction against Defendants from enforcement of the RHNA Laws as violative of the Commerce Clause against Plaintiff(s) and other cities similarly situated; and

7.      Declaratory Judgment that the RHNA Laws that produced a "mandate" that the City zone for 13,368 high density RHNA Units imposed on Plaintiff(s) by the Defendants, violates the City's Charter City Home Rule Authority pursuant to Article XI of the California Constitution; and

8.      Injunction against Defendants from enforcement of the RHNA Laws against Plaintiff(s) as violative of the California Constitution; and

9.      Declaratory Judgment that the State's "mandate" of 13,368 high

61

306069

density RHNA Units allocated to Plaintiff(s) by the Defendants, violates RHNA Laws; and

10.     Injunction against Defendants from enforcement of the mandated allocation of 13,368 high density RHNA Units on Plaintiff(s); and

11.     Declaratory Judgment that the State's "mandate" of 13,368 high density RHNA Units allocated to Plaintiff(s) by the Defendants amounts to an illegal Bill of Attainder in violation of the California Constitution; and

12.     Injunction against Defendants from enforcement of the mandated allocation of 13,368 high density housing units to Plaintiff as an illegal Bill of Attainder in violation of the California Constitution; and

13.     Declaratory Judgment, and Relief, that RHNA Laws impermissibly delegated legislative authority to an administrative agency, HCD, which cannot be scrutinized by a court of law, in violation of the Constitutional doctrine of Separation of Powers; and

14.     Injunction against Defendants from enforcement RHNA Laws against Plaintiff(s) and other cities similarly situated as a violation of the Constitutional doctrine of Separation of Powers; and

15.     Declaratory Judgment, and Relief, that the RHNA Laws are in direct conflict with the California Environmental Quality Act (CEQA) and the City must be able to follow the State's CEQA law without violating RHNA Laws or Housing Laws if the Plaintiff(s) makes appropriate CEQA findings; and

16.     Declaratory Judgment, and Relief, that AB 1537 and SB 106 are a Special Statutes as proscribed by Article IV, Section 16 of the California Constitution, having given special treatment to Marin County under the RHNA Laws, and as such, invalid; and

17.     Enjoin Defendants from enforcing the RHNA Laws against Plaintiff(s) and those cities similarly situated, and from Defendants issuing any future orders or rules similar to the invalid ones described in this Action; and

62

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069

18.     Declaratory Judgment, and Relief, that the Governor, and/or HCD has through its Director, made intentional misrepresentations, including but not limited to, those statements averred herein. In doing so, Defendant(s) have deprived the Plaintiff(s) of legal rights; and

19.     Grant a Preliminary Injunction enjoining the enforcement and further enforcement of RHNA Laws against Plaintiff(s) and all other cities similarly situated; and

20.     Any other such further relief to which Plaintiff(s) may be entitled as a matter of law or equity or which this Court determines to be just and proper.

Dated: March 27, 2023          MICHAEL E. GATES, CITY ATTORNEY


By:_____/s/ *MICHAEL E. GATES*_____
MICHAEL E. GATES, CITY ATTORNEY
Attorney for Plaintiffs,
CITY OF HUNTINGTON BEACH, and
HUNTINGTON BEACH CITY COUNCIL, and
MAYOR TONY STRICKLAND, and
MAYOR PRO TEM GRACEY VAN DER
MARK

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL**

306069

## **DEMAND FOR JURY TRIAL**

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Plaintiffs CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation, the HUNTINGTON BEACH CITY COUNCIL, MAYOR OF HUNTINGTON BEACH, TONY STRICKLAND, also as an individual, and MAYOR PRO TEM OF HUNTINGTON BEACH, GRACEY VAN DER MARK, also as an individual, demand trial by jury in the above-entitled action pursuant to Federal Rules of Civil Procedure 38(b) and Local Rule 38-1.

Dated: March 27, 2023                    MICHAEL E. GATES, CITY ATTORNEY

                                 By:_____/s/ *MICHAEL E. GATES*_____
                                     MICHAEL E. GATES, CITY ATTORNEY
                                     Attorney for Plaintiffs,
                                     CITY OF HUNTINGTON BEACH, and
                                     HUNTINGTON BEACH CITY COUNCIL, and
                                     MAYOR TONY STRICKLAND, and
                                     MAYOR PRO TEM GRACEY VAN DER
                                     MARK

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; INJUNCTIVE RELIEF; JURY TRIAL

306069