1  ROB BONTA
   Attorney General of California
2  DANIEL A. OLIVAS
   Senior Assistant Attorney General
3  DAVID PAI, Bar No. 227058
   Supervising Deputy Attorney General
4  MATTHEW STRUHAR, Bar No. 293973
   THOMAS KINZINGER, Bar No. 323889
5  Deputy Attorneys General
     1300 I Street, 15th Floor
6    Sacramento, CA 95814
     Telephone: (916) 210-7246
7    Fax: (916) 731-2121
     E-mail:   Matthew.Struhar@doj.ca.gov
8              Thomas.Kinzinger@doj.ca.gov

9  *Attorneys for Defendants Gavin Newsom, in his*
   *official capacity as Governor of the State of*
10 *California, and individually; Gustavo Velasquez, in*
   *his official capacity as Director of the State of*
11 *California Department of Housing and Community*
   *Development, and individually; and the California*
12 *Department of Housing and Community*
   *Development*

13

14                IN THE UNITED STATES DISTRICT COURT

15              FOR THE CENTRAL DISTRICT OF CALIFORNIA

16                          SOUTHERN DIVISION

17

18 | CITY OF HUNTINGTON BEACH, a | 8:23-cv-00421-FWS-ADS |
19 | California Charter City, and | |
   | Municipal Corporation, the | **REQUEST FOR JUDICIAL** |
20 | HUNTINGTON BEACH CITY | **NOTICE IN SUPPORT OF STATE** |
   | COUNCIL, MAYOR OF | **DEFENDANTS' MOTION TO** |
21 | HUNTINGTON BEACH, TONY | **DISMISS** |
22 | STRICKLAND, and MAYOR PRO | **Fed. R. Evid. 201** |
   | TEM OF HUNTINGTON BEACH, | |
23 | GRACEY VAN DER MARK, | Date:        July 27, 2023 |
   | | Time:        10:00 a.m. |
24 | | Courtroom:   10D |
   | | Judge:       The Honorable Fred W. |
25 | , | Slaughter |
26 | v. | Trial Date:  None Set |
   | | Action Filed: 3/09/2023 |
27 | GAVIN NEWSOM, in his official | |
28 | capacity as Governor of the State of | |

1
2
3
4
5
6
7
8
9

**California, and individually; GUSTAVO VELASQUEZ in his official capacity as Director of the State of California Department of Housing and Community Development, and individually; STATE LEGISLATURE; STATE OF CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT; SOUTHERN CALIFORNIA ASSOCIATION OF GOVERNMENTS; and DOES 1-50, inclusive,**

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# REQUEST FOR JUDICIAL NOTICE

Defendants Governor Gavin Newsom, Director Gustavo Velasquez, and the California Department of Housing and Community Development (HCD) respectfully request, pursuant to Rule 201 of the Federal Rules of Evidence, that the Court take judicial notice of the following facts:

1. The City of Huntington Beach (the "City") previously sued the State, seeking to have certain housing laws, including the Housing Element Law, held unconstitutional as applied to charter cities. The City lost this case on the merits. *See* Judgment, *City of Huntington Beach v. Newsom, et al.* (Los Angeles County Superior Court, Case No. 30-2019-01044945), a true and correct copy of which is attached hereto as **Exhibit 1**.

2. HCD sued the City in 2019 for allegedly violating its housing element and downzoning property. This case was resolved after the City brought its housing element into compliance. *See* Petition for Writ of Mandate and Complaint for Declaratory Relief, *California Department of Housing and Community Development v. City of Huntington Beach, et al.* (Orange County Superior Court, Case No. 30-2019-01046493); and Stipulation and Order; a true and correct copy of both is attached hereto as **Exhibit 2**.

3. On March 8, 2023, HCD and the Attorney General of California sued the City for its ban on accessory dwelling and duplex units, which the City adopted on February 21, 2023. *See* Petition and Complaint, *People of California ex rel. Rob Bonta et al. v. City of Huntington Beach* (Orange County Superior Court, Case No. 30-2023-01312235), a true and correct copy of which is attached hereto as **Exhibit 3.**

Request for Judicial Notice in Support of State Defendants' Motion to Dismiss (8:23-cv-00421-FWS-ADS)

4.   On April 10, 2023, and after the City allegedly repealed its ban on accessory dwelling and duplex units, HCD and the Attorney General of California moved to amend their Petition and Complaint, adding a claim addressing the City's failure to adopt a complaint sixth-cycle housing element. *See* Motion to Amend, *People of California ex rel. Rob Bonta et al. v. City of Huntington Beach* (Orange County Superior Court, Case No. 30-2023-01312235), a true and correct copy of which is attached hereto as **Exhibit 4.**

5.   HCD issued its final determination of the sixth-cycle allocation of housing units to the Southern California Association of Governments (SCAG) on or about October 15, 2019. SCAG issued its draft allocations to member jurisdictions on or about September 11, 2020. The City appealed its RHNA allocation and argued that, as a charter city, it was exempt from RHNA law. SCAG considered the City's appeal in January 2021 and ultimately denied it. *See* SCAG Regional Housing Needs Assessment Appeals Board, Appeals Determination: City of Huntington Beach, a true and correct copy of which is attached hereto as **Exhibit 5**.

6.   SCAG issued its final RHNA allocations on July 1, 2021. It allocated 13,368 units to Huntington Beach. *See* SCAG 6th Cycle Final RHNA Allocation Plan, a true and correct copy of which is attached hereto as **Exhibit 6**.

7.   The City had, according to HCD, an October 15, 2021, deadline to adopt a housing element update that substantially complied with Article 10.6 of the Government Code (the Housing Element Law). The City submitted a draft housing element to HCD on August 1, 2022. HCD informed the City that the draft housing element substantially complied with the Housing Element Law, but that the City Council would need to formally adopt it, and have it found in compliance, by October 15, 2022.

Request for Judicial Notice in Support of State Defendants' Motion to Dismiss (8:23-cv-00421-FWS-ADS)

1    Otherwise, by law HCD could not find it in compliance until the City

2    completed certain actions to implement the draft housing element. *See*

3    September 30, 2022 Letter from HCD to Ursula Luna-Reynosa, Director

4    of the City's Community Development Department, a true and correct

5    copy of which is attached hereto as **Exhibit 7**.

6    Facts subject to judicial notice include those that "can be accurately and

7    readily determined from sources whose accuracy cannot reasonably be questioned."

8    Fed. R. Evid. 201(b)(2). The Court "must take judicial notice if a party requests it

9    and the court is supplied with the necessary information." *Id.* at (c)(2). Courts

10   regularly take judicial notice of "undisputed matters of public record, including

11   documents on file in federal or state courts." *Harris v. Cty. of Orange*, 682 F.3d

12   1126, 1131-32 (9th Cir. 2012) (internal citations omitted); *Lee v. City of Los

13   Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). **Exhibits 1 through 4** are all

14   documents filed in California state-court actions and available to the public.

15   Information made publicly available by government entities, including data, is

16   also subject to judicial notice. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992,

17   998-99 (9th Cir. 2010); *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 676 fn.6 (9th

18   Cir. 2017). **Exhibits 5 and 6** are reports and data made publicly available on

19   SCAG's website at: https://scag.ca.gov/rhna. **Exhibit 7** is publicly-available

20   correspondence issued by HCD to the City and available on HCD's website at:

21   https://www.hcd.ca.gov/sites/default/files/docs/planning-and-community/housing-

22   element/OraHuntingtonBeachDraftIn092222.pdf.

23   In sum, the above items meet the requirements of Rule 201(b)(2) of the

24   Federal Rules of Evidence, and therefore, the Court must take judicial notice of

25   them pursuant to Rule 201(c)(2) of the Federal Rules of Evidence.

26

27

28

Request for Judicial Notice in Support of State
Defendants' Motion to Dismiss
(8:23-cv-00421-FWS-ADS)

1    Dated: May 1, 2023                      Respectfully submitted,

2                                            ROB BONTA
                                             Attorney General of California
3                                            DAVID PAI
                                             Supervising Deputy Attorney General
4

5                                            /s/ Thomas Kinzinger

6

7                                            MATTHEW T. STRUHAR
                                             THOMAS P. KINZINGER
                                             Deputy Attorneys General
8                                            Attorneys for Defendants, Gavin
                                             Newsom, in his official capacity as
9                                            Governor of the State of California,
                                             and individually; Gustavo Velasquez,
10                                           in his official capacity as Director of
                                             the State of California Department of
11                                           Housing and Community
                                             Development, and individually; and
12                                           the California Department of Housing
                                             and Community Development
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Request for Judicial Notice in Support of State
                                             Defendants' Motion to Dismiss
                                             (8:23-cv-00421-FWS-ADS)

# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 02/18/2021 11:09 AM Sherri R. Carter, Executive Officer/Clerk of Court, by S. Bolden,Deputy Clerk

Case 8:23-cv-00421-FWS-ADS   Document 45-1   Filed 05/01/23   Page 8 of 158   Page ID #:529

**CIV-130**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Deputy Attorney General Jennifer E. Rosenberg, SBN 275496<br>Office of the Attorney General<br>300 S. Spring Street, Suite 1702<br>Los Angeles, CA 90013<br><br>TELEPHONE NO.: 213-269-6617         FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* jennifer.rosenberg@doj.ca.gov<br>ATTORNEY FOR *(Name):* State of California, Gov. Gavin Newsom, Atty. Gen. Xavier Becerra | *FOR COURT USE ONLY* |

| |
|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles |
| STREET ADDRESS:   111 N. Hill Street |
| MAILING ADDRESS: |
| CITY AND ZIP CODE:    Los Angeles, CA 90012 |
| BRANCH NAME:   Stanley Mosk Courthouse |

| |
|---|
| PLAINTIFF/PETITIONER:   City of Huntington Beach |
| DEFENDANT/RESPONDENT:   State of California, et al. |

| | |
|---|---|
| **NOTICE OF ENTRY OF JUDGMENT<br>OR ORDER**<br>*(Check one):*   [x] **UNLIMITED CASE**<br>(Amount demanded exceeded $25,000)   [ ] **LIMITED CASE**<br>(Amount demanded was $25,000 or less) | CASE NUMBER:<br>30-2019-01044945-CU-WM-CJC |

**TO ALL PARTIES :**

1. A judgment, decree, or order was entered in this action on *(date):*  February 18, 2021

2. A copy of the judgment, decree, or order is attached to this notice.

Date: February 18, 2021

Jennifer E. Rosenberg                                                ▶   /s/ Jennifer E. Rosenberg
(TYPE OR PRINT NAME   [x] ATTORNEY   [ ] PARTY WITHOUT ATTORNEY)                          (SIGNATURE)

**Page 1 of 2**

Form Approved for Optional Use<br>Judicial Council of California<br>CIV-130 [New January 1, 2010]   **NOTICE OF ENTRY OF JUDGMENT OR ORDER**   *www.courts.ca.gov*

CIV-130

| | |
|---|---|
| PLAINTIFF/PETITIONER:   City of Huntington Beach<br>DEFENDANT/RESPONDENT:   State of California, et al. | CASE NUMBER:<br>30-2019-01044945-CU-WM-CJC |

## PROOF OF SERVICE BY FIRST-CLASS MAIL

### NOTICE OF ENTRY OF JUDGMENT OR ORDER

***(NOTE: You cannot serve the Notice of Entry of Judgment or Order if you are a party in the action.  The person who served the notice must complete this proof of service.)***

1.  I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

    300 S. Spring Street, Suite 1702
    Los Angeles, CA  90013

2.  I served a copy of the *Notice of Entry of Judgment or Order* by enclosing it in a sealed envelope with postage fully prepaid and *(check one):*

    a. ☐   deposited the sealed envelope with the United States Postal Service.

    b. ☒   placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3.  The *Notice of Entry of Judgment or Order* was mailed:

    a. on *(date):*  2/18/2021

    b. from *(city and state):*  Los Angeles, California

4.  The envelope was addressed and mailed as follows:

    a. Name of person served:
    Michael F. Rawson, The Public Interest Law Project
    Street address: 449 15th Street, Suite 301
    City: Oakland
    State and zip code: CA, 94612

    b. Name of person served:
    Alexander B. Prieto, Western Center on Law and Poverty
    Street address: 3701 Wilshire Blvd., Suite 208
    City: Los Angeles
    State and zip code: CA  90010

    c. Name of person served:
    Michael E. Gates, Office of the Huntington Beach City Atty
    Street address: 2000 Main Street, Fourth Floor
    City: Huntington Beach
    State and zip code: CA  92648

    d. Name of person served:

    Street address:
    City:
    State and zip code:

    ☐   Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

5.  Number of pages attached: _____

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: February 18, 2021 _____

VERONICA SAWERS _____
(TYPE OR PRINT NAME OF DECLARANT)

▶   *Veronica Sawers* _____
(SIGNATURE OF DECLARANT)

Page 2 of 2

**NOTICE OF ENTRY OF JUDGMENT OR ORDER**

Electronically Received 02/17/2021 01:56 PM

Electronically Received 02/17/2021 01:56 PM

1  XAVIER BECERRA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  SETH E. GOLDSTEIN
   Deputy Attorney General
4  JENNIFER E. ROSENBERG
   Deputy Attorney General
5  State Bar No. 275496
     300 South Spring Street, Suite 1702
6  Los Angeles, CA  90013
   Telephone:  (213) 269-6617
7  Fax:  (916) 731-2124
   E-mail:  Jennifer.Rosenberg@doj.ca.gov
8  *Attorneys for Respondents/Defendants Gavin
   Newsom, in his official capacity as Governor of
9  California, and Xavier Becerra, Attorney General of
   California, in his official capacity*

*Exempt from filing fees
per Gov. Code, § 6103*

**FILED**
Superior Court of California
County of Los Angeles

**02/18/2021**

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ Deputy
           J. De Luna

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                     FOR THE COUNTY OF LOS ANGELES

13

14

15  **CITY OF HUNTINGTON BEACH,** a
    California Charter City,

16

17                          Petitioner/Plaintiff,

18           **v.**

19  **THE STATE OF CALIFORNIA; GAVIN
    NEWSOM,** Governor of California, in his
20  official capacity; **XAVIER BECERRA,**
    Attorney General of California, in his official
21  capacity; and **DOES 1 through 20,**

22                          Respondents/Defendants,

23  **CALIFORNIA COALITION FOR RURAL
24  HOUSING; HOUSING CALIFORNIA;** and
    **THE KENNEDY COMMISSION,**

25                          Intervenors/Defendants.

26

27

28

30-2019-01044945-CU-WM-CJC
[Consolidated with Case No. 30-2019-01048692]

[~~PROPOSED~~] **JUDGMENT**

1

This consolidated action came on for trial on January 28, 2021 in Department 85 of the Los Angeles County Superior Court, the Honorable Judge James C. Chalfant presiding.  Jonathan M. Eisenberg and Jennifer E. Rosenberg of the California Attorney General's Office appeared on behalf of Respondents Governor Gavin Newsom, Attorney General Xavier Becerra, and the State of California.  Michael E. Gates appeared on behalf of Petitioner City of Huntington Beach. Michelle K. Kotval and Michael F. Rawson appeared on behalf of Intervenor The Kennedy Commission.  Alexander Prieto appeared on behalf of Intervenors Housing California and California Coalition for Rural Housing.

In this action, Case No. 30-2019-01044945-CU-WM-CJC (*City of Huntington Beach v. State of California*) and Case No. 30-2019-01048692-CU-WM-CJC (*City of Huntington Beach v. State of California*) were transferred to Los Angeles County Superior Court from Orange County Superior Court and consolidated for all purposes, including trial and judgment, under Lead Case No. 30-2019-01044945-CU-WM-CJC in Department 85.  Petitioner City of Huntington Beach filed a Second Amended Consolidated Petition for Writ of Mandamus and Complaint for Declaratory Relief in the consolidated action.

Prior to the trial, the Court issued a tentative ruling denying the petition (attached hereto as Exhibit A), which the Court adopted as its final ruling after argument.

Accordingly, IT IS ORDERED, ADJUDGED, AND DECREED that:

(1)  The consolidated petition for writ of mandate is denied for the reasons set forth in the ruling attached hereto as Exhibit A.

(2)  The claim for declaratory relief is granted for the reasons set forth in the ruling attached hereto as Exhibit A.  The Court finds and declares, based on the evidence and for the reasons set forth in the Court's ruling, incorporated herein by reference, that the Housing Bills (Senate Bill No. 35 (2017-2018 Reg. Sess.), Senate Bill No. 166 (2017-2018 Reg. Sess.), Senate Bill No. 1333 (2017-2018 Reg. Sess.), and Assembly Bill 101 (2019-2020 Reg. Sess.)) and amendments to California statutes effected thereby, challenged by Petitioner City of Huntington Beach, do not violate the municipal affairs doctrine or Article XI, section 5 of the California Constitution and may be enforced.

2

1    (3) As the State of California was erroneously named as a Respondent in this action, the

2    Court hereby dismisses the State of California from the action for the reasons set forth in the

3    ruling attached hereto as Exhibit A.

4    (4) Judgment is entered in favor of Respondents Governor Gavin Newsom and Attorney

5    General Xavier Becerra and Intervenors The Kennedy Commission, Housing California, and

6    California Coalition for Rural Housing.

7

8    Dated:    02/18/2021

9                               James C. Chalfant / Judge
                            The Honorable James C. Chalfant

10

11   Approved as to Form:

12   DATED: February ___ 2021       MICHAEL E. GATES, City Attorney

13

14                          By: _____

15                          ℀ MICHAEL E. GATES, City Attorney
                            Attorneys for Plaintiff-Petitioner
                            CITY OF HUNTINGTON BEACH

16

17   DATED: February ___, 2021     PUBLIC INTEREST LAW PROJECT

18

19                          By: _____
                            MICHAEL F. RAWSON, Esq.

20                          Attorneys for Intervenor
                            THE KENNEDY COMMISSION

21

22   DATED: February ___, 2021     WESTERN CENTER ON LAW AND POVERTY

23                          CALIFORNIA RURAL LEGAL ASSISTANCE
                            FOUNDATION

24

25                          By: _____
                            ALEXANDER PRIETO, Esq.

26                          Attorneys for Intervenors HOUSING CALIFORNIA and
                            CALIFORNIA COALITION FOR RURAL HOUSING

27

28                                   3

(3)  As the State of California was erroneously named as a Respondent in this action, the Court hereby dismisses the State of California from the action for the reasons set forth in the ruling attached hereto as Exhibit A.

(4)  Judgment is entered in favor of Respondents Governor Gavin Newsom and Attorney General Xavier Becerra and Intervenors The Kennedy Commission, Housing California, and California Coalition for Rural Housing.

Dated:  _____        _____
                                                        The Honorable James C. Chalfant

Approved as to Form:

DATED:  February __, 2021          MICHAEL E. GATES, City Attorney

                                        By: _____
                                            MICHAEL E. GATES, City Attorney
                                            Attorneys for Plaintiff-Petitioner
                                            CITY OF HUNTINGTON BEACH

DATED:  February 16, 2021          PUBLIC INTEREST LAW PROJECT

                                        By: _____
                                            MICHAEL F. RAWSON, Esq.
                                            Attorneys for Intervenor
                                            THE KENNEDY COMMISSION

DATED:  February __, 2021          WESTERN CENTER ON LAW AND POVERTY
                                          CALIFORNIA RURAL LEGAL ASSISTANCE
                                          FOUNDATION

                                        By: _____
                                            ALEXANDER PRIETO, Esq.
                                            Attorneys for Intervenors HOUSING CALIFORNIA and
                                            CALIFORNIA COALITION FOR RURAL HOUSING

3

(3)  As the State of California was erroneously named as a Respondent in this action, the Court hereby dismisses the State of California from the action for the reasons set forth in the ruling attached hereto as Exhibit A.

(4)  Judgment is entered in favor of Respondents Governor Gavin Newsom and Attorney General Xavier Becerra and Intervenors The Kennedy Commission, Housing California, and California Coalition for Rural Housing.

Dated: _____      _____

The Honorable James C. Chalfant

Approved as to Form:

DATED:  February __, 2021          MICHAEL E. GATES, City Attorney

By: _____
MICHAEL E. GATES, City Attorney
Attorneys for Plaintiff-Petitioner
CITY OF HUNTINGTON BEACH

DATED:  February __, 2021          PUBLIC INTEREST LAW PROJECT

By: _____
MICHAEL F. RAWSON, Esq.
Attorneys for Intervenor
THE KENNEDY COMMISSION

DATED:  February 16, 2021          WESTERN CENTER ON LAW AND POVERTY
CALIFORNIA RURAL LEGAL ASSISTANCE
FOUNDATION

By: _____
ALEXANDER PRIETO, Esq.
Attorneys for Intervenors HOUSING CALIFORNIA and
CALIFORNIA COALITION FOR RURAL HOUSING

3

1    DATED: February 16, 2021      OFFICE OF THE ATTORNEY GENERAL, CALIFORNIA
2                              DEPARTMENT OF JUSTICE

3

                          By:_____

4                              JENNIFER E. ROSENBERG, Esq.
                             Attorneys for Respondents GOVERNOR GAVIN
5                            NEWSOM, ATTORNEY GENERAL XAVIER
                           BECERRA, and the STATE OF CALIFORNIA
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

EXHIBIT A

7|18

Superior FILED
County Court of California
of Los Angeles

Sherri R. Carter, of
By: J. De Luna, Deputy
Executive Officer/Clerk of Court

JAN 28 2021

City of Huntington Beach v. The State of
California, et al., 30-2019-01044945

~~Tentative~~ decision on petition for writ of
mandate: denied

Petitioner City of Huntington Beach ("City") seeks a writ of mandate prohibiting Respondents State of California, Governor Gavin Newsom ("Governor"), and Attorney General Xavier Becerra ("Attorney General") (collectively, "State")[1] from enforcing Senate Bill ("SB") 35, SB 166 -- which was retroactively applied against charter cities by SB 1333 -- and Assembly Bill ("AB") 101 (collectively "Housing Bills") against City. State and Intervenors the Kennedy Commission's ("Commission"), Housing California ("HC"), and California Coalition for Rural Housing ("CCRH") oppose.

The court has read and considered the moving papers, oppositions, and reply, and renders the following tentative decision.

## A. Statement of the Case
### 1. Petition 30-2019-01044945

City commenced this proceeding on January 17, 2019, in the Orange County Superior Court. The Second Amended Petition ("SAP"), filed on December 9, 2019, is the operative pleading and it alleges claims for traditional mandamus pursuant to CCP section 1085 and declaratory relief. The FAP alleges in pertinent part as follows.

SB 35 when into effect on January 1, 2018 and amended Government Code[2] sections 65400, 65582.1, and 65913.4. SB 35 was part of a "housing package" intended to address the state's alleged housing shortage and high housing cost. The Legislature declared that SB 35 applies to all cities and counties, including charter cities. In part, SB 35 requires cities[3] that have not made sufficient progress towards meeting their allocation of the regional housing need assessment ("RHNA").[4] SB 35 seeks to create a system where the State controls how, where, and when housing is built in every city in California. The effect of SB 35 is to unconstitutionally commandeer cities' discretionary land use authority and permits State to "rezone" a city's local

---

[1] Respondent State of California's opposition points out that mandamus is properly brought against the officer who enforces the law, not the governmental entity. City of Redondo Beach v. Padilla, (2020) 46 Cal.App.5th 902, 908, n.4. State of California argues that it should be dismissed, leaving only the Governor and Attorney General as Respondents. State Opp. at 9, n.1. This is true and State of California is therefore dismissed. Despite this fact, the court will refer to the remaining individual Respondents collectively as "State".

[2] All further statutory references are to the Government Code unless otherwise stated.

[3] Although the laws at issue govern zoning by other local government agencies, the court shall refer to cities for convenience. See State Opp. at 12, n. 5.

[4] RHNA is the statutory process to identify the total number of housing units (by affordability) allocated to each jurisdiction for planning purposes. As part of this process, the California Department of Housing and Community Development ("HCD"), through its regional sub-agencies, identifies the total housing need allocated to each city for an eight-year period.

01/29/2021

land use for political purposes.

AB 101 went into effect in August 2019 and amended multiple sections of the Government Code, Health and Safety Code, Public Resources Code, and Revenue and Taxation Code. The unconstitutional portions of this bill were introduced as part of a budget trailer bill that was touted to incentivize jurisdictions to build more housing and assist in providing housing to the homeless.

On October 9, 2019, the Governor signed SB 113 into law which amended sections 65585 and 65589.11. AB 101, as amended by SB 113, now requires that the Attorney General follow a specific statutory procedure if HCD finds that a city's housing element is not substantially compliant with state law. AB 101 makes a capricious finding that the new law is a matter of statewide concern and therefore applicable to charter cities. AB 101 requires HCD to notify a city or county and authorizes HCD to notify the office of the Attorney General, that the city or county is in violation of state law if the local government has taken action in violation of specified provisions of law. The Attorney General must then request that the court issue an order or judgment directing a violating city to bring its housing element into substantial compliance, and the penalty for noncompliance is a fine of $10,000 per month, with the possibility of multipliers for continued noncompliance.

City's right to control the use of land within its jurisdiction has been consistently recognized by the California Supreme Court as a municipal affair. As a charter city, City has supreme authority over the regulation of land use and zoning within its borders. SB 35 and AB 101 violate the municipal affairs doctrine, which provides that a charter city will not be governed by state law in respect to municipal affairs. The regulation of local land use and local zoning is a vital and core function of local government and therefore is a municipal affair of a charter city.

State has a clear, present, and ministerial duty to administer the California Constitution and laws of the state, including SB 35 and AB 101, without interfering with City's zoning and land use authority. State's action in enacting SB 35 unconstitutionally ignores and undermines City's rights as a charter city under the municipal affairs doctrine to the detriment of the health, welfare, and safety of its residents, as well as the authority of a charter city to establish and provide for an orderly system of zoning and land use regulations.

City seeks a writ of mandate and declaratory relief prohibiting State from enforcing SB 35 and AB 101.

### 2. Petition 30-2019-01048692

Petitioner City commenced this proceeding on February 1, 2019 in the Orange County Superior Court. The Petition alleges claims for traditional mandamus pursuant to CCP section 1085 and for declaratory relief. The Petition alleges in pertinent part as follows.

SB 166 amended section 65863 regarding "No Net Loss" local zoning and land use. SB 166 was part of a housing package intended to address the state's alleged housing shortage and high housing cost. When enacting SB 166, the Legislature correctly determined that the law would not apply to charter cities.

In 2018, the Legislature enacted SB 1333, which again amended section 65863 and through *post hoc* rationalization declared that it applies to all charter cities. The unconstitutional mandates of SB 166 impermissibly strip City's constitutionally protected charter city authority with respect to local zoning municipal affairs.

In conjunction with SB 1333, SB 166 creates a system where State controls how, where,

2

and when housing is built in every city in California, regardless of charter city status, and unconstitutionally purports to vest and exercise authority in the state to rezone established local land designations for political purposes.

City's right to control the use of land within its jurisdiction has been consistently recognized by the California Supreme Court as a municipal affair. As a charter city, City has supreme authority over regulation of local land use and zoning within its borders. SB 166 violates the municipal affairs doctrine, which provides that a charter city will not be governed by state law in respect to municipal affairs. The regulation of local land use and local zoning are vital and core functions of local government, and therefore municipal affairs, of a charter city.

State has a clear, present, and ministerial duty to administer the California Constitution and laws of the State of California, including section 65863, without interfering with City's zoning and land use authority. In enacting SB 166 and SB 1333, the Legislature unconstitutionally ignored and undermined City's rights as a charter city to control the zoning and land use designations within its borders to the detriment of the health, welfare, and safety of its residents.

City seeks mandamus prohibiting State from enforcing amended section 65863 against it and a declaration that section 65863, as amended by SB 166 and SB 1333, is an unconstitutional overreaching into a charter city's ability to create local zoning schemes.

### 3. Course of Proceedings

Petition 30-2019-01044945 (concerning SB 35) and Petition 30-2019-01048692 (concerning SB 166 and SB 1333) are Orange County Superior Court cases that were assigned to the court on March 19, 2019. On June 4, 2019, the court consolidated the two cases with 30-2019-01044945 as the lead case. The parties stipulated that, although properly declaratory relief, the case may be tried on paper as mandamus.

On July 25, 2019, the court granted the Commission's motion for permissive intervention. The court also granted HC and the CCRH leave to intervene on the condition that they and the Commission file a joint intervenors' brief.

### B. The Municipal Affairs Doctrine
#### 1. Article XI, Section 5(a)

"[T]he question whether the power exists to forbid the erection of a building of a particular kind or for a particular use... is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality." Euclid v. Ambler Realty Co., (1926) 272 U.S. 365, 388. "The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities." Schad v. Mt. Ephraim, (1981) 452 U.S. 61, 68 (emphasis added).) Pet. Op. Br. at 11.

Section 5(a) of article XI of the California Constitution provides that a charter city shall not be governed by State law in respect to "municipal affairs", for which charter cities' laws are "supreme and beyond the reach of [State] legislative enactment." California Federal Savings & Loan Assn. v. City of Los Angeles, ("California Federal Savings") (1991) 54 Cal.3d 1, 12 (quoting Ex Parte Braun, (1903) 141 Cal. 204, 207.) The California Supreme Court has summarized article XI, section 5:

3

Article XI, section 5…addresses the "home rule" powers of charter cities…."It shall be competent in any city charter to provide that the city governed thereunder may <u>make and enforce all ordinances and regulations in respect to municipal affairs</u>, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution [] shall supersede any existing charter, and <u>with respect to municipal affairs shall supersede all laws inconsistent therewith.</u>" <u>Johnson v. Bradley</u>, (1992) 4 Cal. 4th 389, 397-98 (emphasis added).

The California Supreme Court also has stated: "We have recognized that a city's or county's power to control its own land use decisions derives from this inherent police power, not from the delegation of authority by the state." <u>DeVita v. County of Napa</u>, ("<u>DeVita</u>") (1995) 9 Cal. 4th 763, 782.) "The Legislature, in its zoning and planning legislation, has recognized the primacy of local control over land use." <u>Id</u>. "[T]he Legislature has been sensitive to the fact that planning and zoning in the conventional sense have traditionally been deemed municipal affairs. It has thus made no attempt to deprive local governments... of their right to manage and control such matters, but rather has attempted to impinge upon local control only to the limited degree necessary to further legitimate state interests.'" <u>Id</u>. (citation omitted). Pet. Op. Br. at 11-12.

The Legislature expressly "recognizes that the capacity of California cities and counties to respond to State planning laws varies <u>due to the legal differences between cities and counties, both charter and general law</u>, and to differences among them in physical size and characteristics, population size and density, fiscal and administrative capabilities, land use and development issues, and human needs." §65300.9 (emphasis added). Indeed, until recently, the Legislature has expressly declared that the diversity of the State's communities and their local needs require local legislative bodies to implement local planning requirements in ways that accommodate local conditions and circumstances. §65300.7.

## 2. The Analytical Framework

Historically, judicial consideration of charter cities' authority over municipal affairs suffered from an *ad hoc*, case-by-case approach. <u>California Federal Savings</u>, *supra*, 54 Cal. 3d at 5, 15-16. In <u>California Federal Savings</u>, the California Supreme Court set forth an analytical framework "for resolving municipal affairs and statewide-concern questions under subdivision (a) of article XI, section 5." <u>Johnson v. Bradley</u>, *supra*, 4 Cal. 4th at 399.

This analytical framework was subsequently re-articulated in a four-part test in <u>State Building & Construction Trades Council of California v. City of Vista</u>, ("<u>Vista</u>") (2012) 54 Cal. 4th 547, 556, as follows: (1) a court first must determine whether the city's authority at issue regulates an activity that can be characterized as a "municipal affair"; (2) second, the court "must satisfy itself that the case presents an actual conflict between local and state law; (3) third, the court must decide whether the state law addresses a matter of "statewide concern."; and (4) fourth, the court must determine whether the law is "reasonably related to … resolution" of that concern and "narrowly tailored" to avoid unnecessary interference in local governance." <u>Id</u>. If the court is persuaded that the subject of the state statute is one of statewide concern and is reasonably related to its resolution, then the conflicting charter city measure ceases to be a municipal affair *pro tanto* and the Legislature is not prohibited by article XI, section 5(a) from

4

addressing the statewide dimension by its own tailored enactments." Id.

### C. Land Use Law
### 1. Background
"Zoning laws regulate land uses in two basic ways. Some uses are permitted as a matter of right if the uses conform to the zoning ordinance. Other sensitive land uses require discretionary administrative approval pursuant to criteria in the zoning ordinance. They require a conditional use permit." Save Lafayette Trees v. City of Lafayette, (2019) 32 Cal.App.5th 148, 155 (citations and internal punctuation omitted).

In 1917, the Legislature passed the first statute enabling cities to enact zoning ordinances. Miller v. Board of Public Works, (1925) 195 Cal. 477, 483. In 1925, the California Supreme Court observed that a city may not enact "unreasonable and discriminatory" zoning ordinances. Id. at 489. In 1927, the Legislature reserved to the state an oversight role in local land use and zoning by prescribing that all general law cities had to adopt general or master plans for land development. DeVita, supra, 9 Cal.4th at 772. In 1976, the California Supreme Court held that a city would exceed its police power with a zoning decision "if [the] restriction significantly affects residents of surrounding communities." Associated Homebuilders of the Greater East Bay, Inc. v. City of Livermore, (1976) 18 Cal.3d 582, 601. State Opp. at 11-12.

In the history of zoning laws, single-family residence zoning districts have been hallmarks of land use. See, e.g., Fourcade v. City and County of San Francisco, (1925) 196 Cal. 655, 659 (describing zoning district). Ewing v. City of Carmel-By-The-Sea, (1991) 234 Cal.App.3d 1579, 1589 (same); Consaul v. City of San Diego, (1992) 6 Cal.App.4th 1781, 1787-89 (city council rezoned land area to single-family residential in order to block multi-family housing development). State Opp. at 12-13.

### 2. The Planning and Zoning Law
In 1965, the Legislature enacted the Planning and Zoning Law (§65000 et seq.). County of Santa Barbara v. Purcell, Inc., (1967) 251 Cal.App.2d 169, 174. That law declares:

> "The Legislature […] finds that decisions involving the future growth of the [S]tate, most of which are made and will continue to be made at the local level, should be guided by an effective planning process, including the local general plan, and should proceed within the framework of officially approved statewide goals and policies directed to land use, population growth and distribution, development, open space, resource preservation and utilization, air and water quality, and other related physical, social and economic development factors." §65030.1 (emphasis added). State Opp. at 13.

Under the Planning and Zoning Law, the State has regional planning districts (§65061), each of which prepares, maintains, and revises a regional land-use plan, seeking to harmonize the master or general plans of the region's cities. §65061.1. Regional planning encompasses transportation planning (§65070) and congestion management (§65088). Each city has a planning agency (or chooses to have its city council play that role). §65100. Each city must "adopt a comprehensive, long-term general plan for the physical development of the city." §65300. A

general plan consists of a "statement of development policies […] setting forth objectives, principles, standards, and plan proposals." §65302.) A general plan includes multiple elements: land use, circulation (movement of people and vehicles), housing (discussed further below), conservation, open space, noise, safety, and environmental justice. Ibid. These plans are filed with their regional planning districts. §65067. The city's planning agency must implement (§65103) and administer (§65400 *et seq*.) the general plan. State Opp. at 13-14.

In 1971, the Legislature required general law cities' zoning ordinances to be consistent with their general plans. §65067. Before that, a general plan was considered "merely an 'interesting study.'" DeVita, *supra*, 9 Cal.4th at 772 (quoting City of Santa Ana v. City of Garden Grove, (1979) 100 Cal.App.3d 521, 532). The Legislature subsequently enacted statutes aimed at requiring cities to act consistently with their general and specific plans. *See* §65300.5 (requiring that city's general plan and elements "comprise an integrated, internally consistent, and compatible statement of policies"); §65301.5 (subjecting adoption of general plan or amendment to mandamus challenge); §65359 (requiring city's specific plan to be consistent with general plan); §65450 (similar); §65454 (similar); §65455 (requiring local public works projects, tentative maps, parcel maps, and zoning ordinances to be consistent with specific plan); §65460.8 (consistency requirement for transit villages). State Opp. at 14.

Also in 1971, the Legislature mandated that charter cities, not just general law cities, adopt general plans with the mandatory elements. DeVita, *supra*, 9 Cal.4th at 772; *see* §65300.5. In 1979, the Legislature extended the general plan consistency requirement to charter cities with more than 2 million people (*i.e.*, Los Angeles). City of Los Angeles v. State of California, (1982) 138 Cal.App.3d 526, 531. State Opp. at 14.

### 2. The Housing Element Law

In 1969, the Legislature enacted the Housing Element Law. §65580 *et seq*. The Housing Element Law declares that "[t]he availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every Californian is a priority of the highest order." §65580. The Housing Element Law recognizes the shared responsibility of state and local government to facilitate housing development for "all economic segments of the community" (§65580(b), (d)), and the need for "cooperation of all levels of government" for the provision of affordable housing (§65580(c)).

The Legislature declared that "[d]esignating and maintaining a supply of land and adequate sites suitable, feasible, and available for the development of housing sufficient to meet the locality's housing need for all income levels is essential to achieving the state's housing goals…." §65580(f). "It is the intent of the Legislature in enacting this article [to] assure that counties and cities recognize their responsibilities in contributing to the attainment of the state housing goal." §65581; *see also* San Franciscans for Livable Neighborhoods v. City and County of San Francisco, (2018) 26 Cal.App.5th 596, 609 (discussing purpose of housing element law). State Opp. at 15; Interv. Opp. at 10.

Under the Housing Element Law, all jurisdictions, including charter cities, must adopt a housing element. §§ 65583, 65700(b). Building Industry Assn. v. Marin Mun. Water Dist., (1991) 235 Cal.App.3d 1641, 1650. The housing element must make adequate provision for the housing needs of all economic segments of the community. §65583. The housing element must contain four basic sections: (1) an assessment of housing needs and an inventory of the resources and

constraints relevant to meeting those needs (§65583(a)); (2) a statement of the city's goals, objectives, and policies relative to maintenance, preservation, improvement, and development of housing (§65583(b)); (3) a five-year schedule of action to achieve the goals and objectives (§65583(c)); and (4) a review and evaluation of the prior element (§65583(d)). The housing element must be consistent with the policies identified in the general plan. §§ 65300, 65359, 65582(f). To plan for the community's share of the state housing needs, a housing element must include an assessment of the existing and projected housing need for each income level, identify resources and constraints relevant to meeting that need, and implement programs to address the need. §65583(a), (c). State Opp. at 15; Interv. Opp. at 10.

Every eight years, HCD, relying on data supplied by the Department of Finance, assigns a target number or goal for additional housing units in each region of the state in a RHNA divided into four income levels: very low, low, moderate, and above moderate income. §65584(a)(1), (f); Then the regional Council of Governments (or in some cases HCD) allocates a share of the regional housing need for each income level to each city and county in its region. §65584.05. The locality must then prepare a housing element that accommodates its allocated share of the RHNA. *See* §§ 65583, 65583.2. Interv. Opp. at 11; State Opp. at 15-16.

Key to a city's accommodation of its allocated RHNA at each income level is the requirement that the city's housing element include an inventory of sites suitable and available for residential development during the planning period. §§ 65583(a)(3), 65583.2(a); *see* Creswell Decl., ¶13. The inventory must detail information about the sites -- such as size and type of zoning -- as well as a determination of what portion of the RHNA each site can accommodate by income level. §65583.2(b), (c). To aid with this determination, the Housing Element Law provides set densities (housing units per acre) deemed appropriate to accommodate lower-income housing. §65583.2(c)(3)(B). For jurisdictions in a metropolitan county, sites allowing at least 30 units per acre represent the appropriate density to facilitate lower-income development. §65583.2(c)(3)(B)(iv). When a jurisdiction's inventory lacks the sites to accommodate its full RHNA allocation, its housing element must include a program to rezone and make additional sites available within three years to accommodate any unmet RHNA. §65583(c)(1)(A). Interv. Opp. at 11.

Before a city can adopt a housing element, it must be submitted to HCD to review whether it complies with the Housing Element Law. §65585. A city also must regularly review and revise its housing element to make sure that it continues to advance the city's goals, objectives, and policies. §65588(e)(4).

Each year, the city must report to both the Governor's Office of Planning & Research and HCD the progress made in implementing the programs of the housing element. §65400. Based on that report, HCD has the power to find that a housing element is not in compliance with the city's general plan. §65585. In such an instance, HCD may refer the matter to the Office of the Attorney General for an enforcement action. §65585(i), (j). The Attorney General may bring litigation against the non-complying city that may lead to a court order circumscribing the city's power to approve new housing development, by either suspending that power or requiring the city to approve a proposed residential development containing affordable housing. §§ 65754, 65754.5, 65755. State Opp. at 16-17.

The housing element is the only part of a city's general plan that is subject to substantial oversight by State. That oversight began in 1980 via statutory amendments to the Housing Element

Law and reflects the fact that there have been high degrees of local non-compliance with the law for many years. Coy Decl., Ex. 1, pp. 26-32. In 1991, HCD certified only 19% of localities as having a compliant housing element. More recently, that figure has increased to 55%. Coy Ex. 1, p. 14. State Opp. at 16.

The Housing Element Law and RHNA zoning law (§65863) were not originally intended to apply to charter cities. This was because section 65700 expressly provided that Chapter 3 (Local Planning) "shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city." Stats. 1965, ch. 1880, §5, p. 4345. The same legislation added Chapter 4 (Zoning Regulations) and similarly provided in section that Chapter 4 does not apply to a charter city. Stats. 1965, ch. 1880, §6, p. 4345-46. Pet. Op. Br. at 8.

A 1971 amendment to section 65700 imposed a requirement that charter cities adopt a general plan, including a housing element, for land use development within their boundaries. Pet. RJN Ex. H (Stats. 1971, ch. 1803, §2, p. 3904). The components of a charter city's housing element were discretionary. A 1982 amendment added an exception that new sections 65590 and 65590.1, relating to affordable housing in the coastal zone, apply to charter cities. Pet. RJN Ex. I (Stats. 1982, ch. 43, §§ 3-4, pp. 105-09). A 2017 amendment (AB 879) added another exception that section 65400 (imposing a reporting requirement on planning agencies) applied to charter cities. Pet. RJN Ex. J (AB 879, §3).

In other words, state law through 2017 reflected -- with the exception of the coastal zone provisions (§§ 65590, 65590.1) -- charter cities' home rule authority over the substance of local land use planning and zoning. Pet. Op. Br. at 8.

### D. The Housing Bills

The Housing Bills are codified in title 7 (Planning and Land Use), division 1 (Planning and Zoning), of the Government Code and changed the inapplicability of the Housing Element Law and RHNA zoning laws to charter cities.

#### 1. SB 35 (2017)

SB 35 was passed in 2017 and as pertinent amended sections 65400 and 65582.1 and added section 65913.4. City RJN Ex. M.

New section 65913.4 provides that a developer of multi-family housing may access a streamlined ministerial approval process which bypasses the California Environmental Quality Act ("CEQA") and the need for a conditional use permit ("CUP") in certain circumstances. §65913.4. The circumstances include that (1) the proposed development will be located on an infill site; (2) the city has issued fewer building permits than necessary to meet its RHNA allocation; (3) the development would have at least a mandated minimum of below market-rate units; and (4) the development is consistent with the city's objective zoning and design review standards. Id. If a city determines that the proposed development does not meet the criteria for streamlined approval, it must timely provide the proponent with written documentation of the proposal's shortcoming(s) or else the proposal is deemed to satisfy the requirements. Id. Pet. Op. Br. at 5-6; State Opp. at 18.

SB 35 provides that if a city (general or charter) approves a project under this scheme, the approval will not expire -- even if developer does not begin construction -- if the project includes affordable housing. SB 35 prohibits a city from adopting any requirement for such a project solely

8

or partially on the basis that it is subject to the streamlined approval. Pet. Op. Br. at 6.

City acknowledges that SB 35 states that it was enacted to address a "statewide housing crisis." City contends that the effect of SB 35 is to commandeer a city's discretionary land use authority over where and how housing construction takes place within its boundaries. SB 35 creates a system where State controls how, where, and when housing is built in throughout California, and essentially imposes a state-wide permissive overlay on local land use. Pet. Op. Br. at 6-7.

### 2. SB 166 (2017) (No Net Loss Zoning)

Historically, most local governments adopted housing elements with site inventories and site rezoning programs to fully accommodate their lower-income RHNA. 2017 LAO Rpt., Kotval Decl., ¶9, Ex. 7, p. 5. When affordable housing developments began to take place on these sites, local governments yielded to neighborhood pressure and reduced site density to hinder these developments. *See* Comm. on Judiciary AB 2292, Interv. RJN Ex. 1, p. 2.

To address this issue, in 2002 the Legislature passed AB 2292 (the "No Net Loss Law"), which prohibits a local jurisdiction from reducing residential density below the figures used in its housing element unless certain conditions are met. §65863 (added by Stats. 2002, c. 706 (AB 2292, §1)). AB 2292 requires a city to ensure that its housing element inventory[5] can accommodate its share of the RHNA throughout the planning period. Section 65863 provides that a city may not allow development of a parcel of land with fewer units by income category than the share allocated in a city's housing element unless the city makes written findings supported by substantial evidence that the reduction in density is consistent with the locality's general plan and housing element, and that the remaining sites identified in the housing element are adequate to accommodate the jurisdiction's share of the regional housing need. §65863(b)(1)(A), (B).

In 2017, the Legislature passed SB 166 to strengthen the No Net Loss Law by closing loopholes, including a city's ability to approve "high-end market-rate housing" or commercial uses on sites identified in their housing elements for lower income households. Interv. RJN Ex. 2, pp. 5-6.

As amended by SB 166 (City RJN Ex. N), section 65863 requires that once a site is identified in a city's RHNA allocation, that site must remain available or, if built upon, the city must within 180 days identify a new site to accommodate its RHNA allocation. Essentially, SB 166 requires a city to maintain adequate sites for low-cost housing development at all times, not just at the beginning of the eight-year RHNA cycle. Pet. Op. Br. at 10; State Opp. at 18.

SB 166 did not amend section 65700, and therefore SB 166 did not apply to charter cities.

### 3. SB 1333 (2018)

In 2013, HCD approved City's 2013-2021 housing element. Covarrubias Decl., ¶25. The housing element identified enough sites to meet its very low and low-income RHNA by incorporating multi-family zoned sites in City's Beach and Edinger Corridors Specific Plan ("BECSP"). *See* Kotval Decl., ¶10, Ex. 8, pp. V-5, V-22–V-23; Covarrubias Decl., ¶25. Facing community opposition to high density development in the BECSP (Covarrubias Decl., ¶26), City

---

[5] "Housing element inventory" means the sites identified within a city where zoning and land use designations allow for housing to be built. Pet. Op. Br. at 9, n.13.

amended the BECSP in May 2015 ("Amendment") to reduce the number of units that can be developed, impose development standards, and require City approval of any development. *See* Kotval Decl., ¶11, Ex. 9; Covarrubias Decl. ¶ 27. The Amendment created a RHNA allocation shortfall of 413 very low and low-income units. Kotval Decl., ¶13, Ex. 11, p. 3.

In July 2015, Kennedy Commission filed suit against City in Kennedy Comm'n v. Huntington Beach, Case No. 30-2015-00801675. Kennedy Commission alleged that the Amendment was inconsistent with City's adopted housing element and that City had failed to identify alternate sites to accommodate the low-income RHNA shortfall created by the Amendment. *See* Kotval Decl. ¶14, Ex. 12, ¶¶ 50-86. On January 20, 2016, the trial court found the Amendment void *ab initio* and issued a writ of mandate ordering City to cease enforcing it.

The appellate court reversed in Kennedy Comm'n v. City of Huntington Beach, ("Kennedy Commission") (2017) 16 Cal. App. 5th 841. Reasoning that section 65700 exempted charter cities from California's local planning provisions, the court held that City was exempt from section 65454's requirement that a city's specific plans be consistent with its general plan and housing element unless City expressly adopted this consistency requirement. Id. at 853-60.

The Legislature deemed this appellate decision to be a loophole left open by its failure in SB 166 to amend sections 65803 and 65700 to expressly apply section 65863's mandatory RHNA provisions and the broader provisions of the Housing Element Law to charter cities.

Passed in 2018, SB 1333 made the Housing Element Law in its entirety, and other planning and zoning provisions dedicated to the promotion of housing development, expressly applicable to charter cities. City RJN Ex. P. The author of SB 1333, Senator Bob Wieckowski, stated that the Kennedy Commission decision "threaten[ed] to undermine […] critical reforms from the 2017 Housing Package," and explained that by making the Housing Element Law and other statutory sections expressly applicable to charter cities, "SB 1333 will ensure that charter cities do not inappropriately subvert the goals stated in required general plan policies, including approved Housing Elements, and that local planning is internally consistent and not undermined by site-specific decisions." Assembly, Senate Third Reading, Analysis of SB 1333 (Aug. 24, 2018), pp. 3-4. State Opp. at 17.

SB 1333 expressly made section 65863, the No New Loss Law, applicable to charter cities. City RJN Ex. P. If a charter city approves the downsizing of a site identified in the housing element as available for development at greater density, or approves a development of market-rate housing units on a site identified as available for lower-income housing, then the city may violate the No Net Loss Law. SB 1333 also expressly provides that several other sections of the Government Code's Planning and Zoning laws apply to charter cities: sections 6536, 65852.10, 65852.25, 65860, 65863.4, 65863.6, 65863.8, 65866, 65867.5, 65869.5.[6] SB 1333 further amended section

---

[6] Sections 65866, 65867.5, and 65869.5 are contained in the Development Agreements Law (§65864 *et seq*.), which authorizes local agencies to enter development agreements with real-estate project builders, entitling them to proceed on their projects under the local rules, regulations, and ordinances in effect at the time of their approvals. North Murrieta Community, LLC v. City of Murrieta, (2020) 50 Cal.App.5th 31 41. The law gives builders some assurance of regulatory stability, given that projects often take years or even decades to complete, and local regulations can and do change over such periods of time. Ibid. The development agreements are contracts, enforceable like other contracts. Id. at 44. State Opp. at 17-18.

65700 to extend the applicability of sections 65300.5, 65301.5, 65359, 65450, 65454, 65455, 65460.8, 65590, 65590.1, and Article 10.6 (commencing with section 65580) to charter cities. Pet. Op. Br. at 9; State Opp. at 18.

City argues that SB 1333 represents a tectonic shift in the separation of powers and unconstitutionally treads on charter cities' traditional control over local land use and zoning. Pet. Op. Br. at 10.

### 4. AB 101 (2019)

AB 101 was adopted in 2019 and it amended section 65585 to require the Attorney General, and the courts, to follow a specific statutory procedure if HCD finds that a city's housing element is not substantially in compliance with the Housing Element Law (§65589.5) and RHNA zoning law (§65863). §65585(j)-(m).

AB 101 requires HCD to notify a city, and then authorizes HCD to notify the Attorney General, that the city is in violation of state law if its housing element is not in substantial compliance. City RJN Ex. O. In any action brought by the Attorney General for a violation of Planning Zoning/Housing Element Law, the Attorney General must request the court issue an order or judgment directing a violating city to bring its housing element into substantial compliance. Id. AB 101 requires that the superior court conduct a status conference if a city has not complied with such an order. Id.

If the superior court determines that a city failed to comply with the order, the court must impose fines. Id. The fines are $10,000 per month, not to exceed $100,000 per month (unless the fines are multiplied by a factor of three or six). Id. If the city has not complied with the order or judgment within specified time periods after the imposition of fines, AB 101 requires the court to conduct additional status conferences and multiply the amount of the fine by three and then six and order the appointment of an agent of the court to bring the city's housing element into substantial compliance. Id. Pet. Op. Br. at 7.

### E. Statement of Facts[7]
### 1. City's Evidence[8]

"The City shall have the power to make and enforce all laws and regulations in respect to municipal affairs, subject only to such restrictions and limitations as may be provided in this Charter or in the Constitution of the State of California." City Charter §103. "The general grant of power to the City under this Charter shall be construed broadly in favor of the City. The specific

---

[7] Petitioner City failed to include the parties' evidence with the trial notebook.

[8] City requests judicial notice of (1) City Charter (Ex. C), (2) Huntington Beach Municipal Code ("HBMC") sections 2.33.010 *et seq*, and 2.34.010 *et seq*. (Ex. D), (3) City Zoning and Subdivision Code titles 20-25 (Ex. E), (4) HCD SB 35 Statewide Determination Summary (7/30/20) (Ex. F), (5) Pertinent portions of Statutes of California, Stats. 1965, ch. 1880 (Ex. G), (6) Pertinent portions of Statutes of California, Stats. 1971, ch. 1803 (Ex. H), (7) Pertinent portions of Statutes of California, Stats. 1982, ch. 43 (Ex. I), (8) Assembly Bill 879 (2017) (Ex. J); and (9) the Housing Bills (Exs. M-P). The requests are granted as to Exhibits C-E, G-J. Evid. Code §452(b), (c). Exhibit F is not subject to judicial notice and the request is denied.

11

provisions enumerated in this Charter are intended to be and shall be interpreted as limitations upon the general grant of power and shall be construed narrowly." City Charter §104.

City's general plan guides its future land use decisions. A city's general plan is the "constitution for all future development" within its borders. Lescher Communications Inc. v. City of Walnut Creek, (1990) 52 Cal. 3d. 531. City's general plan includes a comprehensive long-term plan for City development and includes zoning maps and development goals to achieve the policy recommendations. City has a Department of Community Development and a Planning Commission, which have the duty to administrate the approval process for City's land use decisions. City RJN Ex. D (HBMC §§ 2.33.010, 2.34.010; City Zoning Ordinances titles 20-25). City has promulgated a comprehensive scheme of regulating land use within its borders. Pet. RJN Ex. E (Huntington Beach Zoning and Subdivision Ordinance ("HBZSO") Title 20-25).

The U.S. Department of Housing and Urban Development has observed that Redevelopment Agencies ("RDAs") created 63,600 new affordable housing units and that 44% of the new housing units constructed by RDAs from 2011 to 2008 were affordable at the very low-income level. Gates Decl., Ex. K, p. 4. Before their dissolution, RDAs were an important source of gap funding for federal affordable housing development funds and a longstanding and heavily-used source of funding for affordable housing in California. Gates Decl., Ex. L, p. 3.

City's expert, Nicole Sauviat Criste ("Criste"), opines that the Legislature clearly intended to vest local governments with the authority to control land use in their local jurisdictions. Criste Decl., Ex. B, pp. 1-2. State's general plan reflects this perspective and demonstrates that the Governor believes that land use is a matter of local control. Id., pp. 2-4. City's planning practice is consistent with this legislative intent. Id., p. 5. The flexibility given to cities to control their local issues is critical in enabling cities to regulate consistent with their residents' wishes. Id. Cities are also better situated to manage land use because zoning standards must be based on factors local in nature. Id., pp. 5-6.

Because there is a multiplicity of types of local jurisdictions (e.g., urban, rural, agricultural, industrial), local control over land use and zoning is necessary to meet local needs and concerns, based on local resources and infrastructure. Id., pp. 3-6. For instance, parking requirements in single family residential zones should reflect the demographics of the city – Palm Springs with only two persons per household needs less additional parking than Indio with 3.4 persons per household. Id., p. 6.

Another expert witness, Wendell Cox ("Cox"), opines that the RHNA allocation process imposed by the Housing Bills has no prospect of achieving its housing unit objectives because the funding required for lower income housing subsidies is scarce and because market prices for housing are beyond the financial ability of most middle-income households to afford. Cox Decl., Ex. A, p. 1. These deficiencies cannot be solved by cities. Id.

To the extent there is a shortage of affordable housing production, the fundamental issue is the lack of sufficient funding to build it. Id., pp. 7-8. Through 2018, only 9% of RHNA allocations at the very low-income, and only 13% of RHNA allocations at the low-income, categories have issued permits. Id., p. 13. Builders have not been developing low-income housing however much cities have planned for it. Id. In effect, the RHNA process requires cities to plan for more than ten times the amount of subsidized housing that can be funded. Id., p. 13

City's rate of permitting housing development outpaced all Orange County cities other than Irvine and is greater than California as a whole. Id., 18-19. Whereas the funding for building

market rate housing has been sufficient to meet the need in Orange County, and the permitting of very low-income and low-income housing in Orange County has outpaced the rest of the state, less than a quarter of RHNA allocations in those affordable housing categories have been issued permits. Id., pp. 24-25. In addition to insufficient funding, City is particularly unfit for affordable housing production because transit access to lower income jobs is constrained. Id., pp. 51-54.

### 2. **State's Evidence**[9]

State's expert, Melinda Y. Coy ("Coy"), a land use and planning manager with HCD, opines that the Housing Bills are critical for addressing the state's housing crisis and their application to charter cities is necessary to increase the supply of housing. Coy Decl., ¶9. People burdened in paying for housing suffer an array of problems in physical and mental health, nutrition, education, and job performance. Id., pp. 15-23. Businesses have a harder time recruiting employees, who cannot afford the cost of living. Id., p.20. The overall economy is negatively impacted. Id., pp. 20-21.

Over the last several decades, California has produced 2.3 million fewer housing units than are needed for the people already here. Id., pp. 3-5. The gap between the human population and the number of housing units is growing. Id. Housing prices, whether for sale or rental, are exceedingly expensive all over the state. Id., pp. 5-8.

In 1991, HCD certified only 19% of localities as compliant with their housing elements. By 1995, that figure increased to 52% and has remained more or less at that level until very recently. Coy Decl., Ex. 1, p. 14. Even with charter city participation in the 2013-21 cycle of RHNA, the state has achieved 55% of the goal for zoning for and building more housing for people at all income levels. Id., p. 14. If all charter cities opted out, the rate would be at only 22%. Id.

What happens in one city's housing market indisputably spills over city boundary lines and affects other cities. Id., pp. 8-13. Over the last 30 years, the median sales prices for existing homes in California, the Los Angeles Metro region (the counties of Los Angeles, Orange, Riverside, San Bernardino, and Ventura), and Orange County on its own, trace almost exactly the same price increases. Id., p.10, Fig. 9. This is also reflected by home and condominium sales prices in the City and the surrounding cities—Costa Mesa, Fountain Valley, Garden Grove, Santa Ana, Seal Beach, and Westminster—and Orange County as a whole. Id., p.11, Fig. 9.

Since section 65852.150 has been in place, albeit not binding on charter cities, the number of ADU permits issued in the state has multiplied by eight times. Id., p. 39.

---

[9] State requests judicial notice of: (1) Sen. Rules Comm., Office of Senate Floor Analyses, Unfinished Business, Analysis of SB 35 (2017-2018 Reg. Session) (Sept. 15, 2017) (Ex. 2); (2) Sen. Rules Comm., Office of Senate Floor Analyses, Unfinished Business, Analysis of SB 166 (2017-2018 Reg. Session) (Sept. 15, 2017) (Ex. 3); (3) Assembly, Senate Third Reading, Analysis of SB 1333 (2017-2018 Reg. Session) (Aug. 24, 2018) (Ex. 4); and (4) Assembly, Senate Third Reading, Analysis of SB 1333 (2017-2018 Reg. Session) (Aug. 17, 2018) (Ex. 5). The analyses are subject to judicial notice as legislative history and the requests are granted. Evid. Cod §452(c).

State refers to a Declaration of Jonathan M. Eisenberg (Resp. Opp. at 9, fn.3) but failed to file such a document.

### 3. **Intervenors' Evidence**[10]

Housing is generally considered affordable when a household spends 30% or less of their income on it. Wiener Decl., ¶19. Renters in California need to earn 2.9 times the state minimum wage to afford the average monthly rent of $1,982 for a two-bedroom apartment. Kotval Decl., ¶3, Ex. 1, p. 4. Across the state, 79% of extremely low-income households and 54% of very low-income households pay more than 50% of their income on housing. Id., p. 3.

Renters in Orange County must earn 3.2 times the state minimum wage (or $43.23 per hour) to afford the average monthly rent of $2,196 for a two-bedroom apartment. Kotval Decl., ¶4, Ex. 2, p. 3. Orange County's high housing costs disproportionately burden low-income households, with 81% of extremely low-income households paying more than half of their income on housing costs compared to 1% of moderate income households. Id. at p. 2. In the City, 46% of all renters and 73% of its lower-income renters spend over 30% of their income on housing—leaving seniors, persons with disabilities, and female-headed households with children most vulnerable to losing their housing because they cannot afford the rents. Kotval Decl.. ¶ 5, Ex. 3, p. II-40. According to City, 80% of the 61,000 persons employed within its boundaries commute from outside City limits, indicative of the shortage of local affordable housing opportunities for the community's workforce. Kotval Decl., ¶5, Ex. 3, p. II-6.

Orange County saw a 43% increase in homelessness between 2017 and 2019. Kotval Decl., ¶6, Ex. 4 at p.9. Against this backdrop, the high demand for affordable housing in Orange County has been unprecedented, as exemplified when a recent 80-unit affordable housing development in Irvine received 6,818 applications. Covarrubias Decl., ¶22.

The statewide housing crisis extends to the rural areas of California. In the San Joaquin Valley, 70% of low-income residents spend 50% or more of their income on housing. Wiener Decl., ¶19. In the Salinas and Pajaro Valleys, farmworkers are suffering extreme overcrowding, living seven people per dwelling compared with 3.2 overall in Monterey County and 2.6 overall in Santa Cruz County. Id. at ¶20.

Because California's 121 charter cities have nearly half of the state's population, including its largest 15 cities, the lack of affordable housing in those cities has a significant impact on the statewide housing crisis. Wiener Decl., ¶28. Housing scarcity and higher prices in charter cities would drive up housing costs for the surrounding region by increasing demand and infrastructure needs outside municipal borders. *See* Wiener Decl., ¶32; *see also* Kotval Decl., ¶8, Ex. 6 at pp. 10-12. When charter cities adopt exclusionary policies, they impact the surrounding region,

---

[10] Intervenors request judicial notice of: (1) California State Assembly, Committee on Judiciary, analysis of Assembly Bill No. 2292 (2001-2002 Reg. Sess.) (Apr. 16, 2002) (Ex. 1); (2) California State Senate, Senate Rules Committee, analysis of Senate Bill No. 166 (2017-2018 Reg. Sess.) (Sep. 15, 2017) (Ex. 2); (3) Office of Senator Bob Wieckowski SB 1333 Fact Sheet (2017-2018 Reg. Sess.) (updated Mar. 6, 2018) (Ex. 3); (4) California State Senate, Senate Rules Committee, analysis of Senate Bill No. 1333 (2017-2018 Reg. Sess.) (Aug. 30, 2018) (Ex. 4); (5) California State Assembly, Committee on Local Government, analysis of Senate Bill No. 166 (2017-2018 Reg. Sess.) (Jun. 28, 2017) (Ex. 5); and (6) California State Senate, Senate Third Reading analysis of Senate Bill No. 1333 (2017-2018 Reg. Sess.) (Aug. 24, 2018) (Ex. 6). The exhibits are subject to judicial notice as legislative history and the requests are granted. Evid. Code §452(c).

causing a domino effect as increased demand for low-income housing leads other cities to adopt similar exclusionary policies. *See* Wiener Decl. ¶2.

The Housing Element Law is State's primary planning tool to address the housing needs of all current and expected households at all income levels. Creswell Decl., ¶10. The RHNA requirement that cities facilitate sufficient sites with adequate zoning is necessary to State's goal for the housing needs of persons who have been priced out of the housing market. Creswell Decl., ¶13. SB 166 and SB 1333 were necessary to ensure uniform compliance with RHNA requirements. Creswell Decl., ¶¶ 17-18. Compliance by all jurisdiction is necessary to achieve State's housing goal. Creswell Decl., ¶¶ 19-21.

### F. Analysis

City seeks a writ of mandate and declaratory relief prohibiting State from enforcing the Housing Bills on the ground that they violate the municipal affairs doctrine of the California Constitution.[11] State and Intervenors separately oppose.

The question whether the home rule provisions of the California Constitution bar application of state law to charter cities is a bit different than a facial challenge to a statute because evidence is permitted. Nonetheless, the question turns on the meaning and scope of the state law in question and the relevant state constitutional provisions, and their interpretation presents a legal question, not a factual one. State Building and Construction Trades Council of California, AFL-CIO v. City of Vista ("Vista"), (2012) 54 Cal.4th 547, 558. (citations omitted). In doing, so, courts accord great weight to the factual record that the Legislature has compiled and also to any relevant facts established in trial court proceedings. Id. (citing California Federal Savings, *supra*, 54 Cal.3d at 20-25). Factual findings by the Legislature or the trial court, however, are not controlling and the court ultimately must decide what areas of governance are municipal concerns and what are statewide concerns. Id.

The parties agree that the four-part test set forth in Vista, *supra*, 54 Cal.4th at 556 applies to determining whether the Housing Bills violate the municipal affairs doctrine. Pet. Op. Br. at 14; State Opp. at 19-21; Interv. Opp. at 15. The four factors are: (1) whether the subject of regulation is a municipal affair; (2) whether there is an actual conflict between the local measure and the state law; (3) whether the state law addresses a matter of statewide concern; and (4) whether the state law is reasonably related to addressing the matter and narrowly tailored not to unduly interfere with local control. Vista, *supra*, 54 Cal.4th at 556.[12]

#### 1. Whether the Subject of Regulation is a Municipal Affair

The Housing Bills' subject is the planning, zoning, and development of land within a city's

---

[11] City does not challenge its obligations to adopt a housing element, identify sites for its housing element site inventory, and accommodate its RHNA allocation.

[12] State notes that the SAC's fourth cause of action, which challenges AB 101's amendment of section 65585 to provide new penalties for non-compliance with housing development laws as violating the California Constitution's "prohibition against Excessive Fines and Bills of Attainder." SAC, ¶¶ 85-90. State further notes that City's opening brief contains no argument concerning this legal theory. Accordingly, the SAC's fourth cause of action is denied as unsupported.

borders. Whether a subject of regulation is a municipal affair is determined by reference to both (1) article XI, section 5(b), which has an express, non-exhaustive list of municipal affairs (Anderson v. City of San Jose, ("Anderson") (2019) 42 Cal.App.5th 683, 700), and (2) "the historical circumstances presented" (California Federal, *supra,* 54 Cal.3d at 1), which may illuminate the meaning of the term "municipal affair" in article XI, section 5(b). Vista, *supra*, 54 Cal.4th at 557-58. If the subject of regulation is not a municipal affair, then the analysis ends and State may regulate in that field without violating the home rule doctrine. Id. at 556.

As City notes (Pet. Op. Br. at 14), the courts and the Legislature long have recognized and repeatedly affirmed land use and zoning as quintessentially municipal affairs. Miller v. Board of Public Works, (1925) 195 Cal. 477, 495; Schad v. Mt. Ephraim, (1981) 452 U.S. 61, 68; DeVita, *supra,* 9 Cal.4th at 782; §§ 65300.7 and 65300.9.

State and Intervenors concede that the matter of land use regulation is a municipal affair. State Opp. at 22; Intervenors Opp. at 15.

### 2. Whether There is an Actual Conflict

If the subject of regulation is a municipal affair, then the court considers whether there is an actual, inimical conflict between the pertinent city charter provision, ordinance, or regulation, on one hand, and the state law in question, on the other hand. Vista, *supra*, 54 Cal.4th at 556. A conflict is inimical if it would be impossible to comply with both the local measure and the state law at the same time. Lanier v. City of El Centro, (2016) 245 Cal.App.4th 1494, 1505. If there is no such conflict, then the analysis is over and the local measure and the state law can lawfully co-exist. Vista, *supra*, 54 Cal.4th at 556.

City submits that this factor is satisfied *ipso facto* by the fact that it and State are opposing parties in this litigation as well as an earlier suit, Orange County Superior Court Case No. 30-2019-01046493, which was filed by the HCD over City's alleged non-compliance with its RHNA allocation in its housing element.[13]  City submits that this factor was developed and articulated by the California Supreme Court in California Federal, and in both California Federal and Vista, the petitioners were private third parties seeking to hold charter city enactments unenforceable under state law where State was not a party. California Federal, *supra*, 54 Cal. 3d at 6; Vista, *supra*, 54 Cal. 4th at 552.) This part of the test is necessary for the court to avoid weighing in on a matter where there is no apparent dispute between a charter city and State. But City and State are the opposing parties in this litigation and there necessarily is a conflict. Reply at 4.

City is confusing a dispute or conflict between parties (City and State) with a conflict between local and state law. They are not the same, and the court cannot conclude from the fact of two lawsuits between the parties that there is a conflict between laws for purposes of home rule analysis.

City also argues that the Housing Bills' substantive impositions and potential draconian penalties clearly conflict with its claim to home rule and local control. City has accepted the full breadth of article XI, section 5's grant of autonomy and control over municipal affairs under and has promulgated a comprehensive plan for development and zoning administered by its

---

[13] By stipulation of the parties, HCD's petition was dismissed as moot after City adopted an amended housing element. City argues that it agreed to this resolution to become eligible for SB 2 funding to assist in homelessness prevention efforts.

Community Development Department and Planning Commission.

In the City, a zoning designation is assigned to every legally defined parcel within a zone. The HBZSO contains zoning maps which show the location of the various zones, and the zoning code specifies which uses are permitted in those zones and the standards that apply to each use. A key goal of land use regulation is for nearby land uses to be compatible with one another. If a property owner wants to use property in a manner not consistent with the municipality's plan and zoning for the property, the owner must apply for a CUP. The permit process allows decision-makers to consider the property owner's beneficial use of the property while assuring targeted solutions to the issues raised by the non-conforming proposed use. "The reason for discretionary treatment is that these are uses which cannot be said to be always compatible in some zones while always compatible in others.... uses that should be allowed as of course, but could be allowed subject to conditions." Neighborhood Action Group v. County of Calaveras, (1984) 156 Cal. App. 3d 1176, 1183.) A strong body of law reflects judicial deference to local governing and administrative agencies in their resolution of CUP applications. Snow v. Garden Grove, (1961) 188 Cal. App. 3d 496, 504-05. Pet. Op. Br. at 16.

In sum, the CUP process highlights the traditional close degree of local control which cities exercise in determining local land use and zoning – both in the promulgation of general plans (including housing elements) and zoning schemes, as well as in considering variances for specific projects. City argues that the Housing Bills eviscerate City's scalpel of local control acutely responsive to local needs by imposing a sledgehammer of streamlined, ministerial approvals and mandated rezoning irrespective of local needs, problems, infrastructure and resources. As a result, the Housing Bills' imposition of substantive obligations and associated penalties necessarily conflicts with City's assertion of plenary control over local land use and zoning.

State points out that this prong of the test requires an actual conflict. If it would be possible to comply with City's charter or ordinance and any of the state statutes in question, then there is no conflict and no home rule problem. City of Huntington Beach v. Becerra, ("Huntington Beach") (2020) 44 Cal.App.5th 243, 269-70 (finding no conflict between a City charter provision and state statute). State notes that, although City presents the entire City Charter and zoning code as evidence, it does not specific a single local law in conflict with any state law. State Opp. at 22-23.

State speculates that this may be because HBMC section 2.34.020(a) calls for local law to harmonize with state law. That ordinance states that the duties of the City's Planning Commission derive from the Government Code, title 7—which covers all the state laws at issue -- as well as City ordinances. State Opp. at 22-23.

City properly rebuts this argument. HBMC section 2.34.020(a) describes the duties of City's Planning Commission in reference both to the Government Code "and as provided by ordinance of the City of Huntington Beach." Thus, City does not defer to state law for the Planning Commission's duties; it only lists the Government Code as a partial source of authority. And City does not refer to the Government Code at all for the City Council's authority to make final land use and zoning decisions. Reply at 4.

State further notes that many of the statutes in the challenged Housing Bills contain either permissive language stating what a charter city may, but is not required, to do, or else merely declare state policy with no directive or restriction on how a charter city exercises its authority. See, e.g., §65300.5 (mere statement of legislative intent); §65582.1 (declaration of legislative findings); §65450 (permissive language for charter city actions). State Opp. at 23. State notes that

policy declarations carrying no accompanying mandates pose no possible conflict with charter city authority. *See* Huntington Beach, *supra*, 44 Cal.App.5th at p. 270 (no home rule conflict between City measure giving local police force authority, but not obligation, to enforce all laws and state law limiting local law enforcement participation in federal immigration law enforcement). State Opp. at 23-24.

City replies that the handful of scattered statutes enacted or amended by the Housing Bills merely declaring State policy can be severed from its challenge to the Housing Bills. According to City, the fact remains that the remainder of the Housing Bills impose onerous unconstitutional requirements, prohibitions, and penalties. Reply at 4.

Contrary to City's assertions, it has not demonstrated that the statutes enacted or amended by the Housing Bills necessarily conflict with City's local control such that it is impossible to comply with both simultaneously. City claims that the Housing Bills impose substantive obligations that interfere with its plenary control, but it does not show specifically what statutes conflict and why their obligations cannot be harmonized with local control. City only makes the conclusory claim that the Housing Bills' streamlined, ministerial processing of development runs directly counter to City's discretionary review of CUPs to tailor specific local needs. Reply at 4. This claim is too general and vague. How is the court to know which statutes in SB 35, SB 166, 1333, and 101 conflict with City's zoning and discretionary CUP review and why? How would the court know which statutes City agrees could be severed as permissive or merely declarative of policy?[14]

City has not established that there is an actual, inimical conflict between the Housing Bills and its local laws.

### 3. **Whether the Housing Bills Address a Matter of Statewide Concern**

Whether a state law addresses a matter of statewide concern hinges on "how the state constitution allocates governmental authority between charter cities and the state." Vista, *supra*, 54 Cal.4th at 557. The phrase "statewide concern" is an ultimate legal conclusion that requires courts to allocate powers between local and state legislative bodies in the most sensible and appropriate fashion. California Federal, *supra*, 54 Cal.3d at 17. "In other words, for state law to control, there must be something more than an abstract state interest, as it is always possible to articulate some state interest in even the most local of matters." Vista, *supra*, 54 Cal. 4th at 560 (quoting California Federal, *supra*, 54 Cal. 3d at 18). If the state law does not address a matter of statewide concern, then the state law does not prevail over the conflicting city measure. Vista, *supra*, 54 Cal.4th at 556. A subject of regulation can be both a municipal affair and a matter of statewide concern. Anderson, *supra*, 42 Cal.App.5th at 702; Codding Enterprises v. City of Merced, (1974) 42 Cal.App.3d 375, 377.

The outcome can depend, at least in part, on whether the subject of regulation has extraterritorial dimensions or effects, meaning that it does not obey city boundaries but rather spills over and beyond them, and therefore is appropriately addressed on a statewide basis. Vista, *supra*, 54 Cal.4th at 557-58. This determination is made based on case law, historical circumstances

---

[14] On a related issue, State argues that the court should deny the SAP without examining the Vista factors because City fails to particularize an attack on any state law and does not provide any home rule analysis for any of the individual statutes. State Opp. at 21-22. The court agrees.

presented in the trial court, and legislative declarations, findings, and history, which are entitled to great weight, but are not controlling. California Federal, *supra*, 54 Cal. at 18, 20, n. 16; Vista, *supra*, 54 Cal.4th at 558. The court is required to defer to legislative estimates regarding the significance of a given problem and the responsive measures that should be taken toward its resolution." California Federal, *supra*, 54 Cal.3d at 24. Any fair, reasonable and substantial doubt whether a matter is a municipal affair or broader state concern must be resolved in favor of the legislative authority of the state. City of Los Angeles v. Tesoro Refining and Marketing Co., (2010) 188 Cal.App.4th 840, 848-49. If the Legislature has established a comprehensive regulatory scheme for a subject, then the express or implied goal of uniformity suffices to preclude local action that would disrupt that uniformity. Fiscal v. City and County of San Francisco, (2008) 158 Cal.App.4th 895, 919 (firearms regulations) (*citing* Long Beach Police Officers Assn. v. City of Long Beach, (1976) 61 Cal.App.3d 364).

In Vista, the state law required cities to pay workers at the prevailing wage set by the director of the Department of Industrial Relations. 54 Cal.4th at 560-61. The plaintiff labor union challenged a city charter measure proclaiming that the city would not comply with this state law for its public works projects. Id. at 552-53. The union argued that there is a statewide concern for the state's prevailing wage law based on the "trend toward economic regionalization, with workers driving long distances to a jobsite and multiemployer collective bargaining agreements governing the terms of employment on a regional basis." Id. at 561.

The California Supreme Court admonished that the "hinge of [the statewide concern issue] is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations." 54 Cal. 4th at 560 (citation omitted). "In other words, for state law to control, there must be something more than an abstract state interest, as it is always possible to articulate some state interest in even the most local of matters." Id.

The court held that the union's stated position did not establish a statewide concern because these issues applied statewide only "when considered in the abstract." Id. The courts are "'especially' hesitant to abdicate to the Legislature's view of the issue 'when the issue involves the division of power between local government and that same Legislature.'" Id. (citation omitted). Because the state law substantively infringed on a core, although un-enumerated, municipal affair, it could not be justified "merely by identifying some indirect effect on the regional and state economies." Id. at 562. Laws setting forth generally applicable procedural standards are more likely to address a statewide concern, and impinge less on local authority, than substantive obligations. Id. at 564. The fact that the state law narrowly applied only to public agencies, and "impose[d] substantive obligations on charter cities, undermined the assertion that it presented a statewide concern. Id. at 564-65. As a result, the court held the state law did not address a statewide concern and affirmed the lower court's judgment that the state law was unconstitutional as applied to charter cities. Id. at 566.

### a. City's Position

City compares the Housing Bills to Vista and argues that their generic reference to an affordable housing shortage as a matter of statewide concern is merely a convenient abstract label. There may be a lack of affordable housing in the state, but that fact does not sufficiently backstop the extra-municipal interest in directly targeting local jurisdictions' control over local land use and

19

zoning. Furthermore, the Housing Bills' imposition of substantive duties and penalties and not procedural requirements – such as those previously imposed on charter cities requiring adoption of a general plan and reporting to HCD -- also weighs against State. Pet. Op. Br. at 17-18.

City argues that the state laws regarding land use and zoning in the coastal zone are an example of a proper limited extra-municipal concern sufficient to trump charter city autonomy because the coastal zone is a specific area over which State has a uniquely statewide interest. *See* §§ 65590, 65590.1. In CEEED v. California Coastal Zone Conservation Committee, ("CEEED") (1974) 43 Cal. App. 3d 306, the court considered the former Coastal Zone Conservation Act of 1972 which imposed certain requirements on developments within the coastal zone. In determining that the act was applicable to charter cities, the court observed that the coastal zone is a "distinct and valuable natural resource belonging to all the people" and the coastline is uniquely subject to a statewide interest, citing the federal government's recognition of the importance of the coastal zone as a national interest. Id. at 321-23. Pet. Op. Br. at 18.

In contrast, the Housing Bills impose substantive interruptions of local control over land use and zoning not based on features of a jurisdiction over which there is a statewide interest, but rather to all local jurisdictions. Yet, the demand for housing is not at all uniform throughout the state. The state lost 912,000 net domestic migrants since 2010, and the patterns are not equal in counties across the state. Since 2010, the Fresno and Sacramento labor markets respectively gained 41,000 and 48,000 domestic migrants, Riverside County gained 135,000 domestic migrants, Orange County lost 85,000 domestic migrants, and Los Angeles County lost 655,000 domestic migrants. Cox Decl., Ex A, p. 62. In other words, local population trends vary and present distinct local issues of housing supply and demand. Pet. Op. Br. at 18-19.

Because there is a multiplicity of different types of local jurisdictions (urban, rural, agricultural, industrial), local control over land use and zoning is necessary to meet local needs and concerns based on locally available resources and infrastructure. Sauviat Criste Decl., Ex. B, pp. 3-6 (comparing the varied local conditions that require local control). For instance, the parking requirements in single family residential zones should reflect the demographics of the city – Palm Springs with only two persons per household needs fewer additional parking spaces than Inidio with 3.4 persons per household. Sauviat Criste Ex. B, p. 6. Pet. Op. Br. at 19.

State cannot work backwards from its imposition of a purported statewide solution to a lack of affordable housing to justify its intrusion into inherently municipal affairs. The Legislature's intention to address a statewide interest does not make it one. Johnson, *supra*, 4 Cal. 4th at 405 ("In other words, we must be satisfied that there are good reasons, grounded on statewide interests, to label a given matter a 'statewide concern.'".) "No doubt almost anything [a city] does... can have consequences beyond its borders. But this circumstance does not mean this court may eviscerate clear constitutional provisions, or the Legislature may do what the Constitution expressly prohibits it from doing." County of Riverside v. Superior Court, (2003) 30 Cal. 4th 278, 296. City concludes that the Housing Bills do not address a matter of statewide concern. Pet. Op. Br. at 19.

The court disagrees. State demonstrates that the affordable housing issue addressed in the Housing Bills is a matter of statewide concern, both in case law, legislative findings, and historical fact.

### b. **Historical Facts**

Over the last several decades, California has produced 2.3 million fewer housing units than needed for its existing population. Coy Decl., Ex. A, pp. 3-5. The gap between the human population and the number of housing units is growing. Ibid. Housing prices, whether for sale or rental, are expensive all over the state. Id., pp. 5-8. City's expert, Cox, agrees with that assessment. Cox. Decl., Ex. A, pp. 4-11. State argues that the cost of housing causes an array of physical and mental health, nutrition, education, and job performance problems. Coy Ex. A, pp. 15-23. Businesses have a hard time recruiting employees who cannot afford the cost of living and the state's overall economy is negatively impacted. Id., pp. 20-21.) State Opp. at 24.

No city in California has an insular housing market. What happens in one city's housing market indisputably spills over city boundary lines and affects other cities. Coy Decl., Ex. A, pp. 8-13. Over the last 30 years, the median sales prices for existing homes in California, the Los Angeles Metro region (the counties of Los Angeles, Orange, Riverside, San Bernardino, and Ventura), and Orange County trace almost exactly the same jagged line. Id., p. 10, Fig. 9. Even with charter city participation in the 2013-21 cycle of RHNA, State has achieved 55% of the goal for zoning for and building more housing for people at all income levels. Id., p. 14. If charter cities opted out, the rate would be only 22%. Ibid. State Opp. at 24-25.

Intervenors note that there are 121 charter cities in California, including its 15 largest cities, and they house almost half the state's population. Wiener Decl. ¶28. SB 166 and SB 1333 address zoning practices which hinder affordable housing development by preventing developers from building at higher densities suited to the development of low-income housing. *See* Kotval Decl. ¶ 8, Ex. 6, pp. 15, 20. If charter cities are exempted from SB 166 and SB 1333, State's comprehensive statutory scheme to address the regional housing need under the Housing Element Law would devolve into two unequal, incompatible planning systems incapable of meeting the challenges posed by the housing crisis. Interv. Opp. at 8.[15]

Intervenors add that the concrete "regional spillover effects of insufficient housing" identified in Anderson, 42 Cal. App. 5th at 711, also demonstrate the need to address the shortage of affordable housing from a statewide approach. The lack of affordable housing in all cities impacts the surrounding regions, including by increasing housing demand and costs. *See* Wiener Decl., ¶32; Covarrubias Decl., ¶23; Creswell Decl., ¶19. For example, coastal cities often fail to plan for and produce the housing their communities need. Kotval Decl. ¶8, Ex. 6, pp. 12-13. The actions of coastal cities to block housing development leads to migration further inland, increasing housing demand and housing costs there. Id., pp. 12-13, 15. Interv. Opp. at 19-20.

City's own evidence supports this spillover effect. Nearby Riverside County posted a

---

[15] According to Intervenors, City's actions exemplify the local practices that result in the shortage of sites for affordable housing. Prior to the Amendment, City had a compliant housing element with sufficient sites to meet its RHNA allocation at all income levels. The Amendment reduced the density of development on these sites, required City approval of any development, and imposed onerous development standards. These changes effectively eliminated the sites available to meet City's lower income RHNA obligation and greatly impacted the development of affordable housing in the City. When the Amendment was in place from 2015 to 2020, City permitted no very low-income units and only eight low-income units. Kotval Decl. ¶15, Ex. 13, p. 4. In the two years prior to the Amendment, 89 very low and low-income units were permitted in the City. Id. Interv. Opp. at 19.

strong gain in domestic migration, while Orange County lost domestic migrants. Cox Decl., ¶6, Ex. A, p. 62. While City suggests that this domestic out-migration demonstrates a lower demand for housing in the region, its evidence shows that the out-migration has been associated with the lack of affordable housing. Cox Decl., ¶6, Ex. A, p. 62. City also recently approved a fair housing report stating that the "[l]ack of local or regional cooperation may be a significant contributing factor to fair housing issues in Orange County" and that "there remains a problem with local governments not taking the steps to achieve regionally determined goals like progress toward meeting each jurisdictions [sic] [RHNA] for very low-income and low-income households." Kotval Decl., ¶16, Ex. 14, p. 324. Interven. Opp. at 20.[16]

### c. **Legislative Findings**
In enacting SB 1333, the Legislature found as follows:

"The Legislature finds and declares that <u>the serious shortage of decent, safe, and sanitary housing for low- and moderate-income households that was first identified in 1979 continues</u> and that ensuring the location, development, approval, and access to housing for all income levels in all jurisdictions in California <u>is a matter of statewide concern</u> and not exclusively a municipal affair as that term is used in Section 5 of Article XI of the California Constitution. This situation requires the amendment of the charter city exemptions provided in Sections 65700 and 65803 of the Government Code as inconsistent with Section 1 of Article IV and Section 5 of Article XI of the California Constitution." City RJN Ex. P, §14 (emphasis added).

Intervenors note that the Legislature also declared that the lack of affordable housing is a matter of statewide concern in SB 166 and SB 133. Interv. Opp. at 16-17.

The author of SB 166 stated that it focuses on one of the biggest barriers to increasing affordable housing supply: a lack of appropriately zoned land for the construction of new housing in many localities. Interv. RJN Ex. 5, p.6. Consistent with the author's statement, the Legislature declared in SB 166 that the No Net Loss Law is a reform to facilitate and expedite the construction of affordable housing. §§ 65582.1; 65582.1(i).

Similarly, the Legislature declared for SB 1333 that "the serious shortage of decent, safe, and sanitary housing for low- and moderate-income households that was first identified in 1979 continues," and that it enacted SB 1333 "to address the lack of affordable housing in the state, which is of vital statewide importance, and that ensuring the location, development, approval, and access to housing for all income levels in all jurisdiction in the state is a matter of statewide concern. City RJN Ex. P, §§ 1, 14. According to the author, SB 1333 was necessary because the Kennedy Commission decision threatened to undermine California's Housing Element Law and SB 1333 would ensure that charter cities do not inappropriately subvert the goals stated in required

---

[16] Intervenors also attempt to rely on factual findings in <u>Anderson</u> to support the historical nature of statewide concern. Interv. Opp. at 19. The court may not take judicial notice of the truth of the findings in a court document. <u>Sosinsky v. Grant</u>, (1992) 6 Cal.App.4th 1548, 1551.

general plan policies, including approved housing elements. Interv. RJN Ex. 6, pp. 3-4. Interv.
Opp. at 18.[17]

State points out that the Housing Bills' amended/enacted statutes all concern low-cost
housing or increasing housing generally. Sections 65852.150, 65852.25, 65863, 65863.4, 65863.6,
65866, and 65913.4 substantively address the statewide housing crisis as a matter of statewide
concern. Sections 65852.150 (encouraging development of accessory dwelling units (granny
flats), 65852.25 (preventing opportunistic downzoning in the wake of catastrophes), 65863 (also
about downzoning), 65863.4 (same), 65863.6 (same), 65866 (concerning development
agreements), and 65913.4 (establishing the streamlined, ministerial approval process of proposed
multi-family housing developments that meet objective local standards) all establish obligations
and programs that bolster the provision of housing, and low-cost housing, throughout the state.
State Opp. at 28-29. Sections 65300.5, 65301.5, 65359, 65400, 65450, 65454, 65455, 65460.8,
65580, 655821.5, 65585, 65850, 65860, 65863.4, and 65863.8 govern administrative and
procedural aspects of addressing the statewide housing crisis. State Opp. at 30.

Thus, the Legislature has repeatedly and expressly declared lack of adequate housing to be
a matter of statewide concern. Buena Vista, *supra*, 175 Cal.App.3d at 306 (citing seven statutes).
While the Legislature's characterization of statewide concern is not determinative, the applicable
standard is one of "'defer[ence] to legislative estimates regarding the significance of a given
problem and the responsive measures that should be taken toward its resolution'" Anderson, *supra*,
42 Cal.App.5th at 707 (citation omitted). State Opp. at 27-28.

### d. Case Law

Over the past 50 years, numerous case decisions have upheld statewide housing and land-
use statutes and regulations as overriding conflicting charter-city measures notwithstanding the
home-rule doctrine. State Opp. at 25.

Last year, Anderson upheld the Surplus Land Act ("SLA") (§54220 *et seq.*) against a
charter city's home-rule challenge. 42 Cal.App.5th at 683. The court held that the shortage of sites
available for affordable housing development was a matter of statewide concern in the context of
the charter city's challenge to the application of SLA section 54220, which required municipalities
disposing of surplus land to give first priority to affordable housing development. The Anderson
court held that the SLA advances state land use policy objectives by mandating a uniform approach
to the disposition of local government land that is no longer needed for government use. By
requiring municipalities to prioritize surplus land for the development of low- and moderate-
income housing, the statute addresses the shortage of sites available for affordable housing
development as a matter of statewide concern. 42 Cal.App.5th at 693.

The Anderson court found that while City had a readily identifiable interest in the

---

[17] City notes that SB 166 did not apply to charter cities and the enactment of SB 1333,
citing a purported "serious shortage of... housing for low- and moderate-income households that
was first identified in 1979...", begs the question of what changed in the year between SB 166 and
SB 1333? If the problem was not sufficiently of extra-municipal dimension for SB 166, the
Legislature should not be able to reverse course a year later merely by fiat. Pet. Op. Br. at 19. The
short answer is that the legislative history of SB 1333 shows that Kennedy Commission
demonstrated to the Legislature that it had made a mistake.

disposition of its real property, the well-documented shortage of sites for low and moderate income housing and the regional spillover effects of insufficient housing demonstrate extramunicipal concerns justifying statewide application of the Act's affordable housing priorities. Anderson, *supra*, 42 Cal.App.5th at 711. Judicial decisions have consistently recognized the statewide dimension of the affordable housing shortage in relation to various impositions by the state into the realm of local affairs. Id. at 709. Anderson quoted the California Supreme Court in California Building Industry Assn. v. City of San Jose, (2015) 61 Cal.5th 435, 441 as follows: "It will come as no surprise to anyone familiar with California's current housing market that the significant problems arising from a scarcity of affordable housing have […] become more severe and have reached what might be described as epic proportions in many of the state's localities." Id. at 708-09.

Anderson relied on four appellate decisions issued over the last five and half decades holding unequivocally that the provision of sufficient housing for Californians is a matter of statewide concern:

> "Judicial decisions predating California Building have recognized the statewide dimension of the affordable housing shortage in relation to various impositions by the state into the realm of local affairs. See Green v. Superior Court, (1974) 10 Cal.3d 616, 625…[citing "enormous transformation in the contemporary housing market, creating a scarcity of adequate low-cost housing in virtually every urban setting"]; Buena Vista [Gardens Apartments Assn. v. City of San Diego Planning Dept., (1985) 175 Cal.App.3d 289, 306] [finding "need to provide adequate housing" is a statewide concern and rejecting home rule challenge to state provision that mandated charter city to include certain actionable components in its "housing element"]; Bruce v. City of Alameda, (1985) 166 Cal.App.3d 18, 22…["locally unrestricted development of low-cost housing is a matter of vital state concern"]; Coalition Advocating Legal Housing Options v. City of Santa Monica, (2001) 88 Cal.App.4th 451, 458…[noting the Legislature and courts have declared housing to be a matter of statewide concern]." 42 Cal.App.5th at 709-10.

The Anderson court concluded that "the well-documented shortage of sites for low- and moderate-income housing and the regional spillover effects of insufficient housing demonstrate 'extramunicipal concerns' justifying statewide application of the [SLA's] affordable housing priorities." Id. at 711. State Opp. at 25-26.

Intervenors also rely (Interv. Opp. at 16-17) on Buena Vista Gardens Apartments Ass'n. v. San Diego Planning Dep't, ("Buena Vista") (1985) 175 Cal.App.3d 289, 306-07, in which the court held that section 65583(c), which requires jurisdictions to commit to specific actions to make sites available to meet their RHNA, addressed a matter of statewide concern. The court rejected the city's argument that, while there is a legitimate statewide concern in requiring all jurisdictions to adopt general plans, section 65583(c) did not apply to charter cities because it intruded on municipal affairs. Id. The court explained that the city's position had no merit because it would limit the Legislature to declarations matters were of statewide concern and would prohibit the Legislature from compelling cities to take action to address the concern. Id. at 307.

Intervenors argue that City's position repeats the same argument rejected by Buena Vista.

Intv. Opp. at 16.  City contends that, while the state can require charter cities to adopt general plans and housing elements and to identify sites to facilitate affordable housing, State cannot enforce those requirements by mandating that the local planning and development decisions of charter cities be consistent with their adopted general plans and housing elements.  Id.  This is similar to Buena Vista, where the court expressly stated that the Legislature must be able to require local action for matters of statewide concern.  Interv. Opp. at 17.

State notes that City's opening brief fails to mention Anderson or any of these cases affirming California's interest in addressing the statewide affordable-housing crisis through broadly applicable legislation.  Even the case cited by City, CEEED, observed that "the municipal affairs concept does not preclude the state from regulating land use when necessary to further the state's interest."  43 Cal.App.3d at 324 (emphasis added).  While City disparages those State policy goals as "abstract", the many cases discussed above prove otherwise.  State Opp. at 26-27.

City argues that Anderson and Buena Vista do not justify the elimination of local control simply to address the lack of affordable housing.  Neither case involved a state law that imposed substantive obligations on local land control.

In Anderson, the SLA provision was predominantly procedural with incidental and uncertain substantive effects.  42 Cal.App.5th at 714.  The SLA does not require a local agency to sell surplus land for less than fair market value.  §§ 54221(b)(3), 54226.  The SLA also expressly recognizes the local agency's authority to enforce its pre-existing "authority or discretion to approve land use, zoning, or entitlement decisions in connection with the surplus land." §54223(b).  In other words, the SLA does not override a charter city's land use and zoning decisions and preserves its ability to receive fair market value for surplus land.  If the surplus land is not zoned for residential development, the city does not need to sell it for affordable housing development.  If certain conditions attach to residential development under the city's land use and zoning rules, they need not be altered to facilitate affordable housing development (other than the minimum set-aside for residential development greater than ten units).  Reply at 8-9.

In holding that the SLA passed the third part of the test, the Anderson court made sure to carefully determine whether "it treads within the boundary indicated by Vista for assessing statewide concern based on the degree to which the law impinges on local governing rights."  42 Cal. App. 5th at 712.  The court noted that the SLA initially imposes procedural requirements for notice and good faith negotiations regarding the disposition of the surplus land.  Id. at 713.  It then noted that there are some substantive limitations which kick in if the land is slated for affordable housing or general housing greater than ten units.  Id.  The Anderson court emphasized, however, that the substantive requirements "arise only in select scenarios" while expressly preserving the right to fair market value.  Id.  Anderson held that the SLA's substantive requirements were attenuated and essentially incidental to the procedural requirements that were the main purpose of the law, and the substantive requirements still left substantial discretion to the city in deciding how and whether to dispose of surplus land.  Id. at 714.  Reply at 9.

City concludes that Anderson does not mean that State has carte blanche to eliminate local control when it purports to address a lack of affordable housing.  Rather, Anderson stands for the proposition that the statewide interest in addressing the lack of affordable housing is sufficient to justify a predominantly procedural law with incidental and uncertain substantive effects, and which preserves substantial discretion to a charter city.  None of these features apply to the Housing Bills. State has expressly conceded that sections 65852.150, 65252.25, 65863, 65863.4, 65863.6, 65866,

and 65913.4 impose substantive obligations/prohibitions.  State Opp. at 28.  There is nothing incidental or conditional to these substantive intrusions.  The Housing Bills cut off charter city discretion completely and impose a State-mandated one-size-fits-all scheme for land use and zoning.  Reply at 9-10.

City argues that Intervenors' reliance on Buena Vista, *supra,* 175 Cal. App. 3d at 289, is similarly misplaced.  The Anderson court provides a helpful gloss: "In Buena Vista... the Housing Element Law required the city to adopt a five-year schedule of actions to achieve the housing element goals... but at the same time afforded 'considerable discretion in the manner of implementing programs' to reach those goals... and expressly refrained from imposing on certain aspects of local control....."  42 Ca. App. 5th at 714 (emphasis added).  City argues that the Housing Bills afford no discretion – indeed, SB 35 literally imposes a streamlined, ministerial approval process for housing developments.  Reply at 10.

Thus, the SLA provision in Anderson was predominantly procedural with incidental and uncertain substantive effects and the law in Buena Vista afforded considerable discretion in the manner of implementing programs to reach its goal.  In contrast, the Housing Bills are substantially more intrusive and onerous.  Reply at 9-10.  The interest in low-cost housing may be sufficient to support a minimally intrusive procedural law, but it does not imbue the magic ability to justify a collection of Housing Bills that decimate charter city's home rule authority over local land use and zoning.  Reply at 10-11.

While City has properly distinguished Anderson as concerning a primarily procedural state law and Buena Vista as affording charter cities with discretion, it fails to explain how the Housing Bills "decimate charter city's home rule authority over local land use and zoning".  The Housing Bills are expressly designed to remedy the failure of California cities to comply with the Housing Element Law and RHNA zoning law (§65863) such that low-cost housing remains unavailable and a housing "crisis".  This lack of low-cost housing is concededly a matter of statewide concern.

As explained by Buena Vista, *supra,* 175 Cal.App.3d at 306-07 and argued by Intervenors, the Legislature has to be able to address this matter of statewide concern and cannot be limited to making declarations about a housing crisis without compelling cities, including charter cities, to take action to address the concern.  As Intervenors point out and City never addresses, there are 121 charter cities in California housing almost half the state's population.  Wiener Decl. ¶28.  If charter cities are exempted from SB 166 and SB 1333, the state's comprehensive statutory scheme to address the regional housing need under the Housing Element Law would devolve into two unequal, incompatible planning systems incapable of meeting the challenges posed by the housing crisis.  Interv. Opp. at 8.  City fails to even consider this point.

### e. City's Abstract/Compartmentalization Argument

City concedes that the Housing Bills are intended to address the issue of insufficient low-cost housing.  City argues that the Housing Bills still fail to qualify as a matter of statewide interest because the interest is too abstract to justify the elimination of local control.  City notes that the Supreme Court in Vista held that there is not a statewide concern where the issues apply statewide only "when considered in the abstract."  54 Cal. 4th at 560.  The "hinge of [the statewide concern issue] is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations."  Id.  "In other words, for state law to control, there must be something more than an abstract state

interest, as it is always possible to articulate some state interest in even the most local of matters." Id. Pet. Op. Br. at 17; Reply at 5-6.

City contends that the issue of affordable housing is similarly abstract. The demand for housing is not uniform and varies greatly by area. Cox Decl., Ex. A, p. 62. A uniform, statewide approach is not justified and local control over land use and zoning is necessary to meet local needs and local concerns based on locally available resources and infrastructure. Criste Decl., Ex. B. As with the wage laws in Vista, the fact that the problem of low-cost housing can be aggregated and considered in the abstract is insufficient to make the matter an issue of statewide concern. Reply at 6-7.

City notes that Vista involved the application of a state prevailing wage law to a charter city's public works projects. The Vista petitioner union argued that "the economy of the state has become more integrated... and wage levels in a local area are now more likely to have an effect regionally and statewide," and "in light of our modern integrated economy, it has become a statewide concern." 54 Cal. 4th at 561. The argument was rejected by the Vista court and City contends that State's argument is the same if "wage levels" is replaced with "housing prices". Reply at 6.

By failing to take account of the substantial difference in the intrusiveness of the Housing Bills versus the laws at issue in Anderson and Buena Vista, State and Intervenors have made the mistake of compartmentalizing "affordable housing" as a purported statewide concern. State and Intervenors rely on "de-contextualized snippets" of case law noting that lack of affordable housing is a statewide concern. Pursuant to their position, once a court has held that lack of affordable housing is a statewide concern sufficient to justify a particular state law's supersession of local control, the floodgates are open to any and all future state law. The California Supreme Court has expressly cautioned against this oversimplification and compartmentalization of "an entire area of governmental activity as either a 'municipal affair' or one of statewide concern...." California Federal, supra, 54 Cal. 3d at 17-18. "To approach the dichotomy of "municipal affairs/statewide concern" as one signifying reciprocally exclusive and compartmented domains would, as one commentator has observed, "ultimately all but destroy municipal home rule." Id. Reply at 7.

City suggests that State and Intervenors would be perfectly fine with the destruction of municipal home rule. But Article XI, section 5 is not a dead letter and is still a vital part of the California Constitution. Significantly missing from State's and Intervenors' discussions of the third part of the test is the fact that there is effectively a sliding scale based on the extent to which a state law substantively intrudes on charter cities' local control over a municipal affair. Reply at 8.

The shortage of low-cost housing does not identify extramunicipal concerns sufficient to justify overriding local control. State's own evidence underscores the fact that a one-size-fits-all, top-down mandated solution is inapt. "Place type – rural, suburban, and urban areas – each present their own unique housing challenges (even when located in the same geographical area) and can require different types of solutions." No one disputes City expert Cox's identification of highly variable domestic migration patterns, which reflect a lack of uniform demand for housing. While the state lost 912,000 domestic migrants since 2010, the patterns are not equal across the state. The Fresno and Sacramento labor markets actually gained 41,000 and 48,000 domestic migrants, Riverside County gained 135,000 net domestic migrants, Orange County lost 85,000 domestic migrants, and Los Angeles County lost 655,000 net domestic migrants. Cox Decl., Ex. A, p. 62.

The Legislative Analyst Office issued a chart that shows striking dissimilarities in housing needs between inland and coastal counties, and even among the different coastal counties:



Figure 8

**Housing Needs Vary Considerably Across Counties**

*Average Annual Number of New Housing Units Built by County, 1980-2010*

ª Estimated new housing construction needed to prevent home prices from growing faster than the rest of the country.

(Exhibit 3 at p. 22.) Reply at 7.

As with wage levels, it is not enough that there is an abstract problem of a lack of low-cost housing with a statewide dimension. "[T]hat the Legislature chose to deal with a problem on a statewide basis... does not in itself make the problem a statewide concern.... Put differently, the concept of statewide concern is not coextensive with the state's police power." Vista, *supra*, 54 Cal. 4th at 562. Reply at 7.

It is true that Vista teaches that a statute is more likely to be of statewide concern and impinge less on local authority if it is procedural, not substantive, in nature and is narrowly applied only to public agencies. 54 Cal.4th at 564. Where the state law substantively infringes on a core municipal affair, it cannot be justified "merely by identifying some indirect effect on the regional and state economies." Id. at 562.

The Housing Bills may be summarized as follows. SB 35 provides for a streamlined ministerial approval process which bypasses the discretionary CUP process for developments with below market-rate units that are consistent with the city's objective zoning and design review standards. SB 35 also imposes a time deadline for city disapproval. SB 166 and SB 1333 collectively impose a no net loss requirement for low-cost housing on charter cities. A charter city will violate the No Net Loss Law if it approves the downsizing of a site identified in its housing element as available for development at greater density, or approves a development of market-rate housing units on a site identified as available for lower-income housing. AB 101 is a statutory enforcement scheme where a city is not substantially in compliance with the Housing Element Law

28

and RHNA zoning law.

The Housing Bills are narrowly applied only to charter cities, and therefore meet that piece of Vista. 54 Cal.4th at 564-65. However, they have substantive elements as well as procedural ones. As a result, the court should look closely at the Housing Bills substantive impacts. There are multiple problems with City's argument that the demonstrated lack of low-cost housing is too abstract and wrongly compartmentalized as a statewide concern.

First, City fails to identify the specific substantive elements of the Housing Bills. City merely generally contends that SB 35 commandeers its city's discretionary land use authority over where and how housing construction takes place within its boundaries and that SB 1333 represents a tectonic shift in the separation of powers and unconstitutionally treads on charter cities' traditional control over local land use and zoning. This general discussion is insufficient for a serious analysis of the substantive provisions and their infringement on charter city home rule. City has not established that the Housing Bills necessarily will eliminate local discretion in making land use and planning decisions.

Second, City focuses on the purportedly abstract statewide interest in low-cost housing without considering the purpose of the Housing Bills. SB 166 was passed because cities which had adopted housing elements with site inventories that accommodated their lower-income RHNA were succumbing to neighborhood pressure to reduce site density and hinder low-cost housing development. SB 1333 was passed because Kennedy Commission showed that the Legislature inadvertently left charter cities – which make up half the state's population – out of SB 166. SB 35 serves a similar purpose of compelling all cities to follow a ministerial approval process for developments with low-cost housing that are consistent with objective zoning and design review, again taking the neighborhood pressure out of the equation. AB 101 was passed to provide teeth for these statutes. Thus, the Housing Bills addressed a problem that all cities, general and charter, were not complying with statutory law designed to significantly increase the amount of low-cost housing. As such, this case is more like Buena Vista, which held that section 65583(c), which requires jurisdictions to commit to specific actions to make sites available to meet their RHNA, applied to charter cities because the Legislature may compel charter cities to take action to address a statewide concern. 175 Cal.App.3d at 307.

Third, contrary to City's assertions, the evidence shows that the issue of low-cost housing, unlike the wage laws at issue in Vista, is sufficiently concrete to qualify as a matter of statewide concern. City is correct that the demand for housing is not uniform and varies greatly by area, and local control over land use and zoning is necessary to meet local needs and local concerns based on locally available resources and infrastructure. But these facts do not exclude statewide control of low-cost housing issues. No city in California has an insular housing market and what happens in one city's housing market indisputably spills over city boundary lines and affects other cities. Coy Decl., Ex. A, pp. 8-13. Over the last 30 years, the median sales prices for existing homes in California trace almost exactly the same jagged line. Id., p. 10, Fig. 9. There is a regional spillover effect for affordable housing wherein decisions by local municipalities affect the issue of housing in the state as a whole. Coy Decl., Ex. 1, pp. 8-13; Wiener Decl., ¶32; Covarrubias Decl., ¶23; Creswell Decl., ¶19.

Fourth, City overstates its position in contending that the Housing Bills seek to provide "[a] uniform, statewide approach" of control over land use and zoning and a one-size-fits-all, top-down mandated solution that fails to consider different county housing needs and construction.

The Housing Bills concern a specific issue -- low-cost housing, not housing in general. They do not purport to regulate a charter city's zoning at all and only impose limitations on discretionary CUPs for low-cost housing.

State and Intervenors have demonstrated that, based on case law, legislative declarations, and historical facts context, the lack of affordable housing addressed in the Housing Bills is a matter of statewide concern.

#### 4. Whether the Housing Bills are Reasonably Related and Narrowly Tailored

If the state law is not reasonably related to a matter of statewide concern, it cannot prevail over the conflicting city measure. Vista, *supra*, 54 Cal.4th at 556. If the state law is reasonably related to addressing a matter of statewide concern, but it unnecessarily interferes with local control, then the state law still cannot prevail over the city measure. Id. Only where the state law both is reasonably related to a matter of statewide concern and does not unnecessarily interfere with local control will the state law prevail. Id. A state law passes this test if it legitimately addresses the matter of statewide concern and does not thwart local control. Huntington Beach, *supra*, 44 Cal.App.5th at 278-79.

State notes that the two dozen state statutes at issue in the Housing Bills easily pass the reasonable relationship prong. All the statutes make it simpler for housing developments to get built by removing obstacles to the development. Therefore, they reasonably relate—indeed, directly address—the statewide issue of insufficient affordable housing. State Opp. at 31. City does not address this issue, which is waived.

City makes two arguments that the Housing Bills are not narrowly tailored to avoid unnecessarily interfering with local control. First, they are overbroad, and this overbreadth demonstrates their Trojan horse nature because their effect is to eliminate local control in favor of a uniform statewide system of land use and zoning without any allowance for uniquely local issues, concerns, or problems with proposed development. Pet. Op. Br. at 20.

City's argument – that the Housing Bills are the camel's nose under the tent and State will attempt to regulate all land use and zoning – is pure speculation. As City has pointed out, neither State nor the court can compartmentalize an issue of statewide concern to justify all statutes in that subject area that affect municipal affairs. The court must evaluate each new statute issue on its own merits. Moreover, City has not specified which statutes in the Housing Bills are overbroad or why they are so. When a party asserts a point but fails to support it with reasoned argument and citation to authority, the point may be treated as waived. Badie v. Bank of America (1998) 67 Cal.App.4th 779, 784, 85; Solomont v. Polk Development Co., (1966) 245 Cal.App.2d 488 (point made which lacks supporting authority or argument may be deemed without foundation and rejected). The Housing Bills are reasonably related to the statewide concern of providing low-cost housing.

Second, City argues that the Housing Bills are not narrowly tailored because they are fundamentally unfit to address the issue of low-cost housing. Pet. Op. Br. at 20; Reply at 11. The fundamental issue driving the shortage of affordable housing is the lack of sufficient funding. Id. Housing Bills' imposition of RHNA compliance on charter cities is a quixotic endeavor that is fundamentally not fit to meet the purported statewide concern of inadequate production of affordable housing. Pet. Op. Br. at 20.

City notes that the fundamental issue for low-cost housing production is the lack of

funding. The Legislative Analyst's Office has estimated $15-30 billion annually necessary to meet affordable housing needs and Governor Newsom has proposed only 1.75 billion. Cox Decl., Ex. A, pp. 7-8. According to the UCLA Lewis Center for Regional Policy studies, "[t]o say that there isn't enough public subsidy to build all the income-restricted housing that the state deems necessary is a wild understatement." Id. Through 2018, only 9% of RHNA allocations at the very low-income category, and only 13% of RHNA allocations at the low-income category, have been issued permits. Cox Ex. A, p. 13. In other words, cities have planned for affordable housing, but developers have not been developing. The RHNA process in effect requires cities "to plan for more than 10 times the amount of subsidized housing that can be funded." Cox Ex. A, p. 13. As a result, it is no surprise that 95% of jurisdictions are subject to SB 35's draconian streamlined ministerial permit processing requirement.[18] Pet. Op. Br. at 20.

City contends that it is particularly unfit for low-cost housing production because transit access to lower income jobs is constrained. Cox Ex. A, pp. 51-54. The No Net Loss provisions of SB 166 and SB 1333 exponentially increase the impact on local control by requiring parcels to be set aside for RHNA allocations that have no reasonable prospect of being built, burdening charter cities' ability to manage development and growth in a manner that meets local needs. Pet. Op. Br. at 20-21.

City argues that the growing disconnect between asserted need and production of affordable housing is a result of State's prior attempts to dilute local control – dissolution of Redevelopment Agencies ("RDAs"). As the U.S. Department of Housing and Urban Development observed, RDAs created 63,600 new affordable housing units and 44 percent of new housing units constructed by RDAs from 2011 to 2008 were affordable at the very low-income level. Gates Decl., Ex. K, p. 4. Before their dissolution, RDAs were an important source of gap funding for federal affordable housing development funds and "a longstanding and heavily-used source of funding for affordable housing in California...." Gates Decl., Ex. L, p. 3. Pet. Op. Br. at 21.

City argues that it is contrary to the principles of charter city home rule to impose a draconian uniform statewide solution, including massive financial penalties, that cannot work and which can only serve to leave charter cities perpetually unable to meet local needs with local control. State should not be permitted to take advantage of a problem it exacerbated by dissolving RDAs in order to impose statewide land use and zoning. Narrow tailoring requires the minimal intrusion necessary and the Housing Bills all but guarantee maximum interference with local control. Pet. Op. Br. at 21-22.

City's arguments that the Housing Bills are not narrowly tailored because they will not achieve success in providing low-cost housing, and that the State never should have ended CRAs which did have success, are unavailing. City may be correct that the State's goal of providing sufficient low-cost housing cannot be achieved without a source of funding, but that does not mean that the Housing Bills' housing element and RHNA requirements are not a necessary first step.

---

[18] City notes that its rate of permitting housing development outpaced every Orange County city other than Irvine and was greater than California as a whole. Cox Ex. A, p. 18-19. Although funding for market-rate housing has been sufficient to meet Orange County's needs and permits for very low and low-income housing in Orange County have outpaced the state overall, less than a quarter of RHNA allocations in those affordable housing categories have been issued. Cox Ex. A, pp. 24-25 (Fig. 5-12). Pet. Op. Br. at 20.

City's complaint about the now long-gone CRAs is irrelevant. CRAs were dissolved because they had their own problems of local abuse.

The Housing Bills are tailored to apply only to charter cities, and State demonstrates that each of the statutes does not unnecessarily interfere with or thwart local control. The Housing Bills' procedural statutes -- sections 65300.5, 65301.5, 65359, 65400, 65450, 65454, 65455, 65460.8, 65850, and 65860 – are a mere administrative inconvenience, similar to those with which charter cities already have had to comply in this area of public policy and law. State Opp. at 31.

SB 166 is tailored to narrowly address its specific purpose—to prevent the loss of sites cities have identified as available for low-cost housing, while leaving the cities with significant discretion over the implementation of this obligation. Under SB 166, a city is compelled to identify a new site only when it approves reduced density or different development on a site identified in its housing element as an affordable housing site. §65863(b)-(c). Cities have full discretion over which sites they select. Id.; 65583(a)(3); Creswell Decl., ¶10. While SB 166 requires cities to maintain the sites they previously identified for low-cost housing development, the cities may choose to replace those sites so long as they can show sufficient alternate site capacity to meet their RHNA allocation or they identify a replacement site within 180 days. §65863(b)-(c). Interv. Opp. at 20-21.

SB 1333 amended sections 65300.5, 65301.5, 65359, 65450, 65454, 65455, 65460.8, 65700, 65852.150, 65852.25, 65860, 65863, 65863.4, 65863.6, 65863.8, 65866, 65867.5, and 65869.5 to expressly apply many housing-development statutes to charter cities. SB 1333 is appropriately tailored to ensure the consistent statewide application of the statutory scheme established to address the affordable housing shortage. It does so by making expressly applicable to charter cities those requirements needed to ensure that cities comply with their obligations related to housing element planning to ensure a uniform and comprehensive approach to the statewide lack of affordable housing. Those requirements include taking no action that is inconsistent with a general plan, housing element, specific plan (§65454), or zoning ordinance (§65860), as well as the No Net Loss Law's requirement of taking no action that is inconsistent with the obligation to maintain sites available at all times to meet the RHNA (§ 65863). SB 1333 is narrowly tailored to avoid unnecessarily interfering with local control.[19] Interv. Opp. at 21.[20]

---

[19] Although the original version of SB 1333 would have made all of the Government Code's local planning laws and zoning regulations laws applicable to charter cities, the Legislature addressed opponents' concerns and narrowed the bill's scope to cover only those portions of the laws necessary to the goals of requiring consistency and enforcing no net loss zoning. *See, e.g.*, Assembly, Senate Third Reading, Analysis of Sen. Bill No. 1333 (2017-2018 Reg. Sess.), Aug. 17, 2018, p. 3 ("Opponents argue that this bill goes too far and believe that the author's goal […] can be achieved without broadly applying all of the planning and zoning statutes to charter cities"); Assembly, Senate Third Reading, Analysis of Sen. Bill No. 1333 (2017-2018 Reg. Sess.), Aug. 24, 2018, pp. 3-4 (noting adoption of narrowing recommendation). State Opp. at 31-32.

[20] State explains the individual statutes amended or enacted by SB 35 and SB 1333. Sections 65300.5, 65582.1 (SB 35), and 65450 do not requires a charter city to do or not to do anything. State Opp. at 32. Sections 65301.5 and 65867.5 have minimal practical impact on a charter city. State Opp. at 32-33. Section 65852.25 prevents a city from taking advantage of a catastrophic event to downzone a site, and its numerous exceptions provide appropriate tailoring,

City replies that both State and Intervenors simply repeat the purposes of specific statutes in the Housing Bills and ask the court to accept that they are narrowly tailored, *ipse dixit*. The lack of affordable housing production is not driven by a lack of sufficient planned and zoned sites, but rather the lack of sufficient funding. Narrow tailoring requires State to ensure that the law at issue treads only so far as necessary to address the matter of statewide concern. Yet, the Housing Bills could not have been designed better to permanently interfere with local governance. City concludes that the Housing Bills amount to a *de facto* rescission of article XI, section 5. There will be no longer any meaningful distinction between general law cities and charter cities if the Legislature can simply impose an abstract statewide purpose for a law. Reply at 11.

The court does not agree. It is clear that the Housing Bills, and the statutes they amend or implement, are reasonably related to address the issue of insufficient housing. City does not raise any specific argument to dispute State's assertions that each of the implicated statutes is designed to address the issue of low-cost housing. City also fails to argue or establish with sufficient specificity that the Housing Bills are not narrowly tailored such that they unconstitutionally eliminate local control. City's argument that funding is the primary issue behind the lack of low-cost housing merely focuses on a probable lack of success and does not mean that the Housing Bills are not narrowly tailored. In contrast to City's generalized claims of overbreadth, State and Intervenors persuasively argue that the specific statutes amended or adopted in the Housing Bills are narrowly tailored because they permit local discretion to the extent feasible. State Opp. at 33-34; Interv. Opp. at 20.

The Housing Bills are reasonably related to the issue of statewide concern for insufficient low-cost housing and are narrowly tailored to address the issue.

### G. Conclusion

The petition for writ of mandate is denied. The declaratory relief claim is granted. A

---

avoiding unduly interfering with local control over rebuilding decisions. State Opp. at 33. Section 65852.150 encourages construction of ADUs, merely invites charter cities to share in ADU policy choices, and does not thwart local control. State Opp. at 33. Section 65863 *et seq.* is an anti-downzoning scheme containing numerous exceptions and thereby avoids unnecessarily interfering with local control over rebuilding decisions. State Opp. at 33-34. Section 65863.4's mandate against downzoning is limited and the city retains discretion. State Opp. at 34. Section 65863.6 affords a city broad discretion to consider and to address the needs of the city's residents, as well as the local economic and environmental resources that would be impacted by the zoning decision. State Opp. at 34. Section 65863.8 affords a city discretion with respect to whether the change in use may be approved, evidencing an incursion only so intrusive as necessary to accomplish its goal. State Opp. at 34. Changes to the Development Agreements Law (§65864 *et seq.*) do not intrude on a city's discretion whether or not to enter a development agreement or the structure of the agreement. State Opp. at 35. Section 65913.4 (SB 35) streamlines the approval process for multi-family housing development. Although the statute intrudes upon local control, it applies in only limited circumstances. Cities that are making housing development approval decisions in good faith face no compulsion under this statute, making it narrowly tailored. State Opp. at 35-36.

declaration shall issue that the Housing Bills do not violate the municipal affairs doctrine of the California Constitution and may be enforced.

State's counsel is ordered to prepare a proposed judgment, serve it on the other counsel for approval as to form, wait ten days after service for any objections, meet and confer if there are objections, and then submit the proposed judgment along with a declaration stating the existence/non-existence of any unresolved objections. An OSC re: judgment is set for February 18, 2021 9:30 a.m.

01/29/2021

EXHIBIT 2

1   XAVIER BECERRA
    Attorney General of California
2   DANIEL A. OLIVAS
    Senior Assistant Attorney General
3   JAMEE JORDAN PATTERSON
    Supervising Deputy Attorney General
4   KIMBERLY R. GOSLING (SB No. 247803)
    JEREMY BROWN (SB No. 269159)
5   Deputy Attorneys General
      600 West Broadway, Suite 1800
6     San Diego, CA 92101
      Telephone: (619) 738-9519
7     Fax: (619) 645-2271
      E-mail: Kimberly.Gosling@doj.ca.gov
8   *Attorneys for Petitioner and Plaintiff*
    *Department of Housing & Community Development*

***NO FEE PURSUANT TO***
***GOVERNMENT CODE § 6103***

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**01/25/2019** at 10:24:20 AM
Clerk of the Superior Court
By Mary M Johnson,Deputy Clerk

9

10                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                              COUNTY OF ORANGE

12                            CENTRAL JUSTICE CENTER

13

14   **California Department of Housing and**      Case No. 30-2019-01046493-CU-JR-CJC
     **Community Development,**                              Judge Sheila Fell
15                                                  **PETITION FOR WRIT OF MANDATE**
                          Petitioner and Plaintiff, **AND COMPLAINT FOR**
16                                                  **DECLARATORY RELIEF**
             v.
17

18   **City of Huntington Beach; City Council of**
     **Huntington Beach; and Does 1-50,**
19
                          Respondents and
20                        Defendants.

21

22                              **<u>INTRODUCTION</u>**

23          1.    California's housing crisis has reached historic proportions.  As the Legislature has

24   found, "[t]he lack of housing . . . is a critical problem that threatens the economic, environmental,

25   and social quality of life in California," and the housing that *does* exist is the most expensive in

26   the country.  (Gov. Code, § 65589.5, subd. (a)(1)(A), (B).)  This crisis is "hurting millions of

27   Californians, robbing future generations of the chance to call California home, stifling economic

28

1  opportunities for workers and businesses, worsening poverty and homelessness, and undermining

2  the state's environmental and climate objectives."  (*Id.*, subd. (a)(2)(A).)

3      2.  The failure of local governments to plan for the necessary housing supply has been a

4  key factor contributing to this crisis.  To overcome this failure, the Legislature for years has

5  required local governments to include housing elements in their general plans.  These housing

6  elements must, among other things, ensure that adequate housing is available to meet each

7  region's housing needs for Californians of all income levels, including low and very low incomes.

8  Not all local governments have complied with this requirement.  Respondent/Defendant the City

9  of Huntington Beach is one such city.

10      3.  Petitioner/Plaintiff Department of Housing and Community Development (HCD)

11  brings this action against the City of Huntington Beach and the City Council of Huntington Beach

12  (collectively, the "City") to remedy this violation.  It requests that the Court issue a writ ordering

13  the City to bring its housing element into compliance with State law, and issue a declaration that

14  the City has abrogated its planning obligations.

15                              **PARTIES**

16      4.  HCD is a public agency of the State of California.  (Gov. Code, § 12804.)  Among

17  other things, HCD is responsible for developing housing policy and building codes, for regulating

18  manufactured homes and mobile home parks, and for enforcing state housing laws—including

19  laws regarding housing elements—in a manner that meaningfully and positively impacts the

20  provision of housing in all communities across the State.

21      5.  The City of Huntington Beach is a municipal corporation formed and existing under

22  the laws of the State of California, of which it is a political subdivision.

23      6.  The City Council of Huntington Beach is the elected governing body of the City of

24  Huntington Beach.  It is the legislative body charged under Government Code section 65300 with

25  responsibility for adopting a general plan, including a housing element, for the physical

26  development of the City of Huntington Beach.

27      7.  HCD is unaware of the true names and capacities of respondents and defendants

28  DOES 1 through 50 (the "Doe Respondents"), who are therefore sued by fictitious names

1    pursuant to Code of Civil Procedure section 474.  HCD alleges on information and belief that

2    each such fictitiously named Doe Respondent is responsible or liable in some manner for the

3    events and happenings referred to herein, and HCD will seek leave to amend this Petition and

4    Complaint to allege their true names and capacities after the same have been ascertained.

5    **VENUE AND JURISDICTION**

6        8.   This Court has jurisdiction over this action pursuant to Code of Civil Procedure

7    sections 187, 1060, and 1085.

8        9.   Venue is proper in this Court because the City is located in Orange County and the

9    violations of law alleged herein occurred in Orange County.

10   **BACKGROUND AND FACTUAL ALLEGATIONS**

11   **Housing Elements and the Planning Process**

12       10.  The Legislature has declared that "[t]he availability of housing is of vital statewide

13   importance, and the early attainment of decent housing and a suitable living environment for

14   every Californian . . . is a priority of the highest order."  (Gov. Code, § 65580, subd. (a).)

15   California law requires that all local governments adequately plan to meet the housing needs of

16   everyone in the community, at all economic levels.

17       11.  To meet this requirement, every city and county must adopt and periodically update a

18   housing element as part of its general plan.  (See Gov. Code, §§ 65302, subd. (c), 65580, *et seq.*)

19   The law mandating this adoption and periodic update is known as "Housing Element Law."  (*Id.*,

20   § 65580, *et seq.*)  California's Housing Element Law acknowledges that, for the private market to

21   adequately address the housing needs and demand of Californians, local governments must adopt

22   plans and regulatory systems that provide opportunities for, and do not unduly constrain, housing

23   development, especially for a locality's lower-income households and workforce.  As a result,

24   housing policy in California rests largely on the effective implementation of the housing element

25   contained in the local general plan.

26       12.  The housing element is a roadmap for housing development in a given community.

27   The housing element must identify and analyze existing and projected housing needs, and must

28   include "a statement of goals, policies, quantified objectives, financial resources, and scheduled

3

programs for the preservation, improvement, and development of housing." (Gov. Code, § 65583.)  The housing element must also "identify adequate sites for housing" and "make adequate provision for the existing and projected needs of all economic segments of the community." (*Ibid.*)  Each housing element is also subject to review by HCD, as discussed below.

13.  A local jurisdiction's housing element must be updated periodically to ensure compliance with California's Housing Element Law. (Gov. Code, § 65588.)  Jurisdictions can opt to update their housing elements every five years or every eight years. (See *id.*, subd. (e)(3).)  Each five- or eight-year cycle is known as a "planning period." (See *id.*, subd. (f)(1).)

14.  The process of updating a housing element begins with HCD's determination of a Regional Housing Need Allocation (RHNA) for the region for a given planning period. (Gov. Code, § 65584, subd. (a)(1).)  The RHNA is segmented by income levels.  To arrive at the RHNA, HCD starts with demographic population information from the California Department of Finance and uses a formula to calculate a figure for each region's planning body, known as a "council of governments" (COG).  Each COG also uses its own demographic figures to calculate the regional housing need.  Each COG coordinates with HCD to arrive at a final figure, taking into account factors not captured in the calculations.  This final figure is the RHNA. (See *id.*, § 65584.01.)

15.  Once the RHNA is set, the COG is responsible for allocating the housing need among all of the cities and counties within that region. (Gov. Code, § 65584, subd. (b).)  Each local government must then prepare a housing element that, among other things, identifies adequate sites to accommodate that jurisdiction's fair share of the RHNA at each income level. (*Id.*, §§ 65583, 65583.2.)  Sites must be suitable for residential development and must be made available during the planning period. (*Id.*, § 65583.2, subd. (a).)  If a sufficient quantity of adequate sites is not currently available, the housing element must commit to identifying and rezoning additional sites within three years from the date of adoption. (*Id.*, §§ 65583, subd. (c)(1), 65583.2, subd. (h).)  The housing element must also accommodate any unmet portion of the RHNA from the prior planning period. (*Id.*, § 65584.09, subd. (a).)

4

16.   Each housing element must also evaluate governmental constraints on the development of housing for all income levels, and must show local efforts to remove governmental constraints that impede the local government's ability to meet its share of the RHNA.  (Gov. Code, § 65583, subd. (a)(5).)

17.   Each local government must submit a draft housing element to HCD before adoption.  (Gov. Code, § 65585, subd. (b)(1).)  HCD must review the draft element and issue findings as to whether the draft substantially complies with Housing Element Law.  (*Id.*, subds. (b)(3), (d).)  After adopting the final housing element, the local government must again submit the element to HCD, and HCD must again review and report its findings to the local government.  (*Id.*, subds. (g), (h).)

18.   Under Chapter 370, Statutes of 2017 ("AB 72"), codified at Government Code section 65585, subdivisions (i) and (j), HCD has authority to review any action or failure to act by a local government that it determines is inconsistent with an adopted housing element or section 65583 of California's Housing Element Law.  This includes failure to implement program actions included in the housing element.  HCD may revoke housing element compliance if the local government's actions do not comply with state law.

19.   AB 72 also authorizes HCD to notify the Office of the Attorney General of California that the local jurisdiction is in violation of state law for noncompliance with, among other things, California's Housing Element Law.

20.   Pursuant to Government Code section 65585, subdivision (i)(1)(A), HCD may take any of the actions authorized by AB 72 after issuing written findings to the local government "as to whether the action or failure to act substantially complies with [California's Housing Element Law]," and providing a reasonable time, no longer than 30 days, for the local government to respond.  (Gov. Code, § 65585, subd. (i)(1)(A).)  HCD has satisfied this requirement here, and has issued letters to the City dated June 23, 2015, and November 14, 2018, both of which noted the City's failure to comply with Housing Element Law.  The City's response to the November 14, 2018 letter is discussed below.

**The Huntington Beach Housing Element and**

**The Beach and Edinger Corridors Specific Plan**

21.  The City's current planning period runs from 2013 to 2021.  In 2013, the City submitted a draft housing element for this planning period to HCD for review.  HCD found that the draft met the statutory requirements of California's Housing Element Law.

22.  The City adopted the housing element on September 16, 2013 (the "2013 Housing Element"), and HCD then reviewed it.  On November 12, 2013, HCD found that the adopted 2013 Housing Element was in substantial compliance with California's Housing Element Law.

23.  The compliance finding was based on the identification of sufficient housing development capacity to meet the City's RHNA, and effective programs to facilitate development of housing affordable to lower-income households.  Notably, the housing element's inventory of sites and programs relied heavily on capacity within the Beach and Edinger Corridors Specific Plan (BECSP).  In fact, the housing allocation necessary to meet the needs of the City's lower-income households and workforce was entirely accounted for on sites within the BECSP.

24.  On May 4, 2015, however, the City adopted amendments to the BECSP that changed the maximum number of allowable units in the BECSP to an amount less than the City's remaining RHNA.  The adoption of these amendments fundamentally altered the inventory of available sites, constituting a *de facto* change to the 2013 Housing Element's available sites calculation.  The BECSP amendments changed development standards, reducing unit density by requiring additional parking and restricting development flexibility by requiring a conditional use permit.  These actions posed constraints to the development of housing, particularly on sites identified in the land inventory to meet the City's remaining lower-income housing need.

25.  On June 23, 2015, HCD sent the City a letter notifying the City that the amendments to the BECSP changed the premises upon which HCD's prior certification of the 2013 Housing Element was based, thereby nullifying that prior certification.

26.  HCD also explained in its June 23, 2015 letter that a housing element must be amended when a local government decision changes substantive provisions of the housing element upon which HCD relied in determining substantial compliance.  Housing element drafts

6

1   and amendments must be submitted to HCD for review and commentary before formal adoption.

2   HCD therefore advised the City to immediately submit an amended housing element to HCD to

3   review for compliance with California's Housing Element Law.

4        27.  Shortly after HCD's June 23, 2015 letter, the City began working in consultation with

5   HCD to prepare an amended and legally compliant housing element.

6        28.  On July 31, 2015, while the City was working with HCD to amend the 2013 Housing

7   Element, the City was sued by affordable housing advocates and two individual plaintiffs who

8   argued that the BECSP Amendment was invalid due to its inconsistency with the 2013 Housing

9   Element.  (See *The Kennedy Commission v. City of Huntington Beach*, Case No. 30-2015-

10  00801675, currently pending in the Superior Court of the State of California, County of Los

11  Angeles (hereinafter, "*Kennedy*").)  In its defense against the lawsuit, the City vigorously argued

12  that it was "actively working to amend its housing element to meet its RHNA goals." (*Id.*, City's

13  Opposition to Petition for Writ of Mandate, filed Oct. 29, 2015, at p. 1.)  The City affirmatively

14  represented to the Court that it had held hearings, consulted with HCD and others, and submitted

15  a draft amendment to HCD.  (*Ibid.*)  The City also told the Court that, as a result of this

16  interactive process, the lawsuit was unnecessary and would soon be moot.  (*Ibid.*)  According to

17  the City, "[t]he Court may simply observe that the City is moving quickly to fulfill its statutory

18  obligations and withhold writ relief pending the City's adoption of a new housing element." (*Id.*,

19  at p. 12.)[1]

20  //

21  //

22

23   [1] On January 20, 2016, the Superior Court in *Kennedy* issued a writ of mandate commanding the City to cease enforcing, administering, or implementing the BECSP amendment.

24   The Court stated that Government Code section 65454 required the BECSP to be consistent with the City's general plan.  The City immediately appealed.

25        On May 26, 2016, the Court of Appeal issued an order staying the writ of mandate.  On October 31, 2017, the Court of Appeal reversed the Superior Court and remanded the matter on

26   the basis that charter cities are exempt from the consistency requirement of Government Code section 65454, and the consistency requirement did not apply since the City never affirmatively adopted it.  (*The Kennedy Com. v. City of Huntington Beach* (2017) 16 Cal.App.5th 841, 851-59.)

27        The Court of Appeal denied the petitioners' request for rehearing on November 20, 2017, and the California Supreme Court denied the petitioners' petition for review on January 17, 2018.

28   The case is now proceeding on remand to the Superior Court.

29.   On January 29, 2016, HCD found that the draft amendment prepared by the City would satisfy the requirements of California's Housing Element Law when adopted and submitted to HCD.

30.   Despite the fact that HCD had found the draft amendment to be legally compliant, despite every indication from the City to HCD that it was actively working to bring the housing element into compliance, and despite the City's numerous representations to the *Kennedy* Court to the same effect, the City council voted unanimously to reject the amendment—General Plan Amendment No. 15-001—at a March 7, 2016 hearing.  Until that time, HCD had every reason to believe, based on the City's interactions with HCD staff and its representations to the Court, that the City intended to adopt the amendment.

31.   On November 14, 2018, HCD issued a notice of noncompliance in which it found that the City's housing element remained out of compliance with article 10.6 of Government Code title 7, division 1, chapter 3 ("Article 10.6"); that the City failed to act in compliance with Government Code section 65583 when it failed to approve an amended housing element; and that the City violated Article 10.6 by failing to take action to bring the housing element into compliance with applicable statutory requirements since the City Council's vote on March 7, 2016.

32.   On December 6, 2018, the City sent HCD a letter responding to the November 14, 2018 notice of noncompliance.  The City did not commit to complying with its legal duty to immediately bring the 2013 Housing Element back into substantial compliance.  The City instead proposed further delay, stating that it "will set forth a plan to obtain recertification from HCD" only after the *Kennedy* lawsuit is resolved.  The time for empty promises has come to an end. The City should not be allowed to avoid its statutory obligations any longer.

//

//

//

//

//

Petition for Writ of Mandate and Complaint for Declaratory Relief

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST CAUSE OF ACTION**

**Writ of Mandate (Code Civ. Proc., § 1085)**

**[Against All Defendants]**

33.  HCD incorporates by reference each and every allegation of the preceding paragraphs.

34.  Under California's Housing Element Law, the City must ensure that its general plan contains a legally compliant housing element.

35.  The City has completely abdicated this duty.  Based on the events alleged in paragraphs 10 through 32 above, the City's 2013 Housing Element violates Housing Element Law, and the City has failed to enact an amendment bringing the 2013 Housing Element into substantial compliance.  Indeed, by refusing to adopt General Plan Amendment No. 15-001 on March 7, 2016, and by, on information and belief, making no meaningful effort since then to draft and adopt another amendment that would bring the 2013 Housing Element into substantial compliance, the City has publicly and unequivocally violated its duty to comply with California law.

36.  These actions and failures to act by the City are arbitrary, capricious, entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, an abuse of discretion, and a failure to act as required by law.

37.  Accordingly, a writ of mandate should issue ordering the City to bring the 2013 Housing Element into substantial compliance with California's Housing Element Law (Gov. Code, § 65580, *et seq.*) and to ensure that the 2013 Housing Element meets the City's regional housing needs goals by the end of the 2013 – 2021 planning period, as determined by HCD.

38.  HCD has a beneficial interest in the issuance of such a writ, given its authority and mandate to enforce substantial compliance with California's Housing Element Law.  Likewise, the public at large, as well as the lower income residents and workforce in the City, have a significant interest in ensuring that the City complies with the law.

39.  HCD has exhausted all required administrative remedies, or is excused from exhausting its remedies due to the futility of pursuing such remedies, among other things.

9

40.  HCD has no plain, speedy, or adequate remedy in the ordinary course of law.  The only remedy provided by law for HCD to obtain relief is this Petition for Writ of Mandate pursuant to Code of Civil Procedure section 1085.

## SECOND CAUSE OF ACTION

### Declaratory Relief (Code Civ. Proc., § 1060)

### [Against All Defendants]

41.  HCD incorporates by reference each and every allegation of the preceding paragraphs.

42.  There is a controversy between HCD and the City as to whether the 2013 Housing Element substantially complies with California's Housing Element Law (Gov. Code, § 65580, *et seq.*).  Based on the events alleged in paragraphs 10 through 32 above, HCD believes that the 2013 Housing Element does not substantially comply.  Further, based on information and belief, the events alleged in paragraphs 10 through 32, and the administrative record herein, HCD alleges that the City is aware that 2013 Housing Element does not substantially comply and has failed to take any meaningful action to substantially comply.

43.  It is necessary and appropriate for the Court to render a declaratory judgment that sets forth the parties' legal rights and obligations with respect to whether the 2013 Housing Element substantially complies with California's Housing Element Law.  Among other things, such a judgment would inform the parties' conduct in connection with future contemplated amendments to the City's housing element, including those that occur routinely at the beginning of each housing cycle.

44.  HCD therefore requests a declaration that the 2013 Housing Element does not substantially comply with California's Housing Element Law (Gov. Code, § 65580, *et seq.*).

//

//

//

//

//

## **PRAYER FOR RELIEF**

WHEREFORE, HCD prays as follows:

1.  For a writ of mandate ordering the City to bring the 2013 Housing Element into substantial compliance with California's Housing Element Law (Gov. Code, § 65580, *et seq.*) and to ensure that the 2013 Housing Element meets the City's regional housing needs goals by the end of the 2013 – 2021 planning period, as determined by HCD.

2.  For a declaration that the City's 2013 Housing Element does not substantially comply with California's Housing Element Law (Gov. Code, § 65580, *et seq.*).

3.  For costs and attorneys' fees.

4.  For any other relief the Court may deem appropriate.


Dated: January 25, 2019                         Respectfully Submitted,

                                                XAVIER BECERRA
                                                Attorney General of California
                                                JAMEE JORDAN PATTERSON
                                                Supervising Deputy Attorney General


                                                KIMBERLY R. GOSLING
                                                Deputy Attorney General
                                                *Attorneys for Petitioner and Plaintiff*
                                                *Department of Housing & Community*
                                                *Development*

SD2018102333
82108051.docx

Petition for Writ of Mandate and Complaint for Declaratory Relief

Electronically Received 03/25/2020 09:19 AM

Electronically Received 03/25/2020 09:19 AM

1  XAVIER BECERRA
   Attorney General of California
2  JAMEE JORDAN PATTERSON
   Supervising Deputy Attorney General
3  KIMBERLY R. GOSLING
   Deputy Attorney General
4  State Bar No. 247803
   600 West Broadway, Suite 1800
5  San Diego, CA 92101
   Telephone: (619) 738-9519
6  Fax: (619) 645-2271
   E-mail: Kimberly.Gosling@doj.ca.gov
7  *Attorneys for Petitioner and Plaintiff*
   *Department of Housing and Community*
8  *Development*

*NO FEE PURSUANT TO*
*GOVERNMENT CODE § 6103*

FILED
Superior Court of California
County of Los Angeles

03/25/2020

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ J. De Luna _____ Deputy

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                        COUNTY OF LOS ANGELES

11

12

13  **California Department of Housing and**          Case No. 30-2019-01046493
14  **Community Development,**
                                                     **STIPULATION OF DISMISSAL**
15                          Petitioner and Plaintiff,

16              v.                                    Dept:      85
                                                     Judge:     The Honorable James C.
17                                                              Chalfant
    **City of Huntington Beach; City Council of**    Trial Date:  Not Set
18  **Huntington Beach; and Does 1-50,**             Action Filed: January 25, 2019

19                          Respondents and
                                     Defendants.
20

21

22

23

24

25

26

27

28

1

1    Petitioner and Plaintiff California Department of Housing and Community Development

2   ("HCD"), and Respondents and Defendants City of Huntington Beach and City Council of

3   Huntington Beach (collectively, the "City"), through their respective attorneys of record, hereby

4   stipulate and agree as follows:

5    HCD filed this case on January 25, 2019.  In its Petition and Complaint ("Petition"), HCD

6   alleges that the City has failed to bring its 2013 housing element into substantial compliance with

7   California housing element law, and HCD seeks, among other things, a writ of mandate ordering

8   the City to bring the 2013 housing element into substantial compliance.  The City demurred to the

9   Petition, and the Court overruled the demurrer on August 8, 2019.  The City filed its Answer to

10   the Petition on September 9, 2019, denying the allegations in the Petition.

11    On February 3, 2020, after working with HCD, the City adopted an amended housing

12   element.  The City maintains that it brought its housing element into compliance to receive HCD

13   certification in order to make the City eligible for receipt of State issued SB 2 funds.  On

14   March 24, 2020, HCD certified that the amended housing element substantially complies with

15   California housing element law.  As a result, HCD and the City have agreed and hereby stipulate

16   as follows:

17    1.    HCD's claims against the City shall be dismissed without prejudice; and

18    2.    Each party to this stipulation shall bear its own attorneys' fees and costs.

19

20   Dated:  _March 25_____, 2020

21    Respectfully Submitted,

22    XAVIER BECERRA
     Attorney General of California
     JAMEE JORDAN PATTERSON
     Supervising Deputy Attorney General

23

24

25

26    KIMBERLY R. GOSLING
     Deputy Attorney General
     *Attorneys for Petitioner and Plaintiff*
27    *Department of Housing and Community*
     *Development*

28

2

1

2    Dated:   3/25        , 2020

3

4                                              MICHAEL GATES
                                               City Attorney
5                                              *Attorneys for Respondents and Defendants*
                                               *City of Huntington Beach and City Council*
6                                              *of Huntington Beach*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1

**ORDER**

2

Good cause appearing, the Court hereby ORDERS as follows:

3

1.    HCD's claims against the City of Huntington Beach and City Council of Huntington

4

Beach (collectively, the "City"), are hereby dismissed without prejudice; and

5

2.    HCD and the City shall each bear its own attorneys' fees and costs.

6

**IT IS SO ORDERED.**

7

Dated: 03/25/2020 _____, 2020

8

James C. Chalfant / Judge
_____
Honorable James C. Chalfant
Judge of the Superior Court

9

10

11

SD2018102333
72152440.docx

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **California Department of Housing and Community Dev. v. City of
Huntington Beach; City Counsel of Huntington Beach; and Does 1-50**
Case No.:    **30-2019-01046493-CU-JR-CJC**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the
California State Bar, at which member's direction this service is made.  I am 18 years of age or
older and not a party to this matter.  I am familiar with the business practice at the Office of the
Attorney General for collection and processing of correspondence for mailing with the United
States Postal Service.  In accordance with that practice, correspondence placed in the internal
mail collection system at the Office of the Attorney General is deposited with the United States
Postal Service with postage thereon fully prepaid that same day in the ordinary course of
business.

On March 25, 2020, I served the attached:

## STIPULATION OF DISMISSAL

by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection
system at the Office of the Attorney General at 600 West Broadway, Suite 1800, P.O. Box
85266, San Diego, CA  92186-5266, addressed as follows:

Michael E. Gates
Michael J. Vigliotta
Daniel S. Cha
City of Huntington Beach
City Attorney Office
2000 Main Street
Huntington Beach, CA  92648
***Attorneys for:  Respondents and Defendants,
City of Huntington Beach & City Council of
Huntington Beach***

Sarah J. Gregory
Michelle Kim Kotval
Kate Marr
COMMUNITY LEGAL AID SOCAL
2101 N. Tustin Avenue
Santa Ana, CA  92702
***Attorneys for:  Intervenor and Real Party In
Interest the Kennedy Commission***

Roman E. Darmer
Justin Potesta
Shelby Compton
JONES DAY
3161 Michelson Drive, Ste. 800
Irvine, CA  92612
***Attorneys for:  Intervenor and Real Party In
Interest the Kennedy Commission***

Craig Castellanet
Michael R. Rawson
CALIFORNIA AFFORDABLE HOUSING
LAW PROJECT OF THE PUBLIC
INTEREST LAW PROJECT
449 15th Street, Suite 301
Oakland, CA 94612
***Attorneys for:  Intervenor and Real Party In
Interest the Kennedy Commission***

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on March 25, 2020, at San Diego, California.

| C. Sheppard | | Signature |
| --- | --- | --- |
| Declarant | | |

SD2018102333
72211243.docx

# EXHIBIT 3

Electronically Filed by Superior Court of California, County of Orange, 03/08/2023 07:28:46 PM.
30-2023-01312235-CU-WM-CJC - ROA #2 - DAVID H. YAMASAKI, Clerk of the Court By B. Sanchez, Deputy Clerk.
Page 70 of 158
#:591

ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DAVID PAI, State Bar No. 227058
Supervising Deputy Attorney General
MATTHEW T. STRUHAR, State Bar No. 293973
THOMAS P. KINZINGER, State Bar No. 323889
Deputy Attorneys General
    1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7246
  Fax: (916) 327-2319
  E-mail: Matthew.Struhar@doj.ca.gov
          Thomas.Kinzinger@doj.ca.gov

*Attorneys for Petitioner and Plaintiff, The People of
California ex rel. Rob Bonta, and the California
Department of Housing and Community
Development*

*Exempt from Filing Fees
Government Code § 6103*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| **THE PEOPLE OF CALIFORNIA EX REL. ROB BONTA, AND THE CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT,**<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>**THE CITY OF HUNTINGTON BEACH, A MUNICIPAL CORPORATION; CITY COUNCIL OF HUNTINGTON BEACH; AL ZELINKA, in his official capacity as CITY MANAGER OF HUNTINGTON BEACH; AND DOES 1-50, INCLUSIVE,**<br><br>Respondents and Defendants. | Case No. 30-2023-01312235-CU-WM-CJC<br>**Assigned for All Purposes**<br>Judge Erick L. Larsh<br><br>**PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

# **INTRODUCTION**

1.   Californians continue to suffer under a housing affordability crisis. As the Legislature has found, "[t]he lack of housing . . . is a critical problem that threatens the economic, environmental, and social quality of life in California." (Gov. Code, § 65589.5, subd. (a)(1)(A), (B).) This crisis is "hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic opportunities for workers and businesses, worsening poverty and homelessness, and undermining the state's environmental and climate objectives." (*Id.*, subd. (a)(2)(A).)

2.   A key contributor to this crisis is the failure of local governments to plan for the necessary housing supply. To remedy this, the Legislature requires local governments to include housing elements in their general plans. A housing element must include, among other things, an assessment of housing needs, an inventory of resources and constraints relevant to meeting those needs, and a program to implement the policies, goals, and objectives of the housing element. (Gov. Code, § 65580 et seq.)

3.   Local governments that do not prepare a housing element substantially in compliance with state law, thereby failing to plan for an adequate supply of housing, become subject to various legal consequences. For example, a local agency that fails to adopt a substantially compliant housing element becomes subject to the so-called "Builder's Remedy" provision of the Housing Accountability Act. (Gov. Code, § 65589.5) A local agency without a substantially compliant housing element may not deny, or apply conditions that make infeasible, a housing development project for very low-, low-, or moderate-income households on the basis of inconsistency with a zoning ordinance and land use designation in any general plan element. (Gov. Code, § 65589.5, subd. (d)(5).)

4.   In another effort to alleviate the housing crisis, the Legislature has repeatedly amended the housing laws to encourage, and streamline the approval of, permits for accessory dwelling units ("ADUs") throughout the state. (See generally, Gov. Code, §§ 65852.150, 65852.2, 65852.22.) These units are typically small, easily-constructed residential structures installed as secondary housing units on a single-family property. Current ADU law requires local

1    agencies to approve ADU projects ministerially, or if denied, provide comments to the applicant

2    regarding deficiencies and a description of how the application can be remedied.

3        5.    And, in 2021, the Legislature passed the California Housing Opportunity and More

4    Efficiency Act ("HOME Act," or "SB 9") to streamline the permitting process and remove

5    regulatory barriers for subdividing residential lots into multifamily housing projects like

6    duplexes, triplexes, and four-plexes that are more affordable to middle-class households.

7        6.    The City of Huntington Beach has decided to ignore the laws the Legislature

8    specifically crafted to address California's housing affordability crisis by barring its staff from

9    accepting and processing ADU- and SB 9-related building permits. The City has done this despite

10   the fact that the availability of decent, suitable, and affordable housing is of vital statewide

11   importance to all Californians.

12       7.    In an Action Item at its February 21, 2022 meeting, the Huntington Beach City

13   Council directed its City Manager to "cease the processing of all applications/permits brought to

14   the City by developers under SB 9, SB 10, or 'state law related' ADU projects." [1] (See Exhibit A,

15   at pp. 8-9.) In doing so, the City ignored its own ordinances.

16       8.    The City of Huntington Beach has not adopted a current housing element that is

17   substantially in compliance with state law. In failing to adopt a substantially compliant housing

18   element, Huntington Beach is now subject to the Builder's Remedy.

19       9.    At its March 7, 2023 meeting, the Huntington Beach City Council attempted to

20   excuse itself from the consequences of its failure to comply with the housing element law. It

21   introduced Ordinance No. 4285, purporting to ban Builder's Remedy projects in Huntington

22   Beach. (See Exhibit B.)

23       10.   The City Council's ban on ADU- and SB 9-eligible projects is directly in conflict

24   with the law of this state.

25

26   _____

27   [1] Senate Bill 10 added section 65913.5 to the Government Code, authorizing cities to
     *voluntarily* adopt ordinances allowing for higher residential density in a "transit-rich area" or an
     "urban infill site," as defined. Why the Huntington Beach City Council decided to ban projects
28   that would only be allowed if the City Council itself voted to allow them is unclear.

3

11.  The People of the State of California, by and through Attorney General Rob Bonta, and the Department of Housing and Community Development ("HCD"), bring this action against the City of Huntington Beach, its City Council, and its City Manager (collectively, the "City") to remedy these violations of state law. The People and HCD request that this Court issue a writ ordering the City to continue processing ADU- and SB 9-eligible projects in accordance with state law. Further, the People and HCD request this court issue a judgment declaring that the City's ban on acceptance and processing of ADU and SB 9 project applications is in conflict with the applicable law of this state and void, and to issue an injunction instructing the City to refrain from enforcing its unlawful ban. The People and HCD intend to amend this Petition and Complaint should the City follow through on additional attempts to violate state law, such as passing Ordinance No. 4285 to ban Builder's Remedy projects.

## **PARTIES**

12.  The Attorney General, as the chief law enforcement officer of the State of California, brings this action under his broad independent powers to enforce state laws, and on behalf of HCD. (Cal. Const., Art. V, section 13; Gov. Code, § 65585, subd. (j).)

13.  HCD is a public agency of the State of California. (Gov. Code, § 12804.) Among other duties, HCD is responsible for developing housing policy and building codes, for regulating manufactured homes and mobile home parks, and for enforcing state housing laws, such as the Housing Accountability Act and state ADU laws, in a manner that meaningfully and positively impacts the provision of housing in all communities across the state.

14.  The City of Huntington Beach is a municipal corporation formed and existing under the laws of the State of California, of which it is a political subdivision.

15.  The City Council of Huntington Beach is the elected governing body of the City of Huntington Beach.

16.  The City Manager of Huntington Beach is the city official responsible for the management and oversight of the City's various departments.

17.  The People are unaware of the true names and capacities of respondents and defendants DOES 1 through 50 (the "Doe Respondents"), who are therefore sued by fictitious

1    names pursuant to Code of Civil Procedure section 474. The People allege on information and

2    belief that each such fictitiously named Doe Respondent is responsible or liable in some manner

3    for the events and happenings referred to herein, and the People will seek leave to amend this

4    Petition and Complaint to allege their true names and capacities after the same have been

5    ascertained.

6                            **VENUE AND JURISDICTION**

7         18.  This Court has jurisdiction over this action pursuant to Code of Civil Procedure

8    sections 187, 1060, and 1085.

9         19.  Venue is proper in this Court because the City is located in Orange County and the

10   violations of law alleged herein occurred in Orange County.

11                      **BACKGROUND AND FACTUAL ALLEGATIONS**

12                                **The Housing Crisis**

13        20.  The Legislature has declared that "[t]he availability of housing is of vital statewide

14   importance, and the early attainment of decent housing and a suitable living environment for

15   every Californian . . . is a priority of the highest order."  (Gov. Code, § 65580, subd. (a).)

16        21.  California has a crisis-level housing shortage that stems from the failure of local

17   governments to approve affordable housing to meet the needs of all Californians. For decades, the

18   Legislature has found that California has been suffering from "a severe shortage of affordable

19   housing, especially for persons and families of low and moderate income" and that "there is an

20   immediate need to encourage the development of new housing." (*Ruegg & Ellsworth v. City of*

21   *Berkeley* (2021) 63 Cal.App.5th 277, 295, quoting Gov. Code, § 65913.)

22        22.  Recently, the Legislature stated plainly that "California has a housing supply and

23   affordability crisis of historic proportions." (Gov. Code, § 65589.5, subd. (a)(2)(A).) "The

24   consequences of failing to effectively and aggressively confront this crisis are hurting millions of

25   Californians, robbing future generations of the chance to call California home, stifling economic

26   opportunities for workers and businesses, worsening poverty and homelessness, and undermining

27   the state's environmental and climate objectives." (*Ibid*.)

28        ///

The People's Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**Housing Elements and the Planning Process**

23.  State law requires that all local governments adequately plan to meet the housing needs of everyone in the community, at all economic levels. To meet this requirement, every city and county must adopt and periodically update a housing element as part of its general plan. (See Gov. Code, §§ 65302, subd. (c), 65580, et seq.) The law mandating this adoption and periodic update is known as the "Housing Element Law." (*Id.*, § 65580, et seq.)

24.  California's Housing Element Law requires local governments to adopt plans and regulatory systems that provide opportunities for, and do not unduly constrain, housing development, especially for a locality's lower-income households and workforce. As a result, housing policy in California rests largely on the effective implementation of the housing element contained in the local general plan.

25.  The housing element is a roadmap for housing development in a given community. The housing element must identify and analyze existing and projected housing needs, and must include "a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing." (Gov. Code, § 65583.) The housing element must also "identify adequate sites for housing" and "make adequate provision for the existing and projected needs of all economic segments of the community." (*Ibid.*) Each housing element is also subject to review by HCD.

26.  A local jurisdiction's housing element must be frequently updated to ensure compliance with California's Housing Element Law. (Gov. Code, § 65588.) Jurisdictions must update their housing elements every five or eight years. (See *id.*, subd. (e)(3).) Each five- or eight-year cycle is known as a "planning period." (See *id.*, subd. (f)(1).)

27.  The process of updating a housing element begins with HCD's determination of a Regional Housing Need Allocation ("RHNA") for the region for a given planning period. (Gov. Code, § 65584, subd. (a)(1).) The RHNA sets goals for housing affordable to various income levels. To arrive at the RHNA, HCD starts with demographic population information from the California Department of Finance and uses a formula to calculate a figure for each region's planning body, known as a "council of governments" ("COG"). Each COG (in this case, the

1   Southern California Association of Governments) also uses its own demographic figures to

2   calculate the regional housing need. Each COG coordinates with HCD to arrive at a final figure,

3   taking into account factors not captured in the calculations. This final figure is the RHNA. (See

4   *id.*, § 65584.01.)  Once the RHNA is set, the COG is responsible for allocating the housing need

5   among all of the cities and counties within that region. (Gov. Code, § 65584, subd. (b).) Each

6   local government must then prepare a housing element that identifies adequate sites to

7   accommodate that jurisdiction's fair share of the RHNA at each income level. (*Id.*, §§ 65583,

8   65583.2.))

9       28.  Each local government must submit its draft housing element to HCD before

10   adoption. (Gov. Code, § 65585, subd. (b)(1).) HCD must review the draft element and issue

11   findings as to whether the draft substantially complies with the Housing Element Law. (*Id.*,

12   subds. (b)(3), (d).) After adopting the final housing element, the local government must again

13   submit the element to HCD, and HCD must again review and report its findings to the local

14   government. (*Id.*, subds. (g), (h).)

15                   **The Housing Accountability Act and the "Builder's Remedy"**

16       29.  The Legislature originally enacted the Housing Accountability Act ("HAA") in 1982

17   in an effort to compel local governments to approve more housing, and has repeatedly amended

18   the law to increase its effectiveness. (Gov. Code, § 65589.5, subd. (a); *Ruegg*, supra, 63

19   Cal.App.5th at pp. 295–297.) In 1990, the Legislature made the HAA expressly applicable to

20   charter cities. (*California Renters Legal Advoc. & Educ. Fund v. City of San Mateo* (2021) 68

21   Cal. App. 5th 820, 835.)

22       30.  In general, the HAA provides that when a proposed housing development complies

23   with applicable general plan, zoning, and development policies, the local agency may disapprove

24   the project (or approve it on condition that it be developed at lower density) only if the local

25   agency finds that the project would have a specific, adverse, and unavoidable impact on public

26   health or safety. (Gov. Code, § 65589.5, subd. (j)(1).)

27       31.  Specifically, a local agency must approve any housing development project that

28   complies with locally adopted objective standards, unless it can make two written findings based

on a preponderance of evidence in the record. (Gov. Code, § 65589.5, subd. (j)(1).) First, the proposed development must have a significant and adverse impact on public health or safety. (*Id.*, subd. (j)(1)(A).) Second, disapproval must be the only means of mitigating or avoiding the impact. (*Id.*, subd. (j)(1)(B).) These findings must be project-specific, and the public health or safety impact must constitute "a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete." (*Id.*, subd. (j)(1)(A).)

32.  If the local agency considers a proposed housing development project to be inconsistent, not in compliance, or not in conformity with an applicable objective standard, it must provide the project applicant with "written documentation" that identifies the applicable provision or provisions, along with "an explanation of the reason or reasons it considers the housing development to be inconsistent, not in compliance, or not in conformity" with those standards. This explanation is due within 30 days an application is deemed complete for a housing development with 150 or fewer housing units, or within 60 days an application is deemed complete for a housing development with more than 150 housing units. (*Id.*, subd. (j)(2)(A).) If this documentation is not provided by the applicable deadline, the application is deemed consistent with the applicable standards. (*Id.*, subd. (j)(2)(B).)

33.  The foregoing provisions of subdivision (j) apply to all housing development projects. Where a proposed housing development includes affordable housing, a local agency's discretion to deny the project is even further constrained. (*Id.*, subd. (d).) An affordable housing project may only be denied under five specific and narrow circumstances.

34.  The 1990 HAA amendments modified subdivision (d) to provide that cities and counties could only deny, or apply conditions that make infeasible, a housing development project for very low-, low- or moderate-income households or an emergency shelter if they are able to make one of five specific findings. (Gov. Code, § 65589.5, subd. (d).) Those five findings, paraphrased, are:

        (1) The city or county has met or exceeded its RHNA for the proposed income categories in the development.

(2) The housing development or emergency shelter would have a specific adverse impact on public health and safety, and there is no way to mitigate or avoid the impact without making the development unaffordable. Such an impact must be based on objective, written public health or safety standards in place when the application was deemed complete.

(3) The denial or imposition of conditions is required to comply with state or federal law, and there is no feasible method to comply without making the development unaffordable.

(4) The project is proposed on land zoned for agriculture or resource preservation that is surrounded on at least two sides by land being used for agriculture or resource preservation, or there are not adequate water or sewage facilities to serve the project.

(5) The project is inconsistent with both the zoning ordinance and the land use designation as specified in any general plan element, and the jurisdiction has adopted a substantially compliant housing element.

35.  The last of these five findings, subdivision (d)(5), is the source of the so-called Builder's Remedy. By negative implication, if a locality has *not* adopted a housing element in substantial compliance with state law, it *cannot* deny a project that includes affordable housing on grounds that it does not comply with a zoning or land-use designation.

**The ADU Laws**

36.  One effective means of increasing the housing supply is by removing regulatory barriers to accessory dwelling units, or ADUs. ADUs are sometimes also known as "granny flats," "in-law units," "backyard cottages," or "secondary units," among other names. These small structures provide a cost-effective solution to increasing the housing supply on a rapid timescale.

37.  ADUs have many benefits. They are affordable to construct, since they typically use comparatively inexpensive wood frame construction, and no new land acquisition or major infrastructure is required. ADUs can also provide a source of income for homeowners when rented, increasing incentives for homeowners to build ADUs on their property. In addition, ADUs

9

1   enable extended families to reside close to one another, and for seniors to age in place with family

2   members while maintaining an independent living space. (See generally, Accessory Dwelling

3   Units, Department of Housing and Community Development, available at

4   https://www.hcd.ca.gov/policy-and-research/accessory-dwelling-units.)

5        38.  In recent years, the Legislature has repeatedly amended the housing laws to legalize

6   and promote the construction of accessory dwelling units. In 2018, as part of a package of updates

7   to the housing laws that, among other things, made the ADU laws applicable to charter cities for

8   the first time, the Legislature found and declared all of the following:

9        (1) Accessory dwelling units are a valuable form of housing in California.

10       (2) Accessory dwelling units provide housing for family members, students, the elderly,

11           in-home health care providers, the disabled, and others, at below market prices within

12           existing neighborhoods.

13       (3) Homeowners who create accessory dwelling units benefit from added income, and

14           an increased sense of security.

15       (4) Allowing accessory dwelling units in single-family or multifamily residential zones

16           provides additional rental housing stock in California.

17       (5) California faces a severe housing crisis.

18       (6) The state is falling far short of meeting current and future housing demand with

19           serious consequences for the state's economy, our ability to build green infill consistent

20           with state greenhouse gas reduction goals, and the well-being of our citizens,

21           particularly lower and middle-income earners.

22       (7) Accessory dwelling units offer lower cost housing to meet the needs of existing and

23           future residents within existing neighborhoods, while respecting architectural character.

24       (8) Accessory dwelling units are, therefore, an essential component of California's

25           housing supply.

26   (Gov. Code, § 65852.150, subd. (a).)

27       39.  The bulk of the ADU laws are set forth at Government Code section 65850 et seq.

28   These laws broadly restrict the ability of local agencies, whether general law or charter cities, to

10

deny ADU projects within their jurisdiction, and set tight deadlines for processing applications.

40.  Relevant to this litigation, Government Code section 65852.2, subdivisions (a)(3)(A) and (b)(1), require permitting agencies to approve or deny ADU applications ministerially and without discretionary review within 60 days of a complete application's submittal. Under both provisions, "[i]f the local agency has not acted upon the completed application within 60 days, [an] application shall be deemed approved." In addition, Government Code section 65852.2, subdivision (e)(1), states "a local agency shall ministerially approve an application for a building permit within a residential or mixed-use zone to create" ADUs that meet specific requirements.

41.  In addition, a local agency that denies an ADU application must provide "in writing a full set of comments to the applicant with a list of items that are defective or deficient and a description of how the application can be remedied by the applicant." (Gov. Code, § 65852.2, subd. (b)(2).)

42.  Government Code section 65852.2, subdivision (a)(7), further provides: "No other local ordinance, policy, or regulation shall be the basis for the delay or denial of a building permit or a use permit under this subdivision."

**Senate Bill 9**

43.  The Legislature introduced Senate Bill 9 in 2021 in an effort to streamline the process for creating duplexes or for subdividing an existing lot. SB 9 restrained the discretion of local agencies by creating a ministerial process for such project approvals.

44.  SB 9 ultimately allows up to four homes on lots where only one existed previously, by permitting existing single-family homes to be converted to duplexes or single-family lots to be subdivided into two lots on which two duplexes could be built. (See SB 9 Senate Floor Analysis, August 28, 2021, available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB9.)

45. SB 9 added, among other provisions, sections 65852.21 and 66411.7 to the Government Code. Section 65852.21 requires local agencies to approve a proposed housing development consisting of two residential units within a single-family zone on a ministerial basis. Section 66411.7 requires local agencies to approve a lot split in a single-family zone on a

11

1    ministerial basis. Both provisions became operative on January 1, 2022.

2    46.  SB 9 placed limits on a local agency's ability to deny proposed projects, but it did not

3    entirely eliminate local agencies from the approval process. Local agencies are still permitted to

4    "impose objective zoning standards, objective subdivision standards, and objective design review

5    standards," so long as such standards do not have "the effect of physically precluding the

6    construction of up to two units or...would physically preclude either of the two units from being at

7    least 800 square feet in floor area" within a single-family zone. (Gov. Code, § 65852.21, subd.

8    (b).) Similarly, local agencies can impose "objective" standards with respect to lot splits, so long

9    as those standards do not "have the effect of physically precluding the construction of two units

10   on either of the resulting parcels or that would result in a unit size of less than 800 square feet"

11   within a single-family zone. (Gov. Code, § 66411.7, subd. (c).) Finally, the legislative body of a

12   local agency may reject an SB 9 project if it finds, based on a preponderance of the evidence, that

13   the proposed project would have a "specific, adverse impact" on "public health and safety or the

14   physical environment and for which there is no feasible method to satisfactorily mitigate or avoid

15   the specific, adverse impact." (Gov. Code, §§ 65852.21, subd. (d); 66411.7, subd. (d); see also

16   65589.5, subd. (d)(2).)

17                                     **The Housing Crisis Act**

18   47.  The Housing Crisis Act of 2019 ("HCA") prohibits a local government from "enact[ing]

19   a development policy, standard, or condition" that would have the effect of "[c]hanging the

20   general plan land use designation, specific plan land use designation, or zoning of a parcel or

21   parcels of property to a less intensive use or reducing the intensity of land use within an existing

22   general plan land use designation, specific plan land use designation, or zoning district in effect at

23   the time of the proposed change, below what was allowed under the land use designation or

24   zoning ordinances … in effect on January 1, 2018." (Gov. Code, § 66300, subd. (b)(1)(A).) The

25   statute defines "reducing the intensity of land use" to include "any other action that would

26   individually or cumulatively reduce the site's residential development capacity." (*Ibid*.)

27   48.  The HCA also prohibits a local government from "[i]mposing a moratorium or

28   similar restriction or limitation on housing development … within all or a portion of the

1    jurisdiction … other than to specifically protect against an imminent threat to the health and

2    safety of persons residing in, or within the immediate vicinity of, the area subject to the

3    moratorium…." (Gov. Code, § 66300, subd. (b)(1)(B)(i).)

4         49.  In addition, a local agency shall not enforce such "a moratorium or other similar

5    restriction on or limitation of housing development until it has submitted the ordinance to, and

6    received approval from, [HCD]." (Gov. Code, § 66300, subd. (b)(1)(B)(ii).) If HCD denies

7    approval, "that ordinance shall be deemed void." (*Ibid*.)

8                     **Huntington Beach's Violations of State Housing Laws**

9         50.  At its February 21, 2023 meeting, the Huntington Beach City Council adopted Action

10   Item No. 23-172 (the "Action Item"), directing the City Manager to "cease the processing of all

11   applications/permits brought to the City by developers under SB 9, SB 10, or 'state law related'

12   ADU projects, until the courts have adjudicated the matter(s)."[2] The Action Item also directs the

13   City Attorney to "take any legal action necessary to challenge SB 9 and SB 10 and the laws that

14   permit ADU's [sic]."

15        51.  In deliberating over the Action Item, the City did not cite any statutory exemption

16   under SB 9 as a basis for the Action Item, nor did it make any findings that the Action Item is

17   necessary to protect the public from an immediate, adverse impact to health or safety.

18        52.  On February 22, 2023, the City, pursuant to its Action Item, began refusing to accept

19   any ADU and SB 9 permit applications. (See Planning Division, City of Huntington Beach's

20   website, available at https://www.huntingtonbeachca.gov/government/departments/planning/, last

21   visited March 7, 2023 [stating that, effective February 22, 2023, no SB 9 or ADU permit

22   applications are being accepted until "any legal challenges are resolved."].) The City did so even

23   though it had not, and has not yet, initiated any legal action challenging SB 9 or the state's ADU

24   laws.

25        53.  The Action Item, by instructing City staff to reject SB 9 projects that are otherwise

26   compliant with applicable objective standards without making any of the written findings

27   _____

28        [2] As noted in footnote 1 supra, SB 10 permits local agencies to adopt ordinances allowing
     for increased density near transit-rich and/or urban infill sites. It is a voluntary, opt-in upzoning
     law.

1    required by law, violates the Housing Accountability Act.

2        54.  The Action Item, by imposing a moratorium on SB 9 and ADU permit application

3    processing, also violates the Housing Crisis Act.

4        55.  In addition, at its March 7, 2023 meeting, the City Council introduced Ordinance No.

5    4285, which would amend section 202.04 of the Huntington Beach Zoning and Subdivision

6    Ordinance to "expressly prohibit[] the processing or approval of any application for a housing

7    development project or any project not in conformance with the zoning and General Plan land use

8    designation … regardless of the so-called 'Builder's Remedy' (under the Housing Accountability

9    Act or any other State law), that portend to allow developers of affordable housing projects to

10   bypass the zoning code and general plan of cities that are out of compliance with the Housing

11   Element Law." (See Exhibit B.)

12       56.  The proposed Ordinance No. 4285 makes no specific supporting findings other than

13   to state that it comports with the City's General Plan.

14       57.  Ordinance No. 4285, and its purported ban on Builder's Remedy projects, is directly

15   in conflict with the Housing Accountability Act.

16       58.  Ordinance No. 4285 also violates the Housing Crisis Act, and if invoked on certain

17   proposed projects subject to other state law protections, stands to violate state fair housing laws

18   under Government Code sections 8899.50 and 65008, density bonus law under Government Code

19   section 65915 et seq., and ministerial approval laws under SB 35 (Gov. Code § 65913.4), SB 6

20   and AB 2011 (Gov. Code §§ 65852.24 and 65912.110).

21                    **These Violations Occurred Despite Numerous Warnings**

22       59.  The City Council knowingly violated state laws, as alleged above, despite numerous

23   warnings from both HCD and the Attorney General's Office to both the City Council, the City's

24   Planning Commission, and the City Attorney.

25       60.  On January 9, 2023, HCD issued a Notice of Potential Violation to the City's

26   Planning Commission with respect to the recommendation to adopt Ordinance No. 4285 banning

27   Builders' Remedy projects.

28

The People's Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

61.  On February 13, 2023, HCD issued a second Notice of Potential Violation regarding Ordinance No. 4285. That same day, the Attorney General's Office also transmitted a letter to City Attorney Michael Gates warning that, if adopted, Ordinance No. 4285 would conflict with state law.

62.  On February 21, 2023, HCD issued a Notice of Potential Violation to the City Council regarding the Action Item to cease accepting ADU permit applications.

63.  That same day, the Attorney General's office transmitted a letter to the City Council regarding the Action Item to cease accepting SB 9 permit applications.

64.  On February 22, 2023, HCD issued a Notice of Violation regarding the City Council's decision to adopt the Action Item.

65.  On February 23, 2023, the Attorney General's Office transmitted a letter to the City Attorney requesting him to confirm that (1) the City will refuse to process any permit applications made under SB 9, including permit applications filed pursuant to the City of Huntington Beach's Zoning Text Amendment 22-002, (2) the City is no longer processing any ADU applications, and (3) the City Attorney has not yet initiated any legal action challenging SB 9 or the state's ADU laws.

66.  On February 27, 2023, the City Attorney responded to the Attorney General's Office by email, stating that (1) he did not believe there to be any pending SB 9 permit applications, (2) the City continued to process existing applications but would not be taking new applications, and (3) he had not yet initiated any legal action at the City Council's direction, but would be consulting with the City Council in closed session on March 7th to discuss the matter.

67.  On March 6, 2023, HCD issued another Notice of Potential Violation with respect to the proposed Ordinance No. 4285 banning Builder's Remedy projects.

### FIRST CAUSE OF ACTION
**Writ of Mandate (Code Civ. Proc., § 1085; Gov. Code, § 65585, subd. (n)) – Violation of Gov. Code, §§ 65852.2 (ADU), 65852.21, 66411.7 (SB 9)**
**[Against All Defendants]**

68.  Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

69.  Under state law, the City must process ADU applications ministerially and without discretionary review within 60 days of a complete application's submittal. (Gov. Code, § 65852.2.)

70.  The City must also, before denying any ADU application, provide "in writing a full set of comments to [an] applicant with a list of items that are defective or deficient and a description of how the application can be remedied by the applicant." (Gov. Code, § 65852.2, subd. (b)(2).)

71.  Government Code section 65852.2, subdivision (a)(7), further provides "[n]o other local ordinance, policy, or regulation shall be the basis for the delay or denial of a building permit or a use permit under this subdivision."

72.  Under SB 9, the City must process, on a ministerial basis, (1) proposed housing developments consisting of two residential units within a single-family zone, and (2) lot splits within a single-family zone. (Gov. Code, §§ 65852.21, 66411.7.)

73.  The City is not complying with these mandatory duties. As alleged above, the City has ceased accepting and processing ADU and SB 9 permit applications.

74.  The City's failure to process these applications is arbitrary, capricious, entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, an abuse of discretion, and a failure to act as required by law.

75.  Accordingly, a writ of mandate should issue ordering the City to comply with the ADU law and SB 9. (Gov. Code, §§ 65852.2, 65852.21, 66411.7.)

76.  Petitioners have a beneficial interest in the issuance of such a writ and have a significant interest in ensuring that the City complies with the law.

77.  Petitioners have exhausted all required administrative remedies, or are excused from exhausting their remedies due to the futility of pursuing such remedies, among other things.

78.  Petitioners have no plain, speedy, or adequate remedy in the ordinary course of law. The only remedy provided by law to obtain relief is this Petition for Writ of Mandate pursuant to Code of Civil Procedure section 1085.

### SECOND CAUSE OF ACTION
**Declaratory and Injunctive Relief (Code Civ. Proc., § 1060; Gov. Code, § 65585, subd. (n)) – Violation of Gov. Code, § 66300 (Housing Crisis Act of 2019)**
**[Against All Defendants]**

79.  Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

80.  There is a controversy between Petitioners and the City as to whether the City's ban on ADU and SB 9 projects complies with the Housing Crisis Act of 2019. As alleged above, Petitioners believe that the City's ban on ADU and SB 9 projects does not comply with the HCA because it reduces the intensity of land use and is an effective moratorium on housing development. Petitioners further believe that the City does not intend to become compliant with these laws. Further, based on information and belief, Petitioners allege that the City is deliberately defying applicable state law. It is necessary and appropriate for the Court to render a declaratory judgment that sets forth the parties' legal rights and obligations with respect to whether the City's ban is compliant with the HCA.

81.  In addition to these remedies, Petitioners are entitled to prospective relief directing the City to comply with the HCA.

82.  Petitioners therefore request a declaration that the City's ban on ADU and SB 9 projects violates the Housing Crisis Act of 2019. (Gov. Code, § 66300.)

### THIRD CAUSE OF ACTION
**Declaratory and Injunctive Relief (Code Civ. Proc., § 1060; Gov. Code, § 65585, subd. (n)) – Violation of Gov. Code, § 65589.5 (Housing Accountability Act)**
**[Against All Defendants]**

83.  Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

84.  There is a controversy between Petitioners and the City as to whether the City's ban on SB 9 projects complies with the Housing Accountability Act. As alleged, Petitioners believe that the City's ban on SB 9 projects does not comply with the HAA because it requires the City to reject housing projects that are otherwise compliant with locally adopted objective standards without making any of the written findings required by law. Petitioners further believe that the

17

City does not intend to become compliant with the HAA. Further, based on information and belief, Petitioners allege that the City is deliberately defying applicable state law.

85.  It is necessary and appropriate for the Court to render a declaratory judgment that sets forth the parties' legal rights and obligations with respect to whether the City's ban violates the HAA.

86.  In addition to these remedies, Petitioners are entitled to prospective relief directing the City to comply with the HAA.

87.  Petitioners therefore request a declaration that the City's ban on SB 9 projects violates the Housing Accountability Act. (Gov. Code, § 65589.5.)

**PRAYER FOR RELIEF**

WHEREFORE, Petitioners pray as follows:

1. For a writ of mandate ordering the City to continue processing SB 9 and ADU permit applications in compliance with SB 9 and ADU laws. (Gov. Code, §§ 65852.2; 65852.21; 66411.7; 65586, subd. (n).)

2. For a declaration that the City is in violation of the Housing Crisis Act of 2019, and its moratorium on SB 9 and ADU permit applications is in conflict with the law of this state and void. (Gov. Code, §§ 66300; 65585, subd. (n))

3. For a declaration that the City is subject to the Housing Accountability Act and its ban on SB 9 projects is in conflict with the law of this state and void. (Gov. Code, §§ 65589.5; 65585, subd. (n).)

4. For an injunction requiring the City to comply with the Housing Crisis Act of 2019 and to refrain from enforcing its moratorium on SB 9 and ADU permit applications. (Gov. Code, §§ 66300; 65585, subd. (n).)

5. For an injunction requiring the City to comply with the Housing Accountability Act and to refrain from enforcing its ban on SB 9 projects. (Gov. Code, §§ 65589.5; 65585, subd. (n))

6. For monetary fines imposed by statute, in an amount as the court shall deem proper under the Housing Accountability Act and any other state laws. (Gov. Code, § 65585, subd. (n).)

7. For costs and attorneys' fees.

8. For any other relief the Court may deem appropriate.

Dated:  March 8, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DAVID PAI
Supervising Deputy Attorney General

THOMAS P. KINZINGER
Deputy Attorney General
*Attorneys for Petitioner and Plaintiff, The People of California ex rel. Rob Bonta, and the California Department of Housing and Community Development*

SA2023301106

# EXHIBIT 4

1  Rob Bonta
   Attorney General of California
2  Daniel A. Olivas
   Senior Assistant Attorney General
3  David Pai, State Bar No. 227058
   Supervising Deputy Attorney General
4  Matthew T. Struhar, State Bar No. 293973
   Thomas P. Kinzinger, State Bar No. 323889
5  Deputy Attorneys General
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550                    *Exempt from Filing Fees*
7    Telephone:  (916) 210-7246                   *Government Code § 6103*
     Fax:  (916) 327-2319
8    E-mail:  Matthew.Struhar@doj.ca.gov
              Thomas.Kinzinger@doj.ca.gov
9
   *Attorneys for Petitioners and Plaintiffs, The People*
10 *of California ex rel. Rob Bonta, and the California*
   *Department of Housing and Community*
11 *Development*

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                        COUNTY OF ORANGE

14

15 **THE PEOPLE OF CALIFORNIA EX REL.**        Case No. 30-2023-01312235-CU-WM-CJC
   **ROB BONTA, AND THE CALIFORNIA**
16 **DEPARTMENT OF HOUSING AND**               **NOTICE OF MOTION AND MOTION**
   **COMMUNITY DEVELOPMENT,**                  **FOR LEAVE TO FILE AMENDED**
17                                             **PETITION AND COMPLAINT**
                        Petitioners and Plaintiffs,
18                                             **(Code Civ. Proc., §§ 473, subd. (a)(1); 576.)**
       v.
19                                             Date:        June 8, 2023
                                               Time:        1:30 p.m.
20 **THE CITY OF HUNTINGTON BEACH, A**          Dept:        C20
   **MUNICIPAL CORPORATION; CITY**             Judge:       The Hon. Erick Larsh
21 **COUNCIL OF HUNTINGTON BEACH;**             Trial Date:  None set
   **AL ZELINKA, in his official capacity as** Action Filed: March 8, 2023
22 **CITY MANAGER OF HUNTINGTON**
   **BEACH; AND DOES 1-50, INCLUSIVE,**
23
24                      Respondents and Defendants.

25

26         PLEASE TAKE NOTICE THAT on June 8, 2023, at 1:30 p.m., or as soon as the Court

27 schedules, in Department C20 of the Superior Court of California for the County of Orange,

28 located at 700 Civic Center Drive West, Santa Ana, CA 92701, Petitioners and Plaintiffs the

                                              1

People of California ex rel. Rob Bonta, Attorney General, and the California Department of Housing and Community Development ("HCD"), will and hereby do move the Court for an order permitting the filing of an Amended Petition and Complaint for Declaratory and Injunctive Relief. A copy of the proposed amended pleading is attached as Exhibit A to the Declaration of Thomas P. Kinzinger, filed concurrently herewith in support of this motion.

The proposed amendments will amend the first cause of action seeking a writ of mandate to order the City of Huntington Beach to comply with California's Housing Element Law by adopting a complaint housing element within 120 days. The proposed amendment will also include additional factual allegations that occurred after this action commenced, and revise the second cause of action, seeking declaratory and injunctive relief. Finally, the proposed amendment will strike the third cause of action as moot.

Pursuant to California Rule of Court 3.1324(a), the allegations to be deleted from the original Petition and Complaint are as follows:

| Page (in Original) | Paragraph (in Original) | Line Number (in Original) |
|---|---|---|
| 3 – 4 | 7 – 11 | Page 3, line 12 – Page 4, line 11 |
| 7 – 9 | 29 – 35 | Page 7, line 15 – Page 9, line 19 |
| 13 – 15 | 53 – 67 | Page 13, line 25 – Page 15, line 23 |
| 16 | 69 – 75 | 1 – 20 |
| 17 | 79 – 82 | 1 - 18 |
| 17 – 18 | 83 – 87 | Page 17, line 19 – Page 18, line 9 |
| 18 | Prayer for Relief, 1 – 6 | Page 18, line 12 – Page 19, line 3 |

Pursuant to California Rule of Court 3.1324(a), the allegations to be added to the amended Petition and Complaint are as follows:

| Page (in Amended) | Paragraph (in Amended) | Line Number (in Amended) |
|---|---|---|
| 2 | 3 | 19 – 23 |
| 3 | 7, 8 | 12 – 23 |
| 4 | 17 | 25 – 27 |
| 7 | 27 | 4 – 12 |
| 11 | 42 – 45 | 4 – 26 |
| 12 – 14 | 49 – 65 | Page 12, line 14 – Page 14, line 20 |
| 14 – 15 | 67 – 70 | Page 14, line 26 – Page 15, line 11 |
| 15 – 17 | 74 – 80 | Page 15, line 21 – Page 17, line 2 |
| 17 | Prayer for Relief, 1 – 5 | 5 – 16 |

In addition, there are some minor alterations to the language of allegations present in both the original and amended Petition and Complaint that do not otherwise change the substance of the Petition and Complaint.

This motion will be made on the grounds that granting Petitioners leave to amend is in the interest of justice and of judicial efficiency, as the proposed amendments are related to the operative Notices of Violations and existing controversies giving rise to the originally-filed petition and complaint, and will not result in prejudicing Respondents/Defendants. Allowing the amendment would therefore promote the efficient resolution of all claims between the parties.

Petitioners/Plaintiffs also request an order that the attached proposed amended pleading be deemed to be the amended pleading, and that the filing date of the amended pleading be deemed to be the same date this motion is granted.

1        This motion is based on this notice, the Memorandum of Points and Authorities and the

2   Declaration of Thomas P. Kinzinger, along with attached exhibits, all of which are filed

3   concurrently with and in support of this motion, the files and records in this action, and any

4   further evidence and argument that the Court may receive at or before the hearing.

5

6   Dated:  April 10, 2023                       Respectfully submitted,

7                                         ROB BONTA
                                      Attorney General of California

8                                         DANIEL A. OLIVAS
                                      Senior Assistant Attorney General

9                                         DAVID PAI
                                      Supervising Deputy Attorney General

10

11

12

13                                         THOMAS P. KINZINGER
                                      Deputy Attorney General

14                                         *Attorneys for Petitioner and Plaintiff, The*
                                      *People of California ex rel. Rob Bonta,*

15                                         *and the California Department of Housing*
                                      *and Community Development*

16   SA2023301106
   91605581

17

18

19

20

21

22

23

24

25

26

27

28

Electronically Filed by Superior Court of California, County of Orange, 04/10/2023 02:06:00 PM.
30-2023-01312235-CU-WM-CJC - ROA # 26 - DAVID H. YAMASAKI, Clerk of the Court By E. ellinguser, Deputy Clerk.
#:615

1  ROB BONTA
   Attorney General of California
2  DANIEL A. OLIVAS
   Senior Assistant Attorney General
3  DAVID PAI, State Bar No. 227058
   Supervising Deputy Attorney General
4  MATTHEW T. STRUHAR, State Bar No. 293973
   THOMAS P. KINZINGER, State Bar No. 323889
5  Deputy Attorneys General
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550                    *Exempt from Filing Fees*
7    Telephone: (916) 210-7246                    *Government Code § 6103*
     Fax: (916) 327-2319
8    E-mail: Matthew.Struhar@doj.ca.gov
              Thomas.Kinzinger@doj.ca.gov
9
   *Attorneys for Petitioners and Plaintiffs, The People*
10 *of California ex rel. Rob Bonta, and the California*
   *Department of Housing and Community*
11 *Development*

12            SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                         COUNTY OF ORANGE

14

15 **THE PEOPLE OF CALIFORNIA EX REL.**      Case No. 30-2023-01312235-CU-WM-CJC
   **ROB BONTA, AND THE CALIFORNIA**
16 **DEPARTMENT OF HOUSING AND**             **MEMORANDUM OF POINTS AND**
   **COMMUNITY DEVELOPMENT,**                **AUTHORITIES IN SUPPORT OF**
17                                           **MOTION FOR LEAVE TO FILE**
                        Petitioners and Plaintiffs,  **AMENDED PETITION AND**
18                                           **COMPLAINT**

19            v.                             **(Code Civ. Proc., §§ 473, subd. (a)(1); 576.)**

20 **THE CITY OF HUNTINGTON BEACH, A**       Date:        June 8, 2023
   **MUNICIPAL CORPORATION; CITY**          Time:        1:30 p.m.
21 **COUNCIL OF HUNTINGTON BEACH;**         Dept:        C20
   **AL ZELINKA, in his official capacity as**  Judge:       The Hon. Erick Larsh
22 **CITY MANAGER OF HUNTINGTON**           Trial Date:  None set
   **BEACH; AND DOES 1-50, INCLUSIVE,**     Action Filed: March 8, 2023
23

24            Respondents and Defendants.

25

26 / / /

27 / / /

28

                                    1

# INTRODUCTION

Petitioners and Complainants, the People of the State of California, by and through Attorney General Rob Bonta, and the Department of Housing and Community Development ("HCD"), seek leave to file an Amended Petition and Complaint for Declaratory and Injunctive Relief. The proposed amendments add a violation of the state's Housing Element Law, conforming with recent developments that have ripened such a claim, and strikes claims and allegations that are, at the moment, moot. It also amends Petitioners' declaratory relief cause of action to allege that Respondents/Defendants City of Huntington Beach, its City Council, and its City Manager (collectively, the "City")'s recent actions, taken after this action commenced, were intended to evade judicial review.

The core of these proposed amendments—mainly, to include a Housing Element Law violation—do not deviate from the myriad of Notices of Violation that prompted this action. Nor are there any applicable statute of limitations concerns that would preclude Petitioners from amending the pleadings, because the Housing Element violation and allegations of evading review only ripened *after* the commencement of this action.

This action commenced on March 8, 2023. The need to amend was discovered on the evening of April 4, 2023, when the City Council continued to refuse to adopt an updated housing element for the current 2021 through 2029 (aka "sixth cycle") planning period. The City Council's action occurred *after* HCD offered the City two meetings to resolve the Housing Element Law violations. By refusing to adopt the draft housing element after those two meetings, the Housing Element Law violations ripened.

The proposed amendment will not delay any briefing schedule or trial date, yet to be set, and, thus, causes no prejudice to the City. Should leave to amend be denied, Petitioners would have to needlessly file a separate action involving the same Notices of Violations giving rise to this present action, and subsequently file a notice of related case. Granting this motion, therefore, promotes judicial efficiency and permits the parties to expeditiously adjudicate all violations for which the City was given notice.

**BACKGROUND**

This action commenced on March 8, 2023, after Petitioners issued multiple violation notices, from January 9, 2023 to February 22, 2023, regarding the City Council's actions to defy and violate state housing laws. (See ROA #2: Petition and Complaint, ¶¶ 59-64.) To wit, violation notices were issued because the City Council prohibited certain types of residential building permit applications authorized under state law, such as accessory dwelling units ("ADUs"), and banned streamlined applications for lot splits and duplex development under Senate Bill 9 ("SB 9 applications"). (*Ibid.*) Such constraints also violated the state's Housing Element Law, which the City had yet to comply with, but was moving forward towards updating. (See Exh. A attached to Kinzinger Decl., ¶¶ 53-64.)

The statutory deadline for the City to adopt a sixth cycle housing element, for the planning period covering October 2021 through October 2029, was October 15, 2021. (See Exh. A attached to Kinzinger Decl., ¶ 53.) The City's planning staff previously worked with HCD to develop a compliant draft housing element for the sixth cycle. (See Exh. A attached to Kinzinger Decl., ¶¶ 54.) On September 30, 2022, HCD advised the City that its September 23, 2022 draft housing element met statutory requirements at the time of review. (*Ibid.*)

HCD met with City representatives on March 8, 2023, to discuss the City's violation of the Housing Element Law, and again, on March 24, 2023. (See Exh. A attached to Kinzinger Decl., ¶¶ 60, 62.) At those meetings, discussion topics included minor changes to the sites inventory of the City's housing element, adjustments to ADU projections, and the expectation—later downgraded to hope—that the City Council would adopt its draft housing element at its April 4, 2023 meeting. (See Exh. A attached to Kinzinger Decl., ¶¶ 60, 62.)

On March 27, 2023, the parties' counsel met and conferred regarding whether the City Council's March 21, 2023 action to "accept applications and process permits for ADUs and SB 9 development projects," yet not formally rescind the prior action item to ban such projects, was sufficient to moot the existing causes of action. (Kinzinger Decl., ¶ 3.) On March 30, 2023, the City's counsel was informed that should the City Council not adopt its draft housing element,

1   Petitioners would amend their petition/complaint to include a Housing Element Law violation.

2   (*Ibid*.)

3       On April 3, 2023, the City filed and served an answer to the existing petition/complaint.

4   (Kinzinger Decl., ¶ 4.) One day later, on April 4, 2023, the City Council refused to approve its

5   draft housing element. (*Id*. at ¶ 5.) On April 7, 2023, Petitioners, through their counsel, requested

6   the City stipulate to the filing of the proposed amended petition and complaint. (*Id*. at ¶ 7, Exh. B

7   attached to Kinzinger Decl.) The City's counsel refused. (*Ibid*.)

8   **DISCUSSION**

9   **I.    JUDICIAL POLICY ALLOWS PLEADINGS TO BE LIBERALLY AMENDED**

10      Judicial policy favors resolution of all disputed matters between the parties in the same

11  lawsuit, and thus, the court's discretion to permit amendment of the pleadings are exercised

12  liberally. (See *Nestle v. Santa Monica* (1972) 6 Cal.3d 920, 939; *Morgan v. Sup. Ct. (Morgan)*

13  (1959) 172 Cal. App. 2d 527, 530 [holding that it would be error and an abuse of discretion to

14  refuse to allow a party to amend a pleading if granting such motion would not prejudice the

15  opposing party].) Leave to amend, therefore, should be granted here because it will not cause any

16  meaningful prejudice or delay to the responding party, and would promote judicial efficiency in

17  resolving the parties' dispute in a single action.

18  **II.   THE PROPOSED AMENDMENTS ARE TIMELY RAISED TO INCLUDE RECENTLY RIPENED**
19       **CLAIMS AND STRIKE CLAIMS THAT ARE, AT THE MOMENT, MOOT**

20      "If the motion to amend is timely made and the granting of the motion will not prejudice

21  the opposing party, it is error to refuse permission to amend and where the refusal also results in a

22  party being deprived of the right to assert a meritorious cause of action or a meritorious defense,

23  it is not only error but an abuse of discretion." (*Morgan*, *supra*, 172 Cal. App .2d at 530.)

24      The proposed amendment adds allegations of Housing Element Law violations, and

25  Petitioners seek leave to do so only after it became abundantly apparent that such a claim was

26  ripe; i.e., the City Council will not be adopting a draft housing element that would cure the

27  deficiencies previously raised by Petitioners in the violation notices. (See also Gov. Code, §

28  65585, subd. (k) [requiring HCD to offer two meetings to discuss Housing Element Law

4

1   violations prior to seeking judicial remedies].) As the Housing Element Law violations are

2   ongoing and not barred under any statute of limitations, Petitioners amended claims are timely

3   raised. (See Gov. Code, § 65585, subd. (p) [applying the three-year limitations period under Code

4   of Civil Procedure section 338, subdivision (a) to violations brought under this section by HCD or

5   the Attorney General].)

6       Moreover, the proposed amendment strikes the third cause of action, which, at the moment,

7   appears to be moot. And it includes additional allegations, pertinent to the second cause of action,

8   regarding actions the City took in an attempt to evade judicial review regarding existing claims

9   that remain ripe. The amended petition, therefore, would promote judicial efficiency by updating

10  the pleadings to include new but pertinent factual allegations that occurred after this action

11  commenced, and streamlining the pleadings into two causes of action.

12  **III.   THE PROPOSED AMENDMENTS ARE TIMELY, AND WILL NOT PREJUDICE  DELAY TO**

13       **THE CITY**

14       Absent a showing of actual prejudice, the timing of a proposed amendment to a petition is

15  not a ground to deny leave to amend. (*Higgins v. Del Faro* (1981) 123 Cal. App. 3d 558, 564-

16  565.) Here, amending the petition and complaint less than 30 days from the date this action

17  commenced, and less than a week after the City Council's actions giving rise to the amended

18  claim, will not cause any prejudicial delay to the City. No merits hearing date have been set, no

19  briefing schedule needs to be revised, and the City is afforded the requisite time it needs to

20  respond to or challenge the sufficiency of the amended pleadings pursuant to the Code of Civil

21  Procedure.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

## CONCLUSION

For the foregoing reasons, Petitioners respectfully requests this Court grant this motion leave to file the Amended Petition and Complaint for Declaratory and Injunctive Relief, to be deemed filed and served as of the date of this hearing.

Dated:  April 10, 2023                     Respectfully submitted,

ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DAVID PAI
Supervising Deputy Attorney General


THOMAS P. KINZINGER
Deputy Attorney General
*Attorneys for Petitioner and Plaintiff, The People of California ex rel. Rob Bonta, and the California Department of Housing and Community Development*

SA2023301106
91605580

Electronically Filed by Superior Court of California, County of Orange, 04/10/2023 02:06:00 PM.
30-2023-01312235-CU-WM-CJC - ROA # 22 - DAVID H. YAMASAKI, Clerk of the Court By E. ellinguser, Deputy Clerk.
Case 30-2023-01312235-CU-WM-CJC - ROA # 22 - DAVID H. YAMASAKI, Clerk of the Court By E. ellinguser, Deputy Clerk.
#:621

1    ROB BONTA
     Attorney General of California
2    DANIEL A. OLIVAS
     Senior Assistant Attorney General
3    DAVID PAI, State Bar No. 227058
     Supervising Deputy Attorney General
4    MATTHEW T. STRUHAR, State Bar No. 293973
     THOMAS P. KINZINGER, State Bar No. 323889
5    Deputy Attorneys General
       1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone:  (916) 210-7246
     Fax:  (916) 327-2319
8    E-mail:  Matthew.Struhar@doj.ca.gov
             Thomas.Kinzinger@doj.ca.gov
9
     *Attorneys for Petitioners and Plaintiffs, The People*
10   *of California ex rel. Rob Bonta, and the California*
     *Department of Housing and Community*
11   *Development*

                          *Exempt from Filing Fees*
                          *Government Code § 6103*

12                SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                          COUNTY OF ORANGE

14

15   **THE PEOPLE OF CALIFORNIA EX REL.**        Case No. 30-2023-01312235-CU-WM-CJC
     **ROB BONTA, AND THE CALIFORNIA**
16   **DEPARTMENT OF HOUSING AND**               **DECLARATION OF THOMAS P.**
     **COMMUNITY DEVELOPMENT,**                  **KINZINGER IN SUPPORT OF MOTION**
17                                               **FOR LEAVE TO FILE AMENDED**
                         Petitioners and Plaintiffs,   **PETITION AND COMPLAINT**
18
                                                 **(Code Civ. Proc., §§ 473, subd. (a)(1); 576.)**
19        v.

                                                 Date:       June 8, 2023
20   **THE CITY OF HUNTINGTON BEACH, A**         Time:       1:30 p.m.
     **MUNICIPAL CORPORATION; CITY**             Dept:       C20
21   **COUNCIL OF HUNTINGTON BEACH;**            Judge:      The Hon. Erick Larsh
     **AL ZELINKA, in his official capacity as** Trial Date:   None set
22   **CITY MANAGER OF HUNTINGTON**              Action Filed: March 8, 2023
     **BEACH; AND DOES 1-50, INCLUSIVE,**
23
24                    Respondents and Defendants.
25
26
27
28

                                          1

I, Thomas P. Kinzinger, declare as follows:

1.     I am an attorney at law licensed to practice before all courts of the State of California. I am a Deputy Attorney General and am counsel of record for petitioners and plaintiffs the People of California, ex rel. Rob Bonta, Attorney General, and the California Department of Housing and Community Development ("HCD") (collectively, "Petitioners"). I have personal knowledge of the following facts. If called upon to testify as a witness, I could and would testify competently to these facts under oath.

2.     The proposed Amended Petition and Complaint for Declaratory and Injunctive relief amends Petitioners' first cause of action to allege a Housing Element Law violation, adds additional factual allegations pertinent to the second cause of action, and strikes the third cause of action. A true and correct copy of the proposed amended pleading is attached as Exhibit A.

3.     On March 27, 2023, the parties' counsel met and conferred regarding whether Respondent/Defendant City of Huntington Beach's City Council's March 21, 2023 action to "accept applications and process permits for ADUs and SB 9 development projects," yet not formally rescind the prior action item to ban such projects, was sufficient to moot the existing causes of action. On March 30, 2023, the City Attorney was informed by the Attorney General's Office that should the City Council not adopt its draft housing element, Petitioners would amend their petition/complaint to include a Housing Element Law violation.

4.     On April 3, 2023, I received by email a copy of the City's answer to the existing petition/complaint, purportedly filed that same day.

5.     One day later, on April 4, 2023, the City Council refused to approve its draft housing element. The City Council's meeting was live-streamed and recorded online, which I observed online that evening and have subsequently replayed.

6.     Thus, the need to amend the pleading to add a Housing Element Law violation did not ripen until April 4, 2023, after the City Council failed to adopt its draft housing element for the sixth cycle planning period. The proposed amendments also include pertinent factual allegations that occurred after this action commenced on March 8, 2023.

7.     On April 7, 2023, my office emailed a request to the City Attorney to stipulate to the filing of the proposed amended petition and complaint. The City Attorney refused. A true and correct copy of that email string is attached as Exhibit B.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on April 10, 2023, at Los Angeles, California.

_____
Thomas P. Kinzinger

SA2023301106
91605579

Declaration of Thomas P. Kinzinger ISO Motion for Leave to Amend  (30-2023-01312235-CU-WM-CJC)

# EXHIBIT A

ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DAVID PAI, State Bar No. 227058
Supervising Deputy Attorney General
MATTHEW T. STRUHAR, State Bar No. 293973
THOMAS P. KINZINGER, State Bar No. 323889
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7246
  Fax: (916) 327-2319
  E-mail: Matthew.Struhar@doj.ca.gov
          Thomas.Kinzinger@doj.ca.gov

*Attorneys for Petitioner and Plaintiff, The People of California ex rel. Rob Bonta, and the California Department of Housing and Community Development*

*Exempt from Filing Fees*
*Government Code § 6103*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| **THE PEOPLE OF CALIFORNIA EX REL. ROB BONTA, AND THE CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT,**<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>**THE CITY OF HUNTINGTON BEACH, A MUNICIPAL CORPORATION; CITY COUNCIL OF HUNTINGTON BEACH; AL ZELINKA, in his official capacity as CITY MANAGER OF HUNTINGTON BEACH; AND DOES 1-50, INCLUSIVE,**<br><br>Respondents and Defendants. | Case No. 30-2023-01312235-CU-WM-CJC<br><br>**FIRST AMENDED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     Californians continue to suffer under a housing affordability crisis. As the Legislature has found, "[t]he lack of housing . . . is a critical problem that threatens the economic, environmental, and social quality of life in California." (Gov. Code, § 65589.5, subd. (a)(1)(A),

(B).) This crisis is "hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic opportunities for workers and businesses, worsening poverty and homelessness, and undermining the state's environmental and climate objectives." (*Id.*, subd. (a)(2)(A).)

2.    A key contributor to this crisis is the failure of local governments to plan for the necessary housing supply at all income levels. To remedy this, the Legislature requires local governments to include housing elements in their general plans. A housing element must include, among other things, an assessment of housing needs, an inventory of resources and constraints relevant to meeting those needs, and a program to implement the policies, goals, and objectives of the housing element. (Gov. Code, § 65580 et seq.)

3.    Local governments that do not prepare a housing element substantially in compliance with state law, thereby failing to plan for an adequate supply of housing at all income levels, become subject to various legal consequences. For example, a local agency that fails to adopt a substantially compliant housing element becomes subject to the so-called "Builder's Remedy" provision of the Housing Accountability Act. (Gov. Code, § 65589.5) A local agency without a substantially compliant housing element may not deny, or apply conditions that make infeasible, a housing development project for very low-, low-, or moderate-income households on the basis of inconsistency with a zoning ordinance and land use designation in any general plan element. (Gov. Code, § 65589.5, subd. (d)(5).) In addition, a local government that fails to adopt a compliant housing element by the statutory deadline is subject to legal challenge pursuant to Article 14 of the Housing Element Law. (See Gov. Code. § 65750 et seq.) Article 14 provides for, among other things, temporary relief in the form of a revocation of permitting authority until the legal challenge is concluded. (Gov. Code, § 65757.)

4.    In another effort to alleviate the housing crisis, the Legislature has repeatedly amended the housing laws to encourage, and streamline the approval of, permits for accessory dwelling units ("ADUs") throughout the state. (See generally, Gov. Code, §§ 65852.150, 65852.2, 65852.22.) These units are typically small, easily-constructed residential structures installed as secondary housing units on a single-family property. Current ADU law requires local

2

1   agencies to approve ADU projects ministerially, or if denied, provide comments to the applicant

2   regarding deficiencies and a description of how the application can be remedied.

3        5.    And, in 2021, the Legislature passed the California Housing Opportunity and More

4   Efficiency Act ("HOME Act," or "SB 9") to streamline the permitting process and remove

5   regulatory barriers for subdividing residential lots into multifamily housing projects like

6   duplexes, triplexes, and four-plexes that are more affordable to middle-class households.

7        6.    The City of Huntington Beach recently decided to ignore the laws the Legislature

8   specifically crafted to address California's housing affordability crisis by barring its staff from

9   accepting and processing ADU- and SB 9-related building permits. The City did this despite the

10  fact that the availability of decent, suitable, and affordable housing is of vital statewide

11  importance to all Californians.

12       7.    In addition, the City of Huntington Beach has not adopted a current housing element

13  that is substantially in compliance with state law. In failing to adopt *any* housing element, much

14  less a substantially compliant one, Huntington Beach is not only in violation of state law, it is also

15  now subject to the Builder's Remedy.

16       8.    The People of the State of California, by and through Attorney General Rob Bonta,

17  and the Department of Housing and Community Development ("HCD"), bring this action against

18  the City of Huntington Beach, its City Council, and its City Manager (collectively, the "City") to

19  remedy its violations of state law. The People and HCD request that this Court issue a writ

20  ordering the City to adopt a legally-compliant housing element within 120 days, pursuant to

21  Government Code section 65754, subd. (a). Further, the People and HCD request this court issue

22  a judgment declaring that the City is noncompliant with the Housing Element Law and that it

23  must comply with the ADU laws and SB 9.

24                                    **PARTIES**

25       9.    The Attorney General, as the chief law enforcement officer of the State of California,

26  brings this action under his broad independent powers to enforce state laws, and on behalf of

27  HCD. (Cal. Const., Art. V, section 13; Gov. Code, § 65585, subd. (j).)

28

10.  HCD is a public agency of the State of California. (Gov. Code, § 12804.) Among other duties, HCD is responsible for developing housing policy and building codes, for regulating manufactured homes and mobile home parks, and for enforcing state housing laws, including the Housing Element Law, the Housing Accountability Act, state ADU laws, and the Housing Crisis Act in a manner that meaningfully and positively impacts the provision of housing in all communities across the state.

11.  The City of Huntington Beach is a municipal corporation formed and existing under the laws of the State of California, of which it is a political subdivision.

12.  The City Council of Huntington Beach is the elected governing body of the City of Huntington Beach.

13.  The City Manager of Huntington Beach is the city official responsible for the management and oversight of the City's various departments.

14.  The People are unaware of the true names and capacities of respondents and defendants DOES 1 through 50 (the "Doe Respondents"), who are therefore sued by fictitious names pursuant to Code of Civil Procedure section 474. The People allege on information and belief that each such fictitiously named Doe Respondent is responsible or liable in some manner for the events and happenings referred to herein, and the People will seek leave to amend this Petition and Complaint to allege their true names and capacities after the same have been ascertained.

## **VENUE AND JURISDICTION**

15.  This Court has jurisdiction over this action pursuant to Code of Civil Procedure sections 187, 1060, and 1085.

16.  Venue is proper in this Court because the City is located in Orange County and the violations of law alleged herein occurred in Orange County.

17.  This action is brought pursuant to Government Code section 65751 and is therefore entitled to preference over all other civil actions before this court pursuant to Government Code section 65752.

/ / /

**BACKGROUND AND FACTUAL ALLEGATIONS**

**The Housing Crisis**

18. The Legislature has declared that "[t]he availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every Californian . . . is a priority of the highest order." (Gov. Code, § 65580, subd. (a).)

19. California has a crisis-level housing shortage that stems from the failure of local governments to approve affordable housing to meet the needs of all Californians. For decades, the Legislature has found that California has been suffering from "a severe shortage of affordable housing, especially for persons and families of low and moderate income" and that "there is an immediate need to encourage the development of new housing." (*Ruegg & Ellsworth v. City of Berkeley* (2021) 63 Cal.App.5th 277, 295, quoting Gov. Code, § 65913.)

20. Recently, the Legislature stated plainly that "California has a housing supply and affordability crisis of historic proportions." (Gov. Code, § 65589.5, subd. (a)(2)(A).) "The consequences of failing to effectively and aggressively confront this crisis are hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic opportunities for workers and businesses, worsening poverty and homelessness, and undermining the state's environmental and climate objectives." (*Ibid.*)

**Housing Elements and the Planning Process**

21. State law requires that all local governments adequately plan to meet the housing needs of everyone in the community, at all economic levels. To meet this requirement, every city and county must adopt and periodically update a housing element as part of its general plan. (See Gov. Code, §§ 65302, subd. (c), 65580, et seq.) The law mandating this adoption and periodic update is known as the "Housing Element Law." (*Id.*, § 65580, et seq.)

22. California's Housing Element Law requires local governments to adopt plans and regulatory systems that provide opportunities for, and do not unduly constrain, housing development, especially for a locality's lower-income households and workforce. As a result, housing policy in California rests largely on the effective implementation of the housing element contained in the local general plan.

5

23.   The housing element is a roadmap for housing development in a given community. The housing element must identify and analyze existing and projected housing needs, and must include "a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing." (Gov. Code, § 65583.) The housing element must also "identify adequate sites for housing" and "make adequate provision for the existing and projected needs of all economic segments of the community." (*Ibid.*) Each housing element is also subject to review by HCD.

24.   A local jurisdiction's housing element must be frequently updated to ensure compliance with California's Housing Element Law. (Gov. Code, § 65588.) Jurisdictions must update their housing elements every five or eight years. (See *id.*, subd. (e)(3).) Each five- or eight-year cycle is known as a "planning period." (See *id.*, subd. (f)(1).)

25.   The process of updating a housing element begins with HCD's determination of a Regional Housing Need Allocation ("RHNA") for the region for a given planning period. (Gov. Code, § 65584, subd. (a)(1).) The RHNA sets goals for housing affordable to various income levels. To arrive at the RHNA, HCD starts with demographic population information from the California Department of Finance and uses a formula to calculate a figure for each region's planning body, known as a "council of governments" ("COG"). Each COG (in this case, the Southern California Association of Governments) also uses its own demographic figures to calculate the regional housing need. Each COG coordinates with HCD to arrive at a final figure, taking into account factors not captured in the calculations. This final figure is the RHNA. (See *id.*, § 65584.01.)  Once the RHNA is set, the COG is responsible for allocating the housing need among all of the cities and counties within that region. (Gov. Code, § 65584, subd. (b).) Each local government must then prepare a housing element that identifies adequate sites to accommodate that jurisdiction's fair share of the RHNA at each income level. (*Id.*, §§ 65583, 65583.2.)

26.   Each local government must submit its draft housing element to HCD before adoption. (Gov. Code, § 65585, subd. (b)(1).) HCD must review the draft element and issue findings as to whether the draft substantially complies with the Housing Element Law. (*Id.*,

6

subds. (b)(3), (d).) After adopting the final housing element, the local government must again submit the element to HCD, and HCD must again review and report its findings to the local government. (*Id.*, subds. (g), (h).)

27.  A local government that fails to adopt a compliant housing element by the statutory deadline is subject to legal challenge pursuant to Article 14 of the Housing Element Law. (Gov. Code. § 65750 et seq.) Article 14 authorizes a court to issue various remedies, including ordering a local government to adopt a compliant housing element within 120 days, ordering the suspension of a local government's permitting authority until it adopts a compliant housing element, and even ordering a *temporary* suspension of a local government's permitting authority until a housing element challenge is concluded. (Gov. Code, §§ 65754, 65755, 65757.) In addition, localities that do not have compliant housing elements are automatically subject to the Builder's Remedy under the Housing Accountability Act. (Gov. Code, § 65589.5.)

**The ADU Laws**

28.  One effective means of increasing the housing supply is by removing regulatory barriers to accessory dwelling units, or ADUs. ADUs are sometimes also known as "granny flats," "in-law units," "backyard cottages," or "secondary units," among other names. These small structures provide a cost-effective solution to increasing the housing supply on a rapid timescale.

29.  ADUs have many benefits. They are affordable to construct, since they typically use comparatively inexpensive wood frame construction, and no new land acquisition or major infrastructure is required. ADUs can also provide a source of income for homeowners when rented, increasing incentives for homeowners to build ADUs on their property. In addition, ADUs enable extended families to reside close to one another, and for seniors to age in place with family members while maintaining an independent living space. (See generally, Accessory Dwelling Units, Department of Housing and Community Development, available at https://www.hcd.ca.gov/policy-and-research/accessory-dwelling-units.)

30.  In recent years, the Legislature has repeatedly amended the housing laws to legalize and promote the construction of accessory dwelling units. In 2018, as part of a package of updates to the housing laws that, among other things, made the ADU laws applicable to charter cities for

the first time, the Legislature found and declared all of the following:

(1) Accessory dwelling units are a valuable form of housing in California.

(2) Accessory dwelling units provide housing for family members, students, the elderly, in-home health care providers, the disabled, and others, at below market prices within existing neighborhoods.

(3) Homeowners who create accessory dwelling units benefit from added income, and an increased sense of security.

(4) Allowing accessory dwelling units in single-family or multifamily residential zones provides additional rental housing stock in California.

(5) California faces a severe housing crisis.

(6) The state is falling far short of meeting current and future housing demand with serious consequences for the state's economy, our ability to build green infill consistent with state greenhouse gas reduction goals, and the well-being of our citizens, particularly lower and middle-income earners.

(7) Accessory dwelling units offer lower cost housing to meet the needs of existing and future residents within existing neighborhoods, while respecting architectural character.

(8) Accessory dwelling units are, therefore, an essential component of California's housing supply.

(Gov. Code, § 65852.150, subd. (a).)

31.  The bulk of the ADU laws are set forth at Government Code section 65850 et seq. These laws broadly restrict the ability of local agencies, whether general law or charter cities, to deny ADU projects within their jurisdiction, and set tight deadlines for processing applications.

32.  Relevant to this litigation, Government Code section 65852.2, subdivisions (a)(3)(A) and (b)(1), require permitting agencies to approve or deny ADU applications ministerially and without discretionary review within 60 days of a complete application's submittal. Under both provisions, "[i]f the local agency has not approved or denied the completed application within 60 days, [an] application shall be deemed approved." In addition, Government Code section 65852.2, subdivision (e)(1), states "a local agency shall ministerially approve an application for a building

permit within a residential or mixed-use zone to create" ADUs that meet specific requirements.

33.  In addition, a local agency that denies an ADU application must provide "in writing a full set of comments to the applicant with a list of items that are defective or deficient and a description of how the application can be remedied by the applicant." (Gov. Code, § 65852.2, subd. (b)(2).)

34.  Government Code section 65852.2, subdivision (a)(7), further provides: "No other local ordinance, policy, or regulation shall be the basis for the delay or denial of a building permit or a use permit under this subdivision."

**Senate Bill 9**

35.  The Legislature introduced Senate Bill 9 in 2021 in an effort to streamline the process for creating duplexes or for subdividing an existing lot. SB 9 restrained the discretion of local agencies by creating a ministerial process for such project approvals.

36.  SB 9 ultimately allows up to four homes on lots where only one existed previously, by permitting existing single-family homes to be converted to duplexes or single-family lots to be subdivided into two lots on which two duplexes could be built. (See SB 9 Senate Floor Analysis, August 28, 2021, available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB9.)

37.  SB 9 added, among other provisions, sections 65852.21 and 66411.7 to the Government Code. Section 65852.21 requires local agencies to approve a proposed housing development consisting of two residential units within a single-family zone on a ministerial basis. Section 66411.7 requires local agencies to approve a lot split in a single-family zone on a ministerial basis. Both provisions became operative on January 1, 2022.

38.  SB 9 placed limits on a local agency's ability to deny proposed projects, but it did not entirely eliminate local agencies from the approval process. Local agencies are still permitted to "impose objective zoning standards, objective subdivision standards, and objective design review standards," so long as such standards do not have "the effect of physically precluding the construction of up to two units or...would physically preclude either of the two units from being at least 800 square feet in floor area" within a single-family zone. (Gov. Code, § 65852.21, subd.

9

(b.).) Similarly, local agencies can impose "objective" standards with respect to lot splits, so long as those standards do not "have the effect of physically precluding the construction of two units on either of the resulting parcels or that would result in a unit size of less than 800 square feet" within a single-family zone. (Gov. Code, § 66411.7, subd. (c).) Finally, the legislative body of a local agency may reject an SB 9 project if it finds, based on a preponderance of the evidence, that the proposed project would have a "specific, adverse impact" on "public health and safety or the physical environment and for which there is no feasible method to satisfactorily mitigate or avoid the specific, adverse impact." (Gov. Code, §§ 65852.21, subd. (d); 66411.7, subd. (d); see also 65589.5, subd. (d)(2).)

**The Housing Crisis Act**

39.  The Housing Crisis Act of 2019 ("HCA") prohibits a local government from "enact[ing] a development policy, standard, or condition" that would have the effect of "[c]hanging the general plan land use designation, specific plan land use designation, or zoning of a parcel or parcels of property to a less intensive use or reducing the intensity of land use within an existing general plan land use designation, specific plan land use designation, or zoning district in effect at the time of the proposed change, below what was allowed under the land use designation or zoning ordinances … in effect on January 1, 2018." (Gov. Code, § 66300, subd. (b)(1)(A).) The statute defines "reducing the intensity of land use" to include "any other action that would individually or cumulatively reduce the site's residential development capacity." (*Ibid*.)

40.  The HCA also prohibits a local government from "[i]mposing a moratorium or similar restriction or limitation on housing development … within all or a portion of the jurisdiction … other than to specifically protect against an imminent threat to the health and safety of persons residing in, or within the immediate vicinity of, the area subject to the moratorium…." (Gov. Code, § 66300, subd. (b)(1)(B)(i).)

41.  In addition, a local agency shall not enforce such "a moratorium or other similar restriction on or limitation of housing development until it has submitted the ordinance to, and

1  received approval from, [HCD]." (Gov. Code, § 66300, subd. (b)(1)(B)(ii).) If HCD denies

2  approval, "that ordinance shall be deemed void." (*Ibid*.)

3  **Huntington Beach's Violations of State Housing Laws**

4     42.  On or about December 20, 2022, HCD became aware that the Huntington Beach City

5  Council planned to resist its obligations under California's housing laws. At its December 20th

6  meeting, the City Council directed the City Attorney, via Council Member Items Report 22-1096,

7  to explore a potential legal challenge to the City's RHNA allocation and to draft an ordinance that

8  would conflict with the mandate of the Housing Accountability Act by banning Builder's Remedy

9  projects.

10     43.  On January 9, 2023, HCD issued a Notice of Potential Violation notifying the City

11  that, among other things, recent court decisions confirmed that the RHNA allocation process is

12  not subject to judicial review, and that any attempt to circumvent the Housing Accountability Act

13  could result in a referral to the Attorney General's Office.

14     44.  The City persisted in its efforts to flout the state's housing laws. The City Council

15  introduced Zoning Text Amendment No. 2023-001, which would ban Builder's Remedy projects,

16  for consideration at an upcoming meeting. On February 13, 2023, the Attorney General's Office

17  issued a letter explaining that the proposed ordinance expressly conflicted with applicable state

18  law and warning that the Attorney General's Office was prepared to begin an enforcement action

19  if necessary.[1]

20     45.  Separately, the City Council decided it would attempt to ban ADU and SB 9-eligible

21  project applications. On February 21, 2023, HCD issued a Notice of Potential Violation to the

22  City to advise it that, among other things, the ADU ban was unlawful and would bring the City's

23  draft housing element out of compliance with the Housing Element Law. The Attorney General's

24  Office issued a separate letter on February 21, 2023, informing the City that, among other things,

25  a prohibition on ADU and SB 9-eligible projects would violate state law, including the Housing

26  Crisis Act (Gov. Code, § 66300) and the Housing Accountability Act (Gov. Code, § 65589.5).

27

28  _____

[1] The City Council has not as of the date of this filing adopted the Builder's Remedy ban. Petitioners will challenge any attempt to do so.

46.  Nevertheless, at its February 21, 2023 meeting, the Huntington Beach City Council adopted Action Item No. 23-172 (the "Action Item"), directing the City Manager to "cease the processing of all applications/permits brought to the City by developers under SB 9, SB 10, or 'state law related' ADU projects, until the courts have adjudicated the matter(s)."[2] The Action Item also directed the City Attorney to "take any legal action necessary to challenge SB 9 and SB 10 and the laws that permit ADU's [sic]."

47.  In deliberating over the Action Item, the City did not cite any statutory exemption under SB 9 as a basis for the Action Item, nor did it make any findings that the Action Item is necessary to protect the public from an immediate, adverse impact to health or safety.

48.  On February 22, 2023, the City, pursuant to its Action Item, began refusing to accept any ADU and SB 9 permit applications. Its Planning Division website stated that, effective as of that date, no SB 9 or ADU permit applications would be accepted until "any legal challenges are resolved."

49.  On March 8, 2023, Petitioners filed the instant lawsuit challenging the unlawful ban on SB 9 and ADU permit applications.

50.  At its March 21, 2023 meeting, the City Council voted to direct the City Manager to "accept applications and process permits for accessory dwelling units (ADUs) and SB 9 development projects" but did not formally rescind the Action Item.

51.  The City's voluntary cessation of its unlawful conduct under California's housing laws does not indicate that it will obey the housing laws in the future. It is settled that "voluntary discontinuance of alleged illegal practices does not remove the pending charges of illegality from the sphere of judicial power or relieve the court of the duty of determining the validity of such charges where by the mere volition of a party the challenged practices may be resumed." (*Robinson v. U-Haul Co. of California* (2016) 4 Cal. App. 5th 304, 315–16 (quoting *Marin County Bd. Of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 929.))

52.  The City's continuing pattern of resistance to its obligations under California's

---

[2] SB 10 permits local agencies to adopt ordinances allowing for increased density near transit-rich and/or urban infill sites. It is a voluntary, opt-in upzoning law. The City has not as of the date of this filing brought a challenge to that law.

1  housing laws, as alleged in the foregoing paragraphs and *infra*, indicates that a judicial

2  determination of rights and obligations is necessary. The City has not unambiguously committed

3  itself to a "violation-free future," and Petitioners reasonably "doubt the bona fides of [the] newly

4  established law-abiding policy." (*Robinson*, *supra*, 4 Cal.App.5th at 316.)

5       53.  The City's temporary cessation of unlawful activities does not stop the City from

6  engaging in unlawful behavior again in the future. Absent a resolution to this litigation,

7  Petitioners have no reason to believe the City will permanently comply with state housing law,

8  including the ADU laws and SB 9.

9  **The City of Huntington Beach's Failure to Adopt a Housing Element**

10       54.  The statutory deadline for the City to adopt a sixth cycle housing element, for the

11  planning period covering October 2021 through October 2029, was October 15, 2021.

12       55.  City staff previously worked with HCD to develop a compliant sixth cycle housing

13  element. On September 30, 2022, HCD advised the City that its September 23, 2022 draft housing

14  element met statutory requirements at the time of review.

15       56.  That draft housing element projected the development of 487 new ADUs to meet the

16  City's RHNA allocation.

17       57.  On or about February 17, 2023, HCD discovered the City Council was considering a

18  ban on ADU applications, in contravention of state law and notwithstanding the draft housing

19  element's reliance on ADU production to meet its RHNA target.

20       58.  On February 21, 2023, HCD issued a Notice of Potential Violation to the City to

21  advise it that, among other things, the ADU ban would bring the City's draft housing element out

22  of compliance with the Housing Element Law. In particular, HCD warned that the ADU ban

23  represented a new constraint on the production of housing that would have to be addressed in the

24  new housing element, and that the pending ADU ban called into question the draft element's

25  assumption that new ADU production would help meet the City's RHNA target.

26       59.  Later that day, the City Council passed a ban on ADU and SB 9 permit applications.

27       60.  On February 22, 2023, HCD issued a Notice of Violation advising the City that,

28  among other things, the just-passed ADU ban brought the City out of compliance with the

Housing Element Law and that its draft housing element would need to be revised. The Notice of Violation also advised the City of the potential penalties for noncompliance and stated that HCD would refer the matter to the Office of the Attorney General absent corrective action.

61.   HCD met with City representatives on March 8, 2023, to discuss the City's violation of the Housing Element Law. HCD discussed with City staff the City's reliance on ADU production to meet RHNA targets, the changes to its site inventory, and changes necessary to account for new requirements set by AB 2339 regarding the identification of sites suitable for emergency shelters. At that meeting, City staff expressed confidence that the City would vote to adopt the housing element soon.

62.   At its March 21, 2023 meeting, the City Council considered but did not pass Resolution 2023-14, which would have approved the City's draft housing element.

63.   HCD met again with City representatives on March 24, 2023. At that meeting, discussion topics included minor changes to the sites inventory of the City's plan, and an inquiry to City staff as to whether the AB 2339-related edits were included in the housing element. At this meeting, City staff expressed hope that the City would adopt the housing element at its April 4, 2023 meeting.

64.   At its April 4, 2023 meeting, the City Council again considered and did not pass Resolution 2023-14, thereby persisting in its failure to approve a compliant housing element for the sixth cycle.

65.   The City has made no further efforts to adopt any sixth cycle housing element.

**FIRST CAUSE OF ACTION**
**Writ of Mandate (Code Civ. Proc., § 1085; Gov. Code, §§ 65751, 65585, subd. (n)) – Violation of Gov. Code, § 65585)**
**[Against All Defendants]**

66.   Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

67.   Under California's Housing Element Law, the City must ensure that its general plan contains a legally compliant housing element.

68.  The City has abdicated this duty. The City has failed to adopt a legally compliant sixth cycle housing element by the October 15, 2021 statutory deadline, and the City Council's most recent actions and inactions on April 4, 2023 show that the City has no intention of complying with the Housing Element Law.

69.  The City's failure to act is arbitrary, capricious, entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, an abuse of discretion, and a failure to act as required by law.

70.  Accordingly, a writ of mandate should issue as provided under Government Code section 65754 ordering the City to come into compliance with California's Housing Element Law (Gov. Code, § 65580 et seq.) within 120 days by adopting a compliant sixth cycle housing element that meets the City's regional housing needs goals, as determined by HCD.

71.  Petitioners have a beneficial interest in the issuance of such a writ, given their authority and mandate to enforce substantial compliance with California's Housing Element Law. Likewise, the public at large, as well as the lower income residents and workforce in the City, have a significant interest in ensuring that the City complies with the law.

72.  Petitioners have exhausted all required administrative remedies, or are excused from exhausting its remedies due to the futility of pursuing such remedies, among other things.

73.  Petitioners have no plain, speedy, or adequate remedy in the ordinary course of law. The only remedy provided by law for Petitioners to obtain relief is this Petition for Writ of Mandate pursuant to Code of Civil Procedure section 1085.

## SECOND CAUSE OF ACTION
**Declaratory and Injunctive Relief (Code Civ. Proc., § 1060, Gov. Code, §§ 65755, 65757) – Violation of Gov. Code, §§ 65585 (Housing Element Law); 65850 et seq. (ADU Laws); 65852.21, 66411.7 (SB 9)**
**[Against All Defendants]**

74.  Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

75.  There is a controversy between Petitioners and the City as to whether the City has complied with California's Housing Element Law (Gov. Code, § 65580, et seq.). Based on the

events alleged above, it cannot be disputed that the City is noncompliant with the Housing Element Law and, as made clear by the City Council's April 4, 2023 deliberation and vote, is making no progress on becoming compliant. Further, based on information and belief, Petitioners allege that the City is aware that it is out of compliance with the Housing Element Law and has failed to take any meaningful action to adopt a substantially compliant element, even though its sixth cycle housing element is now almost eighteen months overdue.

76.   It is necessary and appropriate for the Court to render a declaratory judgment that sets forth the parties' legal rights and obligations with respect to whether the city is substantially compliant with California's Housing Element Law. Among other things, such a judgment would inform the parties' conduct in connection with future contemplated amendments to the City's housing element, including those that occur routinely at the beginning of each housing cycle.

77.   Further, there is a controversy between Petitioners and the City as to whether the City complied with state ADU laws and SB 9. The City's ban on ADU and SB 9 projects, even if transient, expressly conflicted with applicable state law. Based on information and belief, Petitioners allege that the City deliberately defied applicable state law, voluntarily ceased doing so once this litigation was filed, and may by its own volition resume violating state law in the absence of a judicial remedy.

78.   It is necessary and appropriate for the Court to render a declaratory judgment that sets forth the parties' legal rights and obligations with respect to whether the City is subject to the state's housing laws.

79.   Petitioners therefore request a declaration that the City is not substantially compliant with California's Housing Element Law (Gov. Code, § 65580, *et seq.*), that the City's ADU and SB 9 project ban violated the Housing Crisis Act (Gov. Code, § 66300), the ADU laws (Gov. Code, § 65850 et seq.), and SB 9 (Gov. Code, §§ 65852.21, 66411.7), and that the City must comply with the ADU laws (Gov. Code, § 65850 et seq.) and SB 9 (Gov. Code, §§ 65852.21; 66411.7).

80.   In addition to these remedies, Petitioners are immediately entitled to temporary relief under Government Code section 65757, including but not limited to the suspension of the City's

16

1   authority to issue non-residential building permits, until the City has substantially complied with

2   Housing Element Law by properly adopting and implementing an adequate housing element.

3   **PRAYER FOR RELIEF**

4   WHEREFORE, Petitioners pray as follows:

5   1.  For a writ of mandate ordering the City to adopt a housing element in compliance with

6   the Housing Element Law within 120 days. (Gov. Code, §§ 65580 *et seq.*)

7   2.  For temporary relief, including but not limited to the suspension of the City's non-

8   residential permitting authority, and mandating the approval of certain residential

9   developments. (Gov. Code, §§ 65755, 65757.)

10  3.  For a declaration that the City is in violation of the Housing Element Law. (Gov. Code,

11  §§ 65580 et seq.; 65585, subd. (n).)

12  4.  For a declaration that the City's ban on ADU and SB 9 projects violated the Housing

13  Crisis Act (Gov. Code, § 66300), the ADU laws (Gov. Code, § 65850 et seq.), and SB 9

14  (Gov. Code, §§ 65852.21, 66411.7), and that the City must comply with the ADU laws

15  (Gov. Code, § 65850 et seq.) and SB 9 (Gov. Code, §§ 65852.21; 66411.7).

16  5.  For statutory fines, levies, and penalties. (Gov. Code, § 65585, subd. (l).)

17  6.  For costs and attorneys' fees.

18  7.  For any other relief the Court may deem appropriate.

19  Dated:  April 10, 2023                    Respectfully submitted,

20                                           ROB BONTA
                                             Attorney General of California
21                                           DANIEL A. OLIVAS
                                             Senior Assistant Attorney General
22                                           DAVID PAI
                                             Supervising Deputy Attorney General
23

24

25                                           THOMAS P. KINZINGER
                                             Deputy Attorney General
26                                           *Attorneys for Petitioner and Plaintiff, The*
                                             *People of California ex rel. Rob Bonta,*
27                                           *and the California Department of Housing*
                                             *and Community Development*
28  SA2023301106

17

# EXHIBIT B

| | |
|---|---|
| **From:** | Gates, Michael |
| **To:** | David Pai |
| **Cc:** | Vigliotta, Mike; Matthew Struhar; Thomas Kinzinger; Said, Nadin |
| **Subject:** | RE: People and HCD v. City of Huntington Beach-- stipulation to amend petition/complaint |
| **Date:** | Friday, April 7, 2023 12:25:58 PM |
| **Attachments:** | image003.png |

---

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

No. The City will not agree.  In fact, the City will oppose leave to amend.

The novel basis for the new controversy you are now presenting in your email today requires the filing of a new lawsuit by the State. What you are now newly alleging is an entirely new set of facts and entirely different laws, none of which relates back the State's lawsuit the City has deemed moot and presently lacking any legal controversy.  The State will be required to follow the laws, including those of Procedure.  With this in mind, I'll renew my request that the State dismiss it's moot lawsuit and file a new lawsuit with the new allegations.

Thank you.

Michael E. Gates, City Attorney
OFFICE OF THE CITY ATTORNEY
CITY OF HUNTINGTON BEACH
2000 Main St., Fourth Floor
Huntington Beach, CA 92648
Ph: (714) 536-5538 Fx: (714) 374-1590

Confidentiality Notice:  This email may contain material that is confidential, privileged and/or attorney work-product for the sole use of the addressee.  Further, this email is protected under the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2522.  Any review by, reliance, or distribution by others or forwarding to others without express permission of the author is strictly prohibited.  If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited.  Moreover, any such inadvertent disclosure shall not compromise or waive the attorney-client privilege as to this communication.  If you have received this communication in error, please immediately notify the sender and delete this e-mail.  Thank you.

-------- Original message --------
From: David Pai <David.Pai@doj.ca.gov>
Date: 4/7/23 12:15 PM (GMT-08:00)
To: "Gates, Michael" <Michael.Gates@surfcity-hb.org>
Cc: "Vigliotta, Mike" <MVigliotta@surfcity-hb.org>, Matthew Struhar
<Matthew.Struhar@doj.ca.gov>, Thomas Kinzinger <Thomas.Kinzinger@doj.ca.gov>
Subject: People and HCD v. City of Huntington Beach-- stipulation to amend petition/complaint

Michael:

We are in receipt of the City's answer to the petition and complaint, filed and served on April 3, 2023. I don't believe a summons has issued yet, so thank you for agreeing to waive service and promoting efficiency in litigating this matter. We will, of course, extend similar courtesies throughout the pendency of this litigation. On that note, as discussed with you over the phone on March 30, 2023, we intend to amend our petition to include Housing Element Law violations *if* the City Council did not adopt and implement the draft housing element the City's planning staff presented on April 4, 2023. It has come to our attention that the City Council tabled that item once again, and remains out of compliance with

Housing Element Law.

Since the City answered the outdated original petition and complaint, Petitioners are now required to file a regularly-noticed motion seeking leave to amend, which we intend to do so on Monday. Will the City and co-respondents/defendants, in the continued interest of judicial efficiency, stipulate to such an amended petition and complaint? The amended petition and complaint will seek a writ of mandate ordering compliance with Housing Element Law within 120 days, injunctive/temporary relief until the City complies with Housing Element Law, and declaratory relief with respect to the City Council's prior actions as set forth in the original petition and complaint. Such stipulation, of course, does not preclude the City from bringing a dispositive motion and challenging the sufficiency of the pleadings, and would be aligned with the judicial policy favoring amended pleadings so as to resolve all disputed matters between the parties in a single lawsuit.

Please let us know via a reply to this email by the close of business today. Thank you.



**DAVID PAI** | Supervising Deputy Attorney General
Land Use and Conservation Section, Public Rights Division
Department of Justice, Office of the Attorney General
1515 Clay Street, 20th Floor | Oakland, California 94612
Telephone (510) 879-0816 | David.Pai@doj.ca.gov
File drop: https://fx.doj.ca.gov/filedrop/~dKliQ4

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

EXHIBIT 5

**AGENDA ITME 9.18**

# SOUTHERN CALIFORNIA ASSOCIATION OF GOVERNMENTS

# REGIONAL HOUSING NEEDS ASSESSMENT APPEALS BOARD

## APPEALS DETERMINATION:  CITY OF HUNTINGTON BEACH

### Hearing Dates:  January 19 and 25, 2021

The City of Huntington Beach has appealed its draft Regional Housing Needs Assessment ("RHNA") allocation.  The following constitutes the decision of the Southern California Association of Governments' RHNA Appeals Board regarding the City's appeal.

## I.    Statutory Background

The California Legislature developed the RHNA process [Government Code Section 65580 *et seq.* (the "RHNA statute")] in 1977 to address the serious affordable housing shortage in California.  Over the years, the housing element laws, including the RHNA process, have been revised to address the changing housing needs in California. As of the last revision, the Legislature has declared that:

(a)     The availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every Californian, including farmworkers, is a priority of the highest order.

(b)     The early attainment of this goal requires the cooperative participation of government and the private sector in an effort to expand housing opportunities and accommodate the housing needs of Californians of all economic levels.

(c)     The provision of housing affordable to low- and moderate-income households requires the cooperation of all levels of government.

(d)     Local and state governments have a responsibility to use the powers vested in them to facilitate the improvement and development of housing to make adequate provision for the housing needs of all economic segments of the community.

(e)     The Legislature recognizes that in carrying out this responsibility, each local government also has the responsibility to consider economic, environmental, and fiscal factors and community goals set forth in the general plan and to cooperate with other local governments and the state in addressing regional housing needs.

(f)     Designating and maintaining a supply of land and adequate sites suitable, feasible, and available for the development of housing sufficient to meet the locality's housing need

for all income levels is essential to achieving the state's housing goals and the purposes of this article.  (Cal. Govt. code § 65580).

To carry out the policy goals above, the Legislature also codified the intent of the housing element laws:

(a)     To assure that counties and cities recognize their responsibilities in contributing to the attainment of the state housing goal.

(b)     To assure that counties and cities will prepare and implement housing elements which, along with federal and state programs, will move toward attainment of the state housing goal.

(c)     To recognize that each locality is best capable of determining what efforts are required by it to contribute to the attainment of the state housing goal, provided such a determination is compatible with the state housing goal and regional housing needs.

(d)     To ensure that each local government cooperates with other local governments in order to address regional housing needs.  (Govt. Code § 65581).

The housing element laws exist within a larger planning framework which requires each city and county in California to develop and adopt a comprehensive, long-term general plan for the physical development of the jurisdiction (See Govt. Code § 65300). A general plan consists of many planning elements, including an element for housing (See Govt. Code § 65302). In addition to identifying and analyzing the existing and projected housing needs, the housing element must also include a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing. Consistent with Section 65583, adequate provision must be made for the existing and projected housing needs of all economic segments of the community.

## A.     RHNA Determination by HCD

Pursuant to Section 65584(a), each cycle of the RHNA process begins with the California Department of Housing and Community Development's (HCD) determination of the existing and projected housing need for each region in the state.  HCD's determination must be based on "population projections produced by the Department of Finance and regional population forecasts used in preparing regional transportation plans, in consultation with each council of governments." (Govt. Code § 65584.01(a)). The RHNA Determination allocates the regional housing need among four income categories: very low, low, moderate, and above moderate.

Prior to developing the existing and projected housing need for a region, HCD "shall meet and consult with the council of governments regarding the assumptions and methodology to be used by HCD

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

to determine the region's housing needs," and "the council of governments shall provide data assumptions from the council's projections, including, if available, the following data for the region:

"(A) Anticipated household growth associated with projected population increases.

(B) Household size data and trends in household size.

(C) The percentage of households that are overcrowded and the overcrowding rate for a comparable housing market. For purposes of this subparagraph:

(i) The term "overcrowded" means more than one resident per room in each room in a dwelling.

(ii) The term "overcrowded rate for a comparable housing market" means that the overcrowding rate is no more than the average overcrowding rate in comparable regions throughout the nation, as determined by the council of governments.

(D) The rate of household formation, or headship rates, based on age, gender, ethnicity, or other established demographic measures.

(E) The vacancy rates in existing housing stock, and the vacancy rates for healthy housing market functioning and regional mobility, as well as housing replacement needs. For purposes of this subparagraph, the vacancy rate for a healthy rental housing market shall be considered no less than 5 percent.

(F) Other characteristics of the composition of the projected population.

(G) The relationship between jobs and housing, including any imbalance between jobs and housing.

(H) The percentage of households that are cost burdened and the rate of housing cost burden for a healthy housing market. For the purposes of this subparagraph:

(i) The term "cost burdened" means the share of very low, low-, moderate-, and above moderate-income households that are paying more than 30 percent of household income on housing costs.

(ii) The term "rate of housing cost burden for a healthy housing market" means that the rate of households that are cost burdened is no more than the average rate of households that are cost burdened in comparable regions throughout the nation, as determined by the council of governments.

(I) The loss of units during a state of emergency that was declared by the Governor pursuant to the California Emergency Services Act (Chapter 7 (commencing with Section

- 3 -

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

8550) of Division 1 of Title 2), during the planning period immediately preceding the relevant revision pursuant to Section 65588 that have yet to be rebuilt or replaced at the time of the data request."  (Govt. Code § 65584.01(b)(1)).

Legislative changes in 2018 modified the nature of the regional housing need determination for the 6th cycle of RHNA by adding measures of household overcrowding and housing cost burden to the list of factors to be considered by HCD for the determination of housing need.  These factors reflect additional latent housing need in the current population (i.e., "existing need").

HCD may accept or reject the information provided by the council of governments or modify its own assumptions or methodology based on this information.  (Govt. Code § 65584.01(b)(2)).  After consultation with the council of governments, the department shall make determinations in writing on the assumptions for each of the factors listed above and the methodology it shall use, and HCD shall provide these determinations to the council of governments. (Id.)

After consultation with the council of governments, HCD shall make a determination of the region's existing and projected housing need which "shall reflect the achievement of a feasible balance between jobs and housing within the region using the regional employment projections in the applicable regional transportation plan."  (Govt. Code § 65584.01(c)(1)).  Within 30 days of receiving the final RHNA Determination from HCD, the council of governments may file an objection to the determination with HCD.  The objection must be based on HCD's failure to base its determination on either the population projection for the region established under Section 65584.01(a), or a reasonable application of the methodology and assumptions determined under Section 65584.01(b). (See Govt. Code § 65584.01(c)(2)).  Within 45 days of receiving the council of governments objection, HCD must "make a final written determination of the region's existing and projected housing need that includes an explanation of the information upon which the determination was made." (Govt. Code § 65584.01(c)(3)).

B.    Development of RHNA Methodology

Each council of governments is required to develop a methodology for allocating the regional housing need to local governments within the region. The methodology must further the following objectives:

"(1)    Increasing the housing supply and the mix of housing types, tenure, and affordability in all cities and counties within the region in an equitable manner, which shall result in each jurisdiction receiving an allocation of units for low- and very low income households.

Packet Pg. 570

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

(2)      Promoting infill development and socioeconomic equity, the protection of environmental and agricultural resources, the encouragement of efficient development patterns, and the achievement of the region's greenhouse gas reductions targets provided by the State Air Resources Board pursuant to Section 65080.

(3)      Promoting an improved intraregional relationship between jobs and housing, including an improved balance between the number of low-wage jobs and the number of housing units affordable to low-wage workers in each jurisdiction.

(4)      Allocating a lower proportion of housing need to an income category when a jurisdiction already has a disproportionately high share of households in that income category, as compared to the countywide distribution of households in that category from the most recent American Community Survey.

(5)      Affirmatively furthering fair housing."  (Govt. Code § 65584(d)).

To the extent that sufficient data is available, the council of government must also include the following factors in development of the methodology consistent with Section 65884.04(e):

"(1)      Each member jurisdiction's existing and projected jobs and housing relationship. This shall include an estimate based on readily available data on the number of low-wage jobs within the jurisdiction and how many housing units within the jurisdiction are affordable to low-wage workers as well as an estimate based on readily available data, of projected job growth and projected household growth by income level within each member jurisdiction during the planning period.

(2)      The opportunities and constraints to development of additional housing in each member jurisdiction, including all of the following:

(A)      Lack of capacity for sewer or water service due to federal or state laws, regulations or regulatory actions, or supply and distribution decisions made by a sewer or water service provider other than the local jurisdiction that preclude the jurisdiction from providing necessary infrastructure for additional development during the planning period.

(B)      The availability of land suitable for urban development or for conversion to residential use, the availability of underutilized land, and opportunities for infill development and increased residential densities. The council of governments may not limit its consideration of suitable housing sites or land suitable for urban development to existing zoning ordinances and land use restrictions of a locality, but shall consider the potential for increased residential development under alternative zoning ordinances and land use restrictions. The determination of available land suitable for urban development may exclude lands where the Federal Emergency Management Agency (FEMA) or the Department of Water

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

- 5 -

Resources has determined that the flood management infrastructure designed to protect that land is not adequate to avoid the risk of flooding.

(C)     Lands preserved or protected from urban development under existing federal or state programs, or both, designed to protect open space, farmland, environmental habitats, and natural resources on a long-term basis, including land zoned or designated for agricultural protection or preservation that is subject to a local ballot measure that was approved by the voters of that jurisdiction that prohibits or restricts conversion to nonagricultural uses.

(D)     County policies to preserve prime agricultural land, as defined pursuant to Section 56064, within an unincorporated area and land within an unincorporated area zoned or designated for agricultural protection or preservation that is subject to a local ballot measure that was approved by the voters of that jurisdiction that prohibits or restricts its conversion to nonagricultural uses.

(3)     The distribution of household growth assumed for purposes of a comparable period of regional transportation plans and opportunities to maximize the use of public transportation and existing transportation infrastructure.

(4)     Agreements between a county and cities in a county to direct growth toward incorporated areas of the county and land within an unincorporated area zoned or designated for agricultural protection or preservation that is subject to a local ballot measure that was approved by the voters of the jurisdiction that prohibits or restricts conversion to nonagricultural uses.

(5)     The loss of units contained in assisted housing developments, as defined in paragraph (9) of subdivision (a) of Section 65583, that changed to non-low-income use through mortgage prepayment, subsidy contract expirations, or termination of use restrictions.

(6)     The percentage of existing households at each of the income levels listed in subdivision (e) of Section 65584 that are paying more than 30 percent and more than 50 percent of their income in rent.

(7)     The rate of overcrowding.

(8)     The housing needs of farmworkers.

(9)     The housing needs generated by the presence of a private university or a campus of the California State University or the University of California within any member jurisdiction.

(10)     The housing needs of individuals and families experiencing homelessness. If a council of governments has surveyed each of its member jurisdictions pursuant to subdivision (b) on or before January 1, 2020, this paragraph shall apply only to the

Packet Pg. 572

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

development of methodologies for the seventh and subsequent revisions of the housing element.

(11)     The loss of units during a state of emergency that was declared by the Governor pursuant to the California Emergency Services Act (Chapter 7 (commencing with Section 8550) of Division 1 of Title 2), during the planning period immediately preceding the relevant revision pursuant to Section 65588 that have yet to be rebuilt or replaced at the time of the analysis.

(12)     The region's greenhouse gas emissions targets provided by the State Air Resources Board pursuant to Section 65080.

(13)     Any other factors adopted by the council of governments, that further the objectives listed in subdivision (d) of Section 65584, provided that the council of governments specifies which of the objectives each additional factor is necessary to further. The council of governments may include additional factors unrelated to furthering the objectives listed in subdivision (d) of Section 65584 so long as the additional factors do not undermine the objectives listed in subdivision (d) of Section 65584 and are applied equally across all household income levels as described in subdivision (f) of Section 65584 and the council of governments makes a finding that the factor is necessary to address significant health and safety conditions."  (Govt. Code § 65584.04(e)).

To guide development of the methodology, each council of governments surveys its member jurisdictions to request, at a minimum, information regarding the factors listed above (See Govt. Code § 65584.04(b)). If a survey is not conducted, however, a jurisdiction may submit information related to the factors to the council of governments before the public comment period for the draft methodology begins (See Govt. Code § 65584.04(b)(5).

Housing element law also explicitly prohibits consideration of the following criteria in determining, or reducing, a jurisdiction's share of the regional housing need:

(1)     Any ordinance, policy, voter-approved measure, or standard of a city or county that directly or indirectly limits the number of residential building permits issued by a city or county.

(2)     Prior underproduction of housing in a city or county from the previous regional housing need allocation, as determined by each jurisdiction's annual production report.

(3)     Stable population numbers in a city or county from the previous regional housing needs cycle.  (Govt. Code § 65584.04(g)).

Finally, Section 65584.04(m) requires that the final RHNA Allocation Plan "allocate[s] housing units within the region consistent with the development pattern included in the sustainable communities strategy," ensures that the total regional housing need by income category is maintained, distributes units

- 7 -

for low- and very low income households to each jurisdiction in the region, and furthers the five objectives listed in Section 65584(d).  (See Govt. Code § 65584.04(m)).

## C.     Public Participation

Section 65584.04(d) provides that "public participation and access shall be required in the development of the methodology and in the process of drafting and adoption of the allocation of the reginal housing needs." The proposed methodology, along with any relevant underlying data and assumptions, an explanation of how the information from the local survey used to develop the methodology, how local planning factors were and incorporated into the methodology, and how the proposed methodology furthers the RHNA objectives in Section 65584(e), must be distributed to the cities, counties, and subregions, and members of the public requesting the information and published on the council of government's website.  (Govt. Code § 65584.04(d) and (f)).

The council of governments is required to open the proposed methodology to public comment and "conduct at least one public hearing to receive oral and written comments on the proposed methodology." (Govt. Code § 65584.04(d)). Following the conclusion of the public comment period and after making any revisions deemed appropriate by the council of governments as a result of comments received during the public comment period and consultation with the HCD, the council of governments publishes the proposed methodology on its website and submits it, along with the supporting materials, to HCD. (See Govt. Code § 65584.04(h)).

## D.     HCD Review of Methodology and Adoption by Council of Governments

HCD has 60 days to review the proposed methodology and report its written findings to the council of governments. The written findings must include a determination by HCD as to "whether the methodology furthers the objectives listed in subdivision (d) of Section 65584." (Govt. Code § 65584.04(i)). If HCD finds that the proposed methodology is not consistent with the statutory objectives, the council of governments must take one of the following actions: (1) revise the methodology to further the objectives in state law and adopt a final methodology; or (2) adopt the methodology without revisions "and include within its resolution of adoption findings, supported by substantial evidence, as to why the council of governments, or delegate subregion, believes that the methodology furthers the objectives listed in subdivision (d) of Section 65584 despite the findings of [HCD]." (Govt. Code § 65584.04(i)).  Upon adoption of the final methodology, the council of governments "shall provide notice of the adoption of the methodology to the jurisdictions within the region, or delegate subregion, as applicable, and to HCD, and

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

shall publish the adopted allocation methodology, along with its resolution and any adopted written findings, on its internet website." (Govt. Code § 65584.04(k)).

### E.   RHNA Draft Allocation, Appeals, and Adoption of Final RHNA Plan

Based on the adopted methodology, each council of governments shall distribute a draft allocation of regional housing needs to each local government in the region and HCD and shall publish the draft allocation on its website. (See Govt. Code § 65584.05(a)). Upon completion of the appeals process, discussed in more detail below, each council of governments must adopt a final regional housing need allocation plan and submit it to HCD (See Govt. Code § 65584.05(g)). HCD has 30 days to review the final allocation plan and determine if it is consistent with the regional housing need developed pursuant to Section 65584.01. The resolution approving the final housing need allocation plan shall demonstrate that the plan is consistent with the SCS and furthers the objectives listed in Section 65584(d) as discussed above. (See Govt. Code § 65584.04(m)(3)).

### F.   The Appeals Process

Within 45 days of following receipt of the draft allocation, a local government or HCD may appeal to the council of governments for a revision of the share of the regional housing need proposed to be allocated to one or more local governments. (See Govt. Code § 65584.05(b)).

"Appeals shall be based upon comparable data available for all affected jurisdictions and accepted planning methodology, and supported by adequate documentation, and shall include a statement as to why the revision is necessary to further the intent of the objectives listed in subdivision (d) of Section 65584. An appeal pursuant to this subdivision shall be consistent with, and not to the detriment of, the development pattern in an applicable sustainable communities strategy developed pursuant to paragraph (2) of subdivision (b) of Section 65080. Appeals shall be limited to any of the following circumstances:

(1) The council of governments or delegate subregion, as applicable, failed to adequately consider the information submitted pursuant to subdivision (b) of Section 65584.04.

(2) The council of governments or delegate subregion, as applicable, failed to determine the share of the regional housing need in accordance with the information described in, and the methodology established pursuant to, Section 65584.04, and in a manner that furthers, and does not undermine, the intent of the objectives listed in subdivision (d) of Section 65584.

- 9 -

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

(3) A significant and unforeseen change in circumstances has occurred in the local jurisdiction or jurisdictions that merits a revision of the information submitted pursuant to subdivision (b) of Section 65584.04. Appeals on this basis shall only be made by the jurisdiction or jurisdictions where the change in circumstances has occurred." (Govt. Code § 65584.05(b)).

At the close of the filing period for filing appeals, the council of governments shall notify all other local governments within the region and HCD of all appeals and shall make all materials submitted in support of each appeal available on its website. (See Govt. Code § 65584.05(c)). Local governments and the department may, within 45 days, comment on one or more appeals. (Id.).

No later than 30 days after the close of the comment period, and after providing local governments within the region at least 21 days prior notice, the council of governments "shall conduct one public hearing to consider all appeals filed . . . and all comments received . . . ." (Govt. Code § 65584.05(d)). No later than 45 days after the public hearing, the council of governments shall (1) make a final determination that either accepts, rejects, or modifies each appeal for a revised share filed pursuant to Section 65584.05(b); and (2) issue a proposed final allocation plan. (Govt. Code § 65584.05(e)). "The final determination on an appeal may require the council of governments . . . to adjust the share of the regional housing need allocated to one or more local governments that are not the subject of an appeal." (Id.).

Pursuant to Section 65584.05(f), if the council of governments lowers any jurisdiction's allocation of housing units as a result of its appeal, and this adjustment totals 7 percent or less of the regional housing need, the council of governments must redistribute those units proportionally to all local governments in the region. (See Govt. Code § 65584.05(f)). In no event shall the total distribution of housing need equal less than the regional housing need as determined by HCD. (Id.).

Within 45 days after issuance of the proposed final allocation plan by the council of governments, the council of governments shall hold a public hearing to adopt a final allocation plan. (Govt. Code § 65584.05(g)). "To the extent that the final allocation plan fully allocates the regional share of statewide housing need . . . and has taken into account all appeals, the council of governments shall have final authority to determine the distribution of the region's existing and projected housing need." (Id.) The council of governments shall submit its final allocation plan to HCD within three days of adoption. Within 30 days after HCD's receipt of the final allocation plan adopted by the council of governments, HCD "shall determine if the final allocation plan is consistent with the existing and projected housing need for the

region," and it "may revise the determination of the council of governments if necessary to obtain this consistency." (Id.).

## II.  Development of the RHNA Process for the Six-County Region Covered by the SCAG Council of Governments (Sixth Cycle)

### A.  Development of the Draft RHNA Allocation Plan[1]

As described in Attachment 1 to the staff reports for each appeal, the Sixth Cycle RHNA began in October 2017, when SCAG staff began surveying each of the region's jurisdictions on its population, household, and employment projections as part of a collaborative process to develop the Integrated Growth Forecast which would be used for all regional planning efforts including the Regional Transportation Plan/Sustainable Communities Strategy ("RTP/SCS" or "Connect SoCal").[2]  On or about December 6, 2017, SCAG sent a letter to all jurisdictions requesting input on the Connect SoCal growth forecast. SCAG met one-on-one with all 197 local jurisdictions between November 2017 and July 2018 and provided training opportunities and staff support.  Following input from SCAG's Technical Working Group (TWG), the Connect SoCal growth forecast reflected precisely the jurisdiction-level growth totals provided during this process.

Forecasts for jurisdictions in Orange County were developed through the 2018 Orange County Projections (OCP-2018) update process conducted by the Center for Demographic Research (CDR) at Cal State Fullerton. Jurisdictions were informed of this arrangement by SCAG at the kickoff of the Process.

On March 19, 2019, SCAG distributed a packet of methodology surveys, which included the local planning factor survey (formerly known as the "AB 2158 factor survey"), Affirmatively Furthering Fair Housing (AFFH) survey, and replacement need survey, to SCAG jurisdictions' Community Development Directors.  Surveys were due on April 30, 2019.  SCAG reviewed all submitted responses as part of the development of the draft RHNA methodology.

Beginning in October 2018, the RHNA Subcommittee, a subcommittee formed by the Community, Economic and Human Development ("CEHD") Committee to provide policy guidance in the development of the RHNA Allocation Methodology, held regular monthly meetings to discuss the RHNA process,

---

[1] The information discussed in this section has been made publicly available during the RHNA process and may be accessed at the SCAG RHNA website: https://scag.ca.gov/rhna.
[2] Information regarding Connect SoCal is available at: http://rtpscs.scag.ca.gov/Pages/Regional-Housing-Needs-Assessment.aspx/index.htm.

Packet Pg. 577

policies, and methodology, to provide recommended actions to the CEHD Committee.  All jurisdictions and interested parties were notified of upcoming meetings to encourage active participation in the process.

On or about June 20, 2019, SCAG submitted a consultation package for the 6th Cycle RHNA to HCD.[3]  On or about August 22, 2019, SCAG received its RHNA determination from HCD.[4]  HCD determined a minimum regional housing need determination of 1,344,740 total units among four income categories for the SCAG region for 2021-2029.

On or about September 18, 2019, SCAG submitted its objection to HCD's RHNA determination.[5]  SCAG objected primarily on the grounds that (1) HCD did not base its determination on SCAG's Connect SoCal growth forecast; (2) HCD compared household overcrowding and cost-burden rates in the SCAG region to national averages rather than to rates in comparable regions; and (3) HCD used unrealistic comparison points to evaluate healthy market vacancy. SCAG proposed an alternative RHNA determination of 823,808 units.

On or about October 15, 2019, after consideration of SCAG's objection, HCD issued its Final RHNA determination of a minimum of **1,341,827** total units among four income categories.[6]  HCD noted that its methodology

> "establishes the minimum number of homes needed to house the region's anticipated growth and brings these housing need indicators more in line with other communities, but does not solve for these housing needs.  Further, RHNA is ultimately a requirement that the region zone sufficiently in order for these homes to have a potential to be built, but it is not a requirement or guarantee that these homes will be built.  In this sense, the RHNA assigned by HCD is already a product of moderation and compromise; a minimum, not a maximum amount of planning needed for the SCAG region."

Meanwhile, the RHNA Subcommittee began to develop the proposed RHNA Methodology that would be further developed into the Draft RHNA Methodology.   On July 22, 2019, the RHNA Subcommittee recommended the release of the proposed RHNA Allocation Methodology to the CEHD Committee.   The CEHD Committee reviewed, discussed, and further recommended the proposed

---

[3] See https://scag.ca.gov/sites/main/files/file-attachments/cehd_fullagn_060619.pdf?1603863793
[4] See https://scag.ca.gov/sites/main/files/file-attachments/6thcyclerhna_scagdetermination_08222019.pdf?1602190292
[5] See https://scag.ca.gov/sites/main/files/file-attachments/scag-objection-letter-rhna-regional-determination.pdf?1602190274
[6] See https://scag.ca.gov/sites/main/files/file-attachments/hcd-scag-rhna-final-determination-101519.pdf?1602190258

methodology to the Regional Council, which approved to release the proposed methodology for distribution on August 1, 2019.  During the 30-day public comment period, SCAG met with interested jurisdictions and stakeholders to present the process, answer questions, and collect input. This included four public hearings to collect verbal and written comments held on August 15, 20, 22, and 27, 2019 and a public information session held on August 29, 2019.

On September 25, 2019, SCAG staff held a public workshop on a Draft RHNA Methodology that was developed as a result of the comments received on the proposed RHNA Methodology. On October 7, 2019, the RHNA Subcommittee voted to recommend the Draft RHNA Methodology, though a substitute motion that changed certain aspects of the Methodology as proposed by a RHNA Subcommittee member failed. On October 21, 2019, the CEHD Committee voted to further recommend the Draft RHNA Methodology recommended by the RHNA Subcommittee.

SCAG staff received several requests from SCAG Regional Councilmembers and Policy Committee members in late October and early November 2021 to consider and review an alternative RHNA Methodology that was based on the one proposed through a substitute motion at the October 7, 2019 RHNA Subcommittee meeting. The staff report of the recommended Draft Methodology and an analysis of the alternative Methodology were posted online on November 2, 2019. Both the recommended and alternative methodologies were presented by SCAG staff at the Regional Council on November 7, 2019. Following extensive debate and public comment, SCAG's Regional Council voted to approve the alternative methodology as the Draft RHNA Methodology and provide it to HCD for review.

On January 13, 2020, HCD found that the Draft RHNA Methodology furthers the five statutory objectives of RHNA.[7]  On March 5, 2020, again following extensive debate and public comment, the Regional Council voted to approve the Draft RHNA Methodology as the Final RHNA Methodology.[8]

Following the adoption of the Final RHNA Methodology, the Regional Council decided to delay full adoption of Connect SoCal for 120 days in order to assess the impacts of the COVID-19 pandemic on the Connect SoCal growth forecast.  SCAG adopted Connect SoCal on September 3, 2020, including its growth forecast.  SCAG released its Draft RHNA allocations to local jurisdictions on or about September 11, 2020.

---

[7] See https://scag.ca.gov/sites/main/files/file-attachments/hcd-review-rc-approved-draft-rhna-methodology.pdf?1602190239
[8] See https://scag.ca.gov/sites/main/files/file-attachments/scag-final-rhna-methodology-030520.pdf?1602189316

## III.   The Appeal Process

The Regional Council adopted the 6th Cycle Appeals Procedures ("Appeals Procedures") on May 7, 2020 (updated September 3, 2020).[9]  The Appeals Procedures sets forth existing law and the procedures and bases for an appeal.  The Appeals Procedure was provided to all jurisdictions and posted on SCAG's website.  Consistent with the RHNA statute, the Appeals Procedures sets forth three grounds for appeal:

1. Methodology – That SCAG failed to determine the jurisdiction's share of the regional housing need in accordance with the information described in the Final RHNA Methodology established and approved by SCAG, and in a manner that furthers, and does not undermine the five objectives listed in Government Code Section 65584(d);

2. Local Planning Factors and Information Affirmatively Furthering Fair Housing (AFFH)[10] – That SCAG failed to consider information submitted by the local jurisdiction relating to certain local factors outlined in Govt. Code § 65584.04(e) and information submitted by the local jurisdiction relating to affirmatively furthering fair housing pursuant to Government Code § 65584.04(b)(2) and 65584(d)(5); and

3. Changed Circumstances – That a significant and unforeseen change in circumstance has occurred in the jurisdiction after April 30, 2019 and merits a revision of the information previously submitted by the local jurisdiction. Appeals on this basis shall only be made by the jurisdiction or jurisdictions where the change in circumstances has occurred.  (Appeals Procedure at pp. 2-4).

The Regional Council delegated authority to the RHNA Subcommittee to review and to make final decisions on RHNA revision requests and appeals pursuant to the RHNA Subcommittee Charter, which was approved by the Regional Council on February 7, 2019.  As such, the RHNA Subcommittee has been designated the RHNA Appeals Board.  The RHNA Appeals Board is comprised of six (6) members and six (6) alternates, each representing one of the six (6) counties in the SCAG region, and each county is entitled to one vote.

The period to file appeals commenced on September 11, 2020.  Local jurisdictions were permitted to file revision requests until October 26, 2020.  SCAG posted all appeals on its website at: https://scag.ca.gov/rhna-appeals-filed.  Fifty-two (52) timely appeals were filed; however, two jurisdictions (West Hollywood and Calipatria) withdrew their appeals.  Four jurisdictions (Irvine, Yorba Linda, Garden Grove, and Newport Beach) filed appeals of their own allocations as well as appeals of the

---

[9] See https://scag.ca.gov/sites/main/files/file-attachments/rhna-adopted-appeals-procedures090320.pdf?1602188788)
[10] In addition to the local planning factors set forth in Section 65584.04(e), AFFH information was included in the survey to facilitate development of the RHNA methodology pursuant to Section 65584.04(b).

Packet Pg. 580

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

City of Santa Ana's allocation. Pursuant to Section 65584.05(c), HCD and several local jurisdictions submitted comments on one or more appeals by December 10, 2020.

The public hearing for the appeals occurred over the course of several weeks on January 6, 8, 11, 13, 15, 19, 22, and 25, 2021. Public comments received during the RHNA process were continually logged and posted on the SCAG website at https://scag.ca.gov/rhna-comments.

## IV.  The City's Appeal

The City of Huntington Beach submits an appeal and requests an unspecified RHNA reduction of its draft allocation of 13,337 units.  The grounds for appeal are as follows:

1)  Application of the adopted Final RHNA methodology for the 6th Cycle RHNA (2021-2029) - incorrect identification of a high-quality transit area (requested reduction of 3,625 units), use of improper year of forecast data (requested reduction 1,861 units).

2)  Existing or projected jobs-housing balance.*

3)  Availability of land suitable for urban development or conversion to residential use - impact of sea level rise, coastal inundation, and FEMA-designated flood zones (requested reduction of 2,000 units).

4)  Distribution of household growth assumed for purposes of comparable Regional Transportation Plans (RTPs).*

5)  The rate of overcrowding - City's lower overcrowding rate should be considered in allocating regional housing need (requested reduction of 6,428 units).

6)  Housing needs generated by the presence of a university campus within any jurisdiction - housing needs generated by colleges or universities in the region in general (requested reduction 360 units).

7)  The region's greenhouse gas emissions target – lower income workers are driving alone, longer commutes because housing would not be placed where it is needed and would not be consistent with the SCS.*

* These issues were checked on the appeals form but are discussed together with the arguments related to application of the methodology.

Other:  Huntington Beach also argues that the State's imposition of RHNA allocation requirements on Charter Cities violates the constitution and is in and of itself an illegal act; the City also argues that the residual adjustment is illegal (and requests an associated reduction of 3,442 units); however, this is not a basis for a RHNA appeal.  In addition, the City mentions change in circumstances with respect to COVID-19 although this box is not checked on the form.

### A.    Appeal Board Hearing and Review

The City's appeal was heard by the RHNA Appeals Board on January 19 and January 25, 2021, at a noticed public hearing.  The City, HCD, other local jurisdictions, and the public were afforded an

- 15 -

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

opportunity to submit comments related to the appeal, and SCAG staff presented its recommendation to the Appeals Board.  SCAG staff prepared a report in response to the City's appeal.  That report provided the background for the draft RHNA allocation to the City and assessed the City's bases for appeal.  The Appeals Board considered the staff report along with the submitted documents, testimony of those providing comments prior to the close of the hearing and comments made by SCAG staff prior to the close of the hearing, which are incorporated herein by reference.  The City's staff report including Attachment 1 to the report is attached hereto as Exhibit A[11] (other attachments to the staff report may be found in the agenda materials at:  https://scag.ca.gov/sites/main/files/file-attachments/rhna-abph012521fullagn.pdf?1611371866).  Video of each hearing is available at:  https://scag.ca.gov/rhna-subcommittee.

## B.    Appeals Board's Decision

Based upon SCAG's adoption of the Final RHNA Methodology and the Connect SoCal growth forecast, the RHNA Appeals Procedure and the process that led thereto, all testimony and all documents and comments submitted by the City, HCD, other local jurisdictions, and the public prior to the close of the hearing, and the SCAG staff report and SCAG staff comments prior to the close of the hearing, the RHNA Appeals Board hereby denies the appeal on the bases set forth in the staff report which are summarized as discussed below.

1), 2), 4), and 7)  SCAG appropriately identified the Beach Boulevard corridor as constituting an HQTA per its adopted procedures; use of future year HQTAs is not illegal and is a part of SCAG's adopted Final RHNA Methodology.  The Final RHNA Methodology does not substitute 2045 forecasts in lieu of 2030 as Huntington Beach attests; data steps using forecasted growth were all conducted consistent with the Final RHNA Methodology and extensive review opportunities were provided to Huntington Beach of these data elements.  The regional greenhouse gas reduction targets are met and the distribution of housing need is consistent with the Sustainable Communities Strategy (SCS).

3)    SCAG appropriately considered available land constraints related to sea level rise, coastal inundation, and FEMA-designated flood zones; however, Huntington Beach does not

---

[11] Note that since the staff reports were published in the agenda packets, SCAG updated its website, and therefore, weblinks in the attached staff report and Attachment 1 have also been updated.

demonstrate why its draft RHNA allocation could not be accommodated in any way in the vast majority of the city's land area which is not subject to such constraints.

5) The City misinterprets the role of overcrowding in HCD's regional housing needs determination as necessitating inclusion in SCAG's final RHNA allocation methodology.  SCAG's Final RHNA Methodology, which was found by HCD to further all necessary statutory objectives, does not and need not include a measure of jurisdiction-level overcrowding; to do so would constitute a change of the methodology which cannot be considered in the appeals process.

6) Huntington Beach fails to demonstrate why housing need generated by colleges and universities outside the city disproportionately affects Huntington Beach or in any way would reduce the city's housing need.

Other:  The residual need component was applied correctly and is a part of SCAG's adopted final RHNA methodology, which was found by HCD to further all statutory objectives, including those related to Affirmatively Furthering Fair Housing (AFFH).  Regarding change in circumstances, impacts from COVID-19 have not been shown to be long-range; as determined by the RHNA Appeals Board, there has not been a slowdown in major construction or a decrease in demand for housing or housing need.  Furthermore, impacts from the pandemic are not unique to any single SCAG jurisdiction, and no evidence has been provided in the appeal that indicates that housing need within jurisdiction is disproportionately impacted in comparison to the rest of the SCAG region.

During the appeals hearing, the City raised a number of issues in its verbal comments that were addressed by staff in more detail during the hearing in response to these comments including (1) charter cities are not subject to the RHNA process; (2) a portion of Beach Boulevard (Route 29) is incorrectly identified as an HQTA; and (3) the attorney for the Appeals Board cannot serve as an attorney for staff. On January 15, 2021 the City submitted information, which was received as a public comment, from an OCTA agenda and a scope of work for bus restructuring addressing potential changes in bus service as a result of decreased revenue.

Charter Cities are Not Exempt from RHNA

The City asserted that as a charter city, it is exempt from RHNA, i.e., the "State's attempt to impose RHNA allocation upon Charter Cities violates the State Constitution."  Housing element law clearly and directly contradicts and refutes this argument.  SB 35 which was enacted in September 2017 and

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

provides a streamlined approval process for affordable housing explicitly sets forth the following legislative intent:

> "The Legislature finds and declares that ensuring access to affordable housing is a matter of statewide concern, and not a municipal affair. Therefore, the changes made by this act are **applicable to a charter city**, a charter county, and a charter city and county." (2017 Cal. Stats. Ch. 366 § 4) [emphasis added].

Furthermore, SB 1333 which was enacted a year later in September 2018 and further amended planning and zoning regulations as applied to charter cities as follows:

> "In amending Sections 65356, 65852.150, 65852.25, 65860, 65863, 65863.4, 65863.6, 65863.8, 65866, 65867.5, and 65869.5 of the Government Code to **extend the applicability of those sections to charter cities**, and in amending Section 65700 of the Government Code to extend the applicability of Sections 65300.5, 65301.5, 65359, 65450, 65454, 65455, 65460.8, 65590, and 65590.1 of, and Article 10.6 (commencing with Section 65580) of Chapter 3 of Division 1 of Title 7 of, the Government Code, **to charter cities**, the Legislature hereby finds and declares that it does so to address the lack of affordable housing in the state, which is of vital statewide importance, and that ensuring the location, development, approval, and access to housing for all income levels in all jurisdictions in the state is a matter of statewide concern." (2018 Cal. Stats. Ch. 856 §1) [emphasis added].

Therefore, based on the foregoing, it is clear, and the RHNA Appeals Board hereby finds and determines, that charter cities are not exempt from the RHNA allocation process.[12]

<u>Identified HQTAs are Consistent with Data Provided by OCTA as Required by the Connect SoCal Data Process</u>

During the hearing, the Appeals Board requested additional information regarding the location of the High Quality Transit Area (HQTA) and/or High Quality Transit Corridor (HQTC) along Beach Boulevard specifically with reference to Bus Routes 29 and 529 and their existing routes. Huntington Beach made the argument that Route 29 doesn't currently (pre-Covid) meet the timing for an HQTC south of Heil Avenue and points out that the 2018 Long Range Transportation Plan (LRTP) Figure 4.1 indicates a reduction recommended for Bus Route 29. In addition, OCTA has indicated that decreases in operating revenue will affect service levels into the future.

---

[12] During the hearing, the City indicated that it was in litigation with the State challenging the legality of SB 35 as to its application to charter cities. On January 28, 2021, the Los Angeles Superior Court denied the City's petition for writ of mandate (LASC Case No. 30-2019-01044945). On February 1, 2021, the Huntington Beach City Council voted not to appeal this ruling.

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

Packet Pg. 584

SCAG staff explained that the adopted Final RHNA Methodology is based on 2045 HQTAs and HQTCs from the adopted Connect SoCal Plan. As part of developing Connect SoCal, SCAG obtained information from each of the County Transportation Commissions as to the location of HQTAs and HQTCs in their jurisdiction.   In Orange County the Orange County Transportation Authority (OCTA) was responsible for providing these data to SCAG.   OCTA has consistently indicated to SCAG staff that they plan to run a 10-min frequency route along the corridor down to PCH and this is part of their LRTP and their submittal to SCAG.   SCAG staff confirmed with OCTA staff during the Connect SoCal public comment period that they still intend to implement 10-min service on the Beach Boulevard corridor within the RTP planning horizon (i.e., by 2045).   OCTA did not provide a route number in their submittal to SCAG.   Beach Boulevard was just identified as a future high frequency route as identified in OCTA's Transit Master Plan which fed into their 2018 LRTP.   Figure 4.1 of the LRTP represents the short-term Orange County Bus 360 transit network restructuring that OCTA implemented in response to recent ridership trends.   This includes schedule adjustments to existing service on Beach Boulevard, but it does not affect the long-range commitment to implement high quality transit along this corridor by 2045.   Figure 4.10 presents the long-term transit vision as expressed in the OC Transit Vision Master Plan and the OCTA 2018 LRTP.   This includes a vision for high-frequency transit service on Beach Boulevard.

With respect to recent information regarding operating revenue reductions, as noted in the staff report (packet page 9), "…it is understood that planned transit projects are subject to further project-specific evaluation, but that is the nature of the long-range planning process.   While there is an inherent chance that transit agencies may change future plans, SCAG's adopted Final RHNA Methodology uses this definition of 2045 HQTAs in order to better align future housing with anticipated future transit and promote the objectives and strategies of SCAG's adopted 2020 Connect SoCal Plan."

SCAG staff verbally made the following points at the hearing:

- Connect SoCal defines high quality transit areas (HQTAs) as "corridor-focused Priority Growth Areas within one half mile of an existing or planned fixed guideway transit stop or a bus transit corridor where buses pick up passengers at a frequency of every 15 minutes (or less) during peak commuting hours."

- Beach Boulevard, including the portion within the City of Huntington Beach south to PCH, has been identified by OCTA as a planned high frequency corridor since 2018:
    - In their 2018 OC Transit Vision transit master plan for Orange County
    - In their 2018 Long Range Transportation Plan (LRTP) which OCTA submitted to SCAG for inclusion in Connect SoCal

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

- City of Huntington Beach submitted a comment during the Draft Connect SoCal public review period, questioning the identification of Beach Boulevard in the City limits as an HQTA.  In response, SCAG confirmed that Beach Boulevard is identified by OCTA as a planned high quality transit corridor and therefore the HQTA designation is appropriate.

- OCTA has not rescinded or amended their OC Transit Vision or their 2018 LRTP, nor have they communicated to SCAG their intention to change the identification of Beach Blvd as a planned high frequency corridor.

The following provides additional background information and a general timeline that was also generally verbally addressed by SCAG at the hearing:

January 2018 – OCTA completes the OC Transit Vision, a transit master plan for Orange County.[13]
- Chapter 5 identifies Beach Boulevard as a priority "Transit Opportunity Corridor" and recommends moving forward with planning, design, and.[14]
- Chapter 6 identifies a strategy for improvements to major corridors including Beach Blvd (p. 6-6), first implementing rapid bus (branded as Bravo!) with frequent service at least every 15 minutes, and then converting over time to more robust Bus Rapid Transit (BRT) with service at least every 10 minutes.[15]
- Public Engagement for OC Transit Vision includes engagement with elected officials and planning directors across the county.[16]  Page B-32 of the Public Engagement Report states:

  "Orange County elected officials and planning directors were engaged to provide input on the OC Transit Vision as well as the update to OCTA's Long-Range Transportation Plan. Like the Citizens Advisory Committee, the feedback from these groups was tied to key milestones and helped to shape the final recommendations. The first meetings were held in May 2017, to present key findings from the State of OC Transit and to introduce the Transit Investment Framework, and in September 2017 to share preliminary recommendations for the Transit Opportunity Corridors and other service enhancements."

- The OC Transit Vision web page states that "The recommendations from the OC Transit Vision were included in OCTA's 2019 Long-Range Transportation Plan".[17]

---

[13] See https://www.octa.net/pdf/OC%20Transit%20Vision%20Final%20Report.pdf.
[14] See https://www.octa.net/pdf/OC%20Transit%20Vision%20FINAL%2005%20TOC%20COMP.pdf (first bullet on p. 5-1, Figure 5-1 on p. 5-2).
[15] See https://www.octa.net/pdf/OC%20Transit%20Vision%20FINAL%2006%20FR%20COMP.pdf (Figure 6-3 on p. 6-5).
[16] See https://www.octa.net/pdf/App%20B%20Public%20Engagement.pdf.
[17] See https://www.octa.net/Projects-and-Programs/Plans-and-Studies/Transit-Master-Plan/ (second paragraph, last sentence).

- 20 -

November 2018 – OCTA completes its 2018 Long Range Transportation Plan.[18]
- The 2018 LRTP identifies a commitment to "Implement OC Transit Vision" (pp. 93-94).
- Figure 4.10 (p. 102) identifies the Beach Blvd corridor as a "2040 High Frequency Corridor"
- LRTP lists "Beach Corridor – High-quality transit between Fullerton Park-and-Ride and Downtown Huntington Beach" (p. 145)
- Attachment D, Public Outreach Report, OCTA explicitly engaged with all 34 Orange County cities including elected officials (pp. 3-4 of Attachment D)
- Of the public comment letters received by OCTA on the 2018 LRTP, none were submitted by City of Huntington Beach.

November 2018 – OCTA submits its project list to SCAG for Connect SoCal, including its 2018 LRTP transit network model input files.
- Submittal includes projects 2160008, OC Transit Vision – Capital, and 2160009, OC Transit Vision – Operations & Maintenance.

November 2019 – SCAG releases Draft Connect SoCal for public review and comment
- Connect SoCal main book Exhibit 3.8 map identifies the Beach corridor as a high quality transit area.
- Transit Technical Report Exhibit 14 map identifies the Beach corridor as a high quality transit corridor.
- Project List Technical Report includes OC Transit Vision projects 2160008 and 2160009, consistent with OCTA's project submittal.

January 2020 – City of Huntington Beach submits public comments on Connect SoCal[19]
- Comment 0001393.02 questions Beach Blvd as a HQTA.
- SCAG responds and confirms that Beach Blvd was identified by OCTA to SCAG as an HQTC which forms the basis for the HQTA.

<u>Attorney for the Appeals Board May Serve in an Advisory/Evaluative Role for Both Appeals Board and Staff</u>

During the hearing, the City asserted that its due process rights were violated because the attorney for the Appeals Board, Patricia Chen, was also "advocating" for staff.  Ms. Chen referred to her explanation during the City of Yorba Linda proceeding and indicated that she was not serving as an advocate for any party including staff, appellants, or the Appeals Board, but rather, she has been assisting

---

[18] See https://www.octa.net/pdf/OCTALRTP111618FINAL.pdf.
[19] See https://scag.ca.gov/sites/main/files/file-attachments/0903fconnectsocal_public-participation-appendix-2.pdf?1606001847 (comment ID# 0001393, p. 92); https://scag.ca.gov/sites/main/files/file-attachments/0903fconnectsocal_public-participation-appendix-3b.pdf?1606001925 (Huntington Beach Comment Letter, p. 3).

the Appeals Board and staff understand the statutory framework of the RHNA process and advising as to SCAG's duties and responsibilities under the statute.

In the California Supreme Court decision, *Today's Fresh Start, Inc. v. Los Angeles County Office of Education*, 57 Cal.4th 197 (2013), an attorney served as both general counsel for the County Office of Education and its governing board.  At issue was a legal challenge brought by a charter school seeking to overturn the County Board's decision to revoke its charter on the grounds that the County Office and County Board had an unconstitutional overlapping adversarial and advisory functions in part because the same attorney served as general counsel for both the County Office and the County Board.  The court found no impropriety on the part of the attorney serving in both roles:

> "Today's Fresh Start repeatedly characterizes her as a prosecutor, but this misstates both the nature of the proceedings and [the attorney's] role. The County Board was charged with considering and weighing the fruits of the staff investigation and what it showed in favor of and against revocation, as well as the argument and evidence of Today's Fresh Start.  Statutorily, the County Office and County Board had no agenda, no stake in one outcome or the other.  Thus, like many administrative proceedings the United States Supreme Court and we have previously approved, this was not a classic adversarial hearing, with a prosecutor and a defendant. There was no prosecutor here.  [The attorney] presented no evidence, examined no witnesses, and made no argument in favor of revocation. Instead, [the attorney's] role was to advise the County Board on its duties in deciding whether to direct charter revocation, just as she had previously advised County Office staff as to their powers and responsibilities when conducting an investigation of Today's Fresh Start. In neither capacity was she charged with being an advocate or an adjudicator." (Id. at 223).

Similar to the facts underlying the decision in *Today's Fresh Start*, the RHNA appeals are not the type of "classic adversarial hearing with a prosecutor and defendant" which case law has held, in other contexts, requires a separation of functions between counsel prosecuting a matter and counsel advising a neutral decisionmaking body (i.e., with a prosecutor and defendant).  In the present appeal (and all other appeals heard by the RHNA Appeals Board) the nature of the appeal (allocation of RHNA units based on statute and approved methodology) is not adversarial or prosecutorial, and, further, Ms. Chen did not present evidence, examine witness, or make specific arguments in favor of an outcome.  While due process may be required to separate the function of "adversarial" or "prosecutorial" advocates from attorneys advising decisionmakers, separation of functions is not required when an attorney serves in an evaluative or advisory role in a non-adversarial or prosecutorial hearing, and (in that case) the same attorney may serve as advisor to both staff and the decisionmaker.  The record demonstrates and the

- 22 -

Attachment: Determination Regarding Appeal from the City of Huntington Beach  (Final Determination of Appeals Decisions)

RHNA Appeals Board specifically finds the facts demonstrate that Ms. Chen served in an evaluative and advisory role during the RHNA appeals process.  As such, no due process violation occurred based on these facts.

## V.    Conclusion

For the foregoing reasons and based on the full record before the RHNA Appeals Board at the close of the public hearing (which the Board has taken into consideration in rendering its decision and conclusion), the RHNA Appeals Board hereby denies the City's appeal and finds that the City's RHNA allocation is consistent with the RHNA statute pursuant to Section 65584.05 (e)(1) as it was developed using SCAG's Final RHNA Methodology which was found by HCD to further the objectives set forth in Section 65584(d).

Reviewed and approved by RHNA Appeals Board this 16th day of February 2021.

EXHIBIT 6

*SCAG 6TH CYCLE FINAL RHNA ALLOCATION PLAN (approved by HCD on 3/22/21 and modified on 7/1/21)\**
*7/1/21*

*ALLOCATION BY COUNTY*

|  | Total | Very-low income | Low income | Moderate income | Above moderate income |
|---|---|---|---|---|---|
| Imperial | 15,993 | 4,671 | 2,357 | 2,198 | 6,767 |
| Los Angeles | 812,060 | 217,273 | 123,022 | 131,381 | 340,384 |
| Orange | 183,861 | 46,416 | 29,242 | 32,546 | 75,657 |
| Riverside | 167,351 | 41,995 | 26,473 | 29,167 | 69,716 |
| San Bernardino | 138,110 | 35,667 | 21,903 | 24,140 | 56,400 |
| Ventura | 24,452 | 5,774 | 3,810 | 4,525 | 10,343 |
| *TOTAL* | 1,341,827 | 351,796 | 206,807 | 223,957 | 559,267 |

*ALLOCATION BY Regional Early Action Planning (REAP) SUBREGIONS*

| REAP Subregion | Total | Very-low income | Low income | Moderate income | Above moderate income |
|---|---|---|---|---|---|
| CVAG | 31,619 | 6,204 | 4,664 | 5,561 | 15,190 |
| Gateway Cities COG | 71,678 | 20,029 | 10,391 | 10,822 | 30,436 |
| Imperial County | 15,993 | 4,671 | 2,357 | 2,198 | 6,767 |
| Las Virgenes-Malibu COG | 933 | 362 | 199 | 183 | 189 |
| Los Angeles City | 456,643 | 115,978 | 68,743 | 75,091 | 196,831 |
| North Los Angeles County | 15,663 | 4,001 | 2,129 | 2,332 | 7,201 |
| Orange County COG | 183,861 | 46,416 | 29,242 | 32,546 | 75,657 |
| San Bernardino COG/SBCTA | 138,110 | 35,667 | 21,903 | 24,140 | 56,400 |
| San Fernando Valley COG | 34,023 | 9,850 | 5,588 | 5,614 | 12,971 |
| San Gabriel Valley COG | 89,616 | 25,208 | 13,400 | 14,074 | 36,934 |
| South Bay Cities COG | 34,179 | 10,221 | 5,236 | 5,539 | 13,183 |
| Uninc. Los Angeles County | 90,052 | 25,648 | 13,691 | 14,180 | 36,533 |
| Uninc. Riverside County | 40,647 | 10,371 | 6,627 | 7,347 | 16,302 |
| Ventura COG | 24,452 | 5,774 | 3,810 | 4,525 | 10,343 |
| Westside Cities COG | 19,273 | 5,976 | 3,645 | 3,546 | 6,106 |
| Western Riverside COG | 95,085 | 25,420 | 15,182 | 16,259 | 38,224 |

*ALLOCATION BY LOCAL JURISDICTION*

| County | Jurisdiction | Total | Very-low income | Low income | Moderate income | Above-moderate income |
|---|---|---|---|---|---|---|
| Imperial | Brawley city | 1426 | 399 | 210 | 202 | 615 |
| Imperial | Calexico city | 4868 | 1279 | 655 | 614 | 2320 |
| Imperial | Calipatria city | 151 | 36 | 21 | 16 | 78 |
| Imperial | El Centro city | 3442 | 1001 | 490 | 462 | 1489 |
| Imperial | Holtville city | 171 | 41 | 33 | 26 | 71 |

SCAG 6TH CYCLE FINAL RHNA ALLOCATION PLAN

*ALLOCATION BY LOCAL JURISDICTION*

| County | Jurisdiction | Total | Very-low income | Low income | Moderate income | Above-moderate income |
|--------|-------------|-------|-----------------|------------|-----------------|----------------------|
| Imperial | Imperial city | 1601 | 704 | 346 | 294 | 257 |
| Imperial | Unincorporated Imp | 4301 | 1203 | 596 | 580 | 1922 |
| Imperial | Westmorland city | 33 | 8 | 6 | 4 | 15 |
| Los Angeles | Agoura Hills city | 318 | 127 | 72 | 55 | 64 |
| Los Angeles | Alhambra city | 6825 | 1774 | 1036 | 1079 | 2936 |
| Los Angeles | Arcadia city | 3214 | 1102 | 570 | 605 | 937 |
| Los Angeles | Artesia city | 1069 | 312 | 168 | 128 | 461 |
| Los Angeles | Avalon city | 27 | 8 | 5 | 3 | 11 |
| Los Angeles | Azusa city | 2651 | 760 | 368 | 382 | 1141 |
| Los Angeles | Baldwin Park city | 2001 | 576 | 275 | 263 | 887 |
| Los Angeles | Bell city | 229 | 43 | 24 | 29 | 133 |
| Los Angeles | Bell Gardens city | 503 | 100 | 29 | 72 | 302 |
| Los Angeles | Bellflower city | 3735 | 1015 | 488 | 553 | 1679 |
| Los Angeles | Beverly Hills city | 3104 | 1008 | 680 | 602 | 814 |
| Los Angeles | Bradbury city | 41 | 16 | 9 | 9 | 7 |
| Los Angeles | Burbank city | 8772 | 2553 | 1418 | 1409 | 3392 |
| Los Angeles | Calabasas city | 354 | 132 | 71 | 70 | 81 |
| Los Angeles | Carson city | 5618 | 1770 | 913 | 875 | 2060 |
| Los Angeles | Cerritos city | 1908 | 679 | 345 | 332 | 552 |
| Los Angeles | Claremont city | 1711 | 556 | 310 | 297 | 548 |
| Los Angeles | Commerce city | 247 | 55 | 22 | 39 | 131 |
| Los Angeles | Compton city | 1004 | 235 | 121 | 131 | 517 |
| Los Angeles | Covina city | 1910 | 614 | 268 | 281 | 747 |
| Los Angeles | Cudahy city | 393 | 80 | 36 | 53 | 224 |
| Los Angeles | Culver City city | 3341 | 1108 | 604 | 560 | 1069 |
| Los Angeles | Diamond Bar city | 2521 | 844 | 434 | 437 | 806 |
| Los Angeles | Downey city | 6525 | 2079 | 946 | 915 | 2585 |
| Los Angeles | Duarte city | 888 | 269 | 145 | 137 | 337 |
| Los Angeles | El Monte city | 8502 | 1797 | 853 | 1233 | 4619 |
| Los Angeles | El Segundo city | 492 | 189 | 88 | 84 | 131 |
| Los Angeles | Gardena city | 5735 | 1485 | 761 | 894 | 2595 |
| Los Angeles | Glendale city | 13425 | 3439 | 2163 | 2249 | 5574 |
| Los Angeles | Glendora city | 2276 | 735 | 386 | 388 | 767 |
| Los Angeles | Hawaiian Gardens ci | 331 | 61 | 44 | 46 | 180 |
| Los Angeles | Hawthorne city | 1734 | 445 | 204 | 249 | 836 |
| Los Angeles | Hermosa Beach city | 558 | 232 | 127 | 106 | 93 |
| Los Angeles | Hidden Hills city | 40 | 17 | 8 | 9 | 6 |
| Los Angeles | Huntington Park city | 1605 | 264 | 196 | 243 | 902 |
| Los Angeles | Industry city | 17 | 6 | 4 | 2 | 5 |
| Los Angeles | Inglewood city | 7439 | 1813 | 955 | 1112 | 3559 |
| Los Angeles | Irwindale city | 119 | 36 | 11 | 17 | 55 |
| Los Angeles | La Cañada Flintridge | 612 | 252 | 135 | 139 | 86 |

SCAG 6TH CYCLE FINAL RHNA ALLOCATION PLAN

*ALLOCATION BY LOCAL JURISDICTION*

| County | Jurisdiction | Total | Very-low income | Low income | Moderate income | Above-moderate income |
|--------|-------------|-------|-----------------|------------|-----------------|----------------------|
| Los Angeles | La Habra Heights city | 172 | 78 | 35 | 31 | 28 |
| Los Angeles | La Mirada city | 1962 | 634 | 342 | 320 | 666 |
| Los Angeles | La Puente city | 1929 | 544 | 275 | 275 | 835 |
| Los Angeles | La Verne city | 1346 | 414 | 239 | 223 | 470 |
| Los Angeles | Lakewood city | 3922 | 1296 | 637 | 653 | 1336 |
| Los Angeles | Lancaster city | 9023 | 2224 | 1194 | 1328 | 4277 |
| Los Angeles | Lawndale city | 2497 | 732 | 311 | 371 | 1083 |
| Los Angeles | Lomita city | 829 | 239 | 124 | 128 | 338 |
| Los Angeles | Long Beach city | 26502 | 7141 | 4047 | 4158 | 11156 |
| Los Angeles | Los Angeles city | 456643 | 115978 | 68743 | 75091 | 196831 |
| Los Angeles | Lynwood city | 1558 | 377 | 139 | 235 | 807 |
| Los Angeles | Malibu city | 79 | 28 | 19 | 17 | 15 |
| Los Angeles | Manhattan Beach city | 774 | 322 | 165 | 155 | 132 |
| Los Angeles | Maywood city | 365 | 55 | 47 | 55 | 208 |
| Los Angeles | Monrovia city | 1670 | 519 | 262 | 254 | 635 |
| Los Angeles | Montebello city | 5186 | 1314 | 707 | 777 | 2388 |
| Los Angeles | Monterey Park city | 5257 | 1324 | 822 | 848 | 2263 |
| Los Angeles | Norwalk city | 5034 | 1546 | 759 | 658 | 2071 |
| Los Angeles | Palmdale city | 6640 | 1777 | 935 | 1004 | 2924 |
| Los Angeles | Palos Verdes Estates | 199 | 82 | 44 | 48 | 25 |
| Los Angeles | Paramount city | 364 | 92 | 43 | 48 | 181 |
| Los Angeles | Pasadena city | 9429 | 2747 | 1662 | 1565 | 3455 |
| Los Angeles | Pico Rivera city | 1024 | 299 | 146 | 149 | 430 |
| Los Angeles | Pomona city | 10558 | 2799 | 1339 | 1510 | 4910 |
| Los Angeles | Rancho Palos Verdes | 639 | 253 | 139 | 125 | 122 |
| Los Angeles | Redondo Beach city | 2490 | 936 | 508 | 490 | 556 |
| Los Angeles | Rolling Hills city | 45 | 20 | 9 | 11 | 5 |
| Los Angeles | Rolling Hills Estates | 191 | 82 | 42 | 38 | 29 |
| Los Angeles | Rosemead city | 4612 | 1154 | 638 | 686 | 2134 |
| Los Angeles | San Dimas city | 1248 | 384 | 220 | 206 | 438 |
| Los Angeles | San Fernando city | 1795 | 461 | 273 | 284 | 777 |
| Los Angeles | San Gabriel city | 3023 | 846 | 415 | 466 | 1296 |
| Los Angeles | San Marino city | 397 | 149 | 91 | 91 | 66 |
| Los Angeles | Santa Clarita city | 10031 | 3397 | 1734 | 1672 | 3228 |
| Los Angeles | Santa Fe Springs city | 952 | 253 | 159 | 152 | 388 |
| Los Angeles | Santa Monica city | 8895 | 2794 | 1672 | 1702 | 2727 |
| Los Angeles | Sierra Madre city | 204 | 79 | 39 | 35 | 51 |
| Los Angeles | Signal Hill city | 517 | 161 | 78 | 90 | 188 |
| Los Angeles | South El Monte city | 577 | 131 | 64 | 70 | 312 |
| Los Angeles | South Gate city | 8282 | 2136 | 994 | 1173 | 3979 |
| Los Angeles | South Pasadena city | 2067 | 757 | 398 | 334 | 578 |
| Los Angeles | Temple City city | 2186 | 630 | 350 | 369 | 837 |

SCAG 6TH CYCLE FINAL RHNA ALLOCATION PLAN

*ALLOCATION BY LOCAL JURISDICTION*

| County | Jurisdiction | Total | Very-low income | Low income | Moderate income | Above-moderate income |
|---|---|---|---|---|---|---|
| Los Angeles | Torrance city | 4939 | 1621 | 846 | 853 | 1619 |
| Los Angeles | Unincorporated Los | 90052 | 25648 | 13691 | 14180 | 36533 |
| Los Angeles | Vernon city | 9 | 5 | 4 | 0 | 0 |
| Los Angeles | Walnut city | 1293 | 427 | 225 | 231 | 410 |
| Los Angeles | West Covina city | 5346 | 1653 | 850 | 865 | 1978 |
| Los Angeles | West Hollywood city | 3933 | 1066 | 689 | 682 | 1496 |
| Los Angeles | Westlake Village city | 142 | 58 | 29 | 32 | 23 |
| Los Angeles | Whittier city | 3439 | 1025 | 537 | 556 | 1321 |
| Orange | Aliso Viejo city | 1195 | 390 | 214 | 205 | 386 |
| Orange | Anaheim city | 17453 | 3767 | 2397 | 2945 | 8344 |
| Orange | Brea city | 2365 | 669 | 393 | 403 | 900 |
| Orange | Buena Park city | 8919 | 2119 | 1343 | 1573 | 3884 |
| Orange | Costa Mesa city | 11760 | 2919 | 1794 | 2088 | 4959 |
| Orange | Cypress city | 3936 | 1150 | 657 | 623 | 1506 |
| Orange | Dana Point city | 530 | 147 | 84 | 101 | 198 |
| Orange | Fountain Valley city | 4839 | 1307 | 786 | 834 | 1912 |
| Orange | Fullerton city | 13209 | 3198 | 1989 | 2271 | 5751 |
| Orange | Garden Grove city | 19168 | 4166 | 2801 | 3211 | 8990 |
| Orange | Huntington Beach ci | 13368 | 3661 | 2184 | 2308 | 5215 |
| Orange | Irvine city | 23610 | 6396 | 4235 | 4308 | 8671 |
| Orange | La Habra city | 804 | 192 | 116 | 130 | 366 |
| Orange | La Palma city | 802 | 224 | 140 | 137 | 301 |
| Orange | Laguna Beach city | 394 | 118 | 80 | 79 | 117 |
| Orange | Laguna Hills city | 1985 | 568 | 353 | 354 | 710 |
| Orange | Laguna Niguel city | 1207 | 348 | 202 | 223 | 434 |
| Orange | Laguna Woods city | 997 | 127 | 136 | 192 | 542 |
| Orange | Lake Forest city | 3236 | 956 | 543 | 559 | 1178 |
| Orange | Los Alamitos city | 769 | 194 | 119 | 145 | 311 |
| Orange | Mission Viejo city | 2217 | 674 | 401 | 397 | 745 |
| Orange | Newport Beach city | 4845 | 1456 | 930 | 1050 | 1409 |
| Orange | Orange city | 3936 | 1067 | 604 | 677 | 1588 |
| Orange | Placentia city | 4398 | 1243 | 680 | 782 | 1693 |
| Orange | Rancho Santa Marga | 680 | 209 | 120 | 125 | 226 |
| Orange | San Clemente city | 982 | 282 | 164 | 188 | 348 |
| Orange | San Juan Capistrano | 1054 | 270 | 173 | 183 | 428 |
| Orange | Santa Ana city | 3137 | 606 | 362 | 545 | 1624 |
| Orange | Seal Beach city | 1243 | 258 | 201 | 239 | 545 |
| Orange | Stanton city | 1231 | 165 | 145 | 231 | 690 |
| Orange | Tustin city | 6782 | 1724 | 1046 | 1132 | 2880 |
| Orange | Unincorporated Ora | 10340 | 3107 | 1866 | 2006 | 3361 |
| Orange | Villa Park city | 296 | 93 | 60 | 61 | 82 |
| Orange | Westminster city | 9759 | 1881 | 1473 | 1784 | 4621 |

*ALLOCATION BY LOCAL JURISDICTION*

| County | Jurisdiction | Total | Very-low income | Low income | Moderate income | Above-moderate income |
|--------|--------------|-------|-----------------|------------|-----------------|-----------------------|
| Orange | Yorba Linda city | 2415 | 765 | 451 | 457 | 742 |
| Riverside | Banning city | 1673 | 317 | 193 | 280 | 883 |
| Riverside | Beaumont city | 4210 | 1229 | 721 | 723 | 1537 |
| Riverside | Blythe city | 494 | 82 | 71 | 96 | 245 |
| Riverside | Calimesa city | 2017 | 495 | 275 | 379 | 868 |
| Riverside | Canyon Lake city | 129 | 43 | 24 | 24 | 38 |
| Riverside | Cathedral City city | 2549 | 540 | 353 | 457 | 1199 |
| Riverside | Coachella city | 7886 | 1033 | 999 | 1367 | 4487 |
| Riverside | Corona city | 6088 | 1752 | 1040 | 1096 | 2200 |
| Riverside | Desert Hot Springs c | 3873 | 569 | 535 | 688 | 2081 |
| Riverside | Eastvale City | 3028 | 1145 | 672 | 635 | 576 |
| Riverside | Hemet city | 6466 | 812 | 732 | 1174 | 3748 |
| Riverside | Indian Wells city | 382 | 117 | 81 | 91 | 93 |
| Riverside | Indio city | 7812 | 1793 | 1170 | 1315 | 3534 |
| Riverside | Jurupa Valley City | 4497 | 1207 | 749 | 731 | 1810 |
| Riverside | La Quinta city | 1530 | 420 | 269 | 297 | 544 |
| Riverside | Lake Elsinore city | 6681 | 1878 | 1099 | 1134 | 2570 |
| Riverside | Menifee city | 6609 | 1761 | 1051 | 1106 | 2691 |
| Riverside | Moreno Valley city | 13627 | 3779 | 2051 | 2165 | 5632 |
| Riverside | Murrieta city | 3043 | 1009 | 583 | 545 | 906 |
| Riverside | Norco city | 454 | 145 | 85 | 82 | 142 |
| Riverside | Palm Desert city | 2790 | 675 | 460 | 461 | 1194 |
| Riverside | Palm Springs city | 2557 | 545 | 408 | 461 | 1143 |
| Riverside | Perris city | 7805 | 2030 | 1127 | 1274 | 3374 |
| Riverside | Rancho Mirage city | 1746 | 430 | 318 | 328 | 670 |
| Riverside | Riverside city | 18458 | 4861 | 3064 | 3139 | 7394 |
| Riverside | San Jacinto city | 3392 | 800 | 465 | 560 | 1567 |
| Riverside | Temecula city | 4193 | 1359 | 801 | 778 | 1255 |
| Riverside | Unincorporated Rive | 40647 | 10371 | 6627 | 7347 | 16302 |
| Riverside | Wildomar city | 2715 | 798 | 450 | 434 | 1033 |
| San Bernardino | Adelanto city | 3763 | 394 | 566 | 651 | 2152 |
| San Bernardino | Apple Valley town | 4290 | 1086 | 600 | 747 | 1857 |
| San Bernardino | Barstow city | 1520 | 172 | 228 | 300 | 820 |
| San Bernardino | Big Bear Lake city | 212 | 50 | 33 | 37 | 92 |
| San Bernardino | Chino city | 6978 | 2113 | 1284 | 1203 | 2378 |
| San Bernardino | Chino Hills city | 3729 | 1388 | 821 | 789 | 731 |
| San Bernardino | Colton city | 5434 | 1318 | 668 | 906 | 2542 |
| San Bernardino | Fontana city | 17519 | 5109 | 2950 | 3035 | 6425 |
| San Bernardino | Grand Terrace city | 630 | 189 | 92 | 106 | 243 |
| San Bernardino | Hesperia city | 8155 | 1921 | 1231 | 1409 | 3594 |
| San Bernardino | Highland city | 2513 | 619 | 409 | 471 | 1014 |
| San Bernardino | Loma Linda city | 2051 | 523 | 311 | 352 | 865 |

SCAG 6TH CYCLE FINAL RHNA ALLOCATION PLAN

*ALLOCATION BY LOCAL JURISDICTION*

| County | Jurisdiction | Total | Very-low income | Low income | Moderate income | Above-moderate income |
|---|---|---|---|---|---|---|
| San Bernardino | Montclair city | 2593 | 698 | 383 | 399 | 1113 |
| San Bernardino | Needles city | 87 | 10 | 11 | 16 | 50 |
| San Bernardino | Ontario city | 20854 | 5640 | 3286 | 3329 | 8599 |
| San Bernardino | Rancho Cucamonga | 10525 | 3245 | 1920 | 2038 | 3322 |
| San Bernardino | Redlands city | 3516 | 967 | 615 | 652 | 1282 |
| San Bernardino | Rialto city | 8272 | 2218 | 1206 | 1371 | 3477 |
| San Bernardino | San Bernardino city | 8123 | 1415 | 1097 | 1448 | 4163 |
| San Bernardino | Twentynine Palms ci | 1047 | 231 | 127 | 185 | 504 |
| San Bernardino | Unincorporated San | 8832 | 2179 | 1360 | 1523 | 3770 |
| San Bernardino | Upland city | 5686 | 1584 | 959 | 1013 | 2130 |
| San Bernardino | Victorville city | 8165 | 1735 | 1136 | 1504 | 3790 |
| San Bernardino | Yucaipa city | 2866 | 708 | 493 | 511 | 1154 |
| San Bernardino | Yucca Valley town | 750 | 155 | 117 | 145 | 333 |
| Ventura | Camarillo city | 1376 | 353 | 244 | 271 | 508 |
| Ventura | Fillmore city | 415 | 73 | 61 | 72 | 209 |
| Ventura | Moorpark city | 1289 | 377 | 233 | 245 | 434 |
| Ventura | Ojai city | 53 | 13 | 9 | 10 | 21 |
| Ventura | Oxnard city | 8549 | 1840 | 1071 | 1538 | 4100 |
| Ventura | Port Hueneme city | 125 | 26 | 16 | 18 | 65 |
| Ventura | San Buenaventura (\ | 5312 | 1187 | 865 | 950 | 2310 |
| Ventura | Santa Paula city | 657 | 102 | 99 | 121 | 335 |
| Ventura | Simi Valley city | 2793 | 749 | 493 | 518 | 1033 |
| Ventura | Thousand Oaks city | 2621 | 735 | 494 | 532 | 860 |
| Ventura | Unincorporated Ven | 1262 | 319 | 225 | 250 | 468 |

*The 6th Cycle RHNA Allocation Plan was approved by HCD on 3/22/21.*

*conditions. This Plan includes a transfer from the County of Orange to the City of Santa Ana, which was approved by the SCAG Regional Council on 6/3/21, and a transfer from the County of Orange to the City of Placentia, which was approved on 7/1/21.*

# EXHIBIT 7

STATE OF CALIFORNIA - BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY       GAVIN NEWSOM, *Governor*

**DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT**
**DIVISION OF HOUSING POLICY DEVELOPMENT**
2020 W. El Camino Avenue, Suite 500
Sacramento, CA 95833
(916) 263-2911 / FAX (916) 263-7453
www.hcd.ca.gov



September 30, 2022

Ursula Luna-Reynosa, Director
Community Development Department
City of Huntington Beach
2000 Main Street
Huntington Beach, CA 92648

Dear Ursula Luna-Reynosa:

**RE: Huntington Beach's 6th Cycle (2021-2029) Revised Draft Housing Element**

Thank you for submitting the City of Huntington Beach's (City) revised draft housing element update received for review on August 1, 2022, along with revisions received on September 23, 2022. Pursuant to Government Code section 65585, subdivision (b), the California Department of Housing and Community Development (HCD) is reporting the results of its review. Conversations on September 7 and 22, 2022 with you and the housing element team facilitated the review.

The revised draft element, incorporating the additional revisions, meets the statutory requirements described in HCD's June 9, 2022 review. The housing element will comply with State Housing Element Law (Article 10.6 of the Gov. Code) when it is adopted, submitted to and approved by HCD, in accordance with Government Code section 65585.

For your information, pursuant to Senate Bill 197 (Chapter 70, Statutes of 2022), as the City did not adopt a compliant housing element within 120 days of the statutory deadline (October 15, 2021). As a result, the City's adopted element must be found in compliance by October 15, 2022 or HCD cannot find the element in compliance until programs to rezone (Program 2A (Adequate Sites) and Program 2B (Establish Affordable Housing Overlay Zone) are complete.

As a reminder, if the housing element relies upon nonvacant sites to accommodate more than 50 percent of the regional housing needs allocation (RHNA) for lower-income households, the housing element must demonstrate that existing uses are not an impediment to additional residential development in the planning period. This can be demonstrated by providing substantial evidence that the existing use is likely to be discontinued during the planning period. (Gov. Code, § 65583.2, subd. (g)(2).) Absent findings in an adoption resolution based on substantial evidence, the existing uses will be presumed to impede additional residential development and will not be utilized

Ursula Luna-Reynosa, Director
Page 2

toward demonstrating adequate sites to accommodate the regional housing need allocation (RHNA).

In addition, pursuant to Government Code section 65583.3, the City must submit an electronic sites inventory with its adopted housing element. The City must utilize standards, forms, and definitions adopted by HCD. Please see HCD's housing element webpage at https://www.hcd.ca.gov/community-development/housing-element/index.shtml#element for a copy of the form and instructions.

HCD understands the City made revisions available on September 23, 2022 for seven days prior to submitting to HCD. While this meets the requirement per AB 215 (Chapter 342, Statutes of 2021), public participation in the development, adoption and implementation of the housing element is essential to effective housing planning. Throughout the housing element process, the City must continue to engage the community, including organizations that represent lower-income and special needs households, by making information regularly available while considering and incorporating comments where appropriate. Please be aware, any revisions to the element must be posted on the local government's website and to email a link to all individuals and organizations that have previously requested notices relating to the local government's housing element at least seven days before submitting to HCD.

Several federal, state, and regional funding programs consider housing element compliance as an eligibility or ranking criteria. With a compliant housing element, the City meets housing element requirements for these and other funding sources.

HCD appreciates the hard work, responsiveness, and dedication the housing element team provided in preparation of the City's housing element and looks forward to receiving the City's adopted housing element. If you have any questions or need additional technical assistance, please contact Jose Ayala, of our staff, at Jose.Ayala@hcd.ca.gov.

Sincerely,

Paul McDougall
Senior Program Manager

# CERTIFICATE OF SERVICE

Case Name: **City of Huntington Beach, et al.**    CaseNo.   **8:23-cv-00421**
            **v. Gavin Newsom, et al.**

I hereby certify that on <u>May 1, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>May 1, 2023</u>, at Los Angeles, California.

<table>
<tr><td>D. Arana<br>Declarant</td><td>Signature</td></tr>
</table>

SA2023301426
POS RJN.docx