Deborah J. Fox (SBN: 110929)
dfox@meyersnave.com
David Mehretu (SBN: 269398)
dmehretu@meyersnave.com
Kristof D. Szoke (SBN: 331561)
kszoke@meyersnave.com
MEYERS NAVE
707 Wilshire Blvd., 24th Floor
Los Angeles, California 90017
Telephone: (213) 626-2906
Facsimile: (213) 626-0215

Attorneys for Defendant
SOUTHERN CALIFORNIA
ASSOCIATION OF GOVERNMENTS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation, the HUNTINGTON BEACH CITY COUNCIL, MAYOR OF HUNTINGTON BEACH, TONY STRICKLAND, and MAYOR PRO TEM OF HUNTINGTON BEACH, GRACEY VAN DER MARK,<br><br>    Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California, and individually; GUSTAVO VELASQUEZ in his official capacity as Director of the State of California Department of Housing and Community Development, and individually; STATE LEGISLATURE; STATE OF CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT; SOUTHERN CALIFORNIA ASSOCIATION OF GOVERNMENTS; and DOES 1-50, inclusive,<br><br>    Defendants. | Case No. 8:23-cv-00421-FWS-ADS<br>The Hon. Fred W. Slaughter<br><br>**SOUTHERN CALIFORNIA ASSOCIATION OF GOVERNMENTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:    July 27, 2023<br>Time:    10:00 a.m.<br>Crtrm:   10D<br><br>Compl. filed:    March 9, 2023<br>First Am. Compl. filed: March 27, 2023<br><br>Trial Date:    None Set |

1  Defendant, Southern California Association of Governments ("SCAG"), by
2  and through its attorneys of record, pursuant to Federal Rules of Evidence, Rule
3  201, hereby requests that the Court take judicial notice of the documents set forth
4  and discussed herein.  Matters that are properly the subject of judicial notice under
5  Federal Rules of Evidence, Rule 201 may be considered when deciding a motion to
6  dismiss under Federal Rules of Civil Procedure, Rule 12.  *MGIC Indem. Corp. v.*
7  *Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).
8  SCAG respectfully contends that the public documents set forth below are
9  proper for judicial notice as well as for consideration by this Court in connection
10  with SCAG's accompanying Motion to Dismiss the First Amended Complaint.
11  Parties may attach documents and reference them in a Rule 12(b)(6) motion as
12  necessary to show that a plaintiff has failed to state a claim.  *See*, *e.g.*, *Branch v.*
13  *Tunnell*, 14 F.3d. 449, 454 (9th Cir. 1994), *overruled on other grounds in Galbraith*
14  *v. Cnty. of Santa Clara*, 307 F.3d. 1119, 1127 (9th Cir. 2002).  Courts may take
15  judicial notice of "a fact that is not subject to reasonable dispute because it… is
16  generally known within the trial court's territorial jurisdiction; or can be accurately
17  and readily determined from sources whose accuracy cannot reasonably be
18  questioned."  Fed. R. Evid. 201(b)(1-2); *U.S. ex rel. Modglin v. DJO Global Inc.*,
19  48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014) ("Under Rule 201, the court can take
20  judicial notice of '[p]ublic records and government documents available from
21  reliable sources on the Internet,' such as websites run by governmental agencies");
22  *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (affirming that
23  judicial notice may be taken of documents upon which the complaint relies, and
24  documents that are part of the public record); *No Cost Conf., Inc. v. Windstream*
25  *Commc'ns, Inc.*, 940 F. Supp. 2d 1285, 1295 (S.D. Cal. 2013) (taking judicial notice
26  of public records); *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*,
27  971 F.2d 244, 248 (9th Cir. 1992) (taking judicial notice of proceedings from other
28  courts).

Here, the attached exhibits are publicly-available records whose authenticity is not reasonably questionable; they are all public records available on official California legislative, executive, and judicial websites.  *See U.S. ex rel. Modglin*, 48 F. Supp. 3d at 1381.  As a result, SCAG respectfully requests that the Court take judicial notice of the following documents:

**Exhibit 1:**   California Department of Housing and Community Development Housing Element Update Schedule for Regional Housing Need Assessment (RHNA).  (Last updated June 15, 2021).

Accessible at the California Department of Housing and Community Development website at: https://www.hcd.ca.gov/community-development/housing-element/docs/6th-web-he-duedate.pdf.

**Exhibit 2:**   Letter from California Department of Housing and Community Development to Ursula Luna-Reynosa, Director of the City of Huntington Beach's Community Development Department.  (September 30, 2022).

Accessible at California Department of Housing and Community Development website at: https://www.hcd.ca.gov/community-development/housing-element/docs/orahuntingtonbeachdraftout060922.pdf.

**Exhibit 3:**   Senate Floor Analysis of Senate Bill 1333.  (Aug. 30, 2018).

Accessible at the Official California Legislative Information website at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1333#

**Exhibit 4:**   Chaptered Assembly Bill 1537.  (September 30, 2014).

Accessible at the Archived Official California Legislative Information website at:  http://www.leginfo.ca.gov/pub/13-14/bill/asm/ab_1501-1550/ab_1537_bill_20140930_chaptered.pdf.

**Exhibit 5:**   Assembly Floor Analysis of Assembly Bill 1537.  (Aug. 19, 2014).

1    Accessible at the Archived Official California Legislative Information

2  website at:  http://www.leginfo.ca.gov/pub/13-14/bill/asm/ab_1501-

3  1550/ab_1537_cfa_20140821_233226_asm_floor.html.

4    **Exhibit 6:**   The People of California ex rel Rob Bonta and the California

5  Department of Housing and Community Development's Complaint filed in Orange

6  County Superior Court, Case No. 30-2023-01312235-CU-WM-CJC.

7    Accessible to download from the Superior Court of California, County of

8  Orange's website, Case No. 30-2023-01312235-CU-WM-CJC, *The People of*

9  *California ex rel Rob Bonta et al. v. the City of Huntington Beach et al.*, Register of

10  Actions No. 1.

11    **Exhibit 7:**   The People of California ex rel Rob Bonta and the California

12  Department of Housing and Community Development's Memorandum of Points

13  and Authorities in Support of Motion for Leave to File Amended Petition and

14  Complaint; Declaration of Thomas P. Kinzinger in Support Thereof.  (April 10,

15  2023)

16    Accessible to download from the Superior Court of California, County of

17  Orange's website, Case No. 30-2023-01312235-CU-WM-CJC, *The People of*

18  *California ex rel Rob Bonta et al. v. the City of Huntington Beach et al.*, Register of

19  Actions Nos. 20 and 22.

20

21

22

23

24

25

26

27

28

1   DATED:  May 1, 2023          MEYERS NAVE

2

3

4                               By: _____

5                                   DEBORAH J. FOX
                                    DAVID MEHRETU
6                                   KRISTOF D. SZOKE
                                    Attorneys for Defendant
7                                   SOUTHERN CALIFORNIA
                                    ASSOCIATION OF GOVERNMENTS
8
5348353
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCAG'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT

# EXHIBIT 1

**California Department of Housing and Community Development**
**Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)**

> The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Project Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual [Note:1, 2] | Housing Element Planning Period |
|---|---|---|---|---|
| **Calaveras County (HCD acts as COG):** Calaveras County (1) and all cities [1] | 2 | December 31, 2018 – June 15, 2027 | June 15, 2019* *Actual* | June 15, 2019 – June 15, 2027 (8 years): [Note 4] |
| **Nevada County (HCD acts as COG):** Nevada County (1) and all cities [3] | 4 | December 31, 2018 – August 15, 2027 | August 15, 2019* *Actual* | August 31, 2019 – August 31, 2027 (8 years): [Note 4] |
| **Mono County (HCD acts as COG):** Mono County (1) and all cities [1] | 2 | | | |
| **Mendocino Council of Governments (MCOG):** Mendocino County (1) and all cities [4] | 5 | | | |
| **Lake County City Area-wide Planning Council:** Lake Country (1) and all cities [2] | 3 | | | |

### California Department of Housing and Community Development
### Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual [Note:1, 2] | Housing Element Planning Period |
|---|---|---|---|---|
| **Humboldt County Association of Governments (HCAOG):** Humboldt County (1) and all cities [7] | 8 | December 31, 2018 – August 31, 2027 | **August 31, 2019\*** *Actual* | August 31, 2019 – August 31, 2027 |
| **Other Regions (non-COG) (HCD acts as COG):** Counties (total 9). Cities [total 8]]. Alpine [0], Lassen [1], Mariposa [0], Modoc [1], Plumas [1], Sierra [1], Tehama [3], Trinity [0], and Tuolumne [1] | 17 | December 31, 2018 – August 31, 2024 | **August 31, 2019** *Actual* | August 31, 2019 – June 30, 2024 |
| **Shasta County (HCD acts as COG):** Shasta County (1) and all cities [3] | 4 | December 31, 2018 – April 15, 2028 | **April 15, 2020\*** *Actual* | April 15, 2020 – April 15, 2028 |
| **Colusa County (HCD acts as COG):** Colusa County (1) and all cities [2] | 3 | December 31, 2018 – December 31, 2028 | **December 31, 2020\*** Actual | December 31, 2020 – December 31, 2028 |

## California Department of Housing and Community Development
## Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

| The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period |
| --- |

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual Note:1, 2 | Housing Element Planning Period |
| --- | --- | --- | --- | --- |
| **San Luis Obispo Council of Governments (SLOCOG):** San Luis Obispo County (1) and all cities [7] | 8 | December 31, 2018 – December 31, 2028 | **December 31, 2020\*** *Actual* | December 31, 2020 – December 31, 2028 |
| **San Diego Association of Governments (SANDAG):** San Diego County (1) and all cities [18] | 19 | June 30, 2020 – April 15, 2029 | **April 15, 2021\*** *Actual* | April 15, 2021 – April 15, 2029 |
| **Inyo County (HCD acts as COG):** Inyo County (1) and all cities (1) | 2 | December 31, 2018 – April 30, 2029 | **April 30, 2021\*** *Actual* | April 30, 2021 – April 30, 2029 |
| **Sacramento Area Council of Governments (SACOG):** Counties (6) and cities [23] within each county: El Dorado [2], Placer [6], Sacramento [7], Sutter [2], Yolo [4], and Yuba [2] | 28 | June 30, 2021 – August 31, 2029 | **May 15, 2021** *Actual* | May 15, 2021 – May 15, 2029 |

## California Department of Housing and Community Development
## Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual Note:1, 2 | Housing Element Planning Period |
|---|---|---|---|---|
| **Tahoe Regional Planning Agency (HCD acts as COG)** <br> City of South Lake Tahoe [1] | 1 | December 31, 2021 – June 30, 2027 | **June 30, 2022** <br> *Actual* | June 30, 2022 – June 30, 2027 |
| **Amador County (HCD acts as COG):** <br> Amador County (1) and all cities [5] | 6 | December 31, 2018 – September 15, 2029 | **September 15, 2021\*** <br> *Actual* | September 15, 2021 – September 15, 2029 |
| **Southern California Association of Governments (SCAG):** <br> Counties (6) and cities [191] within each county: Imperial [7], Los Angeles [88], Orange [34], Riverside [28], San Bernardino [24], and Ventura [10] | 197 | June 30, 2021 – October 15, 2029 | **October 15, 2021\*** <br> *Actual* | October 15, 2021 – October 15, 2029 |
| **Glenn County (HCD acts as COG):** <br> Glenn County (1) and all cities [2] | 3 | December 31, 2018 – November 30, 2029 | **November 30, 2021\*** <br> *Actual* | November 30, 2021 – November 30, 2029 |

**California Department of Housing and Community Development**
**Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)**

> The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual [Note:1, 2] | Housing Element Planning Period |
|---|---|---|---|---|
| **Butte County Association of Governments (BCAG):** Butte County (1) and all cities [5] | 6 | December 31, 2021 – June 15, 2030 | **June 15, 2022\*** *Estimate* | June 15, 2022 – June, 2030 |
| **Del Norte County (HCD acts as COG):** Del Norte County (1) and all cities [1] | 2 | December 31, 2018 – September 15, 2030 | **September 15, 2022\*** **Actual** | September 15, 2022 – September 15, 2030 |
| **Siskiyou (HCD acts as COG):** Siskiyou County (1) and all cities [9] | 10 | December 31, 2018 – November 15, 2030 | **November 15, 2022\*** *Estimate* | November 15, 2022 – November 15, 2030 |
| **Association of Bay Area Governments (ABAG):** Counties (9) and all cities [100] within each county: Alameda [14], Contra Costa [19], Marin [11], Napa [5], San Francisco [0], San Mateo [20], Santa Clara [15], Solano [7], and Sonoma [9] | 109 | June 30, 2022 – December 15, 2030 | **January 31, 2023\*** *Estimate* | January 31, 2023 – January 31, 2031 |

**California Department of Housing and Community Development**
**Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)**

| The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period |
|---|

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual Note:1, 2 | Housing Element Planning Period |
|---|---|---|---|---|
| **Santa Barbara County Assn of Governments (SBCAG):** Santa Barbara County (1) and all cities [8] | 9 | June 30, 2022 – February 15, 2031 | **February 15, 2023\*** *Estimate* | February 15, 2023 – February 15, 2031 |
| **Association of Monterey Bay Area Governments (AMBAG):** The counties (2) and all cities [16] within each county: Monterey County [12] and Santa Cruz County [4] | 18 | June 30, 2023 – December 31, 2031 | **December 31, 2023\*** *Estimate* | December 31, 2023 – December 31, 2031 |
| **San Benito County Council of Governments (San Benito COG):** San Benito County [1] and all cities [2] | 3 | | | |

**California Department of Housing and Community Development**
**Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)**

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual [Note:1, 2] | Housing Element Planning Period |
|---|---|---|---|---|
| **San Joaquin County Council of Governments (SJCOG):** San Joaquin County (1) and all cities [7] | 8 | June 30, 2023 – December 31, 2031 | **December 31, 2023\*** *Estimate* | December 31, 2023 – December 31, 2031 |
| **Stanislaus County Council of Governments (Stan COG):** Stanislaus County (1) and all cities [9] | 10 | | | |
| **Tulare County Association of Governments (TCAG):** Tulare County (1) and all cities [8] | 9 | | | |
| **Fresno Council of Governments (FCOG):** Fresno County (1) and all cities [15] | 16 | | | |

## California Department of Housing and Community Development
## Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)

| The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period |
|---|

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions 6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date Estimated/Actual Note:1, 2 | Housing Element Planning Period |
|---|---|---|---|---|
| **Kern Council of Governments (KCOG):** Kern County (1) and all cities [11] | 12 | June 30, 2023 – December 31, 2031 | **December 31, 2023*** *Estimate* | December 31, 2023 – December 31, 2031 |
| **Kings County Association of Governments (KCAG):** Kings County (1) and all cities [4] | 5 | | | |
| **Kern Council of Governments (KCOG):** Kern County (1) and all cities [11] | 12 | | | |
| **Kings County Association of Governments (KCAG):** Kings County (1) and all cities [4] | 5 | | | |

**California Department of Housing and Community Development**
**Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)**

The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

| Council of Governments/Jurisdictions<br>6th RHNA Cycle | Number of Jurisdictions (539) | 6th Cycle RHNA Projection Period | Sixth Housing Element (HE) Revision Due Date<br>Estimated/Actual [Note:1, 2] | Housing Element Planning Period |
|---|---|---|---|---|
| **Madera County Transportation Commission (MCTC)** *(HCD acts as COG):*<br>Madera County (1) and all cities [2] | 3 | June 30, 2023 – January 31, 2032 | **January 31, 2024\***<br>*Estimate* | January 31, 2024 – January 31, 2032 |
| **Merced County Association of Governments (MCAG):**<br>Merced County (1) and all cities [6] | 7 | | | |

**California Department of Housing and Community Development**
**Housing Element Update Schedule for Regional Housing Need Assessment (RHNA)**

> The jurisdiction that will report new housing units to Department of Finance (annual Housing Unit Survey) can take RHNA credit (1 time) for units approved (entitled or permitted) or built since the start date of the RHNA Projection Period

*Last updated: June 15, 2021*

**<u>NOTES:</u>**

1. Until actual RTP adoption date is known, housing element due date is marked "*Estimated*."

   a. ***"Estimated"*** date is based on required MPO/RTPA 12-month notice to HCD and any subsequent required notices from changes to the <u>estimated</u> RTP adoption date.

   b. **"Actual"** date is based on official RTP adoption date. <u>An adoption date past the estimated date used by HCD to determine the RHNA period will change the actual housing element due date and period</u> past the RHNA period (GC 65588(e)(5)).

2. HCD rounds <u>up</u> the housing element due date falling in a month to the 15th or last day of the month.

3. To <u>change from a 5-year to a 8-year housing element period</u>, an <u>MPO/RTPA must elect to adopt the RTP on a 4-year schedule</u>. After making an election, <u>all local governments within a county in the region change the next housing element period to 8-years</u>. For the next 7th housing element cycle (starting after June 30, 2024), the <u>election must have been made by</u> **<u>January 1, 2020</u>** (54 months before the next housing element due date) and the next RTP adopted within three (3) years of the election date. For HCD to determine RHNA and housing element periods, <u>GC 65588(e)(5) requires MPOs and RTPAs on a 4-year RTP update schedule to notify HCD in writing of the estimated RTP adoption date at least 12 months prior to the estimated adoption date</u>.

4. Elected to change from 5-year to 8-year housing element planning period.

*\* Consequence of late element adoption:  SB 375 (2008, Chapter 728). GC 65588(e)(4).  Jurisdictions on an 8-year planning period that do not adopt their element within 120 calendar days from the start date of the planning period must revise and adopt the housing element every four years until timely adopting at least two consecutive revisions by the applicable due date.*

# EXHIBIT 2

STATE OF CALIFORNIA - BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY                    GAVIN NEWSOM, *Governor*

**DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT**
**DIVISION OF HOUSING POLICY DEVELOPMENT**
2020 W. El Camino Avenue, Suite 500
Sacramento, CA 95833
(916) 263-2911 / FAX (916) 263-7453
www.hcd.ca.gov



June 9, 2022


Ursula Luna-Reynosa, Director
Community Development Department
City of Huntington Beach
2000 Main Street
Huntington Beach, CA 92648

Dear Ursula Luna-Reynosa:

**RE: City of Huntington Beach's 6th Cycle (2021-2029) Revised Draft Housing Element**

Thank you for submitting the City of Huntington Beach's (City) revised draft housing element received for review on April 11, 2022. HCD's review incorporated revisions posted to the City's website on May 27, 2022 and received on June 3, 2022. Pursuant to Government Code section 65585, subdivision (b), the California Department of Housing and Community Development (HCD) is reporting the results of its review. Our review was facilitated by a conversation on May 11 and 24, 2022 with the City's housing element team. In addition, HCD considered comments from the Kennedy Commission pursuant to Government Code section 65585, subdivision (c).

The revised draft element addresses many statutory requirements described in HCD's February 4, 2022 review; however, revisions will be necessary to comply with State Housing Element Law (Article 10.6 of the Gov. Code), as follows:

1. *Affirmatively further[ing] fair housing in accordance with Chapter 15 (commencing with Section 8899.50) of Division 1 of Title 2…shall include an assessment of fair housing in the jurisdiction. (Gov. Code, § 65583, subd. (c)(10)(A).)*

   <u>Integration and Segregation</u>: While the element has added data regarding the integration and segregation factors (race, income, disability, and familial status), it must also complement this data with analysis regarding the impacts of the data related to fair housing issues. Specifically, the element must provide analysis for familial status, disability, and income similar to the analysis conducted for race (beginning on p. 3-64). As noted in the February 4, 2022 review, the analysis should draw fair housing-related conclusions from the data points to better formulate policies and programs.

Ursula Luna-Reynosa, Director
Page 2

<u>Disproportionate Housing Needs Including Displacement</u>: The element states that information regarding cost burdened and overcrowded households and other factors are not available. However, the element must still use applicable Census and other data sources to conduct this analysis. Please see the February 4, 2022 review for more information.

<u>Contributing Factors</u>: As noted in the February 4, 2022 review, upon completion of a full analysis of the affirmatively furthering fair housing (AFFH) section, the element should re-evaluate and prioritize contributing factors.

<u>Goals, Actions, Metrics, and Milestones</u>: While the element includes a number of program actions to AFFH, the programs continue to lack metrics to measure how programs will target overcoming identified patterns and trends. In addition, while the element has added Programs 8A, 8B, and 8C with targeting efforts for the Oak View neighborhood, additional revisions are needed. While Program 8B seeks to proactively seek funding sources to improve quality of life, placemaking, and access to opportunity in low resource areas, the element must commit to applying for funding in the planning period. In addition, while Program 8C intends to analyze childcare facility incentives in housing developments, there is no specific metric or milestone associated with these actions. Moreover, Program 8C should be revised to commit to actionable next steps and should occur earlier in the planning period to provide a beneficial impact.

2. *An inventory of land suitable and available for residential development, including vacant sites and sites having realistic and demonstrated potential for redevelopment during the planning period to meet the locality's housing need for a designated income level, and an analysis of the relationship of zoning and public facilities and services to these sites. (Gov. Code, § 65583, subd. (a)(3).)*

   *Identify actions that will be taken to make sites available during the planning period with appropriate zoning and development standards and with services and facilities to accommodate that portion of the city's or county's share of the regional housing need for each income level that could not be accommodated on sites identified in the inventory... (Gov. Code, § 65583, subd. (c)(1).)*

   <u>Realistic Capacity</u>: The element was not revised to provide support for the capacity assumption of 80 percent build-out of identified sites. To demonstrate the realistic capacity, the element can use recently developed residential projects, describe the built density versus maximum allowable density, and relate factors to the sites listed in the inventory. Please see the February 4, 2022 review for more information. Additionally, the element must demonstrate the likelihood of sites developing with the overlay zoning in place versus the underlying zoning. To do this analysis the element could describe development

Ursula Luna-Reynosa, Director
Page 3

trends in these areas for developments that have use the overlay vs underlining zoning and add or modify programs as appropriate.

<u>Suitability of Nonvacant Sites</u>: The element adds information on Table B-4 and Page B-14 regarding past redevelopment of nonvacant sites to residential uses by providing additional context to the factors that led to redevelopment. However, as the housing element relies upon nonvacant sites to accommodate more than 50 percent of the regional housing needs allocation (RHNA) for lower-income households, additional analysis is needed to determine that the existing uses are not an impediment to additional residential development in the planning period and will likely discontinue in the planning period (Gov. Code, § 65583.2, subd. (g)(2). The element could analyze current market demand for existing uses, include additional criteria to support likelihood of residential development such as condition of structure, whether the use is operating, marginal or discontinued, the presence of any existing leases or other contracts that would perpetuate the existing use or prevent redevelopment of the site for additional residential development, and describe any specific incentives to encourage or facilitate development on these sites. While the element has added this information for past projects, it should be clear how past trends relate to the identified sites.

For your information, absent findings (e.g., adoption resolution) based on substantial evidence, the existing uses will be presumed to impede additional residential development and will not be utilized toward demonstrating adequate sites to accommodate the RHNA.

In addition, the element should describe any environmental constraints Frontier property that would constraint development within the planning period and describe how the Regency Palms is anticipated to be redeveloped given the existing residential uses on the site. Moreover, the element should describe any phasing of the Golden West College site and provide more information regarding the school's intention with the property (e.g., lease, surplus, etc.). The element should also indicate if the development on the Golden West College site would be intended for the general public, faculty, or students only. Please be aware, college and university student housing may be considered noninstitutional group quarters and not a housing unit for purposes of meeting the RHNA.

<u>Accessory Dwelling Units (ADU)</u>: The revised housing element reduces the number of ADUs projected over the planning period to a total of 480 for the planning period. However, this projection remains higher than the per year average from 2018-2022. As noted in the February 4, 2022 review, the element should be basing ADU projections for the planning period using the average from 2018-2022. Given new information for 2022 permits to date, this average is 45 ADUs per year for a total of 360 ADUs for the planning period. HCD cannot accept ADU projections that go beyond this number unless analysis and program

Ursula Luna-Reynosa, Director
Page 4

actions are sufficient to support the projection assumptions beyond historical averages.

<u>Programs</u>: As noted above, the element does not include a complete site analysis; therefore, the adequacy of sites and zoning were not established. Based on the results of a complete sites inventory and analysis, the City may need to add or revise programs to address a shortfall of sites or zoning available to encourage a variety of housing types.

3. *An analysis of potential and actual governmental constraints upon the maintenance, improvement, or development of housing for all income levels, including the types of housing identified in paragraph (1) of subdivision (c), and for persons with disabilities as identified in the analysis pursuant to paragraph (7), including land use controls, building codes and their enforcement, site improvements, fees and other exactions required of developers, and local processing and permit procedures... (Gov. Code, § 65583, subd. (a)(5).)*

   *Address and, where appropriate and legally possible, remove governmental and nongovernmental constraints to the maintenance, improvement, and development of housing, including housing for all income levels and housing for persons with disabilities… (Gov. Code, § 65583, subd. (c)(3).)*

<u>Land Use Controls</u>: While the element states the height limit is not an impediment to residential development, no analysis or supporting information was provided to verify this statement. Also, while similar information was provided regarding the guest parking space requirement not posing a constraint to residential development, no analysis was provided. In addition, the lot coverage requirement was not analyzed as it relates to the feasibility of projects being built in the RH zone to maximum density. As noted in the February 4, 2022 review, the element could describe a sample project and determine the feasibility of a project being built at maximum density.

<u>Large Residential Care Facilities</u>: While the element has added information regarding the permitting of group homes and small and large residential care facilities, it appears to make a distinction between licensed and unlicensed residential care facilities. The element should address how non-licensed group home facilities that serve seven or more residences is permitted. Zoning code regulations that isolate and regulate various types of housing for persons with disabilities based on the number of people and other factors may pose a constraint on housing choice for persons with disabilities. The element should include specific analysis of these and any other constraints for impacts on housing for persons with disabilities and add or modify programs as appropriate. In addition, while Program 5D includes a program to review and amend, if necessary, permit procedures, application requirements, and develop standards

Ursula Luna-Reynosa, Director
Page 5

applicable to group homes, the program should be modified to specifically commit to amending procedures to ensure approval certainty and objectivity for housing for persons with disabilities in the permit process for the development of group homes.

Programs: As noted above, the element does not include a complete analysis of governmental constraints. Based on a complete analysis of governmental constraints, the City may need to add or revise programs to address governmental constraints to residential development.

4. *Include a program which sets forth a schedule of actions during the planning period, each with a timeline for implementation, which may recognize that certain programs are ongoing, such that there will be beneficial impacts of the programs within the planning period, that the local government is undertaking or intends to undertake to implement the policies and achieve the goals and objectives of the Housing Element... (Gov. Code, § 65583, subd. (c).)*

As noted in the prior review, to have a beneficial impact in the planning period and address the goals of the housing element, all programs must have discrete timelines (e.g., month and year) and specific commitment. While some programs have been revised with timelines, Program 3B must commit to a specific timeframe of when monitoring and subsequent adjustments will occur.

The element will meet the statutory requirements of State Housing Element Law once it has been revised and adopted to comply with the above requirements.

For your information, pursuant to Assembly Bill 1398 (Chapter 358, Statutes of 2021), as the City failed to adopt a housing element that was found in compliance within 120 days of the statutory deadline (October 15, 2021), Program 2A (Adequate sites) and 2B (Establish Affordable Housing Overlay zone) to rezone to accommodate the RHNA must be completed no later than one year from the statutory deadline. Otherwise, the local government's housing element will no longer comply with State Housing Element Law, and HCD may revoke its finding of substantial compliance pursuant to Government Code section 65585, subdivision (i).

Public participation in the development, adoption and implementation of the housing element is essential to effective housing planning. During the housing element revision process, the City must continue to engage the community, including organizations that represent lower-income and special needs households, by making information regularly available while considering and incorporating comments where appropriate. Please be aware, any revisions to the element must be posted on the local government's website and to email a link to all individuals and organizations that have previously requested

Ursula Luna-Reynosa, Director
Page 6


notices relating to the local government's housing element at least seven days before
submitting to HCD.

Several federal, state, and regional funding programs consider housing element
compliance as an eligibility or ranking criteria. For example, the CalTrans Senate Bill
(SB) 1 Sustainable Communities grant; the Strategic Growth Council and HCD's
Affordable Housing and Sustainable Communities programs; and HCD's Permanent
Local Housing Allocation consider housing element compliance and/or annual reporting
requirements pursuant to Government Code section 65400. With a compliant housing
element, the City/County meets housing element requirements for these and other
funding sources.

HCD appreciates the responsiveness, dedication, and thoroughness the City's housing
element team. We are committed to assist the City in addressing all statutory
requirements of State Housing Element Law. If you have any questions or need
additional technical assistance, please contact Jose Ayala, of our staff, at
Jose.Ayala@hcd.ca.gov.


Sincerely,

Paul McDougall
Senior Program Manager

# EXHIBIT 3

**SENATE RULES COMMITTEE**                                    SB 1333
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

UNFINISHED BUSINESS

---

Bill No:    SB 1333
Author:     Wieckowski (D), et al.
Amended:    8/24/18
Vote:       21

---

SENATE GOVERNANCE & FIN. COMMITTEE:  4-2, 4/25/18
AYES:  McGuire, Beall, Hertzberg, Lara
NOES:  Nguyen, Moorlach
NO VOTE RECORDED:  Hernandez

SENATE APPROPRIATIONS COMMITTEE: Senate Rule 28.8

SENATE FLOOR:  25-12, 5/30/18
AYES:  Allen, Atkins, Beall, Bradford, Dodd, Galgiani, Glazer, Hernandez,
  Hertzberg, Hill, Hueso, Jackson, Lara, Leyva, McGuire, Mitchell, Monning,
  Newman, Pan, Portantino, Roth, Skinner, Stern, Wieckowski, Wiener
NOES:  Anderson, Bates, Berryhill, Fuller, Gaines, Moorlach, Morrell, Nguyen,
  Nielsen, Stone, Vidak, Wilk
NO VOTE RECORDED:  Cannella, De León

ASSEMBLY FLOOR:  50-26, 8/30/18 - See last page for vote

---

**SUBJECT:**  Planning and zoning:  general plan:  zoning regulations:  charter
cities

**SOURCE:**  California Rural Legal Assistance Foundation
  Public Interest Law Project
  Western Center on Law and Poverty

---

**DIGEST:**  This bill applies specified provisions in the Government Code
pertaining to local planning and zoning requirements to charter cities.

*Assembly Amendments* eliminate the application of some sections of Planning and
Zoning Law to charter cities.

**ANALYSIS:**

Existing law:

1) Allows cities that adopt charters to control their own "municipal affairs," but on all other matters requires charter cities to follow general, statewide laws.

2) Allows a city to "make and enforce within its limits, all local, police, sanitary and other ordinances and regulations not in conflict with general laws."

3) Requires every county and city to adopt a general plan that sets out planned uses for all of the area covered by the plan. A general plan must include seven mandatory elements, including a housing element that establishes the locations and densities of housing, among other requirements. General plans must also either include an eighth element on environmental justice or include environmental justice components in the other elements of the general plan.

4) Requires city or county zoning ordinances to be consistent with the general plan, including charter cities with populations of two million people or greater.

5) Requires a city or county's housing element to identify adequate sites for housing at all income levels—very low, low, moderate, and above moderate income—and must include rental housing, factory-built housing, mobile homes, and emergency shelters.

6) Requires each local jurisdiction to ensure that its housing element makes enough sites available to accommodate its share of the projected need for new housing—known as the regional housing need assessment (RHNA).

7) Requires local land use policies and decisions, including zoning, specific plans, development agreements, and subdivision map approvals, of general law cities (and counties) to be consistent with their general plan. However, charter cities are exempted from many provisions in law that apply to local planning and zoning ordinances, except where state law specifically states that it applies to charter cities.

This bill:

1) Applies the following provisions of Planning and Zoning Law to charter cities:

   a) Requirements for the legislative body of a city or county to adopt or amend a general plan by resolution;

   b) Legislative findings and declarations about accessory dwelling units;

c) Provisions to generally prohibit local agencies from enacting or enforcing any ordinance, regulation, or resolution that would prohibit the reconstruction, restoration, or rebuilding of a multifamily dwelling that is involuntarily damaged or destroyed by a catastrophic event;

d) Requirements for consistency of city zoning ordinances with the city's general plan;

e) Requirements for cities and counties to make the inventory of housing sites available at all times in the planning period;

f) Provisions related to local ordinances and balancing of housing needs with services;

g) Provisions related to mobilehome conversions;

h) Provisions related to development agreements, except that development agreements entered into by a charter city before July 1, 2018, are not required to comply with state development agreement statutes;

i) Provisions related to elements in the General Plan;

j) Provisions related to the adoption of a General Plan and its elements as a legislative act;

k) Provisions related to specific plans;

l) Provisions related to Transit Village Plans;

m) Provisions related to Low and Moderate Income Housing in the Coastal Zone; and

n) Housing element law.

2) Includes findings to support its purposes.

**Background**

Most aspects of state law that influence the siting and permitting of lower-income housing explicitly apply to charter cities. However, a 2017 appellate court decision, *Kennedy Commission v. City of Huntington Beach*, 16 Cal App. 5th 841 (2017), challenged whether charter cities are required to comply with state laws regarding the adoption of specific plans even where an adopted specific plan results in development approvals that are inconsistent with a housing element that

is approved by the Department of Housing and Community Development (HCD) as providing adequate lower-income housing. Specifically, in 2013, the City of Huntington Beach adopted an HCD-approved housing element that provided for affordable housing adequate to accommodate its RHNA. The housing element also referenced a specific plan that would contain some of the lower-income housing that would allow the City to meet its RHNA goals. However, responding to citizen concerns, in 2015 the City amended that specific plan to provide for fewer units of lower-income housing. The HCD notified the City that because it had amended the specific plan in this manner, its housing element was no longer in compliance with state law. Several plaintiffs also sued over the adoption of the specific plan, seeking to invalidate it on the basis that state law provides that "no specific plan may be adopted or amended unless the proposed plan or amendment is consistent with the general plan."

The court found that this consistency requirement does not apply to charter cities because Government Code Section 65700 specifically provides that certain portions of the Planning and Zoning law do not apply to charter cities, and the city had not adopted an ordinance or charter amendment requiring consistency. The City was therefore permitted to adopt a specific plan with zoning rules that are inconsistent with its adopted housing element, eliminating sites that were intended to accommodate affordable housing when originally approved by HCD.

Some housing advocates are concerned that this ruling will allow other charter cities to take actions inconsistent with housing elements approved by HCD. They want to ensure that charter cities are required to follow the same laws on local planning and zoning as general law cities.

**Comments**

1) *Purpose of the bill.* Housing affordability has reached crisis levels in California. According to the Legislative Analyst's Office, an average California home costs about two–and–a–half times the average national home price, and the average monthly rent is about 50 percent higher than the rest of the country. The California Legislature has enacted numerous laws establishing state policies and oversight of local decision-making to ensure that adequate affordable housing is available in jurisdictions throughout the state, including laws that require cities to get approval from HCD for their housing elements. Last year, the Legislature enacted a series of measures intended to increase housing affordability, including giving HCD authority to review local actions for consistency with approved housing elements. But a recent court case threatens to undermine the state's efforts to ensure that affordable housing is

available statewide by allowing charter cities to adopt specific plans that permit many fewer affordable units than required by their HCD-approved housing elements. SB 1333 closes this loophole by applying state planning and zoning laws to charter cities, thereby ensuring that charter cities' zoning ordinances, specific plans, and development agreements are consistent with their plans for affordable housing contained in their housing elements. SB 1333 bolsters the general plan as the foundational document for local planning and codifies a logical policy to which many charter cities already adhere.

2) *Home rule.* The California Constitution vests charter cities with substantial authority over their municipal affairs, and voters choose to adopt charters in order to take advantage of that greater control. Land use is a prototypical example of a municipal affair—the permitting or prohibition of certain types of uses within the boundaries of a local government principally affects the people that live within that community, and zoning in particular has been recognized by courts as having limited statewide effects. The flexibility afforded by adopting a charter allows cities to make the best decisions for their citizens based on local conditions, even if generally applicable state law provides otherwise. SB 1333 runs contrary to these principles by subjecting numerous charter city land use actions to regulation by the state.

**FISCAL EFFECT:** Appropriation: No   Fiscal Com.: Yes   Local: Yes

According to the Assembly Appropriations Committee:

- Local costs are not reimbursable by the state because cities have the authority to levy fees to cover any costs associated with the changes in this bill.

**SUPPORT:** (Verified 8/27/18)

California Rural Legal Assistance Foundation (co-source)
Public Interest Law Project (co-source)
Western Center on Law and Poverty (co-source)
California Renters Legal Advocacy and Education Fund
California YIMBY
Non-Profit Housing Association of Northern California
Resources for Community Development

**OPPOSITION:** (Verified 8/27/18)

League of California Cities

SB 1333
Page  6

ASSEMBLY FLOOR:  50-26, 8/30/18
AYES:  Aguiar-Curry,  Arambula,  Berman,  Bloom,  Bonta,  Burke,  Caballero,
   Calderon,  Carrillo,  Cervantes,  Chau,  Chiu,  Chu, Cooley,  Eggman,  Frazier,
   Friedman,  Gabriel,  Cristina  Garcia,  Eduardo Garcia,  Gipson,  Gloria,  Gonzalez
   Fletcher,  Gray,  Grayson,  Holden,  Irwin,  Jones-Sawyer,  Kalra,  Kamlager-Dove,
   Levine,  Low,  McCarty,  Medina,  Mullin,  Muratsuchi,  Nazarian,  Quirk,  Quirk-
   Silva,  Reyes,  Rivas,  Rodriguez,  Rubio,  Salas,  Santiago,  Mark Stone,  Thurmond,
   Weber,  Wood, Rendon
NOES:  Acosta, Travis  Allen,  Baker,  Bigelow,  Brough,  Chávez,  Chen,  Choi,
   Cunningham,  Dahle,  Flora,  Fong, Gallagher,  Harper,  Kiley,  Lackey,
   Maienschein,  Mathis,  Mayes,  Melendez,  Obernolte,  O'Donnell,  Patterson,
   Steinorth,  Voepel,  Waldron
NO VOTE RECORDED:  Cooper, Daly,  Limón,  Ting


Prepared by:   Anton Favorini-Csorba / GOV. & F. / (916) 651-4119
8/30/18 20:54:26

**** **END** ****

# EXHIBIT 4

## Assembly Bill No. 1537

### CHAPTER 875

An act to amend, repeal, and add Section 65583.2 of the Government Code, relating to land use.

[Approved by Governor September 30, 2014. Filed with
Secretary of State September 30, 2014.]

LEGISLATIVE COUNSEL'S DIGEST

AB 1537, Levine. General plan housing element: regional housing need.

The Planning and Zoning Law requires each city, county, or city and county to prepare and adopt a general plan for its jurisdiction that contains certain mandatory elements, including a housing element. That law requires the housing element to, among other things, include an inventory of land suitable for residential development and make adequate provision for the existing and projected needs of all economic segments of the community. That law prescribes the densities appropriate to accommodate housing for lower income households and varies those densities depending upon how an area is classified, whether as metropolitan, suburban, or in another category. A city, county, or city and county is required to submit a draft housing element or draft amendment to its housing element to the Department of Housing and Community Development for a determination of whether the draft substantially complies with state law governing housing elements.

This bill would require, until December 31, 2023, a county that is in the San Francisco-Oakland-Fremont California Metropolitan Statistical Area and that has a population of less than 400,000 to be considered suburban for purposes of determining the densities appropriate to accommodate housing for lower income households. The bill would require these counties to utilize the sums existing in their housing trust funds as of June 30, 2013, for affordable housing, as specified. The bill would, for that same purpose, also require a city that has a population of less than 100,000 and is incorporated within that county to be considered suburban. The bill would require a county or city so classified to make 2 reports, as specified, to the Legislature and the Department of Housing and Community Development. The bill would apply housing density requirements in place on June 30, 2014, within $\frac{1}{2}$ mile of a Sonoma-Marin Area Rail Transit station.

This bill would incorporate additional changes to Section 65583.2 of the Government Code proposed by AB 1690 that would become operative if this bill and AB 1690 are both enacted and this bill is enacted last.

This bill would make legislative findings and declarations as to the necessity of a special statute for certain areas of the state.

94

*The people of the State of California do enact as follows:*

SECTION 1.   Section 65583.2 of the Government Code is amended to read:

65583.2.   (a)  A city's or county's inventory of land suitable for residential development pursuant to paragraph (3) of subdivision (a) of Section 65583 shall be used to identify sites that can be developed for housing within the planning period and that are sufficient to provide for the jurisdiction's share of the regional housing need for all income levels pursuant to Section 65584. As used in this section, "land suitable for residential development" includes all of the following:

(1)  Vacant sites zoned for residential use.

(2)  Vacant sites zoned for nonresidential use that allows residential development.

(3)  Residentially zoned sites that are capable of being developed at a higher density.

(4)  Sites zoned for nonresidential use that can be redeveloped for, and as necessary, rezoned for, residential use.

(b)  The inventory of land shall include all of the following:

(1)  A listing of properties by parcel number or other unique reference.

(2)  The size of each property listed pursuant to paragraph (1), and the general plan designation and zoning of each property.

(3)  For nonvacant sites, a description of the existing use of each property.

(4)  A general description of any environmental constraints to the development of housing within the jurisdiction, the documentation for which has been made available to the jurisdiction. This information need not be identified on a site-specific basis.

(5)  A general description of existing or planned water, sewer, and other dry utilities supply, including the availability and access to distribution facilities. This information need not be identified on a site-specific basis.

(6)  Sites identified as available for housing for above moderate-income households in areas not served by public sewer systems. This information need not be identified on a site-specific basis.

(7)  A map that shows the location of the sites included in the inventory, such as the land use map from the jurisdiction's general plan, for reference purposes only.

(c)  Based on the information provided in subdivision (b), a city or county shall determine whether each site in the inventory can accommodate some portion of its share of the regional housing need by income level during the planning period, as determined pursuant to Section 65584. The analysis shall determine whether the inventory can provide for a variety of types of housing, including multifamily rental housing, factory-built housing, mobilehomes, housing for agricultural employees, emergency shelters, and transitional housing. The city or county shall determine the number of housing units that can be accommodated on each site as follows:

(1)  If local law or regulations require the development of a site at a minimum density, the department shall accept the planning agency's

calculation of the total housing unit capacity on that site based on the established minimum density. If the city or county does not adopt a law or regulations requiring the development of a site at a minimum density, then it shall demonstrate how the number of units determined for that site pursuant to this subdivision will be accommodated.

(2)  The number of units calculated pursuant to paragraph (1) shall be adjusted as necessary, based on the land use controls and site improvements requirement identified in paragraph (5) of subdivision (a) of Section 65583.

(3)  For the number of units calculated to accommodate its share of the regional housing need for lower income households pursuant to paragraph (2), a city or county shall do either of the following:

(A)  Provide an analysis demonstrating how the adopted densities accommodate this need. The analysis shall include, but is not limited to, factors such as market demand, financial feasibility, or information based on development project experience within a zone or zones that provide housing for lower income households.

(B)  The following densities shall be deemed appropriate to accommodate housing for lower income households:

(i)  For an incorporated city within a nonmetropolitan county and for a nonmetropolitan county that has a micropolitan area: sites allowing at least 15 units per acre.

(ii)  For an unincorporated area in a nonmetropolitan county not included in clause (i): sites allowing at least 10 units per acre.

(iii)  For a suburban jurisdiction: sites allowing at least 20 units per acre.

(iv)  For a jurisdiction in a metropolitan county: sites allowing at least 30 units per acre.

(d)  For purposes of this section, a metropolitan county, nonmetropolitan county, and nonmetropolitan county with a micropolitan area shall be as determined by the United States Census Bureau. A nonmetropolitan county with a micropolitan area includes the following counties: Del Norte, Humboldt, Lake, Mendocino, Nevada, Tehama, and Tuolumne and other counties as may be determined by the United States Census Bureau to be nonmetropolitan counties with micropolitan areas in the future.

(e)  (1)  Except as provided in paragraph (2), a jurisdiction shall be considered suburban if the jurisdiction does not meet the requirements of clauses (i) and (ii) of subparagraph (B) of paragraph (3) of subdivision (c) and is located in a Metropolitan Statistical Area (MSA) of less than 2,000,000 in population, unless that jurisdiction's population is greater than 100,000, in which case it shall be considered metropolitan. A county, not including the City and County of San Francisco, shall be considered suburban unless the county is in an MSA of 2,000,000 or greater in population in which case the county shall be considered metropolitan.

(2)  (A)  (i)  Notwithstanding paragraph (2), if a county that is in the San Francisco-Oakland-Fremont California MSA has a population of less than 400,000, that county shall be considered suburban. If this county includes an incorporated city that has a population of less than 100,000, this city shall also be considered suburban. This paragraph shall apply to a housing

element revision cycle, as described in subparagraph (A) of paragraph (3) of subdivision (e) of Section 65588, that is in effect from July 1, 2014, to December 31, 2023, inclusive.

(ii) A county subject to this subparagraph shall utilize the sum existing in the county's housing trust fund as of June 30, 2013, for the development and preservation of housing affordable to low- and very low income households.

(B) A jurisdiction that is classified as suburban pursuant to this paragraph shall report to the Assembly Committee on Housing and Community Development, the Senate Committee on Transportation and Housing, and the Department of Housing and Community Development regarding its progress in developing low- and very low income housing consistent with the requirements of Section 65400. The report shall be provided twice, once, on or before December 31, 2019, which report shall address the initial four years of the housing element cycle, and a second time, on or before December 31, 2023, which report shall address the subsequent four years of the housing element cycle and the cycle as a whole. The reports shall be provided consistent with the requirements of Section 9795.

(f) A jurisdiction shall be considered metropolitan if the jurisdiction does not meet the requirements for "suburban area" above and is located in an MSA of 2,000,000 or greater in population, unless that jurisdiction's population is less than 25,000 in which case it shall be considered suburban.

(g) For sites described in paragraph (3) of subdivision (b), the city or county shall specify the additional development potential for each site within the planning period and shall provide an explanation of the methodology used to determine the development potential. The methodology shall consider factors including the extent to which existing uses may constitute an impediment to additional residential development, development trends, market conditions, and regulatory or other incentives or standards to encourage additional residential development on these sites.

(h) The program required by subparagraph (A) of paragraph (1) of subdivision (c) of Section 65583 shall accommodate 100 percent of the need for housing for very low and low-income households allocated pursuant to Section 65584 for which site capacity has not been identified in the inventory of sites pursuant to paragraph (3) of subdivision (a) on sites that shall be zoned to permit owner-occupied and rental multifamily residential use by right during the planning period. These sites shall be zoned with minimum density and development standards that permit at least 16 units per site at a density of at least 16 units per acre in jurisdictions described in clause (i) of subparagraph (B) of paragraph (3) of subdivision (c) and at least 20 units per acre in jurisdictions described in clauses (iii) and (iv) of subparagraph (B) of paragraph (3) of subdivision (c). At least 50 percent of the very low and low-income housing need shall be accommodated on sites designated for residential use and for which nonresidential uses or mixed-uses are not permitted.

(i) For purposes of this section and Section 65583, the phrase "use by right" shall mean that the local government's review of the owner-occupied

94

or multifamily residential use may not require a conditional use permit, planned unit development permit, or other discretionary local government review or approval that would constitute a "project" for purposes of Division 13 (commencing with Section 21000) of the Public Resources Code. Any subdivision of the sites shall be subject to all laws, including, but not limited to, the local government ordinance implementing the Subdivision Map Act. A local ordinance may provide that "use by right" does not exempt the use from design review. However, that design review shall not constitute a "project" for purposes of Division 13 (commencing with Section 21000) of the Public Resources Code. Use by right for all rental multifamily residential housing shall be provided in accordance with subdivision (f) of Section 65589.5.

(j)  Notwithstanding any other provision of this section, within one-half mile of a Sonoma-Marin Area Rail Transit station, housing density requirements in place on June 30, 2014, shall apply.

(k)  This section shall remain in effect only until December 31, 2023, and as of that date is repealed, unless a later enacted statute, that is enacted before December 31, 2023, deletes or extends that date.

SEC. 1.5.   Section 65583.2 of the Government Code is amended to read:

65583.2.   (a)  A city's or county's inventory of land suitable for residential development pursuant to paragraph (3) of subdivision (a) of Section 65583 shall be used to identify sites that can be developed for housing within the planning period and that are sufficient to provide for the jurisdiction's share of the regional housing need for all income levels pursuant to Section 65584. As used in this section, "land suitable for residential development" includes all of the following:

(1)  Vacant sites zoned for residential use.

(2)  Vacant sites zoned for nonresidential use that allows residential development.

(3)  Residentially zoned sites that are capable of being developed at a higher density.

(4)  Sites zoned for nonresidential use that can be redeveloped for, and as necessary, rezoned for, residential use.

(b)  The inventory of land shall include all of the following:

(1)  A listing of properties by parcel number or other unique reference.

(2)  The size of each property listed pursuant to paragraph (1), and the general plan designation and zoning of each property.

(3)  For nonvacant sites, a description of the existing use of each property.

(4)  A general description of any environmental constraints to the development of housing within the jurisdiction, the documentation for which has been made available to the jurisdiction. This information need not be identified on a site-specific basis.

(5)  A general description of existing or planned water, sewer, and other dry utilities supply, including the availability and access to distribution facilities. This information need not be identified on a site-specific basis.

(6)  Sites identified as available for housing for above moderate-income households in areas not served by public sewer systems. This information need not be identified on a site-specific basis.

(7)  A map that shows the location of the sites included in the inventory, such as the land use map from the jurisdiction's general plan, for reference purposes only.

(c)  Based on the information provided in subdivision (b), a city or county shall determine whether each site in the inventory can accommodate some portion of its share of the regional housing need by income level during the planning period, as determined pursuant to Section 65584. The analysis shall determine whether the inventory can provide for a variety of types of housing, including multifamily rental housing, factory-built housing, mobilehomes, housing for agricultural employees, emergency shelters, and transitional housing. The city or county shall determine the number of housing units that can be accommodated on each site as follows:

(1)  If local law or regulations require the development of a site at a minimum density, the department shall accept the planning agency's calculation of the total housing unit capacity on that site based on the established minimum density. If the city or county does not adopt a law or regulations requiring the development of a site at a minimum density, then it shall demonstrate how the number of units determined for that site pursuant to this subdivision will be accommodated.

(2)  The number of units calculated pursuant to paragraph (1) shall be adjusted as necessary, based on the land use controls and site improvements requirement identified in paragraph (5) of subdivision (a) of Section 65583.

(3)  For the number of units calculated to accommodate its share of the regional housing need for lower income households pursuant to paragraph (2), a city or county shall do either of the following:

(A)  Provide an analysis demonstrating how the adopted densities accommodate this need. The analysis shall include, but is not limited to, factors such as market demand, financial feasibility, or information based on development project experience within a zone or zones that provide housing for lower income households.

(B)  The following densities shall be deemed appropriate to accommodate housing for lower income households:

(i)  For an incorporated city within a nonmetropolitan county and for a nonmetropolitan county that has a micropolitan area: sites allowing at least 15 units per acre.

(ii)  For an unincorporated area in a nonmetropolitan county not included in clause (i): sites allowing at least 10 units per acre.

(iii)  For a suburban jurisdiction: sites allowing at least 20 units per acre.

(iv)  For a jurisdiction in a metropolitan county: sites allowing at least 30 units per acre.

(d)  For purposes of this section, a metropolitan county, nonmetropolitan county, and nonmetropolitan county with a micropolitan area shall be as determined by the United States Census Bureau. A nonmetropolitan county with a micropolitan area includes the following counties: Del Norte,

Humboldt, Lake, Mendocino, Nevada, Tehama, and Tuolumne and other counties as may be determined by the United States Census Bureau to be nonmetropolitan counties with micropolitan areas in the future.

(e) (1) Except as provided in paragraph (2), a jurisdiction shall be considered suburban if the jurisdiction does not meet the requirements of clauses (i) and (ii) of subparagraph (B) of paragraph (3) of subdivision (c) and is located in a Metropolitan Statistical Area (MSA) of less than 2,000,000 in population, unless that jurisdiction's population is greater than 100,000, in which case it shall be considered metropolitan. A county, not including the City and County of San Francisco, shall be considered suburban unless the county is in an MSA of 2,000,000 or greater in population in which case the county shall be considered metropolitan.

(2) (A) (i) Notwithstanding paragraph (1), if a county that is in the San Francisco-Oakland-Fremont California MSA has a population of less than 400,000, that county shall be considered suburban. If this county includes an incorporated city that has a population of less than 100,000, this city shall also be considered suburban. This paragraph shall apply to a housing element revision cycle, as described in subparagraph (A) of paragraph (3) of subdivision (e) of Section 65588, that is in effect from July 1, 2014, to December 31, 2023, inclusive.

(ii) A county subject to this subparagraph shall utilize the sum existing in the county's housing trust fund as of June 30, 2013, for the development and preservation of housing affordable to low- and very low income households.

(B) A jurisdiction that is classified as suburban pursuant to this paragraph shall report to the Assembly Committee on Housing and Community Development, the Senate Committee on Transportation and Housing, and the Department of Housing and Community Development regarding its progress in developing low- and very low income housing consistent with the requirements of Section 65400. The report shall be provided twice, once, on or before December 31, 2019, which report shall address the initial four years of the housing element cycle, and a second time, on or before December 31, 2023, which report shall address the subsequent four years of the housing element cycle and the cycle as a whole. The reports shall be provided consistent with the requirements of Section 9795.

(f) A jurisdiction shall be considered metropolitan if the jurisdiction does not meet the requirements for "suburban area" above and is located in a MSA of 2,000,000 or greater in population, unless that jurisdiction's population is less than 25,000 in which case it shall be considered suburban.

(g) For sites described in paragraph (3) of subdivision (b), the city or county shall specify the additional development potential for each site within the planning period and shall provide an explanation of the methodology used to determine the development potential. The methodology shall consider factors including the extent to which existing uses may constitute an impediment to additional residential development, development trends, market conditions, and regulatory or other incentives or standards to encourage additional residential development on these sites.

94

(h) The program required by subparagraph (A) of paragraph (1) of subdivision (c) of Section 65583 shall accommodate 100 percent of the need for housing for very low and low-income households allocated pursuant to Section 65584 for which site capacity has not been identified in the inventory of sites pursuant to paragraph (3) of subdivision (a) on sites that shall be zoned to permit owner-occupied and rental multifamily residential use by right during the planning period. These sites shall be zoned with minimum density and development standards that permit at least 16 units per site at a density of at least 16 units per acre in jurisdictions described in clause (i) of subparagraph (B) of paragraph (3) of subdivision (c) and at least 20 units per acre in jurisdictions described in clauses (iii) and (iv) of subparagraph (B) of paragraph (3) of subdivision (c). At least 50 percent of the very low and low-income housing need shall be accommodated on sites designated for residential use and for which nonresidential uses or mixed-uses are not permitted, except that a city or county may accommodate all of the very low and low-income housing need on sites designated for mixed uses if those sites allow 100 percent residential use and require that residential use occupy 50 percent of the total floor area of a mixed-use project.

(i) For purposes of this section and Section 65583, the phrase "use by right" shall mean that the local government's review of the owner-occupied or multifamily residential use may not require a conditional use permit, planned unit development permit, or other discretionary local government review or approval that would constitute a "project" for purposes of Division 13 (commencing with Section 21000) of the Public Resources Code. Any subdivision of the sites shall be subject to all laws, including, but not limited to, the local government ordinance implementing the Subdivision Map Act. A local ordinance may provide that "use by right" does not exempt the use from design review. However, that design review shall not constitute a "project" for purposes of Division 13 (commencing with Section 21000) of the Public Resources Code. Use by right for all rental multifamily residential housing shall be provided in accordance with subdivision (f) of Section 65589.5.

(j) Notwithstanding any other provision of this section, within one-half mile of a Sonoma-Marin Area Rail Transit station, housing density requirements in place on June 30, 2014, shall apply.

(k) This section shall remain in effect only until December 31, 2023, and as of that date is repealed, unless a later enacted statute, that is enacted before December 31, 2023, deletes or extends that date.

SEC. 2. Section 65583.2 is added to the Government Code, to read:

65583.2. (a) A city's or county's inventory of land suitable for residential development pursuant to paragraph (3) of subdivision (a) of Section 65583 shall be used to identify sites that can be developed for housing within the planning period and that are sufficient to provide for the jurisdiction's share of the regional housing need for all income levels pursuant to Section 65584. As used in this section, "land suitable for residential development" includes all of the following:

(1) Vacant sites zoned for residential use.

(2) Vacant sites zoned for nonresidential use that allows residential development.

(3) Residentially zoned sites that are capable of being developed at a higher density.

(4) Sites zoned for nonresidential use that can be redeveloped for, and, as necessary, rezoned for, residential use.

(b) The inventory of land shall include all of the following:

(1) A listing of properties by parcel number or other unique reference.

(2) The size of each property listed pursuant to paragraph (1), and the general plan designation and zoning of each property.

(3) For nonvacant sites, a description of the existing use of each property.

(4) A general description of any environmental constraints to the development of housing within the jurisdiction, the documentation for which has been made available to the jurisdiction. This information need not be identified on a site-specific basis.

(5) A general description of existing or planned water, sewer, and other dry utilities supply, including the availability and access to distribution facilities. This information need not be identified on a site-specific basis.

(6) Sites identified as available for housing for above moderate-income households in areas not served by public sewer systems. This information need not be identified on a site-specific basis.

(7) A map that shows the location of the sites included in the inventory, such as the land use map from the jurisdiction's general plan for reference purposes only.

(c) Based on the information provided in subdivision (b), a city or county shall determine whether each site in the inventory can accommodate some portion of its share of the regional housing need by income level during the planning period, as determined pursuant to Section 65584. The analysis shall determine whether the inventory can provide for a variety of types of housing, including multifamily rental housing, factory-built housing, mobilehomes, housing for agricultural employees, emergency shelters, and transitional housing. The city or county shall determine the number of housing units that can be accommodated on each site as follows:

(1) If local law or regulations require the development of a site at a minimum density, the department shall accept the planning agency's calculation of the total housing unit capacity on that site based on the established minimum density. If the city or county does not adopt a law or regulations requiring the development of a site at a minimum density, then it shall demonstrate how the number of units determined for that site pursuant to this subdivision will be accommodated.

(2) The number of units calculated pursuant to paragraph (1) shall be adjusted as necessary, based on the land use controls and site improvements requirement identified in paragraph (5) of subdivision (a) of Section 65583.

(3) For the number of units calculated to accommodate its share of the regional housing need for lower income households pursuant to paragraph (2), a city or county shall do either of the following:

(A)  Provide an analysis demonstrating how the adopted densities accommodate this need. The analysis shall include, but is not limited to, factors such as market demand, financial feasibility, or information based on development project experience within a zone or zones that provide housing for lower income households.

(B)  The following densities shall be deemed appropriate to accommodate housing for lower income households:

(i)  For an incorporated city within a nonmetropolitan county and for a nonmetropolitan county that has a micropolitan area: sites allowing at least 15 units per acre.

(ii)  For an unincorporated area in a nonmetropolitan county not included in clause (i): sites allowing at least 10 units per acre.

(iii)  For a suburban jurisdiction: sites allowing at least 20 units per acre.

(iv)  For a jurisdiction in a metropolitan county: sites allowing at least 30 units per acre.

(d)  For purposes of this section, a metropolitan county, nonmetropolitan county, and nonmetropolitan county with a micropolitan area shall be as determined by the United States Census Bureau. A nonmetropolitan county with a micropolitan area includes the following counties: Del Norte, Humboldt, Lake, Mendocino, Nevada, Tehama, and Tuolumne and other counties as may be determined by the United States Census Bureau to be nonmetropolitan counties with micropolitan areas in the future.

(e)  A jurisdiction shall be considered suburban if the jurisdiction does not meet the requirements of clauses (i) and (ii) of subparagraph (B) of paragraph (3) of subdivision (c) and is located in a Metropolitan Statistical Area (MSA) of less than 2,000,000 in population, unless that jurisdiction's population is greater than 100,000, in which case it shall be considered metropolitan. A county, not including the City and County of San Francisco, shall be considered suburban unless the county is in an MSA of 2,000,000 or greater in population in which case the county shall be considered metropolitan.

(f)  A jurisdiction shall be considered metropolitan if the jurisdiction does not meet the requirements for "suburban area" above and is located in an MSA of 2,000,000 or greater in population, unless that jurisdiction's population is less than 25,000 in which case it shall be considered suburban.

(g)  For sites described in paragraph (3) of subdivision (b), the city or county shall specify the additional development potential for each site within the planning period and shall provide an explanation of the methodology used to determine the development potential. The methodology shall consider factors including the extent to which existing uses may constitute an impediment to additional residential development, development trends, market conditions, and regulatory or other incentives or standards to encourage additional residential development on these sites.

(h)  The program required by subparagraph (A) of paragraph (1) of subdivision (c) of Section 65583 shall accommodate 100 percent of the need for housing for very low and low-income households allocated pursuant to Section 65584 for which site capacity has not been identified in the inventory

94

of sites pursuant to paragraph (3) of subdivision (a) on sites that shall be zoned to permit owner-occupied and rental multifamily residential use by right during the planning period. These sites shall be zoned with minimum density and development standards that permit at least 16 units per site at a density of at least 16 units per acre in jurisdictions described in clause (i) of subparagraph (B) of paragraph (3) of subdivision (c) and at least 20 units per acre in jurisdictions described in clauses (iii) and (iv) of subparagraph (B) of paragraph (3) of subdivision (c). At least 50 percent of the very low and low-income housing need shall be accommodated on sites designated for residential use and for which nonresidential uses or mixed-uses are not permitted.

(i)  For purposes of this section and Section 65583, the phrase "use by right" shall mean that the local government's review of the owner-occupied or multifamily residential use may not require a conditional use permit, planned unit development permit, or other discretionary local government review or approval that would constitute a "project" for purposes of Division 13 (commencing with Section 21000) of the Public Resources Code. Any subdivision of the sites shall be subject to all laws, including, but not limited to, the local government ordinance implementing the Subdivision Map Act. A local ordinance may provide that "use by right" does not exempt the use from design review. However, that design review shall not constitute a "project" for purposes of Division 13 (commencing with Section 21000) of the Public Resources Code. Use by right for all rental multifamily residential housing shall be provided in accordance with subdivision (f) of Section 65589.5.

(j)  This section shall become operative on December 31, 2023.

SEC. 2.5.   Section 65583.2 is added to the Government Code, to read:

65583.2.   (a)  A city's or county's inventory of land suitable for residential development pursuant to paragraph (3) of subdivision (a) of Section 65583 shall be used to identify sites that can be developed for housing within the planning period and that are sufficient to provide for the jurisdiction's share of the regional housing need for all income levels pursuant to Section 65584. As used in this section, "land suitable for residential development" includes all of the following:

(1)  Vacant sites zoned for residential use.

(2)  Vacant sites zoned for nonresidential use that allows residential development.

(3)  Residentially zoned sites that are capable of being developed at a higher density.

(4)  Sites zoned for nonresidential use that can be redeveloped for, and, as necessary, rezoned for, residential use.

(b)  The inventory of land shall include all of the following:

(1)  A listing of properties by parcel number or other unique reference.

(2)  The size of each property listed pursuant to paragraph (1), and the general plan designation and zoning of each property.

(3)  For nonvacant sites, a description of the existing use of each property.

(4)  A general description of any environmental constraints to the development of housing within the jurisdiction, the documentation for which has been made available to the jurisdiction. This information need not be identified on a site-specific basis.

(5)  A general description of existing or planned water, sewer, and other dry utilities supply, including the availability and access to distribution facilities. This information need not be identified on a site-specific basis.

(6)  Sites identified as available for housing for above moderate-income households in areas not served by public sewer systems. This information need not be identified on a site-specific basis.

(7)  A map that shows the location of the sites included in the inventory, such as the land use map from the jurisdiction's general plan for reference purposes only.

(c)  Based on the information provided in subdivision (b), a city or county shall determine whether each site in the inventory can accommodate some portion of its share of the regional housing need by income level during the planning period, as determined pursuant to Section 65584. The analysis shall determine whether the inventory can provide for a variety of types of housing, including multifamily rental housing, factory-built housing, mobilehomes, housing for agricultural employees, emergency shelters, and transitional housing. The city or county shall determine the number of housing units that can be accommodated on each site as follows:

(1)  If local law or regulations require the development of a site at a minimum density, the department shall accept the planning agency's calculation of the total housing unit capacity on that site based on the established minimum density. If the city or county does not adopt a law or regulations requiring the development of a site at a minimum density, then it shall demonstrate how the number of units determined for that site pursuant to this subdivision will be accommodated.

(2)  The number of units calculated pursuant to paragraph (1) shall be adjusted as necessary, based on the land use controls and site improvements requirement identified in paragraph (5) of subdivision (a) of Section 65583.

(3)  For the number of units calculated to accommodate its share of the regional housing need for lower income households pursuant to paragraph (2), a city or county shall do either of the following:

(A)  Provide an analysis demonstrating how the adopted densities accommodate this need. The analysis shall include, but is not limited to, factors such as market demand, financial feasibility, or information based on development project experience within a zone or zones that provide housing for lower income households.

(B)  The following densities shall be deemed appropriate to accommodate housing for lower income households:

(i)  For an incorporated city within a nonmetropolitan county and for a nonmetropolitan county that has a micropolitan area: sites allowing at least 15 units per acre.

(ii)  For an unincorporated area in a nonmetropolitan county not included in clause (i): sites allowing at least 10 units per acre.

(iii)  For a suburban jurisdiction: sites allowing at least 20 units per acre.

(iv)  For a jurisdiction in a metropolitan county: sites allowing at least 30 units per acre.

(d)  For purposes of this section, a metropolitan county, nonmetropolitan county, and nonmetropolitan county with a micropolitan area shall be as determined by the United States Census Bureau. A nonmetropolitan county with a micropolitan area includes the following counties: Del Norte, Humboldt, Lake, Mendocino, Nevada, Tehama, and Tuolumne and other counties as may be determined by the United States Census Bureau to be nonmetropolitan counties with micropolitan areas in the future.

(e)  A jurisdiction shall be considered suburban if the jurisdiction does not meet the requirements of clauses (i) and (ii) of subparagraph (B) of paragraph (3) of subdivision (c) and is located in a Metropolitan Statistical Area (MSA) of less than 2,000,000 in population, unless that jurisdiction's population is greater than 100,000, in which case it shall be considered metropolitan. A county, not including the City and County of San Francisco, shall be considered suburban unless the county is in an MSA of 2,000,000 or greater in population in which case the county shall be considered metropolitan.

(f)  A jurisdiction shall be considered metropolitan if the jurisdiction does not meet the requirements for "suburban area" above and is located in an MSA of 2,000,000 or greater in population, unless that jurisdiction's population is less than 25,000 in which case it shall be considered suburban.

(g)  For sites described in paragraph (3) of subdivision (b), the city or county shall specify the additional development potential for each site within the planning period and shall provide an explanation of the methodology used to determine the development potential. The methodology shall consider factors including the extent to which existing uses may constitute an impediment to additional residential development, development trends, market conditions, and regulatory or other incentives or standards to encourage additional residential development on these sites.

(h)  The program required by subparagraph (A) of paragraph (1) of subdivision (c) of Section 65583 shall accommodate 100 percent of the need for housing for very low and low-income households allocated pursuant to Section 65584 for which site capacity has not been identified in the inventory of sites pursuant to paragraph (3) of subdivision (a) on sites that shall be zoned to permit owner-occupied and rental multifamily residential use by right during the planning period. These sites shall be zoned with minimum density and development standards that permit at least 16 units per site at a density of at least 16 units per acre in jurisdictions described in clause (i) of subparagraph (B) of paragraph (3) of subdivision (c) and at least 20 units per acre in jurisdictions described in clauses (iii) and (iv) of subparagraph (B) of paragraph (3) of subdivision (c). At least 50 percent of the very low and low-income housing need shall be accommodated on sites designated for residential use and for which nonresidential uses or mixed-uses are not permitted, except that a city or county may accommodate all of the very low and low-income housing need on sites designated for mixed uses if

94

those sites allow 100 percent residential use and require that residential use occupy 50 percent of the total floor area of a mixed-use project.

(i)  For purposes of this section and Section 65583, the phrase "use by right" shall mean that the local government's review of the owner-occupied or multifamily residential use may not require a conditional use permit, planned unit development permit, or other discretionary local government review or approval that would constitute a "project" for purposes of Division 13 (commencing with Section 21000) of the Public Resources Code. Any subdivision of the sites shall be subject to all laws, including, but not limited to, the local government ordinance implementing the Subdivision Map Act. A local ordinance may provide that "use by right" does not exempt the use from design review. However, that design review shall not constitute a "project" for purposes of Division 13 (commencing with Section 21000) of the Public Resources Code. Use by right for all rental multifamily residential housing shall be provided in accordance with subdivision (f) of Section 65589.5.

(j)  This section shall become operative on December 31, 2023.

SEC. 3.   Section 1.5 of this bill incorporates amendments to Section 65583.2 of the Government Code proposed by both this bill and Assembly Bill 1690. It shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2015, (2) each bill amends Section 65583.2 of the Government Code, and (3) this bill is enacted after Assembly Bill 1690, in which case Section 1 of this bill shall not become operative.

SEC. 4.   Section 2.5 of this bill shall become operative only if Section 1.5 of this bill becomes operative pursuant to Section 3, or if Section 1.5 of Assembly Bill 1690 becomes operative pursuant to Section 2 of that bill, and, in either case, Section 2 of this bill shall not become operative.

SEC. 5.   The Legislature finds and declares that a special law is necessary and that a general law cannot be made applicable within the meaning of Section 16 of Article IV of the California Constitution because of the special circumstances of certain areas of the state relating to regional housing needs.

O

# EXHIBIT 5

BILL ANALYSIS

```
                                                 AB 1537
 _____ Page  1

        CONCURRENCE IN SENATE AMENDMENTS
        AB 1537 (Levine)
        As Amended  August 19, 2014
        Majority vote
        _
 _____ -----------------------------------------------------
 _____|ASSEMBLY: |62-4 |(May 19, 2014) |SENATE: |29-1 |(August 21, |
 _____|          |     |               |        |     |2014)       |
 _____ -----------------------------------------------------

 _____ Original Committee Reference:     H. & C.D.

        SUMMARY  :  Creates a pilot program for Marin County to utilize a
     "suburban" default density standard for accommodating its share
     of affordable housing.  Specifically,  this bill  :  _

 _____1)Specifies that, for purposes of determining a jurisdiction's
        "default density" for accommodating affordable housing, if a
        county that is in the San Francisco-Oakland-Fremont,
        California Metropolitan Statistical Area (MSA) has a
        population of less than 400,000, that county is considered
        suburban. If this county includes an incorporated city that
        has a population of less than 100,000, this city is also
        considered suburban.

        2)Provides that this classification shall apply to a housing
        element revision cycle that is in effect from July 1, 2014, to
        December 31, 2023, inclusive.

        3)Requires that all jurisdictions affected by this legislation
        report to the Assembly Committee on Housing and Community
        Development, the Senate Committee on Transportation and
        Housing, and the Department of Housing and Community
        Development (HCD) regarding its progress in developing low-
        and very low-income housing.  The report must be provided
        twice, once, on, or before December 31, 2019, and a second
        time, on or before December 31, 2023.  The report is comprised
        of information that is already required as part of all local
        governments' annual Housing Element Progress Report to HCD.

        4)Requires that density requirements within one-half mile of
        Sonoma-Marin Area Rail Transit stations in place on June 30,
        2014 continue to apply.

        5)Requires the County of Marin to utilize the sum existing in
```

```
                                                 AB 1537
 _____ Page  2

        its housing trust fund as of June 30, 2013, for development
        and preservation of housing affordable to low- and very low-
        income households.

        6)Makes a finding that a special law is necessary and that a
        general law cannot be made applicable because of the special
        circumstances in Marin County relating to regional housing
        needs.

        The Senate amendments:

 _____1)Require that density requirements within one-half mile of
        Sonoma-Marin Area Rail Transit stations in place on June 30,
        2014, continue to apply.

        2)Require the County of Marin to utilize the sum existing in its
        housing trust fund as of June 30, 2013, for development and
        preservation of housing affordable to low- and very low-
        income households.

        3)Make a finding that a special law is necessary and that a
        general law cannot be made applicable because of the special
        circumstances in Marin County relating to regional housing
        needs.

        4)Make a technical, clarifying amendment.

        5)Add chaptering amendments to avoid a conflict with AB 1690
        (Gordon).

        FISCAL EFFECT  :  According to the Senate Appropriations
     Committee, pursuant to Senate Rule 28.8, negligible state costs.

        COMMENTS  :
```

Purpose of the bill:  According to the author, this bill will
refine the default density housing formula to allow for suburban
designations for the lower population in Marin County.  This
bill is intended to help create momentum for more affordable
housing development in areas that have had challenges in getting
projects off the ground due to concerns about high density
development.

Housing Element Working Group:  This bill will impact reforms to
housing element law that came out of the Housing Element Working

                                          AB 1537
                                        Page   3

Group (HEWG).  HEWG, which was convened by HCD in 2003, was a
broad-based group that included representatives from local
government, councils of governments (COGs), the for-profit and
non-profit development community, and affordable housing
advocacy groups.  HCD proposed the group after several lengthy
and divisive legislative battles over changes to housing element
law.

The HEWG met from June through November 2003, and reached
consensus on reform proposals in three major areas:  the
regional housing needs allocation process, increasing housing
development certainty, and the identification of adequate sites.
 The bills that implemented the reform proposals represented a
consensus agreement and received broad bipartisan support
throughout the legislative process.  The bills did not receive
any "no" votes.  One of these bills, AB 2348 (Mullin), Chapter
724, Statutes of 2004, amended housing element law by clarifying
the land inventory requirements to provide local governments
more certainty about the statutory requirements.  Amongst other
things, AB 2348 established the default densities, also known as
"Mullin" densities, for affordable housing sites.

Default density:  Every local government is required to prepare
a housing element as part of its general plan.  The housing
element process starts when HCD determines the number of new
housing units a region is projected to need at all income levels
(very low-, low-, moderate-, and above-moderate income) over the
course of the next housing element planning period to
accommodate population growth and overcome existing deficiencies
in the housing supply.  This number is known as the regional
housing needs assessment (RHNA).  The COG for the region, or HCD
for areas with no COG, then assigns a share of the RHNA number
to every city and county in the region based on a variety of
factors.

In preparing its housing element, a city or county must show how
it plans to accommodate its share of the RHNA.  The housing
element must include an inventory of sites already zoned for
housing.  If a community does not have enough sites within its
existing inventory of residentially zoned land to accommodate
its entire RHNA, then the community must adopt a program to
rezone land within the first three years of the planning period.

Cities and counties are required to demonstrate that sites are

                                          AB 1537
                                        Page   4

adequate to accommodate housing for each income group based on
the zoning after taking into consideration individual site
factors such as property size, existing uses, environmental
constraints, and economic constraints.  With respect to the
zoning, density can be used as a proxy for affordability.
Jurisdictions may establish the adequacy of a site for very low-
or low-income housing by showing that it is zoned at the
"default" density (also referred to as the Mullin density).
These densities range from 10 to 30 units per acre depending on
the type of jurisdiction.  Jurisdictions may also include sites
zoned at lower densities by providing an analysis of how the
lower density can accommodate the need for affordable housing.

This bill was introduced in response to concerns arising out of
Marin County.  Marin County is included in an MSA of two million
persons or greater. Several cities within Marin County have
populations of less than 25,000, and are already considered
"suburban" under the default density standards.  This bill would
reduce the default density from 30 units per acre to 20 units
per acre in the cities of Novato and San Rafael, and in

unincorporated Marin County for one housing element cycle. The
Senate amendments provide that higher density requirements
within one-half mile of Sonoma-Marin Area Rail Transit stations
in place on June 30, 2014, continue to apply, and require the
Marin County to utilize the sum existing in its housing trust
fund as of June 30, 2013, for development and preservation of
housing affordable to low- and very low- income households. The
amendments also make a technical, clarifying change and add
chaptering amendments to avoid a conflict with AB 1690 (Gordon)
of the current legislative session.

Arguments in support:  Supporters of the bill argue that the
default density standards are in need of refinement due to
inconsistent outcomes.  They explain that certain cities and
counties within larger multi-county MSAs are considered
"metropolitan" under the current default density standards
despite being suburban or rural in character.  Specifically,
supporters point to the fact that unincorporated Sonoma County,
which is in a less populous MSA, is considered "suburban"
despite having a higher population than unincorporated Marin
County.  Supporters also point to the fact that Marin has the
same default density standard as San Francisco due to its
inclusion in the same MSA.

Supporters contend that Marin County has difficulty zoning for a

                                              AB 1537
                                              Page  5

default density of 30 units per acre, which impacts their
ability to promote affordable housing.  In this view, reducing
the default density would create momentum for more affordable
housing projects by addressing local concerns about high-density
housing.  Supporters argue that the bill would allow specific
communities more flexibility to zone land suitable for
affordable housing in a way that fits within the communities'
individual circumstances.

Arguments in opposition:  Opponents of the bill point to the
fact that default densities are not mandatory.  In establishing
the adequacy of sites for affordable housing, local governments
can either zone the site at the default density or provide HCD
with an analysis demonstrating that the site is adequate to
support lower-income housing development at its zoned density
level, including factors such as market demand, financial
feasibility, or information based on development project
experience within a zone or zones that provide housing for
lower-income households.

Opponents also point to the issue that default density standards
were instituted after a lengthy working group process involving
a diverse group of stakeholders.  In opponents' view, the bill
is a result of local opposition to affordable housing, and
legislating to accommodate this narrow opposition is the wrong
direction.  Opponents point to the current lack of availability
of affordable housing for low- and moderate-income individuals
and families, and contend that this bill will have the effect of
making it even more costly to develop affordable housing in the
areas affected by the bill.

Analysis Prepared by :   Rebecca Rabovsky / H. & C.D. / (916)
319-2085

                                FN: 0005154

# EXHIBIT 6

1 | ROB BONTA
Attorney General of California
2 | DANIEL A. OLIVAS
Senior Assistant Attorney General
3 | DAVID PAI, State Bar No. 227058
Supervising Deputy Attorney General
4 | MATTHEW T. STRUHAR, State Bar No. 293973
THOMAS P. KINZINGER, State Bar No. 323889
5 | Deputy Attorneys General
  1300 I Street, Suite 125
6 | P.O. Box 944255
Sacramento, CA 94244-2550
7 | Telephone:  (916) 210-7246          *Exempt from Filing Fees*
Fax:  (916) 327-2319                *Government Code § 6103*
8 | E-mail:  Matthew.Struhar@doj.ca.gov
          Thomas.Kinzinger@doj.ca.gov
9 |
*Attorneys for Petitioner and Plaintiff, The People of*
10 | *California ex rel. Rob Bonta, and the California*
*Department of Housing and Community*
11 | *Development*

12 |

13 |                SUPERIOR COURT OF THE STATE OF CALIFORNIA

14 |                          COUNTY OF ORANGE

15 |

16 |

17 |
**THE PEOPLE OF CALIFORNIA EX REL.**           Case No.
18 | **ROB BONTA, AND THE CALIFORNIA**
**DEPARTMENT OF HOUSING AND**              **PETITION FOR WRIT OF MANDATE**
19 | **COMMUNITY DEVELOPMENT,**                 **AND COMPLAINT FOR**
                                            **DECLARATORY AND INJUNCTIVE**
20 |                 Petitioners and Plaintiffs,  **RELIEF**

21 |            v.

22 |
**THE CITY OF HUNTINGTON BEACH, A**
23 | **MUNICIPAL CORPORATION; CITY**
**COUNCIL OF HUNTINGTON BEACH;**
24 | **AL ZELINKA, in his official capacity as**
**CITY MANAGER OF HUNTINGTON**
25 | **BEACH; AND DOES 1-50, INCLUSIVE,**

26 |                 Respondents and Defendants.

27 |

28 |

                                    1

**INTRODUCTION**

1.    Californians continue to suffer under a housing affordability crisis. As the Legislature has found, "[t]he lack of housing . . . is a critical problem that threatens the economic, environmental, and social quality of life in California." (Gov. Code, § 65589.5, subd. (a)(1)(A), (B).) This crisis is "hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic opportunities for workers and businesses, worsening poverty and homelessness, and undermining the state's environmental and climate objectives." (*Id.*, subd. (a)(2)(A).)

2.    A key contributor to this crisis is the failure of local governments to plan for the necessary housing supply. To remedy this, the Legislature requires local governments to include housing elements in their general plans. A housing element must include, among other things, an assessment of housing needs, an inventory of resources and constraints relevant to meeting those needs, and a program to implement the policies, goals, and objectives of the housing element. (Gov. Code, § 65580 et seq.)

3.    Local governments that do not prepare a housing element substantially in compliance with state law, thereby failing to plan for an adequate supply of housing, become subject to various legal consequences. For example, a local agency that fails to adopt a substantially compliant housing element becomes subject to the so-called "Builder's Remedy" provision of the Housing Accountability Act. (Gov. Code, § 65589.5) A local agency without a substantially compliant housing element may not deny, or apply conditions that make infeasible, a housing development project for very low-, low-, or moderate-income households on the basis of inconsistency with a zoning ordinance and land use designation in any general plan element. (Gov. Code, § 65589.5, subd. (d)(5).)

4.    In another effort to alleviate the housing crisis, the Legislature has repeatedly amended the housing laws to encourage, and streamline the approval of, permits for accessory dwelling units ("ADUs") throughout the state. (See generally, Gov. Code, §§ 65852.150, 65852.2, 65852.22.) These units are typically small, easily-constructed residential structures installed as secondary housing units on a single-family property. Current ADU law requires local

agencies to approve ADU projects ministerially, or if denied, provide comments to the applicant regarding deficiencies and a description of how the application can be remedied.

5.   And, in 2021, the Legislature passed the California Housing Opportunity and More Efficiency Act ("HOME Act," or "SB 9") to streamline the permitting process and remove regulatory barriers for subdividing residential lots into multifamily housing projects like duplexes, triplexes, and four-plexes that are more affordable to middle-class households.

6.   The City of Huntington Beach has decided to ignore the laws the Legislature specifically crafted to address California's housing affordability crisis by barring its staff from accepting and processing ADU- and SB 9-related building permits. The City has done this despite the fact that the availability of decent, suitable, and affordable housing is of vital statewide importance to all Californians.

7.   In an Action Item at its February 21, 2022 meeting, the Huntington Beach City Council directed its City Manager to "cease the processing of all applications/permits brought to the City by developers under SB 9, SB 10, or 'state law related' ADU projects." [1] (See Exhibit A, at pp. 8-9.) In doing so, the City ignored its own ordinances.

8.   The City of Huntington Beach has not adopted a current housing element that is substantially in compliance with state law. In failing to adopt a substantially compliant housing element, Huntington Beach is now subject to the Builder's Remedy.

9.   At its March 7, 2023 meeting, the Huntington Beach City Council attempted to excuse itself from the consequences of its failure to comply with the housing element law. It introduced Ordinance No. 4285, purporting to ban Builder's Remedy projects in Huntington Beach. (See Exhibit B.)

10.  The City Council's ban on ADU- and SB 9-eligible projects is directly in conflict with the law of this state.

---

[1] Senate Bill 10 added section 65913.5 to the Government Code, authorizing cities to *voluntarily* adopt ordinances allowing for higher residential density in a "transit-rich area" or an "urban infill site," as defined. Why the Huntington Beach City Council decided to ban projects that would only be allowed if the City Council itself voted to allow them is unclear.

11.   The People of the State of California, by and through Attorney General Rob Bonta, and the Department of Housing and Community Development ("HCD"), bring this action against the City of Huntington Beach, its City Council, and its City Manager (collectively, the "City") to remedy these violations of state law. The People and HCD request that this Court issue a writ ordering the City to continue processing ADU- and SB 9-eligible projects in accordance with state law. Further, the People and HCD request this court issue a judgment declaring that the City's ban on acceptance and processing of ADU and SB 9 project applications is in conflict with the applicable law of this state and void, and to issue an injunction instructing the City to refrain from enforcing its unlawful ban. The People and HCD intend to amend this Petition and Complaint should the City follow through on additional attempts to violate state law, such as passing Ordinance No. 4285 to ban Builder's Remedy projects.

## **PARTIES**

12.   The Attorney General, as the chief law enforcement officer of the State of California, brings this action under his broad independent powers to enforce state laws, and on behalf of HCD. (Cal. Const., Art. V, section 13; Gov. Code, § 65585, subd. (j).)

13.   HCD is a public agency of the State of California. (Gov. Code, § 12804.) Among other duties, HCD is responsible for developing housing policy and building codes, for regulating manufactured homes and mobile home parks, and for enforcing state housing laws, such as the Housing Accountability Act and state ADU laws, in a manner that meaningfully and positively impacts the provision of housing in all communities across the state.

14.   The City of Huntington Beach is a municipal corporation formed and existing under the laws of the State of California, of which it is a political subdivision.

15.   The City Council of Huntington Beach is the elected governing body of the City of Huntington Beach.

16.   The City Manager of Huntington Beach is the city official responsible for the management and oversight of the City's various departments.

17.   The People are unaware of the true names and capacities of respondents and defendants DOES 1 through 50 (the "Doe Respondents"), who are therefore sued by fictitious

1    names pursuant to Code of Civil Procedure section 474. The People allege on information and

2    belief that each such fictitiously named Doe Respondent is responsible or liable in some manner

3    for the events and happenings referred to herein, and the People will seek leave to amend this

4    Petition and Complaint to allege their true names and capacities after the same have been

5    ascertained.

6                                    **VENUE AND JURISDICTION**

7        18.  This Court has jurisdiction over this action pursuant to Code of Civil Procedure

8    sections 187, 1060, and 1085.

9        19.  Venue is proper in this Court because the City is located in Orange County and the

10   violations of law alleged herein occurred in Orange County.

11                             **BACKGROUND AND FACTUAL ALLEGATIONS**

12                                        **The Housing Crisis**

13       20.  The Legislature has declared that "[t]he availability of housing is of vital statewide

14   importance, and the early attainment of decent housing and a suitable living environment for

15   every Californian . . . is a priority of the highest order."  (Gov. Code, § 65580, subd. (a).)

16       21.  California has a crisis-level housing shortage that stems from the failure of local

17   governments to approve affordable housing to meet the needs of all Californians. For decades, the

18   Legislature has found that California has been suffering from "a severe shortage of affordable

19   housing, especially for persons and families of low and moderate income" and that "there is an

20   immediate need to encourage the development of new housing." (*Ruegg & Ellsworth v. City of*

21   *Berkeley* (2021) 63 Cal.App.5th 277, 295, quoting Gov. Code, § 65913.)

22       22.  Recently, the Legislature stated plainly that "California has a housing supply and

23   affordability crisis of historic proportions." (Gov. Code, § 65589.5, subd. (a)(2)(A).) "The

24   consequences of failing to effectively and aggressively confront this crisis are hurting millions of

25   Californians, robbing future generations of the chance to call California home, stifling economic

26   opportunities for workers and businesses, worsening poverty and homelessness, and undermining

27   the state's environmental and climate objectives." (*Ibid.*)

28       ///

**Housing Elements and the Planning Process**

23.  State law requires that all local governments adequately plan to meet the housing needs of everyone in the community, at all economic levels. To meet this requirement, every city and county must adopt and periodically update a housing element as part of its general plan. (See Gov. Code, §§ 65302, subd. (c), 65580, et seq.) The law mandating this adoption and periodic update is known as the "Housing Element Law." (*Id.*, § 65580, et seq.)

24.  California's Housing Element Law requires local governments to adopt plans and regulatory systems that provide opportunities for, and do not unduly constrain, housing development, especially for a locality's lower-income households and workforce. As a result, housing policy in California rests largely on the effective implementation of the housing element contained in the local general plan.

25.  The housing element is a roadmap for housing development in a given community. The housing element must identify and analyze existing and projected housing needs, and must include "a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing." (Gov. Code, § 65583.) The housing element must also "identify adequate sites for housing" and "make adequate provision for the existing and projected needs of all economic segments of the community." (*Ibid.*) Each housing element is also subject to review by HCD.

26.  A local jurisdiction's housing element must be frequently updated to ensure compliance with California's Housing Element Law. (Gov. Code, § 65588.) Jurisdictions must update their housing elements every five or eight years. (See *id.*, subd. (e)(3).) Each five- or eight-year cycle is known as a "planning period." (See *id.*, subd. (f)(1).)

27.  The process of updating a housing element begins with HCD's determination of a Regional Housing Need Allocation ("RHNA") for the region for a given planning period. (Gov. Code, § 65584, subd. (a)(1).) The RHNA sets goals for housing affordable to various income levels. To arrive at the RHNA, HCD starts with demographic population information from the California Department of Finance and uses a formula to calculate a figure for each region's planning body, known as a "council of governments" ("COG"). Each COG (in this case, the

1    Southern California Association of Governments) also uses its own demographic figures to

2    calculate the regional housing need. Each COG coordinates with HCD to arrive at a final figure,

3    taking into account factors not captured in the calculations. This final figure is the RHNA. (See

4    *id.*, § 65584.01.)  Once the RHNA is set, the COG is responsible for allocating the housing need

5    among all of the cities and counties within that region. (Gov. Code, § 65584, subd. (b).) Each

6    local government must then prepare a housing element that identifies adequate sites to

7    accommodate that jurisdiction's fair share of the RHNA at each income level. (*Id.*, §§ 65583,

8    65583.2.))

9        28.  Each local government must submit its draft housing element to HCD before

10   adoption. (Gov. Code, § 65585, subd. (b)(1).) HCD must review the draft element and issue

11   findings as to whether the draft substantially complies with the Housing Element Law. (*Id.*,

12   subds. (b)(3), (d).) After adopting the final housing element, the local government must again

13   submit the element to HCD, and HCD must again review and report its findings to the local

14   government. (*Id.*, subds. (g), (h).)

15                    **The Housing Accountability Act and the "Builder's Remedy"**

16       29.  The Legislature originally enacted the Housing Accountability Act ("HAA") in 1982

17   in an effort to compel local governments to approve more housing, and has repeatedly amended

18   the law to increase its effectiveness. (Gov. Code, § 65589.5, subd. (a); *Ruegg*, supra, 63

19   Cal.App.5th at pp. 295–297.) In 1990, the Legislature made the HAA expressly applicable to

20   charter cities. (*California Renters Legal Advoc. & Educ. Fund v. City of San Mateo* (2021) 68

21   Cal. App. 5th 820, 835.)

22       30.  In general, the HAA provides that when a proposed housing development complies

23   with applicable general plan, zoning, and development policies, the local agency may disapprove

24   the project (or approve it on condition that it be developed at lower density) only if the local

25   agency finds that the project would have a specific, adverse, and unavoidable impact on public

26   health or safety. (Gov. Code, § 65589.5, subd. (j)(1).)

27       31.  Specifically, a local agency must approve any housing development project that

28   complies with locally adopted objective standards, unless it can make two written findings based

on a preponderance of evidence in the record. (Gov. Code, § 65589.5, subd. (j)(1).) First, the proposed development must have a significant and adverse impact on public health or safety. (*Id.*, subd. (j)(1)(A).) Second, disapproval must be the only means of mitigating or avoiding the impact. (*Id.*, subd. (j)(1)(B).) These findings must be project-specific, and the public health or safety impact must constitute "a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete." (*Id.*, subd. (j)(1)(A).)

32.  If the local agency considers a proposed housing development project to be inconsistent, not in compliance, or not in conformity with an applicable objective standard, it must provide the project applicant with "written documentation" that identifies the applicable provision or provisions, along with "an explanation of the reason or reasons it considers the housing development to be inconsistent, not in compliance, or not in conformity" with those standards. This explanation is due within 30 days an application is deemed complete for a housing development with 150 or fewer housing units, or within 60 days an application is deemed complete for a housing development with more than 150 housing units. (*Id.*, subd. (j)(2)(A).) If this documentation is not provided by the applicable deadline, the application is deemed consistent with the applicable standards. (*Id.*, subd. (j)(2)(B).)

33.  The foregoing provisions of subdivision (j) apply to all housing development projects. Where a proposed housing development includes affordable housing, a local agency's discretion to deny the project is even further constrained. (*Id.*, subd. (d).) An affordable housing project may only be denied under five specific and narrow circumstances.

34.  The 1990 HAA amendments modified subdivision (d) to provide that cities and counties could only deny, or apply conditions that make infeasible, a housing development project for very low-, low- or moderate-income households or an emergency shelter if they are able to make one of five specific findings. (Gov. Code, § 65589.5, subd. (d).) Those five findings, paraphrased, are:

(1) The city or county has met or exceeded its RHNA for the proposed income categories in the development.

(2) The housing development or emergency shelter would have a specific adverse impact on public health and safety, and there is no way to mitigate or avoid the impact without making the development unaffordable. Such an impact must be based on objective, written public health or safety standards in place when the application was deemed complete.

(3) The denial or imposition of conditions is required to comply with state or federal law, and there is no feasible method to comply without making the development unaffordable.

(4) The project is proposed on land zoned for agriculture or resource preservation that is surrounded on at least two sides by land being used for agriculture or resource preservation, or there are not adequate water or sewage facilities to serve the project.

(5) The project is inconsistent with both the zoning ordinance and the land use designation as specified in any general plan element, and the jurisdiction has adopted a substantially compliant housing element.

35.  The last of these five findings, subdivision (d)(5), is the source of the so-called Builder's Remedy. By negative implication, if a locality has *not* adopted a housing element in substantial compliance with state law, it *cannot* deny a project that includes affordable housing on grounds that it does not comply with a zoning or land-use designation.

### The ADU Laws

36.  One effective means of increasing the housing supply is by removing regulatory barriers to accessory dwelling units, or ADUs. ADUs are sometimes also known as "granny flats," "in-law units," "backyard cottages," or "secondary units," among other names. These small structures provide a cost-effective solution to increasing the housing supply on a rapid timescale.

37.  ADUs have many benefits. They are affordable to construct, since they typically use comparatively inexpensive wood frame construction, and no new land acquisition or major infrastructure is required. ADUs can also provide a source of income for homeowners when rented, increasing incentives for homeowners to build ADUs on their property. In addition, ADUs

9

1   enable extended families to reside close to one another, and for seniors to age in place with family

2   members while maintaining an independent living space. (See generally, Accessory Dwelling

3   Units, Department of Housing and Community Development, available at

4   https://www.hcd.ca.gov/policy-and-research/accessory-dwelling-units.)

5          38.   In recent years, the Legislature has repeatedly amended the housing laws to legalize

6   and promote the construction of accessory dwelling units. In 2018, as part of a package of updates

7   to the housing laws that, among other things, made the ADU laws applicable to charter cities for

8   the first time, the Legislature found and declared all of the following:

9          (1) Accessory dwelling units are a valuable form of housing in California.

10         (2) Accessory dwelling units provide housing for family members, students, the elderly,

11         in-home health care providers, the disabled, and others, at below market prices within

12         existing neighborhoods.

13         (3) Homeowners who create accessory dwelling units benefit from added income, and

14         an increased sense of security.

15         (4) Allowing accessory dwelling units in single-family or multifamily residential zones

16         provides additional rental housing stock in California.

17         (5) California faces a severe housing crisis.

18         (6) The state is falling far short of meeting current and future housing demand with

19         serious consequences for the state's economy, our ability to build green infill consistent

20         with state greenhouse gas reduction goals, and the well-being of our citizens,

21         particularly lower and middle-income earners.

22         (7) Accessory dwelling units offer lower cost housing to meet the needs of existing and

23         future residents within existing neighborhoods, while respecting architectural character.

24         (8) Accessory dwelling units are, therefore, an essential component of California's

25         housing supply.

26   (Gov. Code, § 65852.150, subd. (a).)

27         39.   The bulk of the ADU laws are set forth at Government Code section 65850 et seq.

28   These laws broadly restrict the ability of local agencies, whether general law or charter cities, to

10

1   deny ADU projects within their jurisdiction, and set tight deadlines for processing applications.

2   　　40.   Relevant to this litigation, Government Code section 65852.2, subdivisions (a)(3)(A)

3   and (b)(1), require permitting agencies to approve or deny ADU applications ministerially and

4   without discretionary review within 60 days of a complete application's submittal. Under both

5   provisions, "[i]f the local agency has not acted upon the completed application within 60 days,

6   [an] application shall be deemed approved." In addition, Government Code section 65852.2,

7   subdivision (e)(1), states "a local agency shall ministerially approve an application for a building

8   permit within a residential or mixed-use zone to create" ADUs that meet specific requirements.

9   　　41.   In addition, a local agency that denies an ADU application must provide "in writing a

10  full set of comments to the applicant with a list of items that are defective or deficient and a

11  description of how the application can be remedied by the applicant." (Gov. Code, § 65852.2,

12  subd. (b)(2).)

13  　　42.   Government Code section 65852.2, subdivision (a)(7), further provides: "No other

14  local ordinance, policy, or regulation shall be the basis for the delay or denial of a building permit

15  or a use permit under this subdivision."

16  　　　　　　　　　　　　　**Senate Bill 9**

17  　　43.   The Legislature introduced Senate Bill 9 in 2021 in an effort to streamline the process

18  for creating duplexes or for subdividing an existing lot. SB 9 restrained the discretion of local

19  agencies by creating a ministerial process for such project approvals.

20  　　44.   SB 9 ultimately allows up to four homes on lots where only one existed previously,

21  by permitting existing single-family homes to be converted to duplexes or single-family lots to be

22  subdivided into two lots on which two duplexes could be built. (See SB 9 Senate Floor Analysis,

23  August 28, 2021, available at

24  https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB9.)

25  　　45.   SB 9 added, among other provisions, sections 65852.21 and 66411.7 to the

26  Government Code. Section 65852.21 requires local agencies to approve a proposed housing

27  development consisting of two residential units within a single-family zone on a ministerial basis.

28  Section 66411.7 requires local agencies to approve a lot split in a single-family zone on a

1    ministerial basis. Both provisions became operative on January 1, 2022.

2        46.  SB 9 placed limits on a local agency's ability to deny proposed projects, but it did not

3    entirely eliminate local agencies from the approval process. Local agencies are still permitted to

4    "impose objective zoning standards, objective subdivision standards, and objective design review

5    standards," so long as such standards do not have "the effect of physically precluding the

6    construction of up to two units or...would physically preclude either of the two units from being at

7    least 800 square feet in floor area" within a single-family zone. (Gov. Code, § 65852.21, subd.

8    (b).) Similarly, local agencies can impose "objective" standards with respect to lot splits, so long

9    as those standards do not "have the effect of physically precluding the construction of two units

10   on either of the resulting parcels or that would result in a unit size of less than 800 square feet"

11   within a single-family zone. (Gov. Code, § 66411.7, subd. (c).) Finally, the legislative body of a

12   local agency may reject an SB 9 project if it finds, based on a preponderance of the evidence, that

13   the proposed project would have a "specific, adverse impact" on "public health and safety or the

14   physical environment and for which there is no feasible method to satisfactorily mitigate or avoid

15   the specific, adverse impact." (Gov. Code, §§ 65852.21, subd. (d); 66411.7, subd. (d); see also

16   65589.5, subd. (d)(2).)

17                        **The Housing Crisis Act**

18       47.  The Housing Crisis Act of 2019 ("HCA") prohibits a local government from "enact[ing]

19   a development policy, standard, or condition" that would have the effect of "[c]hanging the

20   general plan land use designation, specific plan land use designation, or zoning of a parcel or

21   parcels of property to a less intensive use or reducing the intensity of land use within an existing

22   general plan land use designation, specific plan land use designation, or zoning district in effect at

23   the time of the proposed change, below what was allowed under the land use designation or

24   zoning ordinances … in effect on January 1, 2018." (Gov. Code, § 66300, subd. (b)(1)(A).) The

25   statute defines "reducing the intensity of land use" to include "any other action that would

26   individually or cumulatively reduce the site's residential development capacity." (*Ibid*.)

27       48.  The HCA also prohibits a local government from "[i]mposing a moratorium or

28   similar restriction or limitation on housing development … within all or a portion of the

1   jurisdiction … other than to specifically protect against an imminent threat to the health and

2   safety of persons residing in, or within the immediate vicinity of, the area subject to the

3   moratorium….” (Gov. Code, § 66300, subd. (b)(1)(B)(i).)

4         49.  In addition, a local agency shall not enforce such “a moratorium or other similar

5   restriction on or limitation of housing development until it has submitted the ordinance to, and

6   received approval from, [HCD].” (Gov. Code, § 66300, subd. (b)(1)(B)(ii).) If HCD denies

7   approval, “that ordinance shall be deemed void.” (*Ibid*.)

8                    **Huntington Beach's Violations of State Housing Laws**

9         50.  At its February 21, 2023 meeting, the Huntington Beach City Council adopted Action

10   Item No. 23-172 (the “Action Item”), directing the City Manager to “cease the processing of all

11   applications/permits brought to the City by developers under SB 9, SB 10, or ‘state law related’

12   ADU projects, until the courts have adjudicated the matter(s).”[2] The Action Item also directs the

13   City Attorney to “take any legal action necessary to challenge SB 9 and SB 10 and the laws that

14   permit ADU's [sic].”

15         51.  In deliberating over the Action Item, the City did not cite any statutory exemption

16   under SB 9 as a basis for the Action Item, nor did it make any findings that the Action Item is

17   necessary to protect the public from an immediate, adverse impact to health or safety.

18         52.  On February 22, 2023, the City, pursuant to its Action Item, began refusing to accept

19   any ADU and SB 9 permit applications. (See Planning Division, City of Huntington Beach's

20   website, available at https://www.huntingtonbeachca.gov/government/departments/planning/, last

21   visited March 7, 2023 [stating that, effective February 22, 2023, no SB 9 or ADU permit

22   applications are being accepted until “any legal challenges are resolved.”].) The City did so even

23   though it had not, and has not yet, initiated any legal action challenging SB 9 or the state's ADU

24   laws.

25         53.  The Action Item, by instructing City staff to reject SB 9 projects that are otherwise

26   compliant with applicable objective standards without making any of the written findings

27         ──────────────
          [2] As noted in footnote 1 supra, SB 10 permits local agencies to adopt ordinances allowing

28   for increased density near transit-rich and/or urban infill sites. It is a voluntary, opt-in upzoning
     law.

1  required by law, violates the Housing Accountability Act.

2      54.  The Action Item, by imposing a moratorium on SB 9 and ADU permit application

3  processing, also violates the Housing Crisis Act.

4      55.  In addition, at its March 7, 2023 meeting, the City Council introduced Ordinance No.

5  4285, which would amend section 202.04 of the Huntington Beach Zoning and Subdivision

6  Ordinance to "expressly prohibit[] the processing or approval of any application for a housing

7  development project or any project not in conformance with the zoning and General Plan land use

8  designation … regardless of the so-called 'Builder's Remedy' (under the Housing Accountability

9  Act or any other State law), that portend to allow developers of affordable housing projects to

10  bypass the zoning code and general plan of cities that are out of compliance with the Housing

11  Element Law." (See Exhibit B.)

12      56.  The proposed Ordinance No. 4285 makes no specific supporting findings other than

13  to state that it comports with the City's General Plan.

14      57.  Ordinance No. 4285, and its purported ban on Builder's Remedy projects, is directly

15  in conflict with the Housing Accountability Act.

16      58.  Ordinance No. 4285 also violates the Housing Crisis Act, and if invoked on certain

17  proposed projects subject to other state law protections, stands to violate state fair housing laws

18  under Government Code sections 8899.50 and 65008, density bonus law under Government Code

19  section 65915 et seq., and ministerial approval laws under SB 35 (Gov. Code § 65913.4), SB 6

20  and AB 2011 (Gov. Code §§ 65852.24 and 65912.110).

21  **These Violations Occurred Despite Numerous Warnings**

22      59.  The City Council knowingly violated state laws, as alleged above, despite numerous

23  warnings from both HCD and the Attorney General's Office to both the City Council, the City's

24  Planning Commission, and the City Attorney.

25      60.  On January 9, 2023, HCD issued a Notice of Potential Violation to the City's

26  Planning Commission with respect to the recommendation to adopt Ordinance No. 4285 banning

27  Builders' Remedy projects.

28

14

61.  On February 13, 2023, HCD issued a second Notice of Potential Violation regarding Ordinance No. 4285. That same day, the Attorney General's Office also transmitted a letter to City Attorney Michael Gates warning that, if adopted, Ordinance No. 4285 would conflict with state law.

62.  On February 21, 2023, HCD issued a Notice of Potential Violation to the City Council regarding the Action Item to cease accepting ADU permit applications.

63.  That same day, the Attorney General's office transmitted a letter to the City Council regarding the Action Item to cease accepting SB 9 permit applications.

64.  On February 22, 2023, HCD issued a Notice of Violation regarding the City Council's decision to adopt the Action Item.

65.  On February 23, 2023, the Attorney General's Office transmitted a letter to the City Attorney requesting him to confirm that (1) the City will refuse to process any permit applications made under SB 9, including permit applications filed pursuant to the City of Huntington Beach's Zoning Text Amendment 22-002, (2) the City is no longer processing any ADU applications, and (3) the City Attorney has not yet initiated any legal action challenging SB 9 or the state's ADU laws.

66.  On February 27, 2023, the City Attorney responded to the Attorney General's Office by email, stating that (1) he did not believe there to be any pending SB 9 permit applications, (2) the City continued to process existing applications but would not be taking new applications, and (3) he had not yet initiated any legal action at the City Council's direction, but would be consulting with the City Council in closed session on March 7th to discuss the matter.

67.  On March 6, 2023, HCD issued another Notice of Potential Violation with respect to the proposed Ordinance No. 4285 banning Builder's Remedy projects.

## FIRST CAUSE OF ACTION

**Writ of Mandate (Code Civ. Proc., § 1085; Gov. Code, § 65585, subd. (n)) – Violation of Gov. Code, §§ 65852.2 (ADU), 65852.21, 66411.7 (SB 9)**
**[Against All Defendants]**

68.  Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

69.   Under state law, the City must process ADU applications ministerially and without discretionary review within 60 days of a complete application's submittal. (Gov. Code, § 65852.2.)

70.   The City must also, before denying any ADU application, provide "in writing a full set of comments to [an] applicant with a list of items that are defective or deficient and a description of how the application can be remedied by the applicant." (Gov. Code, § 65852.2, subd. (b)(2).)

71.   Government Code section 65852.2, subdivision (a)(7), further provides "[n]o other local ordinance, policy, or regulation shall be the basis for the delay or denial of a building permit or a use permit under this subdivision."

72.   Under SB 9, the City must process, on a ministerial basis, (1) proposed housing developments consisting of two residential units within a single-family zone, and (2) lot splits within a single-family zone. (Gov. Code, §§ 65852.21, 66411.7.)

73.   The City is not complying with these mandatory duties. As alleged above, the City has ceased accepting and processing ADU and SB 9 permit applications.

74.   The City's failure to process these applications is arbitrary, capricious, entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, an abuse of discretion, and a failure to act as required by law.

75.   Accordingly, a writ of mandate should issue ordering the City to comply with the ADU law and SB 9. (Gov. Code, §§ 65852.2, 65852.21, 66411.7.)

76.   Petitioners have a beneficial interest in the issuance of such a writ and have a significant interest in ensuring that the City complies with the law.

77.   Petitioners have exhausted all required administrative remedies, or are excused from exhausting their remedies due to the futility of pursuing such remedies, among other things.

78.   Petitioners have no plain, speedy, or adequate remedy in the ordinary course of law. The only remedy provided by law to obtain relief is this Petition for Writ of Mandate pursuant to Code of Civil Procedure section 1085.

**SECOND CAUSE OF ACTION**
**Declaratory and Injunctive Relief (Code Civ. Proc., § 1060; Gov. Code, § 65585, subd. (n)) –**
**Violation of Gov. Code, § 66300 (Housing Crisis Act of 2019)**
**[Against All Defendants]**

79.   Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

80.   There is a controversy between Petitioners and the City as to whether the City's ban on ADU and SB 9 projects complies with the Housing Crisis Act of 2019. As alleged above, Petitioners believe that the City's ban on ADU and SB 9 projects does not comply with the HCA because it reduces the intensity of land use and is an effective moratorium on housing development. Petitioners further believe that the City does not intend to become compliant with these laws. Further, based on information and belief, Petitioners allege that the City is deliberately defying applicable state law. It is necessary and appropriate for the Court to render a declaratory judgment that sets forth the parties' legal rights and obligations with respect to whether the City's ban is compliant with the HCA.

81.   In addition to these remedies, Petitioners are entitled to prospective relief directing the City to comply with the HCA.

82.   Petitioners therefore request a declaration that the City's ban on ADU and SB 9 projects violates the Housing Crisis Act of 2019. (Gov. Code, § 66300.)

**THIRD CAUSE OF ACTION**
**Declaratory and Injunctive Relief (Code Civ. Proc., § 1060; Gov. Code, § 65585, subd. (n)) –**
**Violation of Gov. Code, § 65589.5 (Housing Accountability Act)**
**[Against All Defendants]**

83.   Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

84.   There is a controversy between Petitioners and the City as to whether the City's ban on SB 9 projects complies with the Housing Accountability Act. As alleged, Petitioners believe that the City's ban on SB 9 projects does not comply with the HAA because it requires the City to reject housing projects that are otherwise compliant with locally adopted objective standards without making any of the written findings required by law. Petitioners further believe that the

17

City does not intend to become compliant with the HAA. Further, based on information and belief, Petitioners allege that the City is deliberately defying applicable state law.

85.  It is necessary and appropriate for the Court to render a declaratory judgment that sets forth the parties' legal rights and obligations with respect to whether the City's ban violates the HAA.

86.  In addition to these remedies, Petitioners are entitled to prospective relief directing the City to comply with the HAA.

87.  Petitioners therefore request a declaration that the City's ban on SB 9 projects violates the Housing Accountability Act. (Gov. Code, § 65589.5.)

## PRAYER FOR RELIEF

WHEREFORE, Petitioners pray as follows:

1.  For a writ of mandate ordering the City to continue processing SB 9 and ADU permit applications in compliance with SB 9 and ADU laws. (Gov. Code, §§ 65852.2; 65852.21; 66411.7; 65586, subd. (n).)

2.  For a declaration that the City is in violation of the Housing Crisis Act of 2019, and its moratorium on SB 9 and ADU permit applications is in conflict with the law of this state and void. (Gov. Code, §§ 66300; 65585, subd. (n))

3.  For a declaration that the City is subject to the Housing Accountability Act and its ban on SB 9 projects is in conflict with the law of this state and void. (Gov. Code, §§ 65589.5; 65585, subd. (n).)

4.  For an injunction requiring the City to comply with the Housing Crisis Act of 2019 and to refrain from enforcing its moratorium on SB 9 and ADU permit applications. (Gov. Code, §§ 66300; 65585, subd. (n).)

5.  For an injunction requiring the City to comply with the Housing Accountability Act and to refrain from enforcing its ban on SB 9 projects. (Gov. Code, §§ 65589.5; 65585, subd. (n))

1      6.   For monetary fines imposed by statute, in an amount as the court shall deem proper

2          under the Housing Accountability Act and any other state laws. (Gov. Code, § 65585,

3          subd. (n).)

4      7.   For costs and attorneys' fees.

5      8.   For any other relief the Court may deem appropriate.

6

7 Dated:  March 8, 2023                Respectfully submitted,

8                      ROB BONTA
                     Attorney General of California

9                      DANIEL A. OLIVAS
                     Senior Assistant Attorney General

10                     DAVID PAI
                    Supervising Deputy Attorney General

11

12

13

14                     THOMAS P. KINZINGER
                    Deputy Attorney General

15                     *Attorneys for Petitioner and Plaintiff, The*
*People of California ex rel. Rob Bonta,*

16                     *and the California Department of Housing*
*and Community Development*

17 SA2023301106

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



# AGENDA

**City Council/Public Financing Authority**

**Tuesday, February 21, 2023**

**Special Meeting of the Housing Authority**

**3:30 PM Study Session**
**6:00 PM Regular Business Meeting**

**MAYOR AND CITY COUNCIL**
*TONY STRICKLAND, Mayor*
*GRACEY VAN DER MARK, Mayor Pro Tem*
*RHONDA BOLTON, Councilmember*
*PAT BURNS, Councilmember*
*DAN KALMICK, Councilmember*
*CASEY McKEON, Councilmember*
*NATALIE MOSER, Councilmember*

**Council Chambers**
**2000 Main Street**
**Huntington Beach, CA 92648**
**--or--**
**Virtual via Zoom Webinar**

**STAFF**
*AL ZELINKA, City Manager*
*MICHAEL E. GATES, City Attorney*
*ROBIN ESTANISLAU, City Clerk*
*ALISA BACKSTROM, City Treasurer*

**IN-PERSON PUBLIC PARTICIPATION/ZOOM ACCESS: Members wishing to attend the meeting in person are encouraged to wear a face covering.**

Assembly Bill 361 (AB 361) authorizes public meetings to take place via teleconference (i.e., virtual using Zoom), or in person if in part, State and Local officials continue to recommend measures to promote social distancing. In addition to this hybrid format, alternate ways to view City Council meetings live or on-demand remain: livestreamed on HBTV Channel 3 (replayed on Wednesday's at 10:00 a.m. and Thursday's at 6:00 p.m.); live and archived meetings for on-demand viewing accessed from https://huntingtonbeach.legistar.com/calendar; or, from any Roku, Fire TV or Apple device by downloading the Cablecast Screenweave App and searching for the City of Huntington Beach channel.

**PUBLIC COMMENTS:** Individuals wishing to provide a comment on agendized or non-agendized items, including Study Session, Closed Session, and Public Hearing, may do so in person by completing a **Request to Speak** form delivered to the City Clerk, or from a virtual location by entering **Zoom Webinar ID 971 5413 0528** via computer device, or by phone at **(669) 900-6833.** The **Zoom Webinar** can be accessed here: https://huntingtonbeach.zoom.us/j/97154130528. Instructions for those utilizing computer devices to request to speak are provided in each section of the agenda where public comments are accepted.

Members of the public unable to personally participate in the meeting but interested in communicating with the City Council on agenda-related items are encouraged to submit a written (supplemental) communication via email at SupplementalComm@Surfcity-hb.org, or City.Council@surfcity-hb.org. Supplemental Communications are public record, and if received by 2:00 PM on the day of the meeting, will be distributed to the City Council prior to consideration of agenda-related items, posted to the City website, and announced, but not read, at the meeting. Communications received following the 2:00 PM deadline will be incorporated into the administrative record.

**MEETING ASSISTANCE NOTICE:** In accordance with the Americans with Disabilities Act, services are available to members of our community who require special assistance to participate in public meetings. If you require special assistance, 48-hour prior notification will enable the City to make reasonable arrangements for an assisted listening device (ALD) for the hearing impaired, American Sign Language interpreters, a reader during the meeting and/or large print agendas. Please contact the City Clerk's Office at (714) 536-5227 for more information.

| City Council/Public Financing Authority | AGENDA | February 21, 2023 |
|---|---|---|

**3:30 PM - COUNCIL CHAMBERS**

**CALL TO ORDER**

**ROLL CALL**

Kalmick, Moser, Van Der Mark, Strickland, McKeon, Bolton, Burns

**CITY COUNCILMEMBER COMMENTS (3-Minute Time Limit)** - The Mayor will facilitate a voluntary opportunity for members of the Huntington Beach City Council to individually make brief comments to the public.  Please note that the Brown Act does not allow for lengthy comments, discussion, or action on topics that are not on the agenda.

**ANNOUNCEMENT OF SUPPLEMENTAL COMMUNICATIONS (Received After Agenda Distribution)**

**PUBLIC COMMENTS (3 Minute Time Limit)**

At this time, the City Council will receive comments from members of the public regarding any topic, including items on the Study Session and/or Closed Session agendas.  Individuals wishing to provide a comment on item(s) may do so in person by filling out a Request to Speak form delivered to the City Clerk.  All speakers are encouraged, but not required to identify themselves by name. Each speaker may  have up to 3 minutes unless the volume of speakers warrants reducing the time allowance.

Please note that the Brown Act does not allow discussion or action on topics that are not on the agenda.  Members of the public who would like to speak directly with a Councilmember on an item not on the agenda may consider scheduling an appointment by contacting the City Council's Administrative Assistant at (714) 536-5553 or emailing the entire City Council at city.council@surfcity-hb.org.

**STUDY SESSION**

1.    **23-158**      **City's Infrastructure Report Card**

**RECESS TO CLOSED SESSION**

**CLOSED SESSION**

2.    **23-151**        **CONFERENCE WITH LEGAL COUNSEL-EXISTING LITIGATION. (Paragraph (1) of subdivision (d) of Section 54956.9.  Name of case: Gapezzani (Gary) v. John Romero, City of Huntington Beach; OCSC Case No.: 30-2021-01225030.**

3.    **23-161**        **CONFERENCE WITH LABOR NEGOTIATORS (Gov. Code section**

54957.6.)   Agency designated representatives: Al Zelinka, City Manager, and Peter Brown, Chief Negotiator; also in attendance: Jose Rodriguez, Human Resources Manager; Travis Hopkins, Assistant City Manager; Michael E. Gates, City Attorney; Eric Parra, Chief of Police; and Sunny Rief, Acting Chief Financial Officer. Employee Organization: Police Officers' Association (POA).

4.    **23-170**    CONFERENCE WITH LEGAL COUNSEL-LITIGATION (Gov. Code section 54956.9(d)(4).): Number of Matters: One (1).

**6:00 PM – COUNCIL CHAMBERS**

**RECONVENE CITY COUNCIL/PUBLIC FINANCING AUTHORITY MEETING AND CALL TO ORDER THE SPECIAL MEETING OF THE HOUSING AUTHORITY**

**ROLL CALL**

Kalmick, Moser, Van Der Mark, Strickland, McKeon, Bolton, Burns

**PLEDGE OF ALLEGIANCE**

**INVOCATION**

In permitting a nonsectarian invocation, the City does not intend to proselytize or advance any faith or belief. Neither the City nor the City Council endorses any particular religious belief or form of invocation.

5.    **22-1118**    Chaplain Roger Wing with the Huntington Beach Fire Department

**CLOSED SESSION REPORT BY CITY ATTORNEY**

**ANNOUNCEMENT OF SUPPLEMENTAL COMMUNICATIONS (Received After Agenda Distribution)**

**PUBLIC COMMENTS (3 Minute Time Limit)**

At this time, the City Council will receive comments from members of the public regarding any topic, including items on the open session agenda.  Individuals wishing to provide a comment may do so in person by filling out a Request to Speak form delivered to the City Clerk.  All speakers are encouraged, but not required to identify themselves by name. Each speaker may have up to 3 minutes unless the volume of speakers warrants reducing the time allowance.

Please note that the Brown Act does not allow discussion or action on topics that are not on the agenda.  Members of the public who would like to speak directly with a Councilmember on an item not on the agenda may consider scheduling an appointment by contacting the City Council's Administrative Assistant at (714) 536-5553 or emailing the entire City Council at

**city.council@surfcity-hb.org.**

**While the City Council welcomes public involvement and supports and defends free speech, the City Council rejects comments from anyone that are discriminatory, defamatory or otherwise not protected free speech. Those comments will not inform nor be considered by the City Council and may be cause for the Mayor to interrupt the public speaker. Such public comments will not be consented to or otherwise adopted by the City Council in its discussions and findings for any matter tonight.**

## COUNCIL COMMITTEE APPOINTMENT ANNOUNCEMENTS

**Councilmembers may make brief announcements on any appointments made to a board, committee, or commission. Councilmembers may not discuss or take any action on these announcements. Announcements are limited to 1 minute.**

## AB 1234 REPORTING

**Per AB 1234 (Government Code Section 53232.3(d)) Councilmembers who attend a meeting, conference, or similar event at the expense of the City must provide a brief report of the meeting, conference, or similar event during the next regular City Council meeting. Reports are limited to 1 minute.**

## OPENNESS IN NEGOTIATION DISCLOSURES

**Councilmembers must publicly disclose any meetings or communications with City employee associations, related to the negotiations of labor agreements. Disclosures are limited to 1 minute and must be made by the next regular City Council Meeting.**

## CITY MANAGER'S REPORT

**6.        23-174        Main Street Redevelopment Project - Additional Outreach Update**

**7.        23-159        Update on the Review of the City's Membership in the Orange County Power Authority (OCPA) Joint Power Authority**

## CITY CLERK'S REPORT

**8.        23-166        Presentation on the Safe and Sane Fireworks Stand Application and Lottery Process for 2023**

## CONSENT CALENDAR

## Office of City Clerk

**9.        23-146        Approve and Adopt Minutes**

**Recommended Action:**

Approve and adopt the City Council/Public Financing Authority regular meeting and the
Housing Authority special meeting minutes of February 7, 2023.

<u>**Office of City Manager**</u>

10.  **23-154**      **City Council to consider positions by Intergovernmental Relations
                Committee (IRC)**

**Recommended Action:**

Consider one or more of the actions on the following issues proposed by the IRC:
1. Submit a Letter of Support for SB 381 (Min) - Electric Bicycles Study; and,
2. Recommend that staff issue Request for Qualifications for State Legislative
   Advocacy Services and Federal Legislative Advocacy Services separately.

<u>**Community Development Department**</u>

11.  **23-104**      **Approve and authorize execution of Amendment No. 1 to License
                Agreement between the City of Huntington Beach and PCH Beach
                Resort, LLC, for the beach concession at 21529 Pacific Coast
                Highway**

**Recommended Action:**

A)  Approve "Amendment No. 1 to License Agreement Between the City of Huntington
Beach and  PCH Beach Resort, LLC" for the Concession Stand at 21529 Pacific Coast
Highway; and,

B)  Authorize the Mayor, City Manager, and City Clerk to execute the Amendment and
other related documents.

12.  **23-147**      **Consider for approval Bonanni Development Company IV, LLC
                Affordable Housing Agreement for the development of 35 ownership
                units at 19070 Holly Lane**

**Recommended Action:**

A)  Approve the "Affordable Housing Agreement for 19070 Holly Lane, Huntington Beach
by and Between the City of Huntington Beach, a California Municipal Corporation and
Bonanni Development Company IV, LLC, a Limited Liability Corporation" for the
development of 35 ownership units at 19070 Holly Lane; and,

B)  Authorize the City Manager or their designee to implement and execute the Affordable
Housing Agreement for the Project, including all necessary related documents; and,

C)  Authorize the City Manager to execute an amendment to the Affordable Housing
Agreement, as prepared by the City Attorney, should the Developer upon completion of the
Project decide to rent instead of sell the townhomes due to market conditions; and,

D)  Authorize the Housing Authority Executive Officer or their designee to execute all necessary implementing agreements and related documents.

**Fire Department**

**13.**   **22-807**   **Authorize execution of an agreement with Toyota for vehicles for Marine Safety, Beach Parking, and Beach Maintenance and approve appropriation of funds**

**Recommended Action:**

Authorize the Mayor and City Clerk to execute "Promotional Agreement Between the City of Huntington Beach and Southern California Toyota Dealers Advertising Association" to provide 24 vehicles for Marine Safety, Beach Parking, and Beach Maintenance uses; approve the appropriation of $216,869 in Equipment Replacement Fund 324 and $22,150 in the General Fund Fleet Maintenance business unit 10085705 to upfit and maintain the vehicles.

**14.**   **23-099**   **Adopt Resolution No. 2023-04 authorizing certain City Officials to execute Grant Applications and Documents**

**Recommended Action:**

Adopt Resolution No. 2023-04, "A Resolution of the City Council of the City of Huntington Beach Authorizing Certain City Officials to Execute Grant Applications and Documents."

**15.**   **23-100**   **Adopt Resolution No. 2023-05 authorizing certain City Officials to execute Applications and Documents to Obtain Disaster and Emergency Relief**

**Recommended Action:**

Adopt Resolution No. 2023-05, "A Resolution of the City Council of the City of Huntington Beach Authorizing Certain City Officials to Execute Applications and Documents to Obtain Disaster and Emergency Relief."

**16.**   **23-139**   **Adopt Resolution No. 2023-06 to accept Grant Funds from the California Department of Fish and Wildlife, Office of Spill Prevention and Response for Oil Response Equipment**

**Recommended Action:**

Adopt Resolution No. 2023-06, "A Resolution of the City Council of the City of Huntington Beach to Accept Grant Funds from the California Department of Fish and Wildlife, Office of Spill Prevention and Response for Oil Spill Response Equipment."

**Police Department**

**17.**   **23-144**   **Adopt Ordinance No. 4275 to Amend to Huntington Beach Municipal**

| City Council/Public Financing Authority | AGENDA | February 21, 2023 |
|---|---|---|

Code Chapter 13.08.070 Relating to Dogs and Other Animals - Approved for Introduction February 7, 2023 - Vote: 7-0

**Recommended Action:**

Adopt Ordinance No. 4275, "An Ordinance of the City of Huntington Beach Amending Chapter 13.08 of the Huntington Beach Municipal Code Relating to Dogs and Other Animals."

## Public Works Department

**18.    23-054**    **Award and authorize the execution of a construction contract with Mehta Mechanical Company, Incorporated, in the amount of $10,648,600 for the Heil Avenue Storm Water Pump Station Replacement Project, CC-1293**

**Recommended Action:**

A)  Accept the lowest responsive and responsible bid submitted by the Mehta Mechanical Company, Incorporated, in the amount of $10,648,600; and,

B)  Authorize the Mayor and the City Clerk to execute a construction contract in a form approved by the City Attorney.

**19.    23-122**    **Authorize the City Manager to Sign a Letter of Commitment for the Local Groundwater Supply Improvement Project ("Local SiP") Application for Grant Funds from the U.S. Department of the Interior's Bureau of Reclamation WaterSMART Program and Authorize Grant Matching Funds in the Amount of $25,000**

**Recommended Action:**

Authorize the City Manager to sign and submit the Letter of Commitment (Attachment 1) to Mesa Water District for the Local SiP application for grant funds from the U.S. Department of the Interior's Bureau of Reclamation WaterSMART Program and authorize grant matching funds in the amount of $25,000.

## ADMINISTRATIVE ITEMS

**20.    23-157**    **Year-End Audit Results for the FY 2021/22 Annual Comprehensive Financial Report (ACFR), Fiscal Year 2022/23 Mid-Year Budget Adjustments, and Fiscal Year 2022/23 Budget Update and Fiscal Health Report**

**Recommended Action:**

A)   Receive and File the FY 2021/22 Annual Comprehensive Financial Report and other auditor-issued reports; and

B)   Receive and file the FY 2022/23 Budget Update and Fiscal Health Report (Attachment 8); and,

B)   Approve mid-year budget adjustments to the FY 2022/23 Revised Budget in the funds and by the amounts contained in Attachment 3; and,

C)   Authorize additional Professional Services authority in the Fiscal Year 2022/23 Revised Budget in the departments and by the amounts contained in Attachment 4; and,

D) Approve and authorize the Mayor and City Clerk to execute "Amendment No. 1 to Agreement between the City of Huntington Beach and CSG Consultants, Inc. for On-Call Building Division Plan Review Services" (Attachment 5); and,

E) Approve and authorize the Mayor and City Clerk to execute "Amendment No. 1 to Agreement between the City of Huntington Beach and True North Compliance Services, Inc. for On-Call Building Division Plan Review Services" (Attachment 6); and,

F) Accept, approve and authorize the City Manager to execute the grant agreement with the State of California Energy Commission in the amount of $80,000 (Attachment 7).

## ORDINANCES FOR INTRODUCTION

**21.**   **23-162**       **Approve for Introduction Ordinance No. 4280 Amending Chapter 2.109 of the Huntington Beach Municipal Code Regarding the Finance Commission**

**Recommended Action:**

Approve for introduction Ordinance No. 4280, "An Ordinance of the City of Huntington Beach Amending Chapter 2.109 to the Huntington Beach Municipal Code Regarding Finance Commission."

**22.**   **23-163**       **Approve the Introduction of Ordinance Nos. 4278, 4279, and 4281 Amending Chapters 2.111, 2.64 and 2.100 of the Huntington Beach Municipal Code Regarding the Citizen Infrastructure Advisory Board/Public Works Commission, the Community and Library Services Commission, and Operating Policy for Boards and Commissions respectively**

**Recommended Action:**

A)  Approve for Introduction Ordinance No. 4278, "An Ordinance of the City of Huntington Beach Amending Chapter 2.111 to the Huntington Beach Municipal Code Regarding Citizen Infrastructure Advisory Board/Public Works Commission"; and/or,

B)  Approve for Introduction Ordinance No. 4279, "An Ordinance of the City of Huntington Beach Amending Chapter 2.64.040 to the Huntington Beach Municipal Code Regarding Community and Library Services Commission"; and/or,

C)  Approve for Introduction Ordinance No. 4281, "An Ordinance of the City of Huntington Beach Amending Chapter 2.100 to the Huntington Beach Municipal Code Regarding Operating Policy for Boards and Commissions."

23.    **23-165**      **Approve for Introduction Ordinance No. 4283 Adding Chapter 13.07 of the Huntington Beach Municipal Code Relating to Government Flags on City Property**

**Recommended Action:**

Approve for introduction Ordinance No. 4283, "An Ordinance of the City of Huntington Beach Amending Title 13 Public Property of the Huntington Beach Municipal Code Adding Chapter 13.07 Relating to Government Flags on City Property."

24.    **23-176**      **Approve for Introduction Ordinance No. 4284 Amending Municipal Code 13.52 Relating to Public Conduct within City-Owned Public Parking Structures**

**Recommended Action:**

Staff recommends City Council approve for introduction Ordinance No. 4284, "An Ordinance of the City of Huntington Beach Amending Huntington Beach Municipal Code Chapter 13.52 Relating to Public Buildings" regarding public conduct within City-owned public parking structures.

25.    **23-177**      **Approve for Introduction Ordinance No. 4273 Amending Municipal Code 13.48 Relating to the Use of Tents and Other Uses Within City Parks**

**Recommended Action:**

Staff recommends City Council approve the introduction of Ordinance 4273, "An Ordinance of the City Council of the City of Huntington Beach Amending Title 13 of the Huntington Beach Municipal Code Relating to Parking Lot and Camping Regulations in Public Parks, and Making a Finding of Exemption Under CEQA" relating to the use of tents and other uses within City parks.

**COUNCILMEMBER ITEMS**

26.    **23-172**      **Submitted by Councilmember Burns - SB 9 and SB 10 Impacts to Huntington Beach**

**Recommended Action:**

Direct the City Attorney to take any legal action necessary to challenge SB 9 and SB 10 and the laws that permit ADU's.  Also, direct the City Manager to cease the processing of

| City Council/Public Financing Authority | AGENDA | February 21, 2023 |
|---|---|---|

all applications/permits brought to the City by developers under SB 9, SB 10, or State law related ADU projects, until the courts have adjudicated the matter(s).

**27.**    **[23-184](#)**      **Submitted by Mayor Strickland and Mayor Pro Tem Van Der Mark - Request to prepare a Invocation Policy**

**Recommended Action:**

Direct the City Manager to work with the City Attorney to return to the City Council with a Resolution for a City Council policy for the constituting of a list of religious associates or leaders, maintaining that list, evaluation of religious associates or leaders, and rotation system for religious leaders at City Council meetings to offer an invocation. The City Attorney should ensure that whatever policy is returned to Council for a vote is compatible with Constitutional principles of government involved/restricted speech and exercise of religion. In doing so, modifications or adjustments to this proposal are welcome from the City Attorney.

## ADJOURNMENT

**The next regularly scheduled meeting of the Huntington Beach City Council/Public Financing Authority is Tuesday, March 7, 2023, in the Civic Center Council Chambers, 2000 Main Street, Huntington Beach, California.**

**INTERNET ACCESS TO CITY COUNCIL/PUBLIC FINANCING AUTHORITY AGENDA AND STAFF REPORT MATERIAL IS AVAILABLE PRIOR TO CITY COUNCIL MEETINGS AT**

**http://www.huntingtonbeachca.gov**

# EXHIBIT B

ORDINANCE NO. 4285

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF HUNTINGTON BEACH
AMENDING CHAPTER 202.04 OF THE HUNTINGTON BEACH ZONING AND
SUBDIVISION ORDINANCE PROHIBITING  BUILDERS REMEDY APPLICATIONS
(ZONING TEXT AMENDMENT NO. 23-001)

WHEREAS, Zoning Text Amendment No. 23-001 will amend Chapter 202 of the Huntington Beach Zoning and Subdivision Ordinance, relating to Organization, Applicability, and Interpretation; and

The Huntington Beach Planning Commission and Huntington Beach City Council have held separate, duly noticed public hearings to consider Zoning Text Amendment No. 23-001; and

After due consideration of the findings and recommendations of the Planning Commission and all other evidence presented, the City Council finds that the aforesaid amendment is proper and consistent with the General Plan;

The City Council of the City of Huntington Beach does hereby ordain as follows:

SECTION 1.  Section 202.04 of the Huntington Beach Zoning and Subdivision Ordinance is hereby amended to read as follows:

202.04 (o)       **Builder's Remedy Ban.** The City expressly prohibits the processing or approval of any application for a housing development project or any project not in conformance with the zoning and General Plan land use designation, including all applicable City laws, zoning and land use regulations, and other environmental laws, such as CEQA, regardless of the so-called "Builder's Remedy" (under the Housing Accountability Act or any other State law), that portend to allow developers of affordable housing projects to bypass the zoning code and general plan of cities that are out of compliance with the Housing Element Law.

This express prohibition requires that all project applicants conform to the applicable zoning and General Plan land use designations regardless of the City's status and regard to Housing Element Law.

SECTION 3.  This Ordinance shall become effective 30 days after its adoption.

PASSED AND ADOPTED by the City Council of the City of Huntington Beach at a regular meeting thereof held on the _____ day of _____, 2023.

22-11143/278340

ORDINANCE NO.  4285

_____
Mayor

ATTEST:                                    APPROVED AS TO FORM:

_____          _____
City Clerk                                 City Attorney   MJV

ATTEST:                                    APPROVED AS TO FORM:

_____          _____
City Manager                               Director of Community Development

**LEGISLATIVE DRAFT**

**HBZC CHAPTER 202.04**

Chapter 2.111

202.04  General Rules of Applicability of the Zoning and Subdivision Ordinance

A.    **Applicability to Property**. The Zoning and Subdivision Ordinance shall apply to all land within the City of Huntington Beach. The Local Coastal Program Implementation Plan shall apply to all land within the City of Huntington Beach coastal zone.

B.    **Applicability to Streets and Rights-of-Way**. Public streets, utility, and other rights-of-way shall be in the same zoning district as contiguous property. Where contiguous properties are classified in different zoning districts, the centerline of the street or right-of-way shall be the district boundary, unless otherwise depicted on the zoning map.

C.    **Who Qualifies as an Applicant**. Only a qualified applicant (including an agent of the applicant with written authorization from the owner) may file an application for approval on a specific site. A qualified applicant is a person who has a freehold interest in the land which is the subject of the application. The Director shall require an applicant to submit proof of the interest. The Director shall require an agent to submit evidence of authority to act for the applicant. Any person or agency may file for a zoning text amendment.

D.    **Compliance with Ordinances**. No land shall be used, and no structure shall be constructed, occupied, enlarged, altered, demolished or moved in any zoning district except in accord with the provisions of Titles 20 through 25. Further, no lot area shall be so reduced or diminished that the yards or other open space shall be smaller than prescribed by these titles nor shall the density be increased in any manner except in conformity with the provisions established herein.

E.    **Public Nuisance**. Neither the provisions of Titles 20 through 25 nor the approval of any permit authorized by these titles shall authorize the maintenance of any public nuisance.

F.    **Compliance with Public Notice Requirements**. Compliance with public notice requirements prescribed by Titles 20 through 25 shall be deemed sufficient notice to allow the City to proceed with a public hearing and take action on an application, regardless of actual receipt of mailed or delivered notice.

G.    **Requests for Notice**. Where Titles 20 through 25 require that notice be given by first class mail to "any person who has filed a written request for such notice," the request shall be filed with the Director and shall be subject to the applicable fees set to cover mailing costs.

H.    **Notice to Surrounding Property Owners**. Notice shall be mailed to all owners of real property as shown on the latest equalized assessment roll within 300 feet of the property that is the subject of the hearing, as required by state law. Applicants may submit and the Director may use records of the County Assessor or Tax Collector which contain more recent information than the assessment roll.

I.    **Conflict with Other Ordinances**. Where conflict occurs between the provisions of Titles 20 through 25 and any other City code, title, chapter, resolution, guideline, or regulation, the more restrictive provision shall control unless otherwise specified in these titles.

J.    **Relation to Private Agreements**. It is not intended by applicable provisions of Titles 20 through 25 to interfere with or abrogate or annul any easements, covenants, or other existing agreements between parties or to repeal any ordinance or other section of the Huntington Beach Municipal Code except as set forth in subsection 202.04(I), above.

K.    **Annexations/Pre-Zoning**. Unincorporated territory adjacent to the City may be pre-zoned for the purpose of determining the zone district which will apply in the event of annexation to the City. The procedure for pre-zoning property shall be the same as that for zone changes within the City. Such zoning shall become effective at the time the annexation becomes effective. Any property which, after annexation or for any other reason, does not have a designation on the zoning map shall be deemed to be zoned RL, low-density residential. Inclusion of an annexed area within the coastal zone into the certified Local Coastal Program shall require approval of a Local Coastal Program amendment by the Coastal Commission.

L.    **Application During Local Emergency**. The City Council may authorize deviations from any provision of this title during a local emergency. Such deviations may be authorized by resolution of the City Council.

M.    **Issuance of Permits or Entitlements Prohibited**. No permit or entitlement shall be issued by any department of the City in any case where a permit or entitlement is required to be granted and for which an appeal period is provided by this zoning and subdivision ordinance until the expiration of such appeal period or the final determination of any appeal filed pursuant to this ordinance.

N.    **Certificate of Occupancy and Final Building Inspection Withheld**. No certificate of occupancy shall be issued or final building inspection shall be made until terms and conditions attached to a permit or entitlement required by this zoning and subdivision ordinance are met.

O.    **Builder's Remedy Ban.**  The City expressly prohibits the processing or approval of any application for a housing development project or any project not in conformance with the zoning and General Plan land use designation, including all applicable City laws, zoning and land use regulations, and other environmental laws, such as CEQA,

of the so-called "Builder's Remedy" (under the Housing Accountability Act or any other State law), that portend to allow developers of affordable housing projects to bypass the zoning code and general plan of cities that are out of compliance with the Housing Element Law.

This express prohibition requires that all project applicants conform to the applicable zoning and General Plan land use designations regardless of the City's status and regard to Housing Element Law.

**ATTACHMENT NO. 1**

**SUGGESTED FINDINGS OF APPROVAL**

**ZONING TEXT AMENDMENT NO. 23-001**

**SUGGESTED FINDINGS FOR PROJECTS EXEMPT FROM CEQA:**

Zoning Text Amendment (ZTA) No. 23-001 is exempt from California Environmental Quality Act (CEQA), pursuant to Section 15061(b), the general rule that CEQA only applies to projects which have the potential for a significant effect on the environment. While this amendment will clarify existing zoning regulations, it does not authorize any development that will result in direct physical changes to the environment.

**SUGGESTED FINDINGS FOR APPROVAL - ZONING TEXT AMENDMENT NO. 23-001:**

1. Zoning Text Amendment No. 23-001 is consistent with the objectives, policies, general land uses and programs specified in the General Plan and any applicable specific plan as follows:

   Land Use Element:

   Goal LU-1 – New commercial, industrial, and residential development is coordinated to ensure that the land use pattern is consistent with the overall goals and needs of the community.

2. Zoning Text Amendment No. 23-001 is compatible with the uses authorized in, and the standards prescribed for, the zoning district for which it is proposed. The ZTA is designed to prevent incompatible land uses that will occur if a developer attempts to bypass the City zoning Code and develop certain residential projects in incompatible zones.

3. A community need is demonstrated for the change proposed because the ZTA would prevent the use of Builder's Remedy, where housing projects could be built near environmentally sensitive areas that could harm the environment or next to industrial sites where residents will be subject to diminished air, light and sound quality because of being next to large industrial complexes.

4. Its adoption will be in conformity with public convenience, general welfare and good zoning practice. The ZTA affirms the City's use of zoning as the legal mechanism to control development on land within their jurisdiction, primarily by designating land for certain uses or categories of uses (zones). This practice of "Euclidean zoning," allows the City to define parcels based on distinct residential or industrial/commercial use.  Euclidean zoning is a way to mitigate negative effects of industrial and urban development (light and air pollution) on residences by separating those uses and another tool or alternative to nuisance tort law.

# EXHIBIT 7

1    ROB BONTA
     Attorney General of California
2    DANIEL A. OLIVAS
     Senior Assistant Attorney General
3    DAVID PAI, State Bar No. 227058
     Supervising Deputy Attorney General
4    MATTHEW T. STRUHAR, State Bar No. 293973
     THOMAS P. KINZINGER, State Bar No. 323889
5    Deputy Attorneys General
       1300 I Street, Suite 125
6      P.O. Box 944255
       Sacramento, CA 94244-2550              *Exempt from Filing Fees*
7      Telephone: (916) 210-7246              *Government Code § 6103*
       Fax: (916) 327-2319
8      E-mail: Matthew.Struhar@doj.ca.gov
               Thomas.Kinzinger@doj.ca.gov
9
     *Attorneys for Petitioners and Plaintiffs, The People*
10   *of California ex rel. Rob Bonta, and the California*
     *Department of Housing and Community*
11   *Development*

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                          COUNTY OF ORANGE

14

15   **THE PEOPLE OF CALIFORNIA EX REL.**    Case No. 30-2023-01312235-CU-WM-CJC
     **ROB BONTA, AND THE CALIFORNIA**
16   **DEPARTMENT OF HOUSING AND**           **MEMORANDUM OF POINTS AND**
     **COMMUNITY DEVELOPMENT,**              **AUTHORITIES IN SUPPORT OF**
17                                           **MOTION FOR LEAVE TO FILE**
                          Petitioners and Plaintiffs,   **AMENDED PETITION AND**
18                                           **COMPLAINT**

19                   v.                      **(Code Civ. Proc., §§ 473, subd. (a)(1); 576.)**

20   **THE CITY OF HUNTINGTON BEACH, A**     Date:       June 8, 2023
     **MUNICIPAL CORPORATION; CITY**         Time:       1:30 p.m.
21   **COUNCIL OF HUNTINGTON BEACH;**        Dept:       C20
     **AL ZELINKA, in his official capacity as**   Judge:      The Hon. Erick Larsh
22   **CITY MANAGER OF HUNTINGTON**          Trial Date: None set
     **BEACH; AND DOES 1-50, INCLUSIVE,**    Action Filed: March 8, 2023
23
24                   Respondents and Defendants.
25

26   / / /

27   / / /

28

**INTRODUCTION**

Petitioners and Complainants, the People of the State of California, by and through Attorney General Rob Bonta, and the Department of Housing and Community Development ("HCD"), seek leave to file an Amended Petition and Complaint for Declaratory and Injunctive Relief. The proposed amendments add a violation of the state's Housing Element Law, conforming with recent developments that have ripened such a claim, and strikes claims and allegations that are, at the moment, moot. It also amends Petitioners' declaratory relief cause of action to allege that Respondents/Defendants City of Huntington Beach, its City Council, and its City Manager (collectively, the "City")'s recent actions, taken after this action commenced, were intended to evade judicial review.

The core of these proposed amendments—mainly, to include a Housing Element Law violation—do not deviate from the myriad of Notices of Violation that prompted this action. Nor are there any applicable statute of limitations concerns that would preclude Petitioners from amending the pleadings, because the Housing Element violation and allegations of evading review only ripened *after* the commencement of this action.

This action commenced on March 8, 2023. The need to amend was discovered on the evening of April 4, 2023, when the City Council continued to refuse to adopt an updated housing element for the current 2021 through 2029 (aka "sixth cycle") planning period. The City Council's action occurred *after* HCD offered the City two meetings to resolve the Housing Element Law violations. By refusing to adopt the draft housing element after those two meetings, the Housing Element Law violations ripened.

The proposed amendment will not delay any briefing schedule or trial date, yet to be set, and, thus, causes no prejudice to the City. Should leave to amend be denied, Petitioners would have to needlessly file a separate action involving the same Notices of Violations giving rise to this present action, and subsequently file a notice of related case. Granting this motion, therefore, promotes judicial efficiency and permits the parties to expeditiously adjudicate all violations for which the City was given notice.

**BACKGROUND**

1       This action commenced on March 8, 2023, after Petitioners issued multiple violation

2   notices, from January 9, 2023 to February 22, 2023, regarding the City Council's actions to defy

3   and violate state housing laws. (See ROA #2: Petition and Complaint, ¶¶ 59-64.) To wit, violation

4   notices were issued because the City Council prohibited certain types of residential building

5   permit applications authorized under state law, such as accessory dwelling units ("ADUs"), and

6   banned streamlined applications for lot splits and duplex development under Senate Bill 9 ("SB 9

7   applications"). (*Ibid*.) Such constraints also violated the state's Housing Element Law, which the

8   City had yet to comply with, but was moving forward towards updating. (See Exh. A attached to

9   Kinzinger Decl., ¶¶ 53-64.)

10      The statutory deadline for the City to adopt a sixth cycle housing element, for the planning

11  period covering October 2021 through October 2029, was October 15, 2021. (See Exh. A

12  attached to Kinzinger Decl., ¶ 53.) The City's planning staff previously worked with HCD to

13  develop a compliant draft housing element for the sixth cycle. (See Exh. A attached to Kinzinger

14  Decl., ¶¶ 54.) On September 30, 2022, HCD advised the City that its September 23, 2022 draft

15  housing element met statutory requirements at the time of review. (*Ibid.*)

16      HCD met with City representatives on March 8, 2023, to discuss the City's violation of the

17  Housing Element Law, and again, on March 24, 2023. (See Exh. A attached to Kinzinger Decl.,

18  ¶¶ 60, 62.) At those meetings, discussion topics included minor changes to the sites inventory of

19  the City's housing element, adjustments to ADU projections, and the expectation—later

20  downgraded to hope—that the City Council would adopt its draft housing element at its April 4,

21  2023 meeting. (See Exh. A attached to Kinzinger Decl., ¶¶ 60, 62.)

22      On March 27, 2023, the parties' counsel met and conferred regarding whether the City

23  Council's March 21, 2023 action to "accept applications and process permits for ADUs and SB 9

24  development projects," yet not formally rescind the prior action item to ban such projects, was

25  sufficient to moot the existing causes of action. (Kinzinger Decl., ¶ 3.) On March 30, 2023, the

26  City's counsel was informed that should the City Council not adopt its draft housing element,

1  Petitioners would amend their petition/complaint to include a Housing Element Law violation.

2  (*Ibid*.)

3        On April 3, 2023, the City filed and served an answer to the existing petition/complaint.

4  (Kinzinger Decl., ¶ 4.) One day later, on April 4, 2023, the City Council refused to approve its

5  draft housing element. (*Id*. at ¶ 5.) On April 7, 2023, Petitioners, through their counsel, requested

6  the City stipulate to the filing of the proposed amended petition and complaint. (*Id*. at ¶ 7, Exh. B

7  attached to Kinzinger Decl.) The City's counsel refused. (*Ibid*.)

8                                   **DISCUSSION**

9  I.   **JUDICIAL POLICY ALLOWS PLEADINGS TO BE LIBERALLY AMENDED**

10       Judicial policy favors resolution of all disputed matters between the parties in the same

11  lawsuit, and thus, the court's discretion to permit amendment of the pleadings are exercised

12  liberally. (See *Nestle v. Santa Monica* (1972) 6 Cal.3d 920, 939; *Morgan v. Sup. Ct. (Morgan)*

13  (1959) 172 Cal. App. 2d 527, 530 [holding that it would be error and an abuse of discretion to

14  refuse to allow a party to amend a pleading if granting such motion would not prejudice the

15  opposing party].) Leave to amend, therefore, should be granted here because it will not cause any

16  meaningful prejudice or delay to the responding party, and would promote judicial efficiency in

17  resolving the parties' dispute in a single action.

18  II.  **THE PROPOSED AMENDMENTS ARE TIMELY RAISED TO INCLUDE RECENTLY RIPENED**
19       **CLAIMS AND STRIKE CLAIMS THAT ARE, AT THE MOMENT, MOOT**

20       "If the motion to amend is timely made and the granting of the motion will not prejudice

21  the opposing party, it is error to refuse permission to amend and where the refusal also results in a

22  party being deprived of the right to assert a meritorious cause of action or a meritorious defense,

23  it is not only error but an abuse of discretion." (*Morgan*, *supra*, 172 Cal. App .2d at 530.)

24       The proposed amendment adds allegations of Housing Element Law violations, and

25  Petitioners seek leave to do so only after it became abundantly apparent that such a claim was

26  ripe; i.e., the City Council will not be adopting a draft housing element that would cure the

27  deficiencies previously raised by Petitioners in the violation notices. (See also Gov. Code, §

28  65585, subd. (k) [requiring HCD to offer two meetings to discuss Housing Element Law

1  violations prior to seeking judicial remedies].) As the Housing Element Law violations are

2  ongoing and not barred under any statute of limitations, Petitioners amended claims are timely

3  raised. (See Gov. Code, § 65585, subd. (p) [applying the three-year limitations period under Code

4  of Civil Procedure section 338, subdivision (a) to violations brought under this section by HCD or

5  the Attorney General].)

6        Moreover, the proposed amendment strikes the third cause of action, which, at the moment,

7  appears to be moot. And it includes additional allegations, pertinent to the second cause of action,

8  regarding actions the City took in an attempt to evade judicial review regarding existing claims

9  that remain ripe. The amended petition, therefore, would promote judicial efficiency by updating

10  the pleadings to include new but pertinent factual allegations that occurred after this action

11  commenced, and streamlining the pleadings into two causes of action.

12  **III.   THE PROPOSED AMENDMENTS ARE TIMELY, AND WILL NOT PREJUDICE  DELAY TO
13         THE CITY**

14        Absent a showing of actual prejudice, the timing of a proposed amendment to a petition is

15  not a ground to deny leave to amend. (*Higgins v. Del Faro* (1981) 123 Cal. App. 3d 558, 564-

16  565.) Here, amending the petition and complaint less than 30 days from the date this action

17  commenced, and less than a week after the City Council's actions giving rise to the amended

18  claim, will not cause any prejudicial delay to the City. No merits hearing date have been set, no

19  briefing schedule needs to be revised, and the City is afforded the requisite time it needs to

20  respond to or challenge the sufficiency of the amended pleadings pursuant to the Code of Civil

21  Procedure.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

1

**CONCLUSION**

2          For the foregoing reasons, Petitioners respectfully requests this Court grant this motion

3    leave to file the Amended Petition and Complaint for Declaratory and Injunctive Relief, to be

4    deemed filed and served as of the date of this hearing.

5    Dated:  April 10, 2023                          Respectfully submitted,

6                                                    ROB BONTA
                                                     Attorney General of California
7                                                    DANIEL A. OLIVAS
                                                     Senior Assistant Attorney General
8                                                    DAVID PAI
                                                     Supervising Deputy Attorney General
9

10

11

12                                                   THOMAS P. KINZINGER
                                                     Deputy Attorney General
13                                                   *Attorneys for Petitioner and Plaintiff, The*
                                                     *People of California ex rel. Rob Bonta,*
14                                                   *and the California Department of Housing*
                                                     *and Community Development*

15   SA2023301106
     91605580
16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum of Points and Authorities ISO Motion for Leave to Amend  (30-2023-01312235-CU-WM-CJC)

Electronically Filed by Superior Court of California, County of Orange, 04/10/2023 02:06:09 PM.
30-2023-01312235-CU-WM-CJC - ROA # 22 - DAVID H. YAMASAKI, Clerk of the Court By E. ellinguser, Deputy Clerk.
Case 8:23-cv-00421 Document 48 Filed 05/07/21 Page 95 of 118 Page ID #:779

1    ROB BONTA
     Attorney General of California
2    DANIEL A. OLIVAS
     Senior Assistant Attorney General
3    DAVID PAI, State Bar No. 227058
     Supervising Deputy Attorney General
4    MATTHEW T. STRUHAR, State Bar No. 293973
     THOMAS P. KINZINGER, State Bar No. 323889
5    Deputy Attorneys General
      1300 I Street, Suite 125
6     P.O. Box 944255
     Sacramento, CA 94244-2550           *Exempt from Filing Fees*
7     Telephone: (916) 210-7246            *Government Code § 6103*
     Fax: (916) 327-2319
8     E-mail: Matthew.Struhar@doj.ca.gov
            Thomas.Kinzinger@doj.ca.gov
9
    *Attorneys for Petitioners and Plaintiffs, The People*
10   *of California ex rel. Rob Bonta, and the California*
     *Department of Housing and Community*
11   *Development*

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                       COUNTY OF ORANGE

14

15   **THE PEOPLE OF CALIFORNIA EX REL.**    Case No. 30-2023-01312235-CU-WM-CJC
    **ROB BONTA, AND THE CALIFORNIA**
16   **DEPARTMENT OF HOUSING AND**        **DECLARATION OF THOMAS P.**
    **COMMUNITY DEVELOPMENT,**          **KINZINGER IN SUPPORT OF MOTION**
17                                   **FOR LEAVE TO FILE AMENDED**
             Petitioners and Plaintiffs,    **PETITION AND COMPLAINT**
18
19       v.                             **(Code Civ. Proc., §§ 473, subd. (a)(1); 576.)**

20   **THE CITY OF HUNTINGTON BEACH, A**    Date:        June 8, 2023
    **MUNICIPAL CORPORATION; CITY**       Time:        1:30 p.m.
21   **COUNCIL OF HUNTINGTON BEACH;**     Dept:        C20
    **AL ZELINKA, in his official capacity as**    Judge:       The Hon. Erick Larsh
22   **CITY MANAGER OF HUNTINGTON**      Trial Date:   None set
    **BEACH; AND DOES 1-50, INCLUSIVE,**     Action Filed: March 8, 2023
23
24         Respondents and Defendants.

25

26

27

28

                                        1

I, Thomas P. Kinzinger, declare as follows:

1.     I am an attorney at law licensed to practice before all courts of the State of California. I am a Deputy Attorney General and am counsel of record for petitioners and plaintiffs the People of California, ex rel. Rob Bonta, Attorney General, and the California Department of Housing and Community Development ("HCD") (collectively, "Petitioners"). I have personal knowledge of the following facts. If called upon to testify as a witness, I could and would testify competently to these facts under oath.

2.     The proposed Amended Petition and Complaint for Declaratory and Injunctive relief amends Petitioners' first cause of action to allege a Housing Element Law violation, adds additional factual allegations pertinent to the second cause of action, and strikes the third cause of action. A true and correct copy of the proposed amended pleading is attached as Exhibit A.

3.     On March 27, 2023, the parties' counsel met and conferred regarding whether Respondent/Defendant City of Huntington Beach's City Council's March 21, 2023 action to "accept applications and process permits for ADUs and SB 9 development projects," yet not formally rescind the prior action item to ban such projects, was sufficient to moot the existing causes of action. On March 30, 2023, the City Attorney was informed by the Attorney General's Office that should the City Council not adopt its draft housing element, Petitioners would amend their petition/complaint to include a Housing Element Law violation.

4.     On April 3, 2023, I received by email a copy of the City's answer to the existing petition/complaint, purportedly filed that same day.

5.     One day later, on April 4, 2023, the City Council refused to approve its draft housing element. The City Council's meeting was live-streamed and recorded online, which I observed online that evening and have subsequently replayed.

6.     Thus, the need to amend the pleading to add a Housing Element Law violation did not ripen until April 4, 2023, after the City Council failed to adopt its draft housing element for the sixth cycle planning period. The proposed amendments also include pertinent factual allegations that occurred after this action commenced on March 8, 2023.

1    7.    On April 7, 2023, my office emailed a request to the City Attorney to stipulate to the

2    filing of the proposed amended petition and complaint. The City Attorney refused. A true and

3    correct copy of that email string is attached as Exhibit B.

4        I declare under penalty of perjury under the laws of the State of California that the

5    foregoing is true and correct and that this declaration was executed on April 10, 2023, at Los

6    Angeles, California.

7

8                                                    _____

                                                     Thomas P. Kinzinger

9

10   SA2023301106

11   91605579

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT A

1 | ROB BONTA
Attorney General of California
2 | DANIEL A. OLIVAS
Senior Assistant Attorney General
3 | DAVID PAI, State Bar No. 227058
Supervising Deputy Attorney General
4 | MATTHEW T. STRUHAR, State Bar No. 293973
THOMAS P. KINZINGER, State Bar No. 323889
5 | Deputy Attorneys General
   1300 I Street, Suite 125
6 | P.O. Box 944255
Sacramento, CA 94244-2550
7 | Telephone:  (916) 210-7246                    *Exempt from Filing Fees*
Fax:  (916) 327-2319                             *Government Code § 6103*
8 | E-mail:  Matthew.Struhar@doj.ca.gov
            Thomas.Kinzinger@doj.ca.gov
9 |
*Attorneys for Petitioner and Plaintiff, The People of*
10 | *California ex rel. Rob Bonta, and the California*
*Department of Housing and Community*
11 | *Development*

12 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

13 | COUNTY OF ORANGE

14 |

15 | **THE PEOPLE OF CALIFORNIA EX REL.** | Case No. 30-2023-01312235-CU-WM-CJC
**ROB BONTA, AND THE CALIFORNIA**
16 | **DEPARTMENT OF HOUSING AND** | **FIRST AMENDED PETITION FOR**
**COMMUNITY DEVELOPMENT,** | **WRIT OF MANDATE AND**
17 | | **COMPLAINT FOR DECLARATORY**
Petitioners and Plaintiffs, | **AND INJUNCTIVE RELIEF**
18 |
19 | v.

20 | **THE CITY OF HUNTINGTON BEACH, A**
**MUNICIPAL CORPORATION; CITY**
21 | **COUNCIL OF HUNTINGTON BEACH;**
**AL ZELINKA, in his official capacity as**
22 | **CITY MANAGER OF HUNTINGTON**
**BEACH; AND DOES 1-50, INCLUSIVE,**
23 |
Respondents and Defendants.
24 |

25 | ## INTRODUCTION

26 |     1.    Californians continue to suffer under a housing affordability crisis. As the Legislature

27 | has found, "[t]he lack of housing . . . is a critical problem that threatens the economic,

28 | environmental, and social quality of life in California." (Gov. Code, § 65589.5, subd. (a)(1)(A),

1

(B).) This crisis is "hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic opportunities for workers and businesses, worsening poverty and homelessness, and undermining the state's environmental and climate objectives." (*Id.*, subd. (a)(2)(A).)

2.   A key contributor to this crisis is the failure of local governments to plan for the necessary housing supply at all income levels. To remedy this, the Legislature requires local governments to include housing elements in their general plans. A housing element must include, among other things, an assessment of housing needs, an inventory of resources and constraints relevant to meeting those needs, and a program to implement the policies, goals, and objectives of the housing element. (Gov. Code, § 65580 et seq.)

3.   Local governments that do not prepare a housing element substantially in compliance with state law, thereby failing to plan for an adequate supply of housing at all income levels, become subject to various legal consequences. For example, a local agency that fails to adopt a substantially compliant housing element becomes subject to the so-called "Builder's Remedy" provision of the Housing Accountability Act. (Gov. Code, § 65589.5) A local agency without a substantially compliant housing element may not deny, or apply conditions that make infeasible, a housing development project for very low-, low-, or moderate-income households on the basis of inconsistency with a zoning ordinance and land use designation in any general plan element. (Gov. Code, § 65589.5, subd. (d)(5).) In addition, a local government that fails to adopt a compliant housing element by the statutory deadline is subject to legal challenge pursuant to Article 14 of the Housing Element Law. (See Gov. Code. § 65750 et seq.) Article 14 provides for, among other things, temporary relief in the form of a revocation of permitting authority until the legal challenge is concluded. (Gov. Code, § 65757.)

4.   In another effort to alleviate the housing crisis, the Legislature has repeatedly amended the housing laws to encourage, and streamline the approval of, permits for accessory dwelling units ("ADUs") throughout the state. (See generally, Gov. Code, §§ 65852.150, 65852.2, 65852.22.) These units are typically small, easily-constructed residential structures installed as secondary housing units on a single-family property. Current ADU law requires local

2

agencies to approve ADU projects ministerially, or if denied, provide comments to the applicant regarding deficiencies and a description of how the application can be remedied.

5.     And, in 2021, the Legislature passed the California Housing Opportunity and More Efficiency Act ("HOME Act," or "SB 9") to streamline the permitting process and remove regulatory barriers for subdividing residential lots into multifamily housing projects like duplexes, triplexes, and four-plexes that are more affordable to middle-class households.

6.     The City of Huntington Beach recently decided to ignore the laws the Legislature specifically crafted to address California's housing affordability crisis by barring its staff from accepting and processing ADU- and SB 9-related building permits. The City did this despite the fact that the availability of decent, suitable, and affordable housing is of vital statewide importance to all Californians.

7.     In addition, the City of Huntington Beach has not adopted a current housing element that is substantially in compliance with state law. In failing to adopt *any* housing element, much less a substantially compliant one, Huntington Beach is not only in violation of state law, it is also now subject to the Builder's Remedy.

8.     The People of the State of California, by and through Attorney General Rob Bonta, and the Department of Housing and Community Development ("HCD"), bring this action against the City of Huntington Beach, its City Council, and its City Manager (collectively, the "City") to remedy its violations of state law. The People and HCD request that this Court issue a writ ordering the City to adopt a legally-compliant housing element within 120 days, pursuant to Government Code section 65754, subd. (a). Further, the People and HCD request this court issue a judgment declaring that the City is noncompliant with the Housing Element Law and that it must comply with the ADU laws and SB 9.

**PARTIES**

9.     The Attorney General, as the chief law enforcement officer of the State of California, brings this action under his broad independent powers to enforce state laws, and on behalf of HCD. (Cal. Const., Art. V, section 13; Gov. Code, § 65585, subd. (j).)

The People's First Amended Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

10.  HCD is a public agency of the State of California. (Gov. Code, § 12804.) Among other duties, HCD is responsible for developing housing policy and building codes, for regulating manufactured homes and mobile home parks, and for enforcing state housing laws, including the Housing Element Law, the Housing Accountability Act, state ADU laws, and the Housing Crisis Act in a manner that meaningfully and positively impacts the provision of housing in all communities across the state.

11.  The City of Huntington Beach is a municipal corporation formed and existing under the laws of the State of California, of which it is a political subdivision.

12.  The City Council of Huntington Beach is the elected governing body of the City of Huntington Beach.

13.  The City Manager of Huntington Beach is the city official responsible for the management and oversight of the City's various departments.

14.  The People are unaware of the true names and capacities of respondents and defendants DOES 1 through 50 (the "Doe Respondents"), who are therefore sued by fictitious names pursuant to Code of Civil Procedure section 474. The People allege on information and belief that each such fictitiously named Doe Respondent is responsible or liable in some manner for the events and happenings referred to herein, and the People will seek leave to amend this Petition and Complaint to allege their true names and capacities after the same have been ascertained.

## **VENUE AND JURISDICTION**

15.  This Court has jurisdiction over this action pursuant to Code of Civil Procedure sections 187, 1060, and 1085.

16.  Venue is proper in this Court because the City is located in Orange County and the violations of law alleged herein occurred in Orange County.

17.  This action is brought pursuant to Government Code section 65751 and is therefore entitled to preference over all other civil actions before this court pursuant to Government Code section 65752.

///

## BACKGROUND AND FACTUAL ALLEGATIONS

### The Housing Crisis

18.  The Legislature has declared that "[t]he availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every Californian . . . is a priority of the highest order."  (Gov. Code, § 65580, subd. (a).).

19.  California has a crisis-level housing shortage that stems from the failure of local governments to approve affordable housing to meet the needs of all Californians. For decades, the Legislature has found that California has been suffering from "a severe shortage of affordable housing, especially for persons and families of low and moderate income" and that "there is an immediate need to encourage the development of new housing." (*Ruegg & Ellsworth v. City of Berkeley* (2021) 63 Cal.App.5th 277, 295, quoting Gov. Code, § 65913.)

20.  Recently, the Legislature stated plainly that "California has a housing supply and affordability crisis of historic proportions." (Gov. Code, § 65589.5, subd. (a)(2)(A).) "The consequences of failing to effectively and aggressively confront this crisis are hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic opportunities for workers and businesses, worsening poverty and homelessness, and undermining the state's environmental and climate objectives." (*Ibid.*)

### Housing Elements and the Planning Process

21.  State law requires that all local governments adequately plan to meet the housing needs of everyone in the community, at all economic levels. To meet this requirement, every city and county must adopt and periodically update a housing element as part of its general plan. (See Gov. Code, §§ 65302, subd. (c), 65580, et seq.) The law mandating this adoption and periodic update is known as the "Housing Element Law." (*Id.*, § 65580, et seq.)

22.  California's Housing Element Law requires local governments to adopt plans and regulatory systems that provide opportunities for, and do not unduly constrain, housing development, especially for a locality's lower-income households and workforce. As a result, housing policy in California rests largely on the effective implementation of the housing element contained in the local general plan.

23.  The housing element is a roadmap for housing development in a given community. The housing element must identify and analyze existing and projected housing needs, and must include "a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing." (Gov. Code, § 65583.) The housing element must also "identify adequate sites for housing" and "make adequate provision for the existing and projected needs of all economic segments of the community." (*Ibid.*) Each housing element is also subject to review by HCD.

24.  A local jurisdiction's housing element must be frequently updated to ensure compliance with California's Housing Element Law. (Gov. Code, § 65588.) Jurisdictions must update their housing elements every five or eight years. (See *id.*, subd. (e)(3).) Each five- or eight-year cycle is known as a "planning period." (See *id.*, subd. (f)(1).)

25.  The process of updating a housing element begins with HCD's determination of a Regional Housing Need Allocation ("RHNA") for the region for a given planning period. (Gov. Code, § 65584, subd. (a)(1).) The RHNA sets goals for housing affordable to various income levels. To arrive at the RHNA, HCD starts with demographic population information from the California Department of Finance and uses a formula to calculate a figure for each region's planning body, known as a "council of governments" ("COG"). Each COG (in this case, the Southern California Association of Governments) also uses its own demographic figures to calculate the regional housing need. Each COG coordinates with HCD to arrive at a final figure, taking into account factors not captured in the calculations. This final figure is the RHNA. (See *id.*, § 65584.01.)  Once the RHNA is set, the COG is responsible for allocating the housing need among all of the cities and counties within that region. (Gov. Code, § 65584, subd. (b).) Each local government must then prepare a housing element that identifies adequate sites to accommodate that jurisdiction's fair share of the RHNA at each income level. (*Id.*, §§ 65583, 65583.2.)

26.  Each local government must submit its draft housing element to HCD before adoption. (Gov. Code, § 65585, subd. (b)(1).) HCD must review the draft element and issue findings as to whether the draft substantially complies with the Housing Element Law. (*Id.*,

6

subds. (b)(3), (d).) After adopting the final housing element, the local government must again submit the element to HCD, and HCD must again review and report its findings to the local government. (*Id.*, subds. (g), (h).)

27.  A local government that fails to adopt a compliant housing element by the statutory deadline is subject to legal challenge pursuant to Article 14 of the Housing Element Law. (Gov. Code. § 65750 et seq.) Article 14 authorizes a court to issue various remedies, including ordering a local government to adopt a compliant housing element within 120 days, ordering the suspension of a local government's permitting authority until it adopts a compliant housing element, and even ordering a *temporary* suspension of a local government's permitting authority until a housing element challenge is concluded. (Gov. Code, §§ 65754, 65755, 65757.) In addition, localities that do not have compliant housing elements are automatically subject to the Builder's Remedy under the Housing Accountability Act. (Gov. Code, § 65589.5.)

**The ADU Laws**

28.  One effective means of increasing the housing supply is by removing regulatory barriers to accessory dwelling units, or ADUs. ADUs are sometimes also known as "granny flats," "in-law units," "backyard cottages," or "secondary units," among other names. These small structures provide a cost-effective solution to increasing the housing supply on a rapid timescale.

29.  ADUs have many benefits. They are affordable to construct, since they typically use comparatively inexpensive wood frame construction, and no new land acquisition or major infrastructure is required. ADUs can also provide a source of income for homeowners when rented, increasing incentives for homeowners to build ADUs on their property. In addition, ADUs enable extended families to reside close to one another, and for seniors to age in place with family members while maintaining an independent living space. (See generally, Accessory Dwelling Units, Department of Housing and Community Development, available at https://www.hcd.ca.gov/policy-and-research/accessory-dwelling-units.)

30.  In recent years, the Legislature has repeatedly amended the housing laws to legalize and promote the construction of accessory dwelling units. In 2018, as part of a package of updates to the housing laws that, among other things, made the ADU laws applicable to charter cities for

the first time, the Legislature found and declared all of the following:

(1) Accessory dwelling units are a valuable form of housing in California.

(2) Accessory dwelling units provide housing for family members, students, the elderly, in-home health care providers, the disabled, and others, at below market prices within existing neighborhoods.

(3) Homeowners who create accessory dwelling units benefit from added income, and an increased sense of security.

(4) Allowing accessory dwelling units in single-family or multifamily residential zones provides additional rental housing stock in California.

(5) California faces a severe housing crisis.

(6) The state is falling far short of meeting current and future housing demand with serious consequences for the state's economy, our ability to build green infill consistent with state greenhouse gas reduction goals, and the well-being of our citizens, particularly lower and middle-income earners.

(7) Accessory dwelling units offer lower cost housing to meet the needs of existing and future residents within existing neighborhoods, while respecting architectural character.

(8) Accessory dwelling units are, therefore, an essential component of California's housing supply.

(Gov. Code, § 65852.150, subd. (a).)

31.  The bulk of the ADU laws are set forth at Government Code section 65850 et seq. These laws broadly restrict the ability of local agencies, whether general law or charter cities, to deny ADU projects within their jurisdiction, and set tight deadlines for processing applications.

32.  Relevant to this litigation, Government Code section 65852.2, subdivisions (a)(3)(A) and (b)(1), require permitting agencies to approve or deny ADU applications ministerially and without discretionary review within 60 days of a complete application's submittal. Under both provisions, "[i]f the local agency has not approved or denied the completed application within 60 days, [an] application shall be deemed approved." In addition, Government Code section 65852.2, subdivision (e)(1), states "a local agency shall ministerially approve an application for a building

8

1    permit within a residential or mixed-use zone to create" ADUs that meet specific requirements.

2       33.  In addition, a local agency that denies an ADU application must provide "in writing a

3    full set of comments to the applicant with a list of items that are defective or deficient and a

4    description of how the application can be remedied by the applicant." (Gov. Code, § 65852.2,

5    subd. (b)(2).)

6       34.  Government Code section 65852.2, subdivision (a)(7), further provides: "No other

7    local ordinance, policy, or regulation shall be the basis for the delay or denial of a building permit

8    or a use permit under this subdivision."

9                                        **Senate Bill 9**

10      35.  The Legislature introduced Senate Bill 9 in 2021 in an effort to streamline the process

11   for creating duplexes or for subdividing an existing lot. SB 9 restrained the discretion of local

12   agencies by creating a ministerial process for such project approvals.

13      36.  SB 9 ultimately allows up to four homes on lots where only one existed previously,

14   by permitting existing single-family homes to be converted to duplexes or single-family lots to be

15   subdivided into two lots on which two duplexes could be built. (See SB 9 Senate Floor Analysis,

16   August 28, 2021, available at

17   https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB9.)

18      37.  SB 9 added, among other provisions, sections 65852.21 and 66411.7 to the

19   Government Code. Section 65852.21 requires local agencies to approve a proposed housing

20   development consisting of two residential units within a single-family zone on a ministerial basis.

21   Section 66411.7 requires local agencies to approve a lot split in a single-family zone on a

22   ministerial basis. Both provisions became operative on January 1, 2022.

23      38.  SB 9 placed limits on a local agency's ability to deny proposed projects, but it did not

24   entirely eliminate local agencies from the approval process. Local agencies are still permitted to

25   "impose objective zoning standards, objective subdivision standards, and objective design review

26   standards," so long as such standards do not have "the effect of physically precluding the

27   construction of up to two units or...would physically preclude either of the two units from being at

28   least 800 square feet in floor area" within a single-family zone. (Gov. Code, § 65852.21, subd.

9

(b).) Similarly, local agencies can impose "objective" standards with respect to lot splits, so long as those standards do not "have the effect of physically precluding the construction of two units on either of the resulting parcels or that would result in a unit size of less than 800 square feet" within a single-family zone. (Gov. Code, § 66411.7, subd. (c).) Finally, the legislative body of a local agency may reject an SB 9 project if it finds, based on a preponderance of the evidence, that the proposed project would have a "specific, adverse impact" on "public health and safety or the physical environment and for which there is no feasible method to satisfactorily mitigate or avoid the specific, adverse impact." (Gov. Code, §§ 65852.21, subd. (d); 66411.7, subd. (d); see also 65589.5, subd. (d)(2).)

**The Housing Crisis Act**

39.  The Housing Crisis Act of 2019 ("HCA") prohibits a local government from "enact[ing] a development policy, standard, or condition" that would have the effect of "[c]hanging the general plan land use designation, specific plan land use designation, or zoning of a parcel or parcels of property to a less intensive use or reducing the intensity of land use within an existing general plan land use designation, specific plan land use designation, or zoning district in effect at the time of the proposed change, below what was allowed under the land use designation or zoning ordinances … in effect on January 1, 2018." (Gov. Code, § 66300, subd. (b)(1)(A).) The statute defines "reducing the intensity of land use" to include "any other action that would individually or cumulatively reduce the site's residential development capacity." (*Ibid*.)

40.  The HCA also prohibits a local government from "[i]mposing a moratorium or similar restriction or limitation on housing development … within all or a portion of the jurisdiction … other than to specifically protect against an imminent threat to the health and safety of persons residing in, or within the immediate vicinity of, the area subject to the moratorium…." (Gov. Code, § 66300, subd. (b)(1)(B)(i).)

41.  In addition, a local agency shall not enforce such "a moratorium or other similar restriction on or limitation of housing development until it has submitted the ordinance to, and

10

1   received approval from, [HCD]." (Gov. Code, § 66300, subd. (b)(1)(B)(ii).) If HCD denies

2   approval, "that ordinance shall be deemed void." (*Ibid*.)

3   **Huntington Beach's Violations of State Housing Laws**

4   42.  On or about December 20, 2022, HCD became aware that the Huntington Beach City

5   Council planned to resist its obligations under California's housing laws. At its December 20th

6   meeting, the City Council directed the City Attorney, via Council Member Items Report 22-1096,

7   to explore a potential legal challenge to the City's RHNA allocation and to draft an ordinance that

8   would conflict with the mandate of the Housing Accountability Act by banning Builder's Remedy

9   projects.

10   43.  On January 9, 2023, HCD issued a Notice of Potential Violation notifying the City

11   that, among other things, recent court decisions confirmed that the RHNA allocation process is

12   not subject to judicial review, and that any attempt to circumvent the Housing Accountability Act

13   could result in a referral to the Attorney General's Office.

14   44.  The City persisted in its efforts to flout the state's housing laws. The City Council

15   introduced Zoning Text Amendment No. 2023-001, which would ban Builder's Remedy projects,

16   for consideration at an upcoming meeting. On February 13, 2023, the Attorney General's Office

17   issued a letter explaining that the proposed ordinance expressly conflicted with applicable state

18   law and warning that the Attorney General's Office was prepared to begin an enforcement action

19   if necessary.[1]

20   45.  Separately, the City Council decided it would attempt to ban ADU and SB 9-eligible

21   project applications. On February 21, 2023, HCD issued a Notice of Potential Violation to the

22   City to advise it that, among other things, the ADU ban was unlawful and would bring the City's

23   draft housing element out of compliance with the Housing Element Law. The Attorney General's

24   Office issued a separate letter on February 21, 2023, informing the City that, among other things,

25   a prohibition on ADU and SB 9-eligible projects would violate state law, including the Housing

26   Crisis Act (Gov. Code, § 66300) and the Housing Accountability Act (Gov. Code, § 65589.5).

27

28   [1] The City Council has not as of the date of this filing adopted the Builder's Remedy ban. Petitioners will challenge any attempt to do so.

11

The People's First Amended Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

46.  Nevertheless, at its February 21, 2023 meeting, the Huntington Beach City Council adopted Action Item No. 23-172 (the "Action Item"), directing the City Manager to "cease the processing of all applications/permits brought to the City by developers under SB 9, SB 10, or 'state law related' ADU projects, until the courts have adjudicated the matter(s)."[2] The Action Item also directed the City Attorney to "take any legal action necessary to challenge SB 9 and SB 10 and the laws that permit ADU's [sic]."

47.  In deliberating over the Action Item, the City did not cite any statutory exemption under SB 9 as a basis for the Action Item, nor did it make any findings that the Action Item is necessary to protect the public from an immediate, adverse impact to health or safety.

48.  On February 22, 2023, the City, pursuant to its Action Item, began refusing to accept any ADU and SB 9 permit applications. Its Planning Division website stated that, effective as of that date, no SB 9 or ADU permit applications would be accepted until "any legal challenges are resolved."

49.  On March 8, 2023, Petitioners filed the instant lawsuit challenging the unlawful ban on SB 9 and ADU permit applications.

50.  At its March 21, 2023 meeting, the City Council voted to direct the City Manager to "accept applications and process permits for accessory dwelling units (ADUs) and SB 9 development projects" but did not formally rescind the Action Item.

51.  The City's voluntary cessation of its unlawful conduct under California's housing laws does not indicate that it will obey the housing laws in the future. It is settled that "voluntary discontinuance of alleged illegal practices does not remove the pending charges of illegality from the sphere of judicial power or relieve the court of the duty of determining the validity of such charges where by the mere volition of a party the challenged practices may be resumed." (*Robinson v. U-Haul Co. of California* (2016) 4 Cal. App. 5th 304, 315–16 (quoting *Marin County Bd. Of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 929.))

52.  The City's continuing pattern of resistance to its obligations under California's

---

[2] SB 10 permits local agencies to adopt ordinances allowing for increased density near transit-rich and/or urban infill sites. It is a voluntary, opt-in upzoning law. The City has not as of the date of this filing brought a challenge to that law.

1   housing laws, as alleged in the foregoing paragraphs and *infra*, indicates that a judicial

2   determination of rights and obligations is necessary. The City has not unambiguously committed

3   itself to a "violation-free future," and Petitioners reasonably "doubt the bona fides of [the] newly

4   established law-abiding policy." (*Robinson*, *supra*, 4 Cal.App.5th at 316.)

5          53.   The City's temporary cessation of unlawful activities does not stop the City from

6   engaging in unlawful behavior again in the future. Absent a resolution to this litigation,

7   Petitioners have no reason to believe the City will permanently comply with state housing law,

8   including the ADU laws and SB 9.

9                    **The City of Huntington Beach's Failure to Adopt a Housing Element**

10         54.   The statutory deadline for the City to adopt a sixth cycle housing element, for the

11  planning period covering October 2021 through October 2029, was October 15, 2021.

12         55.   City staff previously worked with HCD to develop a compliant sixth cycle housing

13  element. On September 30, 2022, HCD advised the City that its September 23, 2022 draft housing

14  element met statutory requirements at the time of review.

15         56.   That draft housing element projected the development of 487 new ADUs to meet the

16  City's RHNA allocation.

17         57.   On or about February 17, 2023, HCD discovered the City Council was considering a

18  ban on ADU applications, in contravention of state law and notwithstanding the draft housing

19  element's reliance on ADU production to meet its RHNA target.

20         58.   On February 21, 2023, HCD issued a Notice of Potential Violation to the City to

21  advise it that, among other things, the ADU ban would bring the City's draft housing element out

22  of compliance with the Housing Element Law. In particular, HCD warned that the ADU ban

23  represented a new constraint on the production of housing that would have to be addressed in the

24  new housing element, and that the pending ADU ban called into question the draft element's

25  assumption that new ADU production would help meet the City's RHNA target.

26         59.   Later that day, the City Council passed a ban on ADU and SB 9 permit applications.

27         60.   On February 22, 2023, HCD issued a Notice of Violation advising the City that,

28  among other things, the just-passed ADU ban brought the City out of compliance with the

The People's First Amended Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

Housing Element Law and that its draft housing element would need to be revised. The Notice of Violation also advised the City of the potential penalties for noncompliance and stated that HCD would refer the matter to the Office of the Attorney General absent corrective action.

61.  HCD met with City representatives on March 8, 2023, to discuss the City's violation of the Housing Element Law. HCD discussed with City staff the City's reliance on ADU production to meet RHNA targets, the changes to its site inventory, and changes necessary to account for new requirements set by AB 2339 regarding the identification of sites suitable for emergency shelters. At that meeting, City staff expressed confidence that the City would vote to adopt the housing element soon.

62.  At its March 21, 2023 meeting, the City Council considered but did not pass Resolution 2023-14, which would have approved the City's draft housing element.

63.  HCD met again with City representatives on March 24, 2023. At that meeting, discussion topics included minor changes to the sites inventory of the City's plan, and an inquiry to City staff as to whether the AB 2339-related edits were included in the housing element. At this meeting, City staff expressed hope that the City would adopt the housing element at its April 4, 2023 meeting.

64.  At its April 4, 2023 meeting, the City Council again considered and did not pass Resolution 2023-14, thereby persisting in its failure to approve a compliant housing element for the sixth cycle.

65.  The City has made no further efforts to adopt any sixth cycle housing element.

## FIRST CAUSE OF ACTION
**Writ of Mandate (Code Civ. Proc., § 1085; Gov. Code, §§ 65751, 65585, subd. (n)) – Violation of Gov. Code, § 65585)**
**[Against All Defendants]**

66.  Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

67.  Under California's Housing Element Law, the City must ensure that its general plan contains a legally compliant housing element.

14

68.   The City has abdicated this duty. The City has failed to adopt a legally compliant sixth cycle housing element by the October 15, 2021 statutory deadline, and the City Council's most recent actions and inactions on April 4, 2023 show that the City has no intention of complying with the Housing Element Law.

69.   The City's failure to act is arbitrary, capricious, entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, an abuse of discretion, and a failure to act as required by law.

70.   Accordingly, a writ of mandate should issue as provided under Government Code section 65754 ordering the City to come into compliance with California's Housing Element Law (Gov. Code, § 65580 et seq.) within 120 days by adopting a compliant sixth cycle housing element that meets the City's regional housing needs goals, as determined by HCD.

71.   Petitioners have a beneficial interest in the issuance of such a writ, given their authority and mandate to enforce substantial compliance with California's Housing Element Law. Likewise, the public at large, as well as the lower income residents and workforce in the City, have a significant interest in ensuring that the City complies with the law.

72.   Petitioners have exhausted all required administrative remedies, or are excused from exhausting its remedies due to the futility of pursuing such remedies, among other things.

73.   Petitioners have no plain, speedy, or adequate remedy in the ordinary course of law. The only remedy provided by law for Petitioners to obtain relief is this Petition for Writ of Mandate pursuant to Code of Civil Procedure section 1085.

**SECOND CAUSE OF ACTION**
**Declaratory and Injunctive Relief (Code Civ. Proc., § 1060, Gov. Code, §§ 65755, 65757) –**
**Violation of Gov. Code, §§ 65585 (Housing Element Law); 65850 et seq. (ADU Laws);**
**65852.21, 66411.7 (SB 9)**
**[Against All Defendants]**

74.   Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

75.   There is a controversy between Petitioners and the City as to whether the City has complied with California's Housing Element Law (Gov. Code, § 65580, et seq.). Based on the

1    events alleged above, it cannot be disputed that the City is noncompliant with the Housing

2    Element Law and, as made clear by the City Council's April 4, 2023 deliberation and vote, is

3    making no progress on becoming compliant. Further, based on information and belief, Petitioners

4    allege that the City is aware that it is out of compliance with the Housing Element Law and has

5    failed to take any meaningful action to adopt a substantially compliant element, even though its

6    sixth cycle housing element is now almost eighteen months overdue.

7         76.   It is necessary and appropriate for the Court to render a declaratory judgment that sets

8    forth the parties' legal rights and obligations with respect to whether the city is substantially

9    compliant with California's Housing Element Law. Among other things, such a judgment would

10   inform the parties' conduct in connection with future contemplated amendments to the City's

11   housing element, including those that occur routinely at the beginning of each housing cycle.

12        77.   Further, there is a controversy between Petitioners and the City as to whether the City

13   complied with state ADU laws and SB 9. The City's ban on ADU and SB 9 projects, even if

14   transient, expressly conflicted with applicable state law. Based on information and belief,

15   Petitioners allege that the City deliberately defied applicable state law, voluntarily ceased doing

16   so once this litigation was filed, and may by its own volition resume violating state law in the

17   absence of a judicial remedy.

18        78.   It is necessary and appropriate for the Court to render a declaratory judgment that sets

19   forth the parties' legal rights and obligations with respect to whether the City is subject to the

20   state's housing laws.

21        79.   Petitioners therefore request a declaration that the City is not substantially compliant

22   with California's Housing Element Law (Gov. Code, § 65580, *et seq.*), that the City's ADU and

23   SB 9 project ban violated the Housing Crisis Act (Gov. Code, § 66300), the ADU laws (Gov.

24   Code, § 65850 et seq.), and SB 9 (Gov. Code, §§ 65852.21, 66411.7), and that the City must

25   comply with the ADU laws (Gov. Code, § 65850 et seq.) and SB 9 (Gov. Code, §§ 65852.21;

26   66411.7).

27        80.   In addition to these remedies, Petitioners are immediately entitled to temporary relief

28   under Government Code section 65757, including but not limited to the suspension of the City's

The People's First Amended Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

1    authority to issue non-residential building permits, until the City has substantially complied with

2    Housing Element Law by properly adopting and implementing an adequate housing element.

3                              **PRAYER FOR RELIEF**

4          WHEREFORE, Petitioners pray as follows:

5    1.   For a writ of mandate ordering the City to adopt a housing element in compliance with

6         the Housing Element Law within 120 days. (Gov. Code, §§ 65580 *et seq.*)

7    2.   For temporary relief, including but not limited to the suspension of the City's non-

8         residential permitting authority, and mandating the approval of certain residential

9         developments. (Gov. Code, §§ 65755, 65757.)

10   3.   For a declaration that the City is in violation of the Housing Element Law. (Gov. Code,

11        §§ 65580 et seq.; 65585, subd. (n).)

12   4.   For a declaration that the City's ban on ADU and SB 9 projects violated the Housing

13        Crisis Act (Gov. Code, § 66300), the ADU laws (Gov. Code, § 65850 et seq.), and SB 9

14        (Gov. Code, §§ 65852.21, 66411.7), and that the City must comply with the ADU laws

15        (Gov. Code, § 65850 et seq.) and SB 9 (Gov. Code, §§ 65852.21; 66411.7).

16   5.   For statutory fines, levies, and penalties. (Gov. Code, § 65585, subd. (l).)

17   6.   For costs and attorneys' fees.

18   7.   For any other relief the Court may deem appropriate.

19   Dated:  April 10, 2023                    Respectfully submitted,

20                                             ROB BONTA
                                               Attorney General of California
21                                             DANIEL A. OLIVAS
                                               Senior Assistant Attorney General
22                                             DAVID PAI
                                               Supervising Deputy Attorney General
23

24

25                                             THOMAS P. KINZINGER
                                               Deputy Attorney General
26                                             *Attorneys for Petitioner and Plaintiff, The*
                                               *People of California ex rel. Rob Bonta,*
27                                             *and the California Department of Housing*
                                               *and Community Development*
28   SA2023301106

                                     17

The People's First Amended Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

# EXHIBIT B

| | |
|---|---|
| **From:** | Gates, Michael |
| **To:** | David Pai |
| **Cc:** | Vigliotta, Mike; Matthew Struhar; Thomas Kinzinger; Said, Nadin |
| **Subject:** | RE: People and HCD v. City of Huntington Beach-- stipulation to amend petition/complaint |
| **Date:** | Friday, April 7, 2023 12:25:58 PM |
| **Attachments:** | image003.png |

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

No. The City will not agree.  In fact, the City will oppose leave to amend.

The novel basis for the new controversy you are now presenting in your email today requires the filing of a new lawsuit by the State. What you are now newly alleging is an entirely new set of facts and entirely different laws, none of which relates back the State's lawsuit the City has deemed moot and presently lacking any legal controversy.  The State will be required to follow the laws, including those of Procedure.  With this in mind, I'll renew my request that the State dismiss it's moot lawsuit and file a new lawsuit with the new allegations.

Thank you.

Michael E. Gates, City Attorney
OFFICE OF THE CITY ATTORNEY
CITY OF HUNTINGTON BEACH
2000 Main St., Fourth Floor
Huntington Beach, CA 92648
Ph: (714) 536-5538 Fx: (714) 374-1590
Confidentiality Notice:  This email may contain material that is confidential, privileged and/or attorney work-product for the sole use of the addressee.  Further, this email is protected under the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2522.  Any review by, reliance, or distribution by others or forwarding to others without express permission of the author is strictly prohibited.  If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited.  Moreover, any such inadvertent disclosure shall not compromise or waive the attorney-client privilege as to this communication.  If you have received this communication in error, please immediately notify the sender and delete this e-mail.  Thank you.


-------- Original message --------
From: David Pai <David.Pai@doj.ca.gov>
Date: 4/7/23 12:15 PM (GMT-08:00)
To: "Gates, Michael" <Michael.Gates@surfcity-hb.org>
Cc: "Vigliotta, Mike" <MVigliotta@surfcity-hb.org>, Matthew Struhar <Matthew.Struhar@doj.ca.gov>, Thomas Kinzinger <Thomas.Kinzinger@doj.ca.gov>
Subject: People and HCD v. City of Huntington Beach-- stipulation to amend petition/complaint

Michael:

We are in receipt of the City's answer to the petition and complaint, filed and served on April 3, 2023. I don't believe a summons has issued yet, so thank you for agreeing to waive service and promoting efficiency in litigating this matter. We will, of course, extend similar courtesies throughout the pendency of this litigation. On that note, as discussed with you over the phone on March 30, 2023, we intend to amend our petition to include Housing Element Law violations *if* the City Council did not adopt and implement the draft housing element the City's planning staff presented on April 4, 2023. It has come to our attention that the City Council tabled that item once again, and remains out of compliance with

Housing Element Law.

Since the City answered the outdated original petition and complaint, Petitioners are now required to file a regularly-noticed motion seeking leave to amend, which we intend to do so on Monday. Will the City and co-respondents/defendants, in the continued interest of judicial efficiency, stipulate to such an amended petition and complaint? The amended petition and complaint will seek a writ of mandate ordering compliance with Housing Element Law within 120 days, injunctive/temporary relief until the City complies with Housing Element Law, and declaratory relief with respect to the City Council's prior actions as set forth in the original petition and complaint. Such stipulation, of course, does not preclude the City from bringing a dispositive motion and challenging the sufficiency of the pleadings, and would be aligned with the judicial policy favoring amended pleadings so as to resolve all disputed matters between the parties in a single lawsuit.

Please let us know via a reply to this email by the close of business today. Thank you.



**DAVID PAI** | Supervising Deputy Attorney General
Land Use and Conservation Section, Public Rights Division
Department of Justice, Office of the Attorney General
1515 Clay Street, 20th Floor | Oakland, California 94612
Telephone (510) 879-0816 | David.Pai@doj.ca.gov
File drop: https://fx.doj.ca.gov/filedrop/~dKliQ4

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.