MICHAEL E. GATES, City Attorney (SBN 258446)
NADIN S. SAID, Senior Deputy City Attorney (SBN 309802)
Office of the City Attorney
2000 Main Street, P.O. Box 190
Huntington Beach, CA 92648
(714) 536-5555
Email:  Michael.Gates@surfcity-hb.org
Email:  Nadin.Said@surfcity-hb.org

Attorneys for Plaintiffs
CITY OF HUNTINGTON BEACH, HUNTINGTON
BEACH CITY COUNCIL, MAYOR TONY STRICKLAND
and MAYOR PRO TEM GRACEY VAN DER MARK

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation, the HUNTINGTON BEACH CITY COUNCIL, MAYOR OF HUNTINGTON BEACH, TONY STRICKLAND, and MAYOR PRO TEM OF HUNTINGTON BEACH, GRACEY VAN DER MARK<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California, and individually; GUSTAVO VELASQUEZ in his official capacity as Director of the State of California Department of Housing and Community Development, and individually; STATE LEGISLATURE; STATE OF CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT; SOUTHERN | CASE NO. 8:23-CV-00421-FWD-ADSx<br><br>**DECLARATION OF PLAINTIFF MAYOR TONY STRICKLAND IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>[Filed concurrently with Plaintiffs' Collective Opposition to Defendants' Motions to Dismiss]<br><br>Date:   July 27, 2023<br>Time:   10:00 a.m.<br>Crtm:  10D |

1

CALIFORNIA ASSOCIATION OF
GOVERNMENTS; and
DOES 1-50, inclusive,

        Defendants.

## DECLARATION OF TONY STRICKLAND

1.     I am the duly elected Mayor of the City of Huntington Beach, a City Chartered under the California Constitution, and am a resident of the City of Huntington Beach.  I was elected to the seven-member City Council on November 8, 2022, and I am among the Plaintiffs listed in the above-entitled action ("Action"). The following is within my own personal knowledge, and if called upon to testify I could and would competently testify thereto.

2.     As part of the City's proposed update to its Housing Element, a City-wide zoning update that necessarily included the Defendants' "mandate" of 13,368 RHNA units of high-density housing, the City had also conducted the State mandated California Environmental Quality Act ("CEQA") environmental review, which studied and reported on the impacts to the environment in the City of the proposed "mandate" of 13,368 RHNA units of high-density housing.  Those environmental impacts are reported in the Environmental Impact Report 22-002 ("EIR") associated with the proposed Housing Element Update.

3.     Because the study found that there are a number of negative impacts to the City's environment, a Statement of Overriding Considerations ("SOC") was generated in order to recognize the negative environmental impacts, to present possible mitigation measures where mitigation could offset or mollify the recognized negative environmental impacts, and to make statements of overriding consideration for negative environmental impacts that were "significant" and "unavoidable."  In essence, the SOC makes express statements that are required to

be made first, in order to move past the substantial but unavoidable environmental impacts in order to implement the Housing Element.  The SOC in this case essentially required me to adopt or accept a statement that 'the benefits of the proposed 13,368 units of high-density RHNA housing outweigh the significant and unavoidable impacts to the City's environment.'  The prospect that I would be forced to make such a statement, or adopt such as statement as part of the RHNA Laws process to adopted the City's updated Housing Element, was troubling and very objectionable to me.

4.      A true and correct copy of the SOC, as part of Resolution No. 2023-15 included within the Environmental Impact Report (relevant portions highlighted) is attached hereto as Exhibit 10 and is Exhibit 10 to the Request for Judicial Notice. The statements within the SOC are presented in Section 4.0 of the EIR attached as Exhibit A to Resolution No. 2023-15.

5.      Ahead of the March 21, 2023, City Council and Public Financing Authority Meeting, I received that EIR to review from the City's Community Development staff and I reviewed the Environmental Impact Report before the March 21, 2023, meeting.

6.      On March 21, 2023, a City Council and Public Financing Authority Meeting was held.  As part of the items on the agenda, Resolution No. 2023-14 was Item No. 25, which proposed approving the General Plan Amendment (Housing Element Update).  The Resolution required approval of a subsequent EIR with findings of fact and the aforementioned SOC as required by State law under CEQA, and necessarily the adoption of the SOC and all of its statements contained therein.

7.      When Item No. 25 was called, I stated that my intentions on this matter have always been to move ahead with the lawsuit challenging State's RHNA Laws (as defined in the Complaint), but at the same time to also approve the proposed Housing Element Update so Huntington Beach is at least attempting to comply, while under protest.  I added that as the proposed Housing Element Update is

studied further, the California Department of Housing and Community Development ("HCD") requires a signed/adopted Statement of Overriding Considerations, which states that Council Members believe the benefits of the affordable housing projects override the negative impact they could cause to the environment.  And, that was the case here; that if the Housing Element Update was to be adopted, that I would be *required to say* 'the benefits of the proposed 13,368 units of high-density RHNA housing outweigh the significant and unavoidable impacts to the City's environment.'  In good conscience, knowing how destructive and damaging the State's mandated 13,368 RHNA Units was going to be to the City's environment, I could not say that, or accept that statement.

8.     By being forced to make the Statement of Overriding Considerations (which is what CEQA requires, and the RHNA Laws require), the State is forcing my speech.  Council Members, like myself, are being forced to agree that these mandates and mandated high-density housing projects are more important, or provide such a benefit to the City, than the known significant and unavoidable negative impacts to the City's environment, such as those to air quality, the greenhouse gases created, the damage to our geology, soils, seismic ground shaking or seismic ground failure, do not matter.  The SOC supersedes all of those significant environmental concerns, and apparently to the State, is more important than the potential significant hazards to the public and environment through accidents, or conditions involving the release of hazardous materials in our environment; more important than strain on precious resources like water, and water discharge which could degrade water quality and supply; more important than the noise created which would degrade quality of life; more important than the strain created on public safety services, or the increase in demand on public spaces and parks, or increased traffic and number of vehicle trips which conflict with the City's policies and goals to maintaining a specific threshold addressing circulation; more important than the impact on the schools and infrastructure.

4

9.      I stated on the record that the March 21, 2023 City Council Meeting, as well as the April 4, 2023 City Council Meeting that I could not in good conscience support the SOC (Exhibit A) and the endorsement of the 13,368 high-density RHNA Units in the City because it goes against everything I stand for.  Since I could not make accept the contents of the SOC, and I would not acknowledge that the 'the benefits of the proposed 13,368 units of high-density RHNA housing outweighed the significant and unavoidable impacts to the City's environment,' my fellow Council Members and I could not certify the proposed Housing Element because accepting and adopting the SOC is a prerequisite to certifying the Housing Element.

10.      In direct response to not certifying the Housing Element because I could not make the State-mandated findings required by the State's CEQA and the State Housing and RHNA Laws, I am informed and believe the State is attempting to amend its lawsuit on June 8, 2023 against the City in Case No. 30-2023-01312235 to reflect the essence of the same legal challenges the City has already presented to this Court by its March 9, 2023 lawsuit.

I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the foregoing is true and correct.

Executed this 2nd of June, at Huntington Beach, California.


_____*/s/ TONY STRICKLAND*_____
TONY STRICKLAND,
MAYOR OF HUNTINGTON BEACH

RESOLUTION NO. 2023-15

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF HUNTINGTON BEACH
CERTIFYING FINAL SUBSEQUENT ENVIRONMENTAL IMPACT REPORT NO. 22-002
FOR THE CITY OF HUNTINGTON BEACH 6TH CYCLE HOUSING ELEMENT UPDATE
(2021-2029), ADOPTING FINDINGS PURSUANT TO THE CALIFORNIA
ENVIRONMENTAL QUALITY ACT, ADOPTING A STATEMENT OF OVERRIDING
CONSIDERATIONS, AND ADOPTING A MITIGATION MONITORING AND REPORTING
PROGRAM

WHEREAS, the City of Huntington Beach ("City") initiated an update to the 6th Cycle
Housing Element Update (2021-2029); and

The City, as Lead Agency has prepared a Final Subsequent Environmental Impact Report
("Final SEIR") for the 6th Cycle Housing Element Update (2021-2029); and

The Final SEIR is a program EIR, as defined by State and local guidelines for the
implementation of the California Environmental Quality Act ("CEQA"); and

The Final SEIR has been prepared to address the environmental effects, mitigation
measures, and project alternatives associated with the 6th Cycle Housing Element Update (2021-
2029) including the implementation programs to accommodating housing sites through rezoning
and housing overlay zones, in accordance with CEQA, the State CEQA Guidelines and City
environmental procedures; and

Written comments on the scope of the Draft SEIR were received from the public and
responsible public agencies during the 30-day review period on the Notice of Preparation from
August 5, 2021 to September 7, 2021.

A Draft SEIR was prepared for the Project between September 2021 and June 2022. In
accordance with the CEQA and the Guidelines, promulgated with respect thereto, the City
analyzed the Project's potential impacts on the environment.

Written comments on the Draft SEIR were received from the public and responsible
public agencies during a 47-day public comment period, from June 29, 2022 through August 15,
2022; and

Such comments and testimony were responded to through Response to Comments
document included in the Final SEIR and said Final SEIR was made available in a manner
prescribed by CEQA and the CEQA Guidelines; and

**EXHIBIT 10**

RESOLUTION NO. 2023-15

Public Resources Code 21092.5(a) requires that the City provide a written response to any public agency that comment on the EIR, and the Response to Comments included in the Final SEIR satisfies this requirement; and

On November 16, 2022, the Planning Commission recommended that the City Council certify Final SEIR No. 22-002; and

The City Council has independently reviewed all environmental documentation comprising the EIR, including all elements of the Final SEIR, and has found that the EIR considers all environmental effects of the 6th Cycle Housing Element Update (2021-2029), is complete and adequate, and fully complies with all the requirements of CEQA and the CEQA Guidelines; and

Section 15092 of the CEQA Guidelines provides that the City shall not decide to approve or carry out a project for which an EIR was prepared unless it has:

    (A)  Eliminated or substantially lessened all significant effects on the environment where feasible as shown in the findings under Section 15091 of the CEQA Guidelines; and

    (B)  Determined that any remaining significant effects found to be unavoidable under Section 15091are acceptable due to overriding concerns as described in Section 15093 of the CEQA Guidelines and as set forth in the attached Statement of Overriding Considerations (Exhibit A); and

Section 15093(a) if the CEQA Guidelines requires that the City balance the benefits of a proposed project against its unavoidable environmental risks in determining whether to approve the project, and the City Council has carefully considered said benefits and risks,

NOW, THEREFORE, the City Council of the City of Huntington Beach does hereby resolve as follows:

    1.    That the City Council hereby certifies the Final SEIR as complete and adequate in that it addresses all environmental effects of the 6th Cycle Housing Element Update (2021-2029), and fully complies with the requirements of CEQA and the CEQA Guidelines. The Final SEIR is composed of the following elements:

        a.  Draft SEIR and Technical Appendices; and

        b.  Planning Commission and City Council staff reports; and

        c.  Planning Commission and City Council Minutes; and

        d.  Comments received on the Draft SEIR and responses to those comments; and

2

**EXHIBIT 10**

RESOLUTION NO. 2023-15

    e.   Mitigation Monitoring and Reporting Program; and

    f.   Errata to the Draft SEIR

All of the above information has been and will be on file with the City of Huntington Beach Community Development Department, 2000 Main Street, Huntington Beach, California, 92648 and with the City Clerk.

2.    That the City Council finds that the Final SEIR has identified all significant environmental effects of the project and that there are no known potential environmental impacts not addressed in the Final SEIR.

3.    That the City Council finds that the Final SEIR has described all reasonable alternatives to the project that could feasibly attain the basic project objectives (including the "No Project" alternative), even when these alternatives might impede attainment of project objectives and might be more costly. Further, the City Council finds that a good faith effort was made to incorporate alternatives in the preparation of the Draft SEIR and all reasonable alternatives were considered in the review process of the Final SEIR and ultimate decisions on the project.

4.    The City Council further finds that the benefits gained by the City and its current and future residents by virtue of implementing the goals and policies of the Housing Element Update and overriding environmental impacts that remain significant and unavoidable despite the imposition of all feasible mitigation, as detailed in Final SEIR No. 22-002 and the Statement of Overriding Considerations attached hereto as Exhibit A, and incorporated by reference as though fully set forth herein.

5.    That the City Council of the City of Huntington Beach does hereby certify Final SEIR No. 22-002.

**EXHIBIT 10**

RESOLUTION NO. 2023-15

PASSED AND ADOPTED by the City Council of the City of Huntington Beach at an adjourned regular meeting held on _____ day of _____, 2023.

_____
Mayor

ATTEST:                                          APPROVED AS TO FORM:

_____        _____
City Clerk                                        City Attorney

REVIEWED AND APPROVED:                INITIATED AND APPROVED:

_____        _____
City Manager                                    Community Development Director

Exhibit A – Findings of Fact and Statement of Overriding Considerations

4

**EXHIBIT 10**

Resolution No. 2023-15
Exhibit "A"

Subsequent Final
Environmental Impact Report:
Findings of Fact/Statement of Overriding Considerations

SCH #2021080104

# 2021-2029 Housing Element Update

---

**LEAD AGENCY**



**CITY OF HUNTINGTON BEACH**
**DEPARTMENT OF COMMUNITY**
2000 MAIN STREET 3RD FLOOR
HUNTINGTON BEACH, CA 92648
(714) 536-5721

**CONSULTANT**



**KIMLEY-HORN AND ASSOCIATES, INC.**
**MS. RITA GARCIA**
1100 TOWN AND COUNTRY ROAD, SUITE 700
ORANGE, CA 92868
(714) 786-6116

**OCTOBER 2022**

**EXHIBIT 10**

## Table of Contents

1.0 **INTRODUCTION** ................................................................................................ 2

2.0 **CEQA FINDINGS** ................................................................................................ 4

3.0 **FINDINGS REGARDING PROJECT ALTERNATIVES** ........................................... 17

    3.1. Introduction ........................................................................................... 17

    3.2. Project Objectives ................................................................................. 17

    3.3. Selection of Alternatives ...................................................................... 18

    3.4. Project Alternative Findings ................................................................ 18

4.0 **STATEMENT OF OVERRIDING CONSIDERATIONS** ........................................... 25

    4.1. Introduction ........................................................................................... 25

    4.2. Significant Adverse Cumulative Impact ............................................. 25

    4.3. Findings ................................................................................................... 26

    4.4. Overriding Considerations ................................................................... 26

### List of Tables

Table 1: CEQA Findings for the HEU.................................................................................. 5

**EXHIBIT 10**

# 1.0   INTRODUCTION

This document presents the Findings of Fact and Statement of Overriding Considerations that must be adopted by the City of Huntington Beach (City) pursuant to the requirements of Sections 15091 and 15093, respectively, of the CEQA Guidelines prior to the approval of the City of of Huntington Beach 2021-2029 Housing Element Update (otherwise referred to as "HEU" or the "Project").

This document is organized as follows:

**Chapter 1**   Introduction to the Findings of Fact and Statement of Overriding Considerations.

**Chapter 2**   CEQA Findings of the Draft Subsequent Environmental Impact Report (Draft SEIR), including the identified significant cumulative impacts.

**Chapter 3**   Summarizes the alternatives to the Project and evaluates them in relation to the findings contained in Section 15091(a)(3) of the CEQA Guidelines. The City must consider and make findings regarding alternatives when a project would involve environmental impacts that cannot be reduced to a less than significant level, or cannot be substantially reduced, by proposed mitigation measures.

**Chapter 4**   Statement of Overriding Considerations, as required by Section 15093 of the CEQA Guidelines, for significant impacts of a proposed project that cannot be mitigated to a less than significant level.

The Housing Element, which is a component of the Huntington Beach General Plan, provides direction for implementation of various programs to meet existing and projected future housing needs for all income levels within Huntington Beach. The City's projected housing need for the 6th Cycle Regional Housing Needs Assessment (RHNA) planning period (2021-2029) is 13,368 dwelling units (11,743 units when accounting for existing applications and projects that are currently under review).

State housing law requires the City to specify the number of housing units that can realistically be accommodated on candidate housing sites. The City is not required to build dwelling units in order to meet its RHNA allocation, only to identify potential sites and create the framework to allow the market the opportunity to develop these units. Therefore, the Project, as defined for CEQA purposes, consists of the Housing Program to accommodate the lower-income RHNA units, including amendments to existing land use designations and zoning districts, an affordable housing overlay, and identification of underutilized, residentially-zoned parcels in an inventory of 378 candidate housing sites.

The Housing Program specifically addressed in the SEIR includes amendments to the Huntington Beach Zoning and Subdivision Ordinance (HBZSO) (Zoning Map Amendment Nos. 22-001 and 22-002 and Zoning Text Amendment Nos. 22-006, 22-007, 22-008, and 22-009) and the Huntington Beach General Plan Land Use Element (General Plan Amendment No. 22-001) for changes to base/overlay districts and land use

EXHIBIT 10

designations, as well amendments to other planning documents, as needed for clarification and consistency purposes and to accommodate future housing sites as part of the HEU's Implementation Program. These amendments provide capacity for future development of approximately 19,738 housing units to meet the City's remaining unmet RHNA of 11,743 housing units.

Other Federal, State, and local agencies are involved in the review and approval of the HEU, including those agencies designated as trustee and responsible agencies. A trustee agency is a State agency that has jurisdiction by law over natural resources affected by a project that are held in trust for the people of the State. A responsible agency is an agency, other than the lead agency, that has responsibility for carrying out or approving a project. Responsible and trustee agencies are consulted by the CEQA lead agency to ensure the opportunity for input and also review and comment on the Draft SEIR. Responsible agencies also use the CEQA document in their decision-making. Several agencies other than the City may require permits, approvals, and/or consultation to implement various HEU programs.

Responsible/Trustee Agencies for the HEU include, but are not limited to:

- South Coast Air Quality Management District (SCAQMD);
- Santa Ana Regional Water Quality Control Board (RWQCB); and
- State Department of Housing and Community Development (HCD).

Other agencies may use the Final SEIR in exercising their duties even if they do not have discretionary permit approval authority over all or parts of the HEU (or implementation of individual projects developed as a result of the HEU). All projects that are proposed in the future under the HEU will be required to obtain all necessary discretionary actions and environmental clearance, separate from this HEU.

**EXHIBIT 10**

## 2.0   CEQA FINDINGS

This chapter summarizes the potential impacts that were identified in the Draft Subsequent EIR (Draft SEIR) and the findings that are required in accordance with Section 15091 of the CEQA Guidelines. The possible findings for each significant and/or potentially significant adverse impact are as follows:

(a) Changes or alterations have been required in, or incorporated into the project which avoid, substantially lessen, or reduce the magnitude of the significant environmental effect as identified in the Draft SEIR ("**Finding 1**").

(b) Such changes or alterations are within the responsibility and jurisdiction of another public agency and not the agency making the findings. Such changes have been adopted by such other agency or can and should be adopted by such other agency. ("**Finding 2**")

(c) Specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives in the Draft SEIR ("**Finding 3**").

CEQA requires that the lead agency adopt mitigation measures or project alternatives, where feasible, to avoid or substantially reduce significant environmental impacts that would otherwise occur as a result of a project. Project modifications or alternatives are not required where they are infeasible or where the responsibility for modifying a project lies with another agency (CEQA Guidelines §15091, subd. (a), [3]). Public Resources Code Section 21061.1 defines "feasible" to mean "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social and technological factors." CEQA Guidelines Section 15364 adds: "legal" considerations. (See also Citizens of Goleta Valley v. Board of Supervisors [Goleta II] [1990] 52 Cal.3d 553, 565 [276 Cal. Rptr. 410].)

Only after fully complying with the findings requirement can an agency adopt a Statement of Overriding Considerations. (Citizens for Quality Growth v. City of Mount Shasta [1988] 198 Cal.App.3d 433, 442, 445 [243 Cal. Rptr. 727].) CEQA requires the Lead Agency to state in writing the specific rationale to support its actions based on a Final EIR and/or information in the record. This written statement is known as the Statement of Overriding Considerations. The Statement of Overriding Considerations provides the information that demonstrates the decision making body of the Lead Agency has weighed the benefits of a project against its unavoidable adverse effects in determining whether to approve a project. If the benefits of a project outweigh the unavoidable adverse environmental effects, the adverse effects may be considered "acceptable."

This document presents the findings of the City as required by CEQA, cites substantial evidence in the record in support of each of the findings, and presents an explanation to supply the logical step between the finding and the facts in the record. (CEQA Guidelines §15091.). Additional facts that support the findings are set forth in the Draft SEIR, the Final SEIR, staff reports to the Planning Commission and City Council, and the record of proceedings.

Table 1 summarizes the potentially significant impacts that were reduced to less than significant levels with mitigation as well as the significant impacts, as proposed for certification and adoption of the HEU.

**EXHIBIT 10**

**Table 1:     CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| **Air Quality** | | |
| The project would result in a project-specific significant and unavoidable air quality impacts associated with a cumulatively considerable net increase of criteria pollutants for which the region is in nonattainment. | Air pollutant emissions associated with implementation of the HEU would result from construction activities and operation of uses allowed under the HEU. The amount of emissions generated by future development projects would vary depending on its size, the land area that would need to be disturbed during construction, the length of the construction schedule, and the number of developments being constructed concurrently. Due to the speculative nature of estimating emissions from individual projects at the programmatic level of the HEU, emissions cannot be quantified (as there is no project-level data) to establish whether the South Coast Air Quality Management District (SCAQMD) thresholds would be exceeded. Despite compliance with applicable General Plan goals and policies and incorporation of mitigation measures GPU PEIR MM 4.2-1 through MM 4.2-14, the HEU would result in a significant and unavoidable air quality impact due to the violation of an air quality standard and exposure of sensitive receptors to substantial pollutant concentrations. | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, emissions associated with the HEU could result in an exceedance of established thresholds for daily emissions due to the speculative nature of future projects. No mitigation measures in addition to GPU PEIR MM 4.2-1 through MM 4.2-14 are feasible to reduce construction or operational air quality impacts to a less than significant level. |
| The project would result in less than significant impacts related to the exposure of sensitive receptors to substantial pollutant concentrations following incorporation of mitigation measures MM AQ-1 and AQ-2. | As previously stated, air pollutant emissions associated with implementation of the HEU would result from construction activities and operation of uses allowed under the HEU. The amount of emissions generated by future development projects would vary depending on its size, the land area that would need to be disturbed during construction, the length of the construction schedule, and the number of developments being constructed concurrently. Future applicants for development projects facilitated by the HEU would be required to implement mitigation measures MM AQ-1 and AQ-2, which would require project-specific health risk assessments to minimize impacts associated with | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation mitigation measures MM AQ-1 and AQ-2. |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| | the exposure of sensitive receptors to toxic air contaminants and to ensure that construction emissions do not result in the exceedance of localized significance thresholds. With implementation of these measures, impacts would be reduced to a less than significant level. | |
| The project would result in a cumulative contribution to an air quality impact, resulting in a significant and unavoidable cumulative impact to air quality. | Cumulative development could violate an air quality standard or contribute to an existing or projected air quality violation because the South Coast Air Basin (SCAB) is currently in nonattainment for ozone, $PM_{10}$, and $PM_{2.5}$. Concerning daily emissions and the cumulative net increase of any criteria pollutant for which the region is in nonattainment, the Project would result in a cumulatively considerable increase to nonattainment of ozone, $PM_{2.5}$, and $PM_{10}$ standards in the SCAB. Because no information on individual projects is currently available, cumulative construction and operational emissions cannot be accurately quantified. Despite compliance with General Plan goals and policies and implementation of mitigation measures GPU PEIR MM 4.2-1 through MM 4.2-14, daily construction and operational air quality emissions would be considered cumulatively significant and unavoidable. | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, implementation of the HEU could result significant unavoidable impacts related to a cumulative increase in construction and operational emissions due to the speculative nature of future projects. No mitigation measures in addition to GPU PEIR MM 4.2-1 through MM 4.2-14 are feasible to reduce cumulative air quality impacts to a less than significant level. |
| **Cultural Resources** | | |
| Construction activities associated with implementation of the Project could cause a substantial adverse change in the significance of a historical and/or an, archaeological resource and may result in the disturbance of unknown human remains. With incorporation of mitigation measures GPU PEIR MM 4.4-1, MM 4.4-2, and MM 4.4-3, these | It is currently infeasible to determine whether future development under the Project would result in demolition or removal of historical or archaeological resources, or the disturbance of unknown human remains, within the planning area. However, future projects would be required to implement mitigation measures GPU PEIR MM 4.4-1, MM 4.4-2, and MM 4.4-3, which outline procedures to be followed during future construction activities to ensure compliance with local, State, and Federal regulations pertaining to | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation mitigation measures GPU PEIR MM 4.4-1, MM 4.4-2, and MM 4.4-3. |

**EXHIBIT 10**

City of Huntington Beach
2021-2029 HEU Implementation Program

Final Subsequent Environmental Impact Report
Findings of Fact/Statement of Overriding Considerations

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| impacts would be reduced to a less than significant level. | such requires. Implementation of these measures would ensure that Project impacts with respect to archaeological and historical resources, as well as unknown human remains, would be less than significant. | |
| **Geology and Soils** | | |
| Future development under the HEU could expose people and/or structures to potentially substantial adverse effects, including the risk of loss, injury, or death, involving fault rupture, expansive soils, strong seismic groundshaking and/or seismic-related ground failure, including liquefaction. Future development under the HEU also has the potential to disturb unknown paleontological resources. With implementation of mitigation measures GPU PEIR 4.5-1 through MM 4.5-3 and MM 4.4-4, as well as compliance with applicable State and City regulations, these impacts would be reduced to a less than significant level. | All future housing development subject to rezoning and within overlay zones would be required to comply with applicable General Plan goals and policies related to geology and soils and would also be required to implement mitigation measures GPU PEIR 4.5-1 through MM 4.5-3, which require that relevant geotechnical studies be undertaken prior to issuance of grading and construction permits. Future development projects would also be required to implement mitigation measures GPU MM 4.4-2 through 4.2-4, which require site-specific studies and compliance with existing regulations to minimize impacts to unknown paleontological resources. Implementation of these measures and compliance with General Plan goals and policies would reduce impacts associated with the exposure of people to significant risk of geological failures, as well as impacts to unknown paleontological resources, to a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation mitigation measures GPU PEIR 4.5-1 through MM 4.5-3 and MM 4.4-4. |
| **Greenhouse Gas Emissions** | | |
| The project would result in project-level and cumulative significant and unavoidable impacts due to the generation of greenhouse gas (GHG) emissions and the potential conflict with an applicable plan. | The Project would potentially generate GHG emissions that could have a significant impact on the environment and could conflict with applicable plans for reducing GHG emissions. Although the Project would aim to comply with GHG reduction strategies outlined in the GPU PEIR, these strategies require additional action by City staff and officials, and the feasibility of implementing these strategies and specific implementation details rely on numerous factors that cannot be adequately forecasted at this time. | **Finding 3.** The City of Huntington Beach finds that even with implementation of all GHG reduction measures and compliance with applicable General Plan goals and policies, GHG emissions associated with the HEU could would be significant and unavoidable. No feasible mitigation measures are available to reduce GHG impacts to a less than significant level. |

**EXHIBIT 10**

**Table 1:     CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| | Furthermore, GHG emissions may differ from actual Project future emissions due to various factors. As such, the Project's potential to generate GHG emissions, either directly or indirectly, and potential to conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the GHG emissions would be significant and unavoidable. Although both future housing development facilitated by the Project and cumulative projects are required to quantify project-specific GHG emissions associated with construction and operational activities and implement feasible mitigation measures and/or GHG reduction strategies to reduce GHG emissions, the contribution of daily construction and operational GHG emissions has the potential to create a significant impact. Thus, the Project's GHG impacts would be cumulatively significant and unavoidable. | |
| **Hazards** | | |
| Implementation of future projects under the HEU could create a potential significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment. However, with implementation of mitigation measure GPU PEIR MM 4.7-1, this impact would be reduced to a less than significant level. | Future housing development facilitated by the Project would not involve ongoing or routine use of substantial quantities of hazardous materials during operations. All future housing development subject to rezoning and within overlay zones would be subject to compliance with General Plan policies aimed at reducing impacts from hazardous materials. All future housing development subject to rezoning and within overlay zones would also be subject to compliance with GPU PEIR MM 4.7-1, which requires compliance with with Huntington Beach Fire Department specifications related to the potential to encounter methane gas. Compliance with City regulations, General Plan policies, and implementation of mitigation measure GPU PEIR MM 4.7-1 would ensure Project impacts would remain less than significant. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure GPU PEIR MM 4.7-1. |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| Individual sites within the planning area are included on a list of hazardous materials sites that could result in the accidental spread of contamination and could create a significant hazard to the public or environment. However, with implementation of mitigation measures GPU PEIR MM 4.7-2 and 4.7-3, this impact would be reduced to a less than significant level. | Development of any identified sites of contamination would be required to undergo remediation and clean up before construction activities can begin. If contamination at any future project site were to exceed regulatory action levels, a future project would be required to undertake remediation procedures prior to grading and development under the supervision of appropriate regulatory oversight agencies. Compliance with City standards and implementation of mitigation measures GPU PEIR MM 4.7-2 and MM 4.7-3, which require preparation of a preliminary environmental site assessment to determine the potential for onsite contamination, would ensure that the Project would not create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment, resulting in a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measures GPU PEIR MM 4.7-2 and MM 4.7-3. |
| Implementation of the HEU could impair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan. However, with implementation of mitigation measure GPU PEIR MM 4.7-4, this impact is considered less than significant. | Future development facilitated by the Project would increase housing density in certain areas of the City, resulting in greater population concentrations within certain areas. This increased density could interfere with emergency evacuation in the event of a City-wide emergency. However, the Project would not result in changes to the City's existing circulation network. No land uses are proposed that would impair the implementation of, or physically conflict with, the Huntington Beach Emergency Operations Plan/Hazard Mitigation Plan. As a result, the Project would not conflict with any State or local plan aimed at preserving and maintaining adopted emergency response or emergency evacuation plans. Notwithstanding, to minimize all potential impacts, all future housing development subject to rezoning and within overlay zones would be required to adhere to GPU PEIR MM | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure GPU PEIR MM 4.7-4. |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| | 4.7-4, which requires future housing developments to consult with the City of Huntington Beach Police or Fire Departments to disclose temporary lane or roadway closures and alternative travel routes during construction, to ensure that there are no conflicts with emergency response and evacuation plans, thereby resulting in a less than significant impact. | |
| **Hydrology and Water Quality** | | |
| Future development under the HEU could result in violations of water quality standard or waste discharge that could degrade surface or groundwater quality and could conflict with a water quality control plan. Implementation of mitigation measure GPU PEIR MM 4.8-1 would reduce this impact to a less than significant level. | It is anticipated that construction activities for future housing development facilitated by the Project would include excavation, grading, and trenching, which could displace soils and temporarily increase the potential for soils to be subject to wind and water erosion. Therefore, construction activities from future housing development could violate water quality standards or otherwise degrade water quality. However, construction activities that could affect water quality would be addressed through compliance with the National Pollutant Discharge Elimination System (NPDES) program's Construction General Permit. Future housing development would also be subject to mitigation measure GPU PEIR MM 4.8-1, which requires new development projects to prepare project-specific Water Quality Management Plans. Compliance with this measure would reduce potential impacts associated with water quality violations and conflicts with a water quality control plan to a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure GPU PEIR MM 4.8-1. |
| Future development under the HEU could result in substantial groundwater dewatering and could deplete groundwater supplies, which in turn could result in conflicts with water quality control plans and/or sustainable groundwater management plans. | As discussed under Utilities and Service systems, there may not be sufficient water supplies available to serve the Project. Therefore, Project-related water demands from future development would result in a significant and unavoidable impact concerning water supplies. For this reason, the Project could substantially decrease groundwater supplies resulting in a significant and | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, implementation of the HEU could result in significant and unavoidable impacts concerning groundwater supplies and the sustainable management of the groundwater Basin. No mitigation measures in |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| Despite implementation of mitigation measure GPU PEIR MM 4.8-2 Project-level and cumulative impacts would be significant and unavoidable. | unavoidable impact concerning sustainable management of the Basin. Although future housing projects would be required to comply with City, state and federal goals and policies requiring water conservation, mitigation measure GPU PEIR MM 4.8-2 would also be required to ensure that applicants of future developments prepare a groundwater hydrology study to ensure that dewatering activities do not interfere with groundwater supplies. Despite compliance with this measure and until water supply improves, both Project-level and cumulative water demands would result in a significant unavoidable impact concerning groundwater supplies. | addition to GPU PEIR MM 4.8-2 are feasible to reduce Project-level or cumulative impacts to a less than significant level. |
| Future development under the HEU could increase stormwater runoff, exceed the capacity of existing or planned stormwater drainage systems, and cause on- or off-site flooding. With implementation of mitigation measure GPU PEIR MM 4.8-3, this impact is considered less than significant. | Development under the HEU could result in an increase in the amount of impervious surfaces compared to existing conditions, thereby increasing stormwater runoff. Incorporation of mitigation measure GPU PEIR MM 4.8-3, which requires each future, project-level development application to demonstrate adequate capacity in the storm drain system and provide for mitigation of constraints, would reduce this impact to a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure GPU PEIR MM 4.8-3. |
| **Noise** | | |
| The Project would result in an increase in ambient noise levels during construction of future housing developments and would also result in an increase in ambient noise levels during operation due to an increase in vehicle trips from operation that would result in a Project-specific significant and unavoidable impact despite implementation of mitigation measures GPU PEIR MM 4.10-1 through 4.10-4. | Construction activities associated with future individual developments could occur near noise-sensitive receptors and noise disturbances could occur for prolonged periods of time, thereby resulting in potential construction noise impacts. In addition, future housing developments facilitated by the Project have the potential to introduce and increase new roadway noise, thereby increasing ambient noise levels. As such, future projects would be required to comply with mitigation measures GPU PEIR 4.10-1 through 4.10-4, which include construction-level and operational noise reduction measures to reduce | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, the Project could result in a significant and unavoidable impact due to an increase in the ambient noise levels. No mitigation measures in addition to mitigation measures GPU PEIR MM 4.10-1 through MM 4.10-4 are feasible to reduce impacts to a less than significant level. |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
|  | ambient noise levels associated with the Project. Despite compliance with General Plan goals and policies aimed at reducing noise and implementation of mitigation measures GPU PEIR 4.10-1 through 4.10-4, the Project would result in significant and unavoidable impacts concerning construction-related and operational noise levels. The Project's impact concerning the substantial temporary and permanent increase of ambient noise levels would be cumulatively considerable. |  |
| The Project would result in a Project-specific significant and unavoidable impact due to the exposure of persons to excessive groundborne vibration during future construction activities despite implementation of mitigation measure GPU PEIR MM 4.10-5. | Future development under HEU has the potential to generate construction vibration levels in exceedance of established thresholds at nearby sensitive receptors. Although future development would comply with General Plan policies to reduce groundborne vibration, mitigation measure GPU PEIR MM 4.10-5, which requires new development projects that include pile driving activities to incorporate vibration-reduction techniques to help to reduce impacts, construction vibration levels would not be reduced to a level that would be less than significant. Compliance with General Plan policies and implementation of mitigation measure GPU PEIR MM 4.10-5 would reduce potential groundborne vibration impacts associated with future construction activities, but not to a level that would be less than significant because certain construction activities may still be required in proximity to nearby sensitive receptors. Therefore, this impact would remain significant and unavoidable and would remain cumulatively significant and unavoidable despite implementation of mitigation. | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, the Project could result in a significant and unavoidable impact due exposure of persons to the generation of groundborne vibration during construction. No mitigation measures in addition to mitigation measure GPU PEIR MM 4.10-5 are feasible to reduce impacts to a less than significant level. |
| **Public Services** | | |
| Future development under the HEU would increase the demand on public services including fire, police, schools, | Future development under the HEU would increase the demand on public services including fire, police, schools, parks/recreational facilities, and libraries. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, |

**EXHIBIT 10**

City of Huntington Beach
2021-2029 HEU Implementation Program

Final Subsequent Environmental Impact Report
Findings of Fact/Statement of Overriding Considerations

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| parks/recreational facilities, and libraries. However, with incorporation of mitigation measures GPU PEIR MM 4.12-1 through MM 4.12-7, impacts to these public services would be reduced to a less than significant level | However, with incorporation of mitigation measures GPU PEIR MM 4.12-1 through MM 4.12-7, which require future projects to pay applicable development impact fees related to each of these serves, impacts to these public services would be reduced to a less than significant level. | are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measures GPU PEIR MM 4.12-1 through MM 4.12-7. |
| **Recreation** | | |
| Future development under the HEU would increase the demand for and on parks and recreational services. However, with incorporation of mitigation measures GPU PEIR MM 4.13-1 and MM 4.13-2, impacts related to parks and recreational facilities would be reduced to a less than significant level | Future development under the HEU would increase the demand on recreational services. However, with incorporation of mitigation measures GPU PEIR MM 4.13-1 and MM 4.13-2, which require compliance with City parkland requirements and payment of park fees, impacts to parks and recreational facilities would be reduced to a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measures GPU PEIR MM 4.13-1 and MM 4.13-2. |
| **Transportation** | | |
| Future development under the HEU would increase the number of vehicular trips in the Project area, which could conflict with City goals and policies aimed at maintaining specific performance thresholds addressing circulation in the City. However, with incorporation of mitigation measures GPU PEIR MM 4.13-1 through MM 4.13-3, impacts to the circulation system would be reduced to a less than significant level | Future development under the HEU could potentially worsen levels of service (LOS) for various intersections in the City, which could conflict with the City's policy to maintain specified performance standards for citywide LOS at traffic-signal-controlled intersections during peak hours. Therefore, all future housing facilitated by the HEU would be required to comply with General Plan goals and policies pertaining to LOS and would be subject to compliance with mitigation measures GPU PEIR MM 4.14.1 through 4.14-3, which require future projects near specified intersections to make fair share contributions toward specified improvements. Compliance with these goals and policies and implementation of mitigation measures GPU PEIR MM 4.14.1 through 4.14-3 would ensure that impacts related to the City's circulation system would be reduced to a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measures MM 4.13-1 through MM 4.13-3. |
| Future development under the HEU would increase the number of vehicular | A total of 325 candidate housing sites would not require preparation of a VMT analysis based on Small Project | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which |

**EXHIBIT 10**

City of Huntington Beach
2021-2029 HEU Implementation Program

Final Subsequent Environmental Impact Report
Findings of Fact/Statement of Overriding Considerations

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| trips in the Project area, which would generate additional vehicle miles travelled (VMT) that could result in conflicts with State guidelines pertaining to VMT. However, with incorporation of mitigation measure MM TRANS-1, impacts would be reduced to a less than significant level | screening (<110 daily trips), low VMT area screening; or proximity to transit screening. A total of 53 candidate housing sites would not be screened out, thereby requiring additional VMT analysis at the time of development application. Candidate housing sites that identify significant VMT impacts would require feasible mitigation measures to reduce the project's VMT impacts. Consequently, future housing development on these 53 sites would be required to reduce their average home-based VMT through compliance with applicable General Plan goals and policies and implementation of mitigation measure MM TRANS-1, which identifies feasible mitigation strategies that could help projects avoid or substantially reduce VMT-related impacts to a less than significant level. Furthermore, future housing development would be subject to all State and local requirements for minimizing VMT-related impacts. Therefore, future housing developments on the 53 candidate housing sites that were not screened out are presumed to result in a less than significant with mitigation incorporated. | would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure MM Trans-1. |
| **Tribal Cultural Resources** | | |
| Construction activities associated with implementation of the HEU could cause a substantial adverse change in the significance of tribal remains on a Project-level basis. With incorporation of mitigation measures GPU PEIR MM 4.4-2 and MM 4.4-3, these impacts would be reduced to a less than significant level. | It is currently infeasible to determine whether future development under the Project would result in the disturbance of tribal cultural resources within the planning area. However, future projects would be required to implement mitigation measures GPU PEIR MM 4.4-2 and MM 4.4-3, which require project applicants to retain a qualified professional and/or Native American monitors to determine if the project could result in impacts to tribal cultural resources and also require the halting of all earth-disturbing activities within 100-feet of a known discovery while data recovery and other methods are implemented. Implementation of these measures would ensure that | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measures GPU PEIR MM 4.4-2 and MM 4.4-3. |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| | Project impacts with respect to tribal cultural resources would be less than significant. | |
| **Utilities and Service Systems** | | |
| Future development under HEU could require new or expanded water, wastewater treatment or storm water drainage, electric power, natural gas, or telecommunication facilities. However, with implementation of mitigation measure GPU PEIR MM 4.15-1, this impact would be considered less than significant. | Future development under the HEU could introduce the need for additional infrastructure or connections to existing infrastructure. With incorporation of mitigation measure GPU PEIR MM 4.15-1, which requires future projects to demonstrate that there is adequate capacity in the wastewater collection system to accommodate discharges from future projects, and adherence to General Plan policies and existing City of Huntington Beach processes, impacts to water, wastewater treatment or storm water drainage, electric power, natural gas, or telecommunication facilities would be reduced to a less than significant level. | **Finding 1.** The City of Huntington beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure GPU PEIR MM 4.15-1. |
| The Project would result in a significant and unavoidable project-specific impact on existing water supplies despite implementation of mitigation measure GPU PEIR MM 4.15-2. | Given the uncertainty of water supplies across the western United States and throughout the state of California, a future supply deficit would result in a significant and unavoidable impact associated with water demands from future development facilitated by the proposed Project. Until such time as greater confidence in and commitment from water suppliers can be made, even with implementation of mitigation measure MM 4.15-2, which requires project-specific applicants to incorporate water conservation measures as part of future projects, and adherence to General Plan policies and existing regulations, the HEU would result in a significant and unavoidable impact related to water supplies. | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, the Project could result in a significant and unavoidable impact to water supplies. No mitigation measures in addition to GPU PEIR MM 4.15-2 are feasible to reduce water supply impacts to a less than significant level. |
| The Project would result in a cumulatively considerable contribution to water demand and a corresponding significant and unavoidable cumulative impact with respect to water supply. | As with the Project-specific impact, given the uncertainty of water supply across the western United States and throughout the state of California, a future supply deficit would result in a significant and unavoidable impact. Until such time as greater | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, the Project could result in a significant and unavoidable impact to water supplies. No mitigation |

**EXHIBIT 10**

**Table 1:   CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| | confidence in and commitment from water suppliers can be made, even with implementation of mitigation measure GPU PEIR MM 4.15-2, the Project would result in a cumulatively considerable contribution to water supplies, resulting in a significant and unavoidable cumulative impact. | measures in addition to MM 4.15-2 are feasible to reduce cumulative water supply impacts to a less than significant level. |

# 3.0   FINDINGS REGARDING PROJECT ALTERNATIVES

## 3.1.   Introduction

The Draft SEIR prepared for the HEU considered two alternatives to the Project as proposed. Pursuant to Section 15126.6(a) of the CEQA Guidelines, the primary intent of an alternatives evaluation is to "describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives."

This chapter describes the project objectives and criteria used to develop and evaluate project alternatives presented in the Draft SEIR. A description of the alternatives compared to the Project and the findings regarding the feasibility of adopting the described alternatives is presented for use by the City in the decision-making process.

## 3.2.   Project Objectives

In accordance with State CEQA Guidelines §15124, the following primary objectives support the HEU's purpose, assist the City, as the lead agency, in developing a reasonable range of alternatives to be evaluated in this SEIR, and ultimately aid decision-makers in preparing findings and overriding considerations, if necessary. The HEU's purpose is to address the housing needs and objectives of the City and to meet the State Housing law requirements. The HEU has the following goals:

- Adopt State-mandated and locally desired programs to implement the City's Housing Element.
- Maintain and enhance the quality and affordability of existing housing in Huntington Beach.
- Provide adequate sites to accommodate projected housing unit needs at all income levels identified by the 2021-2029 RHNA.
- Provide for safe and decent housing for all economic segments of the community.
- Reduce governmental constraints to housing production, with an emphasis on improving processes for projects that provide on-site affordable units.
- Promote equal housing opportunities for all residents, including Huntington Beach's special needs populations.
- Promote a healthy and sustainable Huntington Beach through support of housing at all income levels that minimizes reliance on natural resources and automobile use.
- Maximize solutions for those experiencing or at risk of homelessness.
- Improve quality of life and promote placemaking.
- Affirmatively further fair housing.

**EXHIBIT 10**

## 3.3.   Selection of Alternatives

The range of feasible alternatives was selected and discussed in a manner to foster meaningful public participation and informed decision-making. Among the factors that were taken into account when considering the feasibility of alternatives (as described in CEQA Guidelines Section 15126.6[f][1]) were environmental impacts, economic viability, availability of infrastructure, regulatory limitations, jurisdictional boundaries, and attainment of project objectives. As stated in Section 15126.6(a) of the CEQA Guidelines, the Draft SEIR need not consider an alternative whose effects could not be reasonably identified, whose implementation is remote or speculative, or one that would not achieve the basic project objectives. The analysis includes sufficient information about each alternative to provide meaningful evaluation, analysis and comparison with the proposed project.

## 3.4.   Project Alternative Findings

The following is a description of the alternatives evaluated in comparison to Project, as well as a description of the specific economic, social, or other considerations that make them infeasible for avoiding or lessening the impacts.

As shown below and in Chapter 7.0 (Alternatives) of the Draft SEIR, two alternatives were evaluated in comparison to the Project, including the No Project Alternative required by CEQA. The two alternatives analyzed represent a reasonable range of alternatives to the Project. The analysis in this section focuses on significant and unavoidable impacts attributable to each alternative and the ability of each alternative to meet basic project objectives.

### "No Project" Alternative (Alternative 1)

According to State CEQA Guidelines §15126.6(e), the specific alternative of "No Project" shall also be evaluated along with its impact. The purpose of describing and analyzing a No Project Alternative is to allow decision-makers to compare the impacts of approving the proposed Project with impacts of not approving the Project. The No Project Alternative analysis is required to discuss the existing conditions at the time the Notice of Preparation is published (August 4, 2021), as well as what would be reasonably expected to occur in the foreseeable future, if the Project were not approved, based on current plans and consistent with available infrastructure and community services.

Under Alternative 1, development within the City would proceed pursuant to the adopted City General Plan and zoning. The City's projected regional housing need for the 6th Cycle RHNA planning period (2021-2029) is 13,368 dwelling units (11,743 units when accounting for existing applications and pipeline projects). Under Alternative 1, the City would not implement the Housing Program required to comply with State law, to accommodate the lower-income RHNA units, including amendments to existing land use designations and zoning districts, an affordable housing overlay, and identification of underutilized, residentially-zoned parcels in an inventory of candidate housing sites. In total, the HEU identifies 378 candidate housing sites (approximately 419 acres). The proposed amendments to the Huntington Beach

**EXHIBIT 10**

General Plan and the City of Huntington Beach Zoning and Subdivision Ordinance of the City of Huntington Beach Municipal Code (Zoning Text and Zoning Map amendments) for changes to land use designations and base/overlay districts, as well as ancillary amendments to other planning documents, would not be implemented. These amendments, which are needed to accommodate future housing sites as part of the HEU's Implementation Program, would not be implemented at the 378 identified candidate housing sites. The capacity to develop 11,743 additional housing units that would be facilitated by Project implementation would not be provided under the No Project Alternative. Because the Project proposes only three candidate housing sites (Sites 3, 4, and 5) for rezoning, and all other sites would retain their existing underlying zoning, under Alternative 1, rezoning of Sites 3, 4, and 5 would not occur and existing zoning would remain in place.

Under this alternative, State Housing Law and legislative requirements for implementation of the Project's proposed programs and strategies to increase housing capacity and the production of affordable dwelling units in the City would not occur. Overall, Alternative 1 would not consider the candidate housing sites and adoption of the land use amendments and rezones necessary to achieve the City's RHNA. As a result, the capacity for 11,743 multi-family housing units would not be created. This alternative would not satisfy the Project objectives stated above because implementation of Alternative 1 would not facilitate the development of sufficient residential units to meet the City's RHNA allocation and would not satisfy legislative mandates for the HEU.

### Findings

The No Project Alternative would result in fewer impacts than the Project. Although this Alternative could reduce environmental impacts from future housing development facilitated by the HEU, the No Project Alternative would not achieve any of the project objectives. The No Project Alternative would not provide adequate housing sites to meet the City's 6th Cycle RHNA allocation or satisfy State housing law including AB 1397. Under the No Project Alternative, the City would not meet its RHNA obligations. Thus, this Alternative would directly conflict with California Government Code §65583, which stipulates that a jurisdiction must assess its housing element every eight years and identify adequate sites for housing and provide for the existing and projected needs of all economic segments of the community.

## Beach and Edinger Corridors Alternative (Alternative 2)

As with the proposed Project, the Beach and Edinger Corridors Alternative (Alternative 2) would meet the City's RHNA. However, residential development under Alternative 2 would be concentrated around the Beach and Edinger Corridors area of the Beach and Edinger Corridors Specific Plan (Specific Plan 14). More specifically, new residential development would occur in portions of Specific Plan 14's Transition Corridor Areas (TCAs), which would support transit-oriented communities, and on fewer total parcels. This would have the effect of further reducing vehicle miles traveled (VMT), transportation-related energy demands, and associated criteria air pollutant and greenhouse gas emissions associated with housing development. However, this approach would require taller building heights and higher densities to achieve the target housing production in this area necessary to meet the RHNA, which could result in increased aesthetic

EXHIBIT 10

impacts as compared to the Project. This alternative would also create dense/confined residential development and not expand housing opportunities across the City and would not affirmatively further fair housing to the same degree as the Project.

### Findings

Alternative 2 would meet the majority of the project objectives as it is assumed that development under this alternative would meet the 6th Cycle RHNA housing needs. However, Alternative 2 would fail to affirmatively further fair housing since this alternative would not provide new housing within highest resources areas with access to highly rated schools, parks and community amenities. New housing would be concentrated within one area of the City. Furthermore, Alternative 2 could result in additional constraints to housing because the densities necessary to accommodate all of the RHNA within the Specific Plan may not be supported by the market (e.g., land and construction costs), which could potentially make it cost-prohibitive for developers to construct housing. As such, because Alternative 2 would fail to affirmatively further fair housing and could result in additional constraints to the construction of housing, this alternative would likely not be certified by the California Department of Housing and Community Development (HCD), as it would not substantially conform to Housing Element Law.

## Alternatives Considered but Eliminated from Future Consideration

Five additional alternatives were initially considered during the scoping and planning process, but were not selected for detailed analysis in the Draft SEIR. These included: Reduced Dwelling Units Alternative, Alternate Housing Sites Alternative, Palm/Goldenwest Specific Plan (SP 12) Alternative, Huntington Harbour Area Sites Alternative, and McDonnell Centre Business Park Specific Plan (SP 11) Alternative.

### Reduced Dwelling Units Alternative

A Reduced Dwelling Units Alternative was considered, but rejected from further consideration. This alternative was considered to assess if it would help mitigate the significant and unavoidable impact to potable water resources associated with the proposed Project, as future housing development facilitated by the Project would incrementally increase the demand for potable water. The projected water demand associated with Project implementation at buildout would increase water demand in the City by approximately 2,905 acre-feet per year (AFY), or approximately 11 percent over existing 2022 and projected 2030 City demands. While the Urban Water Management Plan (UWMP) did not specifically account for the population growth associated with the Project, it did project that the City would serve a population of 206,499 persons by 2030[1], which is an additional 9,625 persons over the City's existing population of 196,874 persons.[2] Therefore, it can be inferred that at least a portion (approximately 54 percent[3], or 949 AFY) of the water demand associated with the Project population growth was accounted

---

[1] UWMP Table 3-2: Retail: Population - Current and Projected.
[2] State of California Department of Finance. 2021. *E-5 Population and Housing Estimates for Cities, Counties, and the State, 2011-2021 with 2010 Census Benchmark.* https://www.dof.ca.gov/Forecasting/Demographics/Estimates/e-5/ (accessed June 2021).
[3] Based on 25,020 persons/9,625 persons.

**EXHIBIT 10**

for in the UWMP's anticipated 2030 future water demand. Thus, after considering the existing water demand associated with the displaced land uses that would be removed, the approximately 54 percent assumed to be already accounted for in the UWMP's anticipated population growth, and unaccounted for net Project water demand of approximately 46 percent or 823 AFY which would remain unmet. In order to not exceed the projected water resources for the City, the Reduced Dwelling Units Alternative would have to reduce the number of housing units to a number that would fail to meet the basic RHNA requirements.

### Alternate Housing Sites Alternative

The Alternate Housing Sites Alternative was considered, but rejected from further consideration. This alternative was determined to be infeasible during the scoping process because alternative housing sites not included in the scope of the Project were found to be infeasible due to regulations, site constraints, property owner interest in developing housing, community input, and existing uses. Additionally, some candidate housing sites were considered, but rejected because potentially significant effects of future housing development would be avoided or substantially lessened by rejecting those sites. Examples of alternative sites initially considered are discussed below.

### Palm/Goldenwest Specific Plan (SP 12) Alternative

This is a 96-acre area bordered by Pacific Coast Highway, Goldenwest Street, and Seapoint Street and is located entirely within the Coastal Zone. The property is designated for visitor serving commercial uses within the Palm/Goldenwest Specific Plan. At the time the specific plan was adopted in 2000, the property was an active oil field. Aera Energy owned the property and indicated that the property would remain in oil production for the next 15 to 20 years. As such, the specific plan was adopted to plan for reuse of the site after oil production activities ceased.



**Palm/Goldenwest Specific Plan 12**

This site was originally identified as a candidate housing site in the 6th Cycle Housing Element because of its large size and its potential availability for residential development within the planning period (based on the information in SP 12). Housing capacity on the site, when applying the proposed Affordable

**EXHIBIT 10**

Housing Overlay, would accommodate 40 to 50 percent of the City's total RHNA (96 acres x 55 du/acre up to 96 acres x 70 du/acre). Although this site could accommodate residential uses, the site is located within higher resource areas that could result in greater environmental impacts than other sites included in the scope of the Project. The following are reasons why this alternative was rejected:

- The location of the site within the Coastal Zone would require the California Coastal Commission to approve the Affordable Housing Overlay designation; timing of the "rezoning" effort could be lengthy with no guarantee of approval from the Coastal Commission.
- The potential for costly remediation of the site due to its historic use as oil field.
- The property owner no longer anticipates oil production activities to cease as described in SP 12. Therefore, the property is not expected to be available for development prior to 2030.
- The concentration of almost 50 percent of RHNA allocation on one site may lead to overconcentration of affordable housing in one area.

### *Huntington Harbour Area Sites Alternative*

There are two commercial areas in the Huntington Harbour area with a combined acreage of 21.5 acres. One area is the Huntington Harbour mall, which is an older mall developed in the 1960s. This 10.8-acre site was identified as a potential candidate housing site because it is underutilized with one and two-story buildings developed at a relatively low floor-area-ratio (FAR) considering that the maximum allowed FAR is 1.5. The site has potential to be redeveloped as a mixed-use project with the inclusion of residential units at 30 du/acre. The site has close access to Warner Avenue, a major arterial. The second area is Peter's Landing. This site includes the Peter's Landing commercial center and adjacent properties along Pacific Coast Highway, and has been studied for mixed use (residential/commercial) in prior General Plan planning efforts. In addition, the property owners previously showed interest in adding residential uses in existing or new development projects on the sites. Previous site analyses on this site indicate that residential could be accommodated at higher densities.



Peter's Landing Area



Huntington Harbour Mall

**EXHIBIT 10**

The following are reasons why this alternative was rejected:

- The location of these sites within the Coastal Zone would require the California Coastal Commission to approve any changes to the zoning/land use designation including an Affordable Housing Overlay designation. As such, the timing of the "rezoning" effort could be length with no guarantee that the Coastal Commission would approve the amendments, particularly because residential is a lower priority use in the Coastal Zone.
- These sites, in conjunction with the general Huntington Harbour area, are shown in the City's Sea Level Rise Vulnerability Assessment as one of the most vulnerable areas in the City with development in this area having the highest exposure to sea level rise hazards (e.g., storm and non-storm flood projections becoming widespread with 1.6-foot and 3.3-foot sea level rise, respectively).

### *McDonnell Centre Business Park Specific Plan (SP 11) Alternative*

The McDonnell Centre Business Park Specific Plan encompasses 307 acres in the northwestern portion of the City. It has access from Bolsa Chica Street and Bolsa Avenue, both major arterials, with close access to the 405 freeway. The area was first developed for the aerospace industry in the 1960s and a specific plan was adopted in 1997 with amendments in 2002 and 2006 that allowed for approximately eight million square feet of industrial, office, and ancillary uses (including the existing development). Boeing has been the primary landowner in the area, although other major business tenants have moved into the specific plan area. In 2018, Boeing began marketing some of its properties in the specific plan area. As such, the City evaluated housing potential within portions of the specific plan area for the 6th Cycle, particularly workforce housing and lower income worker housing. The specific plan could accommodate a large capacity of housing units at higher densities due to its size and existing and planned infrastructure.




**McDonnell Centre Business Park Specific Plan (SP 11)**

**EXHIBIT 10**

City of Huntington Beach
2021-2029 HEU Implementation Program

Final Subsequent Environmental Impact Report
Findings of Fact/Statement of Overriding Considerations

The following are reasons why this alternative was rejected:

- There is a strong market for industrial land in this area of the City. The site was even more attractive to potential developers due to its proximity to the freeway and because zoning and environmental approvals were already in place.
- Potential conflicts between industrial uses and residential uses.
- Potential costs to remediate site to residential standards.
- Properties have already started redeveloping with new industrial buildings recently completed and future phases approved.

**EXHIBIT 10**

# 4.0 STATEMENT OF OVERRIDING CONSIDERATIONS

## 4.1. Introduction

Section 15093 of the CEQA guidelines states:

(a) CEQA requires the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits of a proposed project against its unavoidable environmental risks when determining whether to approve the project. If the specific economic, legal, social, technological, or other benefits of a proposed project outweigh the unavoidable adverse environmental effects, the adverse environmental effects may be considered "acceptable."

(b) When the lead agency approves a project which will result in the occurrence of significant effects which are identified in the Final EIR but are not avoided or substantially lessened, the agency shall state in writing the specific reason to support its actions based on the Final EIR and/or other information in the record. The statement of overriding considerations shall be supported by substantial evidence in the record.

(c) If an agency makes a statement of overriding considerations, the statement should be included in the record of the project approval and should be mentioned in the notice of determination.

The City of Huntington Beach proposes to adopt a Statement of Overriding Considerations regarding the significant cumulative air quality, greenhouse gas, hydrology and water quality, noise, and utilities/water supply impacts of the Project. This section describes the anticipated benefits and other considerations of the Project to support the decision to proceed, even though significant and unavoidable impacts are anticipated.

## 4.2. Significant Adverse Project and Cumulative Impacts

The City of Huntington Beach is proposing to approve the proposed Project, with revisions to reduce environmental impacts, and has prepared a SEIR as required by CEQA. Even with revisions to the Project, the following impacts have been identified as being unavoidable as there are no feasible mitigation measures available to further reduce the impacts. Refer to Chapter 2 (CEQA Findings) for further clarification regarding the impact listed below.

### Air Quality

Despite compliance with General Plan policies, GPU PEIR mitigation, and MM AQ-1 and AQ-2, the Project would result in significant and unavoidable impacts concerning construction-related and operational emissions. In addition, sites over two acres could expose sensitive receptors to significant impacts by exceeding construction LST thresholds. The Project-related contribution of daily construction and operational emissions associated with the HEU are considered cumulatively significant and unavoidable.

### Greenhouse Gas Emissions

Despite the recommendation of Greenhouse Gas Reduction program GHG reduction strategies, the Project would generate GHG emissions that may have a significant impact on the environment and could

**EXHIBIT 10**

conflict with applicable plans for reducing GHG emissions. Therefore, impacts on GHG are considered significant and unavoidable, both for the Project and cumulative conditions.

### Hydrology and Water Quality

The Project could substantially decrease groundwater supplies resulting in a significant and unavoidable impact concerning sustainable management of the Basin. The Project's impact concerning groundwater supplies would be cumulatively considerable and a significant unavoidable impact would occur.

### Noise

Despite compliance with GPU PEIR mitigation, the Project would result in significant and unavoidable impacts concerning construction-related noise and vibration levels and operational noise levels associated with traffic. The Project's impact concerning the substantial temporary and permanent increase of ambient noise levels would be cumulatively considerable. The Project's impact concerning construction-related noise and groundborne vibration would also be cumulatively considerable.

### Utilities and Service Systems

Despite compliance with GPU PEIR mitigation, until the water supply situation improves, the water demands from future development pursuant to the HEU would result in a significant and unavoidable impact concerning water supplies. Additionally, until such time as greater confidence in and commitment from water suppliers can be made, or the water supply situation improves, the Project's impacts concerning water supplies to serve future development would be cumulatively considerable.

## 4.3.   Findings

The City of Huntington Beach has evaluated all feasible mitigation measures and potential changes to the Project with respect to reducing the impacts that have been identified as significant and unavoidable (see Chapter 2, CEQA Findings). The City of Huntington Beach has also examined a reasonable range of alternatives to the project as proposed (see Chapter 3, Findings Regarding Project Alternatives). Based on this examination, the City of Huntington Beach has determined that the No Project Alternative is considered to be the environmentally superior alternative.

## 4.4.   Overriding Considerations

Specific economic, social, or other considerations outweigh the significant and unavoidable impacts stated above. The reasons for proceeding with the proposed project, notwithstanding the identified significant and unavoidable impacts are described below.

### Proposed Project Benefits

1) The HEU would facilitate the development of a wide range of housing types in sufficient supply to meet the needs of current and future residents, particularly for persons with specific needs, including but not limited to extremely low, very low, and lower income households; seniors; persons

EXHIBIT 10

with disabilities; large households, single-parent households, people experiencing homelessness or at risk of homelessness, and farmworkers.

2) The HEU would increase the supply of affordable housing in high opportunity/resource areas, including areas with access to employment opportunities, community facilities and services, and amenities.

3) The HEU would provide a comprehensive system of support and would expand housing options aimed to prevent and end homelessness.

4) The HEU would reduce constraints to the development of housing, including affordable housing, through programs that allow ministerial approval processes, permit ready plans for Accessory Dwelling Units, a review and update of the City's small lot ordinance, and housing overlays in non-residential areas.

5) The HEU would address planning and monitoring goals for long-term affordability of adequate housing.

6) The HEU would facilitate the development of an accessible housing supply for all persons without discrimination in accordance with State and federal fair housing laws. The HEU would enhance existing lower resource neighborhoods by promoting livable, healthy, and safe housing for all residents.

7) The HEU provides a plan for meeting the City's RHNA goals and to affirmatively further fair housing, which substantially complies with State law, thereby enabling the City to achieve certification of the HEU through the California Department of Housing and Community Development. Certification of the HEU would also enable the City to maintain eligibility for funding programs tied to a compliant HEU.

8) The HEU would allow the City of to revitalize commercial corridors and older industrial areas by allowing for additional housing opportunities in the City while maintaining the character of existing, long-established single-family residential neighborhoods in the City.  Consistent with General Plan Implementation Program LU-P.14, the Affordable Housing Overlay allows for housing within the Research and Technology zoned areas, which establishes housing opportunities for employees of business in these areas.  The provisions of the Affordable Housing Overlay ensure that potential conflicts between residential and non-residential uses in these areas would be minimized.  The City would continue to ensure that all standards for building design, streetscape design, and landscaping would be adhered to and would review development proposals to ensure consistency with the character and visual appearance of the surrounding neighborhood.

9) The HEU would encourage future housing developments to better integrate with alternative modes of traditional transport because over half of the candidate housing sites identified in the HEU are located along High Quality Transit Areas. New development would also be encouraged to promote and support public transit and alternative modes of transportation by incorporating bus turnouts and shaded bus stops (where appropriate) and providing enhanced pedestrian and bicycle facilities.

10) With more organized development and guided use of existing resources, such potential impacts to water supply can be monitored and improved for the health and benefit of residents. Further, park

EXHIBIT 10

lands and open spaces can be protected and retained in place throughout the planning horizon to provide recreational benefits to residents, visitors and school aged students. A shift toward sustainable resources and self-sufficiency, as outlined in the HEU, will allow for the continuation of the valued way of life within the City of Huntington Beach throughout the planning horizon. For example, future projects would be required to comply with General Plan Goal ERC-15 and Policies ERC-15.A and ERC-15.B, which aim to maintain an adequate supply of water and distribution facilities capable of meeting existing and future water supply needs and require monitoring to reduce impacts to the water system in an effort to maintain and expand water supply and distribution facilities.

**EXHIBIT 10**

Res. No. 2023-15

**STATE OF CALIFORNIA**
**COUNTY OF ORANGE**        )  **ss:**
**CITY OF HUNTINGTON BEACH**   )

      I, ROBIN ESTANISLAU, the duly elected, qualified City Clerk of the City of Huntington Beach, and ex-officio Clerk of the City Council of said City, do hereby certify that the whole number of members of the City Council of the City of Huntington Beach is seven; that the foregoing resolution was denied by the affirmative vote of at least a majority of all the members of said City Council at a **Regular** meeting thereof held on **April 4, 2023** by the following vote:

**AYES:**     Kalmick, Moser, Bolton
**NOES:**     Van Der Mark, Strickland, McKeon, Burns
**ABSENT:**   None
**RECUSE:**   None

_____
City Clerk and ex-officio Clerk of the
City Council of the City of
Huntington Beach, California

39

**EXHIBIT 10**