MICHAEL E. GATES, City Attorney (SBN 258446)
NADIN S. SAID, Senior Deputy City Attorney (SBN 309802)
Office of the City Attorney
2000 Main Street, P.O. Box 190
Huntington Beach, CA 92648
(714) 536-5555
Email:  Michael.Gates@surfcity-hb.org
Email:  Nadin.Said@surfcity-hb.org

Attorneys for Plaintiffs
CITY OF HUNTINGTON BEACH, HUNTINGTON
BEACH CITY COUNCIL, MAYOR TONY STRICKLAND
and MAYOR PRO TEM GRACEY VAN DER MARK

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation, the HUNTINGTON BEACH CITY COUNCIL, MAYOR OF HUNTINGTON BEACH, TONY STRICKLAND, and MAYOR PRO TEM OF HUNTINGTON BEACH, GRACEY VAN DER MARK<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California, and individually; GUSTAVO VELASQUEZ in his official capacity as Director of the State of California Department of Housing and Community Development, and individually; STATE LEGISLATURE; STATE OF CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT; SOUTHERN | CASE NO. 8:23-CV-00421-FWD-ADSx<br><br>**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>[Plaintiffs' Collective Opposition to Defendants' Motions to Dismiss and Declarations of Mayor Tony Strickland and Mayor Pro Tem Gracey Van der Mark filed concurrently herewith]<br><br>Date:   July 27, 2023<br>Time:   10:00 a.m.<br>Ctrm:   10D |

1
2
3
4

CALIFORNIA ASSOCIATION OF
GOVERNMENTS; and
DOES 1-50, inclusive,

Defendants.

5   Plaintiffs respectfully request this Honorable Court take Judicial Notice of the
6   following documents based on Federal Rules of Evidence 201(b). FRCE 201(b)
7   allows judicial notice of records that are not subject to reasonable dispute because it
8   is within the trial court's territorial jurisdiction, or can be accurately and readily
9   determined from sources whose accuracy cannot reasonably be questioned. In
10  *Karim Khoja v. Orexigen Therapeutics, Inc et. Al.,* 899 F.3d 988 (9th Cir. 2018) the
11  Court of appeals affirmed judicial notice of a conference call transcript, a report,
12  application, blog posts, and online articles when considering the issues at the
13  pleading stage. Accordingly, the Plaintiffs respectfully request similar documents to
14  be judicially noticed as follows:

15      1. **Exhibit 1**, a true and correct copy of the City's Charter.
16      2. **Exhibit 2,** a true and correct copy the State's lawsuit filed against the
17         City, Case No. 30-2023-01312235.
18      3. **Exhibit 3**, a true and correct copy of the State's Motion for Temporary
19         Relief in Case No. 30-2023-01312235.
20      4. **Exhibit 4**, a true and correct copy of the California Department of
21         Housing and Community Development, article dated April 10, 2023.
22         Article quotes Governor Newsom and HCD Director Gustavo
23         Velasquez. https://www.hcd.ca.gov/about-hcd/newsroom/california-
24         sues-huntington-beach-violating-state-housing-element-law
25      5. **Exhibit 5**, a true and correct copy of the California Department of
26         Housing and Community Development, Regional Housing Needs
27         Allocation tab with information for public view.

28  / / /

6. **Exhibit 6**, a true and correct copy of the Governor Newsom's press conference can be viewed on Youtube, at https://www.youtube.com/watch?v=JSy2VOGkBF8 at 45:30-45:45:59.

7. **Exhibit 7**, a true and correct copy of the Governor Newsom's tweet on Twitter, stating "California law lets judges appoint a state agent to do their hosing planning for them – HB can do it themselves of the court will take control."

   https://twitter.com/CAgovernor/status/1625898020683538432

8. **Exhibit 8**, a true and correct copy of Assembly Bill No. 101 (2019-2020)

9. **Exhibit 9**, a true and correct copy of the California State Auditor's Report regarding HCD's Housing Needs Assessment Process Lack Sufficient Reviews and Support.

   https://www.auditor.ca.gov/pdfs/reports/2021-125.pdf

10. **Exhibit 10,** a true and correct copy of Proposed Resolution No. 2023-15 (which was not adopted), with relevant portions highlighted. The Statement of Overriding Considerations that would have to be adopted as a finding by City Council is shown on pages 25-28 (highlighted).

Dated:   June 6, 2023          MICHAEL E. GATES, CITY ATTORNEY


            By:_____*/s/  MICHAEL E. GATES*_____
                 MICHAEL E. GATES, CITY ATTORNEY
                 Attorney for Plaintiffs,
                 CITY OF HUNTINGTON BEACH,
                 HUNTINGTON BEACH CITY COUNCIL,
                 MAYOR TONY STRICKLAND and
                 MAYOR PRO TEM GRACEY VAN DER MARK



# CITY OF HUNTINGTON BEACH

# *City Charter*

*Incorporated February 17, 1909*

**Revised 2014**



4

**EXHIBIT 1**

# CITY OF HUNTINGTON BEACH
# CITY CHARTER



Incorporated, February 17, 1909

(Election February 9, 1909; 94 votes cast for incorporation and 25 votes against)

## CHARTER AMENDMENTS
### *Effective Dates*

Charter Election Certified - Res. 773 Results 5/3/37.......…………5/17/37
Amendments………………………………………………………..…2/2/40
Amendments…………………………………………………….......1/29/47
Amendments………………………………………………….......1/27/49
Amendments……………………………………………………....5/9/49
Revised.........................................………...……………......5/1/50
New Charter…………………………………………….....2/10/66
Amendments………………………………………………….......1/18/71
Amendments…………………………………………………..........6/5/75
Amendments…………………………………………….....12/10/76
Amendments………………………………………………….......7/17/78
Amendments..(Consolidation November)…………………..…..12/9/82
Amendments…………………………………………………..…12/7/84
Amendments…………………………………………………....…12/7/90
Amendments………………………………………………….......4/22/02
Revised……..*(Certified by the Secretary of State 1/6/11)*…………12/6/10
Amendments...*(Certified by the Secretary of State 12/30/14)*...........12/1/14

**EXHIBIT 1**

# CITY CHARTER
## TABLE OF CONTENTS

**ARTICLE I**. INCORPORATION AND POWERS OF THE CITY

Section 100. Name
Section 101. Seal
Section 102. Boundaries
Section 103. Powers of City
Section 104. Construction
Section 105. Intergovernmental Relations

**ARTICLE II**. FORM OF GOVERNMENT

Section 200. Council-Manager Form of Government

**ARTICLE III**. ELECTIVE OFFICES

Section 300. City Council, Attorney, Clerk and Treasurer. Terms
Section 301. Powers Vested in City Council
Section 302. Compensation
Section 303. Meetings and Location
Section 304. Quorums, Proceedings and Rules of Order
Section 305. Presiding Officer
Section 306. Mayor Pro Tempore
Section 307. Non-interference with Administration
Section 308. Official Bonds
Section 309. City Attorney. Powers and Duties
Section 310. City Clerk. Powers and Duties
Section 311. City Treasurer. Powers and Duties
Section 312. Vacancies, Forfeitures and Replacement
Section 313. Conflict of Interest, Nepotism

**ARTICLE IV**. APPOINTIVE OFFICES AND PERSONNEL

Section 400. City Manager. Composition, Term, Eligibility, Removal
Section 401. Powers and Duties
Section 402. Acting City Manager
Section 403. Personnel
Section 404. Retirement System
Section 405. Boards, Commissions and Committees

**ARTICLE V**. ORDINANCES AND RESOLUTIONS

Section 500. Regular Ordinances. Enactment, Adoption, Publication, Amendment, When
            Effective and Codification
Section 501. Emergency Ordinances
Section 502. Resolutions
Section 503. Publishing of Legal Notices

**EXHIBIT 1**

**ARTICLE VI**. FISCAL ADMINISTRATION

Section 600. Fiscal Year
Section 601. Annual Budget, Preparation by the City Manager
Section 602. Annual Budget. Submission to the City Council
Section 603. Annual Budget. Public Hearing
Section 604. Annual Budget. Further Consideration and Adoption
Section 605. Annual Budget Appropriations
Section 606. Determination of City Tax Rate
Section 607. Tax Limits
Section 608. Vote Required for Tax Measures
Section 609. Real Estate Transfer Tax
Section 610. Bonded Debt Limit
Section 611. Revenue Bonds
Section 612. Public Utilities and Parks and Beaches
Section 613. Execution of Contracts
Section 614. Contracts on Public Works
Section 615. Granting of Franchises
Section 616. Independent Audit
Section 617. Infrastructure Fund

**ARTICLE VII**. ELECTIONS

Section 700. General Municipal Elections
Section 701. Special Municipal Elections
Section 702. Procedure for Holding Elections
Section 703. Initiative, Referendum and Recall
Section 704. Nomination Papers

**ARTICLE VIII**. MISCELLANEOUS

Section 800. Transition
Section 801. Definitions
Section 802. Violations
Section 803. Property Rights Protection Measure
Section 804. Charter Review
Section 805. Safe and Sane Fireworks

**EXHIBIT 1**

# CHARTER

We, the people of the City of Huntington Beach, State of California believe fiscal responsibility and the prudent stewardship of public funds is essential for confidence in government, that ethics and integrity are the foundation of public trust and that just governance is built upon these values. Through the enactment of this Charter as the fundamental law of the City of Huntington Beach under the Constitution of the State of California, we do hereby exercise the privilege of retaining for ourselves, the benefits of local government, by enacting the laws, rules, regulations and procedures set forth herein pertaining to the governance and operation of our City.

It is incumbent upon those who govern and make decisions for and on behalf of the City of Huntington Beach to legally, as well as morally, abide by the provisions of this Charter, in its strictest sense, to assure the continued success and well-being of our fair City.

## ARTICLE I
## INCORPORATION AND POWERS OF THE CITY

**Section 100. NAME**. The municipal corporation now existing and known as the City of Huntington Beach shall remain and continue to exist as a municipal corporation under its present name of "City of Huntington Beach."

**Section 101. SEAL**. The City shall have an official seal which may be changed from time to time by ordinance. The present official seal shall continue to be the official seal of the City until changed in the manner stated.

**Section 102. BOUNDARIES**. The boundaries of the City shall continue as now established until changed in the manner authorized by law.

**Section 103. POWERS OF CITY**. The City shall have the power to make and enforce all laws and regulations in respect to municipal affairs, subject only to such restrictions and limitations as may be provided in this Charter or in the Constitution of the State of California.

**Section 104. CONSTRUCTION**. The general grant of power to the City under this Charter shall be construed broadly in favor of the City. The specific provisions enumerated in this Charter are intended to be and shall be interpreted as limitations upon the general grant of power and shall be construed narrowly. If any provisions of this Charter, or the application thereof to any person or circumstance is held invalid, the remainder of the Charter and the application of such provision to other persons or circumstances, shall not be affected thereby.

**Section 105. INTERGOVERNMENTAL RELATIONS**. The City may exercise any of its powers or perform any of its functions and may participate in the financing thereof, jointly or in cooperation, by contract or otherwise, with any one or more states or civil divisions or agencies thereof, or the United States or any agency thereof.

## ARTICLE II
## FORM OF GOVERNMENT

**Section 200. COUNCIL-MANAGER FORM OF GOVERNMENT**. The municipal government provided by this Charter shall be known as the Council-Manager form of government.

**EXHIBIT 1**

## ARTICLE III
## ELECTIVE OFFICES

**Section 300. CITY COUNCIL, ATTORNEY, CLERK AND TREASURER. TERMS**. The elective officers of the City shall consist of a City Council of seven members, a City Clerk, a City Treasurer and a City Attorney, all to be elected from the City at large in the manner provided in this Charter and who shall serve for terms of four years and until their respective successors qualify. Subject to the provisions of this Charter, the members of the City Council in office at the time this Charter takes effect shall continue in office until the expiration of their respective terms and until their successors are elected and qualified. Four members of the City Council shall be elected at the general municipal election held in 1966, and each fourth year thereafter. Three members of the City Council shall be elected at the general municipal election held in 1968, and each fourth year thereafter. No person shall be elected as a member of the City Council for more than two consecutive terms and no person who has been a member for more than two years of a term to which some other person was elected a member shall be elected to the City Council more than one further consecutive term. Subject to the provisions of this Charter, the City Clerk, City Treasurer and City Attorney in office at the time this Charter takes effect shall continue in office until the expiration of their respective terms and the qualification of their successors. A City Clerk and City Treasurer shall be elected at the general municipal election held in 1968, and each fourth year thereafter. A City Attorney shall be elected in 1966, and each fourth year thereafter.

The term of each member of the City Council, the City Clerk, the City Treasurer and the City Attorney shall commence on the first Monday following the certification of the election. Ties in voting among candidates for office shall be settled by the casting of lots.

If no candidate meets the qualifications for office of the City Clerk, City Treasurer, or City Attorney, the City Council shall fill that position by appointment until the next municipal general election in which a qualified candidate is elected.

**Section 301. POWERS VESTED IN CITY COUNCIL**. All powers of the City shall be vested in the City Council except as otherwise provided in this Charter.

**Section 302. COMPENSATION**. The members of the City Council including the Mayor shall receive as compensation for their services as such a monthly salary in the sum of One Hundred Seventy-five Dollars per month. In addition, each member of the City Council shall receive reimbursement on order of the City Council for Council authorized traveling and other expenses when on official duty upon submission of itemized expense accounts therefor. In addition, members shall receive such reasonable and adequate amounts as may be established by ordinance, which amounts shall be deemed to be reimbursement to them of other routine and ordinary expenses, losses and costs imposed upon them by virtue of their serving as City Councilpersons.

**Section 303. MEETINGS AND LOCATION**.

(a)     **Regular Meetings**. The City Council shall hold regular meetings at least twice each month at such time as it shall fix by ordinance or resolution and may adjourn or re-adjourn any regular meeting to a date and hour certain which shall be specified in the order of adjournment and when so adjourned each adjourned meeting shall be a regular meeting for all purposes. If the hour to which a meeting is adjourned is not stated in the order of adjournment, such meeting shall be held at the hour for holding regular meetings. If at any time any regular meeting falls on a holiday such regular meeting shall be held on the next business day.

(b)     **Special Meetings**. A special meeting may be called at any time by the Mayor, or by a majority of the members of the City Council, by written notice to each member of the City Council and to each local newspaper of general circulation, radio or television station requesting notice in writing. Such

**EXHIBIT 1**

notice must be delivered personally or by mail at least twenty-four hours before the time of such meeting as specified in the notice.

The call and notice shall specify the time and place of the special meeting and the business to be transacted. No other business shall be considered at such meeting. If any person entitled to such written notice files a written waiver of notice with the City Clerk, it may be dispensed with. This notice requirement shall be considered fulfilled as to any person who is actually present at the meeting at the time it convenes. In the event of an emergency affecting the public peace, health or safety, a special meeting may be called as provided in this section with less than twenty-four hours written notice by the Mayor Pro Tem in the Mayor's absence or by any member of the City Council in the absence of both the Mayor and Mayor Pro Tem provided that the nature of the emergency is set forth in the minutes of the meeting.

     (c)    **Place of Meetings**. All regular meetings shall be held in the Council Chambers of the City or in such place within the City to which any such meeting may be adjourned. If, by reason of fire, flood or other emergency, it shall be unsafe to meet in the place designated, the meetings may be held for the duration of the emergency at such place within the City as is designated by the Mayor, or, if he should fail to act, by a majority of the members of the City Council.

     (d)    **Open Meetings**. All regular and special meetings of the City Council shall be open and public, and all persons shall be permitted to attend such meetings, except that the provisions of this section shall not apply to executive sessions. Subject to the rules governing the conduct of City Council meetings, no person shall be denied the right to be heard by the City Council.

     (e)    **Dissemination of Information**. The City Council shall adopt rules to ensure thorough and timely dissemination of information via current technology by resolution.

**Section 304. QUORUMS, PROCEEDINGS AND RULES OF ORDER.**

     (a)    **Quorum**. A majority of the members of the City Council shall constitute a quorum to do business but a lesser number may adjourn from time to time. In the absence of all the members of the City Council from any regular meeting or adjourned regular meeting, the City Clerk may declare the same adjourned to a stated day and hour. The City Clerk shall cause written notice of a meeting adjourned by less than a quorum or by the City Clerk to be delivered personally or by mail to each Council member at least twenty-four hours before the time to which the meeting is adjourned, or such notice may be dispensed with in the same manner as specified in this Charter for dispensing with notice of special meetings of the City Council.

     (b)    **Proceedings**. The City Council shall judge the qualification of its members as set forth by the Charter. It shall judge all election returns. Each member of the City Council shall have the power to administer oaths and affirmations in any investigation or proceeding pending before the City Council. The City Council shall have the power and authority to compel the attendance of witnesses, to examine them under oath and to compel the production of evidence before it. Subpoenas shall be issued in the name of the City and be attested by the City Clerk. They shall be served and complied with in the same manner as subpoenas in civil actions. Disobedience of such subpoenas, or the refusal to testify (upon other than constitutional grounds), shall constitute a misdemeanor, and shall be punishable in the same manner as violations of this Charter are punishable. The City Council shall have control of all legal business and proceedings and all property of the legal department, and may employ other attorneys to take charge of or may contract for any prosecution, litigation or other legal matter or business.

     (c)    **Rules of Order**. The City Council shall establish rules for the conduct of its proceedings and evict or prosecute any member or other person for disorderly conduct at any of its meetings. Upon adoption of any ordinance, resolution, or order for payment of money, or upon the demand of any

**EXHIBIT 1**

member, the City Clerk shall call the roll and shall cause the ayes and noes taken on the question to be entered in the minutes of the meeting.

**Section 305. PRESIDING OFFICER.** At the Council meeting at which any Council member is installed following any general or special municipal election, and at any time when there is a vacancy in the office of Mayor, the City Council shall meet and shall elect one of its members as its presiding officer, who shall have the title of Mayor. The Mayor may make and second motions and shall have a voice and vote in all its proceedings. The Mayor shall be the official head of the City for all ceremonial purposes; shall have the primary but not the exclusive responsibility for interpreting the policies, programs and needs of the City government to the people, and as occasion requires, may inform the people of any major change in policy or program; and shall perform such other duties consistent with the office as may be prescribed by this Charter or as may be imposed by the City Council. The Mayor shall serve in such capacity at the pleasure of the City Council.

**Section 306. MAYOR PRO TEMPORE.** The City Council shall also designate one of its members as Mayor Pro Tempore, who shall serve in such capacity at the pleasure of the City Council. The Mayor Pro Tempore shall perform the duties of the Mayor during the Mayor's absence or disability or at the Mayor's request.

**Section 307. NON-INTERFERENCE WITH ADMINISTRATION.** Except as otherwise provided in this Charter, no member of the City Council shall order, directly or indirectly, the appointment by the City Manager, or by any of the department heads in administrative service of the City, of any person to any office or employment, or removal therefrom. Except for the purpose of investigation and inquiry, the members of the City Council shall deal with the administrative service under the jurisdiction of the City Manager solely through the City Manager, and no member of the City Council shall give orders to any subordinate of the City Manager, either publicly or privately.

No elected department head or staff of the Office of the elected department head shall be a member of the management negotiation team for the purposes of negotiations of memorandums of understanding with the employee bargaining units.

**Section 308. OFFICIAL BONDS.** The City Council shall fix by ordinance or resolution the amounts and terms of the official bonds of all officials or employees who are required by this Charter or by ordinance to give such bonds. All bonds shall be executed by responsible corporate surety, shall be approved as to form by the City Attorney, and shall be filed with the City Clerk. Premiums on official bonds shall be paid by the City. A blanket bond may be used if it provides the same protection as the required separate bond would provide.

In all cases wherein an employee of the City is required to furnish a faithful performance bond, there shall be no personal liability upon, or any right to recover against, the employee's superior officer or other officer or employee or the bond of the latter, unless such superior officer, or other officer or employee is a party to the act or omission, or has conspired in the wrongful act directly or indirectly causing the loss.

**Section 309. CITY ATTORNEY. POWERS AND DUTIES.** To become and remain eligible for City Attorney the person elected or appointed shall have graduated from a law school accredited by the American Bar Association, be an attorney at law, duly licensed as such under the laws of the State of California, shall have been engaged in the practice of law in this State for at least five years prior to their election or appointment. The City Attorney shall have the power and may be required to:

    (a)    Represent and advise the City Council and all City officers in all matters of law pertaining to their offices.

**EXHIBIT 1**

     (b)     Prosecute on behalf of the people any or all criminal cases arising from violation of the provisions of this Charter or of City ordinances and such state misdemeanors as the City has the power to prosecute, unless otherwise provided by the City Council.

     (c)     Represent and appear for the City in any or all actions or proceedings in which the City is concerned or is a party, and represent and appear for any City officer or employee, or former City officer or employee, in any or all civil actions or proceedings in which such officer or employee is concerned or is a party for any act arising out of their employment or by reason of their official capacity.

     (d)     Attend all regular meetings of the City Council, unless excused, and give their advice or opinion orally or in writing whenever requested to do so by the City Council or by any of the boards or officers of the City.

     (e)     Approve in writing the form of all contracts made by and all bonds and insurance given to the City.

     (f)     Prepare any and all proposed ordinances and City Council resolutions and amendments thereto.

     (g)     Devote such time to the duties of their office and at such place as may be specified by the City Council.

     (h)     Perform such legal functions and duties incident to the execution of the foregoing powers as may be necessary.

     (i)     Surrender to their successor all books, papers, files, and documents pertaining to the City's affairs.

     (j)     Assist and cooperate with the City Manager consistent with Section 403 of the City Charter.

     (k)     Provide advice related to compliance with the City Charter to all elected and appointed officials of the City.

**Section 310. CITY CLERK. POWERS AND DUTIES**. To become and remain eligible for City Clerk, the person elected or appointed shall have a Bachelor's Degree in business, public administration, or a related field, and hold a certification as a Municipal Clerk or obtain such certification within the first three years in office. The City Clerk shall have the power and shall be required to:

     (a)     Attend all meetings of the City Council, unless excused, and be responsible for the recording and maintaining of a full and true record of all of the proceedings of the City Council in records that shall bear appropriate titles and be devoted to such purpose.

     (b)     Maintain separate records, in which shall be recorded respectively all ordinances and resolutions, with the certificate of the Clerk annexed to each thereof stating the same to be the original or a correct copy, and as to an ordinance requiring publication, stating that the same has been published or posted in accordance with this Charter.

     (c)     Maintain separate records of all written contracts and official bonds.

     (d)     Keep all records in their possession properly indexed and open to public inspection when not in actual use.

     (e)     Be the custodian of the seal of the City.

**EXHIBIT 1**

(f)      Administer oaths or affirmations, take affidavits and depositions pertaining to the affairs and business of the City and certify copies of official records.

(g)      Be ex officio Assessor, unless the City Council, has availed itself, or does in the future avail itself, of the provisions of the general laws of the State relative to the assessment of property and the collection of City taxes by county officers, or unless the City Council by ordinance provides otherwise.

(h)      Have charge of all City elections.

(i)      Perform such other duties consistent with this Charter as may be required by ordinance or resolution of the City Council.

(j)      Assist and cooperate with the City Manager consistent with Section 403 of the City Charter.

The City Clerk may, subject to the approval of the City Council, appoint such deputy or deputies to assist them or act for them, at such salaries or compensation as the Council may by ordinance or resolution prescribe.

**Section 311. CITY TREASURER. POWERS AND DUTIES**. To become and remain eligible for City Treasurer, the person elected or appointed shall have a minimum of five years of financial and/or treasury experience, and have either:

A Master's Degree in accounting, finance, business, or public administration; or

A Bachelor's Degree in accounting, finance, business, or public administration with certification by the California Municipal Treasurer's Association, or their successor, within three years of election or appointment.

The City Treasurer shall have the power and shall be required to:

(a)      Receive on behalf of the City all taxes, assessments, license fees and other revenues of the City, or for the collection of which the City is responsible, and receive all taxes or other money receivable by the City from the County, State or Federal governments, or from any court, or from any office, department or agency of the City.

(b)      Have and keep custody of all public funds belonging to or under control of the City or any office, department or agency of the City government and deposit or cause to be deposited all funds coming into their hands in such depository as may be designated by resolution of the City Council, or, if no such resolution be adopted, then in such depository designated in writing by the City Manager, and in compliance with all of the provisions of the State Constitution and laws of the State governing the handling, depositing and securing of public funds.

(c)      Pay out moneys only on proper orders or warrants in the manner provided for in this Charter.

(d)      Prepare and submit to the Director of Finance monthly written reports of all receipts, disbursements and fund balances, and shall file copies of such reports with the City Manager and City Council.

(e)      Perform such other duties consistent with this Charter as may be required by ordinance or resolution of the City Council.

(f)      Assist and cooperate with the City Manager consistent with Section 403 of the City Charter.

The City Treasurer may, subject to the approval of the City Council, appoint such deputy or deputies to assist them or act for them, at such salaries or compensation as the Council may by ordinance or resolution prescribe.

## Section 312. VACANCIES, FORFEITURES AND REPLACEMENT.

(a)      **Vacancies**. A vacancy in the City Council or in any other office designated as elective by this Charter, from whatever cause arising, shall be filled by appointment by the City Council.

(b)      **Forfeiture**. If a member of the City Council is absent from all regular meetings of the City Council for a period of thirty consecutive days from and after the last regular City Council meeting attended by such member, unless by permission of the City Council expressed in its official minutes, the office shall become vacant. If an elected City officer pleads guilty or no contest to or is convicted of a felony or any crime of moral turpitude, or ceases to be an elector of the City, the office shall become vacant. The City Council shall declare the existence of such vacancy. Any elective officer of the City who shall accept or retain any other elective public office, except as provided in this Charter, shall be deemed thereby to have vacated the office under the City Government.

(c)      **Replacement**. In the event it shall fail to fill a vacancy by appointment within sixty days after such office shall become vacant, the City Council shall forthwith cause an election to be held to fill such vacancy for the remainder of the unexpired term.

## Section 313. CONFLICT OF INTEREST, NEPOTISM.

(a)      **Conflict of Interest**. The City Council shall adopt or approve rules and regulations regulating conflicts of interest and promoting fair dealing in all City business.

(b)      **Nepotism**. The City Council shall not appoint to a salaried position under the City government any person who is a relative by blood or marriage within the third degree of any one or more of the members of such City Council, nor shall the City Manager or any department head or other officer having appointive power appoint any relative of such person or of any Council member within such degree to any such position.

This provision shall not affect the employment or promotional status of a person who has attained a salaried position with the City prior to the existence of a situation contemplated by this provision; however, Council members or officers with appointive powers in such a situation shall disqualify themselves from all decisions affecting the employment and promotional status of such person.

## ARTICLE IV
## APPOINTIVE OFFICES AND PERSONNEL

## Section 400. CITY MANAGER. COMPOSITION, TERM, ELIGIBILITY, REMOVAL.

(a)      **Composition**. There shall be a City Manager who shall be the chief administrative officer of the City.

(b)      **Term**. The City Manager shall be appointed by the affirmative vote of at least a majority of the members of the City Council and shall serve at the pleasure of the City Council; provided, however, that the person occupying the office shall not be removed from office except as herein provided.

**EXHIBIT 1**

(c)      **Eligibility**. The City Manager shall be chosen on the basis of executive and administrative qualifications, with special reference to actual experience in and knowledge of accepted practice as regards the duties of the office as herein set forth. No person shall be eligible to be appointed City Manager or Acting City Manager while serving as a member of the City Council nor within one year following the termination of membership on the City Council.

(d)      **Removal**. The City Manager shall not be removed from office during or within a period of ninety days next succeeding any municipal election at which a member of the City Council is elected. At any other time the City Manager may be removed only at a regular meeting of the City Council and upon the affirmative vote of a majority of the members of the City Council. At least thirty days prior to the effective date of removal, the City Manager shall be furnished with a written notice stating the Council's intentions and, if requested by the City Manager, the reasons therefor. Within seven days after receipt of such notice, the City Manager may by written notification to the City Clerk request a public hearing before the City Council, in which event the Council shall fix a time for a public hearing which shall be held at its regular meeting place before the expiration of the thirty-day period above referred to. The City Manager shall appear and be heard at such hearing. After furnishing the City Manager with written notice of the intended removal, the City Council may suspend the City Manager from duty, but his compensation shall continue until removal as herein provided. In removing the City Manager, the City Council shall use its uncontrolled discretion and its action shall be final and shall not depend upon any particular showing or degree of proof at the hearing, the purpose of which is to allow the City Council and the City Manager to present to each other and to the public all pertinent facts prior to the final action of removal.

**Section 401. POWERS AND DUTIES**. Except as otherwise provided in this Charter, the City Manager shall be responsible to the City Council for the proper administration of all affairs of the City. Without limiting this general grant of powers and responsibilities, the City Manager shall have the power and be required to:

(a)      Appoint, promote, demote, suspend or remove department heads, officers and employees of the City except elective officers and the Chief of Police. The Chief of Police shall not be appointed or removed until the City Manager shall first have reviewed such appointment or removal with the City Council and have received approval for such appointment or removal by a majority vote of the full City Council.

(b)      Prepare the budget annually, submit it to the City Council, and be responsible for its administration upon adoption.

(c)      Prepare and submit to the City Council as of the end of each fiscal year, a complete report on the finances of the City, and annually or more frequently, a current report of the principal administrative activities of the City.

(d)      Keep the City Council advised of the financial condition and future needs of the City and make such recommendations as may seem desirable.

(e)      Maintain a centralized purchasing system for all City offices, departments and agencies.

(f)      Prepare, administer and enforce rules and regulations recommended to and adopted by the City Council governing the contracting for, purchase, inspection, storage, inventory, distribution and disposal of all supplies, materials and equipment required by any office, department or agency of the City government.

(g)      Be responsible for the compliance by the City with the laws of the State pertaining to the City, the provisions of this Charter and the ordinances, franchises and rights of the City.

**EXHIBIT 1**

Subject to policy established by the City Council, exercise control of all administrative offices and departments of the City and of all appointive officers and employees, and prescribe such general rules and regulations as deemed necessary or proper for the general conduct of the administrative offices and departments of the City under their jurisdiction.

(h)     Perform such other duties consistent with this Charter as may be required by the City Council.

**Section 402. ACTING CITY MANAGER**. During any temporary absence or disability of the City Manager, the City Manager shall appoint one of the other officers or department heads of the City to serve as Acting City Manager. In the event the City Manager fails to make such appointment, such appointment may be made by the City Council.

**Section 403. PERSONNEL**. In addition to the City Council, a City Clerk, a City Treasurer, a City Attorney and City Manager, the officers and employees of the City shall consist of such other officers, assistants, deputies and employees as the City Council may provide by ordinance or resolution. The City Council shall establish such reasonable compensation and fringe benefits as are appropriate by ordinance or resolution for such offices, officials and employees except as herein provided.

The City Council shall maintain by ordinance a comprehensive personnel system for the City. The City Manager and any officers designated as elective by the Charter shall be exempt. The system shall consist of the establishment of minimum standards of employment and qualifications for the various classes of employment and procedures to be followed in advancement, demotion, suspension and discharge of employees included within the system, as the City Council shall determine to be for the best interest of the public service. The ordinance shall designate the appointive officers and employees who shall be included within the system. By subsequent ordinances the City Council may amend the system or the list of appointive officers and employees included within the system. The system shall comply with all other provisions of this Charter.

It shall be the duty of all department heads, whether appointed or elected, to assist and cooperate with the City Manager in administering the affairs of the City in the most efficient, fiscally responsible, and harmonious manner consistent with the duties as prescribed by law, City Charter, or by ordinance.

**Section 404. RETIREMENT SYSTEM**. The City shall participate in a retirement system.

**Section 405. BOARDS, COMMISSIONS AND COMMITTEES**. The City Council shall establish such boards, commissions and committees as are deemed necessary for the orderly functioning of the City. All such boards, commissions and committees shall report directly to the City Council.

**ARTICLE V**
**ORDINANCES AND RESOLUTIONS**

**Section 500.     REGULAR ORDINANCES. ENACTMENT, ADOPTION, PUBLICATION, AMENDMENT, WHEN EFFECTIVE AND CODIFICATION**.

(a)     **Enactment**. In addition to such other acts of the City Council as are required by this Charter to be taken by ordinance, every act of the City Council establishing a fine or other penalty, or granting a franchise, shall be by ordinance. The enacting clause of all ordinances shall be substantially as follows: "The City Council of the City of Huntington Beach does ordain as follows:" No order for the payment of money shall be adopted or made at other than a regular or adjourned regular meeting. Upon introduction, an ordinance shall be read by title only. Unless a higher vote is required by other provisions of this Charter, the affirmative vote of at least four of the City Council shall be required for the enactment of any ordinance or for the making or approving of any order for the payment of money. All ordinances shall be signed by the Mayor and attested by the City Clerk.

**EXHIBIT 1**

(b)     **Adoption**. A regular ordinance shall be adopted only at a regular or adjourned regular meeting held no less than five days after its introduction. In the event that any ordinance is altered after its introduction, it shall be finally adopted only at a regular or adjourned regular meeting held no less than five days after the date it was so altered. The correction of typographical or clerical errors shall not constitute the making of an alteration within the meaning of the foregoing sentence.

(c)     **Publication**. The City Clerk shall cause each ordinance to be posted in three places designated by the City Council within the City and to be published by title with a brief summary at least once within fifteen days after its adoption in a daily, semiweekly or weekly newspaper, published in the County or the City and circulated in the City, which is selected by the City Council for that purpose. Current technology shall be used to ensure the widest possible dissemination.

(d)     **Amendment**. The amendment of any section or subsection of an ordinance may be accomplished solely by the re-enactment of such section or subsection at length, as amended.

(e)     **When Effective**. Every ordinance shall become effective thirty days from and after the date of its adoption, except the following, which shall take effect upon adoption:

    (1)     An ordinance calling or otherwise relating to an election;

    (2)     An improvement proceeding ordinance adopted under some special law or procedural ordinance relating thereto;

    (3)     An ordinance declaring the amount of money necessary to be raised by taxation, or fixing the rate of property taxation, or levying the annual tax upon property.

    (4)     An emergency ordinance adopted in the manner provided in this Charter.

(f)     **Codification**. Detailed regulations pertaining to any subject and comprehensive codifications of valid ordinances may be adopted by reference, with the same effect as an ordinance, in the manner set forth herein; however, such regulations and codifications need not be published in the manner required for other ordinances, but not less than three copies thereof shall be filed for use and examination by the public in the office of the City Clerk prior to adoption. Ordinances codified shall be repealed as of the effective date of the codification. Amendments to the code shall be enacted by ordinance.

**Section 501. EMERGENCY ORDINANCES**. Any ordinance declared by the City Council to be necessary as an emergency measure for the immediate preservation of the public peace, health, or safety, and containing a statement of the reasons for its urgency, may be adopted in the manner provided in Section 500 except that such emergency ordinance may be introduced, enacted and adopted at one and the same regular or special meeting and shall take effect immediately upon adoption if passed by at least five affirmative votes. An emergency ordinance shall expire automatically after 120 days.

**Section 502. RESOLUTIONS**. The City Council may act by resolution or minute order in all actions not required by this Charter to be taken by ordinance.

**Section 503. PUBLISHING OF LEGAL NOTICES**. The City Council shall cause to be published all legal notices and other matters required to be published by law in a daily, semiweekly or weekly newspaper published in the County or the City and circulated in the City which is selected by the City Council for that purpose and using current technology. No defect or irregularity in proceedings taken under this section shall invalidate any publication where it is otherwise in conformity with this Charter or law or ordinance.

## ARTICLE VI
## FISCAL ADMINISTRATION

**Section 600. FISCAL YEAR.** The fiscal year of the City shall be as set forth by resolution of the City Council.

**Section 601. ANNUAL BUDGET, PREPARATION BY THE CITY MANAGER.** At such date as the City Manager shall determine, each board or commission and each department head shall furnish to the City Manager, personally, or through the Director of Finance, estimates of the department's, board's or commission's revenue and expenditures for the ensuing fiscal year, detailed in such manner as may be prescribed by the City Manager. In preparing the proposed budget, the City Manager shall review the estimates, hold conferences thereon with the respective department heads, boards or commissions as necessary, and may revise the estimates as may be deemed advisable.

**Section 602. ANNUAL BUDGET. SUBMISSION TO THE CITY COUNCIL.** The City Manager shall submit the proposed budget to the City Council at least thirty days prior to the beginning of each fiscal year. After reviewing the proposed budget and making such revisions as it may deem advisable, the City Council shall hold a public hearing thereon at least fifteen days prior to the beginning of each fiscal year and shall cause to be published a notice thereof not less than ten days prior to said hearing. Copies of the proposed budget shall be available for inspection by the public in the office of the City Clerk at least ten days prior to said hearing.

**Section 603. ANNUAL BUDGET. PUBLIC HEARING.** At the time so advertised or at any time to which such public hearing shall from time to time be adjourned, the City Council shall hold a public hearing on the proposed budget, at which interested persons desiring to be heard shall be given such opportunity.

**Section 604. ANNUAL BUDGET. FURTHER CONSIDERATION AND ADOPTION.** At the conclusion of the public hearing the City Council shall further consider the proposed budget and make any revisions thereof that it may deem advisable and on or before the last day of the fiscal year it shall adopt the budget with revisions, if any, by the affirmative vote of at least a majority of the total members of the Council. Upon final adoption, the budget shall be in effect for the ensuing fiscal year. Copies thereof, certified by the City Clerk, shall be filed with the City Manager, Director of Finance, City Treasurer and the person retained by the City Council to perform the post audit function, and a further copy shall be placed, and shall remain on file in the office of the City Clerk where it shall be available for public inspection. The budget so certified shall be reproduced and copies made available for the use of the public and of departments, offices and agencies of the City.

**Section 605. ANNUAL BUDGET APPROPRIATIONS.** From the effective date of the budget, the several amounts stated therein as proposed expenditures shall be and become appropriated to the several departments, offices and agencies for the respective objects and purposes therein named; provided, however, that the City Manager may transfer funds from one object or purpose to another within the same department, office or agency. All appropriations shall lapse at the end of the fiscal year to the extent that they shall not have been expended or lawfully encumbered.

At any public meeting after the adoption of the budget, the City Council may amend or supplement the budget by motion adopted by the affirmative vote of at least a majority of the total members of the City Council.

**Section 606. DETERMINATION OF CITY TAX RATE.** The City Council shall prescribe by ordinance for the assessment, levy and collection of taxes upon property which is taxable for municipal purposes. If the City Council fails to fix the rate and levy taxes on or before August 31 in any year, the rate for the next preceding fiscal year shall thereupon be automatically adopted and a tax at such rate shall be deemed to have been levied on all taxable property in the City for the current fiscal year.

**EXHIBIT 1**

**Section 607. TAX LIMITS**.

(a)      The City Council shall not levy a property tax for municipal purposes in excess of One Dollar annually on each One Hundred Dollars of the assessed value of taxable property in the City, except as otherwise provided in this section, unless authorized by the affirmative vote of a majority of the electors voting on a proposition to increase such levy at any election at which the question of such additional levy for municipal purposes is submitted to the electors. The number of years that such additional levy is to be made shall be specified in such proposition.

(b)      There shall be levied and collected at the same time and in the same manner as other property taxes for municipal purposes are levied and collected, as additional taxes not subject to the above limitation, if no other provision for payment thereof is made:

1.      A tax sufficient to meet all liabilities of the City of principal and interest of all bonds and judgments due and unpaid, or to become due during the ensuing fiscal year, which constitute general obligations of the City; and

2.      A tax sufficient to meet all obligations of the City for the retirement system in which the City participates, due and unpaid or to become due during the ensuing fiscal year.

(c)      Special levies, in addition to the above and not subject to the above limitation, may be made annually, based on City Council approved estimates, for the following specific purposes, but not to exceed the following respective limits for those purposes for which limits are herein set forth, to wit: parks and recreation and human services not to exceed $0.20 per One Hundred Dollars; Libraries not to exceed $0.15 per One Hundred Dollars; promotional interests and cultural affairs not to exceed $0.07 per One Hundred Dollars; and civil defense and disaster preparedness not to exceed $0.03 per One Hundred Dollars. The proceeds of any special levy shall be used for no other purpose than that specified.

**Section 608. VOTE REQUIRED FOR TAX MEASURES**. No tax, property tax, or other measure whose principal purpose is the raising of revenue, or any increase in the amount thereof, shall be levied, enacted or established except by ordinance adopted by the affirmative vote of at least five (5) members of the City Council; provided, however, that any tax levied or collected pursuant to Section 607(b) of this Charter shall be exempt from the minimum voting requirement of this section.

This section shall not apply to any license, permit, or any other fee or charge whose principal purpose is to pay or reimburse the City for the cost of performing any regulatory function of the City under its police power in connection with the City's duty to preserve or maintain the public peace, health, safety and welfare.

This section shall not apply to any user or service fee or charge provided such fee or charge is directly related to such use or service, is charged to the user or person receiving such service, and is to pay or reimburse the City for the costs of providing such use or service.

This section shall not apply to any fee or charge relating to any franchise or proprietary function of the City.

**Section 609. REAL ESTATE TRANSFER TAX**. The City Council shall not levy a tax on the transfer or conveyance of any interest in real property unless authorized by the affirmative vote of a majority of the electors voting on a proposition submitted to the electors to authorize such tax at a general or special election.

**EXHIBIT 1**

**Section 610. BONDED DEBT LIMIT**. The City shall not incur an indebtedness evidenced by general obligation bonds which shall in the aggregate exceed the sum of 12 percent of the total assessed valuation, for purposes of City taxation, of all the real and personal property within the City.

No bonded indebtedness which shall constitute a general obligation of the City may be created unless authorized by the affirmative vote of the majority required by law of the electors voting on such proposition at any election at which the question is submitted to the electors.

**Section 611. REVENUE BONDS**. Bonds which are payable only out of such revenues, other than taxes, as may be specified in such bonds, may be issued when the City Council by ordinance shall have established a procedure for the issuance of such bonds. Such bonds, payable only out of revenues, shall not constitute an indebtedness or general obligation of the City. No such bonds payable out of revenues shall be issued without the assent of the majority of the voters voting upon the proposition for issuing the same at an election at which such proposition shall have been duly submitted to the registered voters of the City.

It shall be competent for the City to make contracts and covenants for the benefit of the holders of any such bonds payable only from revenues and which shall not constitute a general obligation of the City for the establishment of a fund or funds, for the maintaining of adequate rates or charges, for restrictions upon further indebtedness payable out of the same fund or revenues, for restrictions upon transfer out of such fund, and other appropriate covenants. Money placed in any such special fund for the payment of principal and/or interest on any issue of such bonds or to assure the application thereof to a specific purpose shall not be expended for any other purpose whatever except for the purpose for which such special funds were established and shall be deemed segregated from all other funds of the City and reserved exclusively for the purpose for which such special fund was established until the purpose of its establishment shall have been fully accomplished.

**Section 612. PUBLIC UTILITIES AND PARKS AND BEACHES**.

(a)     No public utility or park or beach or portion thereof now or hereafter owned or operated by the City shall be sold, leased, exchanged or otherwise transferred or disposed of unless authorized by the affirmative votes of at least a majority of the total membership of the City Council and by the affirmative vote of at least a majority of the electors voting on such proposition at a general or special election at which such proposition is submitted.

(b)     No golf course, driving range, road, building over three thousand square feet in floor area nor structure costing more than $161,000.00 may be built on or in any park or beach or portion thereof now or hereafter owned or operated by the City unless authorized by the affirmative votes of at least a majority of the total membership of the City Council and by the affirmative vote of at least a majority of the electors voting on such proposition at a general or special election at which such proposition is submitted after the appropriate environmental assessment, conceptual cost estimate, and reasonable project description has been completed and widely disseminated to the public. Effective January 1, 2011, and each year thereafter, the maximum cost will be adjusted by the Consumer Price Index for the Los Angeles-Riverside-Orange County area.

(c)     Section 612(a) and 612(b) shall not apply;

(1)     to libraries or piers;

(2)     to any lease, franchise, concession agreement or other contract where;
- the contract is to perform an act or provide a service in a public park or beach AND
- such act was being performed or service provided at the same location prior to January 1, 1989 AND

**EXHIBIT 1**

    - the proposed lease, franchise, concession agreement or other contract would not increase the amount of parkland or beach dedicated to or used by the party performing such act or providing such service.

(3)    to above ground public works utility structures under 3,000 square feet;

(4)    to underground public works utility structures if park or beach use is not impeded;

(5)    to any public works construction, maintenance or repair mandated by state or federal law that does not negatively impact recreational opportunities; or

(6)    to renewable energy projects that do not negatively impact recreational opportunities.

    (d)    If any section, subsection, part, subpart, paragraph, clause or phrase of this amendment, or any amendment or revision of this amendment, is for any reason held to be invalid or unconstitutional, the remaining sections, subsections, parts, subparts, paragraphs, clauses or phrases shall not be affected but shall remain in full force and effect.

**Section 613. EXECUTION OF CONTRACTS**. Except as hereinafter provided, the City shall be bound by a contract only if it is made in writing, approved by the City Council and signed on behalf of the City by the Mayor and City Clerk or by a City officer designated by the City Council and only upon the direction of the City Council. Exceptions to this procedure are as follows:

    (a)    By ordinance or resolution the City Council may authorize the City Manager or other officer to bind the City, with or without a written contract, for the acquisition of equipment, materials, supplies, labor, services or other items included within the budget approved by the City Council, and may impose a monetary limit upon such authority.

    (b)    By ordinance or resolution, the City Council may provide a method for the sale or exchange of personal property not needed in the City service or not fit for the purpose for which intended, and for the conveyance of title thereto.

    (c)    Contracts for the sale of the products, commodities or services of any public utility owned, controlled or operated by the City may be made by the manager of such utility or by the head of the department or City Manager upon forms approved by the City Manager and at rates fixed by the City Council.

**Section 614. CONTRACTS ON PUBLIC WORKS**. Except as hereinafter expressly provided, every contract involving an expenditure as set forth by ordinance of the City Council for the construction or improvement (excluding maintenance and repair) of public buildings, works, streets, drains, sewers, utilities, parks and playgrounds, and each separate purchase of materials or supplies for the same, where the expenditure required for such purchase shall exceed the amount set by ordinance, shall be let to the lowest responsible bidder after notice by publication in accordance with Section 503 by two or more insertions, the first of which shall be at least ten days before the time for opening bids.

The City Council may reject any and all bids presented and may readvertise in its discretion. After rejecting bids, or if no bids are received, or without advertising for bids if the total amount of the contract or project is below the amount set by ordinance, the City Council may declare and determine that in its opinion, the work in question may be performed better or more economically by the City with its own employees, or that the materials or supplies may be purchased at lower price in the open market, and after the adoption of a resolution to this effect by the affirmative vote of a majority of the total members of the

City Council, it may proceed to have said work done or such materials or supplies purchased in the manner stated without further observance of the provisions of this section.

All public works contracts exceeding the amount set by ordinance may be let and purchases exceeding the amount set by ordinance may be made without advertising for bids if such work or the purchase of such materials or supplies shall be deemed by the City Council to be of urgent necessity for the preservation of life, health, or property and shall be authorized by at least five affirmative votes of the City Council.

Projects for the extension, replacement or expansion of the transmission or distribution system of any existing public utility operated by the City or for the purchase of supplies or equipment for any such project or any such utility may be excepted from the requirements of this section by the affirmative vote of a majority of the total members of the City Council.

**Section 615. GRANTING OF FRANCHISES**. The City Council shall by ordinance regulate the granting of franchises for the City.

**Section 616. INDEPENDENT AUDIT**. The City Council shall provide for an independent annual audit of all City accounts and may provide for such more frequent audits as it deems necessary. Such audits shall be made by a certified public accountant or firm of such accountants who have no personal interest, direct or indirect, in the fiscal affairs of the City government or any of its officers. The Council may, without requiring competitive bids, designate such accountant or firm annually provided that the designation for any particular fiscal year shall be made no later than thirty days after the beginning of such fiscal year. As soon as practicable after the end of the fiscal year, a final audit and report shall be submitted by such accountant to the City Council, one copy thereof to be distributed to each member. Additional copies of the audit shall be placed on file in the office of the City Clerk where they shall be available for inspection by the general public, and a copy of the financial statement as of the close of the fiscal year shall be published in the official newspaper.

**Section 617. INFRASTRUCTURE FUND**.

(a) All revenue raised by vote of the electors or imposed by vote of the City Council on or after March 5, 2002, by a measure which states that the revenue to be raised is for the purpose of infrastructure, as said term is defined in this paragraph, shall be placed in a separate fund entitled "Infrastructure Fund." The term "Infrastructure" shall mean long-lived capital assets that normally are stationary in nature and normally can be preserved for significantly greater number of years. They include storm drains, storm water pump stations, alleys, streets, highways, curbs and gutters, sidewalks, bridges, street trees, landscaped medians, parks, beach facilities, playgrounds, traffic signals, streetlights, block walls along arterial highways, and all public buildings and public ways. Interest earned on monies in the Infrastructure Fund shall accrue to that account. Monies in said Fund shall be utilized only for direct costs relating to infrastructure improvements or maintenance, including construction, design, engineering, project management, inspection, contract administration and property acquisition. Monies in said Fund shall not be transferred, loaned or otherwise encumbered for any other purpose.

(b) Revenues placed in the Infrastructure Fund shall not supplant existing infrastructure funding. The average percentage of general fund revenues utilized for infrastructure improvements and maintenance, for the five- (5) year period of 1996 to 2001, is and was 14.95%. Expenditures for infrastructure improvements and maintenance, subsequent to 2001, shall not be reduced below 15% of general fund revenues based on a five- (5) year rolling average.

(c) The City Council shall by ordinance establish a Citizens Infrastructure Advisory Board to conduct an annual review and performance audit of the Infrastructure Fund and report its findings to the City Council prior to adoption of the following fiscal-year budget.

**EXHIBIT 1**

# ARTICLE VII
## ELECTIONS

**Section 700. GENERAL MUNICIPAL ELECTIONS.** General municipal elections shall be held in the city on the first Tuesday after the first Monday in November in each even-numbered year.

**Section 701. SPECIAL MUNICIPAL ELECTIONS.** All other municipal elections that may be held by authority of this Charter, or of any law, shall be known as special municipal elections.

**Section 702. PROCEDURE FOR HOLDING ELECTIONS.** All elections shall be held in accordance with the provisions of the Elections Code of the State of California, as the same now exists or hereafter may be amended, for the holding of municipal elections, so far as the same are not in conflict with this Charter.

**Section 703. INITIATIVE, REFERENDUM AND RECALL.** There are hereby reserved to the electors of the City the powers of the initiative and referendum and of the recall of municipal elective officers. The provisions of the Elections Code of the State of California, as the same now exists or hereafter may be amended, governing the initiative and referendum and the recall of municipal officers, shall apply to the use thereof in the City so far as such provisions of the Elections Code are not in conflict with the provisions of this Charter.

**Section 704. NOMINATION PAPERS.** Nomination papers for candidates for elective municipal office must be signed by not less than twenty nor more than thirty electors of the City.

# ARTICLE VIII
## MISCELLANEOUS

**Section 800. TRANSITION.** Elective officers and elective officers whose offices are made appointive of the City shall continue to hold such offices until the completion of their current terms and the election or appointment and qualification of their respective successors under this Charter. All boards, commissions and committees presently in existence shall continue to act in accordance with their original grant of authority until such time as the City Council adopts appropriate ordinances pertaining to their activities or for one year, whichever occurs first. All lawful ordinances, resolutions, rules and regulations, and portions thereof, in force at the time this Charter takes effect and not in conflict or inconsistent herewith, are hereby continued in force until the same shall have been duly repealed, amended, changed or superseded by proper authority.

**Section 801. DEFINITIONS.** Unless the provisions or the context otherwise requires, as used in this Charter:

(a)  "Shall" is mandatory, and "may" is permissive.

(b)  "City" is the City of Huntington Beach and "department," "board," "commission," "agency," "officer," or "employee" is a department, board, commission, agency, officer or employee, as the case may be, of the City of Huntington Beach.

(c)  "County" is the County of Orange.

(d)  "State" is the State of California.

(e)  The masculine includes the feminine and the feminine includes the masculine.

(f)  The singular includes the plural and the plural the singular.

(g)     "Person" includes firm and corporation.

**Section 802. VIOLATIONS.** The violation of any provision of this Charter shall be a misdemeanor.

**Section 803. PROPERTY RIGHTS PROTECTION MEASURE.**

(a)     The City shall not enact or enforce any measure which mandates the price or other consideration payable to the owner in connection with the sale, lease, rent, exchange or other transfer by the owner of real property. Any such measure is hereby repealed.

(b)     The word "mandates" as used in subsection (a) includes any measure taken by ordinance, resolution, administrative regulation or other action of the City to establish, continue, implement or enforce any control or system of controls on the price or other terms on which real property in the city may be offered, sold, leased, rented, exchanged or otherwise transferred by its owner. The words "real property" as used in subsection (a) refer to any parcel of land or site, either improved or unimproved, on which a dwelling unit or residential accommodation is or may be situated for use as a home, residence or sleeping place.

(c)     This Section 803 shall not apply to:

(1)     any real property which contains serious health, safety, fire or building code violations, excluding those caused by disasters, for which a civil or criminal citation has been issued by the City and remains unabated for six months or longer;

(2)     any real property owned by a public entity, and real property where the owner has agreed by contract with the public entity, including the City and any of its related agencies, to accept a financial contribution or other tangible benefit including without limitation, assistance under the Community Redevelopment Law;

(3)     any planning or zoning power of the City as relates to the use, occupancy or improvement of real property and to any real property which the City or any of its related agencies may acquire by eminent domain, purchase, grant or donation;

(4)     any power of the City to require a business license for the sale or rental of real property, whether for regulation or general revenue purposes;

(5)     any dwelling unit or accommodation in any hotel, motel or other facility when the transient occupancy of that dwelling unit or accommodation is subject to a transient occupancy tax; or

(6)     to impair the obligation of any contract entered into prior to the enactment of this Section 803 or otherwise required by State law.

**Section 804. CHARTER REVIEW.** The City Council shall determine if there is a need to convene a citizen's Charter Review Commission to conduct a review of the City Charter no less frequently than every ten years.

**Section 805. SAFE AND SANE FIREWORKS.**  It shall be lawful to possess, sell, display, use or discharge within the City, those fireworks that are defined and classified as Safe and Sane Fireworks (a.k.a. "state-approved fireworks") in the California State Fireworks Law (sections 12500 et seq. of the Health and Safety Code and the relevant sections of Code of Regulations Title 19, Subchapter 6) subject to regulation by City Council.

**EXHIBIT 1**

Electronically Filed by Superior Court of California, County of Orange, 03/08/2023 07:28:46 PM.
30-2023-01312235-CU-WM-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By B. Sanchez, Deputy Clerk.
Case 8:23-cv-00421-FWS-ADS Document 1-2 Filed 03/09/23 Page 25 of 234 Page ID #:963

ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DAVID PAI, State Bar No. 227058
Supervising Deputy Attorney General
MATTHEW T. STRUHAR, State Bar No. 293973
THOMAS P. KINZINGER, State Bar No. 323889
Deputy Attorneys General
  1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7246      *Exempt from Filing Fees*
Fax: (916) 327-2319         *Government Code § 6103*
E-mail: Matthew.Struhar@doj.ca.gov
      Thomas.Kinzinger@doj.ca.gov

*Attorneys for Petitioner and Plaintiff, The People of*
*California ex rel. Rob Bonta, and the California*
*Department of Housing and Community*
*Development*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| **THE PEOPLE OF CALIFORNIA EX REL. ROB BONTA, AND THE CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT,**<br><br>          Petitioners and Plaintiffs,<br><br>    **v.**<br><br>**THE CITY OF HUNTINGTON BEACH, A MUNICIPAL CORPORATION; CITY COUNCIL OF HUNTINGTON BEACH; AL ZELINKA, in his official capacity as CITY MANAGER OF HUNTINGTON BEACH; AND DOES 1-50, INCLUSIVE,**<br><br>        Respondents and Defendants. | Case No.   30-2023-01312235-CU-WM-CJC<br>**Assigned for All Purposes**<br>Judge Erick L. Larsh<br><br>**PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**EXHIBIT 2**

**INTRODUCTION**

1.     Californians continue to suffer under a housing affordability crisis. As the Legislature has found, "[t]he lack of housing . . . is a critical problem that threatens the economic, environmental, and social quality of life in California." (Gov. Code, § 65589.5, subd. (a)(1)(A), (B).) This crisis is "hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic opportunities for workers and businesses, worsening poverty and homelessness, and undermining the state's environmental and climate objectives." (*Id.*, subd. (a)(2)(A).)

2.     A key contributor to this crisis is the failure of local governments to plan for the necessary housing supply. To remedy this, the Legislature requires local governments to include housing elements in their general plans. A housing element must include, among other things, an assessment of housing needs, an inventory of resources and constraints relevant to meeting those needs, and a program to implement the policies, goals, and objectives of the housing element. (Gov. Code, § 65580 et seq.)

3.     Local governments that do not prepare a housing element substantially in compliance with state law, thereby failing to plan for an adequate supply of housing, become subject to various legal consequences. For example, a local agency that fails to adopt a substantially compliant housing element becomes subject to the so-called "Builder's Remedy" provision of the Housing Accountability Act. (Gov. Code, § 65589.5) A local agency without a substantially compliant housing element may not deny, or apply conditions that make infeasible, a housing development project for very low-, low-, or moderate-income households on the basis of inconsistency with a zoning ordinance and land use designation in any general plan element. (Gov. Code, § 65589.5, subd. (d)(5).)

4.     In another effort to alleviate the housing crisis, the Legislature has repeatedly amended the housing laws to encourage, and streamline the approval of, permits for accessory dwelling units ("ADUs") throughout the state. (See generally, Gov. Code, §§ 65852.150, 65852.2, 65852.22.) These units are typically small, easily-constructed residential structures installed as secondary housing units on a single-family property. Current ADU law requires local

**EXHIBIT 2**

1   agencies to approve ADU projects ministerially, or if denied, provide comments to the applicant

2   regarding deficiencies and a description of how the application can be remedied.

3        5.   And, in 2021, the Legislature passed the California Housing Opportunity and More

4   Efficiency Act ("HOME Act," or "SB 9") to streamline the permitting process and remove

5   regulatory barriers for subdividing residential lots into multifamily housing projects like

6   duplexes, triplexes, and four-plexes that are more affordable to middle-class households.

7        6.   The City of Huntington Beach has decided to ignore the laws the Legislature

8   specifically crafted to address California's housing affordability crisis by barring its staff from

9   accepting and processing ADU- and SB 9-related building permits. The City has done this despite

10  the fact that the availability of decent, suitable, and affordable housing is of vital statewide

11  importance to all Californians.

12       7.   In an Action Item at its February 21, 2022 meeting, the Huntington Beach City

13  Council directed its City Manager to "cease the processing of all applications/permits brought to

14  the City by developers under SB 9, SB 10, or 'state law related' ADU projects." [1] (See Exhibit A,

15  at pp. 8-9.) In doing so, the City ignored its own ordinances.

16       8.   The City of Huntington Beach has not adopted a current housing element that is

17  substantially in compliance with state law. In failing to adopt a substantially compliant housing

18  element, Huntington Beach is now subject to the Builder's Remedy.

19       9.   At its March 7, 2023 meeting, the Huntington Beach City Council attempted to

20  excuse itself from the consequences of its failure to comply with the housing element law. It

21  introduced Ordinance No. 4285, purporting to ban Builder's Remedy projects in Huntington

22  Beach. (See Exhibit B.)

23       10.  The City Council's ban on ADU- and SB 9-eligible projects is directly in conflict

24  with the law of this state.

25

26  _____

27       [1] Senate Bill 10 added section 65913.5 to the Government Code, authorizing cities to
    *voluntarily* adopt ordinances allowing for higher residential density in a "transit-rich area" or an
28  "urban infill site," as defined. Why the Huntington Beach City Council decided to ban projects
    that would only be allowed if the City Council itself voted to allow them is unclear.

3

**EXHIBIT 2**

11.   The People of the State of California, by and through Attorney General Rob Bonta, and the Department of Housing and Community Development ("HCD"), bring this action against the City of Huntington Beach, its City Council, and its City Manager (collectively, the "City") to remedy these violations of state law. The People and HCD request that this Court issue a writ ordering the City to continue processing ADU- and SB 9-eligible projects in accordance with state law. Further, the People and HCD request this court issue a judgment declaring that the City's ban on acceptance and processing of ADU and SB 9 project applications is in conflict with the applicable law of this state and void, and to issue an injunction instructing the City to refrain from enforcing its unlawful ban. The People and HCD intend to amend this Petition and Complaint should the City follow through on additional attempts to violate state law, such as passing Ordinance No. 4285 to ban Builder's Remedy projects.

## PARTIES

12.   The Attorney General, as the chief law enforcement officer of the State of California, brings this action under his broad independent powers to enforce state laws, and on behalf of HCD. (Cal. Const., Art. V, section 13; Gov. Code, § 65585, subd. (j).)

13.   HCD is a public agency of the State of California. (Gov. Code, § 12804.) Among other duties, HCD is responsible for developing housing policy and building codes, for regulating manufactured homes and mobile home parks, and for enforcing state housing laws, such as the Housing Accountability Act and state ADU laws, in a manner that meaningfully and positively impacts the provision of housing in all communities across the state.

14.   The City of Huntington Beach is a municipal corporation formed and existing under the laws of the State of California, of which it is a political subdivision.

15.   The City Council of Huntington Beach is the elected governing body of the City of Huntington Beach.

16.   The City Manager of Huntington Beach is the city official responsible for the management and oversight of the City's various departments.

17.   The People are unaware of the true names and capacities of respondents and defendants DOES 1 through 50 (the "Doe Respondents"), who are therefore sued by fictitious

1   names pursuant to Code of Civil Procedure section 474. The People allege on information and

2   belief that each such fictitiously named Doe Respondent is responsible or liable in some manner

3   for the events and happenings referred to herein, and the People will seek leave to amend this

4   Petition and Complaint to allege their true names and capacities after the same have been

5   ascertained.

6   **VENUE AND JURISDICTION**

7   18.   This Court has jurisdiction over this action pursuant to Code of Civil Procedure

8   sections 187, 1060, and 1085.

9   19.   Venue is proper in this Court because the City is located in Orange County and the

10   violations of law alleged herein occurred in Orange County.

11   **BACKGROUND AND FACTUAL ALLEGATIONS**

12   **The Housing Crisis**

13   20.   The Legislature has declared that "[t]he availability of housing is of vital statewide

14   importance, and the early attainment of decent housing and a suitable living environment for

15   every Californian . . . is a priority of the highest order."  (Gov. Code, § 65580, subd. (a).)

16   21.   California has a crisis-level housing shortage that stems from the failure of local

17   governments to approve affordable housing to meet the needs of all Californians. For decades, the

18   Legislature has found that California has been suffering from "a severe shortage of affordable

19   housing, especially for persons and families of low and moderate income" and that "there is an

20   immediate need to encourage the development of new housing." (*Ruegg & Ellsworth v. City of*

21   *Berkeley* (2021) 63 Cal.App.5th 277, 295, quoting Gov. Code, § 65913.)

22   22.   Recently, the Legislature stated plainly that "California has a housing supply and

23   affordability crisis of historic proportions." (Gov. Code, § 65589.5, subd. (a)(2)(A).) "The

24   consequences of failing to effectively and aggressively confront this crisis are hurting millions of

25   Californians, robbing future generations of the chance to call California home, stifling economic

26   opportunities for workers and businesses, worsening poverty and homelessness, and undermining

27   the state's environmental and climate objectives." (*Ibid*.)

28   ///

The People's Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**EXHIBIT 2**

**Housing Elements and the Planning Process**

23.  State law requires that all local governments adequately plan to meet the housing needs of everyone in the community, at all economic levels. To meet this requirement, every city and county must adopt and periodically update a housing element as part of its general plan. (See Gov. Code, §§ 65302, subd. (c), 65580, et seq.) The law mandating this adoption and periodic update is known as the "Housing Element Law." (*Id.*, § 65580, et seq.)

24.  California's Housing Element Law requires local governments to adopt plans and regulatory systems that provide opportunities for, and do not unduly constrain, housing development, especially for a locality's lower-income households and workforce. As a result, housing policy in California rests largely on the effective implementation of the housing element contained in the local general plan.

25.  The housing element is a roadmap for housing development in a given community. The housing element must identify and analyze existing and projected housing needs, and must include "a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing." (Gov. Code, § 65583.) The housing element must also "identify adequate sites for housing" and "make adequate provision for the existing and projected needs of all economic segments of the community." (*Ibid.*) Each housing element is also subject to review by HCD.

26.  A local jurisdiction's housing element must be frequently updated to ensure compliance with California's Housing Element Law. (Gov. Code, § 65588.) Jurisdictions must update their housing elements every five or eight years. (See *id.*, subd. (e)(3).) Each five- or eight-year cycle is known as a "planning period." (See *id.*, subd. (f)(1).)

27.  The process of updating a housing element begins with HCD's determination of a Regional Housing Need Allocation ("RHNA") for the region for a given planning period. (Gov. Code, § 65584, subd. (a)(1).) The RHNA sets goals for housing affordable to various income levels. To arrive at the RHNA, HCD starts with demographic population information from the California Department of Finance and uses a formula to calculate a figure for each region's planning body, known as a "council of governments" ("COG"). Each COG (in this case, the

6

1  Southern California Association of Governments) also uses its own demographic figures to

2  calculate the regional housing need. Each COG coordinates with HCD to arrive at a final figure,

3  taking into account factors not captured in the calculations. This final figure is the RHNA. (See

4  *id.*, § 65584.01.)  Once the RHNA is set, the COG is responsible for allocating the housing need

5  among all of the cities and counties within that region. (Gov. Code, § 65584, subd. (b).) Each

6  local government must then prepare a housing element that identifies adequate sites to

7  accommodate that jurisdiction's fair share of the RHNA at each income level. (*Id.*, §§ 65583,

8  65583.2.))

9        28.  Each local government must submit its draft housing element to HCD before

10  adoption. (Gov. Code, § 65585, subd. (b)(1).) HCD must review the draft element and issue

11  findings as to whether the draft substantially complies with the Housing Element Law. (*Id.*,

12  subds. (b)(3), (d).) After adopting the final housing element, the local government must again

13  submit the element to HCD, and HCD must again review and report its findings to the local

14  government. (*Id.*, subds. (g), (h).)

15                    **The Housing Accountability Act and the "Builder's Remedy"**

16        29.  The Legislature originally enacted the Housing Accountability Act ("HAA") in 1982

17  in an effort to compel local governments to approve more housing, and has repeatedly amended

18  the law to increase its effectiveness. (Gov. Code, § 65589.5, subd. (a); *Ruegg*, supra, 63

19  Cal.App.5th at pp. 295–297.) In 1990, the Legislature made the HAA expressly applicable to

20  charter cities. (*California Renters Legal Advoc. & Educ. Fund v. City of San Mateo* (2021) 68

21  Cal. App. 5th 820, 835.)

22        30.  In general, the HAA provides that when a proposed housing development complies

23  with applicable general plan, zoning, and development policies, the local agency may disapprove

24  the project (or approve it on condition that it be developed at lower density) only if the local

25  agency finds that the project would have a specific, adverse, and unavoidable impact on public

26  health or safety. (Gov. Code, § 65589.5, subd. (j)(1).)

27        31.  Specifically, a local agency must approve any housing development project that

28  complies with locally adopted objective standards, unless it can make two written findings based

7

**EXHIBIT 2**

on a preponderance of evidence in the record. (Gov. Code, § 65589.5, subd. (j)(1).) First, the proposed development must have a significant and adverse impact on public health or safety. (*Id.*, subd. (j)(1)(A).) Second, disapproval must be the only means of mitigating or avoiding the impact. (*Id.*, subd. (j)(1)(B).) These findings must be project-specific, and the public health or safety impact must constitute "a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete." (*Id.*, subd. (j)(1)(A).)

32.   If the local agency considers a proposed housing development project to be inconsistent, not in compliance, or not in conformity with an applicable objective standard, it must provide the project applicant with "written documentation" that identifies the applicable provision or provisions, along with "an explanation of the reason or reasons it considers the housing development to be inconsistent, not in compliance, or not in conformity" with those standards. This explanation is due within 30 days an application is deemed complete for a housing development with 150 or fewer housing units, or within 60 days an application is deemed complete for a housing development with more than 150 housing units. (*Id.*, subd. (j)(2)(A).) If this documentation is not provided by the applicable deadline, the application is deemed consistent with the applicable standards. (*Id.*, subd. (j)(2)(B).)

33.   The foregoing provisions of subdivision (j) apply to all housing development projects. Where a proposed housing development includes affordable housing, a local agency's discretion to deny the project is even further constrained. (*Id.*, subd. (d).) An affordable housing project may only be denied under five specific and narrow circumstances.

34.   The 1990 HAA amendments modified subdivision (d) to provide that cities and counties could only deny, or apply conditions that make infeasible, a housing development project for very low-, low- or moderate-income households or an emergency shelter if they are able to make one of five specific findings. (Gov. Code, § 65589.5, subd. (d).) Those five findings, paraphrased, are:

(1) The city or county has met or exceeded its RHNA for the proposed income categories in the development.

The People's Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**EXHIBIT 2**

(2) The housing development or emergency shelter would have a specific adverse impact on public health and safety, and there is no way to mitigate or avoid the impact without making the development unaffordable. Such an impact must be based on objective, written public health or safety standards in place when the application was deemed complete.

(3) The denial or imposition of conditions is required to comply with state or federal law, and there is no feasible method to comply without making the development unaffordable.

(4) The project is proposed on land zoned for agriculture or resource preservation that is surrounded on at least two sides by land being used for agriculture or resource preservation, or there are not adequate water or sewage facilities to serve the project.

(5) The project is inconsistent with both the zoning ordinance and the land use designation as specified in any general plan element, and the jurisdiction has adopted a substantially compliant housing element.

35.  The last of these five findings, subdivision (d)(5), is the source of the so-called Builder's Remedy. By negative implication, if a locality has *not* adopted a housing element in substantial compliance with state law, it *cannot* deny a project that includes affordable housing on grounds that it does not comply with a zoning or land-use designation.

**The ADU Laws**

36.  One effective means of increasing the housing supply is by removing regulatory barriers to accessory dwelling units, or ADUs. ADUs are sometimes also known as "granny flats," "in-law units," "backyard cottages," or "secondary units," among other names. These small structures provide a cost-effective solution to increasing the housing supply on a rapid timescale.

37.  ADUs have many benefits. They are affordable to construct, since they typically use comparatively inexpensive wood frame construction, and no new land acquisition or major infrastructure is required. ADUs can also provide a source of income for homeowners when rented, increasing incentives for homeowners to build ADUs on their property. In addition, ADUs

9

1    enable extended families to reside close to one another, and for seniors to age in place with family

2    members while maintaining an independent living space. (See generally, Accessory Dwelling

3    Units, Department of Housing and Community Development, available at

4    https://www.hcd.ca.gov/policy-and-research/accessory-dwelling-units.)

5            38.   In recent years, the Legislature has repeatedly amended the housing laws to legalize

6    and promote the construction of accessory dwelling units. In 2018, as part of a package of updates

7    to the housing laws that, among other things, made the ADU laws applicable to charter cities for

8    the first time, the Legislature found and declared all of the following:

9            (1) Accessory dwelling units are a valuable form of housing in California.

10           (2) Accessory dwelling units provide housing for family members, students, the elderly,

11               in-home health care providers, the disabled, and others, at below market prices within

12               existing neighborhoods.

13           (3) Homeowners who create accessory dwelling units benefit from added income, and

14               an increased sense of security.

15           (4) Allowing accessory dwelling units in single-family or multifamily residential zones

16               provides additional rental housing stock in California.

17           (5) California faces a severe housing crisis.

18           (6) The state is falling far short of meeting current and future housing demand with

19               serious consequences for the state's economy, our ability to build green infill consistent

20               with state greenhouse gas reduction goals, and the well-being of our citizens,

21               particularly lower and middle-income earners.

22           (7) Accessory dwelling units offer lower cost housing to meet the needs of existing and

23               future residents within existing neighborhoods, while respecting architectural character.

24           (8) Accessory dwelling units are, therefore, an essential component of California's

25               housing supply.

26    (Gov. Code, § 65852.150, subd. (a).)

27           39.   The bulk of the ADU laws are set forth at Government Code section 65850 et seq.

28    These laws broadly restrict the ability of local agencies, whether general law or charter cities, to

10

1   deny ADU projects within their jurisdiction, and set tight deadlines for processing applications.

2       40.   Relevant to this litigation, Government Code section 65852.2, subdivisions (a)(3)(A)

3   and (b)(1), require permitting agencies to approve or deny ADU applications ministerially and

4   without discretionary review within 60 days of a complete application's submittal. Under both

5   provisions, "[i]f the local agency has not acted upon the completed application within 60 days,

6   [an] application shall be deemed approved." In addition, Government Code section 65852.2,

7   subdivision (e)(1), states "a local agency shall ministerially approve an application for a building

8   permit within a residential or mixed-use zone to create" ADUs that meet specific requirements.

9       41.   In addition, a local agency that denies an ADU application must provide "in writing a

10   full set of comments to the applicant with a list of items that are defective or deficient and a

11   description of how the application can be remedied by the applicant." (Gov. Code, § 65852.2,

12   subd. (b)(2).)

13       42.   Government Code section 65852.2, subdivision (a)(7), further provides: "No other

14   local ordinance, policy, or regulation shall be the basis for the delay or denial of a building permit

15   or a use permit under this subdivision."

16                                           **Senate Bill 9**

17       43.   The Legislature introduced Senate Bill 9 in 2021 in an effort to streamline the process

18   for creating duplexes or for subdividing an existing lot. SB 9 restrained the discretion of local

19   agencies by creating a ministerial process for such project approvals.

20       44.   SB 9 ultimately allows up to four homes on lots where only one existed previously,

21   by permitting existing single-family homes to be converted to duplexes or single-family lots to be

22   subdivided into two lots on which two duplexes could be built. (See SB 9 Senate Floor Analysis,

23   August 28, 2021, available at

24   https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB9.)

25       45.   SB 9 added, among other provisions, sections 65852.21 and 66411.7 to the

26   Government Code. Section 65852.21 requires local agencies to approve a proposed housing

27   development consisting of two residential units within a single-family zone on a ministerial basis.

28   Section 66411.7 requires local agencies to approve a lot split in a single-family zone on a

**EXHIBIT 2**

1    ministerial basis. Both provisions became operative on January 1, 2022.

2        46.  SB 9 placed limits on a local agency's ability to deny proposed projects, but it did not

3    entirely eliminate local agencies from the approval process. Local agencies are still permitted to

4    "impose objective zoning standards, objective subdivision standards, and objective design review

5    standards," so long as such standards do not have "the effect of physically precluding the

6    construction of up to two units or...would physically preclude either of the two units from being at

7    least 800 square feet in floor area" within a single-family zone. (Gov. Code, § 65852.21, subd.

8    (b).) Similarly, local agencies can impose "objective" standards with respect to lot splits, so long

9    as those standards do not "have the effect of physically precluding the construction of two units

10   on either of the resulting parcels or that would result in a unit size of less than 800 square feet"

11   within a single-family zone. (Gov. Code, § 66411.7, subd. (c).) Finally, the legislative body of a

12   local agency may reject an SB 9 project if it finds, based on a preponderance of the evidence, that

13   the proposed project would have a "specific, adverse impact" on "public health and safety or the

14   physical environment and for which there is no feasible method to satisfactorily mitigate or avoid

15   the specific, adverse impact." (Gov. Code, §§ 65852.21, subd. (d); 66411.7, subd. (d); see also

16   65589.5, subd. (d)(2).)

17                          **The Housing Crisis Act**

18       47.  The Housing Crisis Act of 2019 ("HCA") prohibits a local government from "enact[ing]

19   a development policy, standard, or condition" that would have the effect of "[c]hanging the

20   general plan land use designation, specific plan land use designation, or zoning of a parcel or

21   parcels of property to a less intensive use or reducing the intensity of land use within an existing

22   general plan land use designation, specific plan land use designation, or zoning district in effect at

23   the time of the proposed change, below what was allowed under the land use designation or

24   zoning ordinances … in effect on January 1, 2018." (Gov. Code, § 66300, subd. (b)(1)(A).) The

25   statute defines "reducing the intensity of land use" to include "any other action that would

26   individually or cumulatively reduce the site's residential development capacity." (*Ibid*.)

27       48.  The HCA also prohibits a local government from "[i]mposing a moratorium or

28   similar restriction or limitation on housing development … within all or a portion of the

**EXHIBIT 2**

1    jurisdiction … other than to specifically protect against an imminent threat to the health and

2    safety of persons residing in, or within the immediate vicinity of, the area subject to the

3    moratorium….” (Gov. Code, § 66300, subd. (b)(1)(B)(i).)

4         49.  In addition, a local agency shall not enforce such “a moratorium or other similar

5    restriction on or limitation of housing development until it has submitted the ordinance to, and

6    received approval from, [HCD].” (Gov. Code, § 66300, subd. (b)(1)(B)(ii).) If HCD denies

7    approval, “that ordinance shall be deemed void.” (*Ibid.*)

8                    **Huntington Beach's Violations of State Housing Laws**

9         50.  At its February 21, 2023 meeting, the Huntington Beach City Council adopted Action

10   Item No. 23-172 (the “Action Item”), directing the City Manager to “cease the processing of all

11   applications/permits brought to the City by developers under SB 9, SB 10, or ‘state law related’

12   ADU projects, until the courts have adjudicated the matter(s).”[2] The Action Item also directs the

13   City Attorney to “take any legal action necessary to challenge SB 9 and SB 10 and the laws that

14   permit ADU's [sic].”

15        51.  In deliberating over the Action Item, the City did not cite any statutory exemption

16   under SB 9 as a basis for the Action Item, nor did it make any findings that the Action Item is

17   necessary to protect the public from an immediate, adverse impact to health or safety.

18        52.  On February 22, 2023, the City, pursuant to its Action Item, began refusing to accept

19   any ADU and SB 9 permit applications. (See Planning Division, City of Huntington Beach's

20   website, available at https://www.huntingtonbeachca.gov/government/departments/planning/, last

21   visited March 7, 2023 [stating that, effective February 22, 2023, no SB 9 or ADU permit

22   applications are being accepted until “any legal challenges are resolved.”].) The City did so even

23   though it had not, and has not yet, initiated any legal action challenging SB 9 or the state's ADU

24   laws.

25        53.  The Action Item, by instructing City staff to reject SB 9 projects that are otherwise

26   compliant with applicable objective standards without making any of the written findings

27        ─────────────
         [2] As noted in footnote 1 supra, SB 10 permits local agencies to adopt ordinances allowing
28   for increased density near transit-rich and/or urban infill sites. It is a voluntary, opt-in upzoning
     law.

The People's Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**EXHIBIT 2**

1   required by law, violates the Housing Accountability Act.

2       54.  The Action Item, by imposing a moratorium on SB 9 and ADU permit application

3   processing, also violates the Housing Crisis Act.

4       55.  In addition, at its March 7, 2023 meeting, the City Council introduced Ordinance No.

5   4285, which would amend section 202.04 of the Huntington Beach Zoning and Subdivision

6   Ordinance to "expressly prohibit[] the processing or approval of any application for a housing

7   development project or any project not in conformance with the zoning and General Plan land use

8   designation … regardless of the so-called 'Builder's Remedy' (under the Housing Accountability

9   Act or any other State law), that portend to allow developers of affordable housing projects to

10   bypass the zoning code and general plan of cities that are out of compliance with the Housing

11   Element Law." (See Exhibit B.)

12       56.  The proposed Ordinance No. 4285 makes no specific supporting findings other than

13   to state that it comports with the City's General Plan.

14       57.  Ordinance No. 4285, and its purported ban on Builder's Remedy projects, is directly

15   in conflict with the Housing Accountability Act.

16       58.  Ordinance No. 4285 also violates the Housing Crisis Act, and if invoked on certain

17   proposed projects subject to other state law protections, stands to violate state fair housing laws

18   under Government Code sections 8899.50 and 65008, density bonus law under Government Code

19   section 65915 et seq., and ministerial approval laws under SB 35 (Gov. Code § 65913.4), SB 6

20   and AB 2011 (Gov. Code §§ 65852.24 and 65912.110).

21       **These Violations Occurred Despite Numerous Warnings**

22       59.  The City Council knowingly violated state laws, as alleged above, despite numerous

23   warnings from both HCD and the Attorney General's Office to both the City Council, the City's

24   Planning Commission, and the City Attorney.

25       60.  On January 9, 2023, HCD issued a Notice of Potential Violation to the City's

26   Planning Commission with respect to the recommendation to adopt Ordinance No. 4285 banning

27   Builders' Remedy projects.

28

61.  On February 13, 2023, HCD issued a second Notice of Potential Violation regarding Ordinance No. 4285. That same day, the Attorney General's Office also transmitted a letter to City Attorney Michael Gates warning that, if adopted, Ordinance No. 4285 would conflict with state law.

62.  On February 21, 2023, HCD issued a Notice of Potential Violation to the City Council regarding the Action Item to cease accepting ADU permit applications.

63.  That same day, the Attorney General's office transmitted a letter to the City Council regarding the Action Item to cease accepting SB 9 permit applications.

64.  On February 22, 2023, HCD issued a Notice of Violation regarding the City Council's decision to adopt the Action Item.

65.  On February 23, 2023, the Attorney General's Office transmitted a letter to the City Attorney requesting him to confirm that (1) the City will refuse to process any permit applications made under SB 9, including permit applications filed pursuant to the City of Huntington Beach's Zoning Text Amendment 22-002, (2) the City is no longer processing any ADU applications, and (3) the City Attorney has not yet initiated any legal action challenging SB 9 or the state's ADU laws.

66.  On February 27, 2023, the City Attorney responded to the Attorney General's Office by email, stating that (1) he did not believe there to be any pending SB 9 permit applications, (2) the City continued to process existing applications but would not be taking new applications, and (3) he had not yet initiated any legal action at the City Council's direction, but would be consulting with the City Council in closed session on March 7th to discuss the matter.

67.  On March 6, 2023, HCD issued another Notice of Potential Violation with respect to the proposed Ordinance No. 4285 banning Builder's Remedy projects.

### FIRST CAUSE OF ACTION
**Writ of Mandate (Code Civ. Proc., § 1085; Gov. Code, § 65585, subd. (n)) – Violation of Gov. Code, §§ 65852.2 (ADU), 65852.21, 66411.7 (SB 9)**
**[Against All Defendants]**

68.  Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

1     69.  Under state law, the City must process ADU applications ministerially and without
2     discretionary review within 60 days of a complete application's submittal. (Gov. Code, §
3     65852.2.)

4     70.  The City must also, before denying any ADU application, provide "in writing a full
5     set of comments to [an] applicant with a list of items that are defective or deficient and a
6     description of how the application can be remedied by the applicant." (Gov. Code, § 65852.2,
7     subd. (b)(2).)

8     71.  Government Code section 65852.2, subdivision (a)(7), further provides "[n]o other
9     local ordinance, policy, or regulation shall be the basis for the delay or denial of a building permit
10    or a use permit under this subdivision."

11    72.  Under SB 9, the City must process, on a ministerial basis, (1) proposed housing
12    developments consisting of two residential units within a single-family zone, and (2) lot splits
13    within a single-family zone. (Gov. Code, §§ 65852.21, 66411.7.)

14    73.  The City is not complying with these mandatory duties. As alleged above, the City
15    has ceased accepting and processing ADU and SB 9 permit applications.

16    74.  The City's failure to process these applications is arbitrary, capricious, entirely
17    lacking in evidentiary support, contrary to established public policy, unlawful, procedurally
18    unfair, an abuse of discretion, and a failure to act as required by law.

19    75.  Accordingly, a writ of mandate should issue ordering the City to comply with the
20    ADU law and SB 9. (Gov. Code, §§ 65852.2, 65852.21, 66411.7.)

21    76.  Petitioners have a beneficial interest in the issuance of such a writ and have a
22    significant interest in ensuring that the City complies with the law.

23    77.  Petitioners have exhausted all required administrative remedies, or are excused from
24    exhausting their remedies due to the futility of pursuing such remedies, among other things.

25    78.  Petitioners have no plain, speedy, or adequate remedy in the ordinary course of law.
26    The only remedy provided by law to obtain relief is this Petition for Writ of Mandate pursuant to
27    Code of Civil Procedure section 1085.

28

The People's Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**EXHIBIT 2**

**SECOND CAUSE OF ACTION**
**Declaratory and Injunctive Relief (Code Civ. Proc., § 1060; Gov. Code, § 65585, subd. (n)) –**
**Violation of Gov. Code, § 66300 (Housing Crisis Act of 2019)**
**[Against All Defendants]**

79.  Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

80.  There is a controversy between Petitioners and the City as to whether the City's ban on ADU and SB 9 projects complies with the Housing Crisis Act of 2019. As alleged above, Petitioners believe that the City's ban on ADU and SB 9 projects does not comply with the HCA because it reduces the intensity of land use and is an effective moratorium on housing development. Petitioners further believe that the City does not intend to become compliant with these laws. Further, based on information and belief, Petitioners allege that the City is deliberately defying applicable state law. It is necessary and appropriate for the Court to render a declaratory judgment that sets forth the parties' legal rights and obligations with respect to whether the City's ban is compliant with the HCA.

81.  In addition to these remedies, Petitioners are entitled to prospective relief directing the City to comply with the HCA.

82.  Petitioners therefore request a declaration that the City's ban on ADU and SB 9 projects violates the Housing Crisis Act of 2019. (Gov. Code, § 66300.)

**THIRD CAUSE OF ACTION**
**Declaratory and Injunctive Relief (Code Civ. Proc., § 1060; Gov. Code, § 65585, subd. (n)) –**
**Violation of Gov. Code, § 65589.5 (Housing Accountability Act)**
**[Against All Defendants]**

83.  Petitioners incorporate by reference each and every allegation of the preceding paragraphs.

84.  There is a controversy between Petitioners and the City as to whether the City's ban on SB 9 projects complies with the Housing Accountability Act. As alleged, Petitioners believe that the City's ban on SB 9 projects does not comply with the HAA because it requires the City to reject housing projects that are otherwise compliant with locally adopted objective standards without making any of the written findings required by law. Petitioners further believe that the

17

1    City does not intend to become compliant with the HAA. Further, based on information and

2    belief, Petitioners allege that the City is deliberately defying applicable state law.

3          85.  It is necessary and appropriate for the Court to render a declaratory judgment that sets

4    forth the parties' legal rights and obligations with respect to whether the City's ban violates the

5    HAA.

6          86.  In addition to these remedies, Petitioners are entitled to prospective relief directing

7    the City to comply with the HAA.

8          87.  Petitioners therefore request a declaration that the City's ban on SB 9 projects

9    violates the Housing Accountability Act. (Gov. Code, § 65589.5.)

10                              **PRAYER FOR RELIEF**

11    WHEREFORE, Petitioners pray as follows:

12    1.  For a writ of mandate ordering the City to continue processing SB 9 and ADU permit

13         applications in compliance with SB 9 and ADU laws. (Gov. Code, §§ 65852.2;

14         65852.21; 66411.7; 65586, subd. (n).)

15    2.  For a declaration that the City is in violation of the Housing Crisis Act of 2019, and its

16         moratorium on SB 9 and ADU permit applications is in conflict with the law of this

17         state and void. (Gov. Code, §§ 66300; 65585, subd. (n))

18    3.  For a declaration that the City is subject to the Housing Accountability Act and its ban

19         on SB 9 projects is in conflict with the law of this state and void. (Gov. Code, §§

20         65589.5; 65585, subd. (n).)

21    4.  For an injunction requiring the City to comply with the Housing Crisis Act of 2019 and

22         to refrain from enforcing its moratorium on SB 9 and ADU permit applications. (Gov.

23         Code, §§ 66300; 65585, subd. (n).)

24    5.  For an injunction requiring the City to comply with the Housing Accountability Act and

25         to refrain from enforcing its ban on SB 9 projects. (Gov. Code, §§ 65589.5; 65585,

26         subd. (n))

27

28

The People's Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**EXHIBIT 2**

1      6. For monetary fines imposed by statute, in an amount as the court shall deem proper

2         under the Housing Accountability Act and any other state laws. (Gov. Code, § 65585,

3         subd. (n).)

4      7. For costs and attorneys' fees.

5      8. For any other relief the Court may deem appropriate.

7  Dated:  March 8, 2023            Respectfully submitted,

8                           ROB BONTA
                           Attorney General of California

9                           DANIEL A. OLIVAS
                           Senior Assistant Attorney General

10                         DAVID PAI
                           Supervising Deputy Attorney General

14                         THOMAS P. KINZINGER
                         Deputy Attorney General
                         *Attorneys for Petitioner and Plaintiff, The*
                         *People of California ex rel. Rob Bonta,*
                         *and the California Department of Housing*
                         *and Community Development*

17  SA2023301106

The People's Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**EXHIBIT 2**

# EXHIBIT A

**EXHIBIT 2**



# AGENDA

### City Council/Public Financing Authority

### Tuesday, February 21, 2023

### Special Meeting of the Housing Authorithy

### 3:30 PM Study Session
### 6:00 PM Regular Business Meeting

**MAYOR AND CITY COUNCIL**
*TONY STRICKLAND, Mayor*
*GRACEY VAN DER MARK, Mayor Pro Tem*
*RHONDA BOLTON, Councilmember*
*PAT BURNS, Councilmember*
*DAN KALMICK, Councilmember*
*CASEY McKEON, Councilmember*
*NATALIE MOSER, Councilmember*

**Council Chambers**
**2000 Main Street**
**Huntington Beach, CA 92648**
**--or--**
**Virtual via Zoom Webinar**

**STAFF**
*AL ZELINKA, City Manager*
*MICHAEL E. GATES, City Attorney*
*ROBIN ESTANISLAU, City Clerk*
*ALISA BACKSTROM, City Treasurer*

**IN-PERSON PUBLIC PARTICIPATION/ZOOM ACCESS: Members wishing to attend the meeting in person are encouraged to wear a face covering.**

Assembly Bill 361 (AB 361) authorizes public meetings to take place via teleconference (i.e., virtual using Zoom), or in person if in part, State and Local officials continue to recommend measures to promote social distancing.  In addition to this hybrid format, alternate ways to view City Council meetings live or on-demand remain:  livestreamed on HBTV Channel 3 (replayed on Wednesday's at 10:00 a.m. and Thursday's at 6:00 p.m.); live and archived meetings for on-demand viewing accessed from https://huntingtonbeach.legistar.com/calendar; or, from any Roku, Fire TV or Apple device by downloading the Cablecast Screenweave App and searching for the City of Huntington Beach channel.

**PUBLIC COMMENTS:**  Individuals wishing to provide a comment on agendized or non-agendized items, including Study Session, Closed Session, and Public Hearing, may do so in person by completing a **Request to Speak** form delivered to the City Clerk, or from a virtual location by entering **Zoom Webinar ID 971 5413 0528** via computer device, or by phone at **(669) 900-6833.**  The **Zoom Webinar** can be accessed here: https://huntingtonbeach.zoom.us/j/97154130528.  Instructions for those utilizing computer devices to request to speak are provided in each section of the agenda where public comments are accepted.

Members of the public unable to personally participate in the meeting but interested in communicating with the City Council on agenda-related items are encouraged to submit a written (supplemental) communication via email at SupplementalComm@Surfcity-hb.org, or City.Council@surfcity-hb.org.  Supplemental Communications are public record, and if received by 2:00 PM on the day of the meeting, will be distributed to the City Council prior to consideration of agenda-related items, posted to the City website, and announced, but not read, at the meeting.  Communications received following the 2:00 PM deadline will be incorporated into the administrative record.

**MEETING ASSISTANCE NOTICE:** In accordance with the Americans with Disabilities Act, services are available to members of our community who require special assistance to participate in public meetings. If you require special assistance, 48-hour prior notification will enable the City to make reasonable arrangements for an assisted listening device (ALD) for the hearing impaired, American Sign Language interpreters, a reader during the meeting and/or large print agendas. Please contact the City Clerk's Office at (714) 536-5227 for more information.

**EXHIBIT 2**

City Council/Public Financing
Authority

**AGENDA**

February 21, 2023

**3:30 PM - COUNCIL CHAMBERS**

<u>**CALL TO ORDER**</u>

<u>**ROLL CALL**</u>

Kalmick, Moser, Van Der Mark, Strickland, McKeon, Bolton, Burns

**CITY COUNCILMEMBER COMMENTS (3-Minute Time Limit) - The Mayor will facilitate a voluntary opportunity for members of the Huntington Beach City Council to individually make brief comments to the public.  Please note that the Brown Act does not allow for lengthy comments, discussion, or action on topics that are not on the agenda.**

<u>**ANNOUNCEMENT OF SUPPLEMENTAL COMMUNICATIONS (Received After Agenda Distribution)**</u>

<u>**PUBLIC COMMENTS (3 Minute Time Limit)**</u>

**At this time, the City Council will receive comments from members of the public regarding any topic, including items on the Study Session and/or Closed Session agendas.  Individuals wishing to provide a comment on item(s) may do so in person by filling out a Request to Speak form delivered to the City Clerk.  All speakers are encouraged, but not required to identify themselves by name. Each speaker may  have up to 3 minutes unless the volume of speakers warrants reducing the time allowance.**

**Please note that the Brown Act does not allow discussion or action on topics that are not on the agenda.  Members of the public who would like to speak directly with a Councilmember on an item not on the agenda may consider scheduling an appointment by contacting the City Council's Administrative Assistant at (714) 536-5553 or emailing the entire City Council at city.council@surfcity-hb.org.**

<u>**STUDY SESSION**</u>

1.   **23-158**      **City's Infrastructure Report Card**

**RECESS TO CLOSED SESSION**

<u>**CLOSED SESSION**</u>

2.   **23-151**      **CONFERENCE WITH LEGAL COUNSEL-EXISTING LITIGATION. (Paragraph (1) of subdivision (d) of Section 54956.9.  Name of case: Gapezzani (Gary) v. John Romero, City of Huntington Beach; OCSC Case No.: 30-2021-01225030.**

3.   **23-161**      **CONFERENCE WITH LABOR NEGOTIATORS (Gov. Code section**

**EXHIBIT 2**

54957.6.)   Agency designated representatives: Al Zelinka, City Manager, and Peter Brown, Chief Negotiator; also in attendance: Jose Rodriguez, Human Resources Manager; Travis Hopkins, Assistant City Manager; Michael E. Gates, City Attorney; Eric Parra, Chief of Police; and Sunny Rief, Acting Chief Financial Officer. Employee Organization: Police Officers' Association (POA).

4.   **23-170**   **CONFERENCE WITH LEGAL COUNSEL-LITIGATION (Gov. Code section 54956.9(d)(4).): Number of Matters: One (1).**

**6:00 PM – COUNCIL CHAMBERS**

**RECONVENE CITY COUNCIL/PUBLIC FINANCING AUTHORITY MEETING AND CALL TO ORDER THE SPECIAL MEETING OF THE HOUSING AUTHORITY**

**ROLL CALL**

Kalmick, Moser, Van Der Mark, Strickland, McKeon, Bolton, Burns

**PLEDGE OF ALLEGIANCE**

**INVOCATION**

In permitting a nonsectarian invocation, the City does not intend to proselytize or advance any faith or belief. Neither the City nor the City Council endorses any particular religious belief or form of invocation.

5.   **22-1118**   **Chaplain Roger Wing with the Huntington Beach Fire Department**

**CLOSED SESSION REPORT BY CITY ATTORNEY**

**ANNOUNCEMENT OF SUPPLEMENTAL COMMUNICATIONS (Received After Agenda Distribution)**

**PUBLIC COMMENTS (3 Minute Time Limit)**

At this time, the City Council will receive comments from members of the public regarding any topic, including items on the open session agenda.  Individuals wishing to provide a comment may do so in person by filling out a Request to Speak form delivered to the City Clerk.  All speakers are encouraged, but not required to identify themselves by name. Each speaker may have up to 3 minutes unless the volume of speakers warrants reducing the time allowance.

Please note that the Brown Act does not allow discussion or action on topics that are not on the agenda.  Members of the public who would like to speak directly with a Councilmember on an item not on the agenda may consider scheduling an appointment by contacting the City Council's Administrative Assistant at (714) 536-5553 or emailing the entire City Council at

**EXHIBIT 2**

city.council@surfcity-hb.org.

While the City Council welcomes public involvement and supports and defends free speech, the City Council rejects comments from anyone that are discriminatory, defamatory or otherwise not protected free speech. Those comments will not inform nor be considered by the City Council and may be cause for the Mayor to interrupt the public speaker. Such public comments will not be consented to or otherwise adopted by the City Council in its discussions and findings for any matter tonight.

## COUNCIL COMMITTEE  APPOINTMENT ANNOUNCEMENTS

Councilmembers may make brief announcements on any appointments made to a board, committee, or commission.  Councilmembers may not discuss or take any action on these announcements.  Announcements are limited to 1 minute.

## AB 1234 REPORTING

Per AB 1234 (Government Code Section 53232.3(d)) Councilmembers who attend a meeting, conference, or similar event at the expense of the City must provide a brief report of the meeting, conference, or similar event during the next regular City Council meeting.  Reports are limited to 1 minute.

## OPENNESS IN NEGOTIATION DISCLOSURES

Councilmembers must publicly disclose any meetings or communications with City employee associations, related to the negotiations of labor agreements.  Disclosures are limited to 1 minute and must be made by the next regular City Council Meeting.

## CITY MANAGER'S REPORT

6.    **23-174**        **Main Street Redevelopment Project - Additional Outreach Update**

7.    **23-159**        **Update on the Review of the City's Membership in the Orange County Power Authority (OCPA) Joint Power Authority**

## CITY CLERK'S REPORT

8.    **23-166**        **Presentation on the Safe and Sane Fireworks Stand Application and Lottery Process for 2023**

## CONSENT CALENDAR

## Office of City Clerk

9.    **23-146**        **Approve and Adopt Minutes**

**EXHIBIT 2**

| City Council/Public Financing Authority | AGENDA | February 21, 2023 |
|---|---|---|

**Recommended Action:**

Approve and adopt the City Council/Public Financing Authority regular meeting and the Housing Authority special meeting minutes of February 7, 2023.

<u>**Office of City Manager**</u>

10.  **23-154**    **City Council to consider positions by Intergovernmental Relations Committee (IRC)**

**Recommended Action:**

Consider one or more of the actions on the following issues proposed by the IRC:

1. Submit a Letter of Support for SB 381 (Min) - Electric Bicycles Study; and,
2. Recommend that staff issue Request for Qualifications for State Legislative Advocacy Services and Federal Legislative Advocacy Services separately.

<u>**Community Development Department**</u>

11.  **23-104**    **Approve and authorize execution of Amendment No. 1 to License Agreement between the City of Huntington Beach and PCH Beach Resort, LLC, for the beach concession at 21529 Pacific Coast Highway**

**Recommended Action:**

A)  Approve "Amendment No. 1 to License Agreement Between the City of Huntington Beach and  PCH Beach Resort, LLC" for the Concession Stand at 21529 Pacific Coast Highway; and,

B)  Authorize the Mayor, City Manager, and City Clerk to execute the Amendment and other related documents.

12.  **23-147**    **Consider for approval Bonanni Development Company IV, LLC Affordable Housing Agreement for the development of 35 ownership units at 19070 Holly Lane**

**Recommended Action:**

A)  Approve the "Affordable Housing Agreement for 19070 Holly Lane, Huntington Beach by and Between the City of Huntington Beach, a California Municipal Corporation and Bonanni Development Company IV, LLC, a Limited Liability Corporation" for the development of 35 ownership units at 19070 Holly Lane; and,

B)  Authorize the City Manager or their designee to implement and execute the Affordable Housing Agreement for the Project, including all necessary related documents; and,

C)  Authorize the City Manager to execute an amendment to the Affordable Housing Agreement, as prepared by the City Attorney, should the Developer upon completion of the Project decide to rent instead of sell the townhomes due to market conditions; and,

**EXHIBIT 2**

| City Council/Public Financing Authority | AGENDA | February 21, 2023 |
| --- | --- | --- |

D)  Authorize the Housing Authority Executive Officer or their designee to execute all necessary implementing agreements and related documents.

**Fire Department**

**13.**   **22-807**        **Authorize execution of an agreement with Toyota for vehicles for Marine Safety, Beach Parking, and Beach Maintenance and approve appropriation of funds**

**Recommended Action:**

Authorize the Mayor and City Clerk to execute "Promotional Agreement Between the City of Huntington Beach and Southern California Toyota Dealers Advertising Association" to provide 24 vehicles for Marine Safety, Beach Parking, and Beach Maintenance uses; approve the appropriation of $216,869 in Equipment Replacement Fund 324 and $22,150 in the General Fund Fleet Maintenance business unit 10085705 to upfit and maintain the vehicles.

**14.**   **23-099**        **Adopt Resolution No. 2023-04 authorizing certain City Officials to execute Grant Applications and Documents**

**Recommended Action:**

Adopt Resolution No. 2023-04, "A Resolution of the City Council of the City of Huntington Beach Authorizing Certain City Officials to Execute Grant Applications and Documents."

**15.**   **23-100**        **Adopt Resolution No. 2023-05 authorizing certain City Officials to execute Applications and Documents to Obtain Disaster and Emergency Relief**

**Recommended Action:**

Adopt Resolution No. 2023-05, "A Resolution of the City Council of the City of Huntington Beach Authorizing Certain City Officials to Execute Applications and Documents to Obtain Disaster and Emergency Relief."

**16.**   **23-139**        **Adopt Resolution No. 2023-06 to accept Grant Funds from the California Department of Fish and Wildlife, Office of Spill Prevention and Response for Oil Response Equipment**

**Recommended Action:**

Adopt Resolution No. 2023-06, "A Resolution of the City Council of the City of Huntington Beach to Accept Grant Funds from the California Department of Fish and Wildlife, Office of Spill Prevention and Response for Oil Spill Response Equipment."

**Police Department**

**17.**   **23-144**        **Adopt Ordinance No. 4275 to Amend to Huntington Beach Municipal**

**EXHIBIT 2**

Code Chapter 13.08.070 Relating to Dogs and Other Animals - Approved for Introduction February 7, 2023 - Vote: 7-0

**Recommended Action:**

Adopt Ordinance No. 4275, "An Ordinance of the City of Huntington Beach Amending Chapter 13.08 of the Huntington Beach Municipal Code Relating to Dogs and Other Animals."

## Public Works Department

**18.    23-054**    **Award and authorize the execution of a construction contract with Mehta Mechanical Company, Incorporated, in the amount of $10,648,600 for the Heil Avenue Storm Water Pump Station Replacement Project, CC-1293**

**Recommended Action:**

A)  Accept the lowest responsive and responsible bid submitted by the Mehta Mechanical Company, Incorporated, in the amount of $10,648,600; and,

B)  Authorize the Mayor and the City Clerk to execute a construction contract in a form approved by the City Attorney.

**19.    23-122**    **Authorize the City Manager to Sign a Letter of Commitment for the Local Groundwater Supply Improvement Project ("Local SiP") Application for Grant Funds from the U.S. Department of the Interior's Bureau of Reclamation WaterSMART Program and Authorize Grant Matching Funds in the Amount of $25,000**

**Recommended Action:**

Authorize the City Manager to sign and submit the Letter of Commitment (Attachment 1) to Mesa Water District for the Local SiP application for grant funds from the U.S. Department of the Interior's Bureau of Reclamation WaterSMART Program and authorize grant matching funds in the amount of $25,000.

## ADMINISTRATIVE ITEMS

**20.    23-157**    **Year-End Audit Results for the FY 2021/22 Annual Comprehensive Financial Report (ACFR), Fiscal Year 2022/23 Mid-Year Budget Adjustments, and Fiscal Year 2022/23 Budget Update and Fiscal Health Report**

**Recommended Action:**

A)    Receive and File the FY 2021/22 Annual Comprehensive Financial Report and other auditor-issued reports; and

**EXHIBIT 2**

B) Receive and file the FY 2022/23 Budget Update and Fiscal Health Report (Attachment 8); and,

B) Approve mid-year budget adjustments to the FY 2022/23 Revised Budget in the funds and by the amounts contained in Attachment 3; and,

C) Authorize additional Professional Services authority in the Fiscal Year 2022/23 Revised Budget in the departments and by the amounts contained in Attachment 4; and,

D) Approve and authorize the Mayor and City Clerk to execute "Amendment No. 1 to Agreement between the City of Huntington Beach and CSG Consultants, Inc. for On-Call Building Division Plan Review Services" (Attachment 5); and,

E) Approve and authorize the Mayor and City Clerk to execute "Amendment No. 1 to Agreement between the City of Huntington Beach and True North Compliance Services, Inc. for On-Call Building Division Plan Review Services" (Attachment 6); and,

F) Accept, approve and authorize the City Manager to execute the grant agreement with the State of California Energy Commission in the amount of $80,000 (Attachment 7).

## ORDINANCES FOR INTRODUCTION

**21.**    **23-162**      **Approve for Introduction Ordinance No. 4280 Amending Chapter 2.109 of the Huntington Beach Municipal Code Regarding the Finance Commission**

**Recommended Action:**

Approve for introduction Ordinance No. 4280, "An Ordinance of the City of Huntington Beach Amending Chapter 2.109 to the Huntington Beach Municipal Code Regarding Finance Commission."

**22.**    **23-163**      **Approve the Introduction of Ordinance Nos. 4278, 4279, and 4281 Amending Chapters 2.111, 2.64 and 2.100 of the Huntington Beach Municipal Code Regarding the Citizen Infrastructure Advisory Board/Public Works Commission, the Community and Library Services Commission, and Operating Policy for Boards and Commissions respectively**

**Recommended Action:**

A) Approve for Introduction Ordinance No. 4278, "An Ordinance of the City of Huntington Beach Amending Chapter 2.111 to the Huntington Beach Municipal Code Regarding Citizen Infrastructure Advisory Board/Public Works Commission"; and/or,

**EXHIBIT 2**

B)  Approve for Introduction Ordinance No. 4279, "An Ordinance of the City of Huntington Beach Amending Chapter 2.64.040 to the Huntington Beach Municipal Code Regarding Community and Library Services Commission"; and/or,

C)  Approve for Introduction Ordinance No. 4281, "An Ordinance of the City of Huntington Beach Amending Chapter 2.100 to the Huntington Beach Municipal Code Regarding Operating Policy for Boards and Commissions."

**23.**   **23-165**        **Approve for Introduction Ordinance No. 4283 Adding Chapter 13.07 of the Huntington Beach Municipal Code Relating to Government Flags on City Property**

**Recommended Action:**

Approve for introduction Ordinance No. 4283, "An Ordinance of the City of Huntington Beach Amending Title 13 Public Property of the Huntington Beach Municipal Code Adding Chapter 13.07 Relating to Government Flags on City Property."

**24.**   **23-176**        **Approve for Introduction Ordinance No. 4284 Amending Municipal Code 13.52 Relating to Public Conduct within City-Owned Public Parking Structures**

**Recommended Action:**

Staff recommends City Council approve for introduction Ordinance No. 4284, "An Ordinance of the City of Huntington Beach Amending Huntington Beach Municipal Code Chapter 13.52 Relating to Public Buildings" regarding public conduct within City-owned public parking structures.

**25.**   **23-177**        **Approve for Introduction Ordinance No. 4273 Amending Municipal Code 13.48 Relating to the Use of Tents and Other Uses Within City Parks**

**Recommended Action:**

Staff recommends City Council approve the introduction of Ordinance 4273, "An Ordinance of the City Council of the City of Huntington Beach Amending Title 13 of the Huntington Beach Municipal Code Relating to Parking Lot and Camping Regulations in Public Parks, and Making a Finding of Exemption Under CEQA" relating to the use of tents and other uses within City parks.

## COUNCILMEMBER ITEMS

**26.**   **23-172**        **Submitted by Councilmember Burns - SB 9 and SB 10 Impacts to Huntington Beach**

**Recommended Action:**

Direct the City Attorney to take any legal action necessary to challenge SB 9 and SB 10 and the laws that permit ADU's.  Also, direct the City Manager to cease the processing of

**EXHIBIT 2**

all applications/permits brought to the City by developers under SB 9, SB 10, or State law related ADU projects, until the courts have adjudicated the matter(s).

27.   **23-184**          **Submitted by Mayor Strickland and Mayor Pro Tem Van Der Mark - Request to prepare a Invocation Policy**

**Recommended Action:**

Direct the City Manager to work with the City Attorney to return to the City Council with a Resolution for a City Council policy for the constituting of a list of religious associates or leaders, maintaining that list, evaluation of religious associates or leaders, and rotation system for religious leaders at City Council meetings to offer an invocation. The City Attorney should ensure that whatever policy is returned to Council for a vote is compatible with Constitutional principles of government involved/restricted speech and exercise of religion. In doing so, modifications or adjustments to this proposal are welcome from the City Attorney.

## ADJOURNMENT

**The next regularly scheduled meeting of the Huntington Beach City Council/Public Financing Authority is Tuesday, March 7, 2023, in the Civic Center Council Chambers, 2000 Main Street, Huntington Beach, California.**

**INTERNET ACCESS TO CITY COUNCIL/PUBLIC FINANCING AUTHORITY AGENDA AND STAFF REPORT MATERIAL IS AVAILABLE PRIOR TO CITY COUNCIL MEETINGS AT**

**http://www.huntingtonbeachca.gov**

**EXHIBIT 2**

# EXHIBIT B

EXHIBIT 2

ORDINANCE NO. 4285

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF HUNTINGTON BEACH
AMENDING CHAPTER 202.04 OF THE HUNTINGTON BEACH ZONING AND
SUBDIVISION ORDINANCE PROHIBITING BUILDERS REMEDY APPLICATIONS
(ZONING TEXT AMENDMENT NO. 23-001)

WHEREAS, Zoning Text Amendment No. 23-001 will amend Chapter 202 of the Huntington Beach Zoning and Subdivision Ordinance, relating to Organization, Applicability, and Interpretation; and

The Huntington Beach Planning Commission and Huntington Beach City Council have held separate, duly noticed public hearings to consider Zoning Text Amendment No. 23-001; and

After due consideration of the findings and recommendations of the Planning Commission and all other evidence presented, the City Council finds that the aforesaid amendment is proper and consistent with the General Plan;

The City Council of the City of Huntington Beach does hereby ordain as follows:

SECTION 1. Section 202.04 of the Huntington Beach Zoning and Subdivision Ordinance is hereby amended to read as follows:

202.04 (o)   **Builder's Remedy Ban.** The City expressly prohibits the processing or approval of any application for a housing development project or any project not in conformance with the zoning and General Plan land use designation, including all applicable City laws, zoning and land use regulations, and other environmental laws, such as CEQA, regardless of the so-called "Builder's Remedy" (under the Housing Accountability Act or any other State law), that portend to allow developers of affordable housing projects to bypass the zoning code and general plan of cities that are out of compliance with the Housing Element Law.

This express prohibition requires that all project applicants conform to the applicable zoning and General Plan land use designations regardless of the City's status and regard to Housing Element Law.

SECTION 3. This Ordinance shall become effective 30 days after its adoption.

PASSED AND ADOPTED by the City Council of the City of Huntington Beach at a regular meeting thereof held on the _____ day of _____, 2023.

56

**EXHIBIT 2**

ORDINANCE NO.  4285

_____
Mayor

ATTEST:                                            APPROVED AS TO FORM:


_____    _____
City Clerk                                         City Attorney   MV


ATTEST:                                            APPROVED AS TO FORM:


_____    _____
City Manager                                      Director of Community Development

2

**EXHIBIT 2**

**LEGISLATIVE DRAFT**

**HBZC CHAPTER 202.04**

Chapter 2.111

202.04  General Rules of Applicability of the Zoning and Subdivision Ordinance

A.    **Applicability to Property**. The Zoning and Subdivision Ordinance shall apply to all land within the City of Huntington Beach. The Local Coastal Program Implementation Plan shall apply to all land within the City of Huntington Beach coastal zone.

B.    **Applicability to Streets and Rights-of-Way**. Public streets, utility, and other rights-of-way shall be in the same zoning district as contiguous property. Where contiguous properties are classified in different zoning districts, the centerline of the street or right-of-way shall be the district boundary, unless otherwise depicted on the zoning map.

C.    **Who Qualifies as an Applicant**. Only a qualified applicant (including an agent of the applicant with written authorization from the owner) may file an application for approval on a specific site. A qualified applicant is a person who has a freehold interest in the land which is the subject of the application. The Director shall require an applicant to submit proof of the interest. The Director shall require an agent to submit evidence of authority to act for the applicant. Any person or agency may file for a zoning text amendment.

D.    **Compliance with Ordinances**. No land shall be used, and no structure shall be constructed, occupied, enlarged, altered, demolished or moved in any zoning district except in accord with the provisions of Titles 20 through 25. Further, no lot area shall be so reduced or diminished that the yards or other open space shall be smaller than prescribed by these titles nor shall the density be increased in any manner except in conformity with the provisions established herein.

E.    **Public Nuisance**. Neither the provisions of Titles 20 through 25 nor the approval of any permit authorized by these titles shall authorize the maintenance of any public nuisance.

F.    **Compliance with Public Notice Requirements**. Compliance with public notice requirements prescribed by Titles 20 through 25 shall be deemed sufficient notice to allow the City to proceed with a public hearing and take action on an application, regardless of actual receipt of mailed or delivered notice.

G.    **Requests for Notice**. Where Titles 20 through 25 require that notice be given by first class mail to "any person who has filed a written request for such notice," the request shall be filed with the Director and shall be subject to the applicable fees set to cover mailing costs.

**EXHIBIT 2**

H.    **Notice to Surrounding Property Owners**. Notice shall be mailed to all owners of real property as shown on the latest equalized assessment roll within 300 feet of the property that is the subject of the hearing, as required by state law. Applicants may submit and the Director may use records of the County Assessor or Tax Collector which contain more recent information than the assessment roll.

I.    **Conflict with Other Ordinances**. Where conflict occurs between the provisions of Titles 20 through 25 and any other City code, title, chapter, resolution, guideline, or regulation, the more restrictive provision shall control unless otherwise specified in these titles.

J.    **Relation to Private Agreements**. It is not intended by applicable provisions of Titles 20 through 25 to interfere with or abrogate or annul any easements, covenants, or other existing agreements between parties or to repeal any ordinance or other section of the Huntington Beach Municipal Code except as set forth in subsection 202.04(I), above.

K.    **Annexations/Pre-Zoning**. Unincorporated territory adjacent to the City may be pre-zoned for the purpose of determining the zone district which will apply in the event of annexation to the City. The procedure for pre-zoning property shall be the same as that for zone changes within the City. Such zoning shall become effective at the time the annexation becomes effective. Any property which, after annexation or for any other reason, does not have a designation on the zoning map shall be deemed to be zoned RL, low-density residential. Inclusion of an annexed area within the coastal zone into the certified Local Coastal Program shall require approval of a Local Coastal Program amendment by the Coastal Commission.

L.    **Application During Local Emergency**. The City Council may authorize deviations from any provision of this title during a local emergency. Such deviations may be authorized by resolution of the City Council.

M.    **Issuance of Permits or Entitlements Prohibited**. No permit or entitlement shall be issued by any department of the City in any case where a permit or entitlement is required to be granted and for which an appeal period is provided by this zoning and subdivision ordinance until the expiration of such appeal period or the final determination of any appeal filed pursuant to this ordinance.

N.    **Certificate of Occupancy and Final Building Inspection Withheld**. No certificate of occupancy shall be issued or final building inspection shall be made until terms and conditions attached to a permit or entitlement required by this zoning and subdivision ordinance are met.

O.    **Builder's Remedy Ban.**  The City expressly prohibits the processing or approval of any application for a housing development project or any project not in conformance with the zoning and General Plan land use designation, including all applicable City laws, zoning and land use regulations, and other environmental laws, such as CEQA,

**EXHIBIT 2**

of the so-called "Builder's Remedy" (under the Housing Accountability Act or any other State law), that portend to allow developers of affordable housing projects to bypass the zoning code and general plan of cities that are out of compliance with the Housing Element Law.

This express prohibition requires that all project applicants conform to the applicable zoning and General Plan land use designations regardless of the City's status and regard to Housing Element Law.

**EXHIBIT 2**

**ATTACHMENT NO. 1**

**SUGGESTED FINDINGS OF APPROVAL**

**ZONING TEXT AMENDMENT NO. 23-001**

**SUGGESTED FINDINGS FOR PROJECTS EXEMPT FROM CEQA:**

Zoning Text Amendment (ZTA) No. 23-001 is exempt from California Environmental Quality Act (CEQA), pursuant to Section 15061(b), the general rule that CEQA only applies to projects which have the potential for a significant effect on the environment. While this amendment will clarify existing zoning regulations, it does not authorize any development that will result in direct physical changes to the environment.

**SUGGESTED FINDINGS FOR APPROVAL - ZONING TEXT AMENDMENT NO. 23-001:**

1. Zoning Text Amendment No. 23-001 is consistent with the objectives, policies, general land uses and programs specified in the General Plan and any applicable specific plan as follows:

   Land Use Element:

   Goal LU-1 – New commercial, industrial, and residential development is coordinated to ensure that the land use pattern is consistent with the overall goals and needs of the community.

2. Zoning Text Amendment No. 23-001 is compatible with the uses authorized in, and the standards prescribed for, the zoning district for which it is proposed. The ZTA is designed to prevent incompatible land uses that will occur if a developer attempts to bypass the City zoning Code and develop certain residential projects in incompatible zones.

3. A community need is demonstrated for the change proposed because the ZTA would prevent the use of Builder's Remedy, where housing projects could be built near environmentally sensitive areas that could harm the environment or next to industrial sites where residents will be subject to diminished air, light and sound quality because of being next to large industrial complexes.

4. Its adoption will be in conformity with public convenience, general welfare and good zoning practice. The ZTA affirms the City's use of zoning as the legal mechanism to control development on land within their jurisdiction, primarily by designating land for certain uses or categories of uses (zones). This practice of "Euclidean zoning," allows the City to define parcels based on distinct residential or industrial/commercial use.  Euclidean zoning is a way to mitigate negative effects of industrial and urban development (light and air pollution) on residences by separating those uses and another tool or alternative to nuisance tort law.

Attachment No. 1.1
**EXHIBIT 2**

1  ROB BONTA
   Attorney General of California
2  DANIEL A. OLIVAS
   Senior Assistant Attorney General
3  DAVID PAI, State Bar No. 227058
   Supervising Deputy Attorney General
4  MATTHEW T. STRUHAR, State Bar No. 293973
   THOMAS P. KINZINGER, State Bar No. 323889
5  Deputy Attorneys General
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone: (916) 210-7246
     Fax: (916) 327-2319
8    E-mail: Matthew.Struhar@doj.ca.gov          *Exempt from Filing Fees*
             Thomas.Kinzinger@doj.ca.gov         *Government Code § 6103*
9
   *Attorneys for Petitioners and Plaintiffs, The People*
10 *of California ex rel. Rob Bonta, and the California*
   *Department of Housing and Community*
11 *Development*

12                SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                            COUNTY OF ORANGE

14

15

16

17 | **THE PEOPLE OF CALIFORNIA EX REL.** | Case No. 30-2023-01312235-CU-WM-CJC
   | **ROB BONTA, AND THE CALIFORNIA** |
18 | **DEPARTMENT OF HOUSING AND** | **NOTICE OF MOTION AND MOTION**
   | **COMMUNITY DEVELOPMENT,** | **FOR TEMPORARY RELIEF**
19 |
   |                  Petitioners and Plaintiffs, | **(Gov. Code, §§ 65585, subd. (n), 65757.)**
20 |
   |                                      | Reservation No. 74013200
21 |                  v. |
   |                                      | Date:       July 20, 2023
22 | **THE CITY OF HUNTINGTON BEACH, A** | Time:       1:30 p.m.
   | **MUNICIPAL CORPORATION; CITY** | Dept:       C20
23 | **COUNCIL OF HUNTINGTON BEACH;** | Judge:      The Hon. Erick Larsh
   | **AL ZELINKA, in his official capacity as** | Trial Date: None set
24 | **CITY MANAGER OF HUNTINGTON** | Action Filed: March 8, 2023
   | **BEACH; AND DOES 1-50, INCLUSIVE,** |
25 |
   |                  Respondents and Defendants. |

26

27

28

1

**EXHIBIT 3**

1    PLEASE TAKE NOTICE THAT on Thursday, July 20, 2023, at 1:30 p.m., or as soon as

2    the Court schedules, in Department C20 of the Superior Court of California for the County of

3    Orange, located at 700 Civic Center Drive West, Santa Ana, CA 92701, that Petitioners and

4    Plaintiffs the People of California ex rel. Rob Bonta, Attorney General, and the California

5    Department of Housing and Community Development ("Petitioners"), will and hereby do move

6    the Court for an order for temporary relief, mandating that the Respondent the City of Huntington

7    Beach (the "City"), approve any affordable housing development project, as defined by

8    subdivision (h)(2)-(3) of Section 65589.5 of the Government Code, notwithstanding its

9    inconsistency with the City's planning and zoning standards that regulate the development of

10   housing within the City.

11    This motion is made pursuant to Government Code Section 65757 on the ground that

12   Petitioners are likely to prevail in the above-referenced action, which challenges the validity of

13   the City's housing element. The City has not adopted a revised housing element for the sixth and

14   current planning cycle as required by Article 10.6 of the Government Code, more commonly

15   known as the Housing Element Law. (See Gov. Code, § 65580, et seq.) Because it has not

16   adopted a revised housing element in accordance with the Housing Element Law, it does not have

17   a valid housing element, which is a mandatory element of the City's general plan. (See Gov.

18   Code, § 65302, subd. (c).) Furthermore, because it lacks a valid housing element, the City is not

19   in substantial compliance with the Housing Element Law, which renders the City's planning and

20   zoning laws invalid insofar as they can be used to deny, or reduce the density of, a proposed

21   affordable housing development project, as defined by subdivision (h)(2)-(3) of Section 65589.5

22   of the Government Code. (§ 65589.5, subd. (d)(5).)

23    Because Petitioners are likely to prevail in their challenge to the validity of the City's

24   housing element, this Court may provide, as temporary relief, any of the forms of relief specified

25   in Section 65755 of the Government Code. (See Gov. Code, § 65757.) Among the forms of relief

26   specified in Section 65755 is an order mandating

27    the approval of all applications for building permits, or other related construction permits, for residential housing where a final subdivision map, parcel map, or plot plan has been approved for the project, where the approval will not impact on the ability of the city, county, or city and county to properly adopt and implement an adequate housing element,

28

2

and where the permit application conforms to all code requirements and other applicable provisions of law except those zoning laws held to be invalid by the final court order, and changes to the zoning ordinances adopted after such final court order which were enacted for the purpose of preventing the construction of a specific residential development.

(Gov. Code, § 65755, subd. (a)(4).)

The Legislature considers violations of California's housing laws to be inherently harmful to the public. That is why the Legislature vested the Attorney General and HCD with the express authority to enforce those laws. (See Gov. Code, § 65585, subds. (i), (j), (n).) By failing to adopt a revised housing element that substantially complies with the Housing Element Law, the City is actively preventing the development of new housing opportunities that are needed for the City to meet its fair share of the regional housing need. This temporary relief will help ensure that their failure to adopt a housing element does not frustrate the development of new and needed housing opportunities for people of all income levels in the region.

This motion is based on this notice and the accompanying papers in support: (1) Memorandum of Points and Authorities; and (2) Request for Judicial Notice.

Dated:  May 12, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DAVID PAI
Supervising Deputy Attorney General

MATTHEW T. STRUHAR
Deputy Attorney General
*Attorneys for Petitioners and Plaintiffs, the People of California ex rel. Rob Bonta, Attorney General, and the California Department of Housing and Community Development*

SA2023301106
37114732.docx

3

**EXHIBIT 3**

## <u>DECLARATION OF SERVICE BY E-MAIL AND OVERNIGHT COURIER</u>

Case Name:   **The People of California ex rel. Rob Bonta v. City of Huntington Beach**
No.:   **30-2023-01312235-CU-WM-CJC**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is: 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for overnight mail with Federal Express ("FedEx").  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the overnight courier that same day in the ordinary course of business.

On <u>May 12, 2023</u>, I served the attached **NOTICE OF MOTION AND MOTION FOR TEMPORARY RELIEF** by transmitting a true copy via electronic mail.  In addition, I placed a true copy thereof enclosed in a sealed envelope, in the internal mail system of the Office of the Attorney General, for overnight delivery, addressed as follows:

Michael E. Gates, City Attorney
Office of the City Attorney
City of Huntington Beach
2000 Main St., Fourth Floor
Huntington Beach, CA 92648
Email: Michael.Gates@surfcity-hb.org

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on May 12, 2023, at Sacramento, California.

| | | |
|---|---|---|
| Leticia Aguirre | | |
| Declarant | | Signature |

SA2023301106
37173007.docx

**EXHIBIT 3**

ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DAVID PAI, State Bar No. 227058
Supervising Deputy Attorney General
MATTHEW T. STRUHAR, State Bar No. 293973
THOMAS P. KINZINGER, State Bar No. 323889
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7246
  Fax:  (916) 327-2319
  E-mail:  Matthew.Struhar@doj.ca.gov
          Thomas.Kinzinger@doj.ca.gov

*Exempt from Filing Fees*
*Government Code § 6103*

*Attorneys for Petitioners and Plaintiffs, The People of California ex rel. Rob Bonta, and the California Department of Housing and Community Development*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| **THE PEOPLE OF CALIFORNIA EX REL. ROB BONTA, AND THE CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT,** | Case No. 30-2023-01312235-CU-WM-CJC |
| Petitioners and Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RELIEF** |
| v. | **(Gov. Code, §§ 65585, subd. (n), 65757.)** |
| | RELATED TO ROA # 31 |
| **THE CITY OF HUNTINGTON BEACH, A MUNICIPAL CORPORATION; CITY COUNCIL OF HUNTINGTON BEACH; AL ZELINKA, in his official capacity as CITY MANAGER OF HUNTINGTON BEACH; AND DOES 1-50, INCLUSIVE,** | Reservation No. 74013200 |
| Respondents and Defendants. | Date:        July 20, 2023<br>Time:        1:30 p.m.<br>Dept:        C20<br>Judge:       The Hon. Erick Larsh<br>Trial Date:  None set<br>Action Filed: March 8, 2023 |

1

**EXHIBIT 3**

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................ 5

Factual Background .................................................................................................... 6

I.  The City Failed to Timely Adopt a Revised Housing Element for the Current Planning Cycle ........................................................................ 6

II.  The City Still Has Not Adopted a Revised Housing Element for the Current Cycle ...................................................................................... 7

Procedural Background ............................................................................................. 7

Standard of Review ................................................................................................... 8

Argument .................................................................................................................. 8

I.  Petitioners Will Succeed on the Merits Because the City Indisputably Lacks a Valid Housing Element ...................................................... 8

    A.  To Have a Valid Housing Element, a Local Government Must Adopt Revisions to Their Housing Elements to Accommodate the Regional Housing Need for All Income Levels ...................................... 8

    B.  The City Has Not Adopted a Revised Housing Element for the Current Planning Cycle, and Thus Its Housing Element Is Invalid Under the Planning and Zoning Law ........................................ 11

II.  As Petitioners Will Succeed on the Merits, This Court Should Grant The Motion for Temporary Relief ........................................................ 12

    A.  The Legislature's Objective in Adopting the Housing Element Law Was to Require Cities to Adopt Land Use Policies Consistent with Meeting State And Regional Housing Needs .................................... 12

    B.  By Refusing to Adopt a Housing Element, the City is Undermining the Legislature's Objectives in Adopting the Housing Element Law ....... 14

    C.  Temporary Relief Is Appropriate to Meet Housing Element Law Objectives .................................................................................... 15

III.  The Public Interest Weighs in Favor of Granting the Requested Relief ............... 16

Conclusion ............................................................................................................... 16

2

**EXHIBIT 3**

1

## TABLE OF AUTHORITIES

2
**Page**

3  CASES

4  *Anderson v. City of San Jose*
5     (2019) 42 Cal.App.4th 683 ................................................................ 11, 14

6  *Bruce v. City of Alameda*
     (1985) 166 Cal.App.3d 18 ....................................................................... 11
7
   *Buena Vista Garden Apartments v. City of San Diego*
8     (1985) 175 Cal.App.3d 289 ...................................................................... 11

9  *California Renters Legal Advocacy & Fund v. City of San Mateo*
     (2021) 68 Cal.App.5th 820 ............................................................ 11, 13, 14
10
   *City of Sacramento v. Drew*
11    (1989) 207 Cal.App.3d 1287 .................................................................... 15

12 *County of Riverside v. Superior Court*
     (2003) 30 Cal.4th 278 ............................................................................. 11
13
   *IT Corp v. County of Imperial*
14    (1983) 35 Cal.3d 63 ............................................................................... 16

15 *Martinez v. City of Clovis*
     (Apr. 7, 2023, F082914) __ Cal.App.5th __, 307 Cal.Rptr.3d ................................ 8, 9, 11, 14
16
   *Ruegg & Ellsworth v. City of Berkeley*
17    (2021) 63 Cal.App.5th 277 ...................................................................... 11

18 *Voters for Responsible Retirement v. Board of Supervisors*
     (1994) 8 Cal.4th 765 .............................................................................. 11
19

20 STATUTES

21 Government Code,
     § 65300 ....................................................................................... 8, 9, 11
22   § 65302 ............................................................................................. 11
     § 65302, subd. (c) ........................................................................ 5, 9, 11, 12
23   § 65580 ............................................................................................. 5
     § 65580, subd. (d) ................................................................................. 15
24   § 65581 .......................................................................................... 13, 16
     § 65581, subd. (a) ................................................................................. 12
25   § 65581, subd. (b) ................................................................................. 12

26

27

28

**EXHIBIT 3**

## TABLE OF AUTHORITIES
### (continued)

**Page**

Government Code,

§ 65581, subd. (c) ........................................................................................ 12

§ 65581, subd. (d) ........................................................................................ 12

§ 65583 ............................................................................................... 9, 12, 13

§ 65583, subd. (a) ........................................................................................... 6

§ 65583, subd. (c) ........................................................................................ 6, 9

§ 65583.2, subd. (c) ......................................................................................... 9

§ 65584 .......................................................................................................... 13

§ 65584, subd. (a) ........................................................................................... 6

§ 65584, subd. (b) ........................................................................................... 6

§ 65584.01 ...................................................................................................... 6

§ 65584.05, subd. (b) ..................................................................................... 11

§ 65585 .................................................................................................. *passim*

§ 65585, subd. (n) ..................................................................................... 9, 16

§ 65588 ..................................................................................................... 5, 13

§ 65588, subd. (e)(3) ...................................................................................... 6

§ 65588, subd. (f)(1) ...................................................................................... 6

§ 65589, subd. (d) ......................................................................................... 12

§ 65589.5 .................................................................................... 5, 13, 16, 17

§ 65589.5, subd. (a) ...................................................................................... 16

§ 65589.5, subd. (a)(1)(D) ........................................................................... 14

§ 65589.5, subd. (b) ...................................................................................... 18

§ 65589.5, subd. (d)(5) ............................................................... 6, 13, 15, 17

§ 65589.5, subd. (d)(5)(B) ........................................................................... 13

§ 65589.5, subd. (e) ........................................................................................ 6

§ 65589.5, subd. (h)(3) .................................................................... 5, 15, 17

§ 65589.5, subd. (j)(1) ................................................................................. 13

§ 65751 ........................................................................................................... 8

§ 65754 .................................................................................................. 5, 8, 10

§ 65754, subd. (a) ......................................................................................... 10

§ 65755 ......................................................................................................... 10

§ 65755, subd. (4) ......................................................................................... 17

§ 65755, subd. (a) ......................................................................................... 10

§ 65755, subd. (a)(1)-(6) ............................................................................... 5

§ 65755, subd. (a)(4) ....................................................................... 6, 15, 16

§ 65757 ................................................................................................. *passim*

§ 65855, subd. (j) ........................................................................................... 9

**EXHIBIT 3**

### INTRODUCTION

Defendant and respondent the City of Huntington Beach (the "City") does not have a compliant housing element, a mandatory component to its general plan. (See Gov. Code, § 65302, subd. (c).)[1] In order to have a compliant housing element, the City's housing element must substantially comply with the state's Housing Element Law. (See *ibid*. ["The [general] plan shall include … [a] housing element as provided in Article 10.6 (commencing with Section 65580)."]; see also § 65580, et seq.) For the present planning cycle, the City had until October 15, 2021, to adopt a housing element in substantial compliance with the Housing Element Law. It did not do so, and since then, has made clear that it will not do so.

That is why plaintiffs and petitioners, the People of California and the California Department of Housing and Community Development ("HCD") filed the proposed First Amended Petition for Writ of Mandate and Complaint for Declaratory Relief (the "FAP").[2] With the proposed FAP, Petitioners challenge the validity of a mandatory element of the City's general plan, the City's unrevised housing element. (See § 65754.) As an ultimate remedy for this failure, this Court *shall* order at least one of six statutory remedies, which include an order mandating the approval of housing development projects. (§ 65755, subd. (a)(1)-(6).) Moreover, under Section 65757 this Court may grant that relief on a temporary basis pending the outcome of this action upon Petitioners' showing of a probable success on the merits. (§ 65757.)

Petitioners clearly meet that standard. The invalidity of the City's housing element under state law is not in dispute, because the Planning and Zoning Law and the Housing Element Law plainly require the City to adopt revisions to the housing element in order to have a valid housing element. (See §§ 65302, subd. (c), 65585, 65588.) This Court should, accordingly, grant Petitioners' motion and issue an order mandating that the City approve any affordable housing development project, as defined by subdivision (h)(3) of Section 65589.5, "that conforms to all code requirements and other applicable provisions of law[,]" except for planning and zoning laws

---

[1] All statutory references are to the Government Code unless otherwise indicated.
[2] Petitioners bring this motion on the assumption that the Court will grant Petitioners' Motion for Leave to File the FAP, deeming the FAP filed and served.

**EXHIBIT 3**

1   that the City cannot enforce against affordable housing projects pursuant to the Housing

2   Accountability Act.[3] (See §§ 65755, subd. (a)(4), 65589.5, subd. (d)(5)).

3   <center>**FACTUAL BACKGROUND**</center>

4   **I.   THE CITY FAILED TO TIMELY ADOPT A REVISED HOUSING ELEMENT FOR THE**

5   **CURRENT PLANNING CYCLE**

6        HCD determines the housing needs at each income level for each region for each planning

7   cycle. (§§ 65584, subds. (a) & (b), 65584.01, 65588, subd. (e)(3).) The planning cycle is the

8   interval between deadlines to submit revised housing elements, and it is usually every eight years.

9   (§ 65588, subds. (e)(3), (f)(1).) After HCD sets the regional housing need for each region, each

10  regional council of governments assigns to each of its local governments its regional housing

11  need allocation ("RHNA"). (§ 65584, subds. (a) & (b).)

12       In 2019, HCD issued its Regional Housing Need Determination for the Southern California

13  Association of Governments ("SCAG") for the Sixth Planning Cycle, which goes from October

14  15, 2021 through October 15, 2029.[4] (See Request for Judicial Notice, Ex. 1 [the City's Draft

15  March 2023 Housing Element] at p. 1-4.) HCD determined that SCAG had a regional housing

16  need totaling 1,341,827 housing units: 351,796 for very low-income, 206,807 for low-income,

17  223,957 for moderate-income, and 559,267 for above moderate-income. (See *ibid*.)

18       SCAG, not HCD, allocated the regional housing need among its member jurisdictions. For

19  the City, SCAG assigned it a RHNA of 13,368 housing units: 3,661 units for very low-income

20  households, 2,184 units for low-income households, 2,308 units for moderate-income households,

21  and 5,215 for above moderate-income households. (*Ibid*.) Upon receiving its RHNA, the City

22  then had to update its housing element. (See § 65585.) The revised housing element was to

23  include an assessment of its housing needs, an inventory of resources and constraints relevant to

24  meeting its housing needs, and a program of scheduled actions that the City will undertake during

25  the planning period to implement its housing element. (§ 65583, subds. (a), (c).)

26

---

27  [3] This order would not exempt such projects from complying with the Coastal Act. (See §§ 65755, subd. (a)(4), 65589.5, subd. (e).)

28  [4] SCAG serves the following six counties and their constituent municipalities: Imperial, Los Angeles, Orange, Riverside, San Bernardino, and Ventura. The City is a SCAG member.

<center>6</center>

Its deadline to adopt a housing element was October 15, 2021. (Request for Judicial Notice, Fact No. 1.) The City missed that deadline. (*Id*., Fact No. 2, Ex. 2 [September 30, 2022 Letter to City of Huntington Beach] at p. 1.)

## II.   THE CITY STILL HAS NOT ADOPTED A REVISED HOUSING ELEMENT FOR THE CURRENT CYCLE

Over a year and a half into the Sixth Planning Cycle, the City does not currently have a housing element that substantially complies with the Housing Element Law. (Request for Judicial Notice, Fact No. 3.) At no point during the Sixth Planning Cycle has the City adopted revisions to its housing element. (*Ibid*.) After HCD again reminded the City of its noncompliance with the Housing Element Law (see *id*., Ex. 3), the City proposed a corrective action plan that envisioned adopting a housing element at the City Council's regularly scheduled March 21, 2023 meeting. (See *id*., Ex. 4.)

And yet, the City failed to adhere to that corrective action plan. On March 21, 2023, a divided City Council deadlocked on certifying a Final Supplemental Environmental Impact Report ("FSEIR"). (*Id*., Fact No. 4, Ex. 5 [Huntington Beach City Council, Regular Minutes for March 21, 2023] at p. 20.) They ultimately continued the matter until their next regular meeting. (*Ibid*.) At that meeting, held on April 4, 2023, the City voted to reject Resolution No. 2023-14, which would have certified the FSEIR. (*Id*., Fact No. 5.) The City, in effect, voted to reject its planning staff's own proposed housing element.

Earlier in March, the City filed a lawsuit in federal court. (*City of Huntington Beach, et al., v. Newsom, et al.* (C.D. Cal. Mar. 21, 2023), Case No. 8:23-00421-FWS-ADS at p. 2.) The City asked the United States District Court for the Central District of California to issue a temporary restraining order for the express purpose of allowing the City Council to refuse to adopt a housing element without fear of penalty. (*Ibid*.) That request was denied. (*Ibid*.) The City refused to adopt a housing element anyway.

## PROCEDURAL BACKGROUND

Petitioners filed this action on March 8, 2023, by filing the Petition for Writ of Mandate and Complaint for Declaratory Relief (the "Petition"). Originally, Petitioners sued the City because of

7

**EXHIBIT 3**

1   its illicit prohibition on ADUs and SB 9 projects, which would also violate the Housing Element

2   Law. After the Petition was filed, the City Council voted to rescind its illegal prohibition on ADU

3   and SB 9 projects. Its failure to adopt a housing element on April 4, however, forced Petitioners

4   to seek leave to file the FAP to add the corresponding violations of Housing Element Law, and to

5   seek declaratory and injunctive relief against the City due to its efforts to flout state ADU and SB

6   9 law remained necessary despite the City's voluntary reversal.

7   **STANDARD OF REVIEW**

8   A court may grant a motion for temporary relief under Section 65757 "upon a showing of

9   probable success on the merits" in an action described in Section 65754. (§ 65757.) The

10  Legislature required petitioners to make no additional showing when moving for temporary relief.

11  (*Ibid.*)

12  **ARGUMENT**

13  **I.   PETITIONERS WILL SUCCEED ON THE MERITS BECAUSE THE CITY INDISPUTABLY**

14      **LACKS A VALID HOUSING ELEMENT**

15  Petitioners bring this action to challenge the validity of the City's housing element. (See §

16  65751.) They will succeed on the merits for a simple reason: The City has not adopted a revised

17  housing element in accordance with the Housing Element Law. As a result, the City lacks a valid

18  housing element for purposes of the Planning and Zoning Law. Because the City lacks a

19  compliant housing element, they cannot prevail as a matter of law, and thus Petitioners are

20  entitled to a writ of mandate compelling the City to bring its actions into compliance with state

21  law. And because Petitioners will succeed on the merits, this Court should grant the motion

22  seeking temporary relief until the City complies with state law. (See § 65757.)

23      **A.   To Have a Valid Housing Element, a Local Government Must Adopt**
            **Revisions to Their Housing Elements to Accommodate the Regional**

24          **Housing Need for All Income Levels**

25  The Legislature requires every local planning agency and legislative body to prepare and

26  adopt "a comprehensive, long-term general plan for the physical development of the county or

27  city…." (§ 65300.) Courts have described the general plan "as the constitution for all future

28  development within the city or county." (*Martinez v. City of Clovis* (Apr. 7, 2023, F082914) __

8

1   Cal.App.5th __, 307 Cal.Rptr.3d 64 [2023 WL 2820092], at *5.) Since 1965, the Legislature has

2   "mandated that the general plans of all cities and counties include a 'housing element' that is

3   updated periodically to accommodate the housing needs of all economic segments of the

4   community." (*Id*. at p. 1.) Today, all cities—including chartered cities like the City (see section

5   65300)—must include in their general plans a "housing element as provided in" the Housing

6   Element Law. (§ 65302, subd. (c).) This means that every local government must comply with the

7   requirements of the Housing Element Law in order to have a valid housing element in its general

8   plan. (See *ibid*.)

9       To comply with the Housing Element Law, the City's legislative body, for each planning

10  cycle, must adopt a revised housing element. (§ 65585.) That revision must include "an

11  identification and analysis of existing and projected housing needs and a statement of goals,

12  policies, quantified objectives, financial resources, and scheduled programs for the preservation,

13  improvement, and development of housing." (§ 65583.) The point of the housing element,

14  ultimately, is to accommodate the housing needs for people at all income levels. "The main way a

15  housing element accommodates lower income housing needs is through zoning ordinances that

16  allow sufficient opportunities to construct multi-family residences." (*Martinez*, *supra*, 2023 WL

17  2820092, at *1.) Density, the Legislature has found, begets affordability. (See § 65583.2, subd.

18  (c), requiring minimum densities for sites suitable for the development of affordable housing.)

19      Put simply, a local government cannot perpetually retain existing land use policies and still

20  comply with the Housing Element Law. They need to update those policies on a cyclical basis to

21  both accommodate growth and achieve affordability, which means they need to adopt zoning

22  policies that enable the development of more affordable housing opportunities. (See § 65583,

23  subd. (c).) Otherwise, their housing element becomes invalid under the Planning and Zoning Law.

24  (See § 65302, subd. (c).) An invalid housing element carries consequences for local governments.

25  The Attorney General and HCD, for instance, may bring an action to compel localities to bring

26  their housing elements into compliance with the Housing Element Law. (See § 65855, subd. (j).)

27  In any such action, the Attorney General may pursue all remedies available under law. (§ 65585,

28

Memorandum of Points and Authorities ISO Motion for Temporary Relief (30-2023-01312235-CU-WM-CJC)

**EXHIBIT 3**

subd. (n).) That necessarily includes the remedies set forth in the remedial provisions of the Planning and Zoning Law, including Sections 65754, 65755, and 65757.

Section 65754 provides that in "*any action* brought to challenge the validity of … any mandatory element" of the general plan in which the challenger prevails, the court must order the locality to bring its element into compliance with Article 5 of the Planning and Zoning Law within 120 days. (§ 65754, subd. (a), italics added.) That requirement expressly applies to actions challenging the validity of a housing element. (See *ibid*.) Following a successful challenge to the validity of a housing element, the local planning agency must submit its revised housing element to HCD 45 days before the locality adopts it. (*Ibid*.) HCD must then review the draft and report its findings within 45 days. (*Ibid*.) The local legislative body must then consider HCD's findings before final adoption. (*Ibid*.)

In addition to those requirements, the judgment must also include one or more of certain enumerated orders. (See § 65755, subd. (a).) The options include, among others, orders that would: (1) Suspend local authority to issue "any category of building permits"; (2) Suspend local authority to grant any category "of zoning changes, variances, or both"; and (3) Suspend local authority "to grant subdivision map approvals" for any category "of subdivision map approvals." (*Ibid*.) In short, the Court may suspend local authority to approve development projects for any and all categories of development.

The Court's judgment may also include orders that mandate the approval of multifamily housing development projects. Those include orders that: (1) Mandate "the approval of all applications for building permits, or other related construction permits, for residential housing" notwithstanding any "zoning laws held to be invalid by the final court order" provided that certain requirements are met; (2) Mandate "the approval of any or all final subdivision maps for residential housing projects" that have already "received a tentative map approval" from the locality"; and (3) Mandate the approval of "any tentative subdivision map for a residential housing project" provided that certain requirements are met. (*Ibid*.)

This Court may order one or more of these requirements on a preliminary basis pursuant to Section 65757.

**EXHIBIT 3**

**B.      The City Has Not Adopted a Revised Housing Element for the Current Planning Cycle, and Thus Its Housing Element Is Invalid Under the Planning and Zoning Law**

Petitioners will succeed on the merits because the City has not adopted a revised housing element for the current planning cycle. The City had no right to refuse to do this, because its obligation to adopt a housing element is *mandatory*. (See §§ 65300, 65302, subd. (c).) Under the Planning and Zoning Law, chartered cities like the City "shall adopt general plans which contain the mandatory elements specified in Section 65302." (§ 65300.) One of those mandatory elements is a housing element that complies with the Housing Element Law. (§ 65302, subd. (c).)

The City cannot seriously dispute that the Legislature can compel the City to adopt a housing element that meets the objectives of the Housing Element Law. The Legislature has plenary authority on matters of statewide concern. (*Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 779.) With respect to matters of statewide concern, the Legislature can impose requirements on localities regardless of their status as chartered or general law cities. (See *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 287.)

Both the Legislature and the courts have made clear that housing is a matter of statewide concern. (*Martinez*, *supra*, 2023 WL 2820092, at *1.) For that reason, courts have routinely upheld California's housing laws, including the Housing Element Law, in home rule challenges. (See, e.g., *California Renters Legal Advocacy & Fund v. City of San Mateo* (2021) 68 Cal.App.5th 820, 850 (*California Renters*) [the Housing Accountability Act]; *Ruegg & Ellsworth v. City of Berkeley* (2021) 63 Cal.App.5th 277, 314-315 (*Ruegg & Ellsworth*) [SB 35]; *Anderson v. City of San Jose* (2019) 42 Cal.App.4th 683, 705 [the Surplus Lands Act]; *Buena Vista Garden Apartments v. City of San Diego* (1985) 175 Cal.App.3d 289, 306-307 [the Housing Element Law]; *Bruce v. City of Alameda* (1985) 166 Cal.App.3d 18, 22 [the Nondiscrimination in Land Use Law].)

For the City to claim otherwise would be frivolous. No controlling authority—no published decisional law, no statute, no guidance from HCD—authorizes local governments to outright refuse to update their housing elements. In good faith, and with a compelling evidentiary basis, local governments may seek a reduction in their RHNA. (See § 65584.05, subd. (b).) But the law

11

1 clearly prohibits local governments from outright refusing to adopt revisions to their housing

2 element. (See § 65585 [requiring cities to adopt housing elements that substantially comply with

3 the Housing Element Law]; see also § 65302, subd. (c) [same].)

4      Here, the City Council simply refuses to do what the law requires. That is a dereliction of

5 duty and a flagrant violation of state law. The City cannot prevail on the merits without upending

6 decades of clear and controlling precedent.

7 **II.    AS PETITIONERS WILL SUCCEED ON THE MERITS, THIS COURT SHOULD GRANT**
**THE MOTION FOR TEMPORARY RELIEF**

8

9     **A.    The Legislature's Objective in Adopting the Housing Element Law Was to**
**Require Cities to Adopt Land Use Policies Consistent with Meeting State**
**And Regional Housing Needs**

10

11      Unlike a typical preliminary injunction motion, in seeking temporary relief, Petitioners

12 need only show probable success on the merits. (See § 65757.) Nothing in the statute requires

13 Petitioners to establish irreparable harm. And although the public interest weighs heavily in favor

14 of granting the requested relief, the statute does not require the Court to conduct interest

15 balancing before doing so. By the statute's plain terms, Petitioners' probable success suffices to

16 grant the motion.

17      In enacting the Housing Element Law, the Legislature sought to "assure that counties and

18 cities recognize their responsibilities in contributing to the state housing goal." (§ 65581, subd.

19 (a).) That goal is to provide "a sufficient supply of decent housing to meet the needs of

20 Californians." (§ 65589, subd. (d).) Achieving that goal depends on counties and cities preparing

21 and implementing housing elements. (§ 65581, subd. (b).) Although localities are in the best

22 position to determine "what efforts are required by it to contribute to the attainment of the state

23 housing goal," that determination must be "compatible with the state housing goal and regional

24 housing needs." (*Id.*, subd. (c).) Finally, the Legislature sought to "ensure that each local

25 government cooperates with other local governments in order to address regional housing needs."

26 (*Id.*, subd. (d).)

27      The core provisions of the Housing Element Law all relate to and further these objectives.

28 Section 65583 sets forth the basic requirements for every housing element, and it compels the

1   implementation of a program that accommodates the RHNA. Section 65584 et seq. establishes the

2   system of coordination between HCD and the region, as well as regional coordination among

3   local governments, in determining the regional housing need and assigning the RHNA. Section

4   65585 sets forth the procedures through which local governments, in consultation with HCD,

5   adopt their housing elements. And Section 65588 requires local governments to update their

6   housing elements on a set schedule and to account for changed circumstances.

7       The Housing Accountability Act, which is a key component of the Housing Element Law,

8   underscores the importance of the housing element in compelling cities to address regional

9   housing needs. (See § 65589.5.) Under that statute, a local agency must approve any project

10  consistent with its objective land use policies unless it can make certain health-or-safety findings.

11  (*Id*., subd. (j)(1).) Local governments that fail to adopt housing elements in accordance with the

12  Housing Element Law lose the authority to rely on local planning and zoning laws to disapprove

13  new affordable housing developments. (*Id*., subd. (d)(5).) Local governments that adopt housing

14  elements but fail to implement them lose the authority to rely on more restrictive zoning laws to

15  disapprove new affordable housing developments on their housing element inventory sites. (*Id*.,

16  subd. (d)(5)(B).) And to the extent the Housing Accountability Act allows local governments to

17  control the development of housing, any such land use controls must be "consistent with meeting

18  the jurisdiction's share of the regional housing need." (*California Renters*, *supra*, 68 Cal.App.5th

19  at p. 850.) In other words, land use controls, on their face and in their enforcement, must be

20  consistent with the jurisdiction meeting its RHNA obligations.

21      For this scheme to work as the Legislature envisioned, local governments must fulfill their

22  obligations at every stage of planning and permitting for housing. Under the Housing

23  Accountability Act, local policies must be consistent with meeting RHNA. (See *ibid*.) Local

24  governments must adopt housing elements that, among other things, accommodate RHNA. (§§

25  65583, 65585.) They must work with HCD, and each other, to project and allocate its share of

26  regional housing needs. (§ 65584.) And in working to meet their RHNA, they do their part to

27  ensure California meets its legislatively enunciated and crucial housing goals. (See § 65581.) That

28

**EXHIBIT 3**

1    is how, when followed, the Housing Element Law achieves the Legislature's policy objectives.

2    (See *ibid*.)

3        **B.    By Refusing to Adopt a Housing Element, the City is Undermining the Legislature's Objectives in Adopting the Housing Element Law**

4

5        Outright failure to adopt a revised housing element for a given planning period is materially

6    incompatible with these objectives. With the Housing Element Law, the Legislature sought to

7    ensure that local governments enable the development of new housing necessary to meet the

8    housing needs of all economic segments. (*Martinez, supra*, 2023 WL 2820092, at *2.) For one

9    locality to declare itself exempt from this obligation forces other localities in the region to make

10   up for that shortfall. It also creates regional spillover effects, namely through restricting supply

11   and thus increasing demand elsewhere, by preventing the development of new affordable housing

12   opportunities for low-income families throughout the SCAG region, not just the City. (*Anderson*,

13   *supra*, 42 Cal.App.5th at p. 711.)

14       And if one locality were allowed to declare itself exempt from its duty to adopt a housing

15   element, that would encourage other localities to follow suit, effectively nullifying the RHNA

16   process and thereby undermining the purpose of regional and statewide coordination. The

17   Legislature adopted these laws to address a "collective action problem" that created a "collective

18   shortfall in housing." (*California Renters, supra*, 68 Cal.App.5th at p. 851.) The statute seeks to

19   encourage HCD, regional councils of governments, and their constituent local governments to

20   work together to solve the housing crisis—a crisis that stems, in part, from local governments

21   prioritizing local opposition to new housing over the regional and statewide benefits of new

22   housing. (See *ibid*.; see also § 65589.5, subd. (a)(1)(D) ["Many local governments do not give

23   adequate attention to the economic, environmental, and social costs of decisions that result in

24   disapproval of housing development projects, reduction in density of housing projects, and

25   excessive standards for housing development projects."].) Through its repeated willful violations

26   of state housing law, the City has refused to engage in the collaboration that the Legislature

27   required of local governments.

28

Memorandum of Points and Authorities ISO Motion for Temporary Relief (30-2023-01312235-CU-WM-CJC)

**EXHIBIT 3**

**C.   Temporary Relief Is Appropriate to Meet Housing Element Law Objectives**

Petitioners acknowledge that, under Section 65757, this Court retains discretion with respect to issuing temporary relief. (See § 65757.) That discretion, however, is not limitless. "The scope of discretion always resides in the particular law being applied." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 (*Drew*).) Here, the City's flagrant refusal to meet its housing needs calls for temporary relief to, at a minimum, ensure it does not further stall needed housing during the pendency of this action.

Accordingly, the Court should temporarily impose the limited relief authorized by subdivision (a)(4) of Section 65755. That provision authorizes courts to mandate "the approval of all applications for building permits, or other related construction permits, for residential housing" notwithstanding any "zoning laws held to be invalid by the final court order" provided that certain requirements are met. (§ 65755, subd. (a)(4).) Because the City lacks a compliant housing element, the Housing Accountability Act already prohibits the City from relying on its outdated local zoning laws to disapprove new affordable housing opportunities.[5] (See § 65589.5, subd. (d)(5).) With the relief provided for under subdivision (a)(4), the *prohibition* on using outdated zoning rules to deny affordable housing projects would become a *mandate* to approve such projects notwithstanding those outdated zoning rules. (Compare § 65589.5, subd. (d)(5) with § 65755, subd. (a)(4).) Relief under subdivision (a)(4), however, would not exempt projects from complying with objective code provisions intended to protect health and safety, nor would it exempt them from the requirements of the Coastal Act. (See § 65755, subd. (a)(4).)

This temporary relief would further key objectives of the Housing Element Law. By requiring the City to approve affordable housing projects, it would ensure that any further delay in the City's adoption and implementation of a housing element does not obstruct the supply of new affordable housing opportunities in the City. (See § 65580, subd. (d) ["Local and state

---

[5] To qualify as an affordable housing project under the Housing Accountability Act, a proposed housing development must offer "at least 20 percent of the total units … to lower income households" or "100 percent of the units … to persons and families of moderate income …." (§ 65589.5, subd. (h)(3).)

**EXHIBIT 3**

1  governments have a responsibility to use the powers vested in them to facilitate the improvement

2  and development of housing to make adequate provision for the housing needs of all economic

3  segments of the community."].)

4  **III.    THE PUBLIC INTEREST WEIGHS IN FAVOR OF GRANTING THE REQUESTED RELIEF**

5  When a statute expressly authorizes a public agency to pursue injunctive relief in the

6  enforcement of public rights, "a rebuttable presumption arises that the potential harm to the public

7  outweighs the potential harm to the plaintiff" so long as it is reasonably probable that the public

8  agency will prevail on the merits. (*IT Corp v. County of Imperial* (1983) 35 Cal.3d 63, 72.) Here,

9  the Legislature vested the Attorney General and HCD with the authority to pursue temporary

10  relief in actions to enforce the Housing Element Law. (See § 65585, subd. (n).)

11  The Legislature empowered the Attorney General and HCD to enforce the Housing

12  Element Law because California is suffering from a crisis-level housing shortage. (See § 65589.5,

13  subds. (a), (b).) Every local government must do its part to enable sufficient housing development

14  to overcome this shortfall. (See § 65581.) Unless remedied, the City's inaction will actively

15  contribute to that shortage.

16  Granting the temporary relief would not prevent the City from enforcing objective health-

17  and-safety standards. To qualify for approval under an order of temporary relief, a project would

18  need to comply with "all code requirements and other applicable provisions"—which would

19  include health-and-safety rules, but not requirements rendered invalid by section 65589.5—

20  "*except* those zoning laws held to be invalid" by the Court. (§ 65755, subd. (a)(4), italics added.)

21  The order of temporary relief would thus not interfere with the City's authority to enforce health-

22  and-safety standards.

23  For those reasons, the public interest weighs in favor of granting the motion, and the City

24  cannot claim that it would be harmed by the issuance of the temporary relief.

25  **CONCLUSION**

26  The City does not have a valid housing element, and it refuses to adopt one. Petitioners will

27  thus likely succeed on the merits. For that reason, this Court should grant this motion and issue an

28  order compelling the City to approve any affordable housing development project, as defined by

16

1    subdivision (h)(3) of Section 65589.5, "that conforms to all code requirements and other

2    applicable provisions of law[,]" except for planning and zoning laws that the City cannot enforce

3    against such affordable housing projects pursuant to the Housing Accountability Act. (See §§

4    65755, subd. (4), 65589.5, subd. (d)(5).)

5

6    Dated:  May 12, 2023                              Respectfully submitted,

7                                                      ROB BONTA
                                                       Attorney General of California
8                                                      DANIEL A. OLIVAS
                                                       Senior Assistant Attorney General
9                                                      DAVID PAI
                                                       Supervising Deputy Attorney General
10

11

12

13                                                     MATTHEW T. STRUHAR
                                                       Deputy Attorney General
14                                                     *Attorneys for Petitioners and Plaintiffs, the
                                                       People of California ex rel. Rob Bonta,
15                                                     Attorney General, and the California
                                                       Department of Housing and Community
16                                                     Development*

17   SA2023301106
     37171580.docx

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 3**

## <u>DECLARATION OF SERVICE BY E-MAIL AND OVERNIGHT COURIER</u>

Case Name:     **The People of California ex rel. Rob Bonta v. City of Huntington Beach**
No.:                 **30-2023-01312235-CU-WM-CJC**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is: 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for overnight mail with Federal Express ("FedEx").  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the overnight courier that same day in the ordinary course of business.

On <u>May 12, 2023</u>, I served the attached **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RELIEF** by transmitting a true copy via electronic mail.  In addition, I placed a true copy thereof enclosed in a sealed envelope, in the internal mail system of the Office of the Attorney General, for overnight delivery, addressed as follows:

Michael E. Gates, City Attorney
Office of the City Attorney
City of Huntington Beach
2000 Main St., Fourth Floor
Huntington Beach, CA 92648
Email: Michael.Gates@surfcity-hb.org

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on May 12, 2023, at Sacramento, California.

| | |
|---|---|
| Leticia Aguirre | |
| Declarant | Signature |

SA2023301106
37173007.docx

**EXHIBIT 3**


(https://www.ca.gov/)

California Department of
**Housing and Community Development (/)**

Grants & Funding (/grants-and-funding)

Manufactured & Mobilehomes (/manufactured-and-mobilehomes)

Building Standards (/building-standards-hcd)

Planning & Community Development (/planning-and-community-development)

Policy & Research (/policy-and-research)

About HCD (/about-hcd)

Home (/)  ›  About HCD (/about-hcd)  ›  Newsroom (/about-hcd/newsroom)  ›  California Sues Huntington Beach for Violating State Housing Element Law

# California Sues Huntington Beach for Violating State Housing Element Law

April 10, 2023



*City of Huntington Beach*

- The state today filed a motion to amend its March 8 housing lawsuit against Huntington Beach

- Since California filed its lawsuit, the City of Huntington Beach rescinded its illegal ban on SB 9 and ADU applications but refused to adopt a housing element in violation of state law, jeopardizing affordable housing opportunities for its residents

SACRAMENTO — Governor Gavin Newsom, Attorney General Rob Bonta, and the California Department of Housing and Community Development (HCD) today filed a motion to amend the state's lawsuit against Huntington Beach in order to hold the City accountable for violating the state Housing Element Law. California originally filed the lawsuit on March 8 ↗ (https://urldefense.com/v3/__https://oag.ca.gov/news/press-releases/attorney-general-bonta-governor-newsom-and-department-housing-and-community__;!!KlquKgc!a26BKQCUKtdvka-tBV0TZ7LBkZhpyVpKUFrQj2iJKWgC-r66oQO9EldvwvuS3bCgDFriVob_aHuYtjr-BB5OMvKzy7dbl7TpWGlFHg$), arguing that the city's ban on the processing of SB 9 and Accessory Dwelling Unit (ADU) applications violated state housing laws and must be struck down. As a result of the state's lawsuit, the Huntington Beach City Council reversed course and voted on March 21 to resume processing SB 9 and ADU project applications. However, at a meeting on April 4, the City Council once again violated state housing law by failing to adopt a housing element that is 16 months overdue – a decision that jeopardizes critical affordable housing opportunities for Huntington Beach residents.

Today, the state submitted an amended complaint in People of California v. City of Huntington Beach, arguing that the city is in violation of the state Housing Element Law, and seeking both penalties and injunctive relief. The state also intends to seek temporary relief against the city as authorized by statute, including, among other things, the suspension of the city's permitting authority and mandating the approval of certain

**EXHIBIT 4**

residential projects until the city comes into compliance with the law. Although the state is no longer seeking a preliminary injunction due to the city's about-face on SB 9 and ADU applications, the amended complaint does also seek a declaration from the court that the city's previous ban on SB 9 and ADU applications was unlawful and may not be reinstated.

"Huntington Beach continues to fail its residents," **said Governor Newsom**. "Every city and county needs to do their part to bring down the high housing and rent costs that are impacting families across this state. California will continue taking every step necessary to ensure everyone is building their fair share of housing and not flouting state housing laws at the expense of the community."

"California is in the midst of a housing crisis, and time and time again, Huntington Beach has demonstrated they are part of the problem by defiantly refusing every opportunity to provide essential housing for its own residents," **said Attorney General Bonta**. "The City's refusal last week to adopt a housing element in accordance with state law is just the latest in a string of willfully illegal actions by the city – decisions that worsen our housing crisis and harm taxpayers and Huntington Beach residents. We won't stand idly by as Huntington Beach continues to flagrantly violate state housing laws designed to bring crucial affordable housing opportunities to our communities. We'll use every legal tool available to hold the city accountable and enforce state housing laws."

"More housing is the path to ending and reducing homelessness but Huntington Beach continues to brazenly violate state housing laws--wasting valuable time and tax-payer money instead of working on solutions," **said HCD Director Gustavo Velasquez**. "HCD is committed to ensuring every city and county follows state housing laws and fulfills their commitment to building housing for all."

State law requires local governments to include housing elements in their general plans. A housing element must include, among other things, an assessment of housing needs, an inventory of resources and constraints relevant to meeting those needs, and a program to implement the policies, goals, and objectives of the housing element. The housing element is a crucial tool for building housing for moderate-, low-, and very low-income Californians. Huntington Beach has been out of compliance on its housing element since October 15, 2021, and last week in a 4-3 vote the City Council once again refused to adopt a draft housing element prepared by the city's own staff. As a result, the state is seeking injunctive relief and penalties against the city for their ongoing failure to comply with state housing law.

Furthermore, under California's Housing Accountability Act, cities that do not have a compliant housing element are subject to the so-called "Builder's Remedy," which allows project developers to submit housing projects with deed-restricted 20% low-income or 100% moderate-income without regard to local zoning and general plan standards. Under the Builder's Remedy provision, localities must approve these low- and moderate-income projects as long as they conform with objective building and design standards and comply with California Environmental Quality Act and the Coastal Act. These laws allow localities to address any specific, legitimate environmental or health and safety concerns on a project-by-project basis. As Huntington Beach remains non-compliant with the state Housing Element Law, the Builder's Remedy is in effect, and the city must approve Builder's Remedy projects that meet the legal criteria.

The city previously attempted to skirt the Builder's Remedy by proposing an ordinance to ban  Builder's Remedy projects. On February 13, HCD and the Attorney General warned the city's planning commission ☐ (https://urldefense.com/v3/__https://oag.ca.gov/news/press-releases/attorney-general-bonta-puts-city-huntington-beach-notice-its-proposed-ordinance__;!!KIquKgc!bREa-1Cd3lx2oYO8X4DAdjCZaVEvvMktswkrPD_QLOCl9eWeTOQ8DOJgOP4yLGufpZnGkpWsFoGwakI7OWCVG4GJrV7pwvumZ6c$) that the proposed ordinance would violate state law. Attorney General Bonta and HCD continue to closely monitor the progress of the proposed ordinance, as well as the city's actions on any Builder's Remedy project applications submitted to the city, and stand ready to take legal action if necessary.

A copy of the motion and of the amended complaint filed today, which is subject to court approval, are available here ☐ (https://urldefense.com/v3/__https://oag.ca.gov/system/files/attachments/press-docs/MPA*20ISO*20Motion*20to*20Amend.pdf__;JSUIJQ!!KIquKgc!a26BKQCUKtdvka-tBV0TZ7LBkZhpyVpKUFrQj2iJKWgC-r66oQO9EldvwvuS3bCgDFriVob_aHuYtjr-BB5OMvKzy7dbl7RA9ab7NQ$)and here ☐ (https://urldefense.com/v3/__https://oag.ca.gov/system/files/attachments/press-docs/Proposed*20Amended*20Petition.pdf__;JSU!!KIquKgc!a26BKQCUKtdvka-tBV0TZ7LBkZhpyVpKUFrQj2iJKWgC-r66oQO9EldvwvuS3bCgDFriVob_aHuYtjr-BB5OMvKzy7dbl7OynB6KZA$).

State leaders stand united in their commitment to defending and increasing access to affordable housing in California. In 2021, Attorney General Bonta announced the creation of a Housing Strike Force ☐ (https://urldefense.com/v3/__https://oag.ca.gov/news/press-releases/attorney-general-bonta-launches-housing-strike-force-announces-convening-tenant__;!!KIquKgc!fKTB94XgOAK5hkLGjvEayNuUvY_H729Cmt1VuFO1fybRzuvzIKs-MuTEcSNquxSLVKy6G28wXSGCNRGNnFToWTVgeGJbM3mYKRo$) within the California Department of Justice aimed at advancing housing access across the state. The same year, Governor Newsom launched a Housing Accountability Unit ☐ (https://urldefense.com/v3/__https://www.gov.ca.gov/2022/11/04/governor-newsoms-newly-created-housing-accountability-unit-marks-first-year/__;!!KIquKgc!fKTB94XgOAK5hkLGjvEayNuUvY_H729Cmt1VuFO1fybRzuvzIKs-MuTEcSNquxSLVKy6G28wXSGCNRGNnFToWTVgeGJb7LzKGMo$) to increase stringent enforcement and oversight at the local level to create more housing, faster across California. Members of the public are encouraged to visit the California Department of Justice's Housing Portal ☐ (https://urldefense.com/v3/__https://oag.ca.gov/housing__;!!KIquKgc!fKTB94XgOAK5hkLGjvEayNuUvY_H729Cmt1VuFO1fybRzuvzIKs-MuTEcSNquxSLVKy6G28wXSGCNRGNnFToWTVgeGJbaM4qv-k$) and HCD's website ☐ (https://urldefense.proofpoint.com/v2/url?u=https-3A__www.hcd.ca.gov_planning-2Dand-2Dcommunity-2Ddevelopment_accountability-2Dand-2Denforcement&d=DwMGaQ&c=uASjV29gZuJt5_5J5CPRuQ&r=m9RwSbk4n3-

**EXHIBIT 4**

L1qsaQxL1aKSbuy_GWYzPa8qdn1tnzaU&m=3zYy7UPUzg9KWr44J5cg-r9S2YPXjMzp6bZdhP30X5pIMRkGcbFyryk-HQEX4YEq&s=oNMdW9mC8F0hf6mPVnXOd3MoY0yJaLEstqE7Fs9W5E4&e=) for more resources and information aimed at supporting access to housing.

Contact Details:
HCD Media Office
Media@hcd.ca.gov (mailto:Media@hcd.ca.gov)

‹ Back to Newsroom (/about-hcd/newsroom)

Press Release (/about-hcd/newsroom/term/59)   Housing Element Sites (/about-hcd/newsroom/term/73)

Search Newsroom

## Recent Post

Governor Newsom Announces $16 Million to Support Farmworker Homeownership (/about-hcd/newsroom/governor-newsom-announces-16-million-to-support-farmworker-homeownership)

Governor Newsom and Attorney General Bonta Announce a Lawsuit Against the City of Elk Grove for Violating State Fair Housing Laws (/about-hcd/newsroom/governor-newsom-and-attorney-general-bonta-announce-lawsuit-against-city-of-elk-grove-violating-state-fair-housing-laws)

DGS and HCD Announce Grand Opening of the First State-Owned Affordable Housing Project to Open Under Governor Newsom's Executive Order (/about-hcd/newsroom/dgs-and-hcd-announce-grand-opening-of-first-state-owned-affordable-housing-project-to-open-under-governor-newsoms-executive-order)

California Sues Huntington Beach for Violating State Housing Element Law (/about-hcd/newsroom/california-sues-huntington-beach-violating-state-housing-element-law)

California Investments Save More Than 700 Affordable Homes from Losing Affordability Restrictions (/about-hcd/newsroom/california-investments-save-more-700-affordable-homes-losing-affordability-restrictions)

‹ Back to Newsroom (/about-hcd/newsroom)

Press Release (/about-hcd/newsroom/term/59)   Success Stories (/about-hcd/newsroom/term/64)   Excess Sites (/about-hcd/newsroom/term/66)

Prohousing (/about-hcd/newsroom/term/67)   Homelessness (/about-hcd/newsroom/term/68)   Disaster Recovery (/about-hcd/newsroom/term/69)

Technical Assistance (/about-hcd/newsroom/term/70)   Report (/about-hcd/newsroom/term/71)   Surplus Properties (/about-hcd/newsroom/term/72)

Housing Element Sites (/about-hcd/newsroom/term/73)   Homekey (/about-hcd/newsroom/term/81)   Affordable Housing (/about-hcd/newsroom/term/82)

Preservation (/about-hcd/newsroom/term/83)   Eblast Announcements (/about-hcd/newsroom/eblast-announcements)

## Archive

2023 (/about-hcd/newsroom/archive/2023)

2022 (/about-hcd/newsroom/archive/2022)

2021 (/about-hcd/newsroom/archive/2021)

2020 (/about-hcd/newsroom/archive/2020)

Contact

California Department of Housing & Community Development

2020 West El Camino Avenue

Sacramento, CA 95833

**Directions**

(https://www.google.com/maps/dir//2020+W+El+Camino+Ave,+Sacramento,+CA+95833/@38.6122067,-121.5107101,17z/data=!4m9!4m8!1m0!1m5!1m1!1s0x8

**EXHIBIT 4**

121.508516!!2d58.6!22067!3e0)
Division of Codes and Standards
9342 Tech Center Drive, Suite 500
Sacramento, CA 95826
(800) 952-8356

**Regional Offices** (/manufactured-and-mobilehomes/registration-and-titling#collapse-4)

## Statewide Campaigns

Register to Vote (https://registertovote.ca.gov/)
Save Our Water (https://saveourwater.com/)
Flex Alert (http://www.flexalert.org/)
Real ID (https://www.dmv.ca.gov/portal/dmv/detail/realid)

Housing Is Key (https://landlordtenant.dre.ca.gov/)
Covid19 Updates (https://covid19.ca.gov/)
Vaccinate ALL 58 (https://covid19.ca.gov/vaccines/)
Rent Relief
(https://urldefense.com/v3/__https:www.bcsh.ca.gov/ab3088/__;!!KIquKgc!MkdD66JIqHAnQp6NTLPcJensK9w0NCXU_tvyS_H_FAJ__vlrJUAzEptQy0LHW4i2p2tQc

Conditions of Use (/condition-of-use) | Privacy Policy (/privacy-policy) | Accessibility Policy (/accessibility) | Contact Us (/contact-us) | Site Map (/sitemap) | Servicios Bilingües (/servicios-bilingues)

Copyright © 2023 State of California

**EXHIBIT 4**



California Department of
**Housing and Community Development (/)**

Grants & Funding (/grants-and-funding)

Manufactured & Mobilehomes (/manufactured-and-mobilehomes)

Building Standards (/building-standards-hcd)

Planning & Community Development (/planning-and-community-development)

Policy & Research (/policy-and-research)

About HCD (/about-hcd)

Home (/)  ›  Planning & Community Development (/planning-and-community-development)  ›  Regional Housing Needs Allocation (RHNA)

# Regional Housing Needs Allocation (RHNA)

The RHNA process refers to the first two steps (Determination and Allocation) of a multi-step process that California governments utilize to plan for housing needs in each region of the state.

Since 1969, California has required that all local governments (cities and counties) adequately plan to meet the housing needs of everyone in the community. This process starts with the state determining how much housing at a variety of affordability levels is needed for each region in the state, and then regional governments developing a methodology to allocate that housing need to local governments. California's local governments then adopt housing plans (called housing elements) as part of their "general plan" (also required by the state) to show how the jurisdiction will meet local housing needs.



**EXHIBIT 5**

# Determination: Calculating the Housing Need in Each Region

HCD is responsible for determining the regional housing need for each region's planning body known as a "council of governments" (COG), with input from the Department of Finance (DOF). HCD and the COG consult and compare data related to demographic trends and housing conditions in the region. After this consultation, HCD issues the final regional housing need number for the region, which is broken out by income categories. The final housing need determination must be issued at least two years before the next Housing Element due date.

The determination is required to account for both the existing and projected housing need in each region. Accordingly, in addition to considering DOF data on future population and household growth, HCD also assesses whether additional housing is needed to serve the existing population. For instance, HCD considers data on overcrowding, cost burden, vacancy rates, and jobs-housing imbalances when determining the regional housing need. HCD is also required to consider whether units have recently been lost due to a state of emergency declared by the Governor.

# Allocation: Distributing the Need to Cities and Counties

Once HCD has issued the region's housing need determination figure (the amount of housing that must be planned for), the COG is responsible for allocating the housing need amongst all of the jurisdictions (cities/counties) within that region. The COG must develop a methodology for allocating the regional housing need and submit the methodology to HCD for review. After the methodology is adopted by the COG, they must develop a Regional Housing Need Allocation Plan (RHNA Plan). The RHNA Plan must be adopted by the COG at least one year before the next Housing Element due date. Learn more: Building Blocks: A Comprehensive Housing-Element Guide (/planning-and-community-development/housing-elements/building-blocks).

Statute requires that the COG develop a RHNA allocation methodology that furthers five statutory objectives ☑ (https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?sectionNum=65584.&lawCode=GOV) (Gov. Code Section 65584(d)). Overall, the statutory objectives encourage the development of a RHNA allocation plan that promotes more economically and racially integrated communities by allocating housing to high-resource, job-rich areas, while also meeting the state's greenhouse gas reduction goals by encouraging infill development and the protection of environmental resources. Statute also lays out 13 factors that COGs are allowed to consider when creating the allocation methodology, as well as three criteria that cannot be considered. HCD is charged with developing the RHNA Plan for 20 predominantly rural counties across the state that do not have a COG.

# California's Housing Future 2040: The Next Regional Housing Needs Allocation

AB 101 (2019) ☑ (https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB101) directs HCD, in collaboration with OPR and after engaging in stakeholder participation, to develop recommendations related to the RHNA process and methodology. Upon completion of this California's Housing Future 2040 stakeholder engagement initiative, HCD will compile its findings and recommendations, and will submit a report to the Legislature by December 31, 2023.

HCD plans to conduct this stakeholder engagement initiative in the Spring of 2023, which will consist of several opportunities for stakeholder input. HCD is undertaking the CA's Housing Future 2040 initiative centering the following guiding principles:

- Ensure RHNA is a fair, transparent, objective, and streamlined process for identifying housing need.

  - Fair in terms of advancing equity, racial justice and inclusion, and environmental justice in a manner that ensures all jurisdictions plan for their fair share of the region's housing need.

  - Transparent in terms of open and accessible public participation, proactive engagement, and making materials available online.

  - Objective in terms of maintaining a data-driven process.

  - Streamlined in terms of ensuring a logical flow of steps with the most efficient process available to accomplish meaningful outcomes.

- Strategically plan for the needs of households of all income levels while promoting infill development, the protection of natural resources, and efficient development patterns.

- Account for future climate risk with the goal of ensuring communities and vulnerable populations are not unduly exposed to climate risks, including but not limited to drought, flooding, sea level rise, and wildfire.

- Encourage increased development to substantially address California's housing shortage and affordability issues.

- Improve compliance and outcomes through incentives and enforcement.

- Enhance and protect RHNA's role in Affirmatively Furthering Fair Housing so that all cities plan for their fair share of growth and future planning does not further entrench segregated living patterns.

EXHIBIT 5

Below you will find information on upcoming stakeholder engagement events and materials created during this CA's Housing Future 2040: The Next RHNA initiative. This webpage will be updated as more information becomes available.

| California's Housing Future 2040: The Next RHNA - Stakeholder Engagement Events and Resources | + |
|---|---|

| Regional Housing Need Determination for the 6th Cycle Housing Element | + |
|---|---|

| Regional Housing Need Determination for the 5th Cycle Housing Element | + |
|---|---|

| HCD RHNA Audit Action Plan | + |
|---|---|

## Contact Us

Can't find what you're looking for?

Email Us (mailto:CAHousingFuture2040@hcd.ca.gov)

## Related Links

Housing Elements (/planning-and-community-development/housing-elements)

Building Blocks (/planning-and-community-development/housing-elements/building-blocks)

Annual Progress Reports (/planning-and-community-development/annual-progress-reports)

Annual Progress Reports - Data Dashboard and Downloads (/planning-and-community-development/housing-open-data-tools/housing-element-implementation-and-apr-dashboard)

## Contact

California Department of Housing & Community Development
2020 West El Camino Avenue
Sacramento, CA 95833

**Directions**
(https://www.google.com/maps/dir//2020+W+El+Camino+Ave,+Sacramento,+CA+95833/@38.6122067,-121.5107101,17z/data=!4m9!4m8!1m0!1m5!1m1!1s0x809ad121.5085161!2d38.612206713e0)
Division of Codes and Standards
9342 Tech Center Drive, Suite 500
Sacramento, CA 95826
(800) 952-8356

**Regional Offices** (/manufactured-and-mobilehomes/registration-and-titling#collapse-4)

## Statewide Campaigns

Register to Vote (https://registertovote.ca.gov/)
Save Our Water (https://saveourwater.com/)
Flex Alert (http://www.flexalert.org/)

EXHIBIT 5

Real ID (https://www.dmv.ca.gov/portal/dmv/detail/realid)

Housing Is Key (https://landlordtenant.dre.ca.gov/)

Covid19 Updates (https://covid19.ca.gov/)

Vaccinate ALL 58 (https://covid19.ca.gov/vaccines/)

Rent Relief
(https://urldefense.com/v3/__https://www.bcsh.ca.gov/ab3088/__;!!KIquKgc!MkdD66JlqHAnQp6NTLPcJensK9w0NCXU_tvyS_H_FAJ__vlrJUAzEptQy0LHW4i2p2tQcv

Conditions of Use (/condition-of-use) | Privacy Policy (/privacy-policy) | Accessibility Policy (/accessibility) | Contact Us (/contact-us) | Site Map (/sitemap) | Servicios Bilingües (/servicios-bilingues)

Copyright © 2023 State of California

**EXHIBIT 5**

# PLACEHOLDER FOR EXHIBIT 6

A true and correct copy of the Governor Newsom's
press conference can be viewed on Youtube, at
https://www.youtube.com/watch?v=JSy2VOGkBF8
at 45:30-45:45:59.

EXHIBIT 6



Office of the Governor of Califor ×

twitter.com/CAgovernor/status/1625898020683538432

Explore

Settings

Tweet

**Office of the Governor of California**
@CAgovernor

Huntington Beach is playing chicken with housing. The state will hold them accountable.

California law lets judges appoint a state agent to do their housing planning for them — HB can do it themselves or the court will take control.

abc7.com
Huntington Beach fighting state over affordable housing issue
The city of Huntington Beach is looking to approve a housing ordinance that state officials say violates California law.

8:41 AM · Feb 15, 2023 · **77K** Views

**89** Retweets **15** Quotes **325** Likes **2** Bookmarks

NPP Lincoln @LincolnFresno · Feb 15

**EXHIBIT 7**



# Bill Text: CA AB101 | 2019-2020 | Regular Session | Chaptered
# California Assembly Bill 101 *(Prior Session Legislation)*

**Bill Title:** Housing development and financing.

**Spectrum:** Committee Bill

**Status:** *(Passed)* 2019-07-31 - Chaptered by Secretary of State - Chapter 159, Statutes of 2019. [AB101 Detail]

**Download:** California-2019-AB101-Chaptered.html

**Assembly Bill No. 101**

CHAPTER 159

An act to amend Sections 30035.7, 65400, 65585, and 65913.4 of, to add Sections 65589.9 and 65589.11 to, and to add and repeal Article 12 (commencing with Section 65660) of Chapter 3 of Division 1 of Title 7 of, the Government Code, to amend Sections 50199.8, 50517.5, 50517.6, 50517.7, 50650, 50650.3, 50650.4, 50843.5, and 53545.13 of, to add Chapter 6 (commencing with Section 50216) to Part 1 of Division 31 of, to add Chapter 3.1 (commencing with Section 50515) to Part 2 of Division 31 of, and to add and add Part 12.5 (commencing with Section 53559) to Division 31 of, the Health and Safety Code, to add Sections 75218.1 and 75244 to the Public Resources Code, to amend Sections 12206, 17058, 17561, 23610.5, and 24692 of the Revenue and Taxation Code, and to amend Section 8256 of the Welfare and Institutions Code, relating to housing, and making an appropriation therefor, to take effect immediately, bill related to the budget.

[ Approved by Governor  July 31, 2019. Filed with Secretary of State  July 31, 2019. ]

## LEGISLATIVE COUNSEL'S DIGEST

AB 101, Committee on Budget. Housing development and financing.

(1) Existing law establishes the Community-Based Transitional Housing Program, administered by the Department of Finance (DOF), for the purpose of providing grants to cities, counties, and cities and counties to increase the supply of transitional housing available to persons previously incarcerated for felony and misdemeanor convictions and funded with moneys appropriated for that purpose in the annual Budget Act or other measure. Existing law requires DOF's Office of State Audits and Evaluations to conduct a review of the program, commencing July 1, 2018, to determine its effectiveness in providing services to offenders released from state prison or county jail, and authorizes DOF to use up to $500,000 of the amount appropriated in any budget act or other measure for the program for this review, as specified. Existing law requires DOF to provide a copy of the audit to the Joint Legislative Budget Committee no later than May 1, 2019.

This bill would instead require the Office of State Audits and Evaluations to conduct an audit of the program, as specified, and would remove the requirement that the Office of State Audits and Evaluations commence the audit on July 1, 2018. The bill would extend the date by which DOF is required to provide a copy of the audit to the Joint Legislative Budget Committee to no later than May 1, 2020.

(2) The Planning and Zoning Law requires a city or county to adopt a general plan for land use development within its boundaries that includes, among other things, a housing element. That law requires the Department of Housing and Community Development (HCD) to determine whether the housing element is in substantial compliance with specified provisions of that law. That law also requires HCD to notify a city, county, or city and county, and authorizes HCD to notify the office of the Attorney General, that the city, county, or city and county is in violation of state law if the local government has taken action in violation of specified provisions of law.

This bill, in any action or special proceeding brought in connection with a violation of state law identified as described above, would require the Attorney General to request that the court issue an order or judgment directing a violating jurisdiction to bring its housing element into substantial compliance with those specified provisions and would require the court to retain jurisdiction to ensure that its order or judgment is carried out. The bill would require a court to conduct a status conference if a jurisdiction has not complied with the order or judgment within a specified time period. The bill, following the status conference and upon a determination that the jurisdiction failed to comply with the order or judgment, would require the court to, among other things, impose fines, as specified. The bill would require these fines to be deposited in the Building Homes and Jobs Trust Fund, which is partially continuously appropriated. By depositing money into a partially continuously appropriated fund, this bill would make an appropriation. If the jurisdiction has not complied with the order or judgment within specified time periods after the imposition of fines, the bill would require the court to conduct additional status conferences and multiply the amount of the fine and order the appointment of an agent of the court to bring

EXHIBIT 8

the jurisdiction's housing element into substantial compliance, as provided. The bill, commencing July 1, 2019, would require HCD, prior to bringing any suit for a violation by a jurisdiction of a specified provision of law, to offer the jurisdiction the opportunity for 2 meetings in person or via telephone to discuss the violation and to provide the jurisdiction written findings regarding the violation, as specified.

This bill, for award cycles commenced after July 1, 2021, would require that jurisdictions, defined as a city, county, or city and county in existing law, that have adopted housing elements determined by HCD to be in substantial compliance with specified provisions of the Planning and Zoning Law, as described above, and that have been designated by HCD as prohousing, as specified, be awarded additional points in the scoring of program applications for housing and infrastructure programs pursuant to guidelines adopted by HCD, as provided.

This bill would require DOF to maintain a list of programs for which a jurisdiction is ineligible if it fails to adopt a housing element that is found to be in substantial compliance with specified provisions of the Planning and Zoning Law. The bill would also require HCD to post on its internet website a list of jurisdictions that have failed to adopt a housing element that has been found by HCD to be in substantial compliance with specified provisions of the Planning and Zoning Law. The bill would require HCD to provide that list to the Office of Planning and Research and any other applicable agency or department, as specified. If a jurisdiction is included on that list, the bill would require HCD to offer the jurisdiction the opportunity for 2 meetings in person or via telephone to discuss the jurisdiction's failure to adopt a housing element that is found to be in substantial compliance with specified provisions of the Planning and Zoning Law and to provide the jurisdiction written findings regarding that failure.

The bill would include findings that changes proposed by these provisions address a matter of statewide concern rather than a municipal affair and, therefore, apply to all cities, including charter cities.

(3) The Planning and Zoning Law requires that supportive housing be a use by right, as defined, in zones where multifamily and mixed uses are permitted, including nonresidential zones permitting multifamily uses, if the proposed housing development meets specified requirements. The California Environmental Quality Act (CEQA) requires a lead agency, as defined, to prepare, or cause to be prepared, and certify the completion of an environmental impact report on a project that it proposes to carry out or approve that may have a significant effect on the environment or to adopt a negative declaration if it finds that the project will not have that effect. CEQA does not apply to the ministerial approval of projects.

This bill would require that a Low Barrier Navigation Center development be a use by right, as defined, in areas zoned for mixed uses and nonresidential zones permitting multifamily uses if it meets specified requirements. The bill would define "Low Barrier Navigation Center" as a Housing First, low-barrier, service-enriched shelter focused on moving people into permanent housing that provides temporary living facilities while case managers connect individuals experiencing homelessness to income, public benefits, health services, shelter, and housing. The bill would define the term "use by right" in this context to mean that the local government's review of the Low Barrier Navigation Center development may not impose certain requirements, such as a conditional use permit or other discretionary review or approval. The bill would provide that CEQA does not apply to an action taken by a public agency to lease, convey, or encumber land owned by a public entity or to facilitate the lease, conveyance, or encumbrance of land owned by a public agency, or to provide financial assistance to, or otherwise approve, a Low Barrier Navigation Center constructed or allowed by this bill. In addition, the bill, by authorizing Low Barrier Navigation Center developments to be a use by right under certain circumstances, would expand the exemption for the ministerial approval of projects under CEQA.

The bill would prescribe requirements for notifying a developer that its application for a Low Barrier Navigation Center development is complete and for the local jurisdiction to complete its review of the application. The bill would declare that Low Barrier Navigation Center developments are essential tools for alleviating the homelessness crisis in this state and are a matter of statewide concern and thus applicable to charter cities.

The bill would repeal these provisions as of January 1, 2027.

By increasing the duties of local planning officials, this bill would impose a state-mandated local program.

(4) The Planning and Zoning Law, until January 1, 2026, authorizes a development proponent to submit an application for a housing development that is subject to a streamlined, ministerial approval process, as provided, and not subject to a conditional use permit, if the development satisfies specified objective planning standards. Existing law provides, among other objective planning standards, that at least $^2/_3$ of the square footage of the development be designated for residential use.

Existing law, known as the Density Bonus Law, requires a city or county to provide a developer that proposes a housing development within the jurisdictional boundaries of that city or county with a density bonus and other incentives or concessions for the production of lower income housing units or for the donation of land within the jurisdiction for housing, if the developer agrees to construct a specified percentage of units for very low income, low-income, or moderate-income households or qualifying residents and meets other requirements.

This bill would require that the calculation to determine whether $^2/_3$ of the square footage of the development is designated for residential use include additional density, floor area, and units, and any other concession, incentive, or waiver, granted pursuant to the Density Bonus Law.

Existing law prohibits a development subject to the streamlined, ministerial approval process from being located on a hazardous waste site, as defined, unless the Department of Toxic Substances Control has cleared the site for residential use.

This bill would instead prohibit a development subject to the streamlined, ministerial approval process from being located on a hazardous waste site, as defined, unless the State Department of Public Health, State Water Resources Control Board, or the Department of Toxic Substances Control has cleared the site for residential use.

**EXHIBIT 8**

(5) Existing law establishes the California Tax Credit Allocation Committee (CTCAC) within state government, which is composed of the Governor, the Controller, and the Treasurer.

This bill would revise the composition of CTCAC to include the Director of Housing and Community Development and the Executive Director of the California Housing Finance Agency.

(6) Existing law establishes various programs, including, among others, the Emergency Housing and Assistance Program, to provide assistance to homeless persons. Existing law sets forth the general responsibilities and roles of the Business, Consumer Services, and Housing Agency, HCD, and the California Housing Finance Agency (CalHFA) in carrying out state housing policies and programs.

This bill would establish the Homeless Housing, Assistance, and Prevention Program administered by the Business, Consumer Services, and Housing Agency for the purpose of providing jurisdictions, as defined, with one-time grant funds to support regional coordination and expand or develop local capacity to address homelessness challenges, as specified. Upon appropriation, the bill would require the agency to distribute $650,000,000 among cities, counties, and continuums of care, as provided. The bill, no later than February 15, 2020, would require an applicant to submit to the agency its program allocation application. The bill would require the agency to review each plan and make an allocation determination no later than April 1, 2020. The bill would require a recipient of program funds to submit annual progress reports to the agency and a final report, no later than January 1, 2026, regarding the expenditure of funds under the program.

(7) The Planning and Zoning Law requires HCD, in consultation with each council of governments, to determine the existing and projected need for housing in each region and further requires the appropriate council of governments, or HCD for cities and counties without a council of governments, to adopt a final regional housing need plan that allocates a share of the regional housing need to each city, county, or city and county, as provided.

This bill would establish the Local Government Planning Support Grants Program administered by HCD for the purpose of providing regions and jurisdictions with one-time funding. The bill, upon appropriation, would require HCD to allocate $250,000,000 to councils of governments and jurisdictions, as those terms are defined, as well as certain other regional entities to be used for technical assistance, the preparation and adoption of planning documents, and process improvements to accelerate housing production and to facilitate compliance with the 6th cycle of the regional housing need assessment, as provided. The bill would specify eligible uses of these funds. The bill would require these entities to apply for an allocation of funds within specified time periods. The bill would also require these entities to either submit an annual report to HCD, and make that report publicly available on its internet website, containing specified information regarding the uses of funds allocated under the program or, if the recipient is a city or county, include that information in a specified annual report required under existing law.

This bill, by December 31, 2022, would also require HCD, in collaboration with the Office of Planning and Research and after engaging in stakeholder participation, to develop a recommended improved regional housing need allocation process and methodology that promotes and streamlines housing development and substantially addresses California's housing shortage, as provided. The bill would require HCD to submit a report on its findings and recommendations to the Legislature upon completion.

(8) Existing law requires HCD to establish and administer the Joe Serna, Jr. Farmworker Housing Grant Program, under which, subject to the availability of funds in the Joe Serna, Jr. Farmworker Housing Grant Fund, a continuously appropriated fund, grants or loans, or both, are made available for the construction or rehabilitation of housing for agricultural employees, as defined, and their families or for the acquisition of manufactured housing to remedy the impacts of the displacement of farmworker families. Existing law requires grants and loans made pursuant to this program to be matched by grantees with at least equal amounts of federal moneys, other cash investments, or in-kind contributions, except as specified. Existing law authorizes HCD to set aside up to 4% of funds available in the Joe Serna, Jr. Farmworker Housing Grant Fund on July 1 of each fiscal year for the purposes of curing or averting a default on the terms of any loan or other obligation by a recipient of financial assistance under the program or to repair or maintain any dwelling unit assisted under the program, under specified conditions.

This bill would require HCD to require, for multifamily housing loans made pursuant to the program, annual loan payments in the minimum amount necessary to cover the costs of project monitoring, as specified. The bill would remove the matching funds requirement. The bill would decrease the amount in the Joe Serna, Jr. Farmworker Housing Grant Fund that HCD is authorized to set aside to 1.5% of funds available.

(9) Existing law establishes the CalHome Program, administered by HCD, to enable low- and very low income households to become or remain homeowners. Existing law requires HCD, under the program, to use appropriated funds to provide grant or loan funds to local public agencies or nonprofit corporations for specified purposes relating to the promotion of home ownership. Existing law requires local public agencies or nonprofit corporations to meet certain eligibility requirements, including underwriting requirements. Existing laws authorizes HCD to permit an applicant to apply its own underwriting guidelines, if HCD approves those guidelines, as well as any alterations to those guidelines. Existing law, the Veterans and Affordable Housing Bond Act of 2018, deposits $300,000,000 to the Self-Help Housing Fund, a continuously appropriated fund, for purposes of the CalHome Program, as specified.

This bill would authorize HCD to make grants to local agencies or nonprofit associations for the construction, repair, reconstruction, or rehabilitation of accessory dwelling units and junior accessory dwelling units. The bill would also authorize HCD to use appropriated funds to make grants to local agencies or nonprofit corporations to assist households that meet certain income requirements and are victims of a disaster, provided that the disaster was proclaimed by the Governor, as specified, received a special appropriation of federal emergency supplemental assistance, or declared by the President. The bill would authorize HCD to adopt guidelines to this effect. The bill would also require HCD to approve any alterations of underwriting guidelines by applicants with respect to how the applicants will ensure participation by low-income households in making loans in response to a disaster.

By expanding the uses of a continuously appropriated fund, this bill would make an appropriation.

**EXHIBIT 8**

(10) Existing law establishes the Local Housing Trust Fund Matching Grant Program for the purpose of supporting local housing trust funds dedicated to the creation or preservation of affordable housing. Under the grant program, HCD is authorized to make matching grants available, through the issuance of a Notice of Funding Availability (NOFA), to cities, counties, cities and counties, and existing charitable nonprofit organizations that have created, funded, and operated housing trust funds.

This bill would authorize HCD to make matching grants available under the program, as described above, to Native American tribes. The bill would authorize HCD to adopt guidelines to implement the program. The bill would also authorize HCD to make grants to trust funds for the construction, repair, reconstruction, or rehabilitation of accessory dwelling units and junior accessory dwelling units.

Under existing law, the minimum allocation to a program applicant is $1,000,000 for existing housing trust funds, or $500,000 for newly established housing trust funds. The maximum allocation for any applicant is $2,000,000, unless the applicant has previously received a grant through the program, in which case the maximum allocation is $1,000,000. Under existing law, all funds provided under the grant program are to be matched on a dollar-for-dollar basis with moneys that are not required by any state or federal law to be spent on housing. Existing law requires that HCD receive adequate documentation of the deposit in the local housing trust fund of the local match and the identity of the source of matching funds before considering an application for an existing housing trust.

This bill would authorize HCD to increase the minimum allocation above $500,000 to an applicant that is a newly established trust and increase the minimum allocation to all other trusts above $1,000,000. The bill would provide that the matching fund requirement does not apply to specified funds allocated under the Building Homes and Jobs Act that are used to capitalize a regional housing trust fund. In the case of an application for an existing housing trust, the bill would also authorize the applicant to provide evidence of a legally binding commitment to deposit matching funds.

Existing law requires HCD to set aside funding for new trusts, as defined in the NOFA issued for the program. Existing law also requires that funds be used for the predevelopment costs, acquisition, construction, or rehabilitation of specified types of housing, including emergency shelters, safe havens, and transitional housing, as defined by specified law.

This bill would instead require that HCD set aside funding for new trusts, as defined in the guidelines that are authorized by this bill to be adopted to implement the program. The bill would also instead require that funds be used for the predevelopment costs, acquisition, construction, or rehabilitation of emergency shelters, transitional housing, and permanent supportive housing, as defined in those guidelines.

Existing law requires that no more than 5% of the funds appropriated to HCD for purposes of the program be used for HCD's administrative costs.

This bill would authorize HCD to allow grantees under the program to use up to 5% of the grant award for administrative costs.

Existing law requires that a housing trust fund encumber funds provided under the program no later than 36 months after receipt, but provides for a 12-month extension in certain circumstances. Existing law requires that any funds not encumbered within this period revert to HCD for use in the program or its successor.

This bill would extend the period in which funds are required to be encumbered from 36 months to 60 months.

This bill would make various technical and conforming changes to the program.

Existing law establishes the Housing Rehabilitation Loan Fund, which is continuously appropriated to HCD for specified purposes relating to housing programs.

By expanding the uses for moneys in the Housing Rehabilitation Loan Fund, a continuously-appropriated fund, the bill would make an appropriation.

(11) The Planning and Zoning Law requires that the housing element of a city's or county's general plan, as described above, include, among other things, an assessment of housing needs and an inventory of land suitable for residential development. Existing law sets forth various classifications and definitions for purposes of determining a city's or county's inventory.

Existing law establishes the Infill Incentive Grant Program of 2007, administered by HCD, a competitive grant program to facilitate the development of qualifying infill residential projects.

This bill would establish the Infill Infrastructure Grant Program of 2019, which would require HCD, upon appropriation of funds by the Legislature, to establish and administer a grant program to allocate those funds to capital improvement projects that are an integral part of, or necessary to facilitate the development of, a qualifying infill project or qualifying infill area, as those terms are defined, pursuant to specified requirements. The bill, upon appropriation by the Legislature, would authorize HCD to expend $500,000,000 for the program, as specified.

(12) Existing law establishes a low-income housing tax credit program pursuant to which CTCAC provides procedures and requirements for the allocation, in modified conformity with federal law, of state insurance, personal income, and corporation tax credit amounts to qualified low-income housing projects that have been allocated, or qualify for, a federal low-income housing tax credit, and farmworker housing. Existing law limits the total annual amount of the state low-income housing credit for which a federal low-income housing credit is required to the sum of $70,000,000, as increased by any percentage increase in the Consumer Price Index for the preceding calendar year, any unused credit for the preceding calendar years, and the amount of housing credit ceiling returned in the calendar year. For purposes of determining the credit amount, existing law defines the term "applicable percentage" depending on, among other things, whether the qualified low-income building is a new building that is not federally subsidized, a new building that is federally subsidized, or is an existing building that is "at risk of conversion."

EXHIBIT 8

This bill would also, under the law governing the taxation of insurers, the Personal Income Tax Law, and the Corporation Tax Law, for calendar years beginning in 2020, provide for an additional $500,000,000 that may be allocated to specified low-income housing projects and would, for calendar years beginning in 2021, provide that this amount is only available for allocation pursuant to an authorization in the annual Budget Act or related legislation, and specified regulatory action by CTCAC. The bill, under those laws, would modify the definition of "applicable percentage" relating to qualified low-income buildings to depend on whether the building is a new building that is federally subsidized that receives an allocation from the additional $500,000,000 or whether the building is, among other things, at least 15 years old, may serve households of very low income or extremely low income, and will complete substantial rehabilitation, as specified.

Existing law, beginning on or after January 1, 2009, and before January 1, 2020, requires, in the case of a project that receives a preliminary reservation of a state low-income housing tax credit, that the credit be allocated to the partners of a partnership owning the project in accordance with the partnership agreement, as provided. Existing law, beginning on or after January 1, 2016, and before January 1, 2020, authorizes a taxpayer that is allowed a low-income housing tax credit to elect to sell all or a portion of that credit to one or more unrelated parties for each taxable year in which the credit is allowed, as described.

This bill would delete the January 1, 2020, date with respect to both of these provisions, thereby requiring the allocation of credits among partners in accordance with the partnership agreement and authorizing the sale of a credit, as described above, indefinitely.

With respect to the sale of a low-income housing tax credit under these provisions, existing law authorizes the taxpayer to elect to sell all or a portion of the credit in its application to CTCAC. Existing law generally requires that this election be irrevocable, but allows the taxpayer, with the approval of the executive director of CTCAC, to rescind the election to sell if the consideration falls below 80% of the amount of the credit. Existing law also requires that an unrelated party that purchases any or all of a credit under these provisions be a taxpayer that is allowed a credit for the taxable year of the purchase, or was allowed a credit for a prior taxable year, and a state or federal low-income housing tax credit and, except as provided, prohibits the unrelated party from reselling the credit to another taxpayer or other party.

This bill would instead authorize a taxpayer to make a one-time revocation of the election to sell all or any portion of a low-income housing tax credit at any time before CTCAC allocates a final credit amount for a project, at which point the election would become irrevocable. The bill would specifically prohibit a taxpayer from electing to sell all or any portion of a low-income housing tax credit if the taxpayer did not make that election in its application submitted to CTCAC. The bill would also delete the requirement that the unrelated party be a taxpayer that is allowed, or have previously been allowed, a state or federal low-income housing tax credit and the prohibition on the resale of a credit by the unrelated party.

(13) The Personal Income Tax Law and the Corporation Tax Law, in modified conformity with federal law, generally disallow passive activity loss and passive activity credits for any taxable year in computing taxable income, but, in the case of a natural person, allow an offset in the case of the low-income housing tax credit of up to $75,000 for any taxable year for all rental real estate activities in which the individual actively participated in the taxable year, as provided.

This bill, for each taxable year beginning on or after January 1, 2020, would provide that the dollar limitation for the offset for rental real estate activities does not apply to the low-income housing tax credit program.

(14) Existing law requires, by July 1, 2019, agencies and departments administering state programs in existence prior to July 1, 2017, to collaborate with the Homeless Coordinating and Financing Council to revise or adopt guidelines and regulations that incorporate the core components of Housing First, an evidence-based model that uses housing as a tool, rather than a reward, for recovery.

This bill would delay the duty of an agency or department that administers programs that fund recovery housing, as defined, to incorporate the core components of Housing First to July 1, 2020. The bill would additionally require an agency or department that administers programs that fund recovery housing to consult with the Homeless Coordinating and Financing Council, the Business, Consumer Services, and Housing Agency, and stakeholders between July 1, 2019, and July 1, 2020, to identify ways to improve the provision of housing to individuals who receive housing assistance from the agency or department and report to the Senate Committee on Budget and Fiscal Review and the Assembly Committee on Budget by March 1, 2020, as specified.

(15) Existing law establishes the Self-Help Housing Fund and continuously appropriates moneys for specified purposes related to the California Self-Help Housing Program. Existing law also establishes CalHFA within HCD with the primary purpose of meeting the housing needs of persons and families of low or moderate income. Existing law authorizes CalHFA to make, or undertake commitments to make, loans to finance the acquisition, construction, rehabilitation, refinancing, or development of housing intended to benefit, among others, persons identified as having special needs relating to intellectual and developmental disabilities.

This bill would continuously appropriate, without regard to fiscal years, the sum of $500,000,000 to HCD and require that these moneys be deposited in the Self-Help Housing Fund based on a specified schedule. Notwithstanding specified law, the bill would require HCD to transfer these moneys to CalHFA to be used to finance low and moderate income housing, as provided.

(16) The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

(17) This bill would declare that it is to take effect immediately as a bill providing for appropriations related to the Budget Bill.

## Digest Key

Vote: majority   Appropriation: yes   Fiscal Committee: yes   Local Program: yes

**EXHIBIT 8**

**Bill Text**

## THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

**SECTION 1.** The Legislature finds and declares the following:

(a) The gap between available and needed housing is increasing the cost of living in our state and negatively impacting middle class Californians.

(b) Addressing the housing cost crisis will require action by the state, local governments, and the private sector to increase housing production and preserve available affordable housing.

(c) The 2019–20 Budget Act provides approximately $8 billion in funding to address California's housing and homelessness crisis.

(d) A key element of increasing housing production is to ensure that local governments are implementing state law, particularly their planning and zoning obligations. To that end, this act establishes incentives, due process requirements, and penalties. Specifically, this act expands judicial remedies that may be imposed by the court when a city, county, or a city and county is found to be out of substantial compliance with housing element law, is provided by the act more than one year to come into substantial compliance, and continues not following the law.

(e) The additional judicial remedies in this act are intended to be used only as a last resort where a jurisdiction has continued to not fulfill its responsibilities under housing element law and disregards the direction of the court.

**SEC. 2.** Section 30035.7 of the Government Code is amended to read:

**30035.7.** (a) Of the amount appropriated in the annual Budget Act or other measure for the program, the department's Office of State Audits and Evaluations may use up to five hundred thousand dollars ($500,000) to conduct an audit of the program to determine its effectiveness in providing services to ex-offenders.

(b) The department's Office of State Audits and Evaluations shall conduct an audit of the program. The department shall provide a copy of the audit to the Joint Legislative Budget Committee no later than May 1, 2020. The copy of the audit shall be submitted in compliance with Section 9795.

(c) Cities, counties, cities and counties, and facility operators that receive program funds shall agree, as a condition of receiving program funds, to cooperate fully with the audit conducted pursuant to this section by the department's Office of State Audits and Evaluations.

**SEC. 3.** Section 65400 of the Government Code is amended to read:

**65400.** (a) After the legislative body has adopted all or part of a general plan, the planning agency shall do both of the following:

(1) Investigate and make recommendations to the legislative body regarding reasonable and practical means for implementing the general plan or element of the general plan, so that it will serve as an effective guide for orderly growth and development, preservation and conservation of open-space land and natural resources, and the efficient expenditure of public funds relating to the subjects addressed in the general plan.

(2) Provide by April 1 of each year an annual report to the legislative body, the Office of Planning and Research, and the Department of Housing and Community Development that includes all of the following:

(A) The status of the plan and progress in its implementation.

(B) The progress in meeting its share of regional housing needs determined pursuant to Section 65584 and local efforts to remove governmental constraints to the maintenance, improvement, and development of housing pursuant to paragraph (3) of subdivision (c) of Section 65583.

The housing element portion of the annual report, as required by this paragraph, shall be prepared through the use of standards, forms, and definitions adopted by the Department of Housing and Community Development. The department may review, adopt, amend, and repeal the standards, forms, or definitions, to implement this article. Any standards, forms, or definitions adopted to implement this article shall not be subject to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2. Before and after adoption of the forms, the housing element portion of the annual report shall include a section that describes the actions taken by the local government towards completion of the programs and status of the local government's compliance with the deadlines in its housing element. That report shall be considered at an annual public meeting before the legislative body where members of the public shall be allowed to provide oral testimony and written comments.

The report may include the number of units that have been substantially rehabilitated, converted from nonaffordable to affordable by acquisition, and preserved consistent with the standards set forth in paragraph (2) of subdivision (c) of Section 65583.1. The report shall document how the units meet the standards set forth in that subdivision.

(C) The number of housing development applications received in the prior year.

(D) The number of units included in all development applications in the prior year.

**EXHIBIT 8**

(E) The number of units approved and disapproved in the prior year.

(F) The degree to which its approved general plan complies with the guidelines developed and adopted pursuant to Section 65040.2 and the date of the last revision to the general plan.

(G) A listing of sites rezoned to accommodate that portion of the city's or county's share of the regional housing need for each income level that could not be accommodated on sites identified in the inventory required by paragraph (1) of subdivision (c) of Section 65583 and Section 65584.09. The listing of sites shall also include any additional sites that may have been required to be identified by Section 65863.

(H) The number of net new units of housing, including both rental housing and for-sale housing, that have been issued a completed entitlement, a building permit, or a certificate of occupancy, thus far in the housing element cycle, and the income category, by area median income category, that each unit of housing satisfies. That production report shall, for each income category described in this subparagraph, distinguish between the number of rental housing units and the number of for-sale units that satisfy each income category. The production report shall include, for each entitlement, building permit, or certificate of occupancy, a unique site identifier that must include the assessor's parcel number, but may include street address, or other identifiers.

(I) The number of applications submitted pursuant to subdivision (a) of Section 65913.4, the location and the total number of developments approved pursuant to subdivision (b) of Section 65913.4, the total number of building permits issued pursuant to subdivision (b) of Section 65913.4, the total number of units including both rental housing and for-sale housing by area median income category constructed using the process provided for in subdivision (b) of Section 65913.4.

(J) If the city or county has received funding pursuant to the Local Government Planning Support Grants Program (Chapter 3.1 (commencing with Section 50515) of Part 2 of Division 31 of the Health and Safety Code), the information required pursuant to subdivision (a) of Section 50515.04 of the Health and Safety Code.

(K) The Department of Housing and Community Development shall post a report submitted pursuant to this paragraph on its internet website within a reasonable time of receiving the report.

(b) If a court finds, upon a motion to that effect, that a city, county, or city and county failed to submit, within 60 days of the deadline established in this section, the housing element portion of the report required pursuant to subparagraph (B) of paragraph (2) of subdivision (a) that substantially complies with the requirements of this section, the court shall issue an order or judgment compelling compliance with this section within 60 days. If the city, county, or city and county fails to comply with the court's order within 60 days, the plaintiff or petitioner may move for sanctions, and the court may, upon that motion, grant appropriate sanctions. The court shall retain jurisdiction to ensure that its order or judgment is carried out. If the court determines that its order or judgment is not carried out within 60 days, the court may issue further orders as provided by law to ensure that the purposes and policies of this section are fulfilled. This subdivision applies to proceedings initiated on or after the first day of October following the adoption of forms and definitions by the Department of Housing and Community Development pursuant to paragraph (2) of subdivision (a), but no sooner than six months following that adoption.

**SEC. 4.** Section 65585 of the Government Code is amended to read:

**65585.** (a) In the preparation of its housing element, each city and county shall consider the guidelines adopted by the department pursuant to Section 50459 of the Health and Safety Code. Those guidelines shall be advisory to each city or county in the preparation of its housing element.

(b) (1) At least 90 days prior to adoption of its housing element, or at least 60 days prior to the adoption of an amendment to this element, the planning agency shall submit a draft element or draft amendment to the department.

(2) The planning agency staff shall collect and compile the public comments regarding the housing element received by the city, county, or city and county, and provide these comments to each member of the legislative body before it adopts the housing element.

(3) The department shall review the draft and report its written findings to the planning agency within 90 days of its receipt of the draft in the case of an adoption or within 60 days of its receipt in the case of a draft amendment.

(c) In the preparation of its findings, the department may consult with any public agency, group, or person. The department shall receive and consider any written comments from any public agency, group, or person regarding the draft or adopted element or amendment under review.

(d) In its written findings, the department shall determine whether the draft element or draft amendment substantially complies with this article.

(e) Prior to the adoption of its draft element or draft amendment, the legislative body shall consider the findings made by the department. If the department's findings are not available within the time limits set by this section, the legislative body may act without them.

(f) If the department finds that the draft element or draft amendment does not substantially comply with this article, the legislative body shall take one of the following actions:

(1) Change the draft element or draft amendment to substantially comply with this article.

(2) Adopt the draft element or draft amendment without changes. The legislative body shall include in its resolution of adoption written findings which explain the reasons the legislative body believes that the draft element or draft amendment substantially complies with this article despite the findings of the department.

**EXHIBIT 8**

(g) Promptly following the adoption of its element or amendment, the planning agency shall submit a copy to the department.

(h) The department shall, within 90 days, review adopted housing elements or amendments and report its findings to the planning agency.

(i) (1) (A) The department shall review any action or failure to act by the city, county, or city and county that it determines is inconsistent with an adopted housing element or Section 65583, including any failure to implement any program actions included in the housing element pursuant to Section 65583. The department shall issue written findings to the city, county, or city and county as to whether the action or failure to act substantially complies with this article, and provide a reasonable time no longer than 30 days for the city, county, or city and county to respond to the findings before taking any other action authorized by this section, including the action authorized by subparagraph (B).

(B) If the department finds that the action or failure to act by the city, county, or city and county does not substantially comply with this article, and if it has issued findings pursuant to this section that an amendment to the housing element substantially complies with this article, the department may revoke its findings until it determines that the city, county, or city and county has come into compliance with this article.

(2) The department may consult with any local government, public agency, group, or person, and shall receive and consider any written comments from any public agency, group, or person, regarding the action or failure to act by the city, county, or city and county described in paragraph (1), in determining whether the housing element substantially complies with this article.

(j) The department shall notify the city, county, or city and county and may notify the Office of the Attorney General that the city, county, or city and county is in violation of state law if the department finds that the housing element or an amendment to this element, or any action or failure to act described in subdivision (i), does not substantially comply with this article or that any local government has taken an action in violation of the following:

(1) Housing Accountability Act (Section 65589.5 of the Government Code).

(2) Section 65863 of the Government Code.

(3) Chapter 4.3 (commencing with Section 65915) of Division 1 of Title 7 of the Government Code.

(4) Section 65008 of the Government Code.

(k) Commencing July 1, 2019, prior to the Attorney General bringing any suit for a violation of the provisions identified in subdivision (j) related to housing element compliance and seeking remedies available pursuant to this subdivision, the department shall offer the jurisdiction the opportunity for two meetings in person or via telephone to discuss the violation, and shall provide the jurisdiction written findings regarding the violation. This paragraph does not affect any action filed prior to the effective date of this section. The requirements set forth in this subdivision shall not apply to any suits brought for a violation or violations of paragraphs (1), (3), and (4) of subdivision (j).

(l) In any action or special proceeding brought by the Attorney General relating to housing element compliance pursuant to subdivision (j), the Attorney General shall request, upon a finding of the court that the housing element does not substantially comply with the requirements of this article pursuant to this section, that the court issue an order or judgment directing the jurisdiction to bring its housing element into substantial compliance with the requirements of this article. The court shall retain jurisdiction to ensure that its order or judgment is carried out, and once a court determines that the housing element of the jurisdiction substantially complies with this article, it shall have the same force and effect, for all purposes, as the department's determination that the housing element substantially complies with this article.

(1) If the jurisdiction has not complied with the order or judgment after twelve months, the court shall conduct a status conference. Following the status conference, upon a determination that the jurisdiction failed to comply with the order or judgment compelling substantial compliance with the requirements of this article, the court shall impose fines on the jurisdiction, which shall be deposited into the Building Homes and Jobs Trust Fund. Any fine levied pursuant to this paragraph shall be in a minimum amount of ten thousand dollars ($10,000) per month, but shall not exceed one hundred thousand dollars ($100,000) per month, except as provided in paragraphs (2) and (3). In the event that the jurisdiction fails to pay fines imposed by the court in full and on time, the court may require the State Controller to intercept any available state and local funds and direct such funds to the Building Homes and Jobs Trust Fund to correct the jurisdiction's failure to pay. The intercept of the funds by the Controller for this purpose shall not violate any provision of the California Constitution.

(2) If the jurisdiction has not complied with the order or judgment after three months following the imposition of fees described in paragraph (1), the court shall conduct a status conference. Following the status conference, if the court finds that the fees imposed pursuant to paragraph (1) are insufficient to bring the jurisdiction into compliance with the order or judgment, the court may multiply the fine determined pursuant to paragraph (1) by a factor of three. In the event that the jurisdiction fails to pay fines imposed by the court in full and on time, the court may require the State Controller to intercept any available state and local funds and direct such funds to the Building Homes and Jobs Trust Fund to correct the jurisdiction's failure to pay. The intercept of the funds by the Controller for this purpose shall not violate any provision of the California Constitution.

(3) If the jurisdiction has not complied with the order or judgment six months following the imposition of fees described in paragraph (1), the court shall conduct a status conference. Upon a determination that the jurisdiction failed to comply with the order or judgment, the court may impose the following:

(A) If the court finds that the fees imposed pursuant to paragraph (1) and paragraph (2) are insufficient to bring the jurisdiction into compliance with the order or judgement, the court may multiply the fine determined pursuant to paragraph (1) by a factor of six. In

**EXHIBIT 8**

the event that the jurisdiction fails to pay fines imposed by the court in full and on time, the court may require the State Controller to intercept any available state and local funds and direct such funds to the Building Homes and Jobs Trust Fund to correct the jurisdiction's failure to pay. The intercept of the funds by the Controller for this purpose shall not violate any provision of the California Constitution.

(B) The court may order remedies available pursuant to Section 564 of the Code of Civil Procedure, under which the agent of the court may be appointed with all the powers necessary to bring the jurisdiction's housing element into substantial compliance pursuant to this article in order to remedy identified deficiencies. The court shall determine whether the housing element of the jurisdiction substantially complies with this article and, once the court makes that determination, it shall have the same force and effect, for all purposes, as the department's determination that the housing element substantially complies with this article. An agent appointed pursuant to this paragraph shall have expertise in planning in California.

(4) This subdivision shall not limit a court's discretion to apply any and all remedies in an action or special proceeding filed by a party other than the state for a violation of any law identified in subdivision (j).

(m) In determining the application of the remedies available under subdivision (l), the court shall consider whether there are any mitigating circumstances delaying the jurisdiction from coming into compliance with state housing law. The court may consider whether a city, county, or city and county is making a good faith effort to come into substantial compliance or is facing substantial undue hardships.

(n) The Office of the Attorney General may seek all remedies available under law including those set forth in this section.

## SEC. 5. Section 65589.9 is added to the Government Code, to read:

65589.9. (a) It is the intent of the Legislature to create incentives for jurisdictions that are compliant with housing element requirements and have enacted prohousing local policies. It is the intent of the Legislature that these incentives be in the form of additional points or other preference in the scoring of competitive housing and infrastructure programs. It is the intent of the Legislature that, in adopting regulations related to prohousing local policy criteria, the department shall create criteria that consider the needs of rural, suburban, and urban jurisdictions and how those criteria may differ in those areas.

(b) For award cycles commenced after July 1, 2021, jurisdictions that have adopted a housing element that has been found by the department to be in substantial compliance with the requirements of this article pursuant to Section 65585, and that have been designated prohousing pursuant to subdivision (c) based upon their adoption of prohousing local policies, shall be awarded additional points or preference in the scoring of program applications for the following programs:

(1) The Affordable Housing and Sustainable Communities Program established by Part 1 (commencing with Section 75200) of Division 44 of the Public Resources Code.

(2) The Transformative Climate Communities Program established by Part 4 (commencing with Section 75240) of Division 44 of the Public Resources Code.

(3) The Infill Incentive Grant Program of 2007 established by Section 53545.13 of the Health and Safety Code.

(4) Additional bonus points may be awarded to other state programs when already allowable under state law.

(c) The department shall designate jurisdictions as prohousing pursuant to the emergency regulations adopted pursuant to subdivision (d) and report these designations to the Office of Planning and Research, and any other applicable agency or department, annually and upon request.

(d) By July 1, 2021, the department, in collaboration with stakeholders, shall adopt emergency regulations to implement this section.

(e) On or before January 1, 2021, and annually thereafter, the Department of Finance shall publish on its internet website the list of programs included under subdivision (b).

(f) For purposes of this section, the following definitions shall apply:

(1) "Compliant housing element" means an adopted housing element that has been found to be in substantial compliance with the requirements of this article by the department pursuant to Section 65585.

(2) "Prohousing local policies" means policies that facilitate the planning, approval, or construction of housing. These policies may include, but are not limited to, the following:

(A) Local financial incentives for housing, including, but not limited to, establishing a local housing trust fund.

(B) Reduced parking requirements for sites that are zoned for residential development.

(C) Adoption of zoning allowing for use by right for residential and mixed-use development.

(D) Zoning more sites for residential development or zoning sites at higher densities than is required to accommodate the minimum existing regional housing need allocation for the current housing element cycle.

(E) Adoption of accessory dwelling unit ordinances or other mechanisms that reduce barriers for property owners to create accessory dwelling units beyond the requirements outlined in Section 65852.2, as determined by the department.

(F) Reduction of permit processing time.

**EXHIBIT 8**

(G) Creation of objective development standards.

(H) Reduction of development impact fees.

(I) Establishment of a Workforce Housing Opportunity Zone, as defined in Section 65620, or a housing sustainability district, as defined in Section 66200.

**SEC. 6.** Section 65589.11 is added to the Government Code, to read:

**65589.11.** (a) The department shall post on its internet website each month a list of jurisdictions that have failed to adopt a housing element that has been found by the department to be in substantial compliance with the requirements of this article pursuant to Section 65585. The department shall, on an annual basis, by July 1, or upon request, provide the most recent version of the list to the Office of Planning and Research and any other applicable agency or department.

(b) If a jurisdiction is included on this list described in subdivision (a), the department shall notify the jurisdiction of its inclusion upon the first occurrence of this inclusion. A copy of all notifications sent to a jurisdiction shall also be submitted to the legislative body of the jurisdiction.

(c) If a jurisdiction is included on the list described in subdivision (a), the department shall offer the jurisdiction the opportunity for two meetings in person or via telephone to discuss the jurisdiction's failure to adopt a housing element that is found to be in substantial compliance with the requirements of this article pursuant to Section 65585, and shall provide the jurisdiction written findings regarding that failure. Meetings previously offered pursuant to subdivision (k) of Section 65585 shall satisfy the requirements of this subdivision.

(d) Within 30 days of a jurisdiction both appearing on the list published pursuant to subdivision (a), and also having adopted a housing element pursuant to paragraph (2) of subdivision (f) of Section 65585, a jurisdiction may request, in writing, that the department review de novo the jurisdiction's last housing element adopted pursuant to paragraph (2) of subdivision (f) of Section 65585. Within 30 days of receipt of the request, the department shall issue written findings as to whether the housing element has been found by the department to be in substantial compliance with the requirements of this article pursuant to Section 65585. If the department's written findings state that the jurisdiction's housing element is not in substantial compliance with the requirements of this article pursuant to Section 65585, then the city, county, or city and county may, within 30 days of receiving those written findings, bring an action to superior court pursuant to Section 1094.5 of the Civil Code of Procedure to challenge the department's determination. Any action pursuant to this subdivision shall not impact the allocation of funds for any programs identified in subdivision (e).

(e) On or before January 1, 2023, and annually thereafter, the Department of Finance shall publish on its internet website a list of programs, if any, where eligibility for funding is contingent upon a jurisdiction having adopted a housing element that has been found by the department to be in substantial compliance with the requirements of this article pursuant to Section 65585. The list shall not include any program where eligibility for funding is contingent upon a housing element that has been found by the department to be in substantial compliance with the requirements of this article pursuant to Section 65585 on or before the effective date of this section.

(f) Subdivisions (c) and (d) of this section shall become operative upon the inclusion of at least one program on the list published pursuant to subdivision (e).

(g) This section shall not affect any action filed on or before the effective date of this section.

**SEC. 7.** Article 12 (commencing with Section 65660) is added to Chapter 3 of Division 1 of Title 7 of the Government Code, to read:

**Article 12. Low Barrier Navigation Centers**

**65660.** For purposes of this article:

(a) "Low Barrier Navigation Center" means a Housing First, low-barrier, service-enriched shelter focused on moving people into permanent housing that provides temporary living facilities while case managers connect individuals experiencing homelessness to income, public benefits, health services, shelter, and housing. "Low Barrier" means best practices to reduce barriers to entry, and may include, but is not limited to, the following:

(1) The presence of partners if it is not a population-specific site, such as for survivors of domestic violence or sexual assault, women, or youth.

(2) Pets.

(3) The storage of possessions.

(4) Privacy, such as partitions around beds in a dormitory setting or in larger rooms containing more than two beds, or private rooms.

(b) "Use by right" has the meaning defined in subdivision (i) of Section 65583.2. Division 13 (commencing with Section 21000) of the Public Resources Code shall not apply to actions taken by a public agency to lease, convey, or encumber land owned by a public agency, or to facilitate the lease, conveyance, or encumbrance of land owned by a public agency, or to provide financial assistance to, or otherwise approve, a Low Barrier Navigation Center constructed or allowed by this section.

**65662.** A Low Barrier Navigation Center development is a use by right in areas zoned for mixed use and nonresidential zones permitting multifamily uses, if it meets the requirements of this article. A local jurisdiction shall permit a Low Barrier Navigation Center development provided that it meets the following requirements:

(a) It offers services to connect people to permanent housing through a services plan that identifies services staffing.

**EXHIBIT 8**

(b) It is linked to a coordinated entry system, so that staff in the interim facility or staff who colocate in the facility may conduct assessments and provide services to connect people to permanent housing. "Coordinated entry system" means a centralized or coordinated assessment system developed pursuant to Section 576.400(d) or Section 578.7(a)(8), as applicable, of Title 24 of the Code of Federal Regulations, as those sections read on January 1, 2020, and any related requirements, designed to coordinate program participant intake, assessment, and referrals.

(c) It complies with Chapter 6.5 (commencing with Section 8255) of Division 8 of the Welfare and Institutions Code.

(d) It has a system for entering information regarding client stays, client demographics, client income, and exit destination through the local Homeless Management Information System as defined by Section 578.3 of Title 24 of the Code of Federal Regulations.

**65664.** Within 30 days of receipt of an application for a Low Barrier Navigation Center development, the local jurisdiction shall notify a developer whether the developer's application is complete pursuant to Section 65943. Within 60 days of receipt of a completed application for a Low Barrier Navigation Center development, the local jurisdiction shall act upon its review of the application.

**65666.** The Legislature finds and declares that Low Barrier Navigation Center developments are essential tools for alleviating the homelessness crisis in this state and are a matter of statewide concern and not a municipal affair as that term is used in Section 5 of Article XI of the California Constitution. Therefore, this article shall apply to all cities, including charter cities.

**65668.** This article shall remain in effect only until January 1, 2027, and as of that date is repealed.

**SEC. 8.** Section 65913.4 of the Government Code is amended to read:

**65913.4.** (a) A development proponent may submit an application for a development that is subject to the streamlined, ministerial approval process provided by subdivision (b) and is not subject to a conditional use permit if the development satisfies all of the following objective planning standards:

(1) The development is a multifamily housing development that contains two or more residential units.

(2) The development is located on a site that satisfies all of the following:

(A) A site that is a legal parcel or parcels located in a city if, and only if, the city boundaries include some portion of either an urbanized area or urban cluster, as designated by the United States Census Bureau, or, for unincorporated areas, a legal parcel or parcels wholly within the boundaries of an urbanized area or urban cluster, as designated by the United States Census Bureau.

(B) A site in which at least 75 percent of the perimeter of the site adjoins parcels that are developed with urban uses. For the purposes of this section, parcels that are only separated by a street or highway shall be considered to be adjoined.

(C) A site that is zoned for residential use or residential mixed-use development, or has a general plan designation that allows residential use or a mix of residential and nonresidential uses, with at least two-thirds of the square footage of the development designated for residential use. Additional density, floor area, and units, and any other concession, incentive, or waiver of development standards granted pursuant to the Density Bonus Law in Section 65915 shall be included in the square footage calculation.

(3) (A) The development proponent has committed to record, prior to the issuance of the first building permit, a land use restriction or covenant providing that any lower income housing units required pursuant to subparagraph (B) of paragraph (4) shall remain available at affordable housing costs or rent to persons and families of lower income for no less than the following periods of time:

(i) Fifty-five years for units that are rented.

(ii) Forty-five years for units that are owned.

(B) The city or county shall require the recording of covenants or restrictions implementing this paragraph for each parcel or unit of real property included in the development.

(4) The development satisfies both of the following:

(A) Is located in a locality that the department has determined is subject to this subparagraph on the basis that the number of units that have been issued building permits is less than the locality's share of the regional housing needs, by income category, for that reporting period. A locality shall remain eligible under this subparagraph until the department's determination for the next reporting period.

(B) The development is subject to a requirement mandating a minimum percentage of below market rate housing based on one of the following:

(i) The locality did not submit its latest production report to the department by the time period required by Section 65400, or that production report reflects that there were fewer units of above moderate-income housing issued building permits than were required for the regional housing needs assessment cycle for that reporting period. In addition, if the project contains more than 10 units of housing, the project seeking approval dedicates a minimum of 10 percent of the total number of units to housing affordable to households making below 80 percent of the area median income. If the locality has adopted a local ordinance that requires that greater than 10 percent of the units be dedicated to housing affordable to households making below 80 percent of the area median income, that local ordinance applies.

(ii) The locality's latest production report reflects that there were fewer units of housing issued building permits affordable to either very low income or low-income households by income category than were required for the regional housing needs assessment cycle for that reporting period, and the project seeking approval dedicates 50 percent of the total number of units to housing affordable to

**EXHIBIT 8**

households making below 80 percent of the area median income, unless the locality has adopted a local ordinance that requires that greater than 50 percent of the units be dedicated to housing affordable to households making below 80 percent of the area median income, in which case that local ordinance applies.

(iii) The locality did not submit its latest production report to the department by the time period required by Section 65400, or if the production report reflects that there were fewer units of housing affordable to both income levels described in clauses (i) and (ii) that were issued building permits than were required for the regional housing needs assessment cycle for that reporting period, the project seeking approval may choose between utilizing clause (i) or (ii).

(5) The development, excluding any additional density or any other concessions, incentives, or waivers of development standards granted pursuant to the Density Bonus Law in Section 65915, is consistent with objective zoning standards, objective subdivision standards, and objective design review standards in effect at the time that the development is submitted to the local government pursuant to this section. For purposes of this paragraph, "objective zoning standards," "objective subdivision standards," and "objective design review standards" mean standards that involve no personal or subjective judgment by a public official and are uniformly verifiable by reference to an external and uniform benchmark or criterion available and knowable by both the development applicant or proponent and the public official before submittal. These standards may be embodied in alternative objective land use specifications adopted by a city or county, and may include, but are not limited to, housing overlay zones, specific plans, inclusionary zoning ordinances, and density bonus ordinances, subject to the following:

(A) A development shall be deemed consistent with the objective zoning standards related to housing density, as applicable, if the density proposed is compliant with the maximum density allowed within that land use designation, notwithstanding any specified maximum unit allocation that may result in fewer units of housing being permitted.

(B) In the event that objective zoning, general plan, subdivision, or design review standards are mutually inconsistent, a development shall be deemed consistent with the objective zoning and subdivision standards pursuant to this subdivision if the development is consistent with the standards set forth in the general plan.

(C) The amendments to this subdivision made by the act adding this subparagraph do not constitute a change in, but are declaratory of, existing law.

(6) The development is not located on a site that is any of the following:

(A) A coastal zone, as defined in Division 20 (commencing with Section 30000) of the Public Resources Code.

(B) Either prime farmland or farmland of statewide importance, as defined pursuant to United States Department of Agriculture land inventory and monitoring criteria, as modified for California, and designated on the maps prepared by the Farmland Mapping and Monitoring Program of the Department of Conservation, or land zoned or designated for agricultural protection or preservation by a local ballot measure that was approved by the voters of that jurisdiction.

(C) Wetlands, as defined in the United States Fish and Wildlife Service Manual, Part 660 FW 2 (June 21, 1993).

(D) Within a very high fire hazard severity zone, as determined by the Department of Forestry and Fire Protection pursuant to Section 51178, or within a high or very high fire hazard severity zone as indicated on maps adopted by the Department of Forestry and Fire Protection pursuant to Section 4202 of the Public Resources Code. This subparagraph does not apply to sites excluded from the specified hazard zones by a local agency, pursuant to subdivision (b) of Section 51179, or sites that have adopted fire hazard mitigation measures pursuant to existing building standards or state fire mitigation measures applicable to the development.

(E) A hazardous waste site that is listed pursuant to Section 65962.5 or a hazardous waste site designated by the Department of Toxic Substances Control pursuant to Section 25356 of the Health and Safety Code, unless the State Department of Public Health, State Water Resources Control Board, or Department of Toxic Substances Control has cleared the site for residential use or residential mixed uses.

(F) Within a delineated earthquake fault zone as determined by the State Geologist in any official maps published by the State Geologist, unless the development complies with applicable seismic protection building code standards adopted by the California Building Standards Commission under the California Building Standards Law (Part 2.5 (commencing with Section 18901) of Division 13 of the Health and Safety Code), and by any local building department under Chapter 12.2 (commencing with Section 8875) of Division 1 of Title 2.

(G) Within a special flood hazard area subject to inundation by the 1 percent annual chance flood (100-year flood) as determined by the Federal Emergency Management Agency in any official maps published by the Federal Emergency Management Agency. If a development proponent is able to satisfy all applicable federal qualifying criteria in order to provide that the site satisfies this subparagraph and is otherwise eligible for streamlined approval under this section, a local government shall not deny the application on the basis that the development proponent did not comply with any additional permit requirement, standard, or action adopted by that local government that is applicable to that site. A development may be located on a site described in this subparagraph if either of the following are met:

(i) The site has been subject to a Letter of Map Revision prepared by the Federal Emergency Management Agency and issued to the local jurisdiction.

(ii) The site meets Federal Emergency Management Agency requirements necessary to meet minimum flood plain management criteria of the National Flood Insurance Program pursuant to Part 59 (commencing with Section 59.1) and Part 60 (commencing with Section 60.1) of Subchapter B of Chapter I of Title 44 of the Code of Federal Regulations.

**EXHIBIT 8**

(H) Within a regulatory floodway as determined by the Federal Emergency Management Agency in any official maps published by the Federal Emergency Management Agency, unless the development has received a no-rise certification in accordance with Section 60.3(d)(3) of Title 44 of the Code of Federal Regulations. If a development proponent is able to satisfy all applicable federal qualifying criteria in order to provide that the site satisfies this subparagraph and is otherwise eligible for streamlined approval under this section, a local government shall not deny the application on the basis that the development proponent did not comply with any additional permit requirement, standard, or action adopted by that local government that is applicable to that site.

(I) Lands identified for conservation in an adopted natural community conservation plan pursuant to the Natural Community Conservation Planning Act (Chapter 10 (commencing with Section 2800) of Division 3 of the Fish and Game Code), habitat conservation plan pursuant to the federal Endangered Species Act of 1973 (16 U.S.C. Sec. 1531 et seq.), or other adopted natural resource protection plan.

(J) Habitat for protected species identified as candidate, sensitive, or species of special status by state or federal agencies, fully protected species, or species protected by the federal Endangered Species Act of 1973 (16 U.S.C. Sec. 1531 et seq.), the California Endangered Species Act (Chapter 1.5 (commencing with Section 2050) of Division 3 of the Fish and Game Code), or the Native Plant Protection Act (Chapter 10 (commencing with Section 1900) of Division 2 of the Fish and Game Code).

(K) Lands under conservation easement.

(7) The development is not located on a site where any of the following apply:

(A) The development would require the demolition of the following types of housing:

(i) Housing that is subject to a recorded covenant, ordinance, or law that restricts rents to levels affordable to persons and families of moderate, low, or very low income.

(ii) Housing that is subject to any form of rent or price control through a public entity's valid exercise of its police power.

(iii) Housing that has been occupied by tenants within the past 10 years.

(B) The site was previously used for housing that was occupied by tenants that was demolished within 10 years before the development proponent submits an application under this section.

(C) The development would require the demolition of a historic structure that was placed on a national, state, or local historic register.

(D) The property contains housing units that are occupied by tenants, and units at the property are, or were, subsequently offered for sale to the general public by the subdivider or subsequent owner of the property.

(8) The development proponent has done both of the following, as applicable:

(A) Certified to the locality that either of the following is true, as applicable:

(i) The entirety of the development is a public work for purposes of Chapter 1 (commencing with Section 1720) of Part 7 of Division 2 of the Labor Code.

(ii) If the development is not in its entirety a public work, that all construction workers employed in the execution of the development will be paid at least the general prevailing rate of per diem wages for the type of work and geographic area, as determined by the Director of Industrial Relations pursuant to Sections 1773 and 1773.9 of the Labor Code, except that apprentices registered in programs approved by the Chief of the Division of Apprenticeship Standards may be paid at least the applicable apprentice prevailing rate. If the development is subject to this subparagraph, then for those portions of the development that are not a public work all of the following shall apply:

(I) The development proponent shall ensure that the prevailing wage requirement is included in all contracts for the performance of the work.

(II) All contractors and subcontractors shall pay to all construction workers employed in the execution of the work at least the general prevailing rate of per diem wages, except that apprentices registered in programs approved by the Chief of the Division of Apprenticeship Standards may be paid at least the applicable apprentice prevailing rate.

(III) Except as provided in subclause (V), all contractors and subcontractors shall maintain and verify payroll records pursuant to Section 1776 of the Labor Code and make those records available for inspection and copying as provided therein.

(IV) Except as provided in subclause (V), the obligation of the contractors and subcontractors to pay prevailing wages may be enforced by the Labor Commissioner through the issuance of a civil wage and penalty assessment pursuant to Section 1741 of the Labor Code, which may be reviewed pursuant to Section 1742 of the Labor Code, within 18 months after the completion of the development, by an underpaid worker through an administrative complaint or civil action, or by a joint labor-management committee though a civil action under Section 1771.2 of the Labor Code. If a civil wage and penalty assessment is issued, the contractor, subcontractor, and surety on a bond or bonds issued to secure the payment of wages covered by the assessment shall be liable for liquidated damages pursuant to Section 1742.1 of the Labor Code.

(V) Subclauses (III) and (IV) shall not apply if all contractors and subcontractors performing work on the development are subject to a project labor agreement that requires the payment of prevailing wages to all construction workers employed in the execution of the development and provides for enforcement of that obligation through an arbitration procedure. For purposes of this clause, "project labor agreement" has the same meaning as set forth in paragraph (1) of subdivision (b) of Section 2500 of the Public Contract Code.

**EXHIBIT 8**

(VI) Notwithstanding subdivision (c) of Section 1773.1 of the Labor Code, the requirement that employer payments not reduce the obligation to pay the hourly straight time or overtime wages found to be prevailing shall not apply if otherwise provided in a bona fide collective bargaining agreement covering the worker. The requirement to pay at least the general prevailing rate of per diem wages does not preclude use of an alternative workweek schedule adopted pursuant to Section 511 or 514 of the Labor Code.

(B) (i) For developments for which any of the following conditions apply, certified that a skilled and trained workforce shall be used to complete the development if the application is approved:

(I) On and after January 1, 2018, until December 31, 2021, the development consists of 75 or more units with a residential component that is not 100 percent subsidized affordable housing and will be located within a jurisdiction located in a coastal or bay county with a population of 225,000 or more.

(II) On and after January 1, 2022, until December 31, 2025, the development consists of 50 or more units with a residential component that is not 100 percent subsidized affordable housing and will be located within a jurisdiction located in a coastal or bay county with a population of 225,000 or more.

(III) On and after January 1, 2018, until December 31, 2019, the development consists of 75 or more units with a residential component that is not 100 percent subsidized affordable housing and will be located within a jurisdiction with a population of fewer than 550,000 and that is not located in a coastal or bay county.

(IV) On and after January 1, 2020, until December 31, 2021, the development consists of more than 50 units with a residential component that is not 100 percent subsidized affordable housing and will be located within a jurisdiction with a population of fewer than 550,000 and that is not located in a coastal or bay county.

(V) On and after January 1, 2022, until December 31, 2025, the development consists of more than 25 units with a residential component that is not 100 percent subsidized affordable housing and will be located within a jurisdiction with a population of fewer than 550,000 and that is not located in a coastal or bay county.

(ii) For purposes of this section, "skilled and trained workforce" has the same meaning as provided in Chapter 2.9 (commencing with Section 2600) of Part 1 of Division 2 of the Public Contract Code.

(iii) If the development proponent has certified that a skilled and trained workforce will be used to complete the development and the application is approved, the following shall apply:

(I) The applicant shall require in all contracts for the performance of work that every contractor and subcontractor at every tier will individually use a skilled and trained workforce to complete the development.

(II) Every contractor and subcontractor shall use a skilled and trained workforce to complete the development.

(III) Except as provided in subclause (IV), the applicant shall provide to the locality, on a monthly basis while the development or contract is being performed, a report demonstrating compliance with Chapter 2.9 (commencing with Section 2600) of Part 1 of Division 2 of the Public Contract Code. A monthly report provided to the locality pursuant to this subclause shall be a public record under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1) and shall be open to public inspection. An applicant that fails to provide a monthly report demonstrating compliance with Chapter 2.9 (commencing with Section 2600) of Part 1 of Division 2 of the Public Contract Code shall be subject to a civil penalty of ten thousand dollars ($10,000) per month for each month for which the report has not been provided. Any contractor or subcontractor that fails to use a skilled and trained workforce shall be subject to a civil penalty of two hundred dollars ($200) per day for each worker employed in contravention of the skilled and trained workforce requirement. Penalties may be assessed by the Labor Commissioner within 18 months of completion of the development using the same procedures for issuance of civil wage and penalty assessments pursuant to Section 1741 of the Labor Code, and may be reviewed pursuant to the same procedures in Section 1742 of the Labor Code. Penalties shall be paid to the State Public Works Enforcement Fund.

(IV) Subclause (III) shall not apply if all contractors and subcontractors performing work on the development are subject to a project labor agreement that requires compliance with the skilled and trained workforce requirement and provides for enforcement of that obligation through an arbitration procedure. For purposes of this subparagraph, "project labor agreement" has the same meaning as set forth in paragraph (1) of subdivision (b) of Section 2500 of the Public Contract Code.

(C) Notwithstanding subparagraphs (A) and (B), a development that is subject to approval pursuant to this section is exempt from any requirement to pay prevailing wages or use a skilled and trained workforce if it meets both of the following:

(i) The project includes 10 or fewer units.

(ii) The project is not a public work for purposes of Chapter 1 (commencing with Section 1720) of Part 7 of Division 2 of the Labor Code.

(9) The development did not or does not involve a subdivision of a parcel that is, or, notwithstanding this section, would otherwise be, subject to the Subdivision Map Act (Division 2 (commencing with Section 66410)) or any other applicable law authorizing the subdivision of land, unless the development is consistent with all objective subdivision standards in the local subdivision ordinance, and either of the following apply:

(A) The development has received or will receive financing or funding by means of a low-income housing tax credit and is subject to the requirement that prevailing wages be paid pursuant to subparagraph (A) of paragraph (8).

**EXHIBIT 8**

(B) The development is subject to the requirement that prevailing wages be paid, and a skilled and trained workforce used, pursuant to paragraph (8).

(10) The development shall not be upon an existing parcel of land or site that is governed under the Mobilehome Residency Law (Chapter 2.5 (commencing with Section 798) of Title 2 of Part 2 of Division 2 of the Civil Code), the Recreational Vehicle Park Occupancy Law (Chapter 2.6 (commencing with Section 799.20) of Title 2 of Part 2 of Division 2 of the Civil Code), the Mobilehome Parks Act (Part 2.1 (commencing with Section 18200) of Division 13 of the Health and Safety Code), or the Special Occupancy Parks Act (Part 2.3 (commencing with Section 18860) of Division 13 of the Health and Safety Code).

(b) (1) If a local government determines that a development submitted pursuant to this section is in conflict with any of the objective planning standards specified in subdivision (a), it shall provide the development proponent written documentation of which standard or standards the development conflicts with, and an explanation for the reason or reasons the development conflicts with that standard or standards, as follows:

(A) Within 60 days of submittal of the development to the local government pursuant to this section if the development contains 150 or fewer housing units.

(B) Within 90 days of submittal of the development to the local government pursuant to this section if the development contains more than 150 housing units.

(2) If the local government fails to provide the required documentation pursuant to paragraph (1), the development shall be deemed to satisfy the objective planning standards specified in subdivision (a).

(c) (1) Any design review or public oversight of the development may be conducted by the local government's planning commission or any equivalent board or commission responsible for review and approval of development projects, or the city council or board of supervisors, as appropriate. That design review or public oversight shall be objective and be strictly focused on assessing compliance with criteria required for streamlined projects, as well as any reasonable objective design standards published and adopted by ordinance or resolution by a local jurisdiction before submission of a development application, and shall be broadly applicable to development within the jurisdiction. That design review or public oversight shall be completed as follows and shall not in any way inhibit, chill, or preclude the ministerial approval provided by this section or its effect, as applicable:

(A) Within 90 days of submittal of the development to the local government pursuant to this section if the development contains 150 or fewer housing units.

(B) Within 180 days of submittal of the development to the local government pursuant to this section if the development contains more than 150 housing units.

(2) If the development is consistent with the requirements of subparagraph (A) or (B) of paragraph (9) of subdivision (a) and is consistent with all objective subdivision standards in the local subdivision ordinance, an application for a subdivision pursuant to the Subdivision Map Act (Division 2 (commencing with Section 66410)) shall be exempt from the requirements of the California Environmental Quality Act (Division 13 (commencing with Section 21000) of the Public Resources Code) and shall be subject to the public oversight timelines set forth in paragraph (1).

(d) (1) Notwithstanding any other law, a local government, whether or not it has adopted an ordinance governing automobile parking requirements in multifamily developments, shall not impose automobile parking standards for a streamlined development that was approved pursuant to this section in any of the following instances:

(A) The development is located within one-half mile of public transit.

(B) The development is located within an architecturally and historically significant historic district.

(C) When on-street parking permits are required but not offered to the occupants of the development.

(D) When there is a car share vehicle located within one block of the development.

(2) If the development does not fall within any of the categories described in paragraph (1), the local government shall not impose automobile parking requirements for streamlined developments approved pursuant to this section that exceed one parking space per unit.

(e) (1) If a local government approves a development pursuant to this section, then, notwithstanding any other law, that approval shall not expire if the project includes public investment in housing affordability, beyond tax credits, where 50 percent of the units are affordable to households making below 80 percent of the area median income.

(2) If a local government approves a development pursuant to this section and the project does not include 50 percent of the units affordable to households making below 80 percent of the area median income, that approval shall automatically expire after three years except that a project may receive a one-time, one-year extension if the project proponent can provide documentation that there has been significant progress toward getting the development construction ready, such as filing a building permit application.

(3) If a local government approves a development pursuant to this section, that approval shall remain valid for three years from the date of the final action establishing that approval and shall remain valid thereafter for a project so long as vertical construction of the development has begun and is in progress. Additionally, the development proponent may request, and the local government shall have discretion to grant, an additional one-year extension to the original three-year period. The local government's action and discretion in determining whether to grant the foregoing extension shall be limited to considerations and process set forth in this section.

EXHIBIT 8

(f) A local government shall not adopt any requirement, including, but not limited to, increased fees or inclusionary housing requirements, that applies to a project solely or partially on the basis that the project is eligible to receive ministerial or streamlined approval pursuant to this section.

(g) This section shall not affect a development proponent's ability to use any alternative streamlined by right permit processing adopted by a local government, including the provisions of subdivision (i) of Section 65583.2.

(h) The California Environmental Quality Act (Division 13 (commencing with Section 21000) of the Public Resources Code) does not apply to actions taken by a state agency or local government to lease, convey, or encumber land owned by the local government or to facilitate the lease, conveyance, or encumbrance of land owned by the local government, or to provide financial assistance to a development that receives streamlined approval pursuant to this section that is to be used for housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code.

(i) For purposes of this section, the following terms have the following meanings:

(1) "Affordable housing cost" has the same meaning as set forth in Section 50052.5 of the Health and Safety Code.

(2) "Affordable rent" has the same meaning as set forth in Section 50053 of the Health and Safety Code.

(3) "Department" means the Department of Housing and Community Development.

(4) "Development proponent" means the developer who submits an application for streamlined approval pursuant to this section.

(5) "Completed entitlements" means a housing development which has received all the required land use approvals or entitlements necessary for the issuance of a building permit.

(6) "Locality" or "local government" means a city, including a charter city, a county, including a charter county, or a city and county, including a charter city and county.

(7) "Production report" means the information reported pursuant to subparagraph (H) of paragraph (2) of subdivision (a) of Section 65400.

(8) "State agency" includes every state office, officer, department, division, bureau, board, and commission, but does not include the California State University or the University of California.

(9) "Subsidized" means units that are price or rent restricted such that the units are permanently affordable to households meeting the definitions of very low and lower income, as defined in Sections 50079.5 and 50105 of the Health and Safety Code.

(10) "Reporting period" means either of the following:

(A) The first half of the regional housing needs assessment cycle.

(B) The last half of the regional housing needs assessment cycle.

(11) "Urban uses" means any current or former residential, commercial, public institutional, transit or transportation passenger facility, or retail use, or any combination of those uses.

(j) The department may review, adopt, amend, and repeal guidelines to implement uniform standards or criteria that supplement or clarify the terms, references, or standards set forth in this section. Any guidelines or terms adopted pursuant to this subdivision shall not be subject to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code.

(k) The determination of whether an application for a development is subject to the streamlined ministerial approval process provided by subdivision (b) is not a "project" as defined in Section 21065 of the Public Resources Code.

(l) It is the policy of the state that this section be interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, increased housing supply.

(m) This section shall remain in effect only until January 1, 2026, and as of that date is repealed.

**SEC. 9.** Section 50199.8 of the Health and Safety Code is amended to read:

**50199.8.** The committee is composed of the Governor, or in the Governor's absence, the Director of Finance, the Controller, the Treasurer, the Director of Housing and Community Development, and the Executive Director of the California Housing Finance Agency. Two representatives of local government, one representative of the counties appointed by the Senate Rules Committee, and one representative of the cities appointed by the Speaker of the Assembly shall serve as ex officio, nonvoting members. The Treasurer shall be the chairperson of the committee. The members of the committee shall serve without compensation. A majority of voting members shall be empowered to act for the committee. The committee may employ an executive director to carry out its duties under this chapter. The committee may, by resolution, delegate to one or more of its members, its executive director, or any other official or employee of the committee any powers and duties that it may deem proper, including, but not limited to, the power to enter into contracts on behalf of the committee.

**SEC. 10.** Chapter 6 (commencing with Section 50216) is added to Part 1 of Division 31 of the Health and Safety Code, to read:

**CHAPTER 6. Homeless Housing, Assistance, and Prevention Program**

**EXHIBIT 8**

**50216.** For purposes of this chapter:

(a) "Agency" means the Business, Consumer Services, and Housing Agency.

(b) "Applicant" means a continuum of care, city, or county.

(c) "City" means a city or city and county that is legally incorporated to provide local government services to its population. A city can be organized either under the general laws of this state or under a charter adopted by the local voters.

(d) "Continuum of care" means the same as defined by the United States Department of Housing and Urban Development at Section 578.3 of Title 24 of the Code of Federal Regulations.

(e) "Coordinated Entry System" means a centralized or coordinated process developed pursuant to Section 578.7 of Title 24 of the Code of Federal Regulations, as that section read on January 10, 2019, designed to coordinate homelessness program participant intake, assessment, and provision of referrals. In order to satisfy this subdivision, a centralized or coordinated assessment system shall cover the geographic area, be easily accessed by individuals and families seeking housing or services, be well advertised, and include a comprehensive and standardized assessment tool.

(f) "Council" means the Homeless Coordinating and Financing Council created pursuant to Section 8257 of the Welfare and Institutions Code.

(g) "Emergency shelter" has the same meaning as defined in subdivision (e) of Section 50801.

(h) "Homeless" has the same meaning as defined in Section 578.3 of Title 24 of the Code of Federal Regulations, as that section read on January 10, 2019.

(i) "Homeless Management Information System" means the information system designated by a continuum of care to comply with federal reporting requirements as defined in Section 578.3 of Title 24 of the Code of Federal Regulations. The term "Homeless Management Information System" also includes the use of a comparable database by a victim services provider or legal services provider that is permitted by the federal government under Part 576 of Title 24 of the Code of Federal Regulations.

(j) "Homeless point-in-time count" means the 2019 homeless point-in-time count pursuant to Section 578.3 of Title 24 of the Code of Federal Regulations. A jurisdiction may elect to instead use their 2017 point-in-time count if they can demonstrate that a significant methodology change occurred between the 2017 and 2019 point-in-time counts that was based on an attempt to more closely align the count with HUD best practices and undertaken in consultation with HUD representatives. A jurisdiction shall submit documentation of this to the agency by the date by which HUD's certification of the 2019 homeless point-in-time count is finalized. The agency shall review and approve or deny a request described in the previous sentence along with a jurisdiction's application for homeless funding.

(k) "Homeless youth" means an unaccompanied youth between 12 and 24 years of age, inclusive, who is experiencing homelessness, as defined in subsection (2) of Section 725 of the federal McKinney-Vento Homeless Assistance Act (42 U.S.C. Sec. 11434a(2)). "Homeless youth" includes unaccompanied youth who are pregnant or parenting.

(l) "Housing First" has the same meaning as in Section 8255 of the Welfare and Institutions Code, including all of the core components listed therein.

(m) "Jurisdiction" means a city, city that is also a county, county, or continuum of care, as defined in this section.

(n) "Navigation center" means a Housing First, low-barrier, service-enriched shelter focused on moving homeless individuals and families into permanent housing that provides temporary living facilities while case managers connect individuals experiencing homelessness to income, public benefits, health services, shelter, and housing.

(o) "Program" means the Homeless Housing, Assistance, and Prevention program established pursuant to this chapter.

(p) "Program allocation" means the portion of program funds available to expand or develop local capacity to address immediate homelessness challenges, in the amount of six hundred fifty million dollars ($650,000,000).

(q) "Recipient" means a jurisdiction that receives funds from the agency for the purposes of the program.

**50217.** (a) The Homeless Housing, Assistance, and Prevention program is hereby established for the purpose of providing jurisdictions with one-time grant funds to support regional coordination and expand or develop local capacity to address their immediate homelessness challenges informed by a best-practices framework focused on moving homeless individuals and families into permanent housing and supporting the efforts of those individuals and families to maintain their permanent housing.

(b) Upon appropriation by the Legislature, the agency shall distribute six hundred fifty million dollars ($650,000,000) in accordance with this chapter.

(c) The agency shall administer the program. The program shall provide grant funds to cities, counties, and continuums of care. No more than 5 percent of the funds available pursuant to this chapter shall be expended on state operations.

(d) The agency's decision to approve or deny an application and the determination of the amount of funding to be provided shall be final.

(e) The agency shall maintain and make available to the public on its internet website records of the following:

(1) The number of applications for program funding received by the agency.

**EXHIBIT 8**

(2) The number of applications for program funding denied by the agency.

(3) The name of each recipient of program funds.

(4) Each applicant receiving funds pursuant to this chapter shall provide a list of all awards to subrecipients.

(5) Annual reports filed by recipients pursuant to Section 50221.

(f)  In administering this chapter, the agency shall not be subject to the rulemaking provisions of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code).

**50218.**  (a) Upon appropriation by the Legislature, six hundred fifty million dollars ($650,000,000) of the funds administered pursuant to this chapter shall be available for implementing the program, as follows:

(1) One hundred ninety million dollars ($190,000,000) of the funding available pursuant to this section shall be available for continuums of care. The agency shall calculate these allocations to a continuum of care based on each continuum of care's proportionate share of the state's total homeless population, based on the homeless point-in-time count. The agency shall award no more than 40 percent of the allocation made pursuant to this section and no less than five hundred thousand ($500,000) to an applicant that is a continuum of care.

(2) Two hundred seventy-five million dollars ($275,000,000) of the funding available pursuant to this section shall be available to each city, or city that is also a county, that has a population of 300,000 or more, as of January 1, 2019, according to data published on the Department of Finance's internet website. The agency shall calculate the allocation to a city based on the city's proportionate share of the total homeless population of the region served by the continuum of care within which the city is located, based on the homeless point-in-time count. The agency shall not award more than 45 percent of the program allocation to a city. If more than one recipient within the continuum of care meets the requirements of this paragraph, the proportionate share of funds shall be equally allocated to those jurisdictions.

(3) One hundred seventy-five million dollars ($175,000,000) of the funding available pursuant to this section shall be available to each county. The agency shall calculate the allocation to county based on the county's proportionate share of the total homeless population of region served by the continuum of care within which the county is located, based on the homeless point-in-time count. The agency shall not award more than 40 percent of the allocation made pursuant to this section to a county.

(4) Once the 2019 point-in-time count numbers have been finalized and posted by the United States Department of Housing and Urban Development, and any determinations described in subdivision (j) of Section 50216 have been announced, the agency shall calculate each jurisdiction's final program allocation award amount and submit that information to the council. The council shall post this information to its internet website.

(5) A program recipient shall not use funding from the program to supplant existing local funds for homeless housing, assistance, or prevention.

(b) A program recipient shall use at least 8 percent, of the funds for services for homeless youth populations.

**50219.**  (a) In order to apply for a program allocation, an applicant shall submit an application pursuant to the timeline specified in Section 50220 and provide the following, in the form and manner prescribed by the agency:

(1) A demonstration of how the jurisdiction has coordinated with other jurisdictions to identify their share of the regional need to address homelessness, and how the requested funds will help meet the jurisdiction's share of that need.

(2) Identification of all funds currently being used by the applicant to provide housing and homeless services for the homeless populations in the jurisdiction, including all federal, state, and local funds, and information on programs supported by the identified funds.

(3) An assessment of existing programs to address homelessness and an identification of gaps in housing and homeless services for the homeless populations in the jurisdiction, as identified by the continuum of care pursuant to paragraph (7), including those provided by entities other than the applicant.

(4) Identification of how funds requested in the application will complement the funds described in paragraph (2), close the gaps identified pursuant to paragraph (3), and serve the homeless populations identified pursuant to paragraph (7).

(5) An outline of proposed uses of funds and explanation of how proposed use of funds meets each of the requirements described in paragraph (4).

(6) A list of measurable goals including but not limited to the number of individuals served and percentage of individuals successfully placed in permanent housing.

(7) If an applicant is a continuum of care, data on the demographics and characteristics of the homeless populations in the jurisdiction and on current programs providing housing and homeless services in the jurisdiction, as reported to the federal government through Homeless Management Information Systems and point-in-time counts.

(8) For a city applying for funds available pursuant to paragraph (2) of subdivision (a) of Section 50218 or a county applying for funds available pursuant to paragraph (3) of subdivision (a) of Section 50218, a plan demonstrating how these funds will complement the regional needs described in the continuum of care's plan for a coordinated housing and service system that meets the needs of

**EXHIBIT 8**

individuals, unaccompanied youth, and families experiencing homelessness, as defined in Section 578.7(c) of Title 24 of the Code of Federal Regulations.

(9) Evidence of connection with the continuum of care's coordinated entry system.

(10) An agreement to participate in a statewide Homeless Management Information System, when available.

(b) The agency may request additional documentation and information from the applicant consistent with the requirements of subdivision (a).

(c) Except as provided in subdivisions (d) and (e) a recipient shall expend funds on evidence-based solutions that address and prevent homelessness among eligible populations including any of the following:

(1) Rental assistance and rapid rehousing.

(2) Operating subsidies in new and existing affordable or supportive housing units, emergency shelters, and navigation centers. Operating subsidies may include operating reserves.

(3) Incentives to landlords, including, but not limited to, security deposits and holding fees.

(4) Outreach and coordination, which may include access to job programs, to assist vulnerable populations in accessing permanent housing and to promote housing stability in supportive housing.

(5) Systems support for activities necessary to create regional partnerships and maintain a homeless services and housing delivery system, particularly for vulnerable populations including families and homeless youth.

(6) Delivery of permanent housing and innovative housing solutions such as hotel and motel conversions.

(7) Prevention and shelter diversion to permanent housing.

(8) New navigation centers and emergency shelters based on demonstrated need. Demonstrated need for purposes of this paragraph shall be based on the following:

(i) The number of available shelter beds in the city, county, or region served by a continuum of care.

(ii) Shelter vacancy rate in the summer and winter months.

(iii) Percentage of exits from emergency shelters to permanent housing solutions.

(iv) A plan to connect residents to permanent housing.

(d) Up to 5 percent of an applicant's program allocation may be expended for the following uses that are intended to meet federal requirements for housing funding:

(1) Strategic homelessness plan, as defined in section 578.7(c) of Title 24 of the Code of Federal Regulations.

(2) Infrastructure development to support coordinated entry systems and Homeless Management Information Systems.

(e) The applicant shall not use more than 7 percent of a program allocation for administrative costs incurred by the city, county, or continuum of care to administer its program allocation. For purposes of this subdivision, "administrative costs" does not include staff or other costs directly related to implementing activities funded by the program allocation.

(f) Pursuant to existing law, a recipient shall comply with Section 8255 of the Welfare and Institutions Code.

(g) Notwithstanding Section 27011 of the Government Code, or any other statute governing the deposit of funds in the county treasury, a county may accept or deposit into the county treasury, funds from any source for the purpose of administering a project, proposal, or program under this chapter.

(h) For purposes of Section 1090 of the Government Code, a representative of a county serving on a board, committee, or body with the primary purpose of administering funds or making funding recommendations for applications pursuant to this chapter shall have no financial interest in any contract, program, or project voted on by the board, committee, or body on the basis of the receipt of compensation for holding public office or public employment as a representative of the county.

(i) The council shall post submitted final applications to its internet website.

**50220.** (a) (1) No later than February 15, 2020, each applicant shall submit to the agency its program allocation application.

(2) No later than April 1, 2020, the agency shall make award determinations for the program allocations based on the point-in-time count numbers.

(3) If, after the first round of awards pursuant to this section, not all funds have been awarded by the agency, the agency shall set aside any remaining funds for a second round of awards.

(4) (A) (i) On or before May 31, 2023, a recipient shall contractually obligate not less than 50 percent of program allocations.

**EXHIBIT 8**

(ii) Recipients that are counties shall contractually obligate the full allocation awarded to them by the agency at this time. Any funds that are not contractually obligated by this date shall be reverted to the continuum of care that serves the county.

(B) If less than 50 percent is obligated after May 31, 2023, recipients that are continuums of care and cities shall not expend any remaining portion of the 50 percent of program allocations required to have been obligated pursuant to subparagraph (A) unless and until both of the following occur:

(i) On or before June 30, 2023, the recipient submits an alternative disbursement plan that includes an explanation for the delay.

(ii) The agency approves the alternative disbursement plan.

(C) On or before December 31, 2023, recipients that are continuums of care and cities shall return to the agency any funds that have not been expended pursuant to an alternative disbursement plan approved pursuant to subparagraph (B) for a subsequent round of awards by the agency.

(b) The agency may request additional information, as needed, to meet other applicable reporting or audit requirements.

(c) In addition to requirements in Section 50221, the agency may monitor the expenditures and activities of an applicant, as the agency deems necessary, to ensure compliance with program requirements.

(d) The agency may, as it deems appropriate or necessary, request the repayment of funds from an applicant, or pursue any other remedies available to it by law for failure to comply with program requirements.

(e) Any remaining amounts of program allocation funds not expended by June 30, 2025, shall revert to, and be paid and deposited in, the General Fund.

**50221.** (a) After receiving program funds, a recipient, by January 1 of the year following receipt of the funds and annually on that date thereafter until all funds have been expended, shall submit a report to the agency on a form and method provided by the agency, that includes all of the following, as well as any additional information the agency deems appropriate or necessary:

(1) An ongoing tracking of the specific uses and expenditures of any program funds broken out by eligible uses listed, including the current status of those funds.

(2) The number of homeless individuals served by the program funds in that year, and a total number served in all years of the program, as well the homeless population served.

(3) The types of housing assistance provided, broken out by the number of individuals.

(4) Outcome data for an individual served through program funds, including the type of housing that an individual exited to, the percent of successful housing exits, and exit types for unsuccessful housing exits.

(b) No later than January 1, 2026, each applicant that receives a program allocation shall submit to the agency a final report in a format provided by the agency, as well as detailed uses of all program funds.

(c) The agency shall post this information to its internet website within 30 days of receipt and provide notice to the Senate Housing Committee, Assembly Housing and Community Development Committee, and the appropriate Fiscal Committees.

**SEC. 11.** Chapter 3.1 (commencing with Section 50515) is added to Part 2 of Division 31 of the Health and Safety Code, to read:

## CHAPTER 3.1. Local Government Planning Support Grants Program

**50515.** For purposes of this chapter:

(a) "Annual progress report" means the annual report required to be submitted to the department pursuant to paragraph (2) of subdivision (a) of Section 65400 of the Government Code.

(b) "Completed entitlement" means a housing development project that has received all the required land use approvals or entitlements necessary for the issuance of a building permit and for which no additional action, including environmental review or appeals, is required to be eligible to apply for and obtain a building permit.

(c) "Council of governments" means a single or multicounty council created by a joint powers agreement pursuant to Chapter 5 (commencing with Section 6500) of Division 7 of Title 1 of the Government Code that is responsible for allocating regional housing need pursuant to Sections 65584, 65584.04, and 65584.05 of the Government Code.

(d) "Housing element" or "element" means the housing element of a community's general plan, as required pursuant to subdivision (c) of Section 65302 of the Government Code and prepared in accordance with Article 10.6 (commencing with Section 65580) of Chapter 3 of Division 1 of Title 7 of the Government Code.

(e) "Jurisdiction" means a city, county, or city and county.

(f) "Program" means the Local Government Planning Support Grants Program established pursuant to this chapter.

(g) "Regional housing need assessment" means the existing and projected need for housing for each region, as determined by the department pursuant to Section 65584.01 of the Government Code.

**EXHIBIT 8**

**50515.01.** (a) (1) The Local Government Planning Support Grants Program is hereby established for the purpose of providing regions and jurisdictions with one-time funding, including grants for planning activities to enable jurisdictions to meet the sixth cycle of the regional housing need assessment.

(2) Upon appropriation by the Legislature, two hundred fifty million dollars ($250,000,000) shall be distributed under the program in accordance with this chapter, as provided in Sections 50515.02 and 50515.03.

(b) The department shall administer the program and, consistent with the requirements of this chapter, provide grants to regions and jurisdictions for technical assistance, preparation and adoption of planning documents, and process improvements to accelerate housing production and facilitate compliance to implement the sixth cycle of the regional housing need assessment.

(c) Of the total amount of any moneys appropriated for purposes of this chapter, the department shall set aside up to 5 percent for program administration, including state operations expenditures and technical assistance, as well as expenditures by recipients of funding pursuant to Sections 50515.02 and 50515.03.

**50515.02.** Of the amount described in paragraph (2) of subdivision (a) of Section 50515.01, one hundred twenty-five million dollars ($125,000,000) shall be available to councils of governments and other regional entities, as follows:

(a) The moneys allocated pursuant to this subdivision shall be available to the following entities:

(1) The Association of Bay Area Governments, representing the Counties of Alameda, Contra Costa, Marin, Napa, San Mateo, Santa Clara, Solano, and Sonoma, and the City and County of San Francisco.

(2) The Sacramento Area Council of Governments, representing the Counties of El Dorado, Placer, Sacramento, Sutter, Yolo, and Yuba.

(3) The San Diego Association of Governments, representing the County of San Diego.

(4) The Southern California Association of Governments, representing the Counties of Imperial, Los Angeles, Orange, Riverside, San Bernardino, and Ventura.

(5) A central coast multiagency working group, formed in accordance with subdivision (c), consisting of the Association of Monterey Bay Area Governments, the San Luis Obispo Council of Governments, and the Santa Barbara County Association of Governments, representing the Counties of Monterey, San Benito, San Luis Obispo, Santa Barbara, and Santa Cruz.

(6) A San Joaquin Valley multiagency working group, formed in accordance with subdivision (c), consisting of the Fresno Council of Governments, the Kern Council of Governments, the Kings County Association of Governments, the Madera County Transportation Commission, the Merced County Association of Governments, the San Joaquin Council of Governments, the Stanislaus Council of Governments, and the Tulare County Association of Governments, representing the Counties of Fresno, Kern, Kings, Madera, Merced, San Joaquin, Stanislaus, and Tulare.

(7) Councils of governments from the Counties of Butte, Humboldt, Lake, and Mendocino. Notwithstanding any other provision of this chapter, the councils of governments described in this paragraph may apply directly to the department for funds pursuant to the program.

(8) The Counties of Alpine, Amador, Calaveras, Colusa, Del Norte, Glenn, Inyo, Lassen, Mariposa, Modoc, Mono, Nevada, Plumas, Shasta, Sierra, Siskiyou, Tehama, Tuolumne, and Trinity. Notwithstanding any other provision of this chapter, the counties described in this paragraph may apply directly to the department for funds pursuant to the program. The department may approve a fiscal agent to receive funds from the amount identified in this section on behalf of a county or consortium of counties listed in this paragraph.

(b) (1) Except as otherwise provided in paragraphs (7) and (8) of subdivision (a), the department shall make the allocations required by this subdivision to each regional entity on behalf of all the jurisdictions represented by that entity. The department shall calculate the amount of each allocation in accordance with the population estimates consistent with the methodology described in subdivision (a) of Section 50515.03.

(2) Each council of governments or other regional entity may, in consultation with the department and consistent with the requirements of this chapter, determine the appropriate use of funds or suballocations within its boundaries to appropriately address its unique housing and planning priorities.

(c) The following shall apply with respect to any allocation made pursuant to this subdivision to a multiagency working group, as described in paragraphs (5) and (6) of subdivision (a):

(1) Before November 30, 2019, the multiagency working groups described in paragraphs (5) and (6) of subdivision (a) shall be formed as follows:

(A) Each working group shall consist of the following members:

(i) One representative from each county described in paragraph (5) or (6), as applicable, of subdivision (a).

(ii) Two city representatives from each county described in paragraph (5) or (6), as applicable, of subdivision (a) appointed by the city selection committee for that county. In appointing city representatives, the city selection committee shall appoint one representative of a larger city within the county and one representative of a smaller city within the county.

(iii) Of the three representatives from each county serving on the multiagency working group pursuant to clauses (i) and (ii), at least one of the representatives shall also be a member of the governing body of the applicable council of governments representing the county.

**EXHIBIT 8**

(B) The multiagency working group shall select a council of governments to serve as the fiscal agent of the multiagency working group and identify staff to assist the work of the group. If the multiagency working group fails to agree to the selection of a council of governments to serve as fiscal agent pursuant to this clause within a reasonable time period, the department shall select a fiscal agent based on factors such as capacity and experience in administering grant programs.

(C) Upon its formation, the multiagency working group shall notify each city and county that is a member of a council of governments described in paragraph (5) or (6), as applicable, of subdivision (a) of its purpose pursuant to this section.

(2) In recognition of the unique challenges in developing a process through a multiagency working group, the department shall allocate eight million dollars ($8,000,000) of the amount available pursuant to this subdivision to the multiagency working groups described in described in paragraphs (5) and (6) of subdivision (a), as follows:

(A) Twenty-five percent of the amount subject to this subparagraph shall be allocated to the central coast multiagency working group described in paragraph (5) of subdivision (a).

(B) Seventy-five percent of the amount subject to this subparagraph shall be allocated to the San Joaquin Valley multiagency working group described in paragraph (6) of subdivision (a).

(d) (1) Until January 31, 2021, a council of governments or other regional entity described in subdivision (a), or a county described in paragraph (8) of subdivision (a), may request an allocation of funds pursuant to this section by submitting an application, in the form and manner prescribed by the department, that includes the following information:

(A) An allocation budget for the funds provided pursuant to this section.

(B) The amounts retained by the council of governments, regional entity, or county, and any suballocations to jurisdictions.

(C) An explanation of how proposed uses will increase housing planning and facilitate local housing production.

(D) Identification of current best practices at the regional and statewide level that promote sufficient supply of housing affordable to all income levels, and a strategy for increasing adoption of these practices at the regional level, where viable.

(E) An education and outreach strategy to inform local agencies of the need and benefits of taking early action related to the sixth cycle regional needs allocation.

(2) The department shall review an application submitted pursuant to this subdivision within 30 days. Upon approval of an application for funds pursuant to this subdivision, the department shall award the moneys for which the council of governments, other regional entity, or county, as applicable, qualifies.

(e) A council of governments, other regional entity, or county that receives an allocation of funds pursuant to this section shall establish priorities and use those moneys to increase housing planning and accelerate housing production, as follows:

(1) Developing an improved methodology for the distribution of the sixth cycle regional housing need assessment to further the objectives described in subdivision (d) of Section 65584 of the Government Code.

(2) Suballocating moneys directly and equitably to jurisdictions or other subregional entities in the form of grants, to be used in accordance with subdivision (f), for planning that will accommodate the development of housing and infrastructure that will accelerate housing production in a way that aligns with state planning priorities, housing, transportation, equity, and climate goals.

(3) Providing jurisdictions and other local agencies with technical assistance, planning, temporary staffing or consultant needs associated with updating local planning and zoning documents, expediting application processing, and other actions to accelerate additional housing production.

(4) Covering the costs of administering any programs described in this subdivision.

(f) An entity that receives a suballocation of funds pursuant to paragraph (2) of subdivision (e) shall only use that suballocation for housing-related planning activities, including, but not limited to, the following:

(1) Technical assistance in improving housing permitting processes, tracking systems, and planning tools.

(2) Establishing regional or countywide housing trust funds for affordable housing.

(3) Performing infrastructure planning, including for sewers, water systems, transit, roads, or other public facilities necessary to support new housing and new residents.

(4) Performing feasibility studies to determine the most efficient locations to site housing consistent with Sections 65041.1 and 65080 of the Government Code.

(5) Covering the costs of temporary staffing or consultant needs associated with the activities described in paragraphs (1) to (4), inclusive.

**50515.03.** Of the amount described in paragraph (2) of subdivision (a) of Section 50515.01, one hundred twenty-five million dollars ($125,000,000) shall be available to jurisdictions to assist in planning for other activities related to meeting the sixth cycle regional housing need assessment, as follows:

(a) (1) The maximum amount that a jurisdiction may receive pursuant to this subdivision shall be as follows:

**EXHIBIT 8**

(A) If the jurisdiction has a population of 750,000 or greater, one million five hundred thousand dollars ($1,500,000).

(B) If the jurisdiction has a population of 300,000 or greater, but equal to or less than 749,999, seven hundred fifty thousand dollars ($750,000).

(C) If the jurisdiction has a population of 100,000 or greater, but equal to or less than 299,999, five hundred thousand dollars ($500,000).

(D) If the jurisdiction has a population of 60,000 or greater, but equal to or less than 99,999, three hundred thousand dollars ($300,000).

(E) If the jurisdiction has a population of 20,000 or greater, but equal to or less than 59,999, one hundred fifty thousand dollars ($150,000).

(F) If the jurisdiction has a population equal to or less than 19,999, sixty-five thousand dollars ($65,000).

(2) For purposes of this subdivision, the population of a jurisdiction shall be based on the population estimates posted on the Department of Finance's internet website as of January 1, 2019.

(b) (1) Until July 1, 2020, a jurisdiction may request an allocation of funds pursuant to this section by submitting an application to the department, in the form and manner prescribed by the department, that contains the following information:

(A) An allocation budget for the funds provided pursuant to this section.

(B) An explanation of how proposed uses will increase housing planning and facilitate local housing production.

(2) The department shall review an application submitted pursuant to this subdivision within 30 days. Upon approval of an application for funds pursuant to this subdivision, the department shall award the moneys for which the jurisdiction qualifies.

(c) A jurisdiction that receives an allocation pursuant to this section shall only use that allocation for housing-related planning activities, including, but not limited to, the following:

(1) Rezoning and encouraging development by updating planning documents and zoning ordinances, such as general plans, community plans, specific plans, sustainable communities' strategies, and local coastal programs.

(2) Completing environmental clearance to eliminate the need for project-specific review.

(3) Establishing a workforce housing opportunity zone pursuant to Article 10.10 (commencing with Section 65620) of Chapter 3 of Division 1 of Title 7 of the Government Code or a housing sustainability district pursuant to Chapter 11 (commencing with Section 66200) of Division 1 of Title 7 of the Government Code.

(4) Performing infrastructure planning, including for sewers, water systems, transit, roads, or other public facilities necessary to support new housing and new residents.

(5) Partnering with other local entities to identify and prepare excess property for residential development.

(6) Revamping local planning processes to speed up housing production.

(7) Developing or improving an accessory dwelling unit ordinance in compliance with Section 65852.2 of the Government Code.

(8) Covering the costs of temporary staffing or consultant needs associated with the activities described in paragraphs (1) to (7), inclusive.

**50515.04.** (a) (1) Subject to paragraph (2), a council of governments, other regional entity, or jurisdiction, as applicable, that receives an allocation of program funds pursuant to Section 50515.02 or 50515.03 shall submit a report, in the form and manner prescribed by the department, to be made publicly available on its internet website, by April 1 of the year following the receipt of those funds, and annually thereafter until those funds are expended, that contains the following information:

(A) The status of the proposed uses listed in the entity's application for funding and the corresponding impact on housing within the region or jurisdiction, as applicable, categorized based on the eligible uses specified in Section 50515.02 or 50515.03, as applicable.

(B) A summary of building permits, certificates of occupancy, or other completed entitlements issued by entities within the region or by the jurisdiction, as applicable.

(2) A city or county that receives program funds shall, in lieu of providing a separate annual report pursuant to this subdivision, provide the information required by paragraph (1) as part of its annual progress report.

(b) (1) The department shall maintain records of the following and provide that information publicly on its internet website:

(A) The name of each applicant for program funds and the status of that entity's application.

(B) The number of applications for program funding received by the department.

(C) The information described in subdivision (a) for each recipient of program funds.

(2) The department may request additional information, as needed, to meet other applicable reporting or audit requirements.

**EXHIBIT 8**

(c) (1) Each recipient of funds under the program shall expend those funds no later than December 31, 2023.

(2) No later than December 31, 2024, each council of governments, other regional entity, or county that receives an allocation of funds pursuant to Section 50515.02 shall submit a final report on the use of those funds to the department. The report required by this paragraph shall include an evaluation of jurisdiction actions taken in support of the entity's proposed uses of those funds, as specified in the entity's application, including which actions had greatest impact on housing production.

(d) The department may monitor expenditures and activities of an applicant, as the department deems necessary, to ensure compliance with program requirements.

(e) The department may, as it deems appropriate or necessary, request the repayment of funds from an applicant, or pursue any other remedies available to it by law for failure to comply with program requirements.

(f) The department may implement the program through the issuance of forms, guidelines, and one or more notices of funding availability, as the department deems necessary, to exercise the powers and perform the duties conferred on it by this chapter. Any forms, guidelines, and notices of funding availability adopted pursuant to this section are hereby exempted from the rulemaking provisions of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code).

(g) The department's decision to approve or deny an application or request for funding pursuant to the program, and its determination of the amount of funding to be provided, shall be final.

**50515.05.** (a) It is the intent of the Legislature to revamp the existing regional housing need allocation process described in Sections 65584 to 65584.2, inclusive, of the Government Code in order to accomplish the following objectives:

(1) Create a fair, transparent, and objective process for identifying housing needs across the state.

(2) Strategically plan for housing growth according to statewide priorities, consistent with Section 65041.1 of the Government Code, and expected future need for housing at all income levels.

(3) Encourage increased development to address the state's housing affordability issues.

(4) Improve compliance and outcomes through incentives and enforcement.

(b) (1) By December 31, 2022, the department, in collaboration with the Office of Planning and Research and after engaging in stakeholder participation, shall develop a recommended improved regional housing need allocation process and methodology that promotes and streamlines housing development and substantially addresses California's housing shortage.

(2) In developing the recommendations required by this subdivision, the department may appoint a third-party consultant to facilitate a comprehensive review of the current regional housing need allocation process and methodology.

(c) Upon completion of the process described in subdivision (b), the department shall submit a report of its findings and recommendations to the Legislature. The report required to be submitted pursuant to this subdivision shall be submitted in compliance with Section 9795 of the Government Code.

## SEC. 12. Section 50517.5 of the Health and Safety Code is amended to read:

**50517.5.** (a) (1) The department shall establish the Joe Serna, Jr. Farmworker Housing Grant Program under which, subject to the availability of funds therefor, grants or loans, or both, shall be made to local public entities, nonprofit corporations, limited liability companies, and limited partnerships, for the construction or rehabilitation of housing for agricultural employees and their families or for the acquisition of manufactured housing as part of a program to address and remedy the impacts of current and potential displacement of farmworker families from existing labor camps, mobilehome parks, or other housing. Under this program, grants or loans, or both, may also be made for the cost of acquiring the land and any building thereon in connection with housing assisted pursuant to this section and for the construction and rehabilitation of related support facilities necessary to the housing. In its administration of this program, the department shall disburse grants or loans, or both, to the local public entities, nonprofit corporations, limited liability companies, or limited partnerships or may, at the request of the local public entity, nonprofit corporation, limited liability company, or limited partnership that sponsors and supervises the rehabilitation or construction program, disburse grant funds to agricultural employees who are participants in a rehabilitation or construction program sponsored and supervised by the local public entity, nonprofit corporation, limited liability company, or limited partnership. No part of a grant or loan made pursuant to this section may be used for project organization or planning.

(2) Notwithstanding any other provision of this chapter, upon the request of a grantee the program also may loan funds to a grantee at no more than 3 percent simple interest. Principal and accumulated interest is due and payable upon completion of the term of the loan. For multifamily housing loans made pursuant to this subdivision, the department shall require annual loan payments in the minimum amount necessary to cover the costs of project monitoring. For the first 30 years of the loan term, the amount of the required loan payments shall not exceed 0.42 percent per annum. For any loan made pursuant to this subdivision, the performance requirements of the lien shall remain in effect for a period of no less than the original term of the loan.

(3) The program shall be administered by the Director of Housing and Community Development and officers and employees of the department as they may designate.

(b) (1) The Joe Serna, Jr. Farmworker Housing Grant Fund is hereby created in the State Treasury. Notwithstanding Section 13340 of the Government Code, all money in the fund is continuously appropriated to the department for making grants or loans, or both,

**EXHIBIT 8**

pursuant to this section and Section 50517.10, for purposes of Chapter 8.5 (commencing with Section 50710), and for costs incurred by the department in administering these programs.

(2) There shall be paid into the fund the following:

(A) Any moneys appropriated and made available by the Legislature for purposes of the fund.

(B) Any moneys that the department receives in repayment or return of grants or loans from the fund, including any interest therefrom.

(C) Any other moneys that may be made available to the department for the purposes of this chapter from any other source or sources.

(D) All moneys appropriated to the department for the purposes of Chapter 8.5 (commencing with Section 50710) and any moneys received by the department from the occupants of housing or shelter provided pursuant to Chapter 8.5 (commencing with Section 50710). These moneys shall be separately accounted for from the other moneys deposited in the fund.

(c) With respect to the supervision of grantees, the department shall do the following:

(1) Establish minimum capital reserves to be maintained by grantees.

(2) Fix and alter from time to time a schedule of rents that may be necessary to provide residents of housing assisted pursuant to this section with affordable rents to the extent consistent with the maintenance of the financial integrity of the housing project. No grantee shall increase the rent on any unit constructed or rehabilitated with the assistance of funds provided pursuant to this section without the prior permission of the department, which shall be given only if the grantee affirmatively demonstrates that the increase is required to defray necessary operating costs or avoid jeopardizing the fiscal integrity of the housing project.

(3) Determine standards for, and control selection by grantees of, tenants and subsequent purchasers of housing constructed or rehabilitated with the assistance of funds provided pursuant to this section.

(4) (A) Require as a condition precedent to a grant or loan, or both, of funds that the applicant have site control that is satisfactory to the department; that the grantee be record owner in fee of the assisted real property or provide other security including a lien on the manufactured home that is satisfactory to the department to ensure compliance with the construction, financial, and program obligations; and that the grantee shall have entered into a written agreement with the department binding upon the grantee and successors in interest to the grantee. The agreement shall include the conditions under which the funds advanced may be repaid. The agreement shall include provisions for a lien on the assisted real property or manufactured home in favor of the State of California for the purpose of securing performance of the agreement. The agreement shall also provide that the lien shall endure until released by the Director of Housing and Community Development.

(B) If funds granted or loaned pursuant to this section constitute less than 25 percent of the total development cost or value, whichever is applicable, of a project assisted under this section, the department may adopt, by regulation, criteria for determining the number of units in a project to which the restrictions on occupancy contained in the agreement apply. In no event may these regulations provide for the application of the agreement to a percentage of units in a project that is less than the percentage of total development costs that funds granted or loaned pursuant to this section represent.

(C) Contemporaneously with the disbursement of the initial funds to a grantee, the department shall cause to be recorded, in the office of the county recorder of the county in which the assisted real property is located, a notice of lien executed by the Director of Housing and Community Development. The notice of lien shall refer to the agreement required by this paragraph for which it secures and it shall include a legal description of the assisted real property that is subject to the lien. The notice of lien shall be indexed by the recorder in the Grantor Index to the name of the grantee and in the Grantee Index to the name of the State of California, Department of Housing and Community Development. For manufactured housing, the liens shall be recorded by the department in the same manner as other manufactured housing liens are recorded. The department shall adopt by regulation criteria for the determination of the lien period. This regulation shall take into account whether the property is held by multifamily rental, single-family ownership, or cooperative ownership and whether it is new construction or rehabilitative construction. The lien period for manufactured housing liens for manufactured homes shall not exceed 10 years.

(D) Pursuant to regulations adopted by the department, the department may execute and cause to be recorded in the office of the recorder of the county in which a notice of lien has been recorded, or the department, as appropriate, a subordination of the lien. The regulations adopted by the department shall provide that any subordination of the lien shall not jeopardize the security interest of the state and shall further the interest of farmworker housing. The recitals contained in the subordination shall be conclusive in favor of any bona fide purchaser or lender relying thereon.

(E) Prior to funds granted pursuant to this section being used to finance the acquisition of a manufactured home, the grantee shall ensure that the home either is already installed in a location where it will be occupied by the eligible household or that a location has been leased or otherwise made available for the manufactured home to be occupied by the eligible household.

(5) Regulate the terms of occupancy agreements or resale controls, to be used in housing assisted pursuant to this section.

(6) Provide linguistically appropriate services and publications, or require grantees to do so, as necessary to implement the purposes of this section.

(7) The agreement between the department and the grantee shall provide, among other things, that both of the following occur:

**EXHIBIT 8**

(A) Upon the sale or conveyance of the real property, or any part thereof, for use other than for agricultural employee occupancy, the grantee or its successors shall, as a condition for the release of the lien provided pursuant to paragraph (4), repay to the fund the department's grant and loan funds.

(B) Upon the sale or conveyance of the real property or any part thereof for continued agricultural employee occupancy, the transferee shall assume the obligation of the transferor and the real property shall be transferred to the new owner; provided that the transferee agrees to abide by the agreement entered into between the transferor and the department and that the new owner takes the property subject to the lien provided pursuant to paragraph (4), except that this lien shall, at the time of the transfer of the property to the new owner, be extended for an additional lien period determined by the department pursuant to paragraph (4), and the new owner shall not be credited with the lien period that had run from the time the transferor had acquired the property to the time of transfer to the new owner, unless the department determines that it is in the best interest of the state and consistent with the intent of this section to so credit the lien period to the new owner. However, the lien shall have priority as of the recording date of the lien for the original grantee, pursuant to paragraph (4).

(d) The department may do any of the following with respect to grantees:

(1) Through its agents or employees enter upon and inspect the lands, buildings, and equipment of a grantee, including books and records, at any time before, during, or after construction or rehabilitation of units assisted pursuant to this section. However, there shall be no entry or inspection of any unit that is occupied, whether or not any occupant is actually present, without the consent of the occupant.

(2) Supervise the operation and maintenance of any housing assisted pursuant to this section and order repairs as may be necessary to protect the public interest or the health, safety, or welfare of occupants of the housing.

(e) The department shall include in its annual report required by Section 50408, a current report of the Joe Serna, Jr. Farmworker Housing Grant Program. The report shall include, but need not be limited to, (1) the number of households assisted, (2) the average income of households assisted and the distribution of annual incomes among assisted households, (3) the rents paid by households assisted, (4) the number and amount of grants or loans, or both, made to each grantee in the preceding year, (5) the dollar value of funding derived from sources other than the state for each project receiving a grant or loan, or both, under this section, and an identification of each source, (6) recommendations, as needed, to improve operations of the program and respecting the desirability of extending its application to other groups in rural areas identified by the department as having special need for state housing assistance, and (7) the number of manufactured housing units assisted under this section.

(f) As used in this section:

(1) "Agricultural employee" has the same meaning as specified in subdivision (b) of Section 1140.4 of the Labor Code, but also includes any person who works on or off the farm in the processing of any agricultural commodity until it is shipped for distribution, whether or not this person is encompassed within the definition specified in subdivision (b) of Section 1140.4 of the Labor Code.

(2) "Grantee" means the local public entity, nonprofit corporation, limited liability company, or limited partnership that is awarded the grant or loan, or both, under this section, and, at the request thereof, may include an agricultural employee receiving direct payment of a grant for rehabilitation under this section who occupies the assisted housing both before and after the rehabilitation and may include an agricultural employee receiving direct payment of a grant for construction under this section who will occupy the assisted housing and who is a participant in a rehabilitation or construction program sponsored and supervised by a local public entity, nonprofit corporation, limited liability company, or limited partnership.

(3) "Housing" may include, but is not necessarily limited to, conventionally constructed units and manufactured housing installed pursuant to either Section 18551 or 18613.

(4) "Limited liability company" means a limited liability company where all the members are nonprofit public benefit corporations.

(5) "Limited partnership" means a limited partnership where all of the general partners are either nonprofit public benefit corporations, limited liability companies, or a combination of nonprofit public benefit corporations and limited liability companies.

(g) The department may provide the assistance offered pursuant to this chapter in any area where there is a substantial unmet need for farmworker housing.

**SEC. 13.** Section 50517.6 of the Health and Safety Code is amended to read:

**50517.6.** (a)  The department may set aside the amount of funds authorized by subdivision (d) for the purposes of curing or averting a default on the terms of any loan or other obligation by the recipient of financial assistance, or bidding at any foreclosure sale where the default or foreclosure sale would jeopardize the department's security in the dwelling unit assisted pursuant to this chapter.

(b)  The department may use the set-aside funds made available pursuant to this chapter to repair or maintain any dwelling unit assisted pursuant to this chapter that was acquired to protect the department's security interest in the dwelling unit.

(c)  The payment or advance of funds by the department pursuant to this section shall be exclusively within the department's discretion, and no person shall be deemed to have any entitlement to the payment or advance of those funds. The amount of any funds expended by the department for the purposes of curing or averting a default shall be added to any grant amount secured by the lien and shall be payable to the department upon demand.

(d)  On the effective date of the act that adds this section, the department may set aside up to two hundred thousand dollars ($200,000) from the Joe Serna, Jr. Farmworker Housing Grant Fund for the purposes authorized by this section. On July 1 of each

**EXHIBIT 8**

subsequent fiscal year, the department may set aside, for the purposes of this section, up to 1.5 percent of the funds available in the Joe Serna, Jr. Farmworker Housing Grant Fund on that date.

**SEC. 14.** Section 50517.7 of the Health and Safety Code is amended to read:

**50517.7.** In counties in which a disaster has been declared by the Governor pursuant to Chapter 7 (commencing with Section 8550) of Division 1 of Title 2 of the Government Code and for a period of 12 months after the declaration, the department may provide grants from the fund established by subdivision (b) of Section 50517.5, subject to the following terms and conditions, which are applicable only to this section:

(a)  Grants may be made to local public entities, nonprofit corporations, and housing owners comprised of either homeowners who are agricultural employees or owners of rental property used primarily by agricultural households.

(b)  The department may enter into master agreements with nonprofit corporations or local public entities or it may enter into contracts directly with housing owners to carry out the activities authorized by this section.

(c)  The department may make grants directly to housing owners or through master agreements for the cost of preparation of applications for funds, and supervision of expenditures from the fund, including, but not limited to estimates, work writeups, bidding supervision, and inspections. Funds granted pursuant to this subdivision shall not be secured by, and subject to, the liens required by Section 50517.5.

(d)  The department, either directly or through master agreements, may provide grants to housing owners which shall be used for housing rehabilitation or acquisition and rehabilitation, and related costs, other than those costs accruing pursuant to subdivision (c). Only those funds from the fund which are actually utilized pursuant to this subdivision shall be secured by, and subject to, the liens required by Section 50517.5.

**SEC. 15.** Section 50650 of the Health and Safety Code is amended to read:

**50650.** The Legislature finds and declares as follows:

(a)  An adequate supply of safe and affordable housing is the foundation for strong and sustainable communities. Owner occupied housing is a key housing resource, contributing to neighborhood stability as well as economic vitality.

(b)  In California, homeownership is beyond the reach of a large segment of the population. There are also many homeowners who lack the resources to make necessary repairs to their homes, or who would welcome the opportunity to share them with suitable tenants.

(c)  Reflecting California's diversity, there is a variety of proven approaches to the promotion of homeownership within the state. The purpose of the CalHome Program established by this chapter is to support existing homeownership programs aimed at lower and very low income households, and in the case of a disaster, as defined in Section 8680.3 of the Government Code, households at or below moderate income, and operated by private nonprofit and local government agencies, and thereby to increase homeownership, encourage neighborhood revitalization and sustainable development, and maximize use of existing homes.

(d)  The CalHome Program is intended to take the place of the Senior Citizens' Shared Housing Program established by Chapter 3.6 (commencing with Section 50533), which is repealed by the act enacting this chapter.

**SEC. 16.** Section 50650.3 of the Health and Safety Code is amended to read:

**50650.3.** (a) Funds appropriated for purposes of this chapter shall be used to enable low- and very low income households to become or remain homeowners as provided in paragraphs (1) and (2), and to provide disaster relief assistance to households at or below 120 percent of area median income as provided in paragraph (3). Funds shall be provided by the department to local public agencies or nonprofit corporations as any of the following:

(1) Grants for programs that assist individual households.

(2) Loans that assist development projects involving multiple home ownership units, including single-family subdivisions.

(3) Grants for programs that assist individual households as provided in subdivision (g).

(b) (1) Grant funds may be used for first-time homebuyer downpayment assistance, home rehabilitation, including the installation or retrofit of ignition resistant exterior components on existing manufactured homes, mobilehomes, and accessory structures required pursuant to Article 2.3 (commencing with Section 4200) of Subchapter 2 of Chapter 3 of Division 1 of Title 25 of the California Code of Regulations, homebuyer counseling, home acquisition and rehabilitation, or self-help mortgage assistance programs, or for technical assistance for self-help and shared housing home ownership.

(2) Home rehabilitation funding for the purpose of installing ignition resistant components on manufactured homes, mobilehomes, or accessory structures pursuant to this subdivision shall not be conditioned upon the rehabilitation of additional or unrelated home components unless that rehabilitation is required pursuant to Article 2.3 (commencing with Section 4200) of Subchapter 2 of Chapter 3 of Division 1 of Title 25 of the California Code of Regulations. In administering funding for this purpose, local public agencies and nonprofit corporations may consider the condition and age of the manufactured home or mobilehome, including whether the home was constructed on or after June 15, 1976, in accordance with federal standards and whether the available funds could be more effectively used to replace the manufactured home or mobilehome.

**EXHIBIT 8**

(c) (1) Except as provided in subdivision (e), loan funds may be used for purchase of real property, site development, predevelopment, and construction period expenses incurred on home ownership development projects, and permanent financing for mutual housing or cooperative developments. Upon completion of construction, the department may convert project loans into grants for programs of assistance to individual homeowners. Except as provided in paragraph (2), financial assistance provided to individual households shall be in the form of deferred payment loans, repayable upon sale or transfer of the homes, when they cease to be owner-occupied, or upon the loan maturity date. Financial assistance may be provided in the form of a secured forgivable loan to an individual household to rehabilitate, repair, or replace manufactured housing located in a mobilehome park and not permanently affixed to a foundation. The loan shall be due and payable in 20 years, with 10 percent of the original principal to be forgiven annually for each additional year beyond the 10th year that the home is owned and continuously occupied by the borrower. Not more than 10 percent of the funds available for the purposes of this chapter in a fiscal year shall be used for financial assistance in the form of secured forgivable loans.

(2) Notwithstanding any other law, the department may, in its discretion, permit the downpayment assistance loan to be subordinated to refinancing if it determines that the borrower has demonstrated hardship, subordination is required to avoid foreclosure, and the new loan meets the department's underwriting requirements. The department may permit subordination on those terms and conditions as it determines as reasonable, however subordination shall not be permitted if the borrower has sufficient equity to repay the loan.

(d) All loan repayments shall be used for activities allowed under this section, and shall be governed by a reuse plan approved by the department. Those reuse plans may provide for loan servicing by the grant recipient or a third-party local government agency or nonprofit corporation.

(e) Notwithstanding subdivision (c), loans provided pursuant to the CalHome Program Disaster Assistance for Imperial County that have been made for the purpose of rehabilitation, reconstruction, or replacement of lower income owner-occupied manufactured homes shall be due and payable in 10 years, with 20 percent of the original principal to be forgiven annually for each additional year beyond the fifth year that the manufactured home is owned and continuously occupied by the borrower.

(f) The department may use funds appropriated pursuant to this chapter to make grants to local agencies or nonprofit corporations to construct accessory dwelling units as defined in Section 65852.2 of the Government Code or junior accessory dwelling units as defined in Section 65852.22 of the Government Code, and to repair, reconstruct, or rehabilitate, in whole or in part, accessory dwelling units and junior accessory dwelling units.

(g) Notwithstanding any other provision of this chapter, the department may use funds appropriated pursuant to this chapter to make grants to local agencies or nonprofit corporations to assist households at or below 120 percent of area median income that are victims of a disaster, if one of the following occurs with respect to the county in which the household's residence is located:

(1) The Governor has proclaimed a state of emergency, pursuant to Section 8625 of the Government Code, resulting from a disaster, as defined in Section 8680.3 of the Government Code.

(2) A special appropriation of federal emergency supplemental assistance or a presidential declaration of disaster has occurred.

(h) The department shall review, adopt, amend, and repeal guidelines to implement the making of grants pursuant to subdivisions (f) and (g). Any guidelines adopted to implement subdivisions (f) and (g) shall not be subject to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code. In the event of inconsistency regarding the requirements of qualified applicants and eligibility of accessory dwelling units and junior accessory dwelling units, and rents associated with them between those guidelines and any regulations otherwise enacted pursuant to this chapter, those guidelines shall prevail.

**SEC. 17.** Section 50650.4 of the Health and Safety Code is amended to read:

**50650.4.** (a) To be eligible to receive a grant or loan, local public agencies or nonprofit corporations shall demonstrate sufficient organizational stability and capacity to carry out the activity for which they are requesting funds, including, where applicable, the capacity to manage a portfolio of individual loans over an extended time period. Capacity may be demonstrated by substantial successful experience performing similar activities, or through other means acceptable to the department. In administering the CalHome program, the department may permit local agencies and nonprofit corporations to apply their own underwriting guidelines when evaluating CalHome rehabilitation loan applications, following prior review and approval of those guidelines by the department. The local agency or nonprofit corporation shall not subsequently alter its underwriting guidelines with respect to the use of CalHome funds without review and approval by the department, including how the local agencies and nonprofit corporations will ensure participation by low-income households if making loans in response to a disaster as described in paragraph (1) of subdivision (g) of Section 50650.3. In allocating funds, the department shall utilize a competitive application process, using weighted evaluation criteria, including, but not limited to, the extent the program or project utilizes volunteer or self-help labor, trains youth and young adults in construction skills, creates balanced communities, involves community participation, or whether the program or project contributes toward community revitalization. To the extent feasible, the application process shall ensure a reasonable geographic distribution of funds.

(b) In administering department funds received pursuant to subdivision (a), local public agencies and nonprofit corporations shall not deny the funding application of, or apply different underwriting guidelines to, a housing program or project solely on the basis of either of the following:

(1) The home is a manufactured home or mobilehome, as defined in Sections 18007 and 18008.

(2) The home is located in a mobilehome park or in a manufactured housing community, as defined in Sections 18210.7 and 18214.

**SEC. 18.** Section 50843.5 of the Health and Safety Code is amended to read:

**EXHIBIT 8**

**50843.5.** (a) Subject to the availability of funding, the department shall make matching grants available to cities, counties, cities and counties, tribes, and charitable nonprofit organizations organized under Section 501(c)(3) of the Internal Revenue Code that have created and are operating or will operate housing trust funds. These funds shall be awarded through the issuance of a Notice of Funding Availability (NOFA). The department may adopt guidelines to administer this chapter. Any guidelines employed by the department in implementing this chapter shall not be subject to the requirements of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code). Notwithstanding anything to the contrary in this chapter, the terms of this section, and the guidelines authorized above, shall control in the event of any other statutory conflict.

(1) Applicants that provide matching funds from a source or sources other than impact fees on residential development shall receive a priority for funding.

(2) The department shall set aside funding for new trusts, as defined by the department in the guidelines adopted pursuant to this section.

(b) Housing trusts eligible for funding under this section shall have the following characteristics:

(1) Utilization of a public or joint public and private fund established by legislation, ordinance, resolution, or a public-private partnership to receive specific revenue to address local housing needs.

(2) Receipt of ongoing revenues from dedicated sources of funding such as taxes, fees, loan repayments, or public or private contributions.

(c) The minimum allocation to an applicant that is a newly established trust shall be five hundred thousand dollars ($500,000), or a higher amount as established by the department. The minimum allocation for all other trusts shall be one million dollars ($1,000,000), or a higher amount as established by the department. All funds provided pursuant to this section shall be matched on a dollar-for-dollar basis with moneys that are not required by any state or federal law to be spent on housing, except as authorized by Chapter 2.5 (commencing with Section 50470), if those funds are used to capitalize a regional housing trust fund. An application for an existing housing trust shall not be considered unless the department has received adequate documentation of the deposit in the local housing trust fund of the local match, or evidence of a legally binding commitment to deposit matching funds, and the identity of the source of matching funds. An application for a new trust shall not be considered unless the department has received adequate documentation, as determined by the department, that an ordinance imposing or dedicating a tax or fee to be deposited into the new trust has been enacted or the applicant has received a legally binding commitment to deposit matching funds into the new trust. Funds shall not be disbursed by the department to any trust until all matching funds are on deposit and then funds may be disbursed only in amounts necessary to fund projects identified to receive a loan from the trust within a reasonable period of time, as determined by the department. Applicants shall be required to continue funding the local housing trust fund from these identified local sources, and continue the trust in operation, for a period of no less than five years from the date of award. If the funding is not continued for a five-year period, then (1) the amount of the department's grant to the local housing trust fund, to the extent that the trust fund has unencumbered funds available, shall be immediately repaid, and (2) any payments from any projects funded by the local housing trust fund that would have been paid to the local housing trust fund shall be paid instead to the department and used for the program or its successor. The total amount paid to the department pursuant to (1) and (2), combined, shall not exceed the amount of the department's grant.

(d) (1) Funds shall be used for the predevelopment costs, acquisition, construction, or rehabilitation of the following types of housing or projects:

(A) Rental housing projects or units within rental housing projects. The affordability of all assisted units shall be restricted for not less than 55 years.

(B) Emergency shelters, transitional housing, and permanent supportive housing, as these terms are defined in the guidelines adopted pursuant to this section.

(C) For-sale housing projects or units within for-sale housing projects.

(D) Notwithstanding any other provision of this chapter, the department may use funds appropriated pursuant to this chapter to make grants to trust funds for the construction of accessory dwelling units as defined in Section 65852.2 of the Government Code, or junior accessory dwelling units as defined in Section 65852.22 of the Government Code, and to repair, reconstruct, or rehabilitate, in whole or in part, accessory dwelling units and junior accessory dwelling units.

(2) At least 30 percent of the total amount of the grant and the match shall be expended on projects, units, or shelters that are affordable to, and restricted for, extremely low income households, as defined in Section 50106. No more than 20 percent of the total amount of the grant and the match shall be expended on projects or units affordable to, and restricted for, moderate-income persons and families whose income does not exceed 120 percent of the area median income. The remaining funds shall be used for projects, units, or shelters that are affordable to, and restricted for, lower income households, as defined in Section 50079.5.

(3) If funds are used for the acquisition, construction, or rehabilitation of for-sale housing projects or units within for-sale housing projects, the grantee shall record a deed restriction against the property that will ensure compliance with one of the following requirements upon resale of the for-sale housing units, unless it is in conflict with the requirements of another public funding source or law:

(A) If the property is sold within 30 years from the date that trust funds are used to acquire, construct, or rehabilitate the property, the owner or subsequent owner shall sell the home at an affordable housing cost, as defined in Section 50052.5, to a household that meets the relevant income qualifications.

**EXHIBIT 8**

(B) The owner and grantee shall share the equity in the unit pursuant to an equity-sharing agreement. The grantee shall reuse the proceeds of the equity-sharing agreement consistent with this section. To the extent not in conflict with another public funding source or law, all of the following shall apply to the equity-sharing agreement provided for by the deed restriction:

(i) Upon resale by an owner-occupant of the home, the owner-occupant of the home shall retain the market value of any improvements, the downpayment, and their proportionate share of appreciation. The grantee shall recapture any initial subsidy and its proportionate share of appreciation, which shall then be used to make housing available to persons and families of the same income category as the original grant and for any type of housing or shelter specified in paragraph (1).

(ii) For purposes of this subdivision, the initial subsidy shall be equal to the fair market value of the home at the time of initial sale to the owner-occupant minus the initial sale price to the owner-occupant, plus the amount of any downpayment assistance or mortgage assistance. If upon resale by the owner-occupant the market value is lower than the initial market value, then the value at the time of the resale shall be used as the initial market value.

(iii) For purposes of this subdivision, the grantee's proportionate share of appreciation shall be equal to the ratio of the initial subsidy to the fair market value of the home at the time of the initial sale.

(4) Notwithstanding subparagraph (A) of paragraph (1) or paragraph (3), a local housing trust fund shall not be required to record a separate deed restriction or equity agreement for any project or home that it finances, if a restriction or agreement that meets the requirements of subparagraph (A) of paragraph (1) or paragraph (3), as applicable, has been, or will be, recorded against the property by another public agency.

(e) Loan repayments shall accrue to the grantee housing trust for use pursuant to this section. If the trust no longer exists, loan repayments shall accrue to the department for use in the program or its successor.

(f) (1) In order for a city, county, or city and county to be eligible for funding, the applicant shall, at the time of application, meet both of the following requirements:

(A) Have an adopted housing element that the department has determined, pursuant to Section 65585 of the Government Code, is in substantial compliance with the requirements of Article 10.6 (commencing with Section 65580) of Chapter 3 of Division 1 of Title 7 of the Government Code.

(B) Have submitted to the department the annual progress report required by Section 65400 of the Government Code within the preceding 12 months, if the department has adopted the forms and definitions pursuant to subparagraph (B) of paragraph (2) of subdivision (a) of Section 65400 of the Government Code.

(2) In order for a nonprofit organization applicant to be eligible for funding, the applicant shall agree to utilize funds provided under this chapter only for projects located in cities, counties, or a city and county that meet both of the following requirements:

(A) Have an adopted housing element that the department has determined, pursuant to Section 65585 of the Government Code, to be in substantial compliance with the requirements of Article 10.6 (commencing with Section 65580) of Chapter 3 of Division 1 of Title 7 of the Government Code.

(B) Have submitted to the department the annual progress report required by Section 65400 of the Government Code within the preceding 12 months, if the department has adopted the forms and definitions pursuant to subparagraph (B) of paragraph (2) of subdivision (a) of Section 65400 of the Government Code.

(3) A city, county, or city and county that has received an award pursuant to this section shall not encumber any program funds unless it has an adopted housing element the department has determined, pursuant to Section 65585 of the Government Code, is in substantial compliance with the requirements of Article 10.6 (commencing with Section 65580) of Chapter 3 of Division 1 of Title 7 of the Government Code.

(g) Recipients shall have held, or shall agree to hold, a public hearing or hearings to discuss and describe the project or projects that will be financed with funds provided pursuant to this section. As a condition of receiving a grant pursuant to this section, any nonprofit organization shall agree that it will hold one public meeting a year to discuss the criteria that will be used to select projects to be funded. That meeting shall be open to the public, and public notice of this meeting shall be provided, except to the extent that any similar meeting of a city or county would be permitted to be held in closed session.

(h) No more than 5 percent of the funds appropriated to the department for the purposes of this program shall be used to pay the department's costs of administration of this section. Notwithstanding any other law, the department may also allow a grantee to use up to 5 percent of the grant award for administrative costs.

(i) A local housing trust fund shall encumber funds provided pursuant to this section no later than 60 months after receipt. In addition, any award to a local housing trust that was under contract on January 1, 2013, shall be extended by 12 months, subject to progress benchmarks to be established by the department. Any funds not encumbered within that period shall revert to the department for use in the program or its successor.

(j) Recipients shall be required to file periodic reports with the department regarding the use of funds provided pursuant to this section. No later than December 31 of each year in which funds are awarded by the program, the department shall provide a report to the Legislature regarding the number of trust funds created, a description of the projects supported, the number of units assisted, and the amount of matching funds received.

**SEC. 19.** Section 53545.13 of the Health and Safety Code is amended to read:

**EXHIBIT 8**

**53545.13.** (a) The Infill Incentive Grant Program of 2007 is hereby established to be administered by the department.

(b) Upon appropriation of funds by the Legislature for the purpose of implementing paragraph (1) of subdivision (b) of Section 53545, the department shall establish and administer a competitive grant program to allocate those funds to selected capital improvement projects that are an integral part of, or necessary to facilitate the development of, a qualifying infill project or a qualifying infill area.

(c) A qualifying infill project or qualifying infill area for which a capital improvement project grant may be awarded shall meet all of the following conditions:

(1) Be located in a city, county, or city and county, in which the general plan of the city, county, or city and county, has an adopted housing element that has been found by the department, pursuant to Section 65585 of the Government Code, to be in compliance with the requirements of Article 10.6 (commencing with Section 65580) of Chapter 3 of Division 1 of Title 7 of the Government Code.

(2) Include not less than 15 percent of affordable units, as follows:

(A) For projects that contain both rental and ownership units, units of either or both product types may be included in the calculation of the affordability criteria.

(B) (i) To the extent included in a project grant application, for the purpose of calculating the percentage of affordable units, the department may consider the entire master development in which the development seeking grant funding is included.

(ii) Where applicable, an applicant may include a replacement housing plan to ensure that dwelling units housing persons and families of low or moderate income are not removed from the low- and moderate-income housing market. Residential units to be replaced may not be counted toward meeting the affordability threshold required for eligibility for funding under this section.

(C) For the purposes of this subdivision, "affordable unit" means a unit that is made available at an affordable rent, as defined in Section 50053, to a household earning no more than 60 percent of the area median income or at an affordable housing cost, as defined in Section 50052.5, to a household earning no more than 120 percent of the area median income. Rental units shall be subject to a recorded covenant that ensures affordability for at least 55 years. Ownership units shall initially be sold to and occupied by a qualified household, and subject to a recorded covenant that includes either a resale restriction for at least 30 years or equity sharing upon resale.

(D) A qualifying infill project or qualifying infill area for which a disposition and development agreement or other project- or area-specific agreement between the developer and the local agency having jurisdiction over the project has been executed on or before the effective date of the act adding this section, shall be deemed to meet the affordability requirement of this paragraph (2) if the agreement includes affordability covenants that subject the project or area to the production of affordable units for very low, low-, or moderate-income households.

(3) Include average residential densities on the parcels to be developed that are equal to or greater than the densities described in subparagraph (B) of paragraph (3) of subdivision (c) of Section 65583.2 of the Government Code, except that a project located in a rural area as defined in Section 50199.21 shall include average residential densities on the parcels to be developed of at least 10 units per acre.

(4) Be located in an area designated for mixed-use or residential development pursuant to one of the following adopted plans:

(A) A general plan adopted pursuant to Section 65300 of the Government Code.

(B) A project area redevelopment plan approved pursuant to Section 33330.

(C) A regional blueprint plan as defined in the California Regional Blueprint Planning Program administered by the Business, Transportation and Housing Agency, or a regional plan as defined in Section 65060.7 of the Government Code.

(5) For qualifying infill projects or qualifying infill areas located in a redevelopment project area, meet the requirements contained in subdivision (a) of Section 33413.

(d) In its review and ranking of applications for the award of capital improvement project grants, the department shall rank the affected qualifying infill projects and qualifying infill areas based on the following priorities:

(1) Project readiness, which shall include all of the following:

(A) A demonstration that the project or area development can complete environmental review and secure necessary entitlements from the local jurisdiction within a reasonable period of time following the submittal of a grant application.

(B) A demonstration that the eligible applicant can secure sufficient funding commitments derived from sources other than this part for the timely development of a qualifying infill project or development of a qualifying infill area.

(C) A demonstration that the project or area development has sufficient local support to achieve the proposed improvement.

(2) The depth and duration of the affordability of the housing proposed for a qualifying infill project or qualifying infill area.

(3) The extent to which the average residential densities on the parcels to be developed exceed the density standards contained in paragraph (3) of subdivision (c).

(4) The qualifying infill project's or qualifying infill area's inclusion of, or proximity or accessibility to, a transit station or major transit stop.

**EXHIBIT 8**

(5) The proximity of housing to parks, employment or retail centers, schools, or social services.

(6) The qualifying infill project or qualifying infill area location's consistency with an adopted regional blueprint plan or other adopted regional growth plan intended to foster efficient land use.

(e) In allocating funds pursuant to this section, the department, to the maximum extent feasible, shall ensure a reasonable geographic distribution of funds.

(f) Funds awarded pursuant to this section shall supplement, not supplant, other available funding.

(g) (1) The department shall adopt guidelines for the operation of the grant program, including guidelines to ensure the tax-exempt status of the bonds issued pursuant to this part, and may administer the program under those guidelines.

(2) The guidelines shall include provisions for the reversion of grant awards that are not encumbered within four years of the fiscal year in which an award was made, and for the recapture of grants awarded, but for which development of the related housing units has not progressed in a reasonable period of time from the date of the grant award, as determined by the department.

(3) The guidelines shall not be subject to the requirements of Chapter 3.5 (commencing with Section 11340) of Division 3 of Title 2 of the Government Code.

(h) For each fiscal year within the duration of the grant program, the department shall include within the report to the Legislature, required by Section 50408, information on its activities relating to the grant program. The report shall include, but is not limited to, the following information:

(1) A summary of the projects that received grants under the program for each fiscal year that grants were awarded.

(2) The description, location, and estimated date of completion for each project that received a grant award under the program.

(3) An update on the status of each project that received a grant award under the program, and the number of housing units created or facilitated by the program.

(i)  Notwithstanding paragraph (3) of subdivision (c), a city of greater than 100,000 in population in a standard metropolitan statistical area of less than 2,000,000 in population may petition the department for, and the department may grant, an exception to the jurisdiction's classification pursuant to subdivisions (d) to (f), inclusive, of Section 65583.2 of the Government Code, if the city believes it is unable to meet the density requirements specified in paragraph (3) of subdivision (c). The city shall submit the petition with its application and shall include the reasons why the city believes the exception is warranted. The city shall provide information supporting the need for the exception, including, but not limited to, any limitations that the city may encounter in meeting the density requirements specified in paragraph (3) of subdivision (c). Any exception shall be for the purposes of this section only. This subdivision shall become inoperative on January 1, 2015.

(j) For notices of funding availability released after July 1, 2021, in awarding funds under the program, the department shall provide additional points or preference to projects located in jurisdictions that have adopted a housing element that has been found by the department to be in substantial compliance with the requirements of Article 10.6 (commencing with Section 65580) of Chapter 3 of Division 1 of Title 7 of the Government Code pursuant to Section 65585 of the Government Code and that are designated prohousing pursuant to subdivision (c) of Section 65589.9 of the Government Code, in the manner determined by the department pursuant to subdivision (d) of Section 65589.9 of the Government Code.

**SEC. 20.** Part 12.5 (commencing with Section 53559) is added to Division 31 of the Health and Safety Code, to read:

## PART 12.5. Infill Infrastructure Grant Program of 2019

**53559.** (a) The Infill Infrastructure Grant Program of 2019 is hereby established to be administered by the department.

(b) Upon appropriation by the Legislature of funds specified in Section 53559.2, the department shall establish and administer a grant program to allocate those funds to capital improvement projects that are an integral part of, or necessary to facilitate the development of, a qualifying infill project or qualifying infill area, pursuant to the requirements of this section.

(c) (1) The department shall administer a competitive application process for grants funded by the allocation specified in paragraph (1) of subdivision (a) of Section 53559.2 for selected capital improvement projects for large jurisdictions pursuant to this subdivision. The department shall release a notice of funding availability no later than November 30, 2019.

(2) In its review and ranking of applications for the award of capital improvement project grants, the department shall rank the affected qualifying infill projects and qualifying infill areas based on the following priorities:

(A) Project readiness, which shall include all of the following:

(i) A demonstration that the project or area development can complete environmental review and secure necessary entitlements from the local jurisdiction within a reasonable period of time following the submission of a grant application.

(ii) A demonstration that the eligible applicant can secure sufficient funding commitments derived from sources other than this part for the timely development of a qualifying infill project or development of a qualifying infill area.

(iii) A demonstration that the project or area development has sufficient local support to achieve the proposed improvement.

(B) The depth and duration of the affordability of the housing proposed for a qualifying infill project or qualifying infill area.

**EXHIBIT 8**

(C) The extent to which the average residential densities on the parcels to be developed exceed the density standards contained in paragraph (4) of subdivision (e).

(D) The qualifying infill project's or qualifying infill area's inclusion of, or proximity or accessibility to, a transit station or major transit stop.

(E) The proximity of housing to parks, employment or retail centers, schools, or social services.

(F) The qualifying infill project or qualifying infill area location's consistency with an adopted sustainable communities strategy pursuant to Section 65080 of the Government Code, alternative planning strategy pursuant to Section 65450 of the Government Code, or other adopted regional growth plan intended to foster efficient land use.

(3) In allocating funds pursuant to this subdivision, the department, to the maximum extent feasible, shall ensure a reasonable geographic distribution of funds.

(4) For purposes of awarding grants pursuant to the competitive application process required by this subdivision:

(A) "Qualifying infill area" means a contiguous area located within an urbanized area (i) that has been previously developed, or where at least 75 percent of the perimeter of the area adjoins parcels that are developed with urban uses, and (ii) in which at least one development application has been approved or is pending approval for a residential or mixed-use residential project that meets the definition and criteria in this section for a qualifying infill project.

(B) (i) "Qualifying infill project" means a residential or mixed-use residential project located within an urbanized area on a site that has been previously developed, or on a vacant site where at least 75 percent of the perimeter of the site adjoins parcels that are developed with urban uses.

(ii) A property is adjoining the side of a project site if the property is separated from the project site only by an improved public right-of-way.

(d) (1) The department shall administer an over-the-counter application process for grants funded by the allocation specified in paragraph (2) of subdivision (a) of Section 53559.2 for capital improvement projects for small jurisdictions, pursuant to this subdivision. A notice of funding availability shall be released no later than November 30, 2019.

(2) Eligible applicants shall submit the following information in the application request for funding:

(A) A complete description of the qualifying infill project or qualifying infill area and documentation of how the infill project or infill area meets the requirements of this section.

(B) A complete description of the capital improvement project and requested grant funding for the project, how the project is necessary to support the development of housing, and how it meets the criteria of this section.

(C) Documentation that specifies how the application meets all of the requirements of subdivision (e).

(D) (i) Except as provided in clause (ii), a financial document that shows the gap financing needed for the project.

(ii) For a qualifying infill project located in the unincorporated area of the county, the department shall allow an applicant to meet the requirement described in clause (i) by submitting copies of an application or applications for other sources of state or federal funding for a qualifying infill project.

(E) (i) Except as provided by clause (ii), documentation of all necessary entitlement and permits, and a certification from the applicant that the project is shovel-ready.

(ii) For a qualifying infill project located in the unincorporated area of the county, the department shall allow the applicant to meet the requirement described in clause (i) by submitting a letter of intent from a willing affordable housing developer that has previously completed at least one comparable housing project, certifying that the developer is willing to submit an application to the county for approval by the county of a qualifying infill project within the area in the event that the funding requested pursuant to this subdivision is awarded.

(3) The department may establish a per-unit formula to determine the amount of funds awarded pursuant to this subdivision.

(4) For purposes of awarding grants pursuant to the over-the-counter application process required by this subdivision:

(A) "Qualifying infill area" means a contiguous area located within an urbanized area that meets either of the following criteria:

(i) The area contains sites included on the inventory of land suitable and available for residential development in the housing element of the applicable city or county general plan pursuant to paragraph (3) of subdivision (a) of Section 65583 of the Government Code, and at least 50 percent of the perimeter of the area shall adjoin parcels that are developed with urban uses.

(ii) The capital improvement project for which funding is requested is necessary, as documented by an environmental review or some other adopted planning document, to make the area suitable and available for residential development, or to allow the area to accommodate housing for additional income levels, and the area otherwise meets the requirements for inclusion on the inventory of land suitable and available for residential development in the housing element of the applicable city or county general plan pursuant to paragraph (3) of subdivision (a) of Section 65583 of the Government Code. At least 50 percent of the perimeter of the area shall adjoin parcels that are developed with urban uses.

**EXHIBIT 8**

(B) "Qualifying infill project" means a residential or mixed-use residential project located within an urbanized area on a site that has been previously developed, or on a vacant site where at least 50 percent of the perimeter of the site adjoins parcels that are developed with urban uses.

(e) A qualifying infill project or qualifying infill area for which a capital improvement project grant may be awarded pursuant to either subdivision (c) or (d) shall meet all of the following conditions:

(1) Be located in a city, county, or city and county in which the general plan of the city, county, or city and county has an adopted housing element that has been found by the department, pursuant to Section 65585 of the Government Code, to be in compliance with the requirements of Article 10.6 (commencing with Section 65580) of Chapter 3 of Division 1 of Title 7 of the Government Code.

(2) Be located in a city, county, or city and county that, at the time of application, has submitted its annual progress reports for 2017 through the most recently required annual progress reports.

(3) Include not less than 15 percent of affordable units, as follows:

(A) For projects that contain both rental and ownership units, units of either or both product types may be included in the calculation of the affordability criteria.

(B) (i) To the extent included in a project grant application, for the purpose of calculating the percentage of affordable units, the department may consider the entire master development in which the development seeking grant funding is included.

(ii) Where applicable, an applicant may include a replacement housing plan to ensure that dwelling units housing persons and families of low or moderate income are not removed from the low- and moderate-income housing market. Residential units to be replaced shall not be counted toward meeting the affordability threshold required for eligibility for funding under this section.

(C) For the purposes of this subdivision, "affordable unit" means a unit that is made available at an affordable rent, as defined in Section 50053, to a household earning no more than 60 percent of the area median income or at an affordable housing cost, as defined in Section 50052.5, to a household earning no more than 120 percent of the area median income. Rental units shall be subject to a recorded covenant that ensures affordability for at least 55 years. Ownership units shall initially be sold to and occupied by a qualified household, and shall be subject to a recorded covenant that includes either a resale restriction for at least 30 years or equity sharing upon resale.

(D) A qualifying infill project or qualifying infill area for which a disposition and development agreement or other project- or area-specific agreement between the developer and the local agency having jurisdiction over the project has been executed on or before the effective date of the act adding this section, shall be deemed to meet the affordability requirements of this paragraph if the agreement includes affordability covenants that subject the project or area to the production of affordable units for very low, low-, or moderate-income households.

(4) Include average residential densities on the parcels to be developed that are equal to or greater than the densities described in subparagraph (B) of paragraph (3) of subdivision (c) of Section 65583.2 of the Government Code, except that a project located in a rural area as defined in Section 50199.21 shall include average residential densities on the parcels to be developed of at least 10 units per acre.

(5) Be located in an area designated for mixed-use or residential development pursuant to one of the following:

(A) A general plan adopted pursuant to Section 65300 of the Government Code.

(B) A sustainable communities strategy adopted pursuant to Section 65080 of the Government Code.

(C) A specific plan adopted pursuant to Section 65450 of the Government Code.

(D) A Workforce Housing Opportunity Zone established pursuant to Section 65620 of the Government Code.

(E) A Housing Sustainability District established pursuant to Section 66201 of the Government Code.

(f) Funds awarded pursuant to this section shall supplement, not supplant, other available funding.

(g) The department shall adopt guidelines for the operation of the grant program. The guidelines shall include provisions for the reversion of grant awards that are not encumbered within two years of the date an award was made, and for the recapture of grants awarded, but for which development of the related housing units has not progressed in a reasonable period of time from the date of the grant award, as determined by the department. The guidelines shall not be subject to the requirements of Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code.

(h) For each fiscal year within the duration of the grant program, the department shall include within the report to the Governor and the Legislature, required by Section 50408, information on its activities relating to the grant program. The report shall include, but is not limited to, the following information:

(1) A summary of the projects that received grants under the program for each fiscal year that grants were awarded.

(2) The description, location, and estimated date of completion for each project that received a grant award under the program.

(3) An update on the status of each project that received a grant award under the program, and the number of housing units created or facilitated by the program.

**EXHIBIT 8**

(i) Notwithstanding paragraph (4) of subdivision (e), a city with a population greater than 100,000 in a standard metropolitan statistical area or a population of less than 2,000,000 may petition the department for, and the department may grant, an exception to the jurisdiction's classification pursuant to subdivisions (d) to (f), inclusive, of Section 65583.2 of the Government Code, if the city believes it is unable to meet the density requirements specified in paragraph (4) of subdivision (e). The city shall submit the petition with its application and shall include the reasons why the city believes the exception is warranted. The city shall provide information supporting the need for the exception, including, but not limited to, any limitations that the city may encounter in meeting the density requirements specified in paragraph (4) of subdivision (e). Any exception shall be for the purposes of this section only. This subdivision shall become inoperative on January 1, 2023.

**53559.1.** For the purposes of this part, the following definitions apply:

(a) "Capital improvement project" means the construction, rehabilitation, demolition, relocation, preservation, acquisition, or other physical improvement of a capital asset, as defined in subdivision (a) of Section 16727 of the Government Code, that is an integral part of, or necessary to facilitate the development of, a qualifying infill project or qualifying infill area. Capital improvement projects that may be funded under the grant program established by this part include, but are not limited to, those related to the following:

(1) Water, sewer, or other utility service improvements.

(2) Streets, roads, or transit linkages or facilities, including, but not limited to, related access plazas or pathways, bus or transit shelters, or facilities that support pedestrian or bicycle transit.

(3) Qualifying infill project or qualifying infill area site preparation or demolition.

(4) Sidewalk or streetscape improvements, including, but not limited, the reconstruction or resurfacing of sidewalks and streets or the installation of lighting, signage, or other related amenities.

(b) "Eligible applicant" means either of the following:

(1) A city, county, city and county, or public housing authority that has jurisdiction over a qualifying infill area.

(2) A nonprofit or for-profit developer of a qualifying infill project applying jointly with a city, county, city and county, or public housing authority that has jurisdiction over a qualifying infill area.

(c) "Small jurisdiction" means a county with a population of less than 250,000 as of January 1, 2019, or any city within that county.

(d) "Large jurisdiction" means a county that is not a small jurisdiction, or any city within that county.

(e) "Urbanized area" means an incorporated city or an urbanized area or urban cluster as defined by the United States Census Bureau. For unincorporated areas outside of an urban area or urban cluster, the area must be within a designated urban service area that is designated in the local general plan for urban development and is served by the public sewer and water.

(f) "Urban uses" means any residential, commercial, industrial, public institutional, transit or transportation passenger facility, or retail use, or any combination of those uses.

**53599.2.** (a) Upon appropriation by the Legislature, the department may expend the sum of five hundred million dollars ($500,000,000) for the Infill Infrastructure Grant Program of 2019, as follows:

(1) Four hundred ten million dollars ($410,000,000) shall be allocated to fund grants pursuant to subdivision (c) of Section 53599.

(2) Ninety million dollars ($90,000,000) shall be allocated to fund grants pursuant subdivision (d) of Section 53599.

(b) Of the amount appropriated in subdivision (a), 5 percent of the funds shall be set aside for program administration, including state operations expenditures and technical assistance.

## SEC. 21. Section 75218.1 is added to the Public Resources Code, to read:

**75218.1.** For notices of funding availability released after July 1, 2021, in awarding funds under the program, the council shall provide additional points or preference to jurisdictions that have adopted a housing element that has been found by the Department of Housing and Community Development to be in substantial compliance with the requirements of Article 10.6 (commencing with Section 65580) of Chapter 3 of Division 1 of Title 7 of the Government Code pursuant to Section 65585 of the Government Code and that are designated prohousing pursuant to subdivision (c) of Section 65589.9 of the Government Code, in the manner determined by the Department of Housing and Community Development pursuant to subdivision (d) of Section 65589.9 of the Government Code.

## SEC. 22. Section 75244 is added to the Public Resources Code, to read:

**75244.** For notices of funding availability released after July 1, 2021, in awarding funds under the program, the council shall provide additional points or preference to jurisdictions that have adopted a housing element that has been found by the Department of Housing and Community Development to be in substantial compliance with the requirements of Article 10.6 (commencing with Section 65580) of Chapter 3 of Division 1 of Title 7 of the Government Code pursuant to Section 65585 of the Government Code and that are designated prohousing pursuant to subdivision (c) of Section 65589.9 of the Government Code, in the manner determined by the Department of Housing and Community Development pursuant to subdivision (d) of Section 65589.9 of the Government Code.

## SEC. 23. Section 12206 of the Revenue and Taxation Code is amended to read:

**EXHIBIT 8**

**12206.** (a) (1) There shall be allowed as a credit against the "tax," described by Section 12201, a state low-income housing tax credit in an amount equal to the amount determined in subdivision (c), computed in accordance with Section 42 of the Internal Revenue Code, relating to low-income housing credit, except as otherwise provided in this section.

(2) "Taxpayer," for purposes of this section, means the sole owner in the case of a "C" corporation, the partners in the case of a partnership, and the shareholders in the case of an "S" corporation.

(3) "Housing sponsor," for purposes of this section, means the sole owner in the case of a "C" corporation, the partnership in the case of a partnership, and the "S" corporation in the case of an "S" corporation.

(b) (1) The amount of the credit allocated to any housing sponsor shall be authorized by the California Tax Credit Allocation Committee, or any successor thereof, based on a project's need for the credit for economic feasibility in accordance with the requirements of this section.

(A) Except for projects to provide farmworker housing, as defined in subdivision (h) of Section 50199.7 of the Health and Safety Code, that are allocated credits solely under the set-aside described in subdivision (c) of Section 50199.20 of the Health and Safety Code, the low-income housing project shall be located in California and shall meet either of the following requirements:

(i) The project's housing sponsor has been allocated by the California Tax Credit Allocation Committee a credit for federal income tax purposes under Section 42 of the Internal Revenue Code, relating to low-income housing credit.

(ii) It qualifies for a credit under Section 42(h)(4)(B) of the Internal Revenue Code, relating to special rule where 50 percent or more of building is financed with tax-exempt bonds subject to volume cap.

(B) The California Tax Credit Allocation Committee shall not require fees for the credit under this section in addition to those fees required for applications for the tax credit pursuant to Section 42 of the Internal Revenue Code, relating to low-income housing credit. The committee may require a fee if the application for the credit under this section is submitted in a calendar year after the year the application is submitted for the federal tax credit.

(C) (i) For a project that receives a preliminary reservation of the state low-income housing tax credit, allowed pursuant to subdivision (a), on or after January 1, 2009, the credit shall be allocated to the partners of a partnership owning the project in accordance with the partnership agreement, regardless of how the federal low-income housing tax credit with respect to the project is allocated to the partners, or whether the allocation of the credit under the terms of the agreement has substantial economic effect, within the meaning of Section 704(b) of the Internal Revenue Code, relating to determination of distributive share.

(ii) This subparagraph shall not apply to a project that receives a preliminary reservation of state low-income housing tax credits under the set-aside described in subdivision (c) of Section 50199.20 of the Health and Safety Code unless the project also receives a preliminary reservation of federal low-income housing tax credits.

(2) (A) The California Tax Credit Allocation Committee shall certify to the housing sponsor the amount of tax credit under this section allocated to the housing sponsor for each credit period.

(B) In the case of a partnership or an "S" corporation, the housing sponsor shall provide a copy of the California Tax Credit Allocation Committee certification to the taxpayer.

(C) (i) The taxpayer shall attach a copy of the certification to any return upon which a tax credit is claimed under this section.

(ii) In the case of a failure to attach a copy of the certification for the year to the return in which a tax credit is claimed under this section, no credit under this section shall be allowed for that year until a copy of that certification is provided.

(D) All elections made by the taxpayer pursuant to Section 42 of the Internal Revenue Code, relating to low-income housing credit, shall apply to this section.

(E) (i) Except as described in clause (ii) or (iii), for buildings located in designated difficult development areas (DDAs) or qualified census tracts (QCTs), as defined in Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas, credits may be allocated under this section in the amounts prescribed in subdivision (c), provided that the amount of credit allocated under Section 42 of the Internal Revenue Code, relating to low-income housing credit, is computed on 100 percent of the qualified basis of the building.

(ii) Notwithstanding clause (i), the California Tax Credit Allocation Committee may allocate the credit for buildings located in DDAs or QCTs that are restricted to having 50 percent of the building's occupants be special needs households, as defined in the California Code of Regulations by the California Tax Credit Allocation Committee, or receiving an allocation pursuant to subparagraph (B) of paragraph (1) of subdivision (g), even if the taxpayer receives federal credits pursuant to Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas, provided that the credit allowed under this section shall not exceed 30 percent of the eligible basis of the building.

(iii) On and after January 1, 2018, notwithstanding clause (i), the California Tax Credit Allocation Committee may allocate the credit pursuant to paragraph (6) of subdivision (c) even if the taxpayer receives federal credits, pursuant to Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas.

(F) (i) The California Tax Credit Allocation Committee may allocate a credit under this section in exchange for a credit allocated pursuant to Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas, in amounts up to 30 percent of the eligible basis of a building if the credits allowed under Section 42 of the Internal Revenue Code, relating to low-income housing credit, are reduced by an equivalent amount.

**EXHIBIT 8**

(ii) An equivalent amount shall be determined by the California Tax Credit Allocation Committee based upon the relative amount required to produce an equivalent state tax credit to the taxpayer.

(c) Section 42(b) of the Internal Revenue Code, relating to applicable percentage: 70 percent present value credit for certain new buildings; 30 percent present value credit for certain other buildings, shall be modified as follows:

(1) In the case of any qualified low-income building that receives an allocation after 1989 and is a new building not federally subsidized, the term "applicable percentage" means the following:

(A) For each of the first three years, the percentage prescribed by the Secretary of the Treasury for new buildings that are not federally subsidized for the taxable year, determined in accordance with the requirements of Section 42(b)(2) of the Internal Revenue Code, relating to temporary minimum credit rate for nonfederally subsidized new buildings, in lieu of the percentage prescribed in Section 42(b)(1)(A) of the Internal Revenue Code.

(B) For the fourth year, the difference between 30 percent and the sum of the applicable percentages for the first three years.

(2) In the case of any qualified low-income building that is a new building and is federally subsidized and receiving an allocation pursuant to subparagraph (B) of paragraph (1) of subdivision (g), the term "applicable percentage" means for the first three years, 9 percent of the qualified basis of the building, and for the fourth year, 3 percent of the qualified basis of the building.

(3) In the case of any qualified low-income building that receives an allocation after 1989 pursuant to subparagraph (A) of paragraph (1) of subdivision (g) and that is a new building that is federally subsidized or that is an existing building that is "at risk of conversion," the term "applicable percentage" means the following:

(A) For each of the first three years, the percentage prescribed by the Secretary of the Treasury for new buildings that are federally subsidized for the taxable year.

(B) For the fourth year, the difference between 13 percent and the sum of the applicable percentages for the first three years.

(4) In the case of any qualified low-income building that receives an allocation pursuant to subparagraph (A) of paragraph (1) of subdivision (g) that meets all of the requirements of subparagraphs (A) through (D), inclusive, the term "applicable percentage" means 30 percent for each of the first three years and 5 percent for the fourth year. A qualified low-income building receiving an allocation under this paragraph is ineligible to also receive an allocation under paragraph (3).

(A) The qualified low-income building is at least 15 years old.

(B) The qualified low-income building is either:

(i) Serving households of very low income or extremely low income such that the average maximum household income as restricted, pursuant to an existing regulatory agreement with a federal, state, county, local, or other governmental agency, is not more than 45 percent of the area median gross income, as determined under Section 42 of the Internal Revenue Code, relating to low-income housing credit, adjusted by household size, and a tax credit regulatory agreement is entered into for a period of not less than 55 years restricting the average targeted household income to no more than 45 percent of the area median income.

(ii) Financed under Section 514 or 521 of the National Housing Act of 1949 (42 U.S.C. Sec. 1485).

(C) The qualified low-income building would have insufficient credits under paragraphs (2) and (3) to complete substantial rehabilitation due to a low appraised value.

(D) The qualified low-income building will complete the substantial rehabilitation in connection with the credit allocation herein.

(5) For purposes of this section, the term "at risk of conversion," with respect to an existing property means a property that satisfies all of the following criteria:

(A) The property is a multifamily rental housing development in which at least 50 percent of the units receive governmental assistance pursuant to any of the following:

(i) New construction, substantial rehabilitation, moderate rehabilitation, property disposition, and loan management set-aside programs, or any other program providing project-based assistance pursuant to Section 8 of the United States Housing Act of 1937, Section 1437f of Title 42 of the United States Code, as amended.

(ii) The Below-Market-Interest-Rate Program pursuant to Section 221(d)(3) of the National Housing Act, Sections 1715l(d)(3) and (5) of Title 12 of the United States Code.

(iii) Section 236 of the National Housing Act, Section 1715z-1 of Title 12 of the United States Code.

(iv) Programs for rent supplement assistance pursuant to Section 101 of the Housing and Urban Development Act of 1965, Section 1701s of Title 12 of the United States Code, as amended.

(v) Programs pursuant to Section 514 of the Housing Act of 1949, Section 1484 of Title 42 of the United States Code, as amended, and Section 515 of the Housing Act of 1949, Section 1485 of Title 42 of the United States Code, as amended.

(vi) The low-income housing credit program set forth in Section 42 of the Internal Revenue Code, relating to low-income housing credit.

**EXHIBIT 8**

(vii) Programs for loans or grants administered by the Department of Housing and Community Development.

(B) The restrictions on rent and income levels will terminate or the federally insured mortgage or rent subsidy contract on the property is eligible for prepayment or termination any time within five years before or after the date of application to the California Tax Credit Allocation Committee.

(C) The entity acquiring the property enters into a regulatory agreement that requires the property to be operated in accordance with the requirements of this section for a period equal to the greater of 55 years or the life of the property.

(D) The property satisfies the requirements of Section 42(e) of the Internal Revenue Code, relating to rehabilitation expenditures treated as separate new building, except that the provisions of Section 42(e)(3)(A)(ii)(I) shall not apply.

(6) On and after January 1, 2018, in the case of any qualified low-income building that is (A) farmworker housing, as defined by paragraph (2) of subdivision (h) of Section 50199.7 of the Health and Safety Code, and (B) is federally subsidized, the term "applicable percentage" means for each of the first three years, 20 percent of the qualified basis of the building, and for the fourth year, 15 percent of the qualified basis of the building.

(d) The term "qualified low-income housing project" as defined in Section 42(c)(2) of the Internal Revenue Code, relating to qualified low-income building, is modified by adding the following requirements:

(1) The taxpayer shall be entitled to receive a cash distribution from the operations of the project, after funding required reserves, that, at the election of the taxpayer, is equal to:

(A) An amount not to exceed 8 percent of the lesser of:

(i) The owner equity that shall include the amount of the capital contributions actually paid to the housing sponsor and shall not include any amounts until they are paid on an investor note.

(ii) Twenty percent of the adjusted basis of the building as of the close of the first taxable year of the credit period.

(B) The amount of the cashflow from those units in the building that are not low-income units. For purposes of computing cashflow under this subparagraph, operating costs shall be allocated to the low-income units using the "floor space fraction," as defined in Section 42 of the Internal Revenue Code, relating to low-income housing credit.

(C) Any amount allowed to be distributed under subparagraph (A) that is not available for distribution during the first five years of the compliance period may be accumulated and distributed any time during the first 15 years of the compliance period but not thereafter.

(2) The limitation on return shall apply in the aggregate to the partners if the housing sponsor is a partnership and in the aggregate to the shareholders if the housing sponsor is an "S" corporation.

(3) The housing sponsor shall apply any cash available for distribution in excess of the amount eligible to be distributed under paragraph (1) to reduce the rent on rent-restricted units or to increase the number of rent-restricted units subject to the tests of Section 42(g)(1) of the Internal Revenue Code, relating to in general.

(e) The provisions of Section 42(f) of the Internal Revenue Code, relating to definition and special rules relating to credit period, shall be modified as follows:

(1) The term "credit period" as defined in Section 42(f)(1) of the Internal Revenue Code, relating to credit period defined, is modified by substituting "four taxable years" for "10 taxable years."

(2) The special rule for the first taxable year of the credit period under Section 42(f)(2) of the Internal Revenue Code, relating to special rule for 1st year of credit period, shall not apply to the tax credit under this section.

(3) Section 42(f)(3) of the Internal Revenue Code, relating to determination of applicable percentage with respect to increases in qualified basis after 1st year of credit period, is modified to read:

If, as of the close of any taxable year in the compliance period, after the first year of the credit period, the qualified basis of any building exceeds the qualified basis of that building as of the close of the first year of the credit period, the housing sponsor, to the extent of its tax credit allocation, shall be eligible for a credit on the excess in an amount equal to the applicable percentage determined pursuant to subdivision (c) for the four-year period beginning with the later of the taxable years in which the increase in qualified basis occurs.

(f) The provisions of Section 42(h) of the Internal Revenue Code, relating to limitation on aggregate credit allowable with respect to projects located in a state, shall be modified as follows:

(1) Section 42(h)(2) of the Internal Revenue Code, relating to allocated credit amount to apply to all taxable years ending during or after credit allocation year, does not apply and instead the following provisions apply:

The total amount for the four-year credit period of the housing credit dollars allocated in a calendar year to any building shall reduce the aggregate housing credit dollar amount of the California Tax Credit Allocation Committee for the calendar year in which the allocation is made.

(2) Paragraphs (3), (4), (5), (6)(E)(i)(II), (6)(F), (6)(G), (6)(I), (7), and (8) of Section 42(h) of the Internal Revenue Code, relating to limitation on aggregate credit allowable with respect to projects located in a state, do not apply to this section.

**EXHIBIT 8**

(g) The aggregate housing credit dollar amount that may be allocated annually by the California Tax Credit Allocation Committee pursuant to this section, Section 17058, and Section 23610.5 shall be an amount equal to the sum of all the following:

(1) (A) Seventy million dollars ($70,000,000) for the 2001 calendar year, and, for the 2002 calendar year and each calendar year thereafter, seventy million dollars ($70,000,000) increased by the percentage, if any, by which the Consumer Price Index for the preceding calendar year exceeds the Consumer Price Index for the 2001 calendar year. For the purposes of this paragraph, the term "Consumer Price Index" means the last Consumer Price Index for All Urban Consumers published by the federal Department of Labor.

(B) Five hundred million dollars ($500,000,000) for the 2020 calendar year, and up to five hundred million dollars ($500,000,000) for the 2021 calendar year and every year thereafter. Allocations shall only be available pursuant to this subparagraph in the 2021 calendar year and thereafter if the annual Budget Act, or if any bill providing for appropriations related to the Budget Act, specifies an amount to be available for allocation in that calendar year by the California Tax Credit Allocation Committee, and the California Tax Credit Allocation Committee has adopted regulatory reforms aimed at increasing production and containing costs. A housing sponsor receiving a nonfederally subsidized allocation under subdivision (c) shall not be eligible for receipt of the housing credit allocated from the increased amount under this subparagraph. A housing sponsor receiving a nonfederally subsidized allocation under subdivision (c) shall remain eligible for receipt of the housing credit allocated from the credit ceiling amount under subparagraph (A).

(i) Eligible projects for allocations under this subparagraph include any new building, as defined in Section 42(i)(4) of the Internal Revenue Code, relating to newly constructed buildings, and the regulations promulgated thereunder, excluding rehabilitation expenditures under Section 42(e) of the Internal Revenue Code, relating to rehabilitation expenditures treated as separate new building, and is federally subsidized.

(ii) Notwithstanding any other provision of this section, for allocations pursuant to this subparagraph for the 2020 calendar year, the California Tax Credit Allocation Committee shall consider projects located throughout the state and shall allocate housing credits, subject to the minimum federal requirements as set forth in Sections 42 and 142 of the Internal Revenue Code, the minimum requirements set forth in Sections 5033 and 5190 of the California Debt Limit Allocation Committee regulations, and the minimum set forth in Section 10326 of the Tax Credit Allocation Committee regulations, for projects that can begin construction within 180 days from award, subject to availability of funds.

(iii) Notwithstanding any other provision of this section, for allocations pursuant to this subparagraph for the 2021 calendar year and thereafter, the California Tax Credit Allocation Committee shall prescribe regulations, rules, guidelines, or procedures necessary to implement a new allocation methodology that is aimed at increasing production and containing costs.

(iv) Of the amount available pursuant to this subparagraph, and notwithstanding any other requirement of this section, the California Tax Credit Allocation Committee may allocate up to two hundred million dollars ($200,000,000) for housing financed by the California Housing Finance Agency under its Mixed-Income Program.

(2) The unused housing credit ceiling, if any, for the preceding calendar years.

(3) The amount of housing credit ceiling returned in the calendar year. For purposes of this paragraph, the amount of housing credit dollar amount returned in the calendar year equals the housing credit dollar amount previously allocated to any project that does not become a qualified low-income housing project within the period required by this section or to any project with respect to which an allocation is canceled by mutual consent of the California Tax Credit Allocation Committee and the allocation recipient.

(4) Five hundred thousand dollars ($500,000) per calendar year for projects to provide farmworker housing, as defined in subdivision (h) of Section 50199.7 of the Health and Safety Code.

(5) The amount of any unallocated or returned credits under former Sections 17053.14, 23608.2, and 23608.3, as those sections read prior to January 1, 2009, until fully exhausted for projects to provide farmworker housing, as defined in subdivision (h) of Section 50199.7 of the Health and Safety Code.

(h) The term "compliance period" as defined in Section 42(i)(1) of the Internal Revenue Code, relating to compliance period, is modified to mean, with respect to any building, the period of 30 consecutive taxable years beginning with the first taxable year of the credit period with respect thereto.

(i) (1) Section 42(j) of the Internal Revenue Code, relating to recapture of credit, shall not be applicable and the provisions in paragraph (2) shall be substituted in its place.

(2) The requirements of this section shall be set forth in a regulatory agreement between the California Tax Credit Allocation Committee and the housing sponsor, and the regulatory agreement shall be subordinated, when required, to any lien or encumbrance of any banks or other institutional lenders to the project. The regulatory agreement entered into pursuant to subdivision (f) of Section 50199.14 of the Health and Safety Code, shall apply, provided that the agreement includes all of the following provisions:

(A) A term not less than the compliance period.

(B) A requirement that the agreement be recorded in the official records of the county in which the qualified low-income housing project is located.

(C) A provision stating which state and local agencies can enforce the regulatory agreement in the event the housing sponsor fails to satisfy any of the requirements of this section.

(D) A provision that the regulatory agreement shall be deemed a contract enforceable by tenants as third-party beneficiaries thereto and that allows individuals, whether prospective, present, or former occupants of the building, who meet the income limitation applicable to the building, the right to enforce the regulatory agreement in any state court.

**EXHIBIT 8**

(E) A provision incorporating the requirements of Section 42 of the Internal Revenue Code, relating to low-income housing credit, as modified by this section.

(F) A requirement that the housing sponsor notify the California Tax Credit Allocation Committee or its designee and the local agency that can enforce the regulatory agreement if there is a determination by the Internal Revenue Service that the project is not in compliance with Section 42(g) of the Internal Revenue Code, relating to qualified low-income housing project.

(G) A requirement that the housing sponsor, as security for the performance of the housing sponsor's obligations under the regulatory agreement, assign the housing sponsor's interest in rents that it receives from the project, provided that until there is a default under the regulatory agreement, the housing sponsor is entitled to collect and retain the rents.

(H) A provision that the remedies available in the event of a default under the regulatory agreement that is not cured within a reasonable cure period include, but are not limited to, allowing any of the parties designated to enforce the regulatory agreement to collect all rents with respect to the project; taking possession of the project and operating the project in accordance with the regulatory agreement until the enforcer determines the housing sponsor is in a position to operate the project in accordance with the regulatory agreement; applying to any court for specific performance; securing the appointment of a receiver to operate the project; or any other relief as may be appropriate.

(j) (1) The committee shall allocate the housing credit on a regular basis consisting of two or more periods in each calendar year during which applications may be filed and considered. The committee shall establish application filing deadlines, the maximum percentage of federal and state low-income housing tax credit ceiling that may be allocated by the committee in that period, and the approximate date on which allocations shall be made. If the enactment of federal or state law, the adoption of rules or regulations, or other similar events prevent the use of two allocation periods, the committee may reduce the number of periods and adjust the filing deadlines, maximum percentage of credit allocated, and the allocation dates.

(2) The committee shall adopt a qualified allocation plan, as provided in Section 42(m)(1) of the Internal Revenue Code, relating to plans for allocation of credit among projects. In adopting this plan, the committee shall comply with the provisions of Sections 42(m)(1)(B) and 42(m)(1)(C) of the Internal Revenue Code, relating to qualified allocation plan and relating to certain selection criteria must be used, respectively.

(3) Notwithstanding Section 42(m) of the Internal Revenue Code, relating to responsibilities of housing credit agencies, the California Tax Credit Allocation Committee shall allocate housing credits in accordance with the qualified allocation plan and regulations, which shall include the following provisions:

(A) All housing sponsors, as defined by paragraph (3) of subdivision (a), shall demonstrate at the time the application is filed with the committee that the project meets the following threshold requirements:

(i) The housing sponsor shall demonstrate there is a need and demand for low-income housing in the community or region for which it is proposed.

(ii) The project's proposed financing, including tax credit proceeds, shall be sufficient to complete the project and that the proposed operating income shall be adequate to operate the project for the extended use period.

(iii) The project shall have enforceable financing commitments, either construction or permanent financing, for at least 50 percent of the total estimated financing of the project.

(iv) The housing sponsor shall have and maintain control of the site for the project.

(v) The housing sponsor shall demonstrate that the project complies with all applicable local land use and zoning ordinances.

(vi) The housing sponsor shall demonstrate that the project development team has the experience and the financial capacity to ensure project completion and operation for the extended use period.

(vii) The housing sponsor shall demonstrate the amount of tax credit that is necessary for the financial feasibility of the project and its viability as a qualified low-income housing project throughout the extended use period, taking into account operating expenses, a supportable debt service, reserves, funds set aside for rental subsidies and required equity, and a development fee that does not exceed a specified percentage of the eligible basis of the project prior to inclusion of the development fee in the eligible basis, as determined by the committee.

(B) The committee shall give a preference to those projects satisfying all of the threshold requirements of subparagraph (A) if both of the following apply:

(i) The project serves the lowest income tenants at rents affordable to those tenants.

(ii) The project is obligated to serve qualified tenants for the longest period.

(C) In addition to the provisions of subparagraphs (A) and (B), the committee shall use the following criteria in allocating housing credits:

(i) Projects serving large families in which a substantial number, as defined by the committee, of all residential units are low-income units with three or more bedrooms.

(ii) Projects providing single-room occupancy units serving very low income tenants.

(iii) Existing projects that are "at risk of conversion," as defined by paragraph (5) of subdivision (c).

EXHIBIT 8

(iv) Projects for which a public agency provides direct or indirect long-term financial support for at least 15 percent of the total project development costs or projects for which the owner's equity constitutes at least 30 percent of the total project development costs.

(v) Projects that provide tenant amenities not generally available to residents of low-income housing projects.

(D) Subparagraphs (B) and (C) shall not apply to projects receiving an allocation pursuant to subparagraph (B) of paragraph (1) of subdivision (g).

(4) For purposes of allocating credits pursuant to this section, the committee shall not give preference to any project by virtue of the date of submission of its application except to break a tie when two or more of the projects have an equal rating.

(k) Section 42(l) of the Internal Revenue Code, relating to certifications and other reports to secretary, shall be modified as follows:

The term "secretary" shall be replaced by the term "Franchise Tax Board."

(l) In the case in which the credit allowed under this section exceeds the "tax," the excess may be carried over to reduce the "tax" in the following year, and succeeding years if necessary, until the credit has been exhausted.

(m) The provisions of Section 11407(a) of Public Law 101-508, relating to the effective date of the extension of the low-income housing credit, apply to calendar years after 1993.

(n) The provisions of Section 11407(c) of Public Law 101-508, relating to election to accelerate credit, shall not apply.

(o) (1) (A) For a project that receives a preliminary reservation under this section beginning on or after January 1, 2016, a taxpayer may elect in its application to the California Tax Credit Allocation Committee to sell all or any portion of any credit allowed under this section to one or more unrelated parties for each taxable year in which the credit is allowed, subject to subparagraphs (B) and (C). The taxpayer may, only once, revoke an election to sell pursuant to this subdivision at any time before the California Tax Credit Allocation Committee allocates a final credit amount for the project pursuant to this section, at which point the election shall become irrevocable.

(B) A credit that a taxpayer elects to sell all or a portion of pursuant to this subdivision shall be sold for consideration that is not less than 80 percent of the amount of the credit.

(C) A taxpayer shall not elect to sell all or any portion of any credit pursuant to this subdivision if the taxpayer did not make that election in its application submitted to the California Tax Credit Allocation Committee.

(2) (A) The taxpayer that originally received the credit shall report to the California Tax Credit Allocation Committee within 10 days of the sale of the credit, in the form and manner specified by the California Tax Credit Allocation Committee, all required information regarding the purchase and sale of the credit, including the social security or other taxpayer identification number of the unrelated party or parties to whom the credit has been sold, the face amount of the credit sold, and the amount of consideration received by the taxpayer for the sale of the credit.

(B) The California Tax Credit Allocation Committee shall provide an annual listing to the Franchise Tax Board, in a form and manner agreed upon by the California Tax Credit Allocation Committee and the Franchise Tax Board, of the taxpayers that have sold or purchased a credit pursuant to this subdivision.

(3) A credit may be sold pursuant to this subdivision to more than one unrelated party.

(4) Notwithstanding any other law, the taxpayer that originally received the credit that is sold pursuant to paragraph (1) shall remain solely liable for all obligations and liabilities imposed on the taxpayer by this section with respect to the credit, none of which shall apply to a party to whom the credit has been sold or subsequently transferred. Parties that purchase credits pursuant to paragraph (1) shall be entitled to utilize the purchased credits in the same manner in which the taxpayer that originally received the credit could utilize them.

(p) The California Tax Credit Allocation Committee may prescribe rules, guidelines, or procedures necessary or appropriate to carry out the purposes of this section, including any guidelines regarding the allocation of the credit allowed under this section. Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code shall not apply to any rule, guideline, or procedure prescribed by the California Tax Credit Allocation Committee pursuant to this section.

(q) This section shall remain in effect for as long as Section 42 of the Internal Revenue Code, relating to low-income housing credit, remains in effect.

**SEC. 24.** Section 17058 of the Revenue and Taxation Code is amended to read:

**17058.** (a) (1) There shall be allowed as a credit against the "net tax," defined in Section 17039, a state low-income housing tax credit in an amount equal to the amount determined in subdivision (c), computed in accordance with Section 42 of the Internal Revenue Code, relating to low-income housing credit, except as otherwise provided in this section.

(2) "Taxpayer," for purposes of this section, means the sole owner in the case of an individual, the partners in the case of a partnership, and the shareholders in the case of an "S" corporation.

(3) "Housing sponsor," for purposes of this section, means the sole owner in the case of an individual, the partnership in the case of a partnership, and the "S" corporation in the case of an "S" corporation.

(b) (1) The amount of the credit allocated to any housing sponsor shall be authorized by the California Tax Credit Allocation Committee, or any successor thereof, based on a project's need for the credit for economic feasibility in accordance with the

EXHIBIT 8

requirements of this section.

(A) The low-income housing project shall be located in California and shall meet either of the following requirements:

(i) Except for projects to provide farmworker housing, as defined in subdivision (h) of Section 50199.7 of the Health and Safety Code, that are allocated credits solely under the set-aside described in subdivision (c) of Section 50199.20 of the Health and Safety Code, the project's housing sponsor has been allocated by the California Tax Credit Allocation Committee a credit for federal income tax purposes under Section 42 of the Internal Revenue Code, relating to low-income housing credit.

(ii) It qualifies for a credit under Section 42(h)(4)(B) of the Internal Revenue Code, relating to special rule where 50 percent or more of building is financed with tax-exempt bonds subject to volume cap.

(B) The California Tax Credit Allocation Committee shall not require fees for the credit under this section in addition to those fees required for applications for the tax credit pursuant to Section 42 of the Internal Revenue Code, relating to low-income housing credit. The committee may require a fee if the application for the credit under this section is submitted in a calendar year after the year the application is submitted for the federal tax credit.

(C) (i) For a project that receives a preliminary reservation of the state low-income housing tax credit, allowed pursuant to subdivision (a), on or after January 1, 2009, the credit shall be allocated to the partners of a partnership owning the project in accordance with the partnership agreement, regardless of how the federal low-income housing tax credit with respect to the project is allocated to the partners, or whether the allocation of the credit under the terms of the agreement has substantial economic effect, within the meaning of Section 704(b) of the Internal Revenue Code, relating to determination of distributive share.

(ii) To the extent the allocation of the credit to a partner under this section lacks substantial economic effect, any loss or deduction otherwise allowable under this part that is attributable to the sale or other disposition of that partner's partnership interest made prior to the expiration of the federal credit shall not be allowed in the taxable year in which the sale or other disposition occurs, but shall instead be deferred until and treated as if it occurred in the first taxable year immediately following the taxable year in which the federal credit period expires for the project described in clause (i).

(iii) This subparagraph shall not apply to a project that receives a preliminary reservation of state low-income housing tax credits under the set-aside described in subdivision (c) of Section 50199.20 of the Health and Safety Code unless the project also receives a preliminary reservation of federal low-income housing tax credits.

(2) (A) The California Tax Credit Allocation Committee shall certify to the housing sponsor the amount of tax credit under this section allocated to the housing sponsor for each credit period.

(B) In the case of a partnership or an "S" corporation, the housing sponsor shall provide a copy of the California Tax Credit Allocation Committee certification to the taxpayer.

(C) The taxpayer shall, upon request, provide a copy of the certification to the Franchise Tax Board.

(D) All elections made by the taxpayer pursuant to Section 42 of the Internal Revenue Code, relating to low-income housing credit, apply to this section.

(E) (i) Except as described in clause (ii) or (iii), for buildings located in designated difficult development areas (DDAs) or qualified census tracts (QCTs), as defined in Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas, credits may be allocated under this section in the amounts prescribed in subdivision (c), provided that the amount of credit allocated under Section 42 of the Internal Revenue Code, relating to low-income housing credit, is computed on 100 percent of the qualified basis of the building.

(ii) Notwithstanding clause (i), the California Tax Credit Allocation Committee may allocate the credit for buildings located in DDAs or QCTs that are restricted to having 50 percent of the building's occupants be special needs households, as defined in the California Code of Regulations by the California Tax Credit Allocation Committee, or receiving an allocation pursuant to subparagraph (B) of paragraph (1) of subdivision (g), even if the taxpayer receives federal credits pursuant to Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas, provided that the credit allowed under this section shall not exceed 30 percent of the eligible basis of the building.

(iii) On and after January 1, 2018, notwithstanding clause (i), the California Tax Credit Allocation Committee may allocate the credit pursuant to paragraph (7) of subdivision (c) even if the taxpayer receives federal credits, pursuant to Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas.

(F) (i) The California Tax Credit Allocation Committee may allocate a credit under this section in exchange for a credit allocated pursuant to Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas, in amounts up to 30 percent of the eligible basis of a building if the credits allowed under Section 42 of the Internal Revenue Code, relating to low-income housing credit, are reduced by an equivalent amount.

(ii) An equivalent amount shall be determined by the California Tax Credit Allocation Committee based upon the relative amount required to produce an equivalent state tax credit to the taxpayer.

(c) Section 42(b) of the Internal Revenue Code, relating to applicable percentage: 70 percent present value credit for certain new buildings; 30 percent present value credit for certain other buildings, shall be modified as follows:

(1) In the case of any qualified low-income building placed in service by the housing sponsor during 1987, the term "applicable percentage" means 9 percent for each of the first three years and 3 percent for the fourth year for new buildings (whether or not the

**EXHIBIT 8**

building is federally subsidized) and for existing buildings.

(2) In the case of any qualified low-income building that receives an allocation after 1989 and is a new building not federally subsidized, the term "applicable percentage" means the following:

(A) For each of the first three years, the percentage prescribed by the Secretary of the Treasury for new buildings that are not federally subsidized for the taxable year, determined in accordance with the requirements of Section 42(b)(2) of the Internal Revenue Code, relating to temporary minimum credit rate for nonfederally subsidized new buildings, in lieu of the percentage prescribed in Section 42(b)(1)(A) of the Internal Revenue Code.

(B) For the fourth year, the difference between 30 percent and the sum of the applicable percentages for the first three years.

(3) In the case of any qualified low-income building that is a new building that is federally subsidized and receiving an allocation pursuant to subparagraph (B) of paragraph (1) of subdivision (g), the term "applicable percentage" means for the first three years, 9 percent of the qualified basis of the building, and for the fourth year, 3 percent of the qualified basis of the building.

(4) In the case of any qualified low-income building that receives an allocation after 1989 pursuant to subparagraph (A) of paragraph (1) of subdivision (g) and that is a new building that is federally subsidized or that is an existing building that is "at risk of conversion," the term "applicable percentage" means the following:

(A) For each of the first three years, the percentage prescribed by the Secretary of the Treasury for new buildings that are federally subsidized for the taxable year.

(B) For the fourth year, the difference between 13 percent and the sum of the applicable percentages for the first three years.

(5) In the case of any qualified low-income building that receives an allocation pursuant to subparagraph (A) of paragraph (1) of subdivision (g) that meets all of the requirements of subparagraphs (A) through (D), inclusive, the term "applicable percentage" means 30 percent for each of the first three years and 5 percent for the fourth year. A qualified low-income building receiving an allocation under this paragraph is ineligible to also receive an allocation under paragraph (3).

(A) The qualified low-income building is at least 15 years old.

(B) The qualified low-income building is either:

(i) Serving households of very low income or extremely low income such that the average maximum household income as restricted, pursuant to an existing regulatory agreement with a federal, state, county, local, or other governmental agency, is not more than 45 percent of the area median gross income, as determined under Section 42 of the Internal Revenue Code, relating to low-income housing credit, adjusted by household size, and a tax credit regulatory agreement is entered into for a period of not less than 55 years restricting the average targeted household income to no more than 45 percent of the area median income.

(ii) Financed under Section 514 or 521 of the National Housing Act of 1949 (42 U.S.C. Sec. 1485).

(C) The qualified low-income building would have insufficient credits under paragraphs (2) and (3) to complete substantial rehabilitation due to a low appraised value.

(D) The qualified low-income building will complete the substantial rehabilitation in connection with the credit allocation herein.

(6) For purposes of this section, the term "at risk of conversion," with respect to an existing property means a property that satisfies all of the following criteria:

(A) The property is a multifamily rental housing development in which at least 50 percent of the units receive governmental assistance pursuant to any of the following:

(i) New construction, substantial rehabilitation, moderate rehabilitation, property disposition, and loan management set-aside programs, or any other program providing project-based assistance pursuant to Section 8 of the United States Housing Act of 1937, Section 1437f of Title 42 of the United States Code, as amended.

(ii) The Below-Market-Interest-Rate Program pursuant to Section 221(d)(3) of the National Housing Act, Sections 1715l(d)(3) and (5) of Title 12 of the United States Code.

(iii) Section 236 of the National Housing Act, Section 1715z-1 of Title 12 of the United States Code.

(iv) Programs for rent supplement assistance pursuant to Section 101 of the Housing and Urban Development Act of 1965, Section 1701s of Title 12 of the United States Code, as amended.

(v) Programs pursuant to Section 514 of the Housing Act of 1949, Section 1484 of Title 42 of the United States Code, as amended, and Section 515 of the Housing Act of 1949, Section 1485 of Title 42 of the United States Code, as amended.

(vi) The low-income housing credit program set forth in Section 42 of the Internal Revenue Code, relating to low-income housing credit.

(vii) Programs for loans or grants administered by the Department of Housing and Community Development.

(B) The restrictions on rent and income levels will terminate or the federally insured mortgage or rent subsidy contract on the property is eligible for prepayment or termination any time within five years before or after the date of application to the California Tax Credit

**EXHIBIT 8**

Allocation Committee.

(C) The entity acquiring the property enters into a regulatory agreement that requires the property to be operated in accordance with the requirements of this section for a period equal to the greater of 55 years or the life of the property.

(D) The property satisfies the requirements of Section 42(e) of the Internal Revenue Code, relating to rehabilitation expenditures treated as separate new building, except that the provisions of Section 42(e)(3)(A)(ii)(I) shall not apply.

(7) On and after January 1, 2018, in the case of any qualified low-income building that is (A) farmworker housing, as defined by paragraph (2) of subdivision (h) of Section 50199.7 of the Health and Safety Code, and (B) is federally subsidized, the term "applicable percentage" means for each of the first three years, 20 percent of the qualified basis of the building, and for the fourth year, 15 percent of the qualified basis of the building.

(d) The term "qualified low-income housing project" as defined in Section 42(c)(2) of the Internal Revenue Code, relating to qualified low-income building, is modified by adding the following requirements:

(1) The taxpayer shall be entitled to receive a cash distribution from the operations of the project, after funding required reserves, that, at the election of the taxpayer, is equal to:

(A) An amount not to exceed 8 percent of the lesser of:

(i) The owner equity, which shall include the amount of the capital contributions actually paid to the housing sponsor and shall not include any amounts until they are paid on an investor note.

(ii) Twenty percent of the adjusted basis of the building as of the close of the first taxable year of the credit period.

(B) The amount of the cashflow from those units in the building that are not low-income units. For purposes of computing cashflow under this subparagraph, operating costs shall be allocated to the low-income units using the "floor space fraction," as defined in Section 42 of the Internal Revenue Code, relating to low-income housing credit.

(C) Any amount allowed to be distributed under subparagraph (A) that is not available for distribution during the first five years of the compliance period may be accumulated and distributed any time during the first 15 years of the compliance period but not thereafter.

(2) The limitation on return shall apply in the aggregate to the partners if the housing sponsor is a partnership and in the aggregate to the shareholders if the housing sponsor is an "S" corporation.

(3) The housing sponsor shall apply any cash available for distribution in excess of the amount eligible to be distributed under paragraph (1) to reduce the rent on rent-restricted units or to increase the number of rent-restricted units subject to the tests of Section 42(g)(1) of the Internal Revenue Code, relating to in general.

(e) The provisions of Section 42(f) of the Internal Revenue Code, relating to definition and special rules relating to credit period, shall be modified as follows:

(1) The term "credit period" as defined in Section 42(f)(1) of the Internal Revenue Code, relating to credit period defined, is modified by substituting "four taxable years" for "10 taxable years."

(2) The special rule for the first taxable year of the credit period under Section 42(f)(2) of the Internal Revenue Code, relating to special rules for 1st year of credit period, shall not apply to the tax credit under this section.

(3) Section 42(f)(3) of the Internal Revenue Code, relating to determination of applicable percentage with respect to increases in qualified basis after 1st year of credit period, is modified to read:

If, as of the close of any taxable year in the compliance period, after the first year of the credit period, the qualified basis of any building exceeds the qualified basis of that building as of the close of the first year of the credit period, the housing sponsor, to the extent of its tax credit allocation, shall be eligible for a credit on the excess in an amount equal to the applicable percentage determined pursuant to subdivision (c) for the four-year period beginning with the taxable year in which the increase in qualified basis occurs.

(f) The provisions of Section 42(h) of the Internal Revenue Code, relating to limitation on aggregate credit allowable with respect to projects located in a state, shall be modified as follows:

(1) Section 42(h)(2) of the Internal Revenue Code, relating to allocated credit amount to apply to all taxable years ending during or after credit allocation year, does not apply and instead the following provisions apply:

The total amount for the four-year credit period of the housing credit dollars allocated in a calendar year to any building shall reduce the aggregate housing credit dollar amount of the California Tax Credit Allocation Committee for the calendar year in which the allocation is made.

(2) Paragraphs (3), (4), (5), (6)(E)(i)(II), (6)(F), (6)(G), (6)(I), (7), and (8) of Section 42(h) of the Internal Revenue Code, relating to limitation on aggregate credit allowable with respect to projects located in a state, do not apply to this section.

(g) The aggregate housing credit dollar amount that may be allocated annually by the California Tax Credit Allocation Committee pursuant to this section, Section 12206, and Section 23610.5 shall be an amount equal to the sum of all the following:

**EXHIBIT 8**

(1) (A) Seventy million dollars ($70,000,000) for the 2001 calendar year, and, for the 2002 calendar year and each calendar year thereafter, seventy million dollars ($70,000,000) increased by the percentage, if any, by which the Consumer Price Index for the preceding calendar year exceeds the Consumer Price Index for the 2001 calendar year. For the purposes of this paragraph, the term "Consumer Price Index" means the last Consumer Price Index for All Urban Consumers published by the federal Department of Labor.

(B) Five hundred million dollars ($500,000,000) for the 2020 calendar year, and up to five hundred million dollars ($500,000,000) for the 2021 calendar year and every year thereafter. Allocations shall only be available pursuant to this subparagraph in the 2021 calendar year and thereafter if the annual Budget Act, or if any bill providing for appropriations related to the Budget Act, specifies an amount to be available for allocation in that calendar year by the California Tax Credit Allocation Committee, and the California Tax Credit Allocation Committee has adopted regulatory reforms aimed at increasing production and containing costs. A housing sponsor receiving a nonfederally subsidized allocation under subdivision (c) shall not be eligible for receipt of the housing credit allocated from the increased amount under this subparagraph. A housing sponsor receiving a nonfederally subsidized allocation under subdivision (c) shall remain eligible for receipt of the housing credit allocated from the credit ceiling amount under subparagraph (A).

(i) Eligible projects for allocations under this subparagraph include any new building, as defined in Section 42(i)(4) of the Internal Revenue Code, relating to newly constructed buildings, and the regulations promulgated thereunder, excluding rehabilitation expenditures under Section 42(e) of the Internal Revenue Code, relating to rehabilitation expenditures treated as separate new building, and is federally subsidized.

(ii) Notwithstanding any other provision of this section, for allocations pursuant to this subparagraph for the 2020 calendar year, the California Tax Credit Allocation Committee shall consider projects located throughout the state and shall allocate housing credits, subject to the minimum federal requirements as set forth in Sections 42 and 142 of the Internal Revenue Code, the minimum requirements set forth in Sections 5033 and 5190 of the California Debt Limit Allocation Committee regulations, and the minimum set forth in Section 10326 of the Tax Credit Allocation Committee regulations, for projects that can begin construction within 180 days from award, subject to availability of funds.

(iii) Notwithstanding any other provision of this section, for allocations pursuant to this subparagraph for the 2021 calendar year and thereafter, the California Tax Credit Allocation Committee shall prescribe regulations, rules, guidelines, or procedures necessary to implement a new allocation methodology that is aimed at increasing production and containing costs.

(iv) Of the amount available pursuant to this subparagraph, and notwithstanding any other requirement of this section, the California Tax Credit Allocation Committee may allocate up to two hundred million dollars ($200,000,000) for housing financed by the California Housing Finance Agency under its Mixed-Income Program.

(2) The unused housing credit ceiling, if any, for the preceding calendar years.

(3) The amount of housing credit ceiling returned in the calendar year. For purposes of this paragraph, the amount of housing credit dollar amount returned in the calendar year equals the housing credit dollar amount previously allocated to any project that does not become a qualified low-income housing project within the period required by this section or to any project with respect to which an allocation is canceled by mutual consent of the California Tax Credit Allocation Committee and the allocation recipient.

(4) Five hundred thousand dollars ($500,000) per calendar year for projects to provide farmworker housing, as defined in subdivision (h) of Section 50199.7 of the Health and Safety Code.

(5) The amount of any unallocated or returned credits under former Sections 17053.14, 23608.2, and 23608.3, as those sections read prior to January 1, 2009, until fully exhausted for projects to provide farmworker housing, as defined in subdivision (h) of Section 50199.7 of the Health and Safety Code.

(h) The term "compliance period" as defined in Section 42(i)(1) of the Internal Revenue Code, relating to compliance period, is modified to mean, with respect to any building, the period of 30 consecutive taxable years beginning with the first taxable year of the credit period with respect thereto.

(i) Section 42(j) of the Internal Revenue Code, relating to recapture of credit, shall not be applicable and the following requirements of this section shall be set forth in a regulatory agreement between the California Tax Credit Allocation Committee and the housing sponsor, and the regulatory agreement shall be subordinated, when required, to any lien or encumbrance of any banks or other institutional lenders to the project. The regulatory agreement entered into pursuant to subdivision (f) of Section 50199.14 of the Health and Safety Code shall apply, provided that the agreement includes all of the following provisions:

(1) A term not less than the compliance period.

(2) A requirement that the agreement be recorded in the official records of the county in which the qualified low-income housing project is located.

(3) A provision stating which state and local agencies can enforce the regulatory agreement in the event the housing sponsor fails to satisfy any of the requirements of this section.

(4) A provision that the regulatory agreement shall be deemed a contract enforceable by tenants as third-party beneficiaries thereto and that allows individuals, whether prospective, present, or former occupants of the building, who meet the income limitation applicable to the building, the right to enforce the regulatory agreement in any state court.

(5) A provision incorporating the requirements of Section 42 of the Internal Revenue Code, relating to low-income housing credit, as modified by this section.

**EXHIBIT 8**

(6) A requirement that the housing sponsor notify the California Tax Credit Allocation Committee or its designee if there is a determination by the Internal Revenue Service that the project is not in compliance with Section 42(g) of the Internal Revenue Code, relating to qualified low-income housing project.

(7) A requirement that the housing sponsor, as security for the performance of the housing sponsor's obligations under the regulatory agreement, assign the housing sponsor's interest in rents that it receives from the project, provided that until there is a default under the regulatory agreement, the housing sponsor is entitled to collect and retain the rents.

(8) A provision that the remedies available in the event of a default under the regulatory agreement that is not cured within a reasonable cure period include, but are not limited to, allowing any of the parties designated to enforce the regulatory agreement to collect all rents with respect to the project; taking possession of the project and operating the project in accordance with the regulatory agreement until the enforcer determines the housing sponsor is in a position to operate the project in accordance with the regulatory agreement; applying to any court for specific performance; securing the appointment of a receiver to operate the project; or any other relief as may be appropriate.

(j) (1) The committee shall allocate the housing credit on a regular basis consisting of two or more periods in each calendar year during which applications may be filed and considered. The committee shall establish application filing deadlines, the maximum percentage of federal and state low-income housing tax credit ceiling that may be allocated by the committee in that period, and the approximate date on which allocations shall be made. If the enactment of federal or state law, the adoption of rules or regulations, or other similar events prevent the use of two allocation periods, the committee may reduce the number of periods and adjust the filing deadlines, maximum percentage of credit allocated, and the allocation dates.

(2) The committee shall adopt a qualified allocation plan, as provided in Section 42(m)(1) of the Internal Revenue Code, relating to plans for allocation of credit among projects. In adopting this plan, the committee shall comply with the provisions of Sections 42(m)(1)(B) and 42(m)(1)(C) of the Internal Revenue Code, relating to qualified allocation plan and relating to certain selection criteria must be used, respectively.

(3) Notwithstanding Section 42(m) of the Internal Revenue Code, relating to responsibilities of housing credit agencies, the California Tax Credit Allocation Committee shall allocate housing credits in accordance with the qualified allocation plan and regulations, which shall include the following provisions:

(A) All housing sponsors, as defined by paragraph (3) of subdivision (a), shall demonstrate at the time the application is filed with the committee that the project meets the following threshold requirements:

(i) The housing sponsor shall demonstrate that there is a need and demand for low-income housing in the community or region for which it is proposed.

(ii) The project's proposed financing, including tax credit proceeds, shall be sufficient to complete the project and that the proposed operating income shall be adequate to operate the project for the extended use period.

(iii) The project shall have enforceable financing commitments, either construction or permanent financing, for at least 50 percent of the total estimated financing of the project.

(iv) The housing sponsor shall have and maintain control of the site for the project.

(v) The housing sponsor shall demonstrate that the project complies with all applicable local land use and zoning ordinances.

(vi) The housing sponsor shall demonstrate that the project development team has the experience and the financial capacity to ensure project completion and operation for the extended use period.

(vii) The housing sponsor shall demonstrate the amount of tax credit that is necessary for the financial feasibility of the project and its viability as a qualified low-income housing project throughout the extended use period, taking into account operating expenses, a supportable debt service, reserves, funds set aside for rental subsidies and required equity, and a development fee that does not exceed a specified percentage of the eligible basis of the project prior to inclusion of the development fee in the eligible basis, as determined by the committee.

(B) The committee shall give a preference to those projects satisfying all of the threshold requirements of subparagraph (A) if both of the following apply:

(i) The project serves the lowest income tenants at rents affordable to those tenants.

(ii) The project is obligated to serve qualified tenants for the longest period.

(C) In addition to the provisions of subparagraphs (A) and (B), the committee shall use the following criteria in allocating housing credits:

(i) Projects serving large families in which a substantial number, as defined by the committee, of all residential units are low-income units with three or more bedrooms.

(ii) Projects providing single-room occupancy units serving very low income tenants.

(iii) Existing projects that are "at risk of conversion," as defined by paragraph (6) of subdivision (c).

(iv) Projects for which a public agency provides direct or indirect long-term financial support for at least 15 percent of the total project development costs or projects for which the owner's equity constitutes at least 30 percent of the total project development costs.

**EXHIBIT 8**

(v) Projects that provide tenant amenities not generally available to residents of low-income housing projects.

(4) For purposes of allocating credits pursuant to this section, the committee shall not give preference to any project by virtue of the date of submission of its application.

(D) Subparagraphs (B) and (C) shall not apply to projects receiving an allocation pursuant to subparagraph (B) of paragraph (1) of subdivision (g).

(k) Section 42(l) of the Internal Revenue Code, relating to certifications and other reports to secretary, shall be modified as follows:

The term "secretary" shall be replaced by the term "Franchise Tax Board."

(l) In the case in which the credit allowed under this section exceeds the "net tax," the excess may be carried over to reduce the "net tax" in the following year, and succeeding years, if necessary, until the credit has been exhausted.

(m) A project that received an allocation of a 1989 federal housing credit dollar amount shall be eligible to receive an allocation of a 1990 state housing credit dollar amount, subject to all of the following conditions:

(1) The project was not placed in service prior to 1990.

(2) To the extent the amendments made to this section by the Statutes of 1990 conflict with any provisions existing in this section prior to those amendments, the prior provisions of law shall prevail.

(3) Notwithstanding paragraph (2), a project applying for an allocation under this subdivision shall be subject to the requirements of paragraph (3) of subdivision (j).

(n) The credit period with respect to an allocation of credit in 1989 by the California Tax Credit Allocation Committee of which any amount is attributable to unallocated credit from 1987 or 1988 shall not begin until after December 31, 1989.

(o) The provisions of Section 11407(a) of Public Law 101-508, relating to the effective date of the extension of the low-income housing credit, apply to calendar years after 1989.

(p) The provisions of Section 11407(c) of Public Law 101-508, relating to election to accelerate credit, shall not apply.

(q) (1) (A) For a project that receives a preliminary reservation under this section beginning on or after January 1, 2016, a taxpayer may elect in its application to the California Tax Credit Allocation Committee to sell all or any portion of any credit allowed, subject to subparagraphs (B) and (C). The taxpayer may, only once, revoke an election to sell pursuant to this subdivision at any time before the California Tax Credit Allocation Committee allocates a final credit amount for the project pursuant to this section, at which point the election shall become irrevocable.

(B) A credit that a taxpayer elects to sell all or a portion of pursuant to this subdivision shall be sold for consideration that is not less than 80 percent of the amount of the credit.

(C) A taxpayer shall not elect to sell all or any portion of any credit pursuant to this subdivision if the taxpayer did not make that election in its application submitted to the California Tax Credit Allocation Committee.

(2) (A) The taxpayer that originally received the credit shall report to the California Tax Credit Allocation Committee within 10 days of the sale of the credit, in the form and manner specified by the California Tax Credit Allocation Committee, all required information regarding the purchase and sale of the credit, including the social security or other taxpayer identification number of the unrelated party or parties to whom the credit has been sold, the face amount of the credit sold, and the amount of consideration received by the taxpayer for the sale of the credit.

(B) The California Tax Credit Allocation Committee shall provide an annual listing to the Franchise Tax Board, in a form and manner agreed upon by the California Tax Credit Allocation Committee and the Franchise Tax Board, of the taxpayers that have sold or purchased a credit pursuant to this subdivision.

(3) A credit may be sold pursuant to this subdivision to more than one unrelated party.

(4) Notwithstanding any other law, the taxpayer that originally received the credit that is sold pursuant to paragraph (1) shall remain solely liable for all obligations and liabilities imposed on the taxpayer by this section with respect to the credit, none of which shall apply to a party to whom the credit has been sold or subsequently transferred. Parties that purchase credits pursuant to paragraph (1) shall be entitled to utilize the purchased credits in the same manner in which the taxpayer that originally received the credit could utilize them.

(5) A taxpayer shall not sell a credit allowed by this section if the taxpayer was allowed the credit on any tax return of the taxpayer.

(r) The California Tax Credit Allocation Committee may prescribe rules, guidelines, or procedures necessary or appropriate to carry out the purposes of this section, including any guidelines regarding the allocation of the credit allowed under this section. Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code shall not apply to any rule, guideline, or procedure prescribed by the California Tax Credit Allocation Committee pursuant to this section.

(s) The amendments to this section made by Chapter 1222 of the Statutes of 1993 apply only to taxable years beginning on or after January 1, 1994.

**EXHIBIT 8**

(t) This section shall remain in effect on and after December 1, 1990, for as long as Section 42 of the Internal Revenue Code, relating to low-income housing credit, remains in effect. Any unused credit may continue to be carried forward, as provided in subdivision (l), until the credit has been exhausted.

**SEC. 25.** Section 17561 of the Revenue and Taxation Code is amended to read:

**17561.** (a) Section 469(c)(7) of the Internal Revenue Code, relating to special rules for taxpayers in real property business, shall not apply.

(b) Section 469(d)(2) of the Internal Revenue Code, relating to passive activity credits, is modified to refer to the following credits:

(1) The credit for research expenses allowed by Section 17052.12.

(2) The credit for certain wages paid (targeted jobs) allowed by Section 17053.7.

(3) The credit allowed by former Section 17057 (relating to clinical testing expenses).

(4) The credit for low-income housing allowed by Section 17058.

(c) Section 469(g)(1)(A) of the Internal Revenue Code is modified to provide that if all gain or loss realized on the disposition of the taxpayer's entire interest in any passive activity (or former passive activity) is recognized, the excess of—

(1) The sum of—

(A) Any loss from that activity for that taxable year (determined after application of Section 469(b) of the Internal Revenue Code), plus

(B) Any loss realized on that disposition, over

(2) Net income or gain for the taxable year from all passive activities (determined without regard to losses described in paragraph (1)),

shall be treated as a loss which is not from a passive activity.

(d) (1) For purposes of applying the provisions of Section 469(i) of the Internal Revenue Code, relating to the twenty-five thousand dollars ($25,000) offset for rental real estate activities, the dollar limitation specified in Section 469(i)(2) of the Internal Revenue Code, relating to dollar limitation, for the credit allowed under Section 17058, relating to low-income housing, shall not apply.

(2) The amendments made to this subdivision by the act adding this paragraph shall apply to each taxable year beginning on or after January 1, 2020.

(e) Section 502 of the Tax Reform Act of 1986 (P.L. 99-514) shall apply.

(f) For taxable years beginning on or after January 1, 1987, the provisions of Section 10212 of Public Law 100-203, relating to treatment of publicly traded partnerships under Section 469 of the Internal Revenue Code, shall be applicable.

**SEC. 26.** Section 23610.5 of the Revenue and Taxation Code is amended to read:

**23610.5.** (a) (1) There shall be allowed as a credit against the "tax," defined in Section 23036, a state low-income housing tax credit in an amount equal to the amount determined in subdivision (c), computed in accordance with Section 42 of the Internal Revenue Code, relating to low-income housing credit, except as otherwise provided in this section.

(2) "Taxpayer," for purposes of this section, means the sole owner in the case of a "C" corporation, the partners in the case of a partnership, and the shareholders in the case of an "S" corporation.

(3) "Housing sponsor," for purposes of this section, means the sole owner in the case of a "C" corporation, the partnership in the case of a partnership, and the "S" corporation in the case of an "S" corporation.

(b) (1) The amount of the credit allocated to any housing sponsor shall be authorized by the California Tax Credit Allocation Committee, or any successor thereof, based on a project's need for the credit for economic feasibility in accordance with the requirements of this section.

(A) The low-income housing project shall be located in California and shall meet either of the following requirements:

(i) Except for projects to provide farmworker housing, as defined in subdivision (h) of Section 50199.7 of the Health and Safety Code, that are allocated credits solely under the set-aside described in subdivision (c) of Section 50199.20 of the Health and Safety Code, the project's housing sponsor has been allocated by the California Tax Credit Allocation Committee a credit for federal income tax purposes under Section 42 of the Internal Revenue Code, relating to low-income housing credit.

(ii) It qualifies for a credit under Section 42(h)(4)(B) of the Internal Revenue Code, relating to special rule where 50 percent or more of building is financed with tax-exempt bonds subject to volume cap.

(B) The California Tax Credit Allocation Committee shall not require fees for the credit under this section in addition to those fees required for applications for the tax credit pursuant to Section 42 of the Internal Revenue Code, relating to low-income housing credit. The committee may require a fee if the application for the credit under this section is submitted in a calendar year after the year the application is submitted for the federal tax credit.

EXHIBIT 8

(C) (i) For a project that receives a preliminary reservation of the state low-income housing tax credit, allowed pursuant to subdivision (a), on or after January 1, 2009, the credit shall be allocated to the partners of a partnership owning the project in accordance with the partnership agreement, regardless of how the federal low-income housing tax credit with respect to the project is allocated to the partners, or whether the allocation of the credit under the terms of the agreement has substantial economic effect, within the meaning of Section 704(b) of the Internal Revenue Code, relating to determination of distributive share.

(ii) To the extent the allocation of the credit to a partner under this section lacks substantial economic effect, any loss or deduction otherwise allowable under this part that is attributable to the sale or other disposition of that partner's partnership interest made prior to the expiration of the federal credit shall not be allowed in the taxable year in which the sale or other disposition occurs, but shall instead be deferred until and treated as if it occurred in the first taxable year immediately following the taxable year in which the federal credit period expires for the project described in clause (i).

(iii) This subparagraph shall not apply to a project that receives a preliminary reservation of state low-income housing tax credits under the set-aside described in subdivision (c) of Section 50199.20 of the Health and Safety Code unless the project also receives a preliminary reservation of federal low-income housing tax credits.

(2) (A) The California Tax Credit Allocation Committee shall certify to the housing sponsor the amount of tax credit under this section allocated to the housing sponsor for each credit period.

(B) In the case of a partnership or an "S" corporation, the housing sponsor shall provide a copy of the California Tax Credit Allocation Committee certification to the taxpayer.

(C) The taxpayer shall, upon request, provide a copy of the certification to the Franchise Tax Board.

(D) All elections made by the taxpayer pursuant to Section 42 of the Internal Revenue Code, relating to low-income housing credit, shall apply to this section.

(E) (i) Except as described in clause (ii) or (iii), for buildings located in designated difficult development areas (DDAs) or qualified census tracts (QCTs), as defined in Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas, credits may be allocated under this section in the amounts prescribed in subdivision (c), provided that the amount of credit allocated under Section 42 of the Internal Revenue Code, relating to low-income housing credit, is computed on 100 percent of the qualified basis of the building.

(ii) Notwithstanding clause (i), the California Tax Credit Allocation Committee may allocate the credit for buildings located in DDAs or QCTs that are restricted to having 50 percent of the building's occupants be special needs households, as defined in the California Code of Regulations by the California Tax Credit Allocation Committee, or receiving an allocation pursuant to subparagraph (B) of paragraph (1) of subdivision (g), even if the taxpayer receives federal credits pursuant to Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas, provided that the credit allowed under this section shall not exceed 30 percent of the eligible basis of the building.

(iii) On and after January 1, 2018, notwithstanding clause (i), the California Tax Credit Allocation Committee may allocate the credit pursuant to paragraph (7) of subdivision (c) even if the taxpayer receives federal credits, pursuant to Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas.

(F) (i) The California Tax Credit Allocation Committee may allocate a credit under this section in exchange for a credit allocated pursuant to Section 42(d)(5)(B) of the Internal Revenue Code, relating to increase in credit for buildings in high-cost areas, in amounts up to 30 percent of the eligible basis of a building if the credits allowed under Section 42 of the Internal Revenue Code, relating to low-income housing credit, are reduced by an equivalent amount.

(ii) An equivalent amount shall be determined by the California Tax Credit Allocation Committee based upon the relative amount required to produce an equivalent state tax credit to the taxpayer.

(c) Section 42(b) of the Internal Revenue Code, relating to applicable percentage: 70 percent present value credit for certain new buildings; 30 percent present value credit for certain other buildings, shall be modified as follows:

(1) In the case of any qualified low-income building placed in service by the housing sponsor during 1987, the term "applicable percentage" means 9 percent for each of the first three years and 3 percent for the fourth year for new buildings (whether or not the building is federally subsidized) and for existing buildings.

(2) In the case of any qualified low-income building that receives an allocation after 1989 and is a new building not federally subsidized, the term "applicable percentage" means the following:

(A) For each of the first three years, the percentage prescribed by the Secretary of the Treasury for new buildings that are not federally subsidized for the taxable year, determined in accordance with the requirements of Section 42(b)(2) of the Internal Revenue Code, relating to temporary minimum credit rate for nonfederally subsidized new buildings, in lieu of the percentage prescribed in Section 42(b)(1)(A) of the Internal Revenue Code.

(B) For the fourth year, the difference between 30 percent and the sum of the applicable percentages for the first three years.

(3) In the case of any qualified low-income building that is a new building and is federally subsidized and receiving an allocation pursuant to subparagraph (B) of paragraph (1) of subdivision (g), the term "applicable percentage" means for the first three years, 9 percent of the qualified basis of the building, and for the fourth year, 3 percent of the qualified basis of the building.

**EXHIBIT 8**

(4) In the case of any qualified low-income building that receives an allocation after 1989 pursuant to subparagraph (A) of paragraph (1) of subdivision (g) and that is a new building that is federally subsidized or that is an existing building that is "at risk of conversion," the term "applicable percentage" means the following:

(A) For each of the first three years, the percentage prescribed by the Secretary of the Treasury for new buildings that are federally subsidized for the taxable year.

(B) For the fourth year, the difference between 13 percent and the sum of the applicable percentages for the first three years.

(5) In the case of any qualified low-income building that receives an allocation pursuant to subparagraph (A) of paragraph (1) of subdivision (g) that meets all of the requirements of subparagraphs (A) through (D), inclusive, the term "applicable percentage" means 30 percent for each of the first three years and 5 percent for the fourth year. A qualified low-income building receiving an allocation under this paragraph is ineligible to also receive an allocation under paragraph (3).

(A) The qualified low-income building is at least 15 years old.

(B) The qualified low-income building is either:

(i) Serving households of very low income or extremely low income such that the average maximum household income as restricted, pursuant to an existing regulatory agreement with a federal, state, county, local, or other governmental agency, is not more than 45 percent of the area median gross income, as determined under Section 42 of the Internal Revenue Code, relating to low-income housing credit, adjusted by household size, and a tax credit regulatory agreement is entered into for a period of not less than 55 years restricting the average targeted household income to no more than 45 percent of the area median income.

(ii) Financed under Section 514, or 521 of the National Housing Act of 1949 (42 U.S.C. Sec. 1485).

(C) The qualified low-income building would have insufficient credits under paragraphs (2) and (3) to complete substantial rehabilitation due to a low appraised value.

(D) The qualified low-income building will complete the substantial rehabilitation in connection with the credit allocation herein.

(6) For purposes of this section, the term "at risk of conversion," with respect to an existing property means a property that satisfies all of the following criteria:

(A) The property is a multifamily rental housing development in which at least 50 percent of the units receive governmental assistance pursuant to any of the following:

(i) New construction, substantial rehabilitation, moderate rehabilitation, property disposition, and loan management set-aside programs, or any other program providing project-based assistance pursuant to Section 8 of the United States Housing Act of 1937, Section 1437f of Title 42 of the United States Code, as amended.

(ii) The Below-Market-Interest-Rate Program pursuant to Section 221(d)(3) of the National Housing Act, Sections 1715l(d)(3) and (5) of Title 12 of the United States Code.

(iii) Section 236 of the National Housing Act, Section 1715z-1 of Title 12 of the United States Code.

(iv) Programs for rent supplement assistance pursuant to Section 101 of the Housing and Urban Development Act of 1965, Section 1701s of Title 12 of the United States Code, as amended.

(v) Programs pursuant to Section 514 of the Housing Act of 1949, Section 1484 of Title 42 of the United States Code, as amended, and Section 515 of the Housing Act of 1949, Section 1485 of Title 42 of the United States Code, as amended.

(vi) The low-income housing credit program set forth in Section 42 of the Internal Revenue Code, relating to low-income housing credit.

(vii) Programs for loans or grants administered by the Department of Housing and Community Development.

(B) The restrictions on rent and income levels will terminate or the federally insured mortgage or rent subsidy contract on the property is eligible for prepayment or termination any time within five years before or after the date of application to the California Tax Credit Allocation Committee.

(C) The entity acquiring the property enters into a regulatory agreement that requires the property to be operated in accordance with the requirements of this section for a period equal to the greater of 55 years or the life of the property.

(D) The property satisfies the requirements of Section 42(e) of the Internal Revenue Code, relating to rehabilitation expenditures treated as separate new building, except that the provisions of Section 42(e)(3)(A)(ii)(I) shall not apply.

(7) On and after January 1, 2018, in the case of any qualified low-income building that is (A) farmworker housing, as defined by paragraph (2) of subdivision (h) of Section 50199.7 of the Health and Safety Code, and (B) is federally subsidized, the term "applicable percentage" means for each of the first three years, 20 percent of the qualified basis of the building, and for the fourth year, 15 percent of the qualified basis of the building.

(d) The term "qualified low-income housing project" as defined in Section 42(c)(2) of the Internal Revenue Code, relating to qualified low-income building, is modified by adding the following requirements:

**EXHIBIT 8**

(1) The taxpayer shall be entitled to receive a cash distribution from the operations of the project, after funding required reserves, that, at the election of the taxpayer, is equal to:

(A) An amount not to exceed 8 percent of the lesser of:

(i) The owner equity, which shall include the amount of the capital contributions actually paid to the housing sponsor and shall not include any amounts until they are paid on an investor note.

(ii) Twenty percent of the adjusted basis of the building as of the close of the first taxable year of the credit period.

(B) The amount of the cashflow from those units in the building that are not low-income units. For purposes of computing cashflow under this subparagraph, operating costs shall be allocated to the low-income units using the "floor space fraction," as defined in Section 42 of the Internal Revenue Code, relating to low-income housing credit.

(C) Any amount allowed to be distributed under subparagraph (A) that is not available for distribution during the first five years of the compliance period may be accumulated and distributed any time during the first 15 years of the compliance period but not thereafter.

(2) The limitation on return shall apply in the aggregate to the partners if the housing sponsor is a partnership and in the aggregate to the shareholders if the housing sponsor is an "S" corporation.

(3) The housing sponsor shall apply any cash available for distribution in excess of the amount eligible to be distributed under paragraph (1) to reduce the rent on rent-restricted units or to increase the number of rent-restricted units subject to the tests of Section 42(g)(1) of the Internal Revenue Code, relating to in general.

(e) The provisions of Section 42(f) of the Internal Revenue Code, relating to definition and special rules relating to credit period, shall be modified as follows:

(1) The term "credit period" as defined in Section 42(f)(1) of the Internal Revenue Code, relating to credit period defined, is modified by substituting "four taxable years" for "10 taxable years."

(2) The special rule for the first taxable year of the credit period under Section 42(f)(2) of the Internal Revenue Code, relating to special rule for 1st year of credit period, shall not apply to the tax credit under this section.

(3) Section 42(f)(3) of the Internal Revenue Code, relating to determination of applicable percentage with respect to increases in qualified basis after 1st year of credit period, is modified to read:

If, as of the close of any taxable year in the compliance period, after the first year of the credit period, the qualified basis of any building exceeds the qualified basis of that building as of the close of the first year of the credit period, the housing sponsor, to the extent of its tax credit allocation, shall be eligible for a credit on the excess in an amount equal to the applicable percentage determined pursuant to subdivision (c) for the four-year period beginning with the later of the taxable years in which the increase in qualified basis occurs.

(f) The provisions of Section 42(h) of the Internal Revenue Code, relating to limitation on aggregate credit allowable with respect to projects located in a state, shall be modified as follows:

(1) Section 42(h)(2) of the Internal Revenue Code, relating to allocated credit amount to apply to all taxable years ending during or after credit allocation year, does not apply and instead the following provisions apply:

The total amount for the four-year credit period of the housing credit dollars allocated in a calendar year to any building shall reduce the aggregate housing credit dollar amount of the California Tax Credit Allocation Committee for the calendar year in which the allocation is made.

(2) Paragraphs (3), (4), (5), (6)(E)(i)(II), (6)(F), (6)(G), (6)(I), (7), and (8) of Section 42(h) of the Internal Revenue Code, relating to limitation on aggregate credit allowable with respect to projects located in a state, do not apply to this section.

(g) The aggregate housing credit dollar amount that may be allocated annually by the California Tax Credit Allocation Committee pursuant to this section, Section 12206, and Section 17058 shall be an amount equal to the sum of all the following:

(1) (A) Seventy million dollars ($70,000,000) for the 2001 calendar year, and, for the 2002 calendar year and each calendar year thereafter, seventy million dollars ($70,000,000) increased by the percentage, if any, by which the Consumer Price Index for the preceding calendar year exceeds the Consumer Price Index for the 2001 calendar year. For the purposes of this paragraph, the term "Consumer Price Index" means the last Consumer Price Index for All Urban Consumers published by the federal Department of Labor.

(B) Five hundred million dollars ($500,000,000) for the 2020 calendar year, and up to five hundred million dollars ($500,000,000) for the 2021 calendar year and every year thereafter. Allocations shall only be available pursuant to this subparagraph in the 2021 calendar year and thereafter if the annual Budget Act, or if any bill providing for appropriations related to the Budget Act, specifies an amount to be available for allocation in that calendar year by the California Tax Credit Allocation Committee, and the California Tax Credit Allocation Committee has adopted regulatory reforms aimed at increasing production and containing costs. A housing sponsor receiving a nonfederally subsidized allocation under subdivision (c) shall not be eligible for receipt of the housing credit allocated from the increased amount under this subparagraph. A housing sponsor receiving a nonfederally subsidized allocation under subdivision (c) shall remain eligible for receipt of the housing credit allocated from the credit ceiling amount under subparagraph (A).

(i) Eligible projects for allocations under this subparagraph include any new building, as defined in Section 42(i)(4) of the Internal Revenue Code, relating to newly constructed buildings, and the regulations promulgated thereunder, excluding rehabilitation

**EXHIBIT 8**

expenditures under Section 42 (e) of the Internal Revenue Code, relating to rehabilitation expenditures treated as separate new building, and is federally subsidized.

(ii) Notwithstanding any other provision of this section, for allocations pursuant to this subparagraph for the 2020 calendar year, the California Tax Credit Allocation Committee shall consider projects located throughout the state and shall allocate housing credits, subject to the minimum federal requirements as set forth in Sections 42 and 142 of the Internal Revenue Code, the minimum requirements set forth in Sections 5033 and 5190 of the California Debt Limit Allocation Committee regulations, and the minimum set forth in Section 10326 of the Tax Credit Allocation Committee regulations, for projects that can begin construction within 180 days from award, subject to availability of funds.

(iii) Notwithstanding any other provision of this section, for allocations pursuant to this subparagraph for the 2021 calendar year and thereafter, the California Tax Credit Allocation Committee shall prescribe regulations, rules, guidelines, or procedures necessary to implement a new allocation methodology that is aimed at increasing production and containing costs.

(iv) Of the amount available pursuant to this subparagraph, and notwithstanding any other requirement of this section, the California Tax Credit Allocation Committee may allocate up to two hundred million dollars ($200,000,000) for housing financed by the California Housing Finance Agency under its Mixed-Income Program.

(2) The unused housing credit ceiling, if any, for the preceding calendar years.

(3) The amount of housing credit ceiling returned in the calendar year. For purposes of this paragraph, the amount of housing credit dollar amount returned in the calendar year equals the housing credit dollar amount previously allocated to any project that does not become a qualified low-income housing project within the period required by this section or to any project with respect to which an allocation is canceled by mutual consent of the California Tax Credit Allocation Committee and the allocation recipient.

(4) Five hundred thousand dollars ($500,000) per calendar year for projects to provide farmworker housing, as defined in subdivision (h) of Section 50199.7 of the Health and Safety Code.

(5) The amount of any unallocated or returned credits under former Sections 17053.14, 23608.2, and 23608.3, as those sections read prior to January 1, 2009, until fully exhausted for projects to provide farmworker housing, as defined in subdivision (h) of Section 50199.7 of the Health and Safety Code.

(h) The term "compliance period" as defined in Section 42(i)(1) of the Internal Revenue Code, relating to compliance period, is modified to mean, with respect to any building, the period of 30 consecutive taxable years beginning with the first taxable year of the credit period with respect thereto.

(i) Section 42(j) of the Internal Revenue Code, relating to recapture of credit, shall not be applicable and the following shall be substituted in its place:

The requirements of this section shall be set forth in a regulatory agreement between the California Tax Credit Allocation Committee and the housing sponsor, and the regulatory agreement shall be subordinated, when required, to any lien or encumbrance of any banks or other institutional lenders to the project. The regulatory agreement entered into pursuant to subdivision (f) of Section 50199.14 of the Health and Safety Code shall apply, provided that the agreement includes all of the following provisions:

(1) A term not less than the compliance period.

(2) A requirement that the agreement be recorded in the official records of the county in which the qualified low-income housing project is located.

(3) A provision stating which state and local agencies can enforce the regulatory agreement in the event the housing sponsor fails to satisfy any of the requirements of this section.

(4) A provision that the regulatory agreement shall be deemed a contract enforceable by tenants as third-party beneficiaries thereto and that allows individuals, whether prospective, present, or former occupants of the building, who meet the income limitation applicable to the building, the right to enforce the regulatory agreement in any state court.

(5) A provision incorporating the requirements of Section 42 of the Internal Revenue Code, relating to low-income housing credit, as modified by this section.

(6) A requirement that the housing sponsor notify the California Tax Credit Allocation Committee or its designee if there is a determination by the Internal Revenue Service that the project is not in compliance with Section 42(g) of the Internal Revenue Code, relating to qualified low-income housing project.

(7) A requirement that the housing sponsor, as security for the performance of the housing sponsor's obligations under the regulatory agreement, assign the housing sponsor's interest in rents that it receives from the project, provided that until there is a default under the regulatory agreement, the housing sponsor is entitled to collect and retain the rents.

(8) A provision that the remedies available in the event of a default under the regulatory agreement that is not cured within a reasonable cure period include, but are not limited to, allowing any of the parties designated to enforce the regulatory agreement to collect all rents with respect to the project; taking possession of the project and operating the project in accordance with the regulatory agreement until the enforcer determines the housing sponsor is in a position to operate the project in accordance with the regulatory agreement; applying to any court for specific performance; securing the appointment of a receiver to operate the project; or any other relief as may be appropriate.

**EXHIBIT 8**

(j) (1) The committee shall allocate the housing credit on a federal basis consisting of two or more periods in each calendar year during which applications may be filed and considered. The committee shall establish application filing deadlines, the maximum percentage of federal and state low-income housing tax credit ceiling that may be allocated by the committee in that period, and the approximate date on which allocations shall be made. If the enactment of federal or state law, the adoption of rules or regulations, or other similar events prevent the use of two allocation periods, the committee may reduce the number of periods and adjust the filing deadlines, maximum percentage of credit allocated, and allocation dates.

(2) The committee shall adopt a qualified allocation plan, as provided in Section 42(m)(1) of the Internal Revenue Code, relating to plans for allocation of credit among projects. In adopting this plan, the committee shall comply with the provisions of Sections 42(m)(1)(B) and 42(m)(1)(C) of the Internal Revenue Code, relating to qualified allocation plan and relating to certain selection criteria must be used, respectively.

(3) Notwithstanding Section 42(m) of the Internal Revenue Code, relating to responsibilities of housing credit agencies, the California Tax Credit Allocation Committee shall allocate housing credits in accordance with the qualified allocation plan and regulations, which shall include the following provisions:

(A) All housing sponsors, as defined by paragraph (3) of subdivision (a), shall demonstrate at the time the application is filed with the committee that the project meets the following threshold requirements:

(i) The housing sponsor shall demonstrate there is a need and demand for low-income housing in the community or region for which it is proposed.

(ii) The project's proposed financing, including tax credit proceeds, shall be sufficient to complete the project and that the proposed operating income shall be adequate to operate the project for the extended use period.

(iii) The project shall have enforceable financing commitments, either construction or permanent financing, for at least 50 percent of the total estimated financing of the project.

(iv) The housing sponsor shall have and maintain control of the site for the project.

(v) The housing sponsor shall demonstrate that the project complies with all applicable local land use and zoning ordinances.

(vi) The housing sponsor shall demonstrate that the project development team has the experience and the financial capacity to ensure project completion and operation for the extended use period.

(vii) The housing sponsor shall demonstrate the amount of tax credit that is necessary for the financial feasibility of the project and its viability as a qualified low-income housing project throughout the extended use period, taking into account operating expenses, a supportable debt service, reserves, funds set aside for rental subsidies and required equity, and a development fee that does not exceed a specified percentage of the eligible basis of the project prior to inclusion of the development fee in the eligible basis, as determined by the committee.

(B) The committee shall give a preference to those projects satisfying all of the threshold requirements of subparagraph (A) if both of the following apply:

(i) The project serves the lowest income tenants at rents affordable to those tenants.

(ii) The project is obligated to serve qualified tenants for the longest period.

(C) In addition to the provisions of subparagraphs (A) and (B), the committee shall use the following criteria in allocating housing credits:

(i) Projects serving large families in which a substantial number, as defined by the committee, of all residential units are low-income units with three or more bedrooms.

(ii) Projects providing single-room occupancy units serving very low income tenants.

(iii) Existing projects that are "at risk of conversion," as defined by paragraph (6) of subdivision (c).

(iv) Projects for which a public agency provides direct or indirect long-term financial support for at least 15 percent of the total project development costs or projects for which the owner's equity constitutes at least 30 percent of the total project development costs.

(v) Projects that provide tenant amenities not generally available to residents of low-income housing projects.

(D) Subparagraph (B) and (C) shall not apply to projects receiving an allocation pursuant to subparagraph (B) of paragraph (1) of subdivision (g).

(4) For purposes of allocating credits pursuant to this section, the committee shall not give preference to any project by virtue of the date of submission of its application except to break a tie when two or more of the projects have an equal rating.

(5) Not less than 20 percent of the low-income housing tax credits available annually under this section, Section 12206, and Section 17058 shall be set aside for allocation to rural areas as defined in Section 50199.21 of the Health and Safety Code. Any amount of credit set aside for rural areas remaining on or after October 31 of any calendar year shall be available for allocation to any eligible project. No amount of credit set aside for rural areas shall be considered available for any eligible project so long as there are eligible rural applications pending on October 31.

**EXHIBIT 8**

(k) Section 42(l) of the Internal Revenue Code, relating to certifications and other reports to secretary, shall be modified as follows:

The term "secretary" shall be replaced by the term "Franchise Tax Board."

(l) In the case in which the credit allowed under this section exceeds the "tax," the excess may be carried over to reduce the "tax" in the following year, and succeeding years, if necessary, until the credit has been exhausted.

(m) A project that received an allocation of a 1989 federal housing credit dollar amount shall be eligible to receive an allocation of a 1990 state housing credit dollar amount, subject to all of the following conditions:

(1) The project was not placed in service prior to 1990.

(2) To the extent the amendments made to this section by the Statutes of 1990 conflict with any provisions existing in this section prior to those amendments, the prior provisions of law shall prevail.

(3) Notwithstanding paragraph (2), a project applying for an allocation under this subdivision shall be subject to the requirements of paragraph (3) of subdivision (j).

(n) The credit period with respect to an allocation of credit in 1989 by the California Tax Credit Allocation Committee of which any amount is attributable to unallocated credit from 1987 or 1988 shall not begin until after December 31, 1989.

(o) The provisions of Section 11407(a) of Public Law 101-508, relating to the effective date of the extension of the low-income housing credit, apply to calendar years after 1989.

(p) The provisions of Section 11407(c) of Public Law 101-508, relating to election to accelerate credit, shall not apply.

(q) (1) A corporation may elect to assign any portion of any credit allowed under this section to one or more affiliated corporations for each taxable year in which the credit is allowed. For purposes of this subdivision, "affiliated corporation" has the meaning provided in subdivision (b) of Section 25110, as that section was amended by Chapter 881 of the Statutes of 1993, as of the last day of the taxable year in which the credit is allowed, except that "100 percent" is substituted for "more than 50 percent" wherever it appears in the section, as that section was amended by Chapter 881 of the Statutes of 1993, and "voting common stock" is substituted for "voting stock" wherever it appears in the section, as that section was amended by Chapter 881 of the Statutes of 1993.

(2) The election provided in paragraph (1):

(A) May be based on any method selected by the corporation that originally receives the credit.

(B) Shall be irrevocable for the taxable year the credit is allowed, once made.

(C) May be changed for any subsequent taxable year if the election to make the assignment is expressly shown on each of the returns of the affiliated corporations that assign and receive the credits.

(r) (1) (A) For a project that receives a preliminary reservation under this section beginning on or after January 1, 2016, a taxpayer may elect in its application to the California Tax Credit Allocation Committee to sell all or any portion of any credit allowed, subject to subparagraphs (B) and (C). The taxpayer may, only once, revoke an election to sell pursuant to this subdivision at any time before the California Tax Credit Allocation Committee allocates a final credit amount for the project pursuant to this section, at which point the election shall become irrevocable.

(B) A credit that a taxpayer elects to sell all or a portion of pursuant to this subdivision shall be sold for consideration that is not less than 80 percent of the amount of the credit.

(C) A taxpayer shall not elect to sell all or any portion of any credit pursuant to this subdivision if the taxpayer did not make that election in its application submitted to the California Tax Credit Allocation Committee.

(2) (A) The taxpayer that originally received the credit shall report to the California Tax Credit Allocation Committee within 10 days of the sale of the credit, in the form and manner specified by the California Tax Credit Allocation Committee, all required information regarding the purchase and sale of the credit, including the social security or other taxpayer identification number of the unrelated party or parties to whom the credit has been sold, the face amount of the credit sold, and the amount of consideration received by the taxpayer for the sale of the credit.

(B) The California Tax Credit Allocation Committee shall provide an annual listing to the Franchise Tax Board, in a form and manner agreed upon by the California Tax Credit Allocation Committee and the Franchise Tax Board, of the taxpayers that have sold or purchased a credit pursuant to this subdivision.

(3) A credit may be sold pursuant to this subdivision to more than one unrelated party.

(4) Notwithstanding any other law, the taxpayer that originally received the credit that is sold pursuant to paragraph (1) shall remain solely liable for all obligations and liabilities imposed on the taxpayer by this section with respect to the credit, none of which shall apply to a party to whom the credit has been sold or subsequently transferred. Parties that purchase credits pursuant to paragraph (1) shall be entitled to utilize the purchased credits in the same manner in which the taxpayer that originally received the credit could utilize them.

(5) A taxpayer shall not sell a credit allowed by this section if the taxpayer was allowed the credit on any tax return of the taxpayer.

**EXHIBIT 8**

(s) The California Tax Credit Allocation Committee may prescribe any guidelines, or procedures necessary or appropriate to carry out the purposes of this section, including any guidelines regarding the allocation of the credit allowed under this section. Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code shall not apply to any rule, guideline, or procedure prescribed by the California Tax Credit Allocation Committee pursuant to this section.

(t) Any unused credit may continue to be carried forward, as provided in subdivision (l), until the credit has been exhausted.

(u) This section shall remain in effect on and after December 1, 1990, for as long as Section 42 of the Internal Revenue Code, relating to low-income housing credit, remains in effect.

(v) The amendments to this section made by Chapter 1222 of the Statutes of 1993 shall apply only to taxable years beginning on or after January 1, 1994, except that paragraph (1) of subdivision (q), as amended, shall apply to taxable years beginning on or after January 1, 1993.

**SEC. 27.** Section 24692 of the Revenue and Taxation Code is amended to read:

**24692.** (a) Section 469 of the Internal Revenue Code, relating to passive activity losses and credits limited, shall apply, except as otherwise provided.

(b) Section 469(c)(7) of the Internal Revenue Code, relating to special rules for taxpayers in real property business, shall not apply.

(c) Section 469(d)(2) of the Internal Revenue Code, relating to passive activity credits, is modified to refer to the following credits:

(1) The credit for research expenses allowed by Section 23609.

(2) The credit for clinical testing expenses allowed by Section 23609.5.

(3) The credit for low-income housing allowed by Section 23610.5.

(4) The credit for certain wages paid (targeted jobs) allowed by Section 23621.

(d) Section 469(g)(1)(A) of the Internal Revenue Code is modified to provide that if all gain or loss realized on the disposition of the taxpayer's entire interest in any passive activity (or former passive activity) is recognized, the excess of—

(1) The sum of—

(A) Any loss from that activity for that taxable year (determined after application of Section 469(b) of the Internal Revenue Code), plus

(B) Any loss realized on that disposition, over

(2) Net income or gain for the taxable year from all passive activities (determined without regard to losses described in paragraph (1)), shall be treated as a loss which is not from a passive activity.

(e) (1) For purposes of applying Section 469(i) of the Internal Revenue Code, relating to the twenty-five thousand dollars ($25,000) offset for rental real estate activities, the dollar limitation specified in Section 469(i)(2) of the Internal Revenue Code, relating to dollar limitation, for the credit allowed under Section 23610.5, relating to low-income housing, shall not apply.

(2) The amendments made to this subdivision by the act adding this paragraph shall apply to each taxable year beginning on or after January 1, 2020.

(f) Section 502 of the Tax Reform Act of 1986 (Public Law 99-514) shall apply.

(g) For each taxable year beginning on or after January 1, 1987, Section 10212 of Public Law 100-203, relating to treatment of publicly traded partnerships under Section 469 of the Internal Revenue Code, shall apply, except as otherwise provided.

(h) The amendments to Section 469(k) of the Internal Revenue Code made by Section 2004 of Public Law 100-647, relating to separate application of section in case of publicly traded partnerships, shall apply to each taxable year beginning on or after January 1, 1990, except as otherwise provided.

**SEC. 28.** Section 8256 of the Welfare and Institutions Code is amended to read:

**8256.** (a) Agencies and departments administering state programs created on or after July 1, 2017, shall collaborate with the coordinating council to adopt guidelines and regulations to incorporate core components of Housing First.

(b) By July 1, 2019, except as otherwise provided in subdivision (c), agencies and departments administering state programs in existence prior to July 1, 2017, shall collaborate with the coordinating council to revise or adopt guidelines and regulations that incorporate the core components of Housing First, if the existing guidelines and regulations do not already incorporate the core components of Housing First.

(c) (1) An agency or department that administers programs that fund recovery housing shall comply with the requirements of subdivision (b) by July 1, 2020.

(2) An agency or department that administers programs that fund recovery housing shall additionally do both of the following:

(A) Consult with the Legislature, the Homeless Coordinating and Financing Council, the Business, Consumer Services, and Housing Agency, and other stakeholders between July 1, 2019, and July 1, 2020, to identify ways to improve the provision of housing to

148

**EXHIBIT 8**

individuals who receive funding from that agency or department, consistent with the applicable requirements of state law.

(B) By March 1, 2020, submit a report to the Senate Committee on Budget and Fiscal Review and the Assembly Committee on Budget on its efforts to comply with Housing First specifically and to improve the provision of housing to individuals who receive housing assistance from the agency or department generally.

(3) (A) For purposes of this subdivision, "recovery housing" means sober living facilities and programs that provide housing in an abstinence-focused and peer-supported community if participation is voluntary, unless that participation is pursuant to a court order or is a condition of release for individuals under the jurisdiction of a county probation department of the Department of Corrections and Rehabilitation.

(B) A recovery housing program shall comply with the core components of Housing First, other than those components described in paragraphs (5) through (7), inclusive, of subdivision (b) of Section 8255.

### SEC. 29.
(a) Notwithstanding Section 13340 of the Government Code, there is hereby continuously appropriated, without regard to fiscal years, the sum of five hundred million dollars ($500,000,000) from the General Fund to the Department of Housing and Community Development. The moneys appropriated pursuant to this section shall be transferred to the Self-Help Housing Fund established pursuant to Section 50697.1 of the Health and Safety Code, based on the following schedule:

(1) For the 2019–20 fiscal year, two hundred million dollars ($200,000,000).

(2) For the 2020–21 fiscal year, ninety-five million dollars ($95,000,000).

(3) For the 2021–22 fiscal year, one hundred twenty million dollars ($120,000,000).

(4) For the 2022–23 fiscal year, eighty-five million dollars ($85,000,000).

(b) Notwithstanding Section 50697.1 of the Health and Safety Code, the Department of Housing and Community Development shall transfer the moneys appropriated pursuant to subdivision (a) to the California Housing Finance Agency, to be used to finance low and moderate income housing.

(c) The Director of Finance may change the release of funds scheduled in subparagraphs (1) through (4), inclusive, of subdivision (a), if deemed necessary. The director shall notify the Chairperson of the Joint Legislative Budget Committee, or the chairpersons's designee, of the director's intent to notify the Controller of the necessity to change the release of funds scheduled in paragraphs (1) through (4), inclusive, of subdivision (a). The total amount appropriated shall not be greater or lesser than the amount appropriated in subdivision (a). The Controller shall make the funds available to the department not sooner than five days after receipt of this notification.

### SEC. 30.
The Legislature finds and declares that Section 4 of this act, amending Section 65585 of, and Sections 5 and 6 of this act, adding Sections 65589.9 and 65589.11 to, the Government Code, address a matter of statewide concern rather than a municipal affair as that term is used in Section 5 of Article XI of the California Constitution. Therefore, Sections 4, 5, and 6 of this act apply to all cities, including charter cities.

### SEC. 31.
No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because a local agency or school district has the authority to levy service charges, fees, or assessments sufficient to pay for the program or level of service mandated by this act, within the meaning of Section 17556 of the Government Code.

### SEC. 32.
This act is a bill providing for appropriations related to the Budget Bill within the meaning of subdivision (e) of Section 12 of Article IV of the California Constitution, has been identified as related to the budget in the Budget Bill, and shall take effect immediately.

**EXHIBIT 8**



# Regional Housing Needs Assessments

The Department of Housing and Community Development Must Improve Its Processes to Ensure That Communities Can Adequately Plan for Housing

*March 2022*

REPORT 2021-125



**EXHIBIT 9**



**CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814

**916.445.0255** | TTY **916.445.0033**

For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
**1.800.952.5665**



*Don't want to miss any of our reports? Subscribe to our email list at* **auditor.ca.gov**

*For questions regarding the contents of this report, please contact our* Public Affairs Office *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternative format reports available upon request | Permission is granted to reproduce reports

**EXHIBIT 9**

**Michael S. Tilden** *Acting State Auditor*



March 17, 2022
*2021-125*

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, my office evaluated the Regional Housing Needs Assessment (needs assessment) process that the Department of Housing and Community Development (HCD) uses to provide key housing guidance for the State's local governments. The availability of sufficient housing is of vital statewide importance, and HCD's needs assessments are what allow jurisdictions to plan for the development of that housing. Overall, our audit determined that HCD does not ensure that its needs assessments are accurate and adequately supported.

In reviewing the needs assessments for three regions, we identified multiple areas in which HCD must improve its process. For example, HCD does not satisfactorily review its needs assessments to ensure that staff accurately enter data when they calculate how much housing local governments must plan to build. As a result, HCD made errors that reduced its projected need for housing in two of the regions we reviewed. We also found that HCD could not demonstrate that it adequately considered all of the factors that state law requires, and it could not support its use of healthy housing vacancy rates. This insufficient oversight and lack of support for its considerations risks eroding public confidence that HCD is informing local governments of the appropriate amount of housing they will need.

HCD's needs assessments also rely on some projections that the Department of Finance (Finance) provides. While we found that most of Finance's projections were reasonably accurate, it has not adequately supported the rates its uses to project the number of future households that will require housing units in the State. Although these household projections are a key component in HCD's needs assessments, Finance has not conducted a proper study or obtained formal recommendations from experts it consulted to support its assumptions in this area. Finance intends to reevaluate its assumptions related to household growth as more detailed 2020 Census data becomes available later in the year, but without such efforts, Finance cannot ensure that it is providing the most appropriate information to HCD.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

**EXHIBIT 9**

Blank page inserted for reproduction purposes only.

**EXHIBIT 9**

# CONTENTS

Summary                                                                              1

Introduction                                                                         3

HCD's Housing Needs Assessment Process Lacks
Sufficient Reviews and Support                                                      11

　　Recommendations                                                                 22

Finance Provides Reasonable Population Projections,
but It Has Not Provided Sufficient Support for Its
Household Formation Projections                                                     25

　　Recommendations                                                                 29

**Appendix A**
HCD Housing Needs Assessments We Reviewed                                           31

**Appendix B**
Scope and Methodology                                                               35

**Responses to the Audit**
Business, Consumer Services and Housing Agency                                      37

　　California State Auditor's Comments on the Response From
　　the Business, Consumer Services and Housing Agency                              41

Department of Finance                                                               43

　　California State Auditor's Comment on the Response From
　　the Department of Finance                                                       45

**EXHIBIT 9**

Blank page inserted for reproduction purposes only.

**EXHIBIT 9**

# SUMMARY

The Legislature recognizes that the availability of housing is of vital statewide importance and that the State and local governments have a responsibility to facilitate the development of adequate housing. State law requires the Department of Housing and Community Development (HCD) to conduct assessments to determine the housing needs (needs assessments) throughout regions in the State. The needs assessments rely on projections of future population and households developed by the Department of Finance (Finance). HCD is required to consider certain factors identified in state law and then can adjust the needs assessments for any of the factors. For example, it makes an adjustment to achieve a healthy vacancy rate in the housing market and an adjustment to reduce the number of overcrowded households. Regions use the needs assessments to plan for additional housing to accommodate population growth and address future housing needs.

### HCD's Housing Needs Assessment Process Lacks Sufficient Reviews and Support

*Page 11*

HCD does not have a formal review process for the data it uses to determine its needs assessments. As a result, the needs assessments for two of three regions we reviewed included errors. One data error reduced a region's needs assessment by nearly 2,500 housing units. HCD also did not demonstrate that it adequately considered certain factors when creating the needs assessments of the three regions we reviewed. For one of those factors, the healthy vacancy rate, HCD did not perform a formal analysis to adequately support its assumptions. HCD's insufficient oversight of its process and the lack of adequate documentation supporting the healthy vacancy rate risks eroding public confidence in HCD's ability to address the State's housing needs.

### Finance Provides Reasonable Population Projections, but It Has Not Provided Sufficient Support for Its Household Formation Projections

*Page 25*

Finance's projections of the statewide future population are reasonably accurate, but it did not sufficiently support its projections of the number of future households. To calculate the household projections, Finance identifies rates at which it expects individuals in different age groups to form new households and applies those rates to its population projections. Although Finance worked with HCD to solicit some advice from experts when it established these rates, it did not conduct a formal study or receive clear recommendations to support them. As a result, Finance cannot ensure that it is providing the most appropriate information for HCD to include in its needs assessment process.

**EXHIBIT 9**

Finance stated that it intends to reevaluate its assumptions related to household growth after it reviews 2020 Census data when those data become available later this year.

................................................................................................................

**Summary of Recommendations**

*Legislature*

To provide HCD additional clarity and guidance in conducting its vacancy rate adjustments, the Legislature should amend state law to clarify whether HCD should continue to use a healthy vacancy rate that includes both rental and owned housing or whether it should determine and use separate healthy vacancy rates for owned housing and rental housing.

*HCD*

To ensure that its needs assessments are accurate and do not contain unnecessary errors, by June 2022 HCD should institute a process to ensure that its staff performs multiple reviews of data in its assessments.

To demonstrate that its needs assessments are complete and address all relevant factors, by September 2022 HCD should establish a formal process to document its consideration of all factors required by state law in its needs assessments.

To ensure that it adequately supports the vacancy rate adjustments it makes to needs assessments, by February 2023 HCD should perform a formal analysis of healthy vacancy rates and historical trends to inform those adjustments.

*Finance*

To ensure that the household formation rates that it provides HCD are appropriate, Finance should, by February 2023, conduct a comprehensive review of its assumptions about the household formation rates it uses in projections, and it should document that review.

**Agency Comments**

HCD and Finance agreed with our recommendations and plan to implement them over the next year.

**EXHIBIT 9**

# Introduction

## Background

As part of the Legislature's efforts to ensure that the State is planning for the construction of enough homes to meet its housing needs and that local governments are facilitating that development, state law requires the Department of Housing and Community Development (HCD) to conduct periodic housing needs assessments to determine existing and projected housing needs throughout California. HCD fulfills its responsibilities under state law by creating Regional Housing Needs Assessments (needs assessments). As Figure 1 shows, HCD provides the needs assessments to councils of governments, which we describe in the text box, across the State and directly to counties that are not in such a council. Figure 2 provides an overview of the councils of government in the State and also shows counties that are not part of a council. After a council of governments receives its needs assessment from HCD, it then must allocate the region's housing needs to the cities and counties within its boundaries. For counties without a council of governments, HCD provides allocations to those counties as well as to the cities within them.[1] Cities and counties must then develop plans to accommodate the existing and projected housing need. HCD performs needs assessments every five to 11 years. HCD does not complete all assessments at the same time and does not always cover the same period, because it attempts to align the needs assessment process with other planning processes, such as regional transportation planning. The three needs assessments that we reviewed are those of the Santa Barbara County Association of Governments (Santa Barbara Association), the Sacramento Area Council of Governments (Sacramento Council), and Amador County.

> **Definition of Council of Governments**
>
> A voluntary association, generally of county and city governments, created by a joint powers agreement.
>
> Source: State law and a council of governments' website.

## Needs Assessment Components

State law requires HCD to use population projections developed by the Department of Finance (Finance) when it completes the needs assessments. Finance factors into its projections multiple sources of information, including data from the U.S. Census Bureau (Census) and records of driver's licenses, births and deaths, school enrollments, and tax filings. Finance provides state- and county-level population projections to assist state, regional, and local planning, among other purposes. Finance also projects the number of future households, based on the population projections

---

[1]  Counties that receive their assessments and allocations directly from HCD represent just 3 percent of the State's population.

**EXHIBIT 9**

and the percentage of people in the population who are expected to form their own households in the future, which is known as the household formation rate.

**Figure 1**
HCD's Housing Needs Assessments Inform County and City Housing Plans



Source: State law and HCD housing needs assessments.

Table 1 describes the factors that state law requires HCD to consider in its needs assessments, including vacancy rates. State law requires HCD to consider vacancy rates in existing housing and the vacancy rates for healthy housing markets when developing the needs assessments. A low supply of housing can result in low rental vacancy rates, which in turn can lead to housing price increases. Therefore, HCD adjusts its needs assessments so that housing markets can achieve a healthy vacancy rate. In some cases, that adjustment will add to the number of housing units HCD determines a region needs so that the region can obtain a healthy vacancy rate. State law specifies that the minimum vacancy rate for a healthy rental housing market is 5 percent, but the law does not define the healthy vacancy rate for owned housing.

EXHIBIT 9

CALIFORNIA STATE AUDITOR | **Report 2021-125**   5
March 2022

**Figure 2**
**Most California Counties Have a Council of Governments That Receives Needs Assessments From HCD**



Source: HCD housing needs assessment letters.

**EXHIBIT 9**

**Table 1**
**Factors HCD Must Consider in Its Assessments**

| FACTOR | DESCRIPTION |
|---|---|
| Anticipated Population Growth | Projection of future population growth in the region. |
| Household Formation Rate | The rate at which individuals form new households in the region. |
| Household Size | The number of people per household in the region. |
| Vacancy Rates | The percentage of homes available for rent or sale compared to the total number of housing units, less vacation and seasonal homes. |
| Overcrowding | The percentage of households that have more than one resident per room in a housing unit. |
| Replacement Needs | Replacement of housing units lost during the planning period, such as because of deterioration. |
| Cost-Burdened Households | The percentage of households that are paying more than 30 percent of their income on housing costs. |
| Units Lost to Emergencies | The loss of housing units during a state of emergency declared by the Governor, such as in wildfires, if the lost units have not yet been rebuilt or replaced. |
| Jobs/Housing Balance | The relationship between the number of jobs in a region and the number of housing units in that same region. |
| Other Characteristics | Other characteristics of the composition of the projected population. |

Source:  State law, the Census website, HCD needs assessments, HCD work group reports, and interviews with HCD staff.

Note:  State law does not require HCD to consider these factors for its needs assessments in counties that do not have a council of governments; however, HCD's practice is to do so.

State law also requires HCD to adjust its needs assessments to account for long-term housing challenges, such as overcrowding, which occurs when a housing unit has more than one resident per room. The Legislature added this overcrowding factor to the needs assessment process in 2017. HCD must also consider cost-burdened households, which are households that pay more than 30 percent of their income for housing costs. When it determines it is appropriate to do so, HCD includes in its assessments adjustments for cost burden and overcrowding. Among the sources HCD uses to determine these adjustments is data that state law requires councils of governments to provide. The councils provide data comparing the cost burden and overcrowding for their respective regions with that of other comparable regions in the United States. HCD then uses this information to calculate adjustments for each council of governments' needs assessment. Table 2 shows a hypothetical example of how HCD incorporates adjustments for the various factors to determine the number of housing units in its needs assessments. Appendix A shows the three needs assessments that we reviewed.

**EXHIBIT 9**

**Table 2**
**Housing Needs Assessments Contain Many Factors and Adjustments**

| HYPOTHETICAL EXAMPLE OF HCD NEEDS ASSESSMENT CALCULATIONS | |
| --- | --- |
| **FACTOR/SOURCE** | **PROJECTED CALCULATION** |
| **8-year Population Projection (Finance)** | **1,500,000** |
| – Group Quarters Population (Finance)* | – 35,000 |
| **Population Needing Housing (Finance)** | **1,465,000** |
| *Household Formation Rate Adjustment (Finance)†: 36.6% average* | |
| **Projected Households (Finance)** | **540,000** |
| + Vacancy Rate Adjustment (HCD): 2.2% | 11,900 |
| + Overcrowding Adjustment (HCD): 0.6% | 3,200 |
| + Replacement Needs Adjustment (HCD): 0.5% | 2,700 |
| Units Lost to Emergencies (HCD)‡ | — |
| Jobs/Housing Balance (HCD)‡ | — |
| – Occupied Units (Finance) | – 480,500 |
| Subtotal | 77,300 |
| + Cost Burden Adjustment (HCD)§: 0.55% | 3,100 |
| **Total Needs Assessment** | **80,400 Housing Units** |

JUNE 2020–JUNE 2028 (8 YEARS)

Source: Auditor review of HCD housing needs assessments.
* This reduction includes individuals housed in prisons and in college dormitories.
† The household formation rate represents the likelihood that individuals in the region's projected population will head their own households. Finance uses different household formation rates for different age groups, which we have simplified for illustrative purposes here.
‡ Factors that state law requires HCD to consider, but that it did not include as an adjustment in the needs assessments we reviewed.
§ HCD makes the cost burden adjustment only after applying all the other adjustments.

Finally, state law requires HCD to consider housing units that communities will need to plan to replace. Some housing units become uninhabitable during the future period covered by the assessments, such as housing lost due to damage, deterioration, and house or apartment building fires. State law requires HCD to review housing replacement needs, and HCD does so by obtaining from Finance the number of housing units a council of governments or county has lost over the past 10 years. HCD then determines the rate at which the region loses housing units and makes an adjustment in the needs assessment to replace those houses. In response to recent wildfires that have destroyed a significant number of houses, the Legislature added the requirement in 2018 that HCD must also consider any housing recently lost during a state of emergency that the Governor declared. Similar to the cost burden factor discussed

**EXHIBIT 9**

above, state law requires councils of governments to provide data to HCD on housing lost during a state of emergency for consideration in the needs assessments.

### Local Actions After HCD Completes a Needs Assessment

After HCD makes a final determination for a needs assessment, state law requires the council of governments to create housing needs allocations for the cities and counties within its region. The council, in consultation with HCD, must develop a proposed methodology for distributing the allocation. The council of governments must conduct a survey and ensure public participation when developing the methodology. The council of governments establishes a draft allocation and then may hear appeals of the allocation, if any are raised. It then must make the allocation final and adopt it.

State law requires local governments, such as cities and counties, to create plans to meet housing needs. Local governments must adopt a general plan, which is a blueprint for meeting the community's long-term vision for the future. Within the general plans, state law requires local governments to include a housing element, which contains an analysis of existing and projected housing needs in their communities. Cities and counties must state their goals, policies, and programs related to the development of housing, to accommodate projected housing needs allocated by their council of governments or HCD. The community, through the housing element, must attempt to meet these housing needs, such as by changing the zoning on specific parcels to allow residential development.

### Needs Assessments Can Be Contentious but Are a Critical Component of Addressing Housing Challenges

Some stakeholders have criticized the needs assessment process and HCD's needs assessments. For example, some homeowners and advocacy organizations believe that HCD's needs assessments have produced higher numbers of housing needs than are reasonable. Changes to state law that became effective in January 2019 allow HCD to account for present unmet housing needs in addition to future housing needs. Potentially as a result of these statutory changes, some regions received housing needs allocations that are more than double the amount of their previous allocations.

We are aware of two lawsuits that challenge HCD's process, including one that alleges that HCD did not consider all factors as required by state law. In one lawsuit, the Orange County Council

**EXHIBIT 9**

of Governments, which is independent from the larger Southern California Association of Governments, sued HCD, alleging that HCD failed to use the appropriate population forecast, failed to appropriately evaluate household overcrowding and cost burden rates, and used unreasonable vacancy rates. In the other lawsuit, several interested individuals and two nonprofit corporations filed a lawsuit alleging that HCD failed to consider data regarding the relationship between jobs and housing in its assessment for the Association of Bay Area Governments, which is the San Francisco Bay Area council of governments. Both lawsuits are pending final resolution. To avoid interference, we did not review the needs assessments for either of the councils involved in these lawsuits as part of this audit.

The needs assessments affect the planning for housing availability across the State and are an important but sometimes contentious component in addressing California's housing crisis. Housing availability and affordability has become a key economic issue, as the Legislative Analyst's Office (LAO) reported in 2019. The LAO noted that the significant shortage of housing, particularly within coastal communities, contributed to higher housing costs for Californians. The LAO also noted that high housing costs increase the State's poverty rate and, in particular, put low-income Californians at risk of instability and homelessness. As discussed above, the State's role in identifying existing and future housing needs to guide the housing planning process is under public scrutiny. Determining accurate, appropriate, and defensible housing needs is a key step in facilitating state and local efforts to plan for housing development.

**EXHIBIT 9**

**Report 2021-125** | CALIFORNIA STATE AUDITOR

March 2022

Blank page inserted for reproduction purposes only.

**EXHIBIT 9**

# HCD's Housing Needs Assessment Process Lacks Sufficient Reviews and Support

## Key Points

- HCD made several errors when entering data into calculations for its needs assessments, which reduced the amount of housing needs in the needs assessments for two of the three regions we reviewed. HCD does not have a sufficient management review process to ensure that it identifies such errors before finalizing needs assessments. Without effective review processes, HCD may be making similar errors in needs assessments for other councils of governments.

- HCD could not demonstrate that it followed work group recommendations when it considered the balance between jobs and housing, and did not maintain consistency in its consideration of housing destroyed during a state of emergency, when it produced the needs assessments for the three regions we reviewed. In at least one needs assessment, the omission led HCD to understate housing needs by not accounting for units that had been destroyed in a wildfire.

- HCD did not adequately support its adjustment to the needs assessments to address vacancy rates for the councils of governments we reviewed. Despite the significant effect that HCD's vacancy rate adjustments have on needs assessments, it has not completed a thorough analysis to determine whether it used the most appropriate value in its calculations.

- HCD's reviews of comparable regions selected by councils of government have been inconsistent because the department does not have a formal process for such reviews. As a result, it did not identify a problematic proposal from a region and inappropriately reduced its needs assessment.

**HCD Has Made Errors When Completing Its Needs Assessments Because It Does Not Sufficiently Review and Verify Data It Uses**

HCD does not have an adequate review process to ensure that its staff members accurately enter data that it uses in the needs assessments. As Table 1 shows, state law requires HCD to consider a variety of information for its needs assessments for councils of governments, including population projections, housing vacancy rates, and income data. HCD staff members enter the data the department obtains from various sources into a spreadsheet for each council of governments and uses the information to determine the housing needs. However, HCD does not sufficiently review its staff member's data entries for accuracy. As Figure 3 shows, we noted data entry errors in two of the three assessments we reviewed. We discuss the other issues presented in Figure 3, including an inadequate consideration of the relationship between jobs and housing, in the following section.

**EXHIBIT 9**

EXHIBIT 9

**Figure 3**
HCD's Errors and Omissions Understated the Needs Assessments for Multiple Regions



**Sacramento Council**   *2019 Assessment:  153,512 units needed*

- HCD failed to adequately consider the Jobs/Housing Balance factor.
- HCD used inconsistent years of Census data for different counties in the Vacancy Rates adjustment.
- HCD's error in the Vacancy Rates Adjustment reduced the Cost Burden adjustment.*

**Amador County**   *2020 Assessment:  741 units needed*

- HCD failed to adequately consider the Jobs/Housing Balance factor.

**Santa Barbara Association**   *2021 Assessment:  24,856 units needed*

- HCD failed to adequately consider the Jobs/Housing Balance factor.
- HCD used one year of Census data instead of five for the Overcrowding adjustment.
- HCD did not identify that the Santa Barbara Association submitted Census data for the wrong years as part of the Overcrowding adjustment.
- HCD's error in the Overcrowding adjustment reduced the Cost Burden adjustment.*
- HCD did not demonstrate that it considered the effect on housing needs from a destructive fire in 2017.

Source:  Analysis of state law, HCD needs assessments, and HCD's 2010 SB 375 implementation work group report.

Note:  We were able to determine the impact on needs assessments from some, but not all errors and omissions presented in this figure. For example, HCD did not collect data on the Jobs/housing balance, and therefore we could not quantify the effect of HCD not considering this factor. We discuss selected errors' impacts on HCD's needs assessments on pages 13 and 22 in the text.

*  Because HCD makes the cost burden adjustment after applying the other adjustments, errors that increase or reduce other adjustments also increase or reduce the cost burden adjustment.

One data entry error resulted in a lower, inaccurate number of needed housing units in the Santa Barbara Association's needs assessment. HCD's needs assessment letter explained that its overcrowding adjustment relied on Census estimates from five years of survey data. However, HCD had only used Census data from a one-year estimate when determining the overcrowding adjustment, which is both less accurate and inconsistent with other steps in the calculation that used five-year estimates. HCD explained that staff members entered data from the wrong table on the Census website. Had HCD used the five-year estimates as

it intended for this step in its calculation, Santa Barbara's needs assessment would have included 1,338 more housing units, or about 5 percent more than the inaccurate assessment HCD provided to the Santa Barbara Association.

HCD made a similar error when using Census estimates to adjust the Sacramento Council's assessment. It had intended to use the 2013–2017 Census vacancy estimate for all the counties within the Sacramento Council, but it mistakenly entered the 2012–2016 estimate for Sacramento County. This error reduced the Sacramento Council's needs assessment by 2,484 units. Although this number represents a small portion of the region's overall needs assessment of more than 153,000 units, it still represents homes for individuals and families for which the Sacramento Council needs to plan to accommodate.

Because HCD did not verify the information the Santa Barbara Association submitted for its needs assessment, it made an additional error. HCD incorporates into the needs assessments some information it receives from the councils of governments, such as data on overcrowding. The Santa Barbara Association submitted data on comparable regions' overcrowding rates using the 2014–2018 Census data, which HCD then incorporated into its overcrowding calculation. However, HCD had intended for its calculation to incorporate 2015–2019 data. Although this particular error was not large, it was in addition to the other errors in the assessments we reviewed, as discussed above. It concerns us that HCD does not have a formal review process to ensure that these important housing needs assessments are as accurate as possible.

> **HCD does not have a formal review process to ensure that these important housing needs assessments are as accurate as possible.**

We identified these errors, which would be difficult to detect in documentation supporting HCD's needs assessments, by comparing the data in the needs assessments to the correct source documents. Therefore, we expected that HCD would have a robust process for dedicated reviewers and management to verify that staff members retrieve and enter the correct data in the spreadsheets. However, HCD told us that its primary process for identifying errors in its needs assessments is to send a draft assessment to each council of governments for review rather than to have HCD supervisors or other HCD staff members review the drafts.

**EXHIBIT 9**

HCD's reliance on the councils of governments for checking the accuracy of the needs assessments is problematic. As we discuss in the Introduction, the needs assessment process can be contentious and draws attention from numerous stakeholders. Therefore, some councils of governments may be reluctant to propose changes or corrections to their needs assessments that increase their own housing needs. In fact, two of the errors we identified inaccurately lowered the needs assessments, but HCD stated that neither the Santa Barbara Association nor the Sacramento Council notified HCD of the errors, and no record we reviewed indicated whether the two councils of governments noticed the errors at all.

When we brought these concerns to HCD's attention, its deputy director of housing policy development (housing policy deputy) stated that the department plans to conduct and document supervisor reviews of its needs assessments for its next planned round of assessments in 2023. It is crucial that HCD do so to ensure that councils of governments plan for the appropriate amount of housing and to maintain public confidence in the validity of the State's assessments of local housing needs.

> **It is crucial that HCD conduct and document supervisor reviews of its needs assessments to ensure that councils of governments plan for the appropriate amount of housing and to maintain public confidence in the validity of the State's assessments.**

### HCD Did Not Demonstrate That It Adequately Considered Certain Factors That State Law Requires for Housing Needs Assessments

HCD did not demonstrate that it adequately considered two factors listed in state law when preparing the three needs assessments we reviewed, which potentially further reduced the reliability of its needs assessments. The law requires HCD to review data and assumptions that councils of governments submit for the factors considered in housing needs assessments, and it allows HCD to make adjustments to the needs assessments after this consideration. HCD may accept or reject the submitted information, and it must issue a written determination on the data assumptions for each factor and the methodology it will use.

**EXHIBIT 9**

Although HCD generally included most of the factors outlined in state law in the three needs assessments we reviewed, it did not adequately demonstrate how it considered two factors: the balance between jobs and housing in the region (jobs/housing balance) and housing lost in emergencies, such as wildfires. The housing policy deputy stated that HCD addresses these factors through its projected household data and other adjustment factors, and currently documents that consideration with an assertion in its final needs assessment that it considered all factors specified in state law.

> **HCD did not adequately demonstrate how it considered the balance between jobs and housing in the region and housing lost in emergencies, such as wildfires.**

When we asked HCD about its specific consideration of the jobs/housing factor, HCD indicated that it relied on a work group's draft analysis of jobs/housing relationships. However, this analysis is outdated and provided limited direction for how the jobs/housing balance would affect needs assessments. The housing policy deputy stated that HCD had studied the jobs/housing balance factor in 2010, 12 years ago. The analysis noted that the inconsistent data available between regions makes regional comparisons of jobs and housing difficult and that statewide standardized employment data are not available for comparison purposes. Although it did not recommend specific adjustments for the jobs/housing balance factor, the 2010 work group indicated that HCD should solicit specific information from councils of governments to address this factor. However, HCD did not specifically request such information from the Sacramento Council, the Santa Barbara Association, or Amador County—the three needs assessments we reviewed—in order to determine those needs assessments.

HCD believes that its other adjustments for different factors also addressed the jobs/housing balance factor. Specifically, HCD asserted that its adjustments to address low vacancy rates, high overcrowding, and high cost burdens address jobs/housing balance issues. However, HCD did not provide an analysis that demonstrated how, or to what extent, these adjustments address the jobs/housing balance. The housing policy deputy also noted the potential for inequitable adjustments for jobs/housing balance between regions because regions receive needs assessments at different times but agreed to review data sources and seek academic perspectives on approaches to account for the jobs/housing balance

**EXHIBIT 9**

in the next round of needs assessments. HCD also agreed that as part of its review of the jobs/housing balance factor, it would consider either adding a specific adjustment or modifying its other adjustments, such as increasing the cost burden adjustment, to better account for the factor in the future.

> **HCD agreed that as part of its review of the jobs/housing balance factor, it would consider either adding a specific adjustment or modifying its other adjustments, such as increasing the cost burden adjustment, to better account for the job/housing balance factor in the future.**

The second factor HCD inadequately considered was housing lost during emergencies. HCD did not consider housing lost during emergencies in a consistent manner across different regions, which led it to understate housing needs in the Santa Barbara Association's needs assessment. State law requires HCD to consider data and assumptions submitted by a council of governments on housing lost during a state of emergency declared by the Governor if that lost housing has not been rebuilt or replaced at the time of the collection of data for the needs assessment. In 2017 the Governor declared a state of emergency in Santa Barbara and Ventura counties due to the Thomas Fire, which destroyed more than 1,000 housing units and other structures. HCD did not consider the loss of units caused by this wildfire, as required by state law, and did not make an adjustment for this factor in the 2021 Santa Barbara Association needs assessment, as it did in another region, which we discuss below. We believe HCD should have worked with state and county officials to consider this factor in the assessment so that the Santa Barbara Association can plan to address actual housing needs.

HCD's housing policy deputy explained that HCD believes another factor addresses housing lost to fire emergencies. As we discuss in the Introduction, HCD determines the replacement rate at which each council of governments' region loses housing units and applies an adjustment in the needs assessment to replace housing. The replacement adjustment reflects the average annual rate of housing loss over the past 10 years that a council of governments needs to replace for units that have been destroyed or demolished, or are no longer inhabitable. The housing policy deputy stated

**EXHIBIT 9**

that Finance provides it with information on the rate of housing replacement, such as when there is a fire that requires a building to be replaced. Although HCD considered replacement units in the Santa Barbara Association needs assessment, it did not include a separate consideration for units destroyed in emergencies. HCD's replacement adjustment identified the average rate that housing is replaced in Santa Barbara County based on 10 years of data from Finance. However, this approach minimized the effect of a wildfire by combining it with normal years of housing losses, resulting in less overall housing than actually needed.

Furthermore, HCD's approach to the Santa Barbara Association's declared state of emergency was not consistent with the approach it took in another assessment. Specifically, for the Butte County Association of Governments, HCD worked with county and state officials, including Finance, when it considered and then included an adjustment specifically for housing destroyed in the 2018 Camp Fire, for which the Governor also declared a state of emergency. HCD noted that it included the adjustment for the Butte County Association of Governments because this fire and associated housing loss was particularly large. We expected HCD to consider housing lost in declared emergencies consistently.

> **It is critical that HCD's actions increase confidence in the needs assessment process.**

HCD needs to thoroughly document its required consideration of each factor because the needs assessment process is complex and can be contentious, drawing significant attention from local governments as well as interest groups. Therefore, it is critical that HCD's actions increase confidence in the needs assessment process. Although state law permits HCD to determine what adjustments, if any, to make in response to a particular factor, documenting the specific methodology and determination will enhance transparency and public trust. It will also allow HCD to more effectively justify its conclusions to stakeholders and potentially avoid litigation. It is also important that HCD conduct its needs assessments consistently across different regions and in compliance with state requirements, especially when adjusting for sensitive issues such as wildfire disasters.

**EXHIBIT 9**

**The Healthy Vacancy Rate HCD Used in Assessments We Reviewed Was Poorly Supported**

HCD did not provide adequate support for a critical determination it made about the healthy housing vacancy rate that it used in the three needs assessments we reviewed, raising questions about whether HCD can support the rate in its other assessments. State law requires HCD to consider how councils of governments' vacancy rates compare with healthy vacancy rates when determining housing needs assessments. As we discuss in the Introduction, state law specifies that a healthy vacancy rate for rental housing should not be less than 5 percent, but it does not specify a healthy vacancy rate for owned housing, allowing HCD to make that determination.

HCD used a 5 percent healthy vacancy rate for the combined rental and ownership markets for two of the councils of governments' assessments we reviewed.[2] HCD calculated the vacancy rate adjustment by subtracting the region's overall vacancy rate from the 5 percent healthy vacancy rate. Based on that rate, the vacancy rate adjustment for the Santa Barbara Association resulted in an increase of more than 4,000 housing units to the overall housing needs. Even a 1 percent difference—higher or lower—can make a significant difference in the needs assessment. For example, if HCD had used a 1 percent higher healthy vacancy rate target, the adjustment would have increased by 40 percent, to 5,600 housing units. Therefore, it is important that the rate that HCD uses is adequately supported.

> **Even a 1 percent difference—higher or lower—in the healthy vacancy rate assumption can make a significant difference in the needs assessment.**

HCD concluded that its choice of a single healthy vacancy rate for the overall market instead of separate rates for owned and rental housing was appropriate. HCD stated that in 2018, for the current round of needs assessments, it began evaluating vacancy rates across the total number of homes available, a change from its previous approach of separating the rental and ownership markets before

---

[2]  HCD used a 4 percent healthy vacancy rate to perform the adjustment for Amador County—a county without a council of governments. HCD explained that it used a lower rate for rural areas because they have a higher proportion of owned housing compared to rental housing and the ownership market typically has less turnover, and thus fewer homes on average will be empty at any given time in rural areas than in the State as a whole.

EXHIBIT 9

evaluating vacancy rates in each of them. HCD stated that it changed its approach to reflect the fact that some owned housing becomes rental housing over time. Conversely, a development may be rented for an initial period and then sold to owners after a condominium conversion. However, as shown in Figure 4, the vacancy rates of the two categories are significantly different—ownership vacancy was much lower than rental vacancy over the past 15 years. We are concerned that HCD has not completed a formal analysis to support its claim that a single healthy vacancy rate was appropriate.

**Figure 4**
**HCD Targeted a Vacancy Rate That Is Between Historical Rates for Rented and Owned Housing**



Source:  Data from the Census and HCD websites.

*  Before it started using a single 5 percent vacancy rate in 2018, HCD used separate rates for rental and owned housing for each assessment.

When we asked HCD for its support for using the 5 percent healthy vacancy rate in the assessments, it provided only limited information that did not adequately support its assumptions. HCD explained that although it understands that the ownership vacancy rate is somewhat lower than 5 percent, the literature it reviewed indicated that a healthy rental vacancy rate is likely somewhat higher than 5 percent, and it believes the 5 percent is defensible for the combined market. However, HCD did not thoroughly analyze vacancy rates when it began to use this healthy vacancy rate assumption in 2018. HCD provided a summary document from a work group it convened in 2010 that reviewed historical vacancy rates in different regions, but the work group's summary did not reach a conclusion on a

**EXHIBIT 9**

healthy vacancy rate. Instead, the summary referenced information the work group had reviewed, including government reports, and noted a range of vacancy rates among other states that included separate rates for owned and rented housing. Additionally, some of the information was outdated because several of the government reports the summary cited were published in the 1980s. The summary also stated that HCD had used the same healthy vacancy rates—using separate rates for owned and rental housing— since 2006 and may adjust them for current economic conditions.

Despite the large impact of the vacancy rate adjustment on a region's total needs assessment, HCD has relied on the 5 percent healthy vacancy rate without providing adequate support for its approach. For example, HCD made a vacancy rate adjustment to increase Sacramento's needs assessment by more than 22,700 units, or nearly 15 percent of the total housing needs. Therefore, we expected HCD to provide sufficient analysis and support for its assumptions underlying the healthy vacancy rate it used in the assessments we reviewed. When HCD does not develop a strong analysis with clear justification for its assumptions, especially those that have significant impact on the size of its final assessments, it risks making adjustments that are not reflective of a region's true housing needs.

> **When HCD does not develop a strong analysis with clear justification for its assumptions, especially those that have significant impact on the size of its final assessments, it risks making adjustments that are not reflective of a region's true housing needs.**

### HCD Did Not Identify a Problematic Proposal From a Region and Inappropriately Reduced Its Needs Assessment

HCD did not sufficiently review the regions that councils of governments compared themselves to as part of the needs assessment process. For two factors in its needs assessments, state law requires HCD to consider how a council of governments' regional data compares to that of other similar regions in the nation. For these factors—overcrowding and cost burden—the law requires councils of governments to provide data from regions they propose as "comparable." For the cost burden adjustment, state law requires councils to provide data from "healthy" housing markets. State law

EXHIBIT 9

allows HCD to adjust a council of governments' needs assessment based on these factors, thus allowing communities to plan for more housing to better address the housing crisis. Under state law, HCD must consider the information a council of governments submits, though it does not have to use that information in its final needs assessment. State law does not provide criteria for the councils of governments to select comparable regions to propose. However, in correspondence to the council of governments we reviewed, HCD recommended that several non-housing factors—such as population, median income, and jobs per capita—be included for comparison to help guide councils of governments in their selections of comparable, healthy regions.

HCD's reviews of comparable regions selected by councils of government have been inconsistent because the department does not have a formal process for such reviews. The housing policy deputy explained that HCD reviews the appropriateness of the regions that councils of governments propose as comparable and has rejected a proposal in the past. However, HCD does not have a documented process to guide its evaluation of councils of governments' proposals to ensure that its reviews are consistent. HCD explained that even though it does provide guidance on what criteria councils of governments could use for their proposals of comparable regions, it has avoided instituting a specific, formal review process because state law specifically allows councils of governments to determine what regions are comparable. However, state law also gives HCD the ability to reject those same proposals. Therefore, we believe it is important for HCD to have a formal process to review the comparable regions that councils of governments propose so it can ensure that it is using this authority consistently for different needs assessments.

> **It is important for HCD to have a formal process to review the comparable regions that councils of governments propose so it can ensure that it is using its authority consistently for different needs assessments.**

The Santa Barbara Association provided HCD with a comparable region proposal that we found problematic. In January 2021, after working with HCD to adjust its comparable region proposal, the Santa Barbara Association provided a memo to HCD explaining that it based its selection of comparable regions on certain categories,

**EXHIBIT 9**

such as population, household size, rent-to-income ratio, age distribution, and poverty. These criteria resulted in the Santa Barbara Association choosing regions that were likely experiencing housing problems similar to its own region because they also had higher, unhealthy, rates of overcrowding and cost-burdened households compared to national averages. The use of household sizes and rent-to-income ratios to select comparable regions was problematic. For example, the overcrowding rate—reflecting the number of housing units that have more than one person per room in a region—is likely higher in a region with a higher average household size. Similarly, a region with a higher rent-to-income ratio is likely to have more households with heavy cost burdens. Higher overcrowding and heavier cost burdens than the national average indicate that those housing markets are not healthy.

HCD accepted the comparable regions the Santa Barbara Association proposed, which likely lowered the needs assessment from what it would have been had HCD used healthy housing markets for one of the adjustments. HCD explained that it views its role as providing guidance to councils of government in their process of selecting comparable regions, rather than being prescriptive. However, our concern is that the Santa Barbara Association specifically used certain criteria that resulted in it selecting unhealthy housing markets, which HCD acknowledges is an approach that has led it to reject other councils' comparisons. Had HCD compared the Santa Barbara Association to regions with cost burden rates closer to the national average, we estimate that its needs assessment would have increased by 470 housing units to about 25,300, or an increase of 1.9 percent. Without a consistent process to review the criteria that councils of governments propose to identify comparable regions, HCD may be allowing some regions to plan for less housing than they otherwise should.

**Recommendations**

*Legislature*

To provide HCD additional clarity and guidance in conducting its vacancy rate adjustments, the Legislature should amend state law to clarify whether HCD should continue to use a healthy vacancy rate that includes both rental and owned housing or whether it should determine and use separate healthy vacancy rates for owned housing and rental housing.

**EXHIBIT 9**

*HCD*

To ensure that its needs assessments are accurate and do not contain unnecessary errors, by June 2022 HCD should institute a process to ensure that its staff performs multiple reviews of data in its assessments, including data that staff members input and councils of governments submit.

To demonstrate that its needs assessments are complete and address all relevant factors, by September 2022 HCD should establish a formal process to document its consideration of all factors required by state law in its needs assessments.

To ensure that it adequately supports the vacancy rate adjustments it makes to needs assessments, by February 2023 HCD should perform a formal analysis of healthy vacancy rates and historical trends to inform those adjustments.

To ensure that it does not reduce its needs assessments based on inappropriate information provided by councils of governments, by June 2022 HCD should develop a formal process to review the appropriateness of councils of governments' proposed comparable regions, including identifying the criteria it will consider when reviewing councils of governments proposals. HCD should use this formal process and criteria to consistently evaluate the appropriateness of the proposals to ensure that they identify regions with healthy housing markets.

**EXHIBIT 9**

Blank page inserted for reproduction purposes only.

**EXHIBIT 9**

## Finance Provides Reasonable Population Projections, but It Has Not Provided Sufficient Support for Its Household Formation Projections

### Key Points

- Finance's population projections are the basis of HCD's needs assessments, and they are generally accurate. Projections for counties with less than 250,000 residents were less accurate than for counties with more than 1 million residents, but the accuracy of projections has improved over time.

- Finance also creates projections of the number of future households in the State by county. Although HCD uses the household projections in its needs assessments, Finance has not conducted a rigorous analysis to support the household formation rates it uses for the projections.

### Finance's Population Projections Have Generally Been Accurate

The basis of housing needs assessments are population forecasts that Finance produces. State law requires Finance to produce short- and long-range projections of the population, and it does so for the entire State and its counties. To develop its population projections, Finance projects future births, deaths, and migration, or movement into and out of the State, to determine the State's future population by county. HCD then uses the projections for five to 10 years into the future in its needs assessments, depending on the period the assessment covers.[3] To review the accuracy of Finance's previous population projections and their potential impact on HCD's needs assessment process, we compared the statewide population projections for 2020 that Finance published in 2011 to Census data for 2020. We found that its projections were overestimated by just 2.7 percent. The variables that affect population estimates, such as the number of deaths, births, and migration, are not constant values and are difficult to predict precisely; therefore, we considered Finance's statewide projections reasonable.

We also reviewed the process and data that Finance uses to make its projections and found that it is appropriate. Finance has programmed the software that it uses to make projections to identify and remove illogical results and fix errors in the results. Finance staff members also perform reviews of these projections. Staff members compare the projections to previous projections to ensure that there are no unexpected or dramatic changes. Finance also stated that managers review the results before the department provides the data to HCD.

When we reviewed Finance's county-level projections over several years, we noted that their accuracy varied. The projections Finance made in 2011 for the 2020 population were less accurate in counties with less than 250,000 residents than in counties with

---

[3] HCD's needs assessments we reviewed are for eight to 10 years in the future, ranging from 2029 to 2031.

**EXHIBIT 9**

more than 1 million residents. For example, Finance projected that Colusa County's 2020 population would be nearly 25,000, but the actual population according to the 2020 Census was only about 22,000, a difference of 12 percent. In contrast, Finance projected that Orange County's 2020 population would be 3.2 million, and the actual 2020 population was 3.19 million, a difference of 0.4 percent. However, we reviewed subsequent projections that Finance published in 2013, 2016, and 2019 of 2020 county populations and found, as would be expected, that its 2019 projections were more accurate.

Finance plans to account for 2020 Census results when making its next population projections in 2023. When we asked Finance about the differences that we identified in its projections compared to Census data, it had already begun reviewing those differences in preparation for its next population projections. In fact, it had identified a series of events and changes that may have affected the accuracy of its projections in specific counties. For example, Finance noted that its projection for Mono County was inaccurate due to population reductions resulting from staffing changes at a military facility in that county. Further, it explained that it overestimated international migration into Imperial County, leading to differences between the Census data and its projection. As a result, Finance told us that it plans to make adjustments in its approach for projections as it incorporates 2020 Census data into its next population projections, which it expects to release in early 2023.

> **Finance plans to make adjustments in its approach for projections as it incorporates 2020 Census data into its next population projections.**

### Finance Has Not Adequately Supported Rates It Uses to Develop Household Formation Projections

Finance did not have a rigorous process to support its projections of the number of households in each region, despite the importance of this data in determining a region's housing needs. One of the factors that HCD's needs assessments include are the projections of the number of households that Finance expects in future years in communities across the State. Finance estimates the number of expected households by identifying a household formation rate for different age groups in each county. The household formation rate

**EXHIBIT 9**

represents the likelihood that individuals in particular age groups will have their own households. HCD applies the rate by age group to the population projections to estimate the number of households that will exist in the future in a region. Because local governments will need to plan housing to accommodate these new households, HCD includes this expected new demand in its needs assessment process.

We expected Finance to use household information in the 2010 Census as its basis for projecting household formation rates, as 2010 data forms the basis of its current set of population projections.[4] However, Finance explained that instead it estimated current household formation rates using information from earlier Census data as well as the 2010 Census. Specifically, Finance projects that Californians will be increasingly likely to form their own households in the coming years until household formation rates reach levels seen before 2010. Finance explained that before 2010, more people were willing to live independently than do currently. However, Finance noted the 2010 Census identified a relatively low household formation rate, which may have resulted from cultural, demographic, or economic changes, such as the Great Recession that began in 2007. According to Finance, its household formation rate reflects an assumption that household formation patterns in California will increase over time to pre-2010 levels—those before that recession, when people were more likely to own homes or take on fewer roommates.

> **Finance did not formally study how Californians would form households; rather, its household formation rates were the result of deliberations among members of the advisory committee.**

However, Finance did not formally study how Californians would form households. In partnership with HCD in 2014, it solicited advice from some experts participating on the 2015–2025 Statewide Housing Plan Technical and Research Advisory Committee (advisory committee) to guide its decisions on household formation rates. Finance noted that its household formation rates were the result of deliberations among members of the advisory committee.

---

[4]  Finance expects to receive detailed 2020 Census information by county in August or September 2022. It plans to release new population projections, which will include information that accounts for the effects of the COVID-19 pandemic, in January or February 2023.

**EXHIBIT 9**

**Report 2021-125** | CALIFORNIA STATE AUDITOR

March 2022

This advisory committee is different from the work group mentioned previously that HCD convened in 2010 that discussed vacancy rates. However, our review of available documentation from the advisory committee found that it did not make any conclusions about household formation rates. The advisory committee also did not provide Finance any formal guidance, analysis, or report on household formation rate trends.

In 2015 and 2016, Finance and HCD staff members reached out to several university professors and other experts from the advisory committee to discuss household formation rates. In a series of emails, staff members from Finance and HCD communicated with experts to discuss factors that may affect household formation rates, such as changes in young adult behavior after the Great Recession and slowing immigration and birth rates. This discussion also reflected concerns about relying on 2010 Census data, because the data reflected conditions during a recession. As part of these conversations, HCD and Finance proposed to the experts several different household rate trends, one of which Finance now uses. Although Finance believes its household formation rates are reasonable, these discussions do not constitute a thorough analysis. Given that this rate is an important component of the household projections that Finance used for multiple years, we expected Finance to better support the assertion that it is using the most appropriate rate. For example, Finance could have documented an analysis of historical household formation trends, a review of academic literature, and its consideration of all factors relevant to household formation rates to demonstrate that its household projections are defensible.

> **Slight changes to household formation rates, which directly increase or decrease the number of projected households, can change HCD's needs assessments by thousands of units.**

Needs assessments can change significantly depending on the accuracy of Finance's assumptions. Slight changes to household formation rates, which directly increase or decrease the number of projected households, can change HCD's needs assessments by thousands of units. For example, if HCD's needs assessment for the Santa Barbara Association used household formation rates 1 percent lower, the region's needs assessment would decrease by

**EXHIBIT 9**

17.5 percent, or about 4,350 fewer units of housing.[5] Similarly, if the needs assessment used 1 percent higher household formation rates, the needs assessment would increase by as many units.

Finance plans to reevaluate its household formation rates soon. Finance believes the household formation rates it uses are still reasonable because available Census data generally indicated that it was still a reasonable expectation for household formation rates to increase in the future and that it would make sense to wait to formally reevaluate its assumption after detailed 2020 Census data is available. Finance also explained that its assumption that household formation rates will grow over time helps it to avoid projecting that recession-era economic issues and housing affordability problems will persist and affect household growth indefinitely in the State. However, without a formal comprehensive review of more recent demographic and economic information, Finance cannot adequately assure the public, stakeholders, and HCD that it is providing the most appropriate household formation rates that HCD includes in the critical needs assessment process.

### Recommendations

#### *Finance*

To ensure that the population projections it provides to inform HCD's needs assessments are as accurate as possible, by February 2023 Finance should review its projections for the counties with the most significant projection inaccuracies and adjust its methodology as necessary based on 2020 Census data and other information.

To ensure that the household formation rates that it provides HCD are appropriate, Finance should, by February 2023, conduct a comprehensive review of its assumptions about the household formation rates it uses in projections, and it should document that review.

---

[5]   The Santa Barbara Association's current needs assessment calculates the number of projected households using a set of eight household formation rates for different age groups, ranging from 11 percent for residents 15 through 24 years old to 72 percent for residents who are 85 and older. Finance explained that older residents have a higher household formation rate because they are likely to be financially independent and thus live in their own households.

**EXHIBIT 9**

We conducted this performance audit in accordance with generally accepted government auditing standards and under the authority vested in the California State Auditor by Government Code section 8543 et seq. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on the audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

Date:    March 17, 2022

**EXHIBIT 9**

# Appendix A

## HCD HOUSING NEEDS ASSESSMENTS WE REVIEWED

The chair of the Joint Legislative Audit Committee (Audit Committee) directed the California State Auditor (State Auditor) to conduct an emergency audit to examine HCD's regional housing needs determination process. We reviewed three of HCD's regional housing needs assessments: the Sacramento Council, the Santa Barbara Association, and Amador County. We provide those assessments in tables A.1 through A.3 to give context to the findings in our report. As noted in the Introduction, for counties without a council of governments, HCD also provides allocations of housing needs to the county and cities within it. Table A.4 provides the allocation HCD provided to Amador County and the cities within that county. In contrast, the councils of governments provide allocations of housing needs by income category to their member counties and cities.

HCD did not provide consistent details in the three assessments reviewed, and as a result, there are some differences among the assessments we display below. The time covered by the assessments, and the total housing needs that communities must accommodate, vary. HCD does not complete all assessments at the same time and does not always cover the same period because it aligns the needs assessment process with other planning processes, such as regional transportation planning. The total regional housing needs assessment corresponds to the time period displayed either in the assessment header as in the case of the Sacramento Council, or in the population projection.

**EXHIBIT 9**

**Table A.1**

**HCD Regional Housing Needs Assessment for the Sacramento Council**

| SACRAMENTO COUNCIL: JUNE 30, 2021–AUGUST 31, 2029 (8.2 YEARS) | |
| --- | --- |
| **STEPS TAKEN TO CALCULATE REGIONAL HOUSING NEEDS** | **AMOUNT** |
| **Population:  August 31, 2029 (Finance June 30, 2029, projection adjusted +2 months to August 31, 2029)** | **2,844,860** |
| – Group Quarters Population | – 57,315 |
| **Adjusted Household Population** | **2,787,545** |
| **Projected Households Minus South Lake Tahoe\*** | **1,021,005** |
| + Vacancy Rate Adjustment  (2.23%) | 22,730 |
| + Overcrowding Adjustment  (0.60%) | 6,111 |
| + Replacement Needs Adjustment  (0.50%) | 5,105 |
| – Occupied Units Estimated (June 30, 2021) | – 908,396 |
| + Cost Burden Adjustment | 6,957 |
| **Sixth Cycle Regional Housing Needs Assessment Total** | **153,512 Housing Units** |

Source:  HCD's needs assessment for the Sacramento Council.

\*   South Lake Tahoe is not in the Sacramento Council planning area, but it is included in Finance's population and household projections for El Dorado County. Discussions between HCD, the city of South Lake Tahoe, the Tahoe Regional Planning Agency (TRPA), and the Sacramento Council have resulted in the determination that the households projected by TRPA for the 2021–2029 needs assessment cycle (445 units) should not be included in the needs assessment determined for the Sacramento Council region.

**Table A.2**

**HCD Regional Housing Needs Assessment for the Santa Barbara Association**

| SANTA BARBARA ASSOCIATION: PROJECTION PERIOD (8.6 YEARS) | |
| --- | --- |
| **STEPS TAKEN TO CALCULATE REGIONAL HOUSING NEEDS** | **AMOUNT** |
| **Population:  February 15, 2031 (Finance June 30, 2031, projection adjusted -4.5 months to February 15, 2031)** | **488,190** |
| – Group Quarters Population | – 27,525 |
| **Adjusted Household Population** | **460,665** |
| **Projected Households** | **160,850** |
| + Vacancy Rate Adjustment  (2.51%) | 4,030 |
| + Overcrowding Adjustment  (6.44%) | 10,359 |
| + Replacement Needs Adjustment  (0.50%) | 804 |
| – Occupied Units | – 152,576 |
| + Cost Burden Adjustment | 1,389 |
| **Sixth Cycle Regional Housing Needs Assessment Total** | **24,856 Housing Units** |

Source:  HCD's needs assessment for the Santa Barbara Association.

**EXHIBIT 9**

**Table A.3**
**HCD Regional Housing Needs Assessment for Amador County**

| AMADOR COUNTY: PROJECTION PERIOD (10.9 YEARS) | |
|---|---|
| **STEPS TAKEN TO CALCULATE REGIONAL HOUSING NEEDS** | **AMOUNT** |
| Population:  September 15, 2029 (Finance June 30, 2029, projection adjusted to September 15, 2029) | 40,090 |
| – Group Quarters Population | – 4,405 |
| Adjusted Household Population | 35,685 |
| Projected Households | 15,330 |
| + Vacancy Rate Adjustment  (0.04%) | 6 |
| + Overcrowding Adjustment  (0%) | 0 |
| + Replacement Needs Adjustment  (0.50%) | 68 |
| – Occupied Units | – 14,697 |
| + Cost Burden Adjustment | 34 |
| **Sixth Cycle Regional Housing Needs Assessment Total** | **741 Housing Units** |

Source:  HCD's needs assessment for Amador County.

**Table A.4**
**HCD Distribution of Regional Housing Needs Allocation for Amador County**

| JURISDICTION | REGIONAL HOUSING NEEDS ALLOCATION BY INCOME CATEGORY | | | | |
|---|---|---|---|---|---|
| | **VERY LOW** | **LOW** | **MODERATE** | **ABOVE MODERATE** | **TOTAL** |
| **Amador County Total** | **189** | **123** | **140** | **289** | **741** |
| Amador | 1 | 1 | 1 | 2 | 5 |
| Ione | 30 | 20 | 25 | 42 | 117 |
| Jackson | 27 | 23 | 24 | 64 | 138 |
| Plymouth | 7 | 5 | 5 | 13 | 30 |
| Sutter Creek | 15 | 12 | 13 | 34 | 74 |
| Unincorporated Amador County | 109 | 62 | 72 | 134 | 377 |

Source:  HCD's needs assessment for Amador County.

**EXHIBIT 9**

Blank page inserted for reproduction purposes only.

**EXHIBIT 9**

# Appendix B

## SCOPE AND METHODOLOGY

The Audit Committee directed the State Auditor in October 2021 to conduct an emergency audit to examine the regional housing needs determination process. The audit was approved under Joint Legislative Audit Committee Rule 17. Recognizing that Rule 17's cost limitations prevented us from satisfying all objectives of the emergency audit, we focused our work on the first three objectives contained in the emergency audit request. The table below lists those objectives and the methods we used to address them.

**Audit Objectives and the Methods Used to Address Them**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the audit objectives. | Reviewed relevant laws, rules, regulations, policies, and procedures related to the housing needs assessment process. |
| 2 | Assess Finance's process for developing population projections used by HCD. Determine what changes Finance made to its projections in response to economic and demographic changes caused by the pandemic as well as new Census information. Evaluate historical accuracy of Finance's population projections. | • Reviewed Finance's calculation process for its most recent set of projections and assessed the reasonableness of its process and the information Finance uses to generate its projections.<br>• Assessed Finance's planned modifications to future projections based on COVID-19 impacts and found them to be reasonable. Finance intends to update its projections in January or February 2023 to take into account recent Census data that reflects reduced births and increased deaths due to the pandemic in 2020 and early 2021.<br>• Compared Finance's past population projections to 2020 Census data to assess their accuracy. |
| 3 | Evaluate HCD's process for developing regional housing needs determinations to ascertain whether it complies with state law and results in appropriate calculations. Assess whether HCD properly used vacancy rates for rental markets and for the entire housing market. | • Reviewed the process HCD used to create three needs assessments for the Sacramento Council, the Santa Barbara Association, and Amador County, and determined which factors listed in state law it considered, and whether its consideration was appropriate.<br>• For the same three assessments, which HCD completed after changes to state law in 2018, reviewed each adjustment HCD made in the assessments and determined the relative impact of the adjustments on the overall assessment.<br>• For the three assessments we reviewed, assessed HCD's support for the 5 percent healthy vacancy rate it uses for the overall housing market, including reviewing available historical information and economic research. |

Source:  Audit workpapers.

**EXHIBIT 9**

Blank page inserted for reproduction purposes only.

**EXHIBIT 9**



State of California
# BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY

**Gavin Newsom,** Governor
**Lourdes M. Castro Ramírez,** Secretary

March 4, 2022

Michael S. Tilden*
Acting State Auditor
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

**RE: Agency Response to 2021-125 Regional Housing Needs Assessments: The Department Of Housing And Community Development Must Improve Its Processes To Ensure Communities Can Adequately Plan For Housing**

Dear Mr. Tilden:

Thank you for the opportunity to review and provide comments to the audit pertaining to the Regional Housing Needs Assessment (RHNA) process led by the Department of Housing and Community Development (HCD).

As noted, the state's RHNA process requires consultation with Councils of Governments and intensive data analysis to determine the housing needs for regions. We appreciate that the audit found that HCD follows a sound methodology in administering this responsibility and offers some process improvement recommendations.          ①

Attached you will find a detailed response from HCD summarizing the additional resources and process improvements that are underway including increasing staff and standardizing documentation processes.

The Business, Consumer Services and Housing Agency (Agency) and HCD are committed to maximizing opportunities for all Californians to have a stable, affordable place to call home.

If you have any additional questions for my team at Agency or HCD, please contact us at your convenience.

Sincerely,

Lourdes Castro Ramírez, M.A.
Secretary

**500 Capitol Mall, Suite 1850, Sacramento, California 95814 (916) 653-4090 www.bcsh.ca.gov**

Alcoholic Beverage Control Appeals Board | Department of Alcoholic Beverage Control | California Horse Racing Board | Department of Real Estate
California Housing Finance Agency | Cannabis Control Appeals Panel | Department of Financial Protection and Innovation | Department of Consumer Affairs
Department of Fair Employment & Housing | Department of Housing and Community Development | Department of Cannabis Control
California Interagency Council on Homelessness

---

\*   California State Auditor's comments appear on page 41.

**EXHIBIT 9**



STATE OF CALIFORNIA - BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY          GAVIN NEWSOM, Governor
**DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT**
**OFFICE OF THE DIRECTOR**
2020 W. El Camino Avenue, Suite 500
Sacramento, CA 95833
(916) 263-7400 / FAX (916) 263-7417

March 4, 2022

Michael S. Tilden
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

**RE: Regional Housing Needs Assessment**

Dear Mr. Tilden:

① This is the California Department of Housing and Community Development's (HCD) response to the Regional Housing Needs Assessment (RHNA) audit conducted by the California State Auditor. HCD is pleased to see the audit found no significant problems with the methodology or instances of double counting. The auditor also identified that statutory changes that allow HCD to provide adjustments to the existing and projected regional housing needs have resulted in larger determinations.

Still, the audit found opportunities for process improvements and HCD is committed to implementing those recommendations. HCD has already added more staff to the RHNA team and, in partnership with our internal audit team, continues to improve the quality of our determination process. HCD remains confident in its approach to the 6th Cycle RHNA Determination both from a legal and methodological perspective. HCD is also confident that, in particular following the auditor's review, process and quality control improvements will be beneficial moving forward.

The audit recommendations and HCD's responses are below.

**Recommendation 1 (Quality Control/Quality Assurance):** To ensure that its needs assessments are accurate and do not contain unnecessary errors, by June 2022 HCD should institute a process to ensure its staff perform multiple reviews of data included in its assessments, including data that staff input and councils of governments (COGs) submit.

- Response: HCD agrees with the first recommendation (page 25 of 38) and will complete documenting the process by the proposed deadline. HCD has started to create additional process documents to aid in implementing this recommendation. HCD is committed to more accurately determining the housing need moving forward and values the improved process suggestions.

**Recommendation 2 (Jobs Housing Factor and Units Lost):** To demonstrate that its needs assessments are complete and address all relevant factors, by September 2022

**EXHIBIT 9**



STATE OF CALIFORNIA - BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY          GAVIN NEWSOM, Governor

**DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT**
OFFICE OF THE DIRECTOR
2020 W. El Camino Avenue, Suite 500
Sacramento, CA 95833
(916) 263-7400 / FAX (916) 263-7417

HCD should establish a formal process to document its consideration of all factors required by state law in its needs assessments.

- Response: HCD is committed to continuous process improvement and providing public documentation of the processes we implement. While HCD does consider all factors described in statute, HCD agrees with the second recommendation (page 26 of 38) and has already initiated the creation of additional process documents to aid in implementing this recommendation.[1] HCD will complete the documentation process by the proposed deadline.          ②

**Recommendation 3 (Vacancy Rate):** To ensure that it adequately supports the vacancy rate adjustments it makes to needs assessments, by February 2023 HCD should perform a formal analysis of healthy vacancy rates and historical trends to inform those adjustments.

- Response: As the auditor's report states, the Legislature did not specify what vacancy rate to use for ownership housing. Given that housing units can fluctuate between renter and home ownership, and acceptable rental vacancies could be higher than 5 percent, HCD's 5 percent target rate for total housing stock vacancy is a reasonable application of the statute. However, HCD agrees with the third recommendation (page 26 of 38) and will complete a formal analysis of trends and compile updated research on this topic by the proposed deadline.          ③

**Recommendation 4 (Comparable Region Analysis):** To ensure that it does not reduce its needs assessments based on inappropriate information provided by councils of governments, by June 2022 HCD should develop a formal process to review the appropriateness of councils of governments' proposed comparable regions, including identifying the criteria it will consider when reviewing councils of governments' proposals. HCD should use this formal process and criteria to consistently evaluate the appropriateness of the proposals to ensure that they identify regions with healthy housing markets.

- Response: HCD agrees with the fourth recommendation (page 26 of 38) and, by the proposed deadline, will formalize a technical assistance document outlining the comparable regions process, as well as a list of criteria HCD will use when

---

[1] At the time of this drafting, under confidentiality provisions related to litigation and mediation, HCD is unable to publicly share the details of how it intends to establish a more formal process to document its consideration of all factors in its needs assessments. These confidentiality provisions are anticipated to be lifted contemporaneously with the current publication date of this audit. Should the Auditor require, though HCD does not believe it to be necessary, HCD will supplement this response with the additional information it currently is unable to disclose.

**EXHIBIT 9**



STATE OF CALIFORNIA - BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY          GAVIN NEWSOM, Governor

**DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT**
OFFICE OF THE DIRECTOR
2020 W. El Camino Avenue, Suite 500
Sacramento, CA 95833
(916) 263-7400 / FAX (916) 263-7417

reviewing comparable region proposals. Though HCD can accept or reject data provided by COGs, HCD also recognizes the inherent challenge of COGs identifying regions that meet both the undefined concept of comparable and having a healthy housing market given the extent California's housing crisis.

Sincerely,

**Gustavo F. Velasquez**
Director

**EXHIBIT 9**

# COMMENTS

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY

To provide clarity and perspective, we are commenting on the response to the audit from the Business, Consumer Services and Housing Agency (agency) and HCD. The numbers below correspond to the numbers we have placed in the margin of the response.

The agency and HCD mischaracterize our conclusions. Our report does not state that HCD follows a sound methodology when developing needs assessments. Rather, we identified several problems with HCD's methodology, such as its limited review of staff members' data entries and a lack of adequate consideration of factors required by state law.

① 

As we state on page 14, HCD could not demonstrate it adequately considered two factors required by state law in the needs assessments we reviewed. Specifically, for the jobs/housing balance in the region, it relied on outdated information during its consideration and did not follow up with regions as it intended. For housing lost in emergencies, HCD did not consistently consider this factor across different regions. As a result, HCD understated housing needs in the Santa Barbara Association's needs assessment and potentially reduced the overall reliability of the assessment.

②

HCD asserts that the 5 percent target rate for total housing stock vacancy is a reasonable application of state law. However, as we note on page 19, HCD did not adequately analyze healthy vacancy rates when it began to use this healthy vacancy rate assumption in 2018. We are concerned that HCD has not completed a formal analysis to support its claim that using the same healthy vacancy rate for both rental and owned housing was appropriate.

③

**EXHIBIT 9**

Blank page inserted for reproduction purposes only.

**EXHIBIT 9**



**DEPARTMENT OF FINANCE**

**Gavin Newsom ■ Governor**
1021 O Street, Suite 3110 ■ Sacramento  CA  95814 ■ www.dof.ca.gov

March 4, 2022

Michael Tilden*
California State Auditor (Acting)
621 Capitol Mall, Suite 1200
Sacramento, California 95814

Re: Department of Finance Response to Draft Audit 2021-125

Dear Michael:

The California Department of Finance has received the California State Auditor's (CSA) draft findings concerning the Regional Housing Needs Assessment Process. The below response addresses CSA's findings and recommendations on Finance's household projections.

CSA first recommends that Finance review its population projections for counties after 2020 Census data are made available. As this is a standard practice for any demographer updating population projections after the release of a new decennial Census and the department intends to conduct this review as it always has, we agree with CSA's recommendation.

Finance's household projections rely on projecting trends in household formation from the 1990, 2000, and 2010 Censuses to 2030. They are intended to show what might happen if these trends continue into the future. There are various reasons why patterns of household formation may be different in the future, such as economic changes, the impact of new government policies, as well as imbalances between housing supply and demand. As these are not generally predictable, we periodically reevaluate trends and assumptions, particularly after the release of a new Census; thus, we agree with the Auditor's second recommendation that Finance review assumptions used in projecting household formation rates after the release of the necessary detailed Census 2020 data later this year.

CSA also recommends that Finance document this review. Each decennial Census is an opportunity to reevaluate and reexamine models and assumptions. Much of Finance's analysis and deliberation has traditionally been internal. Finance agrees with the Auditor's recommendation and will explore ways to more fully document existing processes.

Finally, as the audit notes, Finance reasonably limits its reliance on Census 2010 data for its household projections because that census occurred during the unique—and temporary—economic conditions present in the wake of the Great Recession. In consultation with an advisory committee composed of demographers and other experts in academia, government, and the private sector, Finance's process also

①

---

\* California State Auditor's comment appears on page 45.

**EXHIBIT 9**

reflects the long-run trend evident from the 1990 and 2000 Censuses by using the average of 2000 and 2010 Census headship rates as a reasonable proxy for this trend. Furthermore, Finance notes that the methods used for the current DOF household projections are informed by analysis of as much recent American Community Survey (ACS) data as possible to evaluable changes in household formation since the 2010 Census. Comparisons of Finance's earlier projected headship rates and ACS data indicates that the assumptions underlying the projections are reasonable; and that use of Census 2010 based rates exclusively would have resulted in household under-projection.

Thank you for the opportunity to review this draft report. If you have any questions, please contact Walter Schwarm, Chief Demographer.

Sincerely,

Keely Bosler
Director

**EXHIBIT 9**

# COMMENT

### CALIFORNIA STATE AUDITOR'S COMMENT ON THE RESPONSE FROM THE DEPARTMENT OF FINANCE

To provide clarity and perspective, we are commenting on Finance's response to our audit. The number below corresponds to the number we have placed in the margin of the department's response.

Finance overstates our report's conclusions. We did not make a determination that Finance's reduced reliance on 2010 Census data was reasonable. As we indicate on page 27, Finance explained that its household formation rate reflects an assumption that household formation patterns will increase over time to pre-2010 levels, and on page 28 we note that some experts Finance contacted expressed concern that 2010 Census data reflected recession conditions. We further note on that page that Finance asserted to us that its household formation rates are reasonable based on these and other considerations. However, Finance did not provide us a documented analysis to demonstrate that the household formation rates it used in its projections were reasonable.

① 

**EXHIBIT 9**

RESOLUTION NO. 2023-15

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF HUNTINGTON BEACH
CERTIFYING FINAL SUBSEQUENT ENVIRONMENTAL IMPACT REPORT NO. 22-002
FOR THE CITY OF HUNTINGTON BEACH 6TH CYCLE HOUSING ELEMENT UPDATE
(2021-2029), ADOPTING FINDINGS PURSUANT TO THE CALIFORNIA
ENVIRONMENTAL QUALITY ACT, ADOPTING A STATEMENT OF OVERRIDING
CONSIDERATIONS, AND ADOPTING A MITIGATION MONITORING AND REPORTING
PROGRAM

WHEREAS, the City of Huntington Beach ("City") initiated an update to the 6th Cycle
Housing Element Update (2021-2029); and

The City, as Lead Agency has prepared a Final Subsequent Environmental Impact Report
("Final SEIR") for the 6th Cycle Housing Element Update (2021-2029); and

The Final SEIR is a program EIR, as defined by State and local guidelines for the
implementation of the California Environmental Quality Act ("CEQA"); and

The Final SEIR has been prepared to address the environmental effects, mitigation
measures, and project alternatives associated with the 6th Cycle Housing Element Update (2021-
2029) including the implementation programs to accommodating housing sites through rezoning
and housing overlay zones, in accordance with CEQA, the State CEQA Guidelines and City
environmental procedures; and

Written comments on the scope of the Draft SEIR were received from the public and
responsible public agencies during the 30-day review period on the Notice of Preparation from
August 5, 2021 to September 7, 2021.

A Draft SEIR was prepared for the Project between September 2021 and June 2022. In
accordance with the CEQA and the Guidelines, promulgated with respect thereto, the City
analyzed the Project's potential impacts on the environment.

Written comments on the Draft SEIR were received from the public and responsible
public agencies during a 47-day public comment period, from June 29, 2022 through August 15,
2022; and

Such comments and testimony were responded to through Response to Comments
document included in the Final SEIR and said Final SEIR was made available in a manner
prescribed by CEQA and the CEQA Guidelines; and

22-11961/292550

201

**EXHIBIT 10**

RESOLUTION NO. 2023-15

Public Resources Code 21092.5(a) requires that the City provide a written response to any public agency that comment on the EIR, and the Response to Comments included in the Final SEIR satisfies this requirement; and

On November 16, 2022, the Planning Commission recommended that the City Council certify Final SEIR No. 22-002; and

The City Council has independently reviewed all environmental documentation comprising the EIR, including all elements of the Final SEIR, and has found that the EIR considers all environmental effects of the 6th Cycle Housing Element Update (2021-2029), is complete and adequate, and fully complies with all the requirements of CEQA and the CEQA Guidelines; and

Section 15092 of the CEQA Guidelines provides that the City shall not decide to approve or carry out a project for which an EIR was prepared unless it has:

(A) Eliminated or substantially lessened all significant effects on the environment where feasible as shown in the findings under Section 15091 of the CEQA Guidelines; and

(B) Determined that any remaining significant effects found to be unavoidable under Section 15091are acceptable due to overriding concerns as described in Section 15093 of the CEQA Guidelines and as set forth in the attached Statement of Overriding Considerations (Exhibit A); and

Section 15093(a) if the CEQA Guidelines requires that the City balance the benefits of a proposed project against its unavoidable environmental risks in determining whether to approve the project, and the City Council has carefully considered said benefits and risks,

NOW, THEREFORE, the City Council of the City of Huntington Beach does hereby resolve as follows:

1.     That the City Council hereby certifies the Final SEIR as complete and adequate in that it addresses all environmental effects of the 6th Cycle Housing Element Update (2021-2029), and fully complies with the requirements of CEQA and the CEQA Guidelines. The Final SEIR is composed of the following elements:

    a.  Draft SEIR and Technical Appendices; and

    b.  Planning Commission and City Council staff reports; and

    c.  Planning Commission and City Council Minutes; and

    d.  Comments received on the Draft SEIR and responses to those comments; and

2

**EXHIBIT 10**

RESOLUTION NO. 2023-15

    e.   Mitigation Monitoring and Reporting Program; and

    f.   Errata to the Draft SEIR

All of the above information has been and will be on file with the City of Huntington Beach Community Development Department, 2000 Main Street, Huntington Beach, California, 92648 and with the City Clerk.

    2.   That the City Council finds that the Final SEIR has identified all significant environmental effects of the project and that there are no known potential environmental impacts not addressed in the Final SEIR.

    3.   That the City Council finds that the Final SEIR has described all reasonable alternatives to the project that could feasibly attain the basic project objectives (including the "No Project" alternative), even when these alternatives might impede attainment of project objectives and might be more costly.  Further, the City Council finds that a good faith effort was made to incorporate alternatives in the preparation of the Draft SEIR and all reasonable alternatives were considered in the review process of the Final SEIR and ultimate decisions on the project.

    4.   The City Council further finds that the benefits gained by the City and its current and future residents by virtue of implementing the goals and policies of the Housing Element Update and overriding environmental impacts that remain significant and unavoidable despite the imposition of all feasible mitigation, as detailed in Final SEIR No. 22-002 and the Statement of Overriding Considerations attached hereto as Exhibit A, and incorporated by reference as though fully set forth herein.

    5.   That the City Council of the City of Huntington Beach does hereby certify Final SEIR No. 22-002.

3

**EXHIBIT 10**

RESOLUTION NO. 2023-15

PASSED AND ADOPTED by the City Council of the City of Huntington Beach at an adjourned regular meeting held on _____ day of _____, 2023.

_____
Mayor

ATTEST:                                      APPROVED AS TO FORM:

_____            _____
City Clerk                                   City Attorney

REVIEWED AND APPROVED:                       INITIATED AND APPROVED:

_____            _____
City Manager                                 Community Development Director

Exhibit A – Findings of Fact and Statement of Overriding Considerations

4

**EXHIBIT 10**

Resolution No. 2023-15
Exhibit "A"

Subsequent Final
Environmental Impact Report:
Findings of Fact/Statement of Overriding Considerations

SCH #2021080104

# 2021-2029 Housing Element Update

LEAD AGENCY



CITY OF HUNTINGTON BEACH
DEPARTMENT OF COMMUNITY
2000 MAIN STREET 3RD FLOOR
HUNTINGTON BEACH, CA 92648
(714) 536-5721

CONSULTANT



KIMLEY-HORN AND ASSOCIATES, INC.
MS. RITA GARCIA
1100 TOWN AND COUNTRY ROAD, SUITE 700
ORANGE, CA 92868
(714) 786-6116

OCTOBER 2022

**EXHIBIT 10**

## Table of Contents

1.0  **INTRODUCTION** ................................................................................................ 2

2.0  **CEQA FINDINGS** ............................................................................................... 4

3.0  **FINDINGS REGARDING PROJECT ALTERNATIVES** ................................................ 17

    3.1.  Introduction ............................................................................................... 17

    3.2.  Project Objectives ....................................................................................... 17

    3.3.  Selection of Alternatives ............................................................................. 18

    3.4.  Project Alternative Findings ........................................................................ 18

4.0  **STATEMENT OF OVERRIDING CONSIDERATIONS** ............................................... 25

    4.1.  Introduction ............................................................................................... 25

    4.2.  Significant Adverse Cumulative Impact ....................................................... 25

    4.3.  Findings ..................................................................................................... 26

    4.4.  Overriding Considerations .......................................................................... 26

**List of Tables**

Table 1: CEQA Findings for the HEU.................................................................................5

**EXHIBIT 10**

# 1.0   INTRODUCTION

This document presents the Findings of Fact and Statement of Overriding Considerations that must be adopted by the City of Huntington Beach (City) pursuant to the requirements of Sections 15091 and 15093, respectively, of the CEQA Guidelines prior to the approval of the City of of Huntington Beach 2021-2029 Housing Element Update (otherwise referred to as "HEU" or the "Project").

This document is organized as follows:

**Chapter 1**   Introduction to the Findings of Fact and Statement of Overriding Considerations.

**Chapter 2**   CEQA Findings of the Draft Subsequent Environmental Impact Report (Draft SEIR), including the identified significant cumulative impacts.

**Chapter 3**   Summarizes the alternatives to the Project and evaluates them in relation to the findings contained in Section 15091(a)(3) of the CEQA Guidelines. The City must consider and make findings regarding alternatives when a project would involve environmental impacts that cannot be reduced to a less than significant level, or cannot be substantially reduced, by proposed mitigation measures.

**Chapter 4**   Statement of Overriding Considerations, as required by Section 15093 of the CEQA Guidelines, for significant impacts of a proposed project that cannot be mitigated to a less than significant level.

The Housing Element, which is a component of the Huntington Beach General Plan, provides direction for implementation of various programs to meet existing and projected future housing needs for all income levels within Huntington Beach. The City's projected housing need for the 6th Cycle Regional Housing Needs Assessment (RHNA) planning period (2021-2029) is 13,368 dwelling units (11,743 units when accounting for existing applications and projects that are currently under review).

State housing law requires the City to specify the number of housing units that can realistically be accommodated on candidate housing sites. The City is not required to build dwelling units in order to meet its RHNA allocation, only to identify potential sites and create the framework to allow the market the opportunity to develop these units. Therefore, the Project, as defined for CEQA purposes, consists of the Housing Program to accommodate the lower-income RHNA units, including amendments to existing land use designations and zoning districts, an affordable housing overlay, and identification of underutilized, residentially-zoned parcels in an inventory of 378 candidate housing sites.

The Housing Program specifically addressed in the SEIR includes amendments to the Huntington Beach Zoning and Subdivision Ordinance (HBZSO) (Zoning Map Amendment Nos. 22-001 and 22-002 and Zoning Text Amendment Nos. 22-006, 22-007, 22-008, and 22-009) and the Huntington Beach General Plan Land Use Element (General Plan Amendment No. 22-001) for changes to base/overlay districts and land use

**EXHIBIT 10**

designations, as well amendments to other planning documents, as needed for clarification and consistency purposes and to accommodate future housing sites as part of the HEU's Implementation Program. These amendments provide capacity for future development of approximately 19,738 housing units to meet the City's remaining unmet RHNA of 11,743 housing units.

Other Federal, State, and local agencies are involved in the review and approval of the HEU, including those agencies designated as trustee and responsible agencies. A trustee agency is a State agency that has jurisdiction by law over natural resources affected by a project that are held in trust for the people of the State. A responsible agency is an agency, other than the lead agency, that has responsibility for carrying out or approving a project. Responsible and trustee agencies are consulted by the CEQA lead agency to ensure the opportunity for input and also review and comment on the Draft SEIR. Responsible agencies also use the CEQA document in their decision-making. Several agencies other than the City may require permits, approvals, and/or consultation to implement various HEU programs.

Responsible/Trustee Agencies for the HEU include, but are not limited to:

- South Coast Air Quality Management District (SCAQMD);
- Santa Ana Regional Water Quality Control Board (RWQCB); and
- State Department of Housing and Community Development (HCD).

Other agencies may use the Final SEIR in exercising their duties even if they do not have discretionary permit approval authority over all or parts of the HEU (or implementation of individual projects developed as a result of the HEU). All projects that are proposed in the future under the HEU will be required to obtain all necessary discretionary actions and environmental clearance, separate from this HEU.

EXHIBIT 10

## 2.0   CEQA FINDINGS

This chapter summarizes the potential impacts that were identified in the Draft Subsequent EIR (Draft SEIR) and the findings that are required in accordance with Section 15091 of the CEQA Guidelines. The possible findings for each significant and/or potentially significant adverse impact are as follows:

(a) Changes or alterations have been required in, or incorporated into the project which avoid, substantially lessen, or reduce the magnitude of the significant environmental effect as identified in the Draft SEIR ("**Finding 1**").

(b) Such changes or alterations are within the responsibility and jurisdiction of another public agency and not the agency making the findings. Such changes have been adopted by such other agency or can and should be adopted by such other agency. ("**Finding 2**")

(c) Specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives in the Draft SEIR ("**Finding 3**").

CEQA requires that the lead agency adopt mitigation measures or project alternatives, where feasible, to avoid or substantially reduce significant environmental impacts that would otherwise occur as a result of a project. Project modifications or alternatives are not required where they are infeasible or where the responsibility for modifying a project lies with another agency (CEQA Guidelines §15091, subd. (a), [3]). Public Resources Code Section 21061.1 defines "feasible" to mean "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social and technological factors." CEQA Guidelines Section 15364 adds: "legal" considerations. (See also Citizens of Goleta Valley v. Board of Supervisors [Goleta II] [1990] 52 Cal.3d 553, 565 [276 Cal. Rptr. 410].)

Only after fully complying with the findings requirement can an agency adopt a Statement of Overriding Considerations. (Citizens for Quality Growth v. City of Mount Shasta [1988] 198 Cal.App.3d 433, 442, 445 [243 Cal. Rptr. 727].) CEQA requires the Lead Agency to state in writing the specific rationale to support its actions based on a Final EIR and/or information in the record. This written statement is known as the Statement of Overriding Considerations. The Statement of Overriding Considerations provides the information that demonstrates the decision making body of the Lead Agency has weighed the benefits of a project against its unavoidable adverse effects in determining whether to approve a project. If the benefits of a project outweigh the unavoidable adverse environmental effects, the adverse effects may be considered "acceptable."

This document presents the findings of the City as required by CEQA, cites substantial evidence in the record in support of each of the findings, and presents an explanation to supply the logical step between the finding and the facts in the record. (CEQA Guidelines §15091.). Additional facts that support the findings are set forth in the Draft SEIR, the Final SEIR, staff reports to the Planning Commission and City Council, and the record of proceedings.

Table 1 summarizes the potentially significant impacts that were reduced to less than significant levels with mitigation as well as the significant impacts, as proposed for certification and adoption of the HEU.

**EXHIBIT 10**

City of Huntington Beach
2021-2029 HEU Implementation Program

Final Subsequent Environmental Impact Report
Findings of Fact/Statement of Overriding Considerations

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| **Air Quality** | | |
| The project would result in a project-specific significant and unavoidable air quality impacts associated with a cumulatively considerable net increase of criteria pollutants for which the region is in nonattainment. | Air pollutant emissions associated with implementation of the HEU would result from construction activities and operation of uses allowed under the HEU. The amount of emissions generated by future development projects would vary depending on its size, the land area that would need to be disturbed during construction, the length of the construction schedule, and the number of developments being constructed concurrently. Due to the speculative nature of estimating emissions from individual projects at the programmatic level of the HEU, emissions cannot be quantified (as there is no project-level data) to establish whether the South Coast Air Quality Management District (SCAQMD) thresholds would be exceeded. Despite compliance with applicable General Plan goals and policies and incorporation of mitigation measures GPU PEIR MM 4.2-1 through MM 4.2-14, the HEU would result in a significant and unavoidable air quality impact due to the violation of an air quality standard and exposure of sensitive receptors to substantial pollutant concentrations. | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, emissions associated with the HEU could result in an exceedance of established thresholds for daily emissions due to the speculative nature of future projects. No mitigation measures in addition to GPU PEIR MM 4.2-1 through MM 4.2-14 are feasible to reduce construction or operational air quality impacts to a less than significant level. |
| The project would result in less than significant impacts related to the exposure of sensitive receptors to substantial pollutant concentrations following incorporation of mitigation measures MM AQ-1 and AQ-2. | As previously stated, air pollutant emissions associated with implementation of the HEU would result from construction activities and operation of uses allowed under the HEU. The amount of emissions generated by future development projects would vary depending on its size, the land area that would need to be disturbed during construction, the length of the construction schedule, and the number of developments being constructed concurrently. Future applicants for development projects facilitated by the HEU would be required to implement mitigation measures MM AQ-1 and AQ-2, which would require project-specific health risk assessments to minimize impacts associated with | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation mitigation measures MM AQ-1 and AQ-2. |

**EXHIBIT 10**

City of Huntington Beach
2021-2029 HEU Implementation Program

Final Subsequent Environmental Impact Report
Findings of Fact/Statement of Overriding Considerations

**Table 1:   CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| | the exposure of sensitive receptors to toxic air contaminants and to ensure that construction emissions do not result in the exceedance of localized significance thresholds. With implementation of these measures, impacts would be reduced to a less than significant level. | |
| The project would result in a cumulative contribution to an air quality impact, resulting in a significant and unavoidable cumulative impact to air quality. | Cumulative development could violate an air quality standard or contribute to an existing or projected air quality violation because the South Coast Air Basin (SCAB) is currently in nonattainment for ozone, $PM_{10}$, and $PM_{2.5}$. Concerning daily emissions and the cumulative net increase of any criteria pollutant for which the region is in nonattainment, the Project would result in a cumulatively considerable increase to nonattainment of ozone, $PM_{2.5}$, and $PM_{10}$ standards in the SCAB. Because no information on individual projects is currently available, cumulative construction and operational emissions cannot be accurately quantified. Despite compliance with General Plan goals and policies and implementation of mitigation measures GPU PEIR MM 4.2-1 through MM 4.2-14, daily construction and operational air quality emissions would be considered cumulatively significant and unavoidable. | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, implementation of the HEU could result significant unavoidable impacts related to a cumulative increase in construction and operational emissions due to the speculative nature of future projects. No mitigation measures in addition to GPU PEIR MM 4.2-1 through MM 4.2-14 are feasible to reduce cumulative air quality impacts to a less than significant level. |
| **Cultural Resources** | | |
| Construction activities associated with implementation of the Project could cause a substantial adverse change in the significance of a historical and/or an, archaeological resource and may result in the disturbance of unknown human remains. With incorporation of mitigation measures GPU PEIR MM 4.4-1, MM 4.4-2, and MM 4.4-3, these | It is currently infeasible to determine whether future development under the Project would result in demolition or removal of historical or archaeological resources, or the disturbance of unknown human remains, within the planning area. However, future projects would be required to implement mitigation measures GPU PEIR MM 4.4-1, MM 4.4-2, and MM 4.4-3, which outline procedures to be followed during future construction activities to ensure compliance with local, State, and Federal regulations pertaining to | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation mitigation measures GPU PEIR MM 4.4-1, MM 4.4-2, and MM 4.4-3. |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| impacts would be reduced to a less than significant level. | such requires. Implementation of these measures would ensure that Project impacts with respect to archaeological and historical resources, as well as unknown human remains, would be less than significant. | |
| **Geology and Soils** | | |
| Future development under the HEU could expose people and/or structures to potentially substantial adverse effects, including the risk of loss, injury, or death, involving fault rupture, expansive soils, strong seismic groundshaking and/or seismic-related ground failure, including liquefaction. Future development under the HEU also has the potential to disturb unknown paleontological resources. With implementation of mitigation measures GPU PEIR 4.5-1 through MM 4.5-3 and MM 4.4-4, as well as compliance with applicable State and City regulations, these impacts would be reduced to a less than significant level. | All future housing development subject to rezoning and within overlay zones would be required to comply with applicable General Plan goals and policies related to geology and soils and would also be required to implement mitigation measures GPU PEIR 4.5-1 through MM 4.5-3, which require that relevant geotechnical studies be undertaken prior to issuance of grading and construction permits. Future development projects would also be required to implement mitigation measures GPU MM 4.4-2 through 4.2-4, which require site-specific studies and compliance with existing regulations to minimize impacts to unknown paleontological resources. Implementation of these measures and compliance with General Plan goals and policies would reduce impacts associated with the exposure of people to significant risk of geological failures, as well as impacts to unknown paleontological resources, to a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation mitigation measures GPU PEIR 4.5-1 through MM 4.5-3 and MM 4.4-4. |
| **Greenhouse Gas Emissions** | | |
| The project would result in project-level and cumulative significant and unavoidable impacts due to the generation of greenhouse gas (GHG) emissions and the potential conflict with an applicable plan. | The Project would potentially generate GHG emissions that could have a significant impact on the environment and could conflict with applicable plans for reducing GHG emissions. Although the Project would aim to comply with GHG reduction strategies outlined in the GPU PEIR, these strategies require additional action by City staff and officials, and the feasibility of implementing these strategies and specific implementation details rely on numerous factors that cannot be adequately forecasted at this time. | **Finding 3.** The City of Huntington Beach finds that even with implementation of all GHG reduction measures and compliance with applicable General Plan goals and policies, GHG emissions associated with the HEU could would be significant and unavoidable. No feasible mitigation measures are available to reduce GHG impacts to a less than significant level. |

**EXHIBIT 10**

City of Huntington Beach
2021-2029 HEU Implementation Program

Final Subsequent Environmental Impact Report
Findings of Fact/Statement of Overriding Considerations

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
|  | Furthermore, GHG emissions may differ from actual Project future emissions due to various factors. As such, the Project's potential to generate GHG emissions, either directly or indirectly, and potential to conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the GHG emissions would be significant and unavoidable. Although both future housing development facilitated by the Project and cumulative projects are required to quantify project-specific GHG emissions associated with construction and operational activities and implement feasible mitigation measures and/or GHG reduction strategies to reduce GHG emissions, the contribution of daily construction and operational GHG emissions has the potential to create a significant impact. Thus, the Project's GHG impacts would be cumulatively significant and unavoidable. |  |
| **Hazards** |  |  |
| Implementation of future projects under the HEU could create a potential significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment. However, with implementation of mitigation measure GPU PEIR MM 4.7-1, this impact would be reduced to a less than significant level. | Future housing development facilitated by the Project would not involve ongoing or routine use of substantial quantities of hazardous materials during operations. All future housing development subject to rezoning and within overlay zones would be subject to compliance with General Plan policies aimed at reducing impacts from hazardous materials. All future housing development subject to rezoning and within overlay zones would also be subject to compliance with GPU PEIR MM 4.7-1, which requires compliance with with Huntington Beach Fire Department specifications related to the potential to encounter methane gas. Compliance with City regulations, General Plan policies, and implementation of mitigation measure GPU PEIR MM 4.7-1 would ensure Project impacts would remain less than significant. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure GPU PEIR MM 4.7-1. |

**EXHIBIT 10**

**Table 1:   CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| Individual sites within the planning area are included on a list of hazardous materials sites that could result in the accidental spread of contamination and could create a significant hazard to the public or environment. However, with implementation of mitigation measures GPU PEIR MM 4.7-2 and 4.7-3, this impact would be reduced to a less than significant level. | Development of any identified sites of contamination would be required to undergo remediation and clean up before construction activities can begin. If contamination at any future project site were to exceed regulatory action levels, a future project would be required to undertake remediation procedures prior to grading and development under the supervision of appropriate regulatory oversight agencies. Compliance with City standards and implementation of mitigation measures GPU PEIR MM 4.7-2 and MM 4.7-3, which require preparation of a preliminary environmental site assessment to determine the potential for onsite contamination, would ensure that the Project would not create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment, resulting in a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measures GPU PEIR MM 4.7-2 and MM 4.7-3. |
| Implementation of the HEU could impair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan. However, with implementation of mitigation measure GPU PEIR MM 4.7-4, this impact is considered less than significant. | Future development facilitated by the Project would increase housing density in certain areas of the City, resulting in greater population concentrations within certain areas. This increased density could interfere with emergency evacuation in the event of a City-wide emergency. However, the Project would not result in changes to the City's existing circulation network. No land uses are proposed that would impair the implementation of, or physically conflict with, the Huntington Beach Emergency Operations Plan/Hazard Mitigation Plan. As a result, the Project would not conflict with any State or local plan aimed at preserving and maintaining adopted emergency response or emergency evacuation plans. Notwithstanding, to minimize all potential impacts, all future housing development subject to rezoning and within overlay zones would be required to adhere to GPU PEIR MM | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure GPU PEIR MM 4.7-4. |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| | 4.7-4, which requires future housing developments to consult with the City of Huntington Beach Police or Fire Departments to disclose temporary lane or roadway closures and alternative travel routes during construction, to ensure that there are no conflicts with emergency response and evacuation plans, thereby resulting in a less than significant impact. | |
| **Hydrology and Water Quality** | | |
| Future development under the HEU could result in violations of water quality standard or waste discharge that could degrade surface or groundwater quality and could conflict with a water quality control plan. Implementation of mitigation measure GPU PEIR MM 4.8-1 would reduce this impact to a less than significant level. | It is anticipated that construction activities for future housing development facilitated by the Project would include excavation, grading, and trenching, which could displace soils and temporarily increase the potential for soils to be subject to wind and water erosion. Therefore, construction activities from future housing development could violate water quality standards or otherwise degrade water quality. However, construction activities that could affect water quality would be addressed through compliance with the National Pollutant Discharge Elimination System (NPDES) program's Construction General Permit. Future housing development would also be subject to mitigation measure GPU PEIR MM 4.8-1, which requires new development projects to prepare project-specific Water Quality Management Plans. Compliance with this measure would reduce potential impacts associated with water quality violations and conflicts with a water quality control plan to a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure GPU PEIR MM 4.8-1. |
| Future development under the HEU could result in substantial groundwater dewatering and could deplete groundwater supplies, which in turn could result in conflicts with water quality control plans and/or sustainable groundwater management plans. | As discussed under Utilities and Service systems, there may not be sufficient water supplies available to serve the Project. Therefore, Project-related water demands from future development would result in a significant and unavoidable impact concerning water supplies. For this reason, the Project could substantially decrease groundwater supplies resulting in a significant and | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, implementation of the HEU could result in significant and unavoidable impacts concerning groundwater supplies and the sustainable management of the groundwater Basin. No mitigation measures in |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| Despite implementation of mitigation measure GPU PEIR MM 4.8-2 Project-level and cumulative impacts would be significant and unavoidable. | unavoidable impact concerning sustainable management of the Basin. Although future housing projects would be required to comply with City, state and federal goals and policies requiring water conservation, mitigation measure GPU PEIR MM 4.8-2 would also be required to ensure that applicants of future developments prepare a groundwater hydrology study to ensure that dewatering activities do not interfere with groundwater supplies. Despite compliance with this measure and until water supply improves, both Project-level and cumulative water demands would result in a significant unavoidable impact concerning groundwater supplies. | addition to GPU PEIR MM 4.8-2 are feasible to reduce Project-level or cumulative impacts to a less than significant level. |
| Future development under the HEU could increase stormwater runoff, exceed the capacity of existing or planned stormwater drainage systems, and cause on- or off-site flooding. With implementation of mitigation measure GPU PEIR MM 4.8-3, this impact is considered less than significant. | Development under the HEU could result in an increase in the amount of impervious surfaces compared to existing conditions, thereby increasing stormwater runoff. Incorporation of mitigation measure GPU PEIR MM 4.8-3, which requires each future, project-level development application to demonstrate adequate capacity in the storm drain system and provide for mitigation of constraints, would reduce this impact to a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure GPU PEIR MM 4.8-3. |
| **Noise** | | |
| The Project would result in an increase in ambient noise levels during construction of future housing developments and would also result in an increase in ambient noise levels during operation due to an increase in vehicle trips during operation that would result in a Project-specific significant and unavoidable impact despite implementation of mitigation measures GPU PEIR MM 4.10-1 through 4.10-4. | Construction activities associated with future individual developments could occur near noise-sensitive receptors and noise disturbances could occur for prolonged periods of time, thereby resulting in potential construction noise impacts. In addition, future housing developments facilitated by the Project have the potential to introduce and increase new roadway noise, thereby increasing ambient noise levels. As such, future projects would be required to comply with mitigation measures GPU PEIR 4.10-1 through 4.10-4, which include construction-level and operational noise reduction measures to reduce | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, the Project could result in a significant and unavoidable impact due to an increase in the ambient noise levels. No mitigation measures in addition to mitigation measures GPU PEIR MM 4.10-1 through MM 4.10-4 are feasible to reduce impacts to a less than significant level. |

**EXHIBIT 10**

City of Huntington Beach
2021-2029 HEU Implementation Program

Final Subsequent Environmental Impact Report
Findings of Fact/Statement of Overriding Considerations

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| | ambient noise levels associated with the Project. Despite compliance with General Plan goals and policies aimed at reducing noise and implementation of mitigation measures GPU PEIR 4.10-1 through 4.10-4, the Project would result in significant and unavoidable impacts concerning construction-related and operational noise levels. The Project's impact concerning the substantial temporary and permanent increase of ambient noise levels would be cumulatively considerable. | |
| The Project would result in a Project-specific significant and unavoidable impact due to the exposure of persons to excessive groundborne vibration during future construction activities despite implementation of mitigation measure GPU PEIR MM 4.10-5. | Future development under HEU has the potential to generate construction vibration levels in exceedance of established thresholds at nearby sensitive receptors. Although future development would comply with General Plan policies to reduce groundborne vibration, mitigation measure GPU PEIR MM 4.10-5, which requires new development projects that include pile driving activities to incorporate vibration-reduction techniques to help to reduce impacts, construction vibration levels would not be reduced to a level that would be less than significant. Compliance with General Plan policies and implementation of mitigation measure GPU PEIR MM 4.10-5 would reduce potential groundborne vibration impacts associated with future construction activities, but not to a level that would be less than significant because certain construction activities may still be required in proximity to nearby sensitive receptors. Therefore, this impact would remain significant and unavoidable and would remain cumulatively significant and unavoidable despite implementation of mitigation. | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, the Project could result in a significant and unavoidable impact due exposure of persons to the generation of groundborne vibration during construction. No mitigation measures in addition to mitigation measure GPU PEIR MM 4.10-5 are feasible to reduce impacts to a less than significant level. |
| **Public Services** | | |
| Future development under the HEU would increase the demand on public services including fire, police, schools, | Future development under the HEU would increase the demand on public services including fire, police, schools, parks/recreational facilities, and libraries. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| parks/recreational facilities, and libraries. However, with incorporation of mitigation measures GPU PEIR MM 4.12-1 through MM 4.12-7, impacts to these public services would be reduced to a less than significant level | However, with incorporation of mitigation measures GPU PEIR MM 4.12-1 through MM 4.12-7, which require future projects to pay applicable development impact fees related to each of these serves, impacts to these public services would be reduced to a less than significant level. | are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measures GPU PEIR MM 4.12-1 through MM 4.12-7. |
| **Recreation** | | |
| Future development under the HEU would increase the demand for and on parks and recreational services. However, with incorporation of mitigation measures GPU PEIR MM 4.13-1 and MM 4.13-2, impacts related to parks and recreational facilities would be reduced to a less than significant level | Future development under the HEU would increase the demand on recreational services. However, with incorporation of mitigation measures GPU PEIR MM 4.13-1 and MM 4.13-2, which require compliance with City parkland requirements and payment of park fees, impacts to parks and recreational facilities would be reduced to a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measures GPU PEIR MM 4.13-1 and MM 4.13-2. |
| **Transportation** | | |
| Future development under the HEU would increase the number of vehicular trips in the Project area, which could conflict with City goals and policies aimed at maintaining specific performance thresholds addressing circulation in the City. However, with incorporation of mitigation measures GPU PEIR MM 4.13-1 through MM 4.13-3, impacts to the circulation system would be reduced to a less than significant level | Future development under the HEU could potentially worsen levels of service (LOS) for various intersections in the City, which could conflict with the City's policy to maintain specified performance standards for citywide LOS at traffic-signal-controlled intersections during peak hours. Therefore, all future housing facilitated by the HEU would be required to comply with General Plan goals and policies pertaining to LOS and would be subject to compliance with mitigation measures GPU PEIR MM 4.14.1 through 4.14-3, which require future projects near specified intersections to make fair share contributions toward specified improvements. Compliance with these goals and policies and implementation of mitigation measures GPU PEIR MM 4.14.1 through 4.14-3 would ensure that impacts related to the City's circulation system would be reduced to a less than significant level. | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measures MM 4.13-1 through MM 4.13-3. |
| Future development under the HEU would increase the number of vehicular | A total of 325 candidate housing sites would not require preparation of a VMT analysis based on Small Project | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which |

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| trips in the Project area, which would generate additional vehicle miles travelled (VMT) that could result in conflicts with State guidelines pertaining to VMT. However, with incorporation of mitigation measure MM TRANS-1, impacts would be reduced to a less than significant level | screening (<110 daily trips), low VMT area screening; or proximity to transit screening. A total of 53 candidate housing sites would not be screened out, thereby requiring additional VMT analysis at the time of development application. Candidate housing sites that identify significant VMT impacts would require feasible mitigation measures to reduce the project's VMT impacts. Consequently, future housing development on these 53 sites would be required to reduce their average home-based VMT through compliance with applicable General Plan goals and policies and implementation of mitigation measure MM TRANS-1, which identifies feasible mitigation strategies that could help projects avoid or substantially reduce VMT-related impacts to a less than significant level. Furthermore, future housing development would be subject to all State and local requirements for minimizing VMT-related impacts. Therefore, future housing developments on the 53 candidate housing sites that were not screened out are presumed to result in a less than significant with mitigation incorporated. | would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure MM Trans-1. |
| **Tribal Cultural Resources** | | |
| Construction activities associated with implementation of the HEU could cause a substantial adverse change in the significance of tribal remains on a Project-level basis. With incorporation of mitigation measures GPU PEIR MM 4.4-2 and MM 4.4-3, these impacts would be reduced to a less than significant level. | It is currently infeasible to determine whether future development under the Project would result in the disturbance of tribal cultural resources within the planning area. However, future projects would be required to implement mitigation measures GPU PEIR MM 4.4-2 and MM 4.4-3, which require project applicants to retain a qualified professional and/or Native American monitors to determine if the project could result in impacts to tribal cultural resources and also require the halting of all earth-disturbing activities within 100-feet of a known discovery while data recovery and other methods are implemented. Implementation of these measures would ensure that | **Finding 1.** The City of Huntington Beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measures GPU PEIR MM 4.4-2 and MM 4.4-3. |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| | Project impacts with respect to tribal cultural resources would be less than significant. | |
| **Utilities and Service Systems** | | |
| Future development under HEU could require new or expanded water, wastewater treatment or storm water drainage, electric power, natural gas, or telecommunication facilities. However, with implementation of mitigation measure GPU PEIR MM 4.15-1, this impact would be considered less than significant. | Future development under the HEU could introduce the need for additional infrastructure or connections to existing infrastructure. With incorporation of mitigation measure GPU PEIR MM 4.15-1, which requires future projects to demonstrate that there is adequate capacity in the wastewater collection system to accommodate discharges from future projects, and adherence to General Plan policies and existing City of Huntington Beach processes, impacts to water, wastewater treatment or storm water drainage, electric power, natural gas, or telecommunication facilities would be reduced to a less than significant level. | **Finding 1.** The City of Huntington beach finds that the identified changes or alterations in the Project, which would reduce this impact to a less than significant level, are hereby incorporated into the Project. No additional mitigation measures are necessary with implementation of mitigation measure GPU PEIR MM 4.15-1. |
| The Project would result in a significant and unavoidable project-specific impact on existing water supplies despite implementation of mitigation measure GPU PEIR MM 4.15-2. | Given the uncertainty of water supplies across the western United States and throughout the state of California, a future supply deficit would result in a significant and unavoidable impact associated with water demands from future development facilitated by the proposed Project. Until such time as greater confidence in and commitment from water suppliers can be made, even with implementation of mitigation measure MM 4.15-2, which requires project-specific applicants to incorporate water conservation measures as part of future projects, and adherence to General Plan policies and existing regulations, the HEU would result in a significant and unavoidable impact related to water supplies. | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, the Project could result in a significant and unavoidable impact to water supplies. No mitigation measures in addition to GPU PEIR MM 4.15-2 are feasible to reduce water supply impacts to a less than significant level. |
| The Project would result in a cumulatively considerable contribution to water demand and a corresponding significant and unavoidable cumulative impact with respect to water supply. | As with the Project-specific impact, given the uncertainty of water supply across the western United States and throughout the state of California, a future supply deficit would result in a significant and unavoidable impact. Until such time as greater | **Finding 3.** The City of Huntington Beach finds that even with implementation of all feasible mitigation measures and compliance with applicable General Plan goals and policies, the Project could result in a significant and unavoidable impact to water supplies. No mitigation |

**EXHIBIT 10**

**Table 1:    CEQA Findings for the HEU**

| Impact Statement | Impact Summary | Impact Finding |
|---|---|---|
| | confidence in and commitment from water suppliers can be made, even with implementation of mitigation measure GPU PEIR MM 4.15-2, the Project would result in a cumulatively considerable contribution to water supplies, resulting in a significant and unavoidable cumulative impact. | measures in addition to MM 4.15-2 are feasible to reduce cumulative water supply impacts to a less than significant level. |

**EXHIBIT 10**

# 3.0   FINDINGS REGARDING PROJECT ALTERNATIVES

## 3.1.   Introduction

The Draft SEIR prepared for the HEU considered two alternatives to the Project as proposed. Pursuant to Section 15126.6(a) of the CEQA Guidelines, the primary intent of an alternatives evaluation is to "describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives."

This chapter describes the project objectives and criteria used to develop and evaluate project alternatives presented in the Draft SEIR. A description of the alternatives compared to the Project and the findings regarding the feasibility of adopting the described alternatives is presented for use by the City in the decision-making process.

## 3.2.   Project Objectives

In accordance with State CEQA Guidelines §15124, the following primary objectives support the HEU's purpose, assist the City, as the lead agency, in developing a reasonable range of alternatives to be evaluated in this SEIR, and ultimately aid decision-makers in preparing findings and overriding considerations, if necessary. The HEU's purpose is to address the housing needs and objectives of the City and to meet the State Housing law requirements. The HEU has the following goals:

- Adopt State-mandated and locally desired programs to implement the City's Housing Element.
- Maintain and enhance the quality and affordability of existing housing in Huntington Beach.
- Provide adequate sites to accommodate projected housing unit needs at all income levels identified by the 2021-2029 RHNA.
- Provide for safe and decent housing for all economic segments of the community.
- Reduce governmental constraints to housing production, with an emphasis on improving processes for projects that provide on-site affordable units.
- Promote equal housing opportunities for all residents, including Huntington Beach's special needs populations.
- Promote a healthy and sustainable Huntington Beach through support of housing at all income levels that minimizes reliance on natural resources and automobile use.
- Maximize solutions for those experiencing or at risk of homelessness.
- Improve quality of life and promote placemaking.
- Affirmatively further fair housing.

**EXHIBIT 10**

## 3.3.   Selection of Alternatives

The range of feasible alternatives was selected and discussed in a manner to foster meaningful public participation and informed decision-making. Among the factors that were taken into account when considering the feasibility of alternatives (as described in CEQA Guidelines Section 15126.6[f][1]) were environmental impacts, economic viability, availability of infrastructure, regulatory limitations, jurisdictional boundaries, and attainment of project objectives. As stated in Section 15126.6(a) of the CEQA Guidelines, the Draft SEIR need not consider an alternative whose effects could not be reasonably identified, whose implementation is remote or speculative, or one that would not achieve the basic project objectives. The analysis includes sufficient information about each alternative to provide meaningful evaluation, analysis and comparison with the proposed project.

## 3.4.   Project Alternative Findings

The following is a description of the alternatives evaluated in comparison to Project, as well as a description of the specific economic, social, or other considerations that make them infeasible for avoiding or lessening the impacts.

As shown below and in Chapter 7.0 (Alternatives) of the Draft SEIR, two alternatives were evaluated in comparison to the Project, including the No Project Alternative required by CEQA. The two alternatives analyzed represent a reasonable range of alternatives to the Project. The analysis in this section focuses on significant and unavoidable impacts attributable to each alternative and the ability of each alternative to meet basic project objectives.

### "No Project" Alternative (Alternative 1)

According to State CEQA Guidelines §15126.6(e), the specific alternative of "No Project" shall also be evaluated along with its impact. The purpose of describing and analyzing a No Project Alternative is to allow decision-makers to compare the impacts of approving the proposed Project with impacts of not approving the Project. The No Project Alternative analysis is required to discuss the existing conditions at the time the Notice of Preparation is published (August 4, 2021), as well as what would be reasonably expected to occur in the foreseeable future, if the Project were not approved, based on current plans and consistent with available infrastructure and community services.

Under Alternative 1, development within the City would proceed pursuant to the adopted City General Plan and zoning. The City's projected regional housing need for the 6th Cycle RHNA planning period (2021-2029) is 13,368 dwelling units (11,743 units when accounting for existing applications and pipeline projects). Under Alternative 1, the City would not implement the Housing Program required to comply with State law, to accommodate the lower-income RHNA units, including amendments to existing land use designations and zoning districts, an affordable housing overlay, and identification of underutilized, residentially-zoned parcels in an inventory of candidate housing sites. In total, the HEU identifies 378 candidate housing sites (approximately 419 acres). The proposed amendments to the Huntington Beach

**EXHIBIT 10**

General Plan and the City of Huntington Beach Zoning and Subdivision Ordinance of the City of Huntington Beach Municipal Code (Zoning Text and Zoning Map amendments) for changes to land use designations and base/overlay districts, as well as ancillary amendments to other planning documents, would not be implemented. These amendments, which are needed to accommodate future housing sites as part of the HEU's Implementation Program, would not be implemented at the 378 identified candidate housing sites. The capacity to develop 11,743 additional housing units that would be facilitated by Project implementation would not be provided under the No Project Alternative. Because the Project proposes only three candidate housing sites (Sites 3, 4, and 5) for rezoning, and all other sites would retain their existing underlying zoning, under Alternative 1, rezoning of Sites 3, 4, and 5 would not occur and existing zoning would remain in place.

Under this alternative, State Housing Law and legislative requirements for implementation of the Project's proposed programs and strategies to increase housing capacity and the production of affordable dwelling units in the City would not occur. Overall, Alternative 1 would not consider the candidate housing sites and adoption of the land use amendments and rezones necessary to achieve the City's RHNA. As a result, the capacity for 11,743 multi-family housing units would not be created. This alternative would not satisfy the Project objectives stated above because implementation of Alternative 1 would not facilitate the development of sufficient residential units to meet the City's RHNA allocation and would not satisfy legislative mandates for the HEU.

*Findings*

The No Project Alternative would result in fewer impacts than the Project. Although this Alternative could reduce environmental impacts from future housing development facilitated by the HEU, the No Project Alternative would not achieve any of the project objectives. The No Project Alternative would not provide adequate housing sites to meet the City's 6th Cycle RHNA allocation or satisfy State housing law including AB 1397. Under the No Project Alternative, the City would not meet its RHNA obligations. Thus, this Alternative would directly conflict with California Government Code §65583, which stipulates that a jurisdiction must assess its housing element every eight years and identify adequate sites for housing and provide for the existing and projected needs of all economic segments of the community.

## Beach and Edinger Corridors Alternative (Alternative 2)

As with the proposed Project, the Beach and Edinger Corridors Alternative (Alternative 2) would meet the City's RHNA. However, residential development under Alternative 2 would be concentrated around the Beach and Edinger Corridors area of the Beach and Edinger Corridors Specific Plan (Specific Plan 14). More specifically, new residential development would occur in portions of Specific Plan 14's Transition Corridor Areas (TCAs), which would support transit-oriented communities, and on fewer total parcels. This would have the effect of further reducing vehicle miles traveled (VMT), transportation-related energy demands, and associated criteria air pollutant and greenhouse gas emissions associated with housing development. However, this approach would require taller building heights and higher densities to achieve the target housing production in this area necessary to meet the RHNA, which could result in increased aesthetic

**EXHIBIT 10**

impacts as compared to the Project. This alternative would also create dense/confined residential development and not expand housing opportunities across the City and would not affirmatively further fair housing to the same degree as the Project.

### *Findings*

Alternative 2 would meet the majority of the project objectives as it is assumed that development under this alternative would meet the 6th Cycle RHNA housing needs. However, Alternative 2 would fail to affirmatively further fair housing since this alternative would not provide new housing within highest resources areas with access to highly rated schools, parks and community amenities. New housing would be concentrated within one area of the City. Furthermore, Alternative 2 could result in additional constraints to housing because the densities necessary to accommodate all of the RHNA within the Specific Plan may not be supported by the market (e.g., land and construction costs), which could potentially make it cost-prohibitive for developers to construct housing. As such, because Alternative 2 would fail to affirmatively further fair housing and could result in additional constraints to the construction of housing, this alternative would likely not be certified by the California Department of Housing and Community Development (HCD), as it would not substantially conform to Housing Element Law.

## Alternatives Considered but Eliminated from Future Consideration

Five additional alternatives were initially considered during the scoping and planning process, but were not selected for detailed analysis in the Draft SEIR. These included: Reduced Dwelling Units Alternative, Alternate Housing Sites Alternative, Palm/Goldenwest Specific Plan (SP 12) Alternative, Huntington Harbour Area Sites Alternative, and McDonnell Centre Business Park Specific Plan (SP 11) Alternative.

### *Reduced Dwelling Units Alternative*

A Reduced Dwelling Units Alternative was considered, but rejected from further consideration. This alternative was considered to assess if it would help mitigate the significant and unavoidable impact to potable water resources associated with the proposed Project, as future housing development facilitated by the Project would incrementally increase the demand for potable water. The projected water demand associated with Project implementation at buildout would increase water demand in the City by approximately 2,905 acre-feet per year (AFY), or approximately 11 percent over existing 2022 and projected 2030 City demands. While the Urban Water Management Plan (UWMP) did not specifically account for the population growth associated with the Project, it did project that the City would serve a population of 206,499 persons by 2030[1], which is an additional 9,625 persons over the City's existing population of 196,874 persons.[2] Therefore, it can be inferred that at least a portion (approximately 54 percent[3], or 949 AFY) of the water demand associated with the Project population growth was accounted

---

[1] UWMP Table 3-2: Retail: Population - Current and Projected.
[2] State of California Department of Finance. 2021. *E-5 Population and Housing Estimates for Cities, Counties, and the State, 2011-2021 with 2010 Census Benchmark.* https://www.dof.ca.gov/Forecasting/Demographics/Estimates/e-5/ (accessed June 2021).
[3] Based on 25,020 persons/9,625 persons.

**EXHIBIT 10**

City of Huntington Beach
2021-2029 HEU Implementation Program

Final Subsequent Environmental Impact Report
Findings of Fact/Statement of Overriding Considerations

for in the UWMP's anticipated 2030 future water demand. Thus, after considering the existing water demand associated with the displaced land uses that would be removed, the approximately 54 percent assumed to be already accounted for in the UWMP's anticipated population growth, and unaccounted for net Project water demand of approximately 46 percent or 823 AFY which would remain unmet. In order to not exceed the projected water resources for the City, the Reduced Dwelling Units Alternative would have to reduce the number of housing units to a number that would fail to meet the basic RHNA requirements.

### Alternate Housing Sites Alternative

The Alternate Housing Sites Alternative was considered, but rejected from further consideration. This alternative was determined to be infeasible during the scoping process because alternative housing sites not included in the scope of the Project were found to be infeasible due to regulations, site constraints, property owner interest in developing housing, community input, and existing uses. Additionally, some candidate housing sites were considered, but rejected because potentially significant effects of future housing development would be avoided or substantially lessened by rejecting those sites. Examples of alternative sites initially considered are discussed below.

### Palm/Goldenwest Specific Plan (SP 12) Alternative

This is a 96-acre area bordered by Pacific Coast Highway, Goldenwest Street, and Seapoint Street and is located entirely within the Coastal Zone. The property is designated for visitor serving commercial uses within the Palm/Goldenwest Specific Plan. At the time the specific plan was adopted in 2000, the property was an active oil field. Aera Energy owned the property and indicated that the property would remain in oil production for the next 15 to 20 years. As such, the specific plan was adopted to plan for reuse of the site after oil production activities ceased.



**Palm/Goldenwest Specific Plan 12**

This site was originally identified as a candidate housing site in the 6th Cycle Housing Element because of its large size and its potential availability for residential development within the planning period (based on the information in SP 12). Housing capacity on the site, when applying the proposed Affordable

**EXHIBIT 10**

Housing Overlay, would accommodate 40 to 50 percent of the City's total RHNA (96 acres x 55 du/acre up to 96 acres x 70 du/acre). Although this site could accommodate residential uses, the site is located within higher resource areas that could result in greater environmental impacts than other sites included in the scope of the Project. The following are reasons why this alternative was rejected:

- The location of the site within the Coastal Zone would require the California Coastal Commission to approve the Affordable Housing Overlay designation; timing of the "rezoning" effort could be lengthy with no guarantee of approval from the Coastal Commission.
- The potential for costly remediation of the site due to its historic use as oil field.
- The property owner no longer anticipates oil production activities to cease as described in SP 12. Therefore, the property is not expected to be available for development prior to 2030.
- The concentration of almost 50 percent of RHNA allocation on one site may lead to overconcentration of affordable housing in one area.

### *Huntington Harbour Area Sites Alternative*

There are two commercial areas in the Huntington Harbour area with a combined acreage of 21.5 acres. One area is the Huntington Harbour mall, which is an older mall developed in the 1960s. This 10.8-acre site was identified as a potential candidate housing site because it is underutilized with one and two-story buildings developed at a relatively low floor-area-ratio (FAR) considering that the maximum allowed FAR is 1.5. The site has potential to be redeveloped as a mixed-use project with the inclusion of residential units at 30 du/acre. The site has close access to Warner Avenue, a major arterial. The second area is Peter's Landing. This site includes the Peter's Landing commercial center and adjacent properties along Pacific Coast Highway, and has been studied for mixed use (residential/commercial) in prior General Plan planning efforts. In addition, the property owners previously showed interest in adding residential uses in existing or new development projects on the sites. Previous site analyses on this site indicate that residential could be accommodated at higher densities.



**Peter's Landing Area**



**Huntington Harbour Mall**

**EXHIBIT 10**

The following are reasons why this alternative was rejected:

- The location of these sites within the Coastal Zone would require the California Coastal Commission to approve any changes to the zoning/land use designation including an Affordable Housing Overlay designation. As such, the timing of the "rezoning" effort could be length with no guarantee that the Coastal Commission would approve the amendments, particularly because residential is a lower priority use in the Coastal Zone.
- These sites, in conjunction with the general Huntington Harbour area, are shown in the City's Sea Level Rise Vulnerability Assessment as one of the most vulnerable areas in the City with development in this area having the highest exposure to sea level rise hazards (e.g., storm and non-storm flood projections becoming widespread with 1.6-foot and 3.3-foot sea level rise, respectively).

### McDonnell Centre Business Park Specific Plan (SP 11) Alternative

The McDonnell Centre Business Park Specific Plan encompasses 307 acres in the northwestern portion of the City. It has access from Bolsa Chica Street and Bolsa Avenue, both major arterials, with close access to the 405 freeway. The area was first developed for the aerospace industry in the 1960s and a specific plan was adopted in 1997 with amendments in 2002 and 2006 that allowed for approximately eight million square feet of industrial, office, and ancillary uses (including the existing development). Boeing has been the primary landowner in the area, although other major business tenants have moved into the specific plan area. In 2018, Boeing began marketing some of its properties in the specific plan area. As such, the City evaluated housing potential within portions of the specific plan area for the 6th Cycle, particularly workforce housing and lower income worker housing. The specific plan could accommodate a large capacity of housing units at higher densities due to its size and existing and planned infrastructure.

 

**McDonnell Centre Business Park Specific Plan (SP 11)**

**EXHIBIT 10**

The following are reasons why this alternative was rejected:

- There is a strong market for industrial land in this area of the City. The site was even more attractive to potential developers due to its proximity to the freeway and because zoning and environmental approvals were already in place.
- Potential conflicts between industrial uses and residential uses.
- Potential costs to remediate site to residential standards.
- Properties have already started redeveloping with new industrial buildings recently completed and future phases approved.

**EXHIBIT 10**

# 4.0   STATEMENT OF OVERRIDING CONSIDERATIONS

## 4.1.   Introduction

Section 15093 of the CEQA guidelines states:

(a) CEQA requires the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits of a proposed project against its unavoidable environmental risks when determining whether to approve the project. If the specific economic, legal, social, technological, or other benefits of a proposed project outweigh the unavoidable adverse environmental effects, the adverse environmental effects may be considered "acceptable."

(b) When the lead agency approves a project which will result in the occurrence of significant effects which are identified in the Final EIR but are not avoided or substantially lessened, the agency shall state in writing the specific reason to support its actions based on the Final EIR and/or other information in the record. The statement of overriding considerations shall be supported by substantial evidence in the record.

(c) If an agency makes a statement of overriding considerations, the statement should be included in the record of the project approval and should be mentioned in the notice of determination.

The City of Huntington Beach proposes to adopt a Statement of Overriding Considerations regarding the significant cumulative air quality, greenhouse gas, hydrology and water quality, noise, and utilities/water supply impacts of the Project. This section describes the anticipated benefits and other considerations of the Project to support the decision to proceed, even though significant and unavoidable impacts are anticipated.

## 4.2.   Significant Adverse Project and Cumulative Impacts

The City of Huntington Beach is proposing to approve the proposed Project, with revisions to reduce environmental impacts, and has prepared a SEIR as required by CEQA. Even with revisions to the Project, the following impacts have been identified as being unavoidable as there are no feasible mitigation measures available to further reduce the impacts. Refer to Chapter 2 (CEQA Findings) for further clarification regarding the impact listed below.

### Air Quality

Despite compliance with General Plan policies, GPU PEIR mitigation, and MM AQ-1 and AQ-2, the Project would result in significant and unavoidable impacts concerning construction-related and operational emissions. In addition, sites over two acres could expose sensitive receptors to significant impacts by exceeding construction LST thresholds. The Project-related contribution of daily construction and operational emissions associated with the HEU are considered cumulatively significant and unavoidable.

### Greenhouse Gas Emissions

Despite the recommendation of Greenhouse Gas Reduction program GHG reduction strategies, the Project would generate GHG emissions that may have a significant impact on the environment and could

conflict with applicable plans for reducing GHG emissions. Therefore, impacts on GHG are considered significant and unavoidable, both for the Project and cumulative conditions.

## Hydrology and Water Quality

The Project could substantially decrease groundwater supplies resulting in a significant and unavoidable impact concerning sustainable management of the Basin. The Project's impact concerning groundwater supplies would be cumulatively considerable and a significant unavoidable impact would occur.

## Noise

Despite compliance with GPU PEIR mitigation, the Project would result in significant and unavoidable impacts concerning construction-related noise and vibration levels and operational noise levels associated with traffic. The Project's impact concerning the substantial temporary and permanent increase of ambient noise levels would be cumulatively considerable. The Project's impact concerning construction-related noise and groundborne vibration would also be cumulatively considerable.

## Utilities and Service Systems

Despite compliance with GPU PEIR mitigation, until the water supply situation improves, the water demands from future development pursuant to the HEU would result in a significant and unavoidable impact concerning water supplies. Additionally, until such time as greater confidence in and commitment from water suppliers can be made, or the water supply situation improves, the Project's impacts concerning water supplies to serve future development would be cumulatively considerable.

## 4.3.  Findings

The City of Huntington Beach has evaluated all feasible mitigation measures and potential changes to the Project with respect to reducing the impacts that have been identified as significant and unavoidable (see Chapter 2, CEQA Findings). The City of Huntington Beach has also examined a reasonable range of alternatives to the project as proposed (see Chapter 3, Findings Regarding Project Alternatives). Based on this examination, the City of Huntington Beach has determined that the No Project Alternative is considered to be the environmentally superior alternative.

## 4.4.  Overriding Considerations

Specific economic, social, or other considerations outweigh the significant and unavoidable impacts stated above. The reasons for proceeding with the proposed project, notwithstanding the identified significant and unavoidable impacts are described below.

### Proposed Project Benefits

1) The HEU would facilitate the development of a wide range of housing types in sufficient supply to meet the needs of current and future residents, particularly for persons with specific needs, including but not limited to extremely low, very low, and lower income households; seniors; persons

**EXHIBIT 10**

City of Huntington Beach
2021-2029 HEU Implementation Program

Final Subsequent Environmental Impact Report
Findings of Fact/Statement of Overriding Considerations

with disabilities; large households, single-parent households, people experiencing homelessness or at risk of homelessness, and farmworkers.

2) The HEU would increase the supply of affordable housing in high opportunity/resource areas, including areas with access to employment opportunities, community facilities and services, and amenities.

3) The HEU would provide a comprehensive system of support and would expand housing options aimed to prevent and end homelessness.

4) The HEU would reduce constraints to the development of housing, including affordable housing, through programs that allow ministerial approval processes, permit ready plans for Accessory Dwelling Units, a review and update of the City's small lot ordinance, and housing overlays in non-residential areas.

5) The HEU would address planning and monitoring goals for long-term affordability of adequate housing.

6) The HEU would facilitate the development of an accessible housing supply for all persons without discrimination in accordance with State and federal fair housing laws. The HEU would enhance existing lower resource neighborhoods by promoting livable, healthy, and safe housing for all residents.

7) The HEU provides a plan for meeting the City's RHNA goals and to affirmatively further fair housing, which substantially complies with State law, thereby enabling the City to achieve certification of the HEU through the California Department of Housing and Community Development. Certification of the HEU would also enable the City to maintain eligibility for funding programs tied to a compliant HEU.

8) The HEU would allow the City of to revitalize commercial corridors and older industrial areas by allowing for additional housing opportunities in the City while maintaining the character of existing, long-established single-family residential neighborhoods in the City.  Consistent with General Plan Implementation Program LU-P.14, the Affordable Housing Overlay allows for housing within the Research and Technology zoned areas, which establishes housing opportunities for employees of business in these areas.  The provisions of the Affordable Housing Overlay ensure that potential conflicts between residential and non-residential uses in these areas would be minimized.  The City would continue to ensure that all standards for building design, streetscape design, and landscaping would be adhered to and would review development proposals to ensure consistency with the character and visual appearance of the surrounding neighborhood.

9) The HEU would encourage future housing developments to better integrate with alternative modes of traditional transport because over half of the candidate housing sites identified in the HEU are located along High Quality Transit Areas. New development would also be encouraged to promote and support public transit and alternative modes of transportation by incorporating bus turnouts and shaded bus stops (where appropriate) and providing enhanced pedestrian and bicycle facilities.

10) With more organized development and guided use of existing resources, such potential impacts to water supply can be monitored and improved for the health and benefit of residents. Further, park

**EXHIBIT 10**

lands and open spaces can be protected and retained in place throughout the planning horizon to provide recreational benefits to residents, visitors and school aged students. A shift toward sustainable resources and self-sufficiency, as outlined in the HEU, will allow for the continuation of the valued way of life within the City of Huntington Beach throughout the planning horizon. For example, future projects would be required to comply with General Plan Goal ERC-15 and Policies ERC-15.A and ERC-15.B, which aim to maintain an adequate supply of water and distribution facilities capable of meeting existing and future water supply needs and require monitoring to reduce impacts to the water system in an effort to maintain and expand water supply and distribution facilities.

**EXHIBIT 10**

Res. No. 2023-15

**STATE OF CALIFORNIA**
**COUNTY OF ORANGE**      )   **ss:**
**CITY OF HUNTINGTON BEACH**   )

I, ROBIN ESTANISLAU, the duly elected, qualified City Clerk of the City of Huntington Beach, and ex-officio Clerk of the City Council of said City, do hereby certify that the whole number of members of the City Council of the City of Huntington Beach is seven; that the foregoing resolution was denied by the affirmative vote of at least a majority of all the members of said City Council at a **Regular** meeting thereof held on **April 4, 2023** by the following vote:

**AYES:**      Kalmick, Moser, Bolton
**NOES:**      Van Der Mark, Strickland, McKeon, Burns
**ABSENT:**    None
**RECUSE:**    None

_Robin Estanislau_

City Clerk and ex-officio Clerk of the
City Council of the City of
Huntington Beach, California

234

**EXHIBIT 10**